**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Boston Generating, LLC, <br> <u>et al</u>.,[1] | Case No. 10-14419 (SCC) |
| Debtors. | Joint Administration Requested |

**DECLARATION OF JEFF HUNTER, MANAGER, EXECUTIVE VICE PRESIDENT AND CHIEF FINANCIAL OFFICER OF EBG HOLDINGS LLC, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Under 28 U.S.C. § 1746, I, Jeff Hunter, declare as follows under penalty of perjury:

1.      I am Manager, Executive Vice President and Chief Financial Officer of debtor and debtor-in-possession EBG Holdings LLC, a Delaware limited liability company, ("**EBG**") and the ultimate parent company of each of the other debtors and debtors-in-possession (each, a "**Debtor**" and collectively, the "**Debtors**" or the "**Company**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").  I am also Executive Vice President and Chief Financial Officer of Debtors Boston Generating, LLC ("**BostonGen**"), Mystic I, LLC, Mystic Development, LLC, and Fore River Development, LLC and Executive Vice President of Debtors BG New England Power Services, Inc. ("**BG New England**") and BG Boston Services, LLC.  I have been employed by the Debtors since June 2007, and I am familiar with the day-to-day operations, financial conditions, business affairs, and books and records of the Debtors.

2.      Prior to my tenure as an officer of EBG, I served and continue to serve as an officer of Astoria Generating Company Holdings, LLC ("**Astoria**").  Prior to joining Astoria in

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Boston Generating, LLC (0631); EBG Holdings LLC (3635); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC (7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

February 2006, I was a Partner with PA Consulting Group and served as the Global Practice Head of Energy Strategy & Risk Management.

3.     On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**").  The Debtors are operating their business and managing their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or statutory committee has yet been appointed in these Chapter 11 Cases.  To enable the Debtors to operate effectively and to avoid the adverse effects of the chapter 11 filings, the Debtors have requested various types of relief in "first day" applications and motions (collectively, the "**First Day Pleadings**") filed with this Court, including a motion (the "**Joint Administration Motion**") seeking to have the Chapter 11 Cases consolidated for procedural purposes and jointly administered.

4.     Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), I submit this First Day Declaration to (a) explain to the Court and other interested parties the circumstances that compelled the Debtors to seek relief under chapter 11 and (b) support the relief requested in the various First Day Pleadings.  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the relevant First Day Pleading, as applicable.  I am authorized to submit this declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5.     This First Day Declaration is divided into three parts.  Part I contains an overview of the Debtors' businesses, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events

leading to the Debtors' chapter 11 filings. Part II sets forth relevant facts in support of the Debtors' First Day Pleadings. Part III contains the schedules providing additional information about the Debtors, as required by Local Rule 1007-2(a)(3)-(12), (b)(1)-(3).

## I.   BACKGROUND

### THE NATURE OF THE DEBTORS' BUSINESS OPERATIONS AND THE CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.   Preliminary Statement

6.     The Debtors are a wholesale power generation company that own and operate three electric power generating facilities located in the Boston metropolitan area. The Debtors' facilities are vital to maintaining a reliable electricity supply to the city of Boston and surrounding communities. The Debtors' headquarters and the majority of the Debtors' senior management are located in New York City. The Debtors generate revenue by selling electric energy, installed capacity and ancillary services. In addition, the Debtors use a variety of derivative instruments and other long-term contracts to manage the various risks and market price fluctuations inherent in the conversion of fossil fuels to electric energy.

### B.   Overview of the Debtors' Corporate History and Structure

#### a.   *The Acquisition and Combination of the Debtor Entities*

7.     On May 15, 1998, Boston Edison Company completed its sale of a portfolio of fossil fueled electric generating stations to Sithe Energies, Inc. Among others, the electric generating assets sold in this transaction included the Mystic 7 and Mystic Jet generating units ("**Mystic Station**"). Following the sale, Sithe Energies, Inc. entered into an Assignment of Purchase and Sale Agreement dated as of May 15, 1998 (the "**APSA**") with Sithe New England Holdings, LLC (a wholly owned subsidiary of Sithe New England, Inc., a wholly owned subsidiary of Sithe Energies, Inc.) whereby Sithe Energies, Inc. assigned its rights and

3

obligations under the documents governing the sale transaction to Sithe New England Holdings, LLC. At the time Sithe New England Holdings, LLC entered into the APSA, it was the sole member of several special purpose entities formed for the purpose of directly owning the electric generating stations, including Sithe Mystic LLC, Sithe Mystic Development LLC and Sithe Fore River Development, LLC. Sithe New England Holdings, LLC caused its subsidiaries, including Sithe Mystic LLC, to enter into an Assignment and Assumption Agreement dated as of May 15, 1998 ("**AAA**") with Boston Edison Company to assume ownership, but none of the liabilities, of the transferred assets. As a result of the transaction consummated by the AAA, Sithe Mystic LLC became the owner of Mystic Station.

8. The construction and development of the Mystic 8 and Mystic 9 generating units ("**Mystic 8&9**") and the Fore River generating unit began in early 2000. On or about August 10, 2000, Sithe Boston Generating, LLC was formed as a Delaware limited liability company. Sithe New England Holdings, LLC was the sole member of Sithe Boston Generating, LLC. In late 2000, PECO Energy Company acquired a 49% interest in Sithe Energies, Inc. PECO Energy Company subsequently merged with Unicom Corporation (owner of Commonwealth Edison) to form Exelon Corporation. On January 31, 2001, Sithe Boston Generating, LLC replaced Sithe New England Holdings, LLC as the sole member of Sithe Mystic LLC, Sithe Mystic Development LLC and Sithe Fore River Development, LLC. In 2002, Exelon Corporation acquired the BostonGen ownership interests from Sithe Energies, Inc. On November 1, 2002, Sithe Boston Generating, LLC changed its name to Exelon Boston Generating, LLC, Sithe Mystic LLC changed its name to Exelon Mystic, LLC, Sithe Mystic Development LLC changed its name to Exelon Mystic Development, LLC, and Sithe Fore River Development, LLC changed its name to Exelon Fore River Development, LLC.

4

9. On January 22, 2004, Exelon Boston Generating, LLC changed its name to Boston Generating, LLC, Exelon Mystic, LLC changed its name to Mystic I, LLC, Exelon Mystic Development, LLC changed its name to Mystic Development, LLC and Exelon Fore River Development, LLC changed its name to Fore River Development, LLC. In 2004, Exelon Corporation transferred all of its interest in BostonGen to EBG.

10. Following a series of transactions in late 2005, EBG was recapitalized at the BostonGen level. As part of the recapitalization, K Road Power Inc. ("**K Road**"), a company founded by former Sithe executives, purchased 10% of the equity and was contracted to serve as asset manager of BostonGen and its subsidiaries. K Road exited its investment in EBG through an auction that resulted in the June 2007 merger of EBG with a subsidiary of US Power Generating Company ("**USPowerGen**").

   b. *The Current Debtor Entities*

11. EBG is a wholly owned subsidiary of non-debtor USPowerGen. BostonGen is wholly owned by EBG and BostonGen wholly owns each of Mystic Development, LLC, Fore River Development, LLC, Mystic I, LLC, BG Boston Services, LLC and BG New England. Exhibit A provides an overview of the Company's current legal organizational structure.

12. EBG is a holding company with no significant independent business operations and BostonGen serves as the Company's main operating entity. Mystic I, LLC is the current owner of Mystic Station, which includes the Mystic 7 and Mystic Jet plants, Mystic Development, LLC owns Mystic 8&9 and Fore River Development, LLC owns the Fore River plant. BG Boston Services, LLC and BG New England provide plant personnel for Mystic 8&9, Mystic Station and Fore River. BG Boston Services, LLC provides union plant personnel for Mystic 8&9 and Fore River. BG New England provides union plant personnel for Mystic Station and all salaried employees for the Company.

13.     Pursuant to an asset management agreement by and among USPowerGen, Astoria Generating Company Acquisitions, LLC ("**Astoria Acquisitions**") and BostonGen, dated January 1, 2008 (as amended and restated as of July 30, 2010, the "**USPG Asset Management Agreement**"), the Company receives general asset management services and energy management services from approximately 48 employees of USPG Power Services, Inc. ("**PSI**"), a subsidiary of USPowerGen, located in New York City, Austin, Texas and Houston, Texas (collectively, the "**Service Providers**").  Energy management services provided to the Company pursuant to the USPG Asset Management Agreement by the Service Providers include marketing power, capacity and ancillary services for all BostonGen units as well as nominating, scheduling, notification, administration and management for all required fuel quantities for the units.  The Service Providers also coordinate the daily schedules for power delivery and intraday schedule changes and reconcile the ISO New England Inc. ("**ISO-NE**") monthly statement against the bids and the actual output of the BostonGen units (collectively, "**Energy Management Services**").  Other asset management services provided by the Service Providers under the USPG Asset Management Agreement include strategic planning, comprehensive risk management, financial planning and analysis, internal audit, project development and expansion, engineering, human resources, legal, accounting, IT, regulatory, external affairs and investor relations ("**General Management Services**").

14.     The Company also has a local management team with 20 full-time personnel who provide general, administrative and technical support services.  Ten of these management employees operate out of a 10,639 square foot office space leased at the Schrafft Center in Charlestown, MA, located adjacent to Mystic Station and Mystic 8&9.  The remaining 10 management and support services employees are on-site at the electric power generating

6

facilities. The Company employs 148 people, including 45 employees at Mystic 8&9, 31 employees at Fore River, 52 employees at Mystic Station, and the local management team which consists of 20 employees. Of the 148 total employees, 107 employees are members of the Utility Workers Union of America, A.F.L. – C.I.O. and Local No. 369, U.W.U.A., A.F.L. – C.I.O, whose benefits and retirement plans are governed by two collective bargaining agreements. The Mystic Development (Units 8&9) and Fore River Development collective bargaining agreement, which applies to 63 employees, will expire in February 2012. The Mystic Station collective bargaining agreement, which applies to 44 employees, expires in September 2010.

c. *The Non-Debtor Affiliates*

15. USPowerGen also wholly owns non-debtor Astoria and its subsidiaries, which own and operate electric power generation facilities located in New York City. USPowerGen is 54% owned by a group of Class A shareholders and 46% owned by New Astoria Generating Company Holdings, LLC ("**New Astoria**"). New Astoria, in turn, is owned by Madison Dearborn, Hunt Generation Investments, L.P., and certain individuals who each own less than a 10% interest in New Astoria.

16. While certain energy management services and general asset management services are provided to the Company by PSI, as described above, the Debtors are distinct and separate from the rest of the USPowerGen family. The Debtors' secured debt is neither (i) guaranteed by USPowerGen or any of its subsidiaries (including Astoria) nor (ii) secured by any of these non-Debtor entities' assets.

## C. **The United States Electricity Market**

17. The United States electricity industry includes approximately 100 investor-owned power companies, over 2,000 public power systems, nearly 1,000 consumer-owned rural electric cooperatives and a growing number of power companies owned by financial sponsors. Many

7

regions of the United States have adopted competitive electricity markets with independent power producers owning generation and selling electricity at market-based rates in lieu of traditional public utilities that are subject to cost-of-service rate regulation. While the extent of "deregulation" and the characteristics of competitive power markets vary from region to region, common elements of organized energy markets generally include bid-based energy and ancillary services markets, and in some cases, developed capacity markets. Most of these organized markets operate under the oversight of the Federal Energy Regulatory Commission ("**FERC**"). FERC is an independent regulatory commission within the U.S. Department of Energy that, among other things, regulates the transmission and the sale of electricity in wholesale markets in interstate commerce under the authority of the Federal Power Act ("**FPA**"). Under the FPA, FERC has jurisdiction with respect to the transmission and wholesale sale of electric energy in interstate commerce.

18. Over the last several years, low fuel prices, eroding demand and a significant surplus of supply have put downward pressure on margins in the energy, capacity and ancillary service markets in New England. Peak load and overall energy demand forecasts of ISO-NE, the regional organization designated by FERC to manage the transmission system and organized energy markets in New England, have fallen significantly year-over-year for the last few years. Additionally a significant amount of new uneconomic supply is expected to come online over the next three to five years. This new uneconomic capacity, combined with the declining load forecasts, has created a significant surplus of capacity, depressing market prices for capacity in ISO-NE capacity markets and markets are further weakened by ISO-NE specific market rules such as "peak energy rent reduction."

8

**D. Overview of the Debtors' Business**

    a. *Business Operations and Sales*

19. The Debtors have approximately 2,942 MW of merchant generation capacity comprising the third-largest generation fleet in New England. The majority of the portfolio consists of highly-efficient combined-cycle natural gas-fired facilities with the lowest heat rates and the lowest environmental impact throughout the New England energy market area operated by ISO-NE. The majority of the Debtors' fleet (99%) can operate using clean burning natural gas as its primary fuel, with the exception of the 9 MW Mystic Jet located at the Mystic Station.

20. The Debtors' fleet operates three facilities: (1) Mystic 8&9, (2) Fore River, and (3) Mystic Station, each of which is described in more detail below. These units are essential for the provision of reliable electric service to the greater Boston area.

    <u>Mystic 8&9</u>. Mystic 8&9, along with Fore River, are the most environmentally efficient natural gas-fired combined-cycle intermediate load power plants in New England and, in aggregate, comprise 1,580 MW of generating capacity which constitutes the bulk of the generating capacity within NEMA/Boston load pocket. Mystic 8&9 became operative in April and June 2003, respectively, and are located adjacent to Mystic Station on a 53-acre site in Everett, Massachusetts, which is directly north of Boston. Mystic 8&9 constitute two independently dispatchable 790 MW plants utilizing Mitsubishi Heavy Industries ("**MHI**") 501-G technology with dry low NOx combustion systems. The use of MHI advanced technology 501-G gas turbines gives Mystic 8&9 significant operating and environmental efficiency advantages over other combined-cycle electric power generating facilities. Mystic 8&9 have an attractively priced, long-term fuel supply agreement with Distrigas of Massachusetts, LLC ("**Distrigas**"). Pursuant to this agreement, Mystic 8&9 receive natural gas exclusively from the neighboring Distrigas LNG import and vaporization facility via a dedicated high pressure

pipeline. Mystic Development, LLC is Distrigas' second largest gas customer. In the summer period, Mystic Development, LLC is Distrigas' largest gas purchaser, at times consuming one-third of all regassification capacity at the Distrigas terminal. Mystic 8&9 are interconnected with the NSTAR electric power transmission grid at the 345-kV and 115kV level, respectively.

Fore River. Fore River is an environmentally efficient 787 MW natural gas-fired combined-cycle power plant that commenced operations in August 2003. The facility is located on a 77-acre site in North Weymouth, Massachusetts, which is approximately 12 miles south of Boston. Fore River employs the same MHI 501-G technology including dry low NOx combustion systems and substantially similar plant design as Mystic 8&9. Fore River is interconnected with the NSTAR electric power transmission grid at the 115-kV level and is connected to the Algonquin HubLine natural gas pipeline. In addition, the site was commissioned in 2007 for operation using ultra low sulfur distillate fuel oil.

Mystic Station. Mystic Station, which is comprised of Mystic 7 and Mystic Jet, is located adjacent to Mystic 8&9 on the Everett property. Mystic Jet is a black-start capable 9 MW distillate fuel oil facility installed in 1969. Mystic Jet runs infrequently and generally runs in response to abnormal power grid conditions. Mystic 7 is a 566 MW oil and natural gas-fired steam turbine generating unit that was installed in 1975 and has the ability to operate at output levels ranging between 90 MW and 566 MW. Mystic 7 has the capability to switch fuels while in midstream operation and benefits from substantial fuel oil storage capacity. Mystic 7 has 288,000 barrels of fuel oil storage on-site and leases an additional 575,000 barrels of storage capacity from ExxonMobil, which is connected to the facility through a dedicated pipeline. Mystic Station also has an auxiliary boiler which is used to start Mystic 8&9 in the unlikely event that all of Mystic 7, 8 and 9 are offline. Mystic 7 and Mystic Jet interconnect at the 345-

kV and 115-kV levels, respectively, with existing NSTAR substations adjacent to Mystic Station.

21.     The Company is a participant in the electric energy markets administered by ISO-NE.  ISO-NE is the regional transmission organization designated by FERC to serve all or parts of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont and is subject to FERC's regulation.  ISO-NE administers the day-ahead and real-time energy markets as well as capacity and ancillary service markets in accordance with market rules on file with, and approved by, FERC.  In addition, ISO-NE is responsible for managing and providing fair and competitive access to the New England transmission grid which is required to ensure the reliability, adequacy and security of the electric transmission system.

22.     The Company sells electric energy generated by its facilities in the centralized ISO-NE electric energy markets.  The Company also sells capacity in ISO-NE's Forward Capacity Market ("**FCM**").  Pursuant to ISO-NE's rules, load-serving entities (entities that provide electric service to end-use customers, such as National Grid plc) in New England are required to demonstrate that they have capacity in an amount equal to the peak load forecast for the relevant period plus a reserve margin.  Such load-serving entities may fulfill their capacity obligations by, among other things, purchasing capacity from entities like the Company, either through the FCM or bilateral transactions.  The FCM was implemented on December 1, 2006 pursuant to a FERC-approved settlement (the "**FCM Settlement**").  Under the FCM Settlement, prices for capacity from the filing date through May 2010 (the "**Transition Period**") were fixed based on a negotiated schedule that began at $3.05 per kW-month and increased to $4.10 per kW-month.  After the Transition Period, capacity prices have been determined through annual forward capacity auctions that occur approximately three years in advance of the commitment

CH\1168650.38

period. At the first FCM auction, held in February 2008 for the 2010/2011 capacity year (beginning June 1, 2010), more capacity was bid into the auction than was required resulting in downward pressure on the final auction price. As a result, the price in the first auction cleared at the regulatory administered floor of $4.50 per kW-month. Prices in the second auction (for the 2011/2012 capacity year), the third auction (for the 2012/2013 capacity year) and the fourth auction (for the 2013/2014 capacity year) cleared at the regulatory administered floor of $3.60 per kW-month, $2.95 per kW-month, and $2.95 per kW-month, respectively.

23. The Company has entered into energy hedges with Credit Suisse Energy LLC and Sempra Energy Trading LLC which run through December 31, 2010 as a means to reduce its exposure to energy commodity price risk. The Company has effectively sold a series of daily call options for a fixed premium of $14.5 million per month from May to September and $15.0 million per month from October to April. The call options must be exercised for the block of time specified in the contracts (generally daytime and nighttime). For the periods where the options are exercised, the Company pays the counterparty a floating amount for each megawatt hour that is equal to the average hourly price specified in the contract less the sum of (i) the product of the heat rate times the daily gas price specified in the contract and (ii) a fixed amount, intended to approximate other costs, including variable plant operating costs and start-up costs.

24. The Company has also entered into certain interest rate hedge transactions with Goldman Sachs Capital Markets ("**Goldman**") as a means to minimize its exposure to interest rate risk and to comply with the terms of its secured credit facility agreements. Such transactions provide protection on a significant portion of the Company's variable-rate obligations. One of these agreements, which runs through December 31, 2010, requires the Company to make fixed-rate interest payments and the Company receives floating-rate interest payments in return.

CH\1168650.38

The Company has also entered into interest-rate cap agreements with Goldman whereby the Company paid a fixed amount up front in order to receive payments when the LIBOR rate moves above certain maximum thresholds. These agreements run from December 31, 2010 through December 30, 2012.

b. *Management Agreements*

25. <u>Asset Management Agreement</u>. In January 2008, USPowerGen, Astoria Acquisitions and BostonGen entered into the USPG Asset Management Agreement. Pursuant to the terms of the USPG Asset Management Agreement, PSI (a subsidiary of USPowerGen) provides Energy Management Services and General Management Services to the Company. Prior to August 1, 2010, the Debtors paid the management fees required by the USPG Asset Management Agreement to, and the Service Providers were employed by, Astoria Acquisitions. As of August 1, 2010, the management services previously provided to the Company by Astoria Acquisitions are now provided by PSI and the Debtors now pay to PSI all management fees due under the USPG Asset Management Agreement. The USPG Asset Management Agreement provides that the following amounts are to be paid by BostonGen: (a) a fee for General Management Services, which started at $500,000/month in 2008 (the "**Management Fee**"), (b) a fee for Energy Management Services, which started at $833,333/month in 2008 (the "**Energy Management Fee**"), (c) any direct costs incurred by PSI for the sole benefit of BostonGen (the "**Direct Costs**"), and (d) the allocable costs relating to any management related costs and expenses incurred by PSI in excess of the fixed fees paid by BostonGen and the fixed fees attributable to or paid by Astoria Acquisitions (the "**Allocable Costs**") which are allocated between BostonGen (54%) and Astoria Acquisitions (46%) at the end of each calendar year. Allocable Costs were capped at $1,325,000/month in 2009 (the "**Allocable Costs Cap**") and the

cap increases at a rate of 6% per year. The Management Fee and Energy Management Fee also increase at a rate of 6% per year. The Management Fee and the Energy Management Fee are intended to cover BostonGen's 54% share of all management related costs and expenses incurred by PSI. The remaining 46% of costs is allocated to or paid by Astoria Acquisitions. In addition, Astoria Acquisitions, BostonGen and USPowerGen have agreed that, for any calendar year beginning January 1, 2009, the 54% allocation to BostonGen and the 46% allocation to Astoria Acquisitions may be adjusted as such parties deem necessary to ensure a fair and reasonable allocation of costs. BostonGen paid Astoria Acquisitions a fixed fee of $1,413,333 per month in 2009 and a fixed fee of $1,498,133.33 per month in 2010 (prior to August 1, 2010) and, since August 1, 2010, now pays PSI a fixed fee of $1,498,133.33 per month in 2010 covering the Management Fee and the Energy Management Fee. BostonGen did not pay any Allocable Costs or Direct Costs for 2009. The USPG Asset Management Agreement remains in effect until terminated by written notice by one of the parties thereto.

26. <u>Management Services Agreement</u>. A management services agreement exists between BostonGen and BG New England, dated as of September 1, 2004 (as amended as of October 11, 2005 to add Mystic I, LLC, Mystic Development, LLC, and Fore River Development, LLC as parties to the agreement, the "**MSA**"). Under the MSA, BG New England provides certain management personnel to assist BostonGen in connection with the development, management, and maintenance of Mystic Station, Mystic 8&9 and the Fore River plant. In return for the provision of personnel, BostonGen pays BG New England its expenses for: (1) salaries, wages, benefits and related direct and indirect employment costs including payroll taxes of personnel provided by BG New England; (2) direct and indirect costs associated with the services rendered by BG New England pursuant to the MSA, including costs of meals, lodging,

CH\1168650.38

travel and telecommunications; (3) indirect costs such as general, administrative and overhead costs; and (4) any other necessary costs and expenses reasonably incurred by BG New England in fulfilling its obligations under the MSA. Unless otherwise terminated by the parties, the MSA remains in effect until and including January 1, 2021.

**E.    Summary of Prepetition Indebtedness**

27.    On December 21, 2006, BostonGen entered into a first lien secured credit facility agreement and a second lien secured credit facility agreement. Also on December 21, 2006, EBG entered into an unsecured credit facility agreement. Each of the credit facilities and the amounts owed thereunder is described below. As noted above, none of the Debtors' credit facilities are (i) guaranteed by USPowerGen or any of its non-Debtor subsidiaries (including Astoria) or (ii) secured by any of these non-Debtor entities' assets.

| Type of Prepetition Indebtedness | Approximate Amount of Outstanding Debt as of Petition Date[2] |
|---|---|
| First Lien Debt<br>        Revolver<br>        Term B | $1,107,950,000 (in the aggregate)<br>        $17,500,000<br>        $1,090,450,000 |
| Second Lien Debt | $350,000,000 |
| Mezzanine Debt | $422,578,510 |
| Trade Debt (unsecured) | $9,457,516 |

a.    *First Lien Debt*

28.    The first lien facility (the "**First Lien Facility**") is evidenced by that certain First Lien Credit and Guaranty Agreement dated as of December 21, 2006 by and among BostonGen, as borrower, the guarantors listed therein, the initial lenders, synthetic issuing banks and the fronting bank named therein, Credit Suisse AG, Cayman Islands Branch (formerly known as Credit Suisse, Cayman Islands Branch ("**Credit Suisse**"), as first lien collateral agent and

---

[2]    These amounts exclude interest, fees, expenses.

administrative agent, and Credit Suisse Securities (USA) LLC and Goldman Sachs Credit Partners L.P., as co-syndication agents, co-documentation agents, joint lead arrangers and joint book running managers (the "**First Lien Credit Agreement**").  The First Lien Facility includes a $70 million revolving credit facility, a $1.1 billion Term Loan B facility and a $250 million synthetic letter of credit facility.  As of the Petition Date, BostonGen had $17.5 million outstanding under the revolver, with an interest rate of 2.78344%, and $231.5 million in letters of credit outstanding under the synthetic letter of credit facility.[3]  The revolver and synthetic letter of credit facilities are also subject to a 2.375% annual fee, payable quarterly, on the full facility amounts.  As of the Petition Date, BostonGen also had $1.090 billion outstanding under the Term Loan B facility with an interest rate of 2.78344%.  As of the Petition Date, the total outstanding indebtedness under the First Lien Facility was approximately $1,107,950,000.  The First Lien Facility matures on December 20, 2013.

29.    The first lien debt is collaterally secured by first priority liens upon and security interests in substantially all of the properties and assets owned directly by BostonGen and its subsidiaries including, without limitation: accounts, equipment, inventory, equity interests, intercompany indebtedness, all investment property, all agreements, contracts and documents (including hedge agreements), and intellectual property (collectively, the "**First Lien Collateral**").  The first lien debt is guaranteed by each of BG Boston Services, LLC, BG New England, Mystic I, LLC, Mystic Development, LLC, and Fore River Development, LLC.  In addition, on December 21, 2006, EBG entered into that certain First Lien Pledge Agreement with Credit Suisse, in its capacity as collateral agent under the First Lien Facility, pursuant to which

---

[3]    On August 16, 2010, in accordance with the SDA (as defined below), the Debtors directed the applicable issuing bank to reduce the amount of the first lien and second lien debt service reserve letters of credit outstanding under the synthetic letter of credit facility by $47 million and $13 million, respectively, because no debt service is anticipated to be payable in the next six months.

EBG agreed to grant Credit Suisse, as collateral agent, a continuing security interest in EBG's membership interests in BostonGen and all rights and benefits under BostonGen's LLC Agreement.

b. *Second Lien Debt*

30.     The second lien facility (the "**Second Lien Facility**") is a $350 million Term Loan C facility and is evidenced by that certain Second Lien Credit and Guaranty Agreement, dated as of December 21, 2006, by and among BostonGen, as borrower, the guarantors listed therein, the initial lenders, synthetic issuing banks and the fronting bank named therein, Credit Suisse, as second lien collateral agent and administrative agent, and Credit Suisse Securities (USA) LLC and Goldman Sachs Credit Partners L.P., as co-syndication agents, co-documentation agents, joint lead arrangers and joint book running managers (the "**Second Lien Credit Agreement**").   On February 18, 2009 Credit Suisse resigned as second lien collateral agent and administrative agent and Wilmington Trust FSB was appointed as successor second lien collateral agent and administrative agent.   As of the Petition Date, BostonGen had $350 million outstanding under the Second Lien Facility, with an interest rate of 4.78344%.   The Second Lien Facility matures on June 20, 2014.

31.     The second lien debt is collaterally secured by second priority liens on and security interests in all of the First Lien Collateral.   The second lien debt is also guaranteed by each of BG Boston Services, LLC, BG New England, Mystic I, LLC, Mystic Development, LLC, and Fore River Development, LLC.   In addition, on December 21, 2006, EBG entered into that certain Second Lien Pledge Agreement with Credit Suisse, in its capacity as collateral agent under the Second Lien Facility, pursuant to which EBG agreed to grant Credit Suisse, as collateral agent, a second priority security interest in EBG's membership interests in BostonGen and all rights and benefits under BostonGen's LLC Agreement.

17

c. *Intercreditor Agreement*

32.     On December 21, 2006, EBG entered into a Collateral Agency and Intercreditor Agreement (the "**Intercreditor Agreement**") with BostonGen, Credit Suisse, in its capacity as collateral agent for the First Lien Facility and the Second Lien Facility, and Credit Suisse Energy LLC, in its capacity as first lien commodity hedge counterparty (collectively, the "**Intercreditor Parties**").  Pursuant to the terms of the First Lien Credit Agreement and the Second Lien Credit Agreement, and in order to induce first and second lien secured parties to enter into the transactions contemplated by the First Lien Credit Agreement and the Second Lien Credit Agreement, each of the Intercreditor Parties agreed to enter into the Intercreditor Agreement which sets forth their respective rights and remedies with respect to the First Lien Collateral.

33.     Pursuant to the Intercreditor Agreement, the second lien agent and the second lien secured parties are prohibited from objecting to the use of cash collateral except under certain circumstances which are not present here.  The Intercreditor Agreement further prohibits the second lien agent and the second lien secured parties from contesting any request by the first lien secured parties for adequate protection.  These prohibitions were the result of good faith, arms' length negotiations between the first lien agent and the second lien agent.

d. *Unsecured Debt*

34.     The mezzanine facility (the "**Mezzanine Facility**") is a $300 million term loan facility evidenced by that certain Credit Agreement dated as of December 21, 2006 by and among EBG, as borrower, the lenders listed therein, Credit Suisse, as administrative agent for the lenders,[4] and Credit Suisse Securities (USA) LLC and Goldman Sachs Credit Partners L.P., as

---

[4]     The Debtors were informed by Credit Suisse that The Bank of New York Mellon will replace Credit Suisse as administrative agent under the Mezzanine Facility.  The Debtors do not believe this replacement has taken place as of the Petition Date.

18

co-syndication agents, co-documentation agents, joint lead arrangers, and joint lead book running managers.

35.     As of the Petition Date, the total outstanding indebtedness under the Mezzanine Facility was approximately $422.6 million, with an interest rate of 7.53344%.   Under the Mezzanine Facility, EBG has the option to pay interest either with cash or by increasing the principal amount of the term loan.   To date, EBG has elected to pay interest by increasing the principal amount of the Mezzanine Facility.   The Mezzanine Facility has a maturity date of December 20, 2016.

e.     *Synthetic Letter of Credit Facility, Hedging Transactions, and Other First Liens*

36.     In connection with its energy hedges, the Company is required to provide credit support to the hedge counterparties in the form of letters of credit and/or a first lien on the assets of BostonGen and its subsidiaries.   The Company has posted letters of credit to hedge counterparties as well as contracted service providers under the $250 million first lien synthetic letter of credit facility.   As of the Petition Date, there were $231.5 million of outstanding letters of credit issued under the facility.

37.     On November 20, 2006, BostonGen entered into certain hedging transactions with Credit Suisse Energy LLC ("**CSE**") documented under an ISDA Master Agreement dated as of December 20, 2006.   The transactions have an effective date of January 1, 2007 and will continue through December 31, 2010.   BostonGen has provided a first lien and a $60 million letter of credit to CSE to secure its obligations under these contracts.

38.     On December 11, 2007, BostonGen entered into a hedging transaction with Sempra Energy Trading LLC ("**Sempra**") for the period from January 1, 2008 to December 31, 2010.  Under the terms of the hedge, Sempra has been provided a letter of credit in the amount of

19

$25 million and has been granted a first lien on the assets of BostonGen *pari passu* in right of payment with, and secured equally and ratably with all amounts owed and outstanding under the First Lien Facility and all other first lien obligations of BostonGen for an amount up to $75 million.

39.     In connection with the operation of the Mystic 8&9 facilities, Mystic Development, LLC and Distrigas are parties to an Amended and Restated Firm Gas Sales and Purchase Agreement dated as of December 3, 2007 (the "**ARGA**") which obligates Mystic Development, LLC to purchase and take a specified periodic quantity of natural gas vaporized from liquefied natural gas delivered by Distrigas's adjacent LNG facility through 2027 at a specified below-market contract price.  Mystic I, LLC and Distrigas have entered into a Non-Firm Gas Sales and Purchase Agreement dated April 11, 2008 (the "**Non-Firm Gas Agreement**") which provides Distrigas with a right of first offer to provide gas to Mystic 7. Distrigas has been provided with a $75 million letter of credit and a $1.5 million letter of credit to secure the Company's obligations under the ARGA and the Non-Firm Gas Agreement.

40.     BostonGen and Sequent Energy Management, L.P. ("**Sequent**") entered into a Fuel Management Agreement dated April 1, 2008 (the "**FMA**") pursuant to which Sequent's major responsibilities include activities such as purchasing and/or selling fuel, and arranging and scheduling delivery.  BostonGen and Sequent also entered into the related NAESB Base Contract (the "**NAESB**") on March 1, 2008.  Sequent has been provided with a $10 million letter of credit to secure BostonGen's obligations under the FMA and NAESB.

41.     On February 14, 2007, BostonGen entered into an interest rate swap agreement with Goldman Sachs Credit Partners L.P. ("**Goldman**") for a period from February 27, 2007 to December 31, 2010.  BostonGen's obligations to Goldman under the interest rate swap are

secured *pari passu* with BostonGen's obligations under the First Lien Facility. On September 23, 2009, BostonGen entered into two interest rate cap transactions with Goldman for calendar years 2011 and 2012. BostonGen has paid the fixed premiums and was not required to provide any additional credit support. Any value remaining on the interest rate cap transactions may be used to set-off other amounts BostonGen owes to Goldman.

f. *Trade Debt*

42. The Company has been paying obligations due and owing to its vendors, suppliers and other pre-petition creditors as they come due in the ordinary course of business. As of the Petition Date, the total outstanding obligations due and owing to vendors, suppliers and other general unsecured creditors (other than the lenders under the Mezzanine Facility) are approximately $9,457,516.

**F.**     **Restructuring Efforts and Prepetition Marketing Process**

43. Despite its strategically positioned and highly efficient facilities and other competitive advantages, the Company is over-levered and, due to market conditions, is unable to generate sufficient cash to service its debt and fund ongoing operations. The Company's liquidity constraints will be exacerbated as a result of the expiration of its energy hedge agreements on December 31, 2010 that are currently cash-positive and help the Company service its debt and fund operations. Although neither the First Lien Credit Facility, the Second Lien Credit Facility nor the Mezzanine Facility were in default prior to the Petition Date, given the Company's current liquidity position and projected ongoing liquidity needs, the Company will have insufficient liquidity to continue to service its debt and fund ongoing operations in the upcoming months.

44. In an effort to address the issues with its balance sheet, USPowerGen retained Perella Weinberg Partners LP ("**PWP**") as its financial advisor from September 2008 through

early June 2010. On June 7, 2010, the Company retained PWP to, in consultation with certain of the prepetition lenders, pursue a range of options to address the Company's liquidity concerns, including new financing, refinancing and the sale of certain or all of the Debtors' assets or businesses. To that end, in early 2009, Goldman Sachs & Co. ("**Goldman Sachs**") was also retained by USPG to facilitate the possible issuance of new equity or convertible debt securities by USPG in one or a series of transactions. For nearly 18 months, Goldman Sachs pursued this transaction but, ultimately, a transaction was not consummated.

45.     In late April 2010, J.P. Morgan Securities Inc. ("**JPM**") began an extensive marketing and sale process, aggressively canvassing the marketplace to locate potential financial or strategic partners to purchase the assets of the Company. JPM contacted 199 potential buyers (81 strategic and 118 financial), and distributed a confidential information memorandum requesting preliminary letters of interest by May 18, 2010 to 36 of those parties (the "**CIM Recipients**"). Ten CIM Recipients (the "**Potential Purchasers**") responded with preliminary letters of interest.

46.     The preliminary letters of interest came from a variety of Potential Purchasers, including strategic buyers and financial buyers, with wide-ranging indicative bids. After evaluating these preliminary letters of interest, as well as the seriousness of the Potential Purchasers' interest and their ability to move expeditiously to consummate the transaction, the Debtors, in consultation with JPM, opted to pursue further discussions with six Potential Purchasers. Each of the six Potential Purchasers (three strategic and three financial) received access to an electronic data room, a management presentation, site visits, extensive written Q&A with management and a draft asset purchase agreement. Two of the six Potential Purchasers submitted "final" bids, which were accompanied by marked purchase agreements.

47. After considering these two proposals, the Debtors, in consultation with their advisors, engaged in parallel, but individual, arm's-length, good faith negotiations with such parties and their counsel and advisors. Following extensive negotiations on the terms and conditions of each offer, the Debtors, with the assistance of JPM and their other advisors, conducted a side-by-side analysis of the proposals, and, ultimately, made the considered determination that the offer of Constellation Holdings, Inc. (the "**Stalking Horse Bidder**") of $1.1 billion for substantially all of the Company's assets was the highest and best offer presented.

48. On August 7, 2010, the Debtors and the Stalking Horse Bidder entered into the Asset Purchase Agreement dated August 7, 2010, between the Debtors, as sellers, and Constellation Holdings, Inc., or its designee, as buyer, and Constellation Energy Group, Inc., as guarantor (the "**APA**").

49. On August 17, 2010, the members of the steering committee[5] of first lien lenders together with certain other first lien lenders (the "**Consenting First Lien Lenders**"), who hold in excess of 50% of the outstanding first lien obligations under the First Lien Credit Agreement, executed a sale support agreement (the "**Sale Support Agreement**") evidencing their support of the Sale (as defined below) of substantially all of the Debtors' assets. The Sale Support Agreement is attached hereto as **Exhibit B**. The Sale Support Agreement recognizes the Debtors' fiduciary obligations to maximize value for all creditors, and, as such, does not impair the Debtors' ability to consider Alternative Transactions (as defined in the Sale Support Agreement), regardless of whether such Alternative Transaction results from the bid and auction procedures provided for in the APA or otherwise. See Sale Support Agreement at Section 5(b).

---

[5] The steering committee of first lien lenders is made up of: TCW Asset Management Company, Highland Capital Management, L.P., Avenue Investment, L.P., Silver Oak Capital, L.L.C., Strategic Value Special Situations Master Fund, L.P., Strategic Value Master Fund, Ltd., Franklin Mutual Advisers, LLC and Trilogy Capital.

CH\1168650.38

Similarly, the Sale Support Agreement allows the Debtors to withdraw from the Sale Support Agreement in the event that the Board of Directors (as defined in the Sale Support Agreement) reasonably determines that proceeding with or consummating the Sale would be inconsistent with the exercise of their respective fiduciary duties. See Sale Support Agreement at Section 7(b).

50. Accordingly, with a stalking horse bidding floor and the APA in place (the key terms of which have already been subject to a fulsome market test), the Debtors now seek to promptly effectuate the sale transaction (the "**Sale**") to the Stalking Horse Bidder, subject to a competitive bidding process that is consistent with both the timing of these Chapter 11 Cases and the Debtors' fiduciary duties to maximize value for their estates, stakeholders and parties in interest.

51. During this same period that the Debtors were pursuing the Sale, the Debtors, PWP, Goldman Sachs and JPM also investigated other strategic alternatives, including issuance of subordinated debt to potential new lenders and issuance of high yield debt in the capital markets. The Debtors have been unable to raise additional equity or debt to fund their operations or service their debt and believe that the Sale will maximize the value of their assets for the benefit of all of their creditors and equity holders.

## II. THE CHAPTER 11 CASES

52. It is critically important for the Debtors to improve their balance sheet and strengthen their business for the benefit of creditors, customers, employees, and the communities in which the Debtors operate. Achieving these goals is likely to be particularly challenging while operating in chapter 11. To that end, the Debtors have filed First Day Pleadings seeking relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption of the Debtors' business operations, thereby preserving and maximizing the value of

24

the Debtors' estates. Unless this "first day" relief is granted, I believe the Debtors' business operations will suffer significant consequences because vendors may refuse to continue to do business with the Debtors.

53. I am generally familiar with the content of each First Day Pleading (including the exhibits thereto) described in further detail herein, and based upon that familiarity and information provided to me by other members of the Debtors' management team and my colleagues who provide information to me in the ordinary course of the Debtors' business, I believe that the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful restructuring of the Debtors; and (c) best serves the Debtors' estates and creditors' interests, and the failure to grant the motions described herein would have an immediate and irreparable effect on the Debtors' businesses taken as a whole as well as the surrounding communities that rely on the electricity supply generated by the Debtors.

**A.** **Joint Administration**

54. The Debtors have requested that this Court enter an order directing joint administration of the Chapter 11 Cases for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). Specifically, in the Joint Administration Motion, the Debtors request that the Court maintain one file and one docket for all of the jointly administered cases under the case of Boston Generating, LLC. Further, the Debtors request that an entry be made on the docket of each of the Debtors other than Boston Generating, LLC to indicate the joint administration of these Chapter 11 Cases. Finally, in the Joint Administration Motion, the Debtors seek authority to file the monthly operating reports required by the U.S. Trustee Operating Guidelines on a consolidated basis.

CH\1168650.38

55.     Given the complexity and interlinked commercial relationships among the Debtors, joint administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party-in-interest.  Many of the motions, hearings and orders that will arise in these Chapter 11 Cases will affect each and every Debtor.  Thus, I believe that entry of an order directing joint administration of these cases will reduce fees and costs by, for example, avoiding duplicative filings and objections.  Joint administration also will allow parties-in-interest to monitor these cases with greater ease.  Moreover, this Court will be relieved of the burden of entering duplicative orders and maintaining duplicative files.  Also, joint administration will ease the burden on the Office of the United States Trustee in supervising these bankruptcy cases, and will permit the Clerk of the Court to use a single general docket for each of the Debtors' cases and to combine notices to creditors and other parties in interest of the Debtors' respective estates.

56.     The joint administration of these Chapter 11 Cases will not give rise to any conflict among the Debtors' estates, nor will joint administration adversely affect the Debtors' respective creditors, because the Debtors seek only administrative, not substantive, consolidation of their estates.  For these reasons, I believe that joint administration of these Chapter 11 Cases is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**B.     Notice of Commencement**

57.     The Debtors have requested that this Court enter an order (a) waiving the requirement to file a list of creditors on the Petition Date, (b) authorizing certain procedures (the "**Notice Procedures**") for notifying creditors of the commencement of the Chapter 11 Cases and of the meeting of creditors to be held pursuant to Section 341 of the Bankruptcy Code (the "**341 Meeting**"), including the form of such notice (the "**Notice of Commencement**").

CH\1168650.38

58.     The Debtors intend to retain and employ The Garden City Group, Inc. as their claims and noticing agent (the "**Claims and Noticing Agent**") in these Chapter 11 Cases. Because the Claims and Noticing Agent will receive the consolidated list of creditors and mail the Notice of Commencement to the parties identified therein, the Debtors believe that filing the list of creditors will serve no useful, independent purpose.    Additionally, the Debtors have conferred with the Clerk of the Court and the Clerk has been informed that the Debtors will provide the list of creditors to the Claims and Noticing Agent.    Furthermore, having the Claims and Noticing Agent mail the Notice of Commencement relieves the Clerk of this Court of the administrative burden of providing notice to the Debtors' creditors.

59.     The Debtors also propose to publish, as soon as practicable, the Notice of Commencement once in the national edition of <u>USA Today</u>.    It is my belief that publication of the Notice of Commencement is the most practical method by which to notify creditors who do not receive the Notice of Commencement by mail and to notify other parties in interest of the commencement of these Chapter 11 Cases.    Notice by publication also constitutes an efficient use of the estates' resources.    I believe that the proposed Notice Procedures will ensure that parties in interest receive prompt notice of the commencement of these Chapter 11 Cases. Moreover, the proposed Procedures are beneficial to the Debtors' estates and to the Debtors' creditors because they provide actual notice to all of the Debtors' creditors in an efficient and cost-effective manner.

60.     For the foregoing reasons I believe that waiving the requirement to file a list of creditors on the Petition Date and the authorization of certain Notice Procedures for notifying creditors of the commencement of the Chapter 11 Cases is necessary and in the best interest of the Debtors' estates and their creditors.

## C.    Schedules and Statements

61.    In the Schedules and Statements Motion, the Debtors request entry of an order extending the deadline by which the Debtors must file their Schedules and Statements by thirty-one (31) days, so that the deadline will be forty-five (45) days after the Petition Date.

62.    Bankruptcy Rules 1007(b) and (c) require a chapter 11 debtor to file its Schedules and Statements with its voluntary petition or within fourteen days thereafter. Bankruptcy Rule 1007(c) provides a bankruptcy court with the ability to further extend a debtor's time to file its Schedules and Statements "for cause."

63.    Completing the Schedules and Statements requires the Debtors to collect, review and assemble a substantial amount of information. The Debtors have hundreds of creditors, many located in geographically diverse areas, and the conduct and operation of the Debtors' business operations requires the Debtors to maintain extensive books, records and accounting systems. Given the size and complexity of their business operations, the number of creditors, the fact that certain prepetition invoices have likely not yet been received, and the extensive efforts that the Debtors' management and other professionals devoted to the preparation of filing these Chapter 11 Cases, the Debtors have been unable to compile all of the information required to complete the Schedules and Statements.

64.    Moreover, given the numerous operational matters that the Debtors' accountants and legal personnel must address in the early days of these Chapter 11 Cases, I believe that the Debtors will not be in a position to complete the Schedules and Statements within the time specified in Bankruptcy Rule 1007(c). Nevertheless, recognizing the importance of the Schedules and Statements in these Chapter 11 Cases, the Debtors intend to complete the Schedules and Statements as quickly as possible under the circumstances.

CH\1168650.38

65. Accordingly, the Debtors respectfully request that the Court extend the deadline for filing the Schedules and Statements by an additional thirty-one days (to a total of forty-five days from the Petition Date) without prejudice to the Debtors' rights to seek further extensions of such period upon a showing of cause pursuant to Bankruptcy Rule 1007.

66. I believe that the additional time requested herein also should help ensure that the Schedules and Statements are as accurate as possible. Rushing to complete the Schedules and Statements so soon after the Petition Date would likely compromise the completeness and accuracy of the documents.

**D.** **Case Management**

67. As described more fully and with greater particularity in the Case Management Motion, the Debtors request that this Court implement certain procedures (the "**Procedures**") to facilitate the orderly administration of the Chapter 11 Cases.

    a. *Notice Procedures*

68. In the Case Management Motion, the Debtors propose to establish a master service list (the "**Master Service List**"). Any creditor or party-in-interest that wishes to receive notice, other than as required by Bankruptcy Rule 2002 and Local Rule 2002, would need to file a notice of appearance and request for service of papers (a "**Request**") with the Clerk of the Court and serve a copy of such Request upon each of the parties set forth on the Master Service List. Each Request would need to include such party's: (a) name, (b) address, (c) client's name, if applicable, (d) telephone number, (e) facsimile number; and (f) electronic mail ("**e-mail**") address, unless such party files a request to be exempted from providing an e-mail address.

69. In the Case Management Motion, the Debtors propose to update the Master Service List on a monthly basis to include the names, addresses, and e-mail addresses of any party-in-interest who has made a written Request since the prior month. In the event any

changes are made, the Debtors would file the updated Master Service List with the Court. The Debtors also propose that notice of Pleadings in these Chapter 11 Cases only be served upon: (a) the parties then-listed on the Master Service List, (b) any parties that have, pursuant to Bankruptcy Rule 2002, formally appeared and requested service since the last Master Service List was filed with the Court, and (c) any party against whom direct relief is sought in such matter.

70.     The proceedings with respect to which notice is proposed to be limited to those parties included on the Master Service List would include all matters covered by Bankruptcy Rule 2002 and the Local Rules, with the express exception of the following: (a) a 341 Meeting, (b) notice of the time fixed for filing proofs of claim pursuant to Bankruptcy Rule 3003(c), (c) notice of the time fixed for filing objections to, and the hearing to consider approval of, a disclosure statement and a plan of reorganization or plan of liquidation, (d) notice of and transmittal of ballots for accepting or rejecting a plan of reorganization or plan of liquidation, and (e) notice of a motion seeking approval of the sale of all or substantially all of the Debtors' assets. Notice of the foregoing matters would be given to all parties-in-interest in accordance with Bankruptcy Rule 2002 and other applicable Bankruptcy Rules and Local Rules, unless otherwise ordered by the Court or otherwise proscribed by the Bankruptcy Code.

71.     Pursuant to the Court's General Order on Electronic Means for Filing, Signing and Verification of Documents (the "**Electronic Filing Order**"), M-399, dated May 17, 2010, it is my understanding that service by e-mail may be made on a person who has requested, or is deemed to have requested, electronic notice in accordance with Bankruptcy Rule 9036 or the

Electronic Filing Order;[6] provided, however, that hard copies of documents or notices shall be served in the following circumstances: (a) service made in accordance with Bankruptcy Rules 7004, 9014(b) and 9016, (b) service made upon an agency of the United States, including the United States Attorney, the U.S. Trustee, or chambers, in accordance with the Bankruptcy Rules, the Local Rules, or an order of the Court, and (c) notice served pursuant to Bankruptcy Rule 2002(a)(1).

72.    If notice is served by e-mail, service of a paper copy of documents on interested parties by any other method is not necessary and e-mail service shall satisfy the Court's rules for service.  The Debtors propose that service by e-mail be effective as of the date the document is sent to the e-mail address provided by a party and that upon the completion of noticing of any particular matter, the Debtors will file electronically with the Court either an affidavit of service or certificate of service, annexing thereto the list of those parties to whom notice was provided.

b.    *Hearings and Related Procedural Matters*

73.    Omnibus Hearings.    In the Case Management Motion, the Debtors seek authorization to schedule, in cooperation with the Court, periodic omnibus hearings at which Pleadings shall be heard.  To the extent that omnibus hearings are scheduled, as an administrative matter, the Debtors will serve notice of the omnibus hearing dates scheduled on the Master Service List.   The Case Management Motion also details additional Procedures for establishing guidelines for setting a hearing date, telephonic appearances, objection deadlines, and deadlines for filing replies.

---

[6]    The Electronic Filing Order provides that "[w]henever service is required to be made on a person who has requested, or is deemed to have requested, electronic notice in accordance with Federal Rule of Bankruptcy Procedure 9036 or the annexed order, the service may be made by serving the "Notice of Electronic Filing" generated by the System by e-mail . . ."

31

74. <u>Notices of Hearing</u>. The Debtors propose that a notice of hearing be affixed to all Pleadings and include the following: (a) the title of the Pleading, (b) the parties upon whom any objection to the Pleading is required to be served, (c) the date and time of the applicable objection deadline, (d) the date of the hearing at which the Pleading shall be considered by the Court, and (e) a statement that the relief requested may be granted without a hearing if no objection is timely filed and served in accordance with these Procedures ("**<u>Notice of Hearing</u>**"). The applicable objection deadline and hearing date would also appear in the upper right corner of the first page of the Notice of Hearing.

75. <u>Proposed Agenda Hearing</u>. The Debtors further propose that, by 12:00 noon, prevailing Eastern Time, on the day prior to each hearing day, the Debtors' counsel will file with the Court a proposed agenda with regard to the matters which are or were to be heard on such hearing day.

76. <u>Settlements</u>. In the Case Management Motion, the Debtors propose that unless otherwise shortened by an order of the Court, motions and applications to compromise and settle claims, disputes and causes of action pursuant to Bankruptcy Rule 9019 shall be noticed for hearing on the next hearing day that is at least twenty-one (21) days after such motion or application is filed with the Clerk of the Court. Unless otherwise ordered by the Court, the objection deadline with respect thereto would be seven (7) days prior to the hearing day with respect thereto. In the event a matter is properly noticed for hearing and the parties reach agreement on a settlement of the dispute prior to the final hearing, the parties may announce the settlement at the scheduled hearing on the hearing day. To the extent that the parties reach an agreement prior to the hearing thus obviating the need for a contested hearing, the parties would notify chambers that the matter has been settled as soon as practicable. In the event the Court

CH\1168650.38

determines that the notice of the dispute and the hearing is adequate notice of the effects of the settlement (i.e., that the terms of the settlement are not materially different from what parties-in-interest could have expected if the dispute were fully litigated), the Court may approve the settlement at the hearing without further notice of the terms of the settlement. In the event the Court determines that additional or supplemental notice is required, the Debtors would serve such notice in accordance with the procedures set forth in the Case Management Motion and a hearing to consider such settlement would be held on the next hearing day deemed appropriate by the Court.

        c.     *Automatic Stay Proceedings*

77.    <u>Hearings and Objection Deadlines</u>.  The Debtors propose that motions for relief from the automatic stay filed pursuant to Section 362 of the Bankruptcy Code be noticed for consideration on the omnibus hearing date that is at least twenty-eight (28) days after the motion is filed and notice is served upon the Debtors. Unless otherwise ordered by the Court, the objection deadline would be seven (7) calendar days before the scheduled hearing. The Case Management Motion also outlines proposed rules for discovery in adversary proceedings.

78.    I believe that approval of the procedures proposed in the Case Management Motion (the "**Case Management Procedures**") is in the best interests of the Debtors' estates and their creditors. The Case Management Procedures will make the administration of the Chapter 11 Cases more efficient and cost-effective if the relief requested is granted. The nature of the Debtors' financial difficulties has placed significant demands on the Debtors and their personnel and professionals. In addition to the discharge of their ordinary duties, the Debtors' personnel now carry the additional burdens imposed by the commencement of these Chapter 11 Cases. The implementation of the Case Management Procedures will assist the Debtors' management in preserving limited resources and will permit them focus on issues raised in the Chapter 11 Cases.

33

E.      **Claims Agent Retention**

79.     The Debtors seek to retain The Garden City Group ("**GCG**") as their claims and noticing agent because, among other things, GCG specializes in chapter 11 administration, consulting, and analysis, including noticing, claims processing, voting, and other administrative tasks in chapter 11 cases. Moreover, in compliance with the Southern District of New York's "Protocol for the Employment of Claims Agents," the Debtors obtained and reviewed engagement proposals from three other court-approved claims agents, including Epiq Bankruptcy Solutions, LLC, Kurtzman Carson Consultants LLC, and Logan & Company, Inc. GCG will be tasked with sending out certain designated notices, receiving and docketing claims, and maintaining claims files and a claims and voting register. The Debtors believe that the retention of GCG will expedite service of notices, streamline the claims administration process, and permit the Debtors to focus on their efforts to maximize value for all creditors.

80.     To the best of the Debtors' knowledge, GCG is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code, as modified by Section 1107(b) of the Bankruptcy Code. The bankruptcy administration agreement (as defined in the GCG retention application) outlines the fee arrangements between the Debtors and GCG. The Debtors have paid GCG a retainer fee of $25,000.

81.     I believe that due to the number of anticipated claimants and parties-in-interest in these Chapter 11 Cases, the retention of GCG is necessary and in the best interest of the Debtors' estates and their creditors. GCG, an independent third party, will provide the most efficient and effective means of providing notice to parties in interest and administering the claims process.

**F.     Cash Management**

   a.     *Request for Authority to Continue Using the Debtors' Existing Cash Management System, As Modified*

82.     The Debtors request (a) authority to continue to use their existing cash management system (the "**Cash Management System**"), modified as described below, and maintain their existing prepetition bank accounts and business forms, and (b) a waiver of the requirements of Section 345(b) of the Bankruptcy Code with respect to the Debtors' deposit practices.

83.     As required by the Debtors' First Lien Facility and Second Lien Facility, the Debtors' Cash Management System is governed by a Security Deposit Agreement, dated December 21, 2006, by and among the Borrower, the Guarantors, the First Lien Collateral Agent, the Second Lien Collateral Agent, the Prior Agent (each as defined in the Security Deposit Agreement) and U.S. Bank National Association (the "**SDA**").  The Debtors' business and financial affairs require the collection, disbursement and movement of funds through 33 bank accounts (the "**Bank Accounts**") in the ordinary course of the Debtors' business.  Nineteen of the Debtors' Bank Accounts are held at US Bank Corporate Trust Services ("**US Bank**"), an affiliate of U.S. Bank National Association, and are governed by the SDA.  The remaining fourteen Bank Accounts are held at Citi Private Bank ("**Citi**"), an affiliate of Citibank, N.A., and are subject to a deposit account control agreement with the Debtors' first lien lenders.  Each of the Bank Accounts holds only cash.  A complete description of the Debtors' existing Cash Management System is set forth below.

(I)     *The Operating Account*

84.     In the ordinary course of business, and as required by the SDA, the Debtors maintain a main operating account (the "**Operating Account**") at US Bank in the name of

BostonGen. The Operating Account funds five checking accounts (collectively, the "**Checking Accounts**") and two payroll accounts (the "**Payroll Accounts**") at Citi that are used for accounts payable and payroll purposes, respectively. A separate Checking Account is maintained by BostonGen on behalf of each of BostonGen, Fore River Development, LLC, Mystic I, LLC and Mystic Development, LLC. The EBG Holdings LLC Checking Account is maintained directly by EBG Holdings LLC. Money is transferred from the Operating Account to fund the Checking Accounts on a bi-weekly basis to fund checks presented each business day. Each Checking Account carries a surplus balance of approximately $5,000 to $10,000 that is available to the entities serviced by the Checking Accounts to expedite the payment of employee reimbursements or to cover other unanticipated business expenses.

85. The Operating Account also funds two Payroll Accounts, which are held in the name of BostonGen and maintained on behalf of BG New England Power Services, Inc. and BG Boston Services, LLC. Funds are typically transferred from the Operating Account to the Payroll Accounts bi-weekly on Wednesdays to fund the Debtors' bi-weekly payroll schedule for salaried employees and weekly or bi-weekly payroll schedule for hourly employees. Funds are drafted via ACH from the Payroll Accounts by Automatic Data Processing, Inc. ("**ADP**") for the purpose of issuing payroll. Funds are also drafted via ACH from the Payroll Accounts by Fidelity Brokerage Services, LLC for the purpose of administrating the Debtors' 401(k) program.

86. Additionally, funds are wired directly from the Operating Account to approximately twelve entities, including the Debtors' largest fuel vendors, counterparties to certain hedge contracts, and Mitsubishi Power Systems Americas, Inc. pursuant to the terms of its Long Term Service Agreements with Mystic Development, LLC, dated November 6, 2000 and May 25, 2010, and its Long Term Service Agreement with Fore River Development, LLC,

36

dated December 8, 2000 (the "**LTSAs**"). In addition, funds are wired directly from the Operating Account to PSI for management fees owed by the Debtors pursuant to the USPG Asset Management Agreement. The Debtors wire approximately $1.5 million per month from the Operating Account to PSI pursuant to the USPG Asset Management Agreement. The aggregate amount that is directly wired out of the Operating Account each month varies greatly depending upon the cost of fuel received by the Debtors.

87. It is my understanding that, in the ordinary course of their business, the Debtors also maintain seven money market accounts (collectively, the "**Money Market Accounts**") that are linked to the five Checking Accounts and two Payroll Accounts. Historically, the Debtors transferred excess funds in the Checking Accounts and Payroll Accounts to the Money Market Accounts to earn interest. The Debtors have not used the Money Market Accounts for approximately one year, due to the low interest rates on such accounts. Each of the Money Market Accounts currently maintains a zero balance.

(II) <em>The Revenue Account</em>

88. It is my understanding that, in the ordinary course of their business, and as required by the SDA, the Debtors also maintain a revenue account (the "**Revenue Account**") at US Bank in the name of BostonGen which collects funds from a variety of different sources. Primarily, the Revenue Account receives weekly, monthly and variable payments from ISO NE pursuant to the energy credit arrangements between the Debtors and ISO NE. The Debtors receive weekly and monthly settlement payments from ISO NE to cover, among other things, the Debtors' variable fuel costs, fixed costs of the Debtors' plants and other operating costs. The Debtors also receive ancillary payments from ISO NE on a monthly or weekly basis on account of certain regulations, reserves, support and other services provided by the Debtors to ISO NE. In addition, other miscellaneous revenues that the Debtors receive are placed in the Revenue

37

Account, including proceeds from the sale of scrap materials, COBRA receipts, and monthly settlements pursuant to certain hedging contracts to which the Debtors are a party.

89.     The Revenue Account is also funded by several other accounts maintained by the Debtors.  First, the Revenue Account is funded by an account (the "**Loss Proceeds Account**") held by US Bank in the name of BostonGen and maintained for the purpose of collecting insurance proceeds and the proceeds of eminent domain actions.  For example, this account was funded by insurance proceeds received by the Debtors when they experienced an equipment failure at one of their plants in October 2008.  The Debtors paid vendors who repaired the equipment from the Loss Proceeds Account.  Any additional amounts necessary to resolve an insured event would be transferred from the Revenue Account.  In the event the Loss Proceeds Account has a balance subsequent to resolution of the insured event and payment of all associated costs, the remaining amount would be transferred to the Revenue Account.  In addition, the Debtors settled an eminent domain action with Massachusetts Water Resource Authority in May 2010, and the settlement funds were deposited into the Loss Proceeds Account and subsequently transferred to the Revenue Account.  The Loss Proceeds Account currently maintains a zero balance.  Second, the Revenue Account is funded by an account (the "**Emissions Credit Account**") held by US Bank in the name of BostonGen for the purpose of collecting proceeds from the sale of emissions credits.  Funds in this account, if any, are transferred to the Revenue Account on an as needed basis.  The Emissions Credit Account currently maintains a zero balance.  Third, the Revenue Account is funded by an account (the "**Mandatory Prepayment Account**") held by US Bank in the name of BostonGen, which is funded by (i) the proceeds of any asset sales by the Debtors in excess $10 million and (ii) 50% of any deposits that are made into the Equity Proceeds Account (as defined and described below).

The remainder of any deposits made into the Equity Proceeds Account are transferred to the Liquidity Reserve Account (as defined and described below). Funds in the Mandatory Prepayment Account, if any, are applied to pay down the Debtors' prepetition secured loans. The Mandatory Prepayment Account currently maintains a zero balance and has never been funded.

90.     It is my understanding that the Revenue Account funds various accounts in an order of priority governed by the Security Deposit Agreement between BostonGen, Credit Suisse, Cayman Islands Branch and US Bank National Association, dated December 21, 2006 (the "**SDA**"). Under the SDA, funds are transferred from the Revenue Account and applied to thirteen tiers of obligations under a waterfall system governing the order of priority according to which the transfers must be made. The Debtors generally maintain sufficient funds in the Revenue Account to fund only the first, second and third tiers of the waterfall. *First*, funds flow from the Revenue Account to the Operating Account for the purpose of funding ordinary course business operations and maintenance of EBG Holdings LLC and its subsidiaries, and to an account (the "**Permitted Borrower Account**") held by US Bank in the name of BostonGen to be applied as directed by BostonGen so long as funds in the Permitted Borrower Account do not exceed $100,000. The Permitted Borrower Account was funded in 2006 for the purpose of paying various fees related to the Debtors' refinancing and currently carries a balance of approximately $100,000. *Second*, funds flow out of the Revenue Account to service an account (the "**Debt Service Payment Account**") held by US Bank in the name of BostonGen for the purpose of paying (i) interest expenses due or coming due under the terms of the Debtors' prepetition first lien credit facility (the "**Prepetition First Lien Credit Facility**"); and (ii) any participation fees, interest expenses and ordinary course settlements due under certain hedge

agreements (the "**First Lien Hedge Agreements**").  *Third*, funds flow from the Revenue Account to the Debt Service Payment Account for the purpose of paying (a) the principal amount of first lien loans due and one third of the principal amount of first lien loans coming due under the Prepetition First Lien Credit Facility, (b) the final principal installment of the Debtors' Term B loans (the "**Term B Loans**") that is coming due on December 20, 2013, (c) the aggregate principal amount under the Debtors' revolving credit loans that is coming due, (d) the outstanding principal amount of any synthetic letter of credit loan, and (e) termination payments due or coming due under any First Lien Hedge Agreements.

91.     *Fourth*, funds flow from the Revenue Account to the Debt Service Payment Account for the purpose of paying interest expenses under the Debtors' second lien credit facility (the "**Prepetition Second Lien Credit Facility**").  *Fifth*, funds flow from the Revenue Account to the Debt Service Payment Account for the purpose of paying the principal amount of second lien loans due or coming due under the Prepetition Second Lien Credit Facility.  *Sixth*, funds flow from the Revenue Account to the agent under the Prepetition First Lien Credit Facility for repayment of the Debtors' outstanding prepetition revolving loans.  *Seventh*, funds flow from the Revenue Account to an account (the "**EBG Holdings Tax Payment Account**") held by US Bank in the name of BostonGen and created for the purpose of funding the tax liabilities of EBG Holdings LLC.  The EBG Holdings Tax Payment Account currently maintains a zero balance. *Eighth*, funds flow from the Revenue Account to an account (the "**Major Maintenance Reserve Account**") held by US Bank in the name of BostonGen for the purpose of funding major overhauls of plant operations or to provide funding during forced outages, if necessary, provided funds in the Major Maintenance Reserve Account do not exceed $10,000,000.  The Major Maintenance Reserve Account currently maintains a zero balance.  *Ninth*, funds flow from the

Revenue Account to an account (the "**First Lien Debt Service Reserve Account**") held by US Bank in the name of BostonGen for the purpose of establishing a reserve for future payments under the Prepetition First Lien Credit Facility. This account currently maintains a zero balance. *Tenth*, funds flow from the Revenue Account to an account (the "**Second Lien Debt Service Reserve Account**") held by US Bank in the name of BostonGen for the purpose of establishing a reserve for future payments under the Prepetition Second Lien Credit Facility. This account currently maintains a zero balance. *Eleventh*, funds flow from the Revenue Account to the agent under the Prepetition First Lien Credit Facility or the agent under the Prepetition Second Lien Credit Facility for the purpose of making voluntary prepayments under the Prepetition First Lien Credit Facility or the Prepetition Second Lien Credit Facility, respectively. *Twelfth*, funds flow from the Revenue Account to an account (the "**Liquidity Reserve Capped Sub-Account**") held by US Bank in the name of BostonGen for the purpose of establishing a reserve for future debt obligations, or to increase liquidity reserves provided that the amount in the Liquidity Reserve Capped Sub-Account does not exceed $25,000,000. This account currently maintains a zero balance. *Thirteenth*, any funds remaining in the Revenue Account would be transferred to the Mandatory Prepayment Account.

(III)   *Additional Accounts*

92.     In the ordinary course of business, the Debtors maintain an account (the "**Equity Proceeds Account**") held by US Bank in the name of BostonGen to receive the net proceeds of all equity sales. Pursuant to the Debtors' Cash Management System, 50% of all deposits into the Equity Proceeds Account are transferred to the Mandatory Prepayment Account, which is used to pay down the Debtors' prepetition secured loans, as described above. The remainder of the funds deposited into the Equity Proceeds Account are transferred to an account (the "**Liquidity**

**Reserve Account**") held by US Bank in the name of BostonGen to hold excess funds to be applied as directed by the Debtors' prepetition financing documents. The Equity Proceeds Account and the Liquidity Reserve Account have never been used by the Debtors.

93. In the ordinary course of business, the Debtors maintain an account (the "**Funding Account**") held by US Bank in the name of BostonGen that was created to hold the initial funds that the Debtors received from their prepetition lenders pursuant to the 2006 refinancing which were subsequently transferred according to the terms of the Closing Date Funds Flow Memorandum, as defined in the SDA. This account has not been funded since 2006.

94. In the ordinary course of business, the Debtors maintain an account (the "**Post-Closing Contingency Account**") held by US Bank in the name of BostonGen created in connection with the settlement of that certain Reliability Must-Run Contract between BostonGen and ISO NE (the "**RMR**"). The RMR settlement involved a series of payments from ISO NE to the Debtors in 2006, and then a small refund to ISO NE in 2007. Funds in the Post-Closing Contingency Account were applied to settle certain litigation matters or were applied as otherwise directed by BostonGen. There are currently no funds in this account. Furthermore, the Debtors maintain an account that is subsidiary to the Post-Closing Contingency Account (the "**RMR Revenues Sub-Account**") held by US Bank in the name of BostonGen, which was funded by RMR settlement payments from ISO NE in October, November and December of 2006. Certain of the funds from the RMR Revenues Sub-Account were applied to pay the refund to ISO NE in 2007, and the remainder of the funds were transferred to the Post-Closing Contingency Account to be applied as stated above. This account is no longer used by the Debtors.

CH\1168650.38

95.     In the ordinary course of business, the Debtors maintain an account (the "**Permitted Development Account**") held by US Bank in the name of BostonGen for the purpose of funding large projects at the Debtors' physical plants.  This account has never been used by the Debtors.

96.     In the ordinary course of business, the Debtors maintain an account (the "**Synthetic L/C Cash Collateral Account**") held by US Bank in the name of BostonGen to be applied as directed by the agent for the Prepetition First Lien Credit Facility.  This account has never been used by the Debtors.

97.     A schematic setting forth the Debtors' Cash Management System, as described above, is attached to the Cash Management Motion as Exhibit C and a list of accounts comprising the Cash Management System is attached to the Cash Management Motion as Exhibit D.

98.     The Debtors request authority to modify the SDA and the Cash Management System solely to the extent set forth below.  Pursuant to the Prepetition Credit Facilities, the SDA governs the flow of the Debtors' funds through a group of Bank Accounts held in the Borrower's name but controlled by the first lien collateral agent (and, only after the discharge of first lien obligations (as defined in the SDA), the second lien collateral agent (collectively, the "**Prepetition Agents**")) for the benefit of the Debtors' prepetition lenders (the "**Required Accounts**").  As described above, the SDA regulates the flow of funds through the Required Accounts by means of various waterfall provisions.  At this time, the majority of the Required Accounts are dormant, and many of the waterfall provisions have become cumbersome and irrelevant given the Debtors' current situation.  In order to streamline the Cash Management System postpetition, the Debtors request authority to modify the SDA and the Cash Management

43

System solely to the extent that the Debtors may, in accordance with the Approved Budget (as defined and described in the Cash Collateral Order), make all necessary disbursements and collect all receipts through only the Revenue Account and the Operating Account, and that the Required Accounts are no longer subject to the provisions of the SDA. The Debtors request that remainder of the Required Accounts, other than the Revenue Account and Operating Account, may be closed at the Debtors' discretion.

99.     Notwithstanding the foregoing, the Revenue Account and Operating Account (and any other Required Account that is permitted to be but is not in fact closed pursuant to the Order) will remain subject to the control of the first lien collateral agent (and, only after the discharge of first lien obligations, the second lien collateral agent), as set forth in the SDA. Furthermore, the Prepetition Agents' liens on the Revenue Account, the Operating Account (and any other Required Accounts that is permitted to be but is not in fact closed pursuant to the Order) will remain intact and are perfected. As described and defined in the Cash Collateral Motion and Cash Collateral Order, the Revenue Account and Operating Account are part of the Adequate Protection Collateral (as defined in the Cash Collateral Order) and, to the extent of any Diminution in Value (as defined in the Cash Collateral Order) in the collateral of the prepetition secured lenders, the Prepetition Agents, for the benefit of the prepetition secured lenders, as applicable, will have Adequate Protection Replacement Liens (as defined in the Cash Collateral Order) on the Revenue Account and Operating Account. Furthermore, the Debtors' Bank Accounts at Citi are, and will remain, subject to a deposit account control agreement dated November 29, 2007 between the Borrower and the First Lien Agent. The Debtors intend to continue to use those accounts in the ordinary course of business.

100.    I believe the Debtors must be able to continue using the Cash Management System for the efficient and effective operation of their business.  The Cash Management System allows the Debtors to collect, transfer and disburse funds as needed throughout the Debtors' business operations and provides significant benefits to the Debtors, including the ability to:  (a) closely track all corporate funds; (b) ensure cash availability; and (c) reduce administrative expenses by facilitating the movement of funds and the development of up-to-date status reports and account balance information.  Any disruption in the Cash Management System could delay the collection and disbursement of funds and threaten the orderly operation of the Debtors' business.  By authorizing the modification to the Cash Management System outlined above, I believe that the Debtors will retain all of the benefits of continued use of the Cash Management System, but will be able to operate more efficiently and in conformity with the Approved Budget.

101.    Under these circumstances, maintaining the Cash Management System is both essential and in the best interests of the Debtors' estates and their creditors.  Furthermore, preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with any substantial disruption in the Cash Management System will facilitate the Debtors' restructuring efforts.  Moreover, the proposed modifications to the Cash Management System will permit the Debtors to operate in a more streamlined and efficient manner.  Of course, as they have historically, the Debtors will continue to maintain records with respect to transfers of cash, so that the Debtors, as well as their creditors and this Court, can trace funds through the Cash Management System and ensure that all transactions are adequately documented and readily ascertainable.

102.     In conjunction with the authority to continue to use their Cash Management System, the Debtors request that no bank participating in the Cash Management System (the "**Cash Management Banks**") that honors a prepetition check or other item drawn on any account that is the subject of the Cash Management Motion (a) at the direction of the Debtors, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of an innocent mistake made despite implementation of reasonable item handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored post-petition. I believe that affording the Cash Management Banks this flexibility is necessary to induce the Cash Management Banks to continue providing cash management services without additional credit support.  Finally, the Debtors request the authority to pay reasonable fees, expenses and costs of the Cash Management Banks that are incurred in connection with or related to the Cash Management System, whether accrued or incurred before or after the Petition Date.  The Debtors estimate that approximately $4,400.00 is due and owing to the Cash Management Banks on account of services provided prior to the Petition Date.

  b.  *Request for Authority to Continue Intercompany Transactions*

103.     It is my understanding that, in the ordinary course of business, the Debtors regularly participate in transactions (the "**Affiliate Transactions**") with non-Debtor affiliates (the "**Non-Debtor Entities**") in which the Debtors and the Non-Debtor Entities exchange administrative services.  As a result of the Affiliate Transactions, the Debtors' books and records reflect prepetition obligations between the Debtors and the Non-Debtor Entities.  Before the commencement of these Chapter 11 Cases, the Debtors engaged in the following Affiliate Transactions.  First, the Debtors pay approximately $1.5 million in fixed management fees per month in 2010 pursuant to the terms of the USPG Asset Management Agreement, as described

46

above.  If the Debtors' share of all management costs exceeds the aggregate of all monthly fees paid by the Debtors at calendar year end, the Debtors may pay additional management fees as provided by the USPG Asset Management Agreement.  The Debtors have not paid additional fees in excess of the fixed monthly management fees since 2008.  Second, the payroll manager employed by Boston Generating New England Power Services, Inc. has historically assisted Astoria Acquisitions with certain payroll services.[7]  Historically, Astoria Acquisitions paid the Debtors approximately $4,311.11 per quarter for these services, and the payments were deposited into the Revenue Account.  The Debtors anticipate that they will cease providing payroll services to Astoria Acquisitions on or near the Petition Date.

104.    The Debtors seek the authority, in their discretion, to continue to participate in Affiliate Transactions postpetition, in the ordinary course of business.

c.      *Request for Authority to Maintain Existing Bank Accounts and Business Forms*

105.    The U.S. Trustee has issued certain chapter 11 operating guidelines pursuant to 28 U.S.C. § 586.  It is my understanding that these guidelines require that chapter 11 debtors, among other things: (a) close all existing bank accounts upon filing of their petitions and open new "debtor-in-possession" accounts in certain financial institutions designated as authorized depositories by the U.S. Trustee; (b) establish one debtor-in-possession account for all estate monies required for the payment of taxes; (c) establish one debtor-in-possession account for all estate monies required for payroll; and (d) establish one debtor-in-possession account for all estate monies required for the payment of business operations.

---

[7]      Pursuant to the transfer of services under the USPG Asset Management Agreement from Astoria Acquisitions to PSI, as described above, the payroll services previously provided by the Debtors to Astoria Acquisitions will cease, and such payroll services will not be provided to PSI going forward.  Therefore, any payments to the Debtors from Astoria Acquisitions on account of payroll services rendered will cease in the near term.

106.     In the Cash Management Motion, the Debtors seek a waiver of the U.S. Trustee requirement that their Bank Accounts be closed and that new postpetition bank accounts be opened.  If enforced in this case, I believe such requirements, and the attendant cost in time and money in complying with them, would greatly disrupt the Debtors' business and impair the Debtors' chapter 11 efforts.  As described above, the Debtors' Bank Accounts comprise an established cash management system that the Debtors must maintain in order to ensure smooth collections and disbursements in the ordinary course of their business.  Therefore, to avoid delays in paying debts incurred post-petition, and to ensure a smooth transition into these Chapter 11 Cases, the Debtors should be permitted to continue to maintain the existing Bank Accounts and, if necessary, and in the normal course of business operations, to close existing accounts and open new accounts at an authorized depository as set forth in the U.S. Trustee's operating guidelines.

107.     Accordingly, the Debtors request that this Court waive the strict enforcement of the requirement that the Debtors close their existing Bank Accounts and open new bank accounts.  The Debtors further request that the Bank Accounts be deemed debtor-in-possession accounts and that the Debtors be authorized to maintain and continue using these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

108.     I believe that, if the relief requested in the Cash Management Motion is granted, the Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by this Court. To prevent the possible inadvertent payment of prepetition claims, except those otherwise authorized by the Court, the Debtors will work closely with the Cash Management Banks to

48

ensure appropriate procedures are in place to prevent checks issued prepetition from being honored other than as discussed herein or approved by this Court. Furthermore, the Debtors will use their reasonable best efforts to mark "Debtor-In-Possession" on any checks printed after the filing of these Chapter 11 Cases.

109.    It is my understanding that the Debtors use certain pre-printed letterhead, purchase orders, invoices and other such related forms (the "**<u>Business Forms</u>**") in the ordinary course of their business. The Debtors request that they be authorized to continue to use all such Business Forms existing immediately before the Petition Date without reference to the Debtors' status as debtors in possession. Parties doing business with the Debtors undoubtedly will be aware of their status as debtors in possession as a result of the publicity surrounding these Chapter 11 Cases. If the Debtors were required to change the Business Forms, they would be forced to choose standard forms rather than the current Business Forms with which the Debtors' employees, customers and vendors are familiar. Such a change in operations would cause disruption and confusion for the Debtors' employees, customers and vendors. The Debtors believe that it would be costly and disruptive to cease using the Business Forms and to purchase and begin using new stationery and forms. The Debtors respectfully submit that to do so would be unnecessary and that appropriate care can be taken to assure the proper use of the Business Forms.

110.    Due to the burdensome tangible and intangible costs of replacing the Debtors' Business Forms, the Debtors request that they be authorized to use their existing Business Forms for the duration of these Chapter 11 Cases.

CH\1168650.38

d.     *Request for a Waiver of the Deposit Requirements of 11 U.S.C. § 345(b) on an Interim Basis*

111.     It is my understanding that, as of the Petition Date, the Debtors had no deposits or investments of money other than the cash on hand in the Revenue Account, the Operating Account, the Debt Service Account, the Permitted Borrower Account, the Checking Accounts, and the Payroll Accounts. The Debtors have approximately $101 million in cash on hand as of the Petition Date. In addition, prior to the Petition Date, as described above, the Debtors were permitted to invest excess funds in the Money Market Accounts pursuant to the terms of their prepetition financing documents. The Debtors believe that the Bank Accounts are in financially stable banking institutions with government-guaranteed deposit protection insurance from the Federal Deposit Insurance Corporation ("**FDIC**") or another appropriate government entity.

112.     It is my understanding that the Debtors believe that their use of the Bank Accounts substantially conforms with the approved investment practices identified in Section 345 of the Bankruptcy Code. Nonetheless, out of an abundance of caution, to the extent that the Debtors' use of the Bank Accounts does not conform with the approved investment practices identified in Section 345 of the Bankruptcy Code, the Debtors seek a waiver on an interim basis of such requirements to permit the Debtors to maintain any deposits in accordance with their existing deposit practices until such time as the Debtors obtain this Court's approval to deviate from the guidelines imposed under Section 345(b) of the Bankruptcy Code on a final basis.

113.     It is my understanding, and the Debtors submit, that "cause" exists pursuant to Section 345(b) of the Bankruptcy Code to waive this requirement because, among other considerations, (i) the Debtors' Cash Management Banks are highly-rated, federally-chartered banks subject to supervision by federal banking regulators, (ii) the Debtors retain the right to remove funds held at the Cash Management Banks and establish new bank accounts as needed,

50

(iii) the cost associated with satisfying the requirements of Section 345 of the Bankruptcy Code is burdensome and (iv) the process of satisfying those requirements would lead to needless inefficiencies in the management of the Debtors' businesses. Moreover, strict compliance with the requirements of Section 345 of the Bankruptcy Code would not be practical in these Chapter 11 Cases. A bond secured by the undertaking of a corporate surety would be prohibitively expensive, if such bond is available at all. Given the relative security of the Debtors' Cash Management System, the Debtors believe that cause exists to grant an interim sixty-day waiver of the requirements of Section 345(b) of the Bankruptcy Code.

114. I believe that the Cash Management System is crucial to the Debtors' continued operations. Without the Cash Management System, payments by the Debtors may not be made timely, the Debtors may have difficulty tracking incoming receipts and the complex system for managing their funds would be disrupted. Such disruptions would reduce the Debtors' knowledge of critical information on current liquidity, which may cause a diminution in the value of their estates to the detriment of all parties in interest. As a result, immediate and irreparable harm would result without the relief requested in the Cash Management Motion being granted.

**G.    Taxes**

115. The Debtors request the authorization to pay certain taxes incurred prior to the Petition Date. The Debtors own certain real and personal property located in various jurisdictions that is subject to local property taxes (the "**Real Property Taxes**" and "**Personal Property Taxes**," respectively, and collectively, the "**Property Taxes**"). The Debtors' Real Property Taxes are prepaid on a quarterly basis. In the event outstanding Real Property Taxes are not paid, the Taxing Authority will generally be permitted to assert a lien or security interest on the taxed property. The Debtors' Personal Property Taxes are also paid quarterly, and certain

51

jurisdictions may also allow for the creation of a lien on the taxed property where outstanding Personal Property Taxes remain unpaid.

116. On November 22, 1999, Sithe Edgar, LLC entered into a Tax Increment Financing Agreement with the Town of Weymouth (the "**Weymouth TIF Agreement**"). On December 10, 1999, Sithe Mystic LLC, which subsequently changed its name to Mystic I, LLC, entered into a Tax Increment Financing Agreement with the City of Everett (the "**Everett TIF Agreement**" and together with the Weymouth TIF Agreement, the "**TIF Agreements**"). On January 31, 2001 Sithe Edgar, LLC assigned its interest in the Weymouth TIF Agreement to Debtor Fore River Development, LLC. Under the TIF Agreements, the Debtors' properties in the Town of Weymouth and City of Everett were designated tax increment financing zones. This designation entitles the Debtors to tax increment exemptions from property taxes for a twenty year period. Pursuant to the TIF Agreements, tax liabilities accrue annually and the Debtors are billed on a quarterly basis. The Debtors paid approximately $21,654,000 for Real Property Taxes pursuant to the TIF Agreements in 2009. If Real Property Taxes are not paid in accordance with the TIF Agreements, the Debtors risk the loss of the exemptions provided under the TIF Agreements.

117. In addition, Fore River Development, LLC accrues approximately $2,300 in Property Taxes each quarter related to property it owns in the City of Quincy, and BostonGen pays approximately $400 in Personal Property Taxes each quarter related to property it owns in the City of Boston.

118. In 2009, the Debtors expended approximately $21,664,000 for Property Taxes. The Debtors do not believe that any amounts are due and owing for Property Taxes as of the Petition Date, but are requesting the authority, in their discretion, to pay any prepetition Property

CH\1168650.38

Taxes that are determined to be due, and to continue to pay all Property Taxes and any penalties and interest thereon as they come due in the ordinary course of business.

119.   The Debtors were not required to pay any income taxes in 2009 and do not anticipate owing any income taxes in 2010.  However, the Debtors are required to pay an annual minimum state excise tax (the "**Excise Tax**") in the amount of $912.  As of the Petition Date, there are no Excise Taxes due and owing by the Debtors.  However, the Excise Tax accrues in the ordinary course of business.

120.   The Debtors also pay Delaware and Massachusetts franchise taxes (the "**Franchise Taxes**").  In some instances the Franchise Taxes are paid directly to the relevant Taxing Authority, and in other instances the Franchise Taxes are paid to third parties who transfer those payments to the relevant Taxing Authority.   The Debtors expended approximately $5,515 for Franchise Taxes in 2009.  It is my understanding that as of the Petition Date approximately $2,700 in Franchise and Excise Taxes have accrued, but have not yet been paid, some of which will likely be due and payable during the period prior to the Final Hearing.

121.   Ample cause exists to authorize the payment of the prepetition Property, Franchise, and Excise Taxes (collectively, the "**Taxes**") and any penalties and interest thereon, which payment is critical to the Debtors' continued and uninterrupted operations.  To the extent that certain Taxes remain unpaid by the Debtors, the Debtors' officers, directors, and other employees may be subject to lawsuits or criminal prosecution during the pendency of these Chapter 11 Cases.  Any such lawsuit or criminal prosecution, and any ensuing liability, would distract the Debtors and their personnel from important tasks related to the Chapter 11 Cases. The dedicated and active participation of the Debtors' directors, officers, and other employees is not only integral to the Debtors' continued, uninterrupted operations, but also essential to the

orderly administration of these Chapter 11 Cases. Accordingly, I believe, that the relief proposed in the Tax Motion is in the best interests of the Debtors' estates.

**H.**     **Insurance**

122.    Pursuant to the Insurance Motion, the Debtors seek authorization to pay any amounts due and owing under certain insurance policies for the pre-petition period and to maintain their insurance policies post-petition. In connection with the operation of their businesses, the Debtors maintain (i) a workers' compensation program and related policies (the "**Workers' Compensation Program**") and (ii) various liability, property, accident and other insurance programs and policies (the "**Liability and Property Insurance Programs**" and, together with the Workers' Compensation Program, the "**Insurance Programs**") through several different insurance carriers (the "**Insurance Carriers**"). Annexed to the Insurance Motion as Exhibit C is a list of each of the policies associated with the Insurance Programs, identifying, among other things, the Insurance Carrier, the type of coverage, the limits and deductibles under the policies, the coverage period, and the aggregate annual premiums due thereunder.

    a.    *The Workers' Compensation Program*

123.    It is my understanding that the laws of Massachusetts, the only state in which the Debtors operate, require the Debtors to maintain workers' compensation policies and programs to provide their employees with compensation for injuries arising from or related to their employment with the Debtors.

124.    The Debtors maintain the Workers' Compensation Program through a third-party insurance program provided by Liberty Mutual Insurance Group Inc. ("**Liberty Mutual**"). In connection with the Workers' Compensation Program, employees seeking reimbursement for work-related injuries and illness typically file accident reports with the Debtors and work with

the Debtors to file the appropriate claims and forms with Liberty Mutual. There is no deductible on the policies associated with the Workers' Compensation Program.

125.    Under this program, BostonGen is obliged to pay an annual premium in the amount of approximately $137,115 for the period September 1, 2009 through September 1, 2010. This annual premium (the "**Estimated Premium**") was paid at the inception of the applicable policy. As of the Petition Date, there are no accrued or unpaid prepetition premiums outstanding for the policy associated with the Workers' Compensation Program.

126.    Additionally, Liberty Mutual performs an audit of the Debtors' actual payroll at the conclusion of each policy year. If the Debtors' actual payroll exceeds the amount of the Estimated Premium, the Debtors are required to pay an additional "true-up" premium to Liberty Mutual. If, however, the actual payroll is less than the Estimated Premium paid, the Debtors receive a refund from Liberty Mutual for the difference. Accordingly, following the annual audit for the policy period ending September 1, 2010, and at some point subsequent to the Petition Date, Liberty Mutual may have a liquidated claim for premiums relating to the prepetition period. By way of example, for the policy period ending August 31, 2009, the additional "true-up" premium was approximately $35,000.

b.    *Liability and Property Insurance Programs*

127.    As listed on Exhibit C to the Insurance Motion, the Debtors' Liability and Property Insurance Programs provide the Debtors with insurance coverage for liabilities relating to, among other things, losses from unplanned power outages, general commercial claims, property damage, automobile damage, directors' and liability run-off and various other property-related and general liabilities. I believe that continuation of these policies is essential to the ongoing operation of the Debtors' businesses.

CH\1168650.38

128.    The Debtors are required to pay premiums under the Liability and Property Insurance Programs based upon fixed rates established by the applicable Insurance Carrier.  The annual premiums for these policies aggregate approximately $5.9 million and are pre-paid at policy inception or renewal, with the exception of the property insurance policy, which is financed as described below.  Because each policy is pre-paid, with the exception of the property insurance policy, there are no accrued and unpaid prepetition premiums for the Liability and Property Insurance Programs as of the Petition Date.

129.    In connection with certain of the Liability and Property Insurance Programs, the Debtors are responsible for a deductible, as set forth on Exhibit C to the Insurance Motion. Typically, if a claim covered by a liability policy has a deductible, the Debtors will pay the claim in full and seek reimbursement from the Insurance Carrier for the amount of the claim, less the deductible.  The Debtors rarely experience accidents that give rise to deductible payments.  In 2009, the Debtors incurred de minimis expenses.  As of the Petition Date, there are no accrued and unpaid deductibles.

c.    *Insurance Brokers*

130.    In the ordinary course of the Debtors' businesses, the Debtors employ Aon Risk Services Northeast, Inc. ("**Aon**") to assist them with the procurement and negotiation of their Insurance Programs, to process certain claims, and, in certain circumstances, to remit payment to the Insurance Carriers on their behalf.  Aon is paid a fixed fee each year upon renewal of Aon's services.  The Debtors paid Aon approximately $440,000 for the period from November 30, 2009 to November 30, 2010 for services related to property insurance policies.  The Debtors paid Aon approximately $80,000 for the period from September 1, 2009 to September 1, 2010 for services related to liability insurance policies.

56

d. *Prepetition Insurance Premium Finance and Security Agreements*

131.    The Debtors maintain an insurance premium finance agreement with Premium Financing Specialists, Inc. ("**PFS**").  In order to obtain the best possible economic terms from Factory Mutual Insurance Company, the Insurance Carrier that provides the Debtors' property insurance, the Debtors finance those premiums under a Premium Finance Agreement (the "**Finance Agreement**"), effective as of December 1, 2009 through November 30, 2010, between BostonGen and PFS.  Pursuant to the Finance Agreement, PFS agreed to pay the insurance premiums due under the covered insurance policies in exchange for a promissory note by the Debtors in favor of PFS.  The Debtors paid a deposit at the inception of the Finance Agreement and thereafter are required to make monthly payments of approximately $322,000 through November 2010.  As of the Petition Date, the Debtors have paid amounts due and owing through and including September 30, 2010.  The Debtors' obligation to pay PFS under the promissory note is secured by all unearned premiums and loss payments.  I believe the property insurance policy subject to the Finance Agreement is essential to the preservation of the Debtors' businesses, properties, and assets.

132.    In the Debtors' business judgment, the terms of the Finance Agreement represent the best possible terms for financing the premiums of the Debtors' property insurance policy. The Debtors' estates will benefit by maintaining this low-cost financing from PFS.  Moreover, any interruption of payments might adversely affect the Debtors' ability to obtain financing for future policies on favorable terms.  In some cases, coverage is required by regulations, laws, and/or contracts that govern the Debtors' business obligations.  Thus, the Debtors request the authority to continue honoring their obligations pursuant to the Finance Agreement and to continue the grant of a security interest to PFS.

e. *USPG Policies*

133.    In addition to the Insurance Programs described above, USPowerGen and Astoria Acquisitions maintain certain insurance policies (the "**USPG Policies**") that provide liability coverage to BostonGen.  The USPG Policies are set forth on Exhibit D to the Insurance Motion. USPowerGen, a non-Debtor, maintains, and is the primary insured on, the USPG Policies pursuant to the USPG Asset Management Agreement.    The USPG Asset Management Agreement provides that USPG may purchase certain insurance policies—primarily directors and officers liability insurance—that cover the Debtors as well as the Non-Debtor Entities, including USPowerGen, Astoria Acquisitions and affiliates of Astoria Acquisitions.  Astoria Acquisitions pays the premiums on the USPG Policies.  In exchange, the Debtors indirectly pay Astoria Acquisitions for, among other things, the applicable share of the cost of the USPG Policies according to the procedures set forth in the USPG Asset Management Agreement.[8]  In 2009, the Debtors paid Astoria Acquisitions approximately $484,000 indirectly on account of the USPG Policies covering premiums and broker commissions.

134.    Furthermore, USPowerGen employs Marsh Inc. ("**Marsh**") to assist them with the procurement and negotiation of the USPG Policies.  Astoria Acquisitions pays Marsh an annual commission for its services.  Pursuant to and according to the terms of the USPG Asset Management Agreement, the Debtors indirectly pay Astoria Acquisitions for their applicable share of the payments to Marsh.  In 2010, the Debtors estimate they will indirectly pay Astoria

---

[8]        On August 1, pursuant to the terms of the USPG Asset Management Agreement, the management services and related rights to payment held by Astoria were transferred to PSI.  However, the USPowerGen policies are still maintained by USPowerGen and Astoria Acquisitions and, as described above, the premiums for the USPG Policies were paid for in full by Astoria Acquisitions.  Going forward, the Debtors will make required USPG Asset Management Agreement payments to PSI, and PSI will then forward to Astoria Acquisitions the portion of the payment that is meant to reimburse Astoria Acquisitions for the Debtors' share of the USPG Policies.

Acquisitions, through PSI as described above, approximately $37,000 on account of the services performed by Marsh in procuring the 2010 USPG Policies.

### I.    Warehousing Charges, Lien Claims and Maintenance Charges

The Debtors request the authorization to pay certain pre-petition warehousing charges, lien claims and maintenance charges incurred in the ordinary course of their business.

a.    *Warehousing Charges*

135.    In order to guard against potential disruptions to the Debtors' operations, the Debtors entered into that certain Terminalling Agreement Number 1 (together with any amendments, the "**Exxon Agreement**") with Exxon Company, USA ("**Exxon**").  Pursuant to the Exxon Agreement, Exxon has agreed to off load and store heavy fuel oil in its tanks (the "**Tanks**"") for use at Mystic Station.  The Debtors pay Exxon a per barrel storage fee, a per barrel handling fee, a monthly fee for tank energy plus fuel cost and a monthly fee for line energy plus fuel cost.  Unless terminated earlier in accordance with its terms, the Exxon Agreement may be terminated on 18 months notice by either party thereto.  Having ready access to the fuel oil stored in the Tanks is important to the Debtors' operations.  In light of the commencement of these Chapter 11 Cases, Exxon may refuse to continue to provide storage and delivery services to the Debtors upon demand, which could have an adverse effect on the Debtors' ability to operate their business.  The Debtors pay between $140,000 and $200,000 per month to Exxon pursuant to the Exxon Agreement.  As of the Petition Date, the Debtors owe Exxon approximately $236,000 pursuant to the Exxon Agreement.

136.    The Debtors store various corporate documents including their books and records at warehousing facilities off premises for preservation.  These warehousing facilities are owned by Iron Mountain.  As of the Petition Date the Debtors estimate that they owe approximately $1,750 to Iron Mountain on account of prepetition charges (the "**Iron Mountain Claim**").  The

59

Debtors believe that it is in their best interest to continue to store these corporate documents at the Iron Mountain facilities for preservation. Accordingly, the Debtors request authorization to pay, in their discretion, the Exxon Claim and Iron Mountain Claim (together, the "**Warehousing Charges**") and any prepetition claims that may later be determined to be due and owing to Exxon or Iron Mountain to avoid any potential interruptions in the Debtors' business operations during the pendency of the Chapter 11 Cases.

        b.     *Lien Claims*

137.     The Debtors are required to perform significant construction, maintenance and repair work to maintain their various power plant facilities, production wells, turbines and other equipment (collectively, the "**Equipment**"). Although the Debtors utilize their own employees to perform much of this work, in the ordinary course of business, the Debtors also rely on outside mechanics and repairmen (collectively, the "**Mechanics**") to repair and/or refurbish the Equipment, as needed. As of the Petition Date, several pieces of Equipment were in the possession of and being repaired by or refurbished by Mechanics. To the extent the Mechanics have prepetition claims against the Debtors for services rendered by the Mechanics, the Mechanics may be entitled, under applicable state law, to a possessory lien against the personal property of the Debtors that is the subject of the services (the "**Lien Claims**"). It is my understanding that the Debtors anticipate that the Lien Claims will not exceed $400,000.

        c.     *Maintenance Charges*

138.     Debtor Mystic Development, LLC is party to a Long Term Service Agreement for Mystic 8, dated as of November 6, 2000, and a separate Long Term Service Agreement for Mystic 9, dated as of May 25, 2010 (collectively, as amended, the "**Mystic LTSAs**") with Mitsubishi Power Systems Americas, Inc. ("**Mitsubishi**" and together with Exxon, Iron Mountain, the Mechanics, the Other Vendors, and the Outage Vendors, the "**Claimants**"). In

addition, Debtor Fore River Development, LLC is party to a Long Term Service Agreement (as amended, the "**Fore River LTSA**" and together with the Mystic LTSAs, the "**LTSAs**"), dated as of December 8, 2000, with Mitsubishi. Pursuant to the LTSAs, Mitsubishi provides all major maintenance services and parts for the 501-G gas turbine-generators and associated systems, auxiliaries and components. Mitsubishi's services under the LTSAs include planned maintenance, unplanned maintenance, extra work specifically requested by the Debtors and the provision of parts and services for the continued maintenance of the Mystic 8&9 and Fore River facilities. In consideration of the parts and services provided by Mitsubishi, Mystic Development is obligated to make (a) fixed monthly payments of approximately $22,246.25 and (b) certain variable monthly payments, and Fore River Development, LLC is obligated to make (a) fixed monthly payments of $10,016.67 and (b) certain variable monthly payments. In addition, payments for parts, equipment, and services in respect of unplanned maintenance are calculated in accordance with prices set in the LTSAs. Prior to the Petition Date, the Debtors placed orders with Mitsubishi for a rotor, other equipment, and various spare parts (collectively, the "**Spare Parts and Equipment**") with a total cost of $19,060,417 currently outstanding, none of which will come due before a final hearing on the Warehousing Motion (the "**Final Hearing**"). Certain of the Spare Parts are expected to be delivered in September 2010 and others are expected to be delivered in September 2011. The rotor is to be delivered on or before December 31, 2012.

139. In addition, prior to the Petition Date, the Debtors ordered certain parts and equipment (the "**Other Parts and Equipment**") from vendors other than Mitsubishi (the "**Other Vendors**") necessary to maintain day to day business operations that have not yet been delivered to the Debtors. While the Debtors may be able to obtain certain of the Other Parts and

61

Equipment from other sources in the event the original supplier refuses to perform after the Petition Date, the delay and additional costs that may result from the necessity of having to re-order Other Parts and Equipment could cause a substantial strain on the Debtors' ability to maintain their business operations. As of the Petition Date, the Debtors have placed orders for Other Parts and Equipment with a total cost of approximately $308,000 still outstanding, approximately $150,000 of which will come due prior to the Final Hearing.

140. Based on the requirements of the LTSAs, the Debtors power plant facilities typically undergo a maintenance outage (the "**Outage**") every twelve (12) to eighteen (18) months to maintain the safe and reliable operation of the facility. The Mystic 8 facility is currently preparing for an Outage which is expected to begin on September 18, 2010. Preparation work for the Outage began on or about August 9, 2010, and the Debtors have ordered various parts and goods (the "**Outage Related Parts and Equipment**") from vendors (the "**Outage Vendors**"). As of the Petition Date, the Debtors placed orders for Outage Related Parts and Equipment with a total cost of approximately $928,798 still outstanding, approximately $10,000 of which will come due before the Final Hearing. The consequences of any delay in completing the Outage caused by a delay in receipt of any Outage Related Parts and Equipment could be significant for the Debtors, and would include lost market opportunity given that the Mystic 8 facility is typically competitive in the market. The Debtors estimate that each week the Outage is delayed past the scheduled end date would cost, per week, at least $2 million and could cost as much as $3.8 million.

141. In the Warehousing Motion, the Debtors request authorization to pay, in their discretion, up to $21,000,000 for any prepetition amounts due and owing to Mitsubishi on account of the Spare Parts and Equipment, any prepetition amounts due and owing to any Outage

Vendor on account of the Outage Related Parts and Equipment, and any prepetition amounts due and owing to any Other Vendors on account of Other Parts and Equipment, including any related shipping charges (collectively, the "**Maintenance Charges**") to ensure their prompt delivery to the Debtors, which are necessary to the smooth and efficient operation of the Debtors' business.

142.     The Debtors rely on the storage services provided by Exxon in order to ensure minimal disruptions to their business operations in the event fuel oil cannot be obtained expeditiously.   The Debtors also rely on Iron Mountain to store and maintain their corporate documents and books and records.   In addition, the Debtors rely on the Mechanics, Mitsubishi, the Outage Vendors and the Other Vendors to provide maintenance services necessary to keep their power plants in good working condition as the Debtors cannot produce energy if a critical piece of equipment is not properly maintained or promptly replaced.   Although the Debtors believe that any refusal by certain of the Claimants to perform their obligations under their respective agreements with the Debtors would be violative of the automatic stay imposed by Section 362 of the Bankruptcy Code, the Debtors simply cannot afford the time and expense of an enforcement action if the Claimants wrongfully refuse to perform.   Therefore, the prompt payment to the Claimants, which may be necessary to obtain delivery of the goods in their possession, is crucial for the orderly and efficient operation of the Debtors' businesses.   Unless the Debtors have the authority to pay for these essential services, their businesses will suffer immediate and irreparable harm.   As a result, it is essential that the commencement of these Chapter 11 Cases not give any Claimant a reason or excuse to cease performing timely services. Thus, I believe that the relief requested in the Warehousing Motion is necessary and appropriate.

CH\1168650.38

## J.    Essential Trade Vendors

143.    Pursuant to the Essential Vendors Motion, the Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to pay the prepetition claims (the "**Essential Vendor Claims**") of certain essential vendors (the "**Essential Vendors**").

144.    The Debtors estimate that the majority of the Essential Vendor Claims (approximately 65% overall) will become due and payable, in the ordinary course and consistent with past practices, within 21 days after the Petition Date.  The Debtors seek an Interim Order authorizing, but not obligating, the Debtors to pay, in their sole discretion, the amounts needed to satisfy the Essential Vendor Claims that become due and payable prior to the Final Hearing.

145.    The Debtors estimate that the aggregate amount of prepetition Essential Vendor Claims they seek authority to pay under the Essential Vendors Motion is approximately $56.2 million, approximately $36.3 million of which will come due prior to the Final Hearing.

146.    I believe that the Essential Vendors, as described in the Essential Vendors Motion, are critical to maintaining and maximizing the value of the Debtors' operations.  The Debtors purchase goods and services from various vendors, and the Debtors have determined in their business judgment that approximately thirty (30) of these vendors provide goods and services that are essential to the Debtors' operations.  The Essential Vendors are critical to maintaining and maximizing the value of the Debtors' operations because, as discussed in greater detail below, they are Single Source Providers, Equipment Maintenance/Specialized Labor Vendors, Regulatory Compliance Vendors, or Outage Vendors (each as defined below).

147.    I believe that failure to pay these Essential Vendors would result in the Debtors' loss of their ability to obtain the requisite products and services necessary for their operations in an orderly and efficient manner and result in serious harm to the Debtors' estate and the value available to the Debtors' creditors during these Chapter 11 Cases.  Although the Debtors have

64

contracts with many of the Essential Vendors, and believe that any refusal by such Essential Vendors would be violative of the automatic stay imposed by Section 362 of the Bankruptcy Code, the Debtors simply cannot afford the time and expense of an enforcement action against the Essential Vendors, if they wrongfully refuse to perform, due to the serious harm to the Debtors' business that would result from even a short delay in receiving the goods and services provided by the Essential Vendors.

a. *Single Source Providers*

148.    In the ordinary course of their businesses, the Debtors rely on a number of Essential Vendors to supply essential raw materials, specialized replacement parts and supplies, and certain other goods and services required to operate the Debtors' plants and ensure continuous business operations (collectively, the "**Single Source Goods**").  Typically, the Single Source Goods are available only from the Debtors' existing suppliers that are Essential Vendors.

149.    In some cases, other suppliers cannot supply the required Single Source Goods in sufficient quantity, quality or reliability, or they are unable to supply the required Single Source Goods on a cost-efficient and timely basis in the appropriate areas.  For example, the Debtors' power plants are designed to utilize bulk quantities of certain chemicals, such as ammonia, as part of the energy production and pollution control process.  Due to the chemical specifications and quantities involved, the Debtors are dependant on a few Essential Vendors who can provide such chemicals to their plants in order to keep the plants running and compliant with environmental regulations.  Other Single Source Providers supply the Debtors with specially fabricated repair and replacement parts, and control and safety systems, for the Debtors' power plants.  Typically, these parts are based upon designs available only from the manufacturer or are made or provided to the Debtors' exact specifications.

150. Further, certain of the Debtors' facilities require enormous amounts of natural gas, delivery of which often requires a significant infrastructure investment on the part of the Essential Vendor. Because of the necessary investment and the time required to establish such an infrastructure, there are simply no alternative suppliers to whom the Debtors could turn if the Single Source Providers ceased providing these goods and, without these goods, the Debtors operations would grind to a halt.

151. Since the Debtors do not have viable alternatives to obtain substitute Single Source Goods from other suppliers promptly, they have determined that they must be able to satisfy the prepetition claims of these Single Source Providers, in the Debtors' discretion, to ensure the continued delivery of the Single Source Goods to their plants without interruption. The Debtors estimate that they owe, in the aggregate, approximately $51.3 million on account of Essential Vendor Claims of Single Source Providers, approximately $18.3 million of which is on account of goods received within twenty (20) days of the Petition Date.[9] The Debtors estimate that approximately $33.2 million will become due on account of the Essential Vendor Claims of Sole Source Providers during the Interim Period.

   b.   *Essential Maintenance and Specialized Labor Vendors*

152. To ensure that the wide range of specialized equipment required for energy production and pollution control including, without limitation, boilers, turbines, pumps, information technology and software, and information systems and other ancillary equipment, operates in an effective, safe and efficient manner, the Debtors rely on specialized maintenance

---

[9] Approximately $50.7 million of this amount is owed to one of the Debtors' natural gas suppliers, Distrigas of Massachusetts LLC ("**Distrigas**"), for prepetition goods delivered. This amount comprises a substantial portion of the Essential Vendor Claims that the Debtors seek the authority, but not direction, to pay pursuant to this Motion. Contemporaneously herewith the Debtors have filed a *Motion of the Debtors for Entry of Interim and Final Orders Providing Certain Protections in Connection With, And Authorizing The Assumption Of, Executory Contracts With Distrigas of Massachusetts LLC And GDF Suez Energy North America, Inc.* (the "**Distrigas Assumption Motion**"), seeking to assume certain contracts with Distrigas and pay cure amounts related thereto.

and repair service provided by certain Essential Vendors (collectively the "**Equipment Maintenance/Specialized Labor Vendors**").  Many of the Equipment Maintenance/Specialized Labor Vendors possess a vast amount of institutional knowledge relating to the Debtors plants and their operations, which would be impossible to replace.  Additionally, due to the specialized and often hazardous nature of some of the services involved, certain of the services can only be obtained by the Debtors from the Equipment Maintenance/Specialized Labor Vendors with permits or licenses as required by state and federal laws and regulations.

153.    Further, the Debtors' plant staffing model places a great deal of importance on the services provided by the Equipment Maintenance/Specialized Labor Vendors.  When the Debtors' plants were constructed, they were designed to require minimal in-house staffing capable of performing routine maintenance, but supplemented by the specialized maintenance and repair services that are provided by the Equipment Maintenance/Specialized Labor Vendors on a regular or as-needed basis.

154.    Additionally, due to the nature of the Debtors' operations, various government regulatory bodies, including the Department of Homeland Security, require the Debtors to maintain a full time security presence at the Debtors' power plants.  While replacing the Equipment Maintenance/Specialized Labor Vendors performing these security functions would be feasible, it is not possible without a delay that could result in insufficient security at the Debtors' plants and the Debtors' inability to comply with the requirements imposed by the Department of Homeland Security and other regulatory bodies.

155.    Due to the limited availability of vendors able to provide the Debtors with these services and/or the difficulty and risks involved in replacing such vendors, the Debtors believe that at least some of the Equipment Maintenance/Specialized Labor Providers will refuse to

provide postpetition goods and services to the Debtors if all or a portion of their prepetition claims are not satisfied. Although the Debtors will make every effort to obtain continued performance from the Equipment Maintenance/Specialized Labor Providers, it is vitally important that the equipment required for energy production and pollution control be maintained and protected in an appropriate manner to reduce the risk of disruption to the Debtors' operations and any risks to public security. It is, therefore, crucial that the Debtors have the authority to satisfy the prepetition claims of the Equipment Maintenance/Specialized Labor Providers. The Debtors estimate that they owe, in the aggregate, approximately $4.37 million on account of Essential Vendor Claims of Equipment Maintenance/Specialized Labor Providers. The Debtors estimate that approximately $2.94 million will become due on account of the Essential Vendor Claims of Equipment Maintenance/Specialized Labor Providers during the Interim Period.

      c.     *Regulatory Compliance Vendors*

156.    In the ordinary course of their businesses, the Debtors rely on a number of Essential Vendors to assist the Debtors in complying with applicable laws and regulations (the "**Regulatory Compliance Vendors**"). For example, the Debtors rely on companies who perform emissions testing who are typically employed and/or licensed by state or local governments in the jurisdictions in which the Debtors operate. Additionally, the Debtors are required to retain certain vendors who have developed response plans and trained response teams to perform services to deal with unanticipated environmental events involving the Debtors' power plants. Further, in the course of their operations the Debtors must purchase and maintain various permits from federal, state, and local governments. Because of the unique nature of the services provided by the Regulatory Compliance Vendors, the Debtors cannot obtain qualified

service from any other source without significantly disrupting the Debtors' operations and regulatory compliance status.

157.     The Debtors believe that some of the Regulatory Compliance Vendors will refuse to perform postpetition services if their prepetition claims are not paid, thereby exposing the Debtors to the risk of noncompliance with applicable government laws and regulations.  Any such potential violation of applicable government laws and regulations could cause governmental entities to attempt to levy fines or penalties against the Debtors or require closing of facilities.

158.     Since the Debtors must comply with applicable laws and regulations on a postpetition basis and cannot afford the potentially irreparable damage to their businesses that would be caused by adverse governmental action for regulatory compliance, the Debtors believe that having the ability, in their sole discretion, to pay the Regulatory Compliance Vendors is essential to the success of these Chapter 11 Cases. The Debtors estimate that they owe, in the aggregate, approximately $453,000 on account of Essential Vendor Claims of Regulatory Compliance Vendors.  The Debtors estimate that approximately $80,000 will become due on account of the Essential Vendor Claims of Regulatory Compliance Vendors during the Interim Period.

d.     *Outage Vendors*

159.     During the Outage, the Debtors will employ various contractors (the "**Outage Vendors**"), many working around the clock, to perform a wide range of repairs and maintenance on the facility including, but not limited to, valve overhauls, boiler inspections and repair, scaffolding, preventative maintenance tasks, and disassembly and replacement of components in both gas turbines and the steam turbine located at the facility.

69

160.     The preparation work by Outage Vendors began on approximately August 9, 2010, with the erection of scaffolding throughout the plant.  Additionally, various parts and goods have been arriving and will continue to arrive to the site on a regular basis throughout the Outage.  The Outage was scheduled months prior to the Petition Date, and require advanced notice to the Debtors' power grid operator as well as the Debtors' fuel supplier.  Further, the Debtors have prepared for the Outage by reducing their existing hedging agreements to reflect the reduced generating capacity during the Outage.

161.     The consequences of any delay in completing the Outage could be significant for the Debtors, and would include lost market opportunity given that the Mystic 8 facility is typically competitive in the market.  Additionally, the Debtors would risk penalties in the forward capacity market as well as risk breaching obligations under many contracts, including fuel and hedging contracts, as a result of any delay in the Outage.  As noted above, the Debtors estimate that each week the Outage is delayed past the scheduled end date would cost, per week, at least $2 million and could cost as much as $3.8 million.

162.     Due to the inability to replace the Outage Vendors without disrupting the Outage, the Debtors believe that some of the Outage Vendors will refuse to provide postpetition goods and services to the Debtors if all or a portion of their prepetition claims are not satisfied.  As discussed above, due to the complicated and highly time sensitive nature of the Outage, any interruption in the provision of goods or services by the Outage Vendors would delay the time of the Outage and seriously harm the Debtors' operations.  As a result, the Debtors believe that having the ability, in their sole discretion, to pay the Outage Vendors is essential to the success of these Chapter 11 Cases.  The Debtors estimate that they owe, in the aggregate, approximately

$35,000 on account of Essential Vendor Claims of Outage Vendors, substantially all of which will become due during the Interim Period.

e. *Analysis Undertaken*

163.    It is my understanding that, in order to determine which of the Debtors' vendors are critical to the Debtors' ability to operate, the Debtors' senior management undertook the following analysis:

o   The Debtors first identified all vendors who supply goods and services used in the Debtors' business operations.   Of this total universe of vendors, the Debtors then analyzed whether (a) the failure to pay the prepetition claims of such vendors would, in the Debtors' business judgment, result in a substantial risk that such vendors may refuse to provide goods or services to the Debtors during the postpetition period, (b) the enforcement of a contract with a vendor that refuses to ship product or provide services could be accomplished in a timely and cost-efficient manner without unduly disrupting the Debtors' operations in light of all relevant circumstances, and (c) the Debtors had received goods from such vendors in the ordinary course of business within 20 days prior to the Petition Date (the "**503(b)(9) Period**").

o   The Debtors then identified which of the vendors are unique in that they (a) are the sole (or only feasible) source for the supply of goods or services used in the Debtors' operations, (b) meet certain quality requirements or other specifications of the Debtors that would prevent the Debtors from obtaining the goods or services from alternative sources, (c) provide materials that have been specially manufactured for use in the Debtors' operations or provide services that require institutional knowledge of the Debtors' facilities, (d) are geographically located in close proximity to the Debtors' operations such that transportation and/or other cost savings associated with the Debtors' purchase of their goods or use of their services cannot be replicated by replacement vendors, (e) have so integrated their operations with those of the Debtors that it would be costly, impractical, disruptive, and imprudent for the Debtors to change vendors, (f) provide services essential to the Debtors' continued operation and compliance with applicable laws, (g) provide significant cost savings or other advantageous terms to the Debtors if they purchase goods from such vendors or utilize such vendors' services or (h) are engaged in such large scale and time sensitive tasks that replacing such vendors would cause the Debtors significant harm.

CH\1168650.38

164.     Applying the criteria set forth above, the Debtors determined that making payments on account of the Essential Vendor Claims, the sum of which may be small in comparison to the immediate and irreparable harm to the Debtors if not paid immediately, is essential to the continuation of the Debtors' operations and critical to the Debtors' ability to maximize value through sale of their assets as a going concern or reorganization.  Absent payment of the Essential Vendor Claims, the Debtors believe that the Essential Vendors will likely refuse to provide goods or services or refuse to provide goods and services on reasonable credit terms.  Without a seamless transition of the provision of goods and services by the Essential Vendors after the Petition Date, the Debtors would experience an immediate disruption to their operations.  The payment of the Essential Vendor Claims as requested in the Essential Vendors Motion is intended to ensure there is no disruption in the Debtors' ability to obtain the goods and services necessary to the Debtors' operations.

165.     While the Debtors seek authority to make payments on account of the Essential Vendor Claims, the Debtors will seek to make such payments only where nonpayment of such claims would put at risk the delivery of goods and/or the provision of services that are essential to the Debtors' operations and if the value to the Debtors' estates of a continued relationship with the Essential Vendors is equal to or greater than the amount owed to such vendors.  Thus, the Debtors submit that the relief requested is narrowly tailored to facilitate the maximization of the Debtors' estate value during these Chapter 11 Cases.  Under these circumstances, the Debtors should be able to exercise their discretion and business judgment to pay the Essential Vendor Claims.

**K.**     **Employees**

166.     Pursuant to the Employee Wage Motion, the Debtors seek entry of an order authorizing, but not requiring, the Debtors to (i) pay, in their sole discretion, all obligations

incurred under or related to Wage Obligations, Garnishment Obligations, Independent Contractor Obligations, Reimbursement Obligations, Payroll Tax Obligations, Performance Bonus Award Program Obligations, and Employee Benefit Obligations (each as defined below, and collectively, the "**Employee Obligations**") and all costs incident to the foregoing, and (ii) maintain and continue to honor their practices, programs, and policies for their employees as they were in effect as of the Petition Date, and as such may be modified, amended, or supplemented from time to time in the ordinary course.

167. The Debtors estimate that the aggregate amount of prepetition Employee Obligations they seek authority to pay under this Motion and all costs and administrative expenses relating thereto is approximately $476,397, substantially all of which will come due prior to the Final Hearing. The Debtors estimate that the combined prepetition and postpetition amounts that will come due during the Interim Period will be approximately $1,341,205.

168. In connection with the Debtors' operations, BG Boston Services, LLC ("**BG Boston**") and BG New England currently employ approximately 148 employees on behalf of all of the Debtors (the "**Employees**"). None of the other Debtors have any employees. Specifically, the Debtors have a local management team with 20 full-time personnel who provide general, administrative and technical support services. Ten of these management employees operate out of a 10,639 square foot office space leased at the Schrafft Center in Charlestown, MA, located adjacent to Mystic Station and Mystic 8&9. The remaining 10 management and support services employees are on-site at the plants. Additionally, the Debtors employ 45 employees at the Mystic 8&9 facilities; 31 employees at the Fore River facility; and 52 employees at Mystic Station.

73

a. *Payroll and Related Obligations*

169. Included in the Employee headcount are approximately 107 Employees (the "**Union Employees**") who are covered by two collective bargaining agreements (the "**Union Agreements**") with the Utility Workers Union of America, A.F.L. – C.I.O. and Local No. 369, U.W.U.A., A.F.L. – C.I.O (the "**Union**"). All Employees who are not Union Employees are salaried employees (the "**Salaried Employees**"). In the ordinary course of business, the Debtors incur payroll and various other obligations and provide other benefits to their Employees. Maintaining the Debtors' workforce with minimal interruption is critical to maintaining the Debtors' business and operations and to their ability to maximize value through a sale or restructuring.

170. Wage Obligations. The Debtors' average monthly gross payroll based on the last 12 months (i.e., gross wages paid to Employees before Employee taxes or other deductions are withheld) for all Employees is approximately $1,698,051 (the "**Wage Obligations**"). All Salaried Employees and Union Employees of BG Boston are paid biweekly on Fridays for the pay period ending on the prior Sunday. All Union Employees of BG NEPS are paid weekly on Thursdays for the pay period ending on the prior Saturday. The last date Salaried Employees were compensated prior to the Petition Date was August 16, 2010, which primarily included all salaries and wages earned through August 15, 2010. The last date the Union Employees of BG Boston were compensated prior to the Petition Date was August 13, 2010, which primarily included all wages earned through August 8, 2010. The last date the Union Employees of BG NEPS were compensated prior to the Petition Date was August 16, 2010, which primarily included all wages earned through August 14, 2010.

171. The Debtors estimate that, as of the Petition Date, accrued and unpaid prepetition Wage Obligations (i.e., gross wages to be paid to Employees before Employee taxes or other

deductions, including Garnishments (as defined below) are withheld) total approximately $322,605, all of which will likely be due and payable during the Interim Period.[10] The Wage Obligations the Debtors seek authority to pay do not exceed the $11,725 cap per Employee under Section 507(a)(4) of the Bankruptcy Code.[11]

172. <u>Garnishments</u>. In the ordinary course of processing the Employees' payroll, the Debtors, through ADP (as defined below), withhold certain amounts for garnishments such as tax levies, child support, and other court-ordered garnishments (the "**<u>Garnishments</u>**"). The Debtors, through ADP withhold, on average, $11,906 per month on account of Garnishments. As of the Petition Date, the Debtors estimate that approximately $3,259 has accrued and will be deducted by ADP during the Interim Period (the "**<u>Garnishment Obligations</u>**").

173. <u>Payroll Tax Obligations</u>. In connection with the salaries and wages paid to Employees, the Debtors are required by law to withhold from their Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "**<u>Employee Withholding Taxes</u>**") and to remit the same to the applicable taxing authorities (the "**<u>Taxing Authorities</u>**"). In addition, the Debtors are required to make matching payments from their own funds for, among other things, social security and Medicare taxes and to pay, based on a percentage of gross payroll, state and federal unemployment insurance, employment training taxes, and state disability insurance contributions (the "**<u>Employer Payroll Tax Obligations</u>**" and together with Employee Withholding Taxes, "**<u>Payroll Tax Obligations</u>**"). As of the Petition Date, the accrued and unpaid prepetition

---

[10]   Employee Withholding Taxes (as defined below) and Garnishment Obligations (as defined below), constitute approximately $98,653 of the Debtors' total prepetition Wage Obligations outstanding as of the Petition Date.

[11]   This analysis excludes earned and unpaid paid time off and amounts that may be owed under the Performance Award Bonus Program (as defined below). If these additional obligations were accounted for, in addition to the Wage Obligations, as of the Petition Date, such obligations would exceed the $11,725 cap for certain Employees.

CH\1168650.38

Employer Payroll Tax Obligations are approximately $21,537, substantially all of which will become due and payable during the Interim Period.

174.    As is customary in the case of most large companies, the Debtors pay a third party, ADP, to maintain or provide record keeping and other administrative services with respect to their payroll and various Employee benefit programs.  ADP also administers the deductions from Employee payroll for the Employee Benefit Plans (as defined below).  ADP's services cost the Debtors approximately $4,500 per month.  Additionally, the Debtors pay ADP a yearly fee for year-end administrative services of approximately $1,400, which is typically paid in January of the following year.  The Debtors request that they be authorized, but not directed, to pay the various costs incident to maintaining, or paying ADP to maintain and provide, record keeping relating to their payroll and various Employee benefit programs identified in the Employee Wages Motion that may be outstanding as of the Petition Date.  The Debtors believe that accrued but unpaid administrative processing costs owed to ADP total approximately $2,331 as of the Petition Date.

175.    **Reimbursement Obligations**.  The Debtors customarily reimburse their Employees for a variety of business expenses incurred as part of their official duties and in furtherance of the Debtors' businesses, consisting of, among other things, travel expenses and, from time to time, goods purchased by Employees for the benefit of the Debtors' businesses (the "**Reimbursement Obligations**").  In most cases, Employees pay for such expenses directly from their own funds and are reimbursed upon the submission of a claim itemizing the business expenses.  All such expenses are incurred with the understanding that they will be reimbursed by the Debtors in accordance with the Debtors' reimbursement policy.

76

176.     As of the Petition Date, the Debtors are aware of approximately $3,500 in Reimbursement Obligations owed directly to Employees that will become due and owing during the Interim Period.   While the Debtors can provide an estimate of the Reimbursement Obligations, it is difficult for the Debtors to determine the precise amount of Reimbursement Obligations outstanding as of the Petition Date because Employees may have expenses that have yet to be submitted to the Debtors for reimbursement.  As such, the Debtors seek authorization to pay all Reimbursement Obligations in the ordinary course of business, including those incurred prior to the Petition Date, and to continue their policies relating to the Reimbursement Obligations.

177.     <u>Performance Bonus Award Program</u>.  The Debtors maintain a performance bonus award program for certain of the Debtors' Employees (the "**Performance Bonus Award Program**").  Both Union Employees of BG Boston and Salaried Employees participate in the Performance Bonus Award Program.  The Debtors are required to maintain the Performance Bonus Award Program for the Union Employees of BG Boston pursuant to one of the Union Agreements.  Pursuant to the Performance Bonus Award Program, bonuses are dependant on the attainment of certain annual performance goals set by the Debtors.  Goals typically relate to areas such as production efficiency, achieved heat rate, safety, environmental indices, and specific water chemistry parameters.  Bonuses are also dependent on the level, title, and performance of the relevant Employee.  The target amount of an Employee's bonus, historically, has ranged from approximately 7.5% to approximately 50% of the Employee's base salary, though actual payouts have sometimes exceeded those targets based on above target business and individual performance.  In 2010, the Debtors paid approximately $2.8 million in bonus payments to approximately 105 Employees pursuant to the Performance Bonus Award Program for 2009.

CH\1168650.38

Payments under the Performance Bonus Award Program are typically made in late February or early March for the prior year. The Debtors estimate that approximately 97 Employees may become eligible for bonuses under the Performance Bonus Award Program for 2010, in part for services performed prior to the Petition Date, and that the aggregate amount of such payments for services prior to the Petition Date will be approximately $852,692 (the "**Performance Bonus Award Program Obligations**"). The Debtors do not believe that any amounts on account of the Performance Bonus Award Program will be payable during the Interim Period pursuant to the Performance Bonus Award Program.

178. I do not believe that the Performance Bonus Award Program is a retention or severance plan contemplated by Section 503(c) of the Bankruptcy Code as such statute has been explained to me. The Debtors do not seek, under the Employee Wages Motion, the authority to make payments under the Performance Bonus Award Program, or any other bonus program, to insiders (as such term is defined in the Bankruptcy Code), and will not make any such payments without further order of the Court.

179. <u>Temporary Employees</u>. The Debtors maintain a program pursuant to which summer interns, typically college students, are provided by Advantage Technical Resourcing formerly known as TAC Worldwide Companies, a temporary staffing company. The program typically begins in June and ends in August. Currently, there are three college students working at the Debtors' facilities pursuant to the program (the "**Temporary Employees**"). The Temporary Employees are paid weekly and are required to enter their hours worked into a program maintained by Advantage Technical Resourcing. The Debtors are, in turn, invoiced by Advantage Technical Resourcing each Thursday. On average, the Debtors pay approximately $2,625 per week on account of the Temporary Employees. The Debtors estimate that

approximately $10,500 will become due and owing, in the aggregate, for the Temporary Employees before the program expires.

180.     Independent Contractors.  In the ordinary course of business, the Debtors retain one independent contractor to provide information technology services (the "**Independent Contractor**").  The Debtors pay an agency for the services of the Independent Contractor on a monthly basis.  The Debtors expend approximately $7,200 per month for the Independent Contractor's services and estimate that as of the Petition Date, approximately $3,800 is outstanding for services performed prior to the Petition Date (the "**Independent Contractor Obligations**"), all of which will become due and payable in the Interim Period.

b.     *Employee Benefit Plan Obligations*

181.     In the ordinary course of business, the Debtors have established various benefit plans and policies for their Employees which can be divided into the following categories: (i) medical insurance, dental insurance, and vision care (collectively, the "**Health Plans**"); (ii) basic life and accidental death and dismemberment insurance, short-and long-term disability insurance, and travel insurance (collectively, the "**Welfare Plans**" and together with the Health Plans, the "**Health and Welfare Plans**"); (iii) paid time off plans, including vacation and sick days (collectively, the "**PTO Plans**") (the Debtors offer Employees between 40 to 48 hours of sick leave each year which can be used when an Employee is ill or injured and cannot work); (iv) a 401(k) plan (the "**401(k) Plan**"); (v) a Union pension plan (the "**Union Pension Plan**"); (vi) severance plans (the "**Severance Plans**"); and (vii) certain other benefits programs including a retiree medical savings plan, a tuition reimbursement plan, an adoption assistance plan, and a flexible spending plan (the "**Other Benefits Programs**" and together with the Health and Welfare Plans, PTO Plans, the 401(k) Plan, the Union Pension Plan, and the Severance Plans, the

79

"**Employee Benefit Plans**").  In certain instances, the Debtors deduct specified amounts from the Employees' wages in connection with the Employee Benefits Plans, such as, among others, the Health Plans and the 401(k) Plan.

182.   For calendar year 2009, the Debtors' expenditures under all Employee Benefit Plans, including Employee contributions and administration costs, totaled approximately $7,062,369, of which approximately $2,726,780, or 38.6 percent, was funded by Employee contributions.  All obligations with respect to the Employee Benefit Plans (including insurance policies and coverage) are hereinafter referred to as the "**Employee Benefit Obligations**," which include the obligations arising under the various plans described below.  The majority of the Employee Benefit Obligations are paid in advance each month.  As of the Petition Date, the Debtors believe that the accrued and unpaid prepetition Employee Benefit Obligations, excluding Employee contributions, is approximately $130,402.[12]  Employee contributions that have already been deducted from employee wages with respect to Employee Benefit Obligations, but have not yet been transmitted to the appropriate third party, are approximately $46,467.

183.   <u>Health and Welfare Plans</u>.  The Debtors provide their Employees with a standard range of Health and Welfare Plans.  Participants in the Health and Welfare Plans include the Debtors' Employees and their eligible dependents.  An Employee's eligibility to participate in the Health and Welfare Plans is determined by his or her union or salaried status, as well as the duration of the Employee's employment.  The Health and Welfare Plans are administered by several different vendors, including HMO Blue New England and the Blue Care Elect Preferred (PPO), Delta Dental, Eastern Vision Service Plan, Inc., Prudential Insurance Company of America, Hartford Life Insurance Company, and Ace American Insurance Company.

---

[12]     This calculation does not include PTO Obligations as any such accrued PTO Obligations do not represent a current cash pay obligation.

CH\1168650.38

Approximately $89,625 is deducted from Employees' wages each month on account of the Health and Welfare Plans. During calendar year 2009, the Debtors paid approximately $3,472,820 to provide the Health and Welfare Plans to their Employees, of which approximately $774,365, or 27 percent, was funded by Employee contributions.

a.  <u>Medical Plan Coverage</u>.[13]  The Debtors offer all Employees a choice of two medical plan options, both of which are administered by HMO Blue New England and the Blue Care Elect Preferred (PPO) through Blue Cross/Blue Shield of Massachusetts (the "**Healthcare Plans**"). The HMO Blue New England Plan is a health maintenance organization plan and the Blue Care Elect Preferred Plan is a preferred provider organization. All Employees, along with their spouses and eligible dependants, may participate in either the HMO Blue New England Plan or the Blue Care Elect Preferred Plan. The Debtors pay a portion of the cost of the Healthcare Plans. Depending on the coverage options chosen, Employees may be required to make contributions to the Healthcare Plans via payroll deductions on a pre-tax basis. Typically, the Debtors pay approximately 80% of the costs of the Healthcare Plans and the Employees pay the remaining 20%. On average, the Debtors pay approximately $268,000 per month to maintain the Healthcare Plans (exclusive of Employee contributions), and withhold approximately $53,000 per month from Employees' wages in respect of the Healthcare Plans. As of the Petition Date, the Debtors do not believe there are any accrued and unpaid prepetition amounts on account of the Health Care Plans. Approximately $33,513 has already been deducted from the Employees' wages in respect of the Healthcare Plans but has not yet been transferred to the appropriate provider.

b.  <u>Dental Plan Coverage</u>.  The Debtors offer dental coverage for the Debtors' Employees with Delta Dental under the Delta Dental PPO Plus Premier Program (the "**Dental Plan**"). All Employees, along with their spouses and eligible dependants, may participate in the Dental Plan. The Debtors pay a portion of the cost of the Dental Plan. Depending on the coverage options chosen, Employees may be required to make contributions to the Dental Plan via payroll deductions on a pre-tax basis. The Debtors pay approximately $22,200 per month to maintain the Dental Plan (exclusive of Employee contributions) and withhold approximately $4,500 per month from Employees' wages in respect of the Dental Plan. As of the Petition Date, the Debtors do not believe there are any accrued and unpaid prepetition amounts on account of the Dental Plan. Approximately $2,830 has already been deducted from the Employees' wages in respect of the Dental Plan but has not yet been transferred to the appropriate provider.

---

[13]  Employees have the opportunity to continue their health insurance at the full health insurance premium for a period of approximately 18 months through the Consolidated Omnibus Budget Reconciliation Act (COBRA) if their employment is terminated.

c. _Vision Plan Coverage_. The Debtors offer vision coverage to the Employees under a Group Vision Care Policy provided by Eastern Vision Service Plan, Inc. (the "**Vision Plan**"). All Employees, along with their spouses and eligible dependants, may participate in the Vision Plan, and Employees are provided a choice of three different Vision Plan alternatives. The Debtors pay a portion of the costs associated with the Vision Plan, while the Employee contribution depends on the plan alternative the specific Employee has selected. The Debtors pay approximately $3,200 per month to maintain the Vision Plan (exclusive of Employee contributions) and withhold approximately $1,200 per month from Employees' wages in respect of the Vision Plan. As of the Petition Date, the Debtors do not believe there are any accrued and unpaid prepetition amounts on account of the Vision Plan. Approximately $993 has already been deducted from the Employees' wages in respect of the Vision Plan but has not yet been transferred to the appropriate provider.

d. _Long Term Disability Coverage_. The Debtors maintain long term disability plans with Prudential Insurance Company of America for the benefit of Union Employees of BG Boston, Union Employees of BG NEPS, and Salaried Employees of BG NEPS ("**Prudential LTD Plans**"). Under the Prudential LTD Plans, all covered Employees, who typically work at least 30 hours per week and are disabled for a period greater than 180 days, are entitled to receive 60% of their monthly earnings. Under this option, the Prudential LTD Plans are paid for entirely by the Debtors. Additionally, eligible Union Employees of BG NEPS may choose to increase the coverage to 70% of monthly earnings. Under this option, there is a required employee contribution in addition to the amounts paid by the Debtors. Under either option, the benefits under the Prudential LTD Plans are capped at $7,500 per month per Employee. The Debtors fund the Prudential LTD Plans in its entirety, except for employees opting for the higher coverage benefits, and pay approximately $7,000 per month to maintain these plans (inclusive of Employee contributions). As of the Petition Date, the Debtors do not believe there are any accrued and unpaid prepetition amounts on account of the Prudential LTD Plans. Approximately $811 has already been deducted from the Employees' wages in respect of the Prudential LTD Plans but has not yet been transferred to the appropriate provider.

e. _Short Term Disability_. The Debtors also maintain a short-term disability insurance plan (the "**STD Plan**"). The STD Plan is funded and administered entirely by the Debtors. Employees are automatically enrolled in the STD Plan, and plan coverage begins after five business days of approved disability due to illness or injury. Pursuant to the STD Plan, Employees typically receive 100% of base pay for weeks two through thirteen of approved disability, after which the benefit is paid at 60% through week 26 (subject to coordination with other disability benefits to which the Employee may be entitled). When the benefit drops to 60% of base pay, Employees have the option of requesting a supplementary payment using any or all of the vacation time for which the Employee is eligible in order to supplement the STD Plan benefits. The STD Plan applies to Employees who are away from work for maternity leave or substance abuse rehabilitation leave. The Debtors fund the STD Plan in its entirety and pay approximately $184,468 per year to maintain this plan. As of the Petition Date, the Debtors believe that approximately $1,872 has accrued in the prepetition period on account of the STD Plan, all of which will become due and owing during the Interim Period.

f.     Life and AD&D Coverage.  The Debtors maintain basic life and accidental death and dismemberment insurance for the Employees through Hartford Life Insurance Company (the "**Life and AD&D Insurance Policies**").  The cost of the Life and AD&D Insurance Policies is paid by the Debtors, although Employees are responsible for costs associated with certain "buy-up" options.  The Debtors pay approximately $15,500 per month to maintain this coverage (exclusive of Employee contributions) and withhold approximately $12,750 per month from Employees' wages in respect of the Life and AD&D Insurance Policies.  As of the Petition Date, the Debtors do not believe there are any accrued and unpaid prepetition amounts on account of the Life and AD&D Insurance Policies.  Approximately $8,318 has already been deducted from the Employees' wages in respect of the Life and AD&D Insurance Policies but has not yet been transferred to the appropriate provider.

g.     Travel Insurance Plan. The Debtors maintain a business travel insurance policy with Ace American Insurance Company for the benefit of all Employees of BG New England (the "**Business Travel Insurance Policy**").  The Debtors pay approximately $1,900  per year to maintain this coverage.  As of the Petition Date, the Debtors do not believe that there are any accrued and unpaid amounts due on account of the Business Travel Insurance Policy.

184.     Paid Time Off Benefits.  Employees are eligible, in certain circumstances, to receive their full wages for, among other things, vacation, personal days, and holidays (the "**PTO Obligations**").  The specifics of the PTO Obligations vary based upon whether the Employee is a Salaried Employee, a Union Employee of BG Boston, or a Union Employee of BG New England.  The rate at which Employees earn paid vacation varies depending upon how long an Employee has been employed, and the segment of the Debtors' business in which the Employee works.  As of the Petition Date, the Debtors estimate that they have approximately $1,196,855 of earned but unpaid PTO Obligations under the PTO Plans.  This amount is not a current cash pay obligation as Employees are only entitled to be paid for accrued and unused vacation time, personal days and holidays (if payable by law) in the event they are terminated.  Because the PTO Plans are essential features of the employment package provided to the Debtors' Employees, and failure to provide these benefits would harm Employee morale and encourage the premature departure of valuable Employees, in the Employee Wages Motion the Debtors request authority to honor all of their PTO Obligations as and when they come due in the ordinary course of business.

83

185.  <u>401(k) Plan</u>.  Debtors maintain three retirement savings plans pursuant to Section 401 of the Internal Revenue Code (the "**401(k) Plans**").  The 401(k) Plans are administered by Fidelity Management Trust Company ("**Fidelity**").  All Employees who have been employed by the Debtors for at least three months are eligible to participate.  The Employees may contribute pre-tax earnings to the 401(k) Plans up to the maximum yearly annual amount set by the Internal Revenue Service (the "**Employee Contributions**").  For Employees with the required amount of service time, the Debtors provide a mandatory matching of 100% of the first 5% of the pre-tax earnings contributed to the 401(k) Plans by the Salaried Employees per pay period and an additional discretionary matching of 100% of the first 5% of the pre-tax earning contributed by the Salaried Employees per quarter, 100% of the first 4% of the pre-tax earnings contributed to the 401(k) Plans by the Union Employees of BG Boston per pay period, and 100% of the first 3% of the pre-tax earnings contributed to the 401(k) Plans by the Union Employees of BG New England per pay period (the "**Matching Contribution**").  The administrative expenses incurred in connection with the 401(k) Plans are funded entirely by the Debtors.  The administrative fees paid to Fidelity average approximately $3,000 per year (the "**Administrative Fees**" and together with the Employee Contributions and the Matching Contribution, the "**401(k) Plan Obligations**").  On average, the Debtors contribute approximately $247,650 per quarter on account of the 401(k) Plan Obligations.  As of the Petition Date, the accrued and unpaid portion of the 401(k) Plan Obligations total approximately $128,951.  Approximately $32,879 has been deducted from Employees' wages in respect of the 401(k) Plans but has not yet been transferred to Fidelity.

186.  <u>Union Pension Plan</u>.  The Debtors maintain the BG New England Union Employees Pension Plan, effective August 19, 2005, for the benefit of certain Union Employees

at BG NEPS and BG Boston. The Union Pension Plan is maintained in order to satisfy certain obligations under the Union Agreements. The Union Pension Plan succeeds, and is substantially identical to, the prior plan in which Union Employees participated as of August 31, 2004. As of January 1, 2009, the Union Pension Plan was underfunded by approximately $987,383.

187. The Union Pension Plan has two separate benefit formulas, referred to in the Union Pension Plan as "Plan A" and "Plan B." Plan A is a cash balance pension benefit formula. Plan B is a modified traditional defined benefit pension formula. Both Plan A and Plan B are components of a single employer plan under ERISA, which is intended to qualify under Section 401(a) of the Internal Revenue Code. Union Employees become eligible for Plan A participation after being credited with at least one thousand hours of service during a plan year. Employees eligible for Plan A receive a pay credit to the Employee's cash balance account equal to five percent of the Employee's compensation for a calendar year quarter. Interest credits are determined based on the first day of each calendar quarter, and added to the Employee's cash account on the last day of such quarter. Generally, the annual rate of interest used to determine interest credits is the annual average of the yield on one-year constant maturity Treasury Bill rates in the preceding year plus one percent. Employees are generally eligible to participate in Plan B of the Union Pension Plan if the Union Employee was age forty-five or older and employed by Sithe New England Power Service, Inc. on December 31, 2000, declined as of that date to make an irrevocable election to transfer into coverage under Plan A, and is not otherwise accruing benefits under Plan A. Under Plan B, a Union Employee receives certain retirement benefits calculated pursuant to a formula set forth in the Union Pension Plan.

188.     On average, the Debtors contribute approximately $842,000 per year to the Union Pension Plan.  The estimated contributions for 2010, in the aggregate, are $496,646.[14]  The Debtors are currently scheduled to make their next payment to US Bank on account of the Union Pension Plan on October 15, 2010, and the amount of the payment is scheduled to be $115,000.

189.     <u>Severance Plans and Obligations</u>.  The Debtors maintain a severance plan for the Salaried Employees (the "**<u>Severance Plan</u>**") pursuant to which Employees will be provided certain benefits and payments upon termination of employment.  The Severance Plan generally provides for three weeks of base pay per year of service, from a minimum of 12 weeks to a maximum of 66 weeks, as well as continued health coverage, employee benefits, and outplacement assistance.  For certain Salaried Employees, the policy provides for a minimum of 27 weeks to a maximum of 66 weeks.  An Employee's entitlement to the above referenced benefits is conditioned upon the Employee signing and properly submitting a waiver and general release, in the form provided by the Debtors, which releases all claims the Employee may have against the Debtors, as well as certain other related parties such as the officers, directors, and other Employees of the Debtors.  Employees terminated for "cause" are not eligible for severance benefits.  Additionally, approximately five (5) of the Salaried Employees have entered separate letter agreements with the Debtors whereby the Salaried Employees will receive different severance benefits upon termination.  These letters generally provide that the Employees party thereto are entitled to between nine (9) and twelve (12) months of the Employee's base pay, as well as continuation of the Employee's medical and dental benefits through COBRA for the same amount of time, in the event the Employee is terminated without cause as a direct result of a change in control due to a sale, merger, or other substantial change in

---

[14]     The Debtors' required contribution to the Union Pension Plan varies depending on market fluctuations in the prior year.  As a result of such fluctuations during 2009, the Debtors' projected contributions for 2010 are lower than the typical year.

CH\1168650.38

the beneficial ownership of either US Power Generating Company or any of US Power Generating Company's affiliates, including the Debtors. Employees that are party to such agreements may choose either the severance under the letter agreement or the severance under the Debtors' standard severance policy. As of the Petition Date, the Debtors do not owe severance payments to any Employee.

190. I believe that it is imperative that the prepetition Severance Plan be permitted to continue postpetition. Continuing the Severance Plan is necessary to preserve the goodwill and morale of current Employees. The Debtors' current employees rely on the expectation that the Severance Plan will provide them with income protection in the event they are terminated without cause, and, as such the Severance Plan represents a key component of the Debtors' retention effort which is critical to maintaining staffing essential to the ongoing operation of the Debtors' business. The Debtors' businesses rely heavily on their Employees, and a failure to continue the Severance Plan would inevitably result in decreased Employee morale and confidence, consequences that would thwart the Debtors' efforts to maximize value during these Chapter 11 Cases.

191. <u>Other Benefit Plans</u>. The Debtors provide a number of miscellaneous benefits to Employees (the "**Other Benefits Programs**"). The Debtors believe that the amounts owing on the Petition Date on account of these Other Benefits Programs are approximately $32,168 in the aggregate (including any Employee contributions). Pursuant to the Employee Wages Motion, the Debtors seek authority, but not direction, to pay any outstanding prepetition obligations under the Other Benefits Programs and to continue these benefits postpetition. The Other Benefits Programs include, but are not limited to, the following:

a. <u>Flexible Spending Plan</u>. The Debtors have established a flexible spending account plan (the "**Flexible Spending Plan**") which provides eligible Employees the opportunity

to choose a Health Care Spending Account and/or a Dependant Care Spending Account. The Health Care Spending Account is intended to qualify as a medical expense reimbursement plan under Section 105 of the Internal Revenue Code, and the Dependant Care Spending Account is intended to qualify as a dependent care assistance plan under Section 129 of the Internal Revenue Code. Under the Flexible Spending Plan, Employees may choose from a combination of pre-tax contributions to fund the accounts available under the Flexible Spending Plan during an annual election period. The Debtors have an obligation under the Flexible Spending Plan to apply Employee contributions to fund benefits as soon as administratively feasible. The Debtors are responsible for the reasonable expenses incurred in administering the Flexible Spending Plan, although if Employee contributions remain unused at the end of the year then such Employee contributions may be used to pay administrative expenses in connection with the Flexible Spending Plan. The Debtors pay approximately $500 per month to maintain the Flexible Spending Plan and withhold approximately $7,144 per month from Employees' wages in respect of the Flexible Spending Plan. As of the Petition Date, approximately $16,912 has been deducted from the Employees' wages in respect of the Flexible Spending Plan. The Flexible Spending Plan is administered by ADP, and the Debtors, on average, pay ADP approximately $328 per month for such services. As of the Petition Date, the Debtors estimate that approximately $328 is owing to ADP for administrative services in connection with the Flexible Spending Plan.

      b.    <u>Union Retiree Medical Savings Plan</u>. The Debtors maintain a post-employment medical savings account plan (the "**Union Retiree Medical Savings Plan**") as required by the Union Agreements. Union Employees of BG NEPS are eligible to participate when the Employees are 35 years old. There is no age requirement for Union of Employees of BG Boston. The Union Retiree Medical Savings Plan is designed to qualify under Section 105(b) of the Internal Revenue Code as a medical expense reimbursement plan and is maintained for the purpose of enabling former Union Employees to defray the cost of certain health care expenses. Covered Union Employees may defer any portion of the Employee's after-tax wages to the Union Retiree Medical Savings Plan (the "**Deferred Salary Contributions**"). The Debtors make certain notional matching contributions up to a capped amount per Employee (the "**Notional Contributions**"). In addition, the Debtors make a flat monthly cash contribution of approximately $12,762 to the Utility Workers Union of America Health and Welfare Fund (the "**Union Fund**") on behalf of the Union Employees of BG NEPS (the "**Union Contributions**"). When expenses are incurred by a retiree covered by the Union Retiree Medical Savings Plan, the retiree will submit receipts or invoices to the Debtors for the amount (the "**Retiree Payable**"). The Debtors will then pay the Retiree Payable from the Notional Contributions that had accrued for that specific retiree. If there are no remaining Notional Contributions amounts for that specific retiree, then the Debtors' will pay the Retiree Payable from the retiree's Deferred Salary Contributions. If there are no remaining Deferred Salary Contributions for the specific retiree, then, if the retiree had previously been a Union Employee of BG NEPS, the Union Fund will pay the Retiree Payable up to the specific retiree's portion of the Union Contributions. If there are no remaining amounts in any of the accounts the benefit is exhausted and the Debtors no longer have any further obligation. As of the Petition Date, there are five (5) retirees who are participants in the Retiree Medical Savings Plan. Upon the death of a retiree covered by the Union Retiree Medical Savings Plan, the spouse, or other beneficiary, of the retiree may elect to receive a one time death benefit payout, rather than continued payment of medical expenses. On average, the Debtors pay approximately $21,000 per month on account of the Union Retiree

Medical Savings Plan, which includes the $12,762 payment to the Union Fund. As of the Petition Date, the accrued and unpaid contributions under the Retiree Medical Savings Plan total approximately $20,000, all of which will become due and payable during the Interim Period.

c. <u>Tuition Reimbursement Plan</u>. The Debtors have a tuition reimbursement policy for Salaried Employees for certain courses or degree programs in engineering, computer/information technology, physics, mathematics, chemistry, business, and other similar programs (the "**Tuition Reimbursement Plan**"). Under the Tuition Reimbursement Plan, Salaried Employees may receive up to $10,000 per year for undergraduate studies and up to $15,000 per year for graduate studies. The Debtors paid approximately $15,700 on account of the Tuition Reimbursement Plan during 2009. As of the Petition Date, accrued and unpaid amounts under the Tuition Reimbursement Plan total approximately $11,840.

d. <u>Other Policies.</u> The Debtors also maintain an adoption assistance policy, an employee assistance program, a military leave policy, and a jury duty policy. The Debtors believe that a *de minimis* amount was accrued and unpaid under these other policies as of the Petition Date.

192. I believe that the relief requested in the Employee Wages Motion is necessary for the Debtors' businesses to continue to operate in the ordinary course of business to maximize value for all stakeholders. The Employees are vital to the success of the Chapter 11 Cases. I believe that the relief sought in the Employee Wages Motion is entirely consistent with the intent of Section 105(a) of the Bankruptcy Code and the rehabilitative purpose of chapter 11. I believe that any delay or failure to pay wages, salaries, benefits, and other similar items would irreparably impair the Employees' morale, dedication, confidence, and cooperation, and would adversely impact the Debtors' relationship with their Employees at a time when the Employees' support is critical to these Chapter 11 Cases and to their restructuring efforts. At this early stage, I believe that the Debtors simply cannot risk the substantial damage to their businesses that would inevitably result from a rapid decline in their Employees' morale

## L. Distrigas Assumption

193. In the Distrigas Assumption Motion, the Debtors seek entry of an order providing certain protections to Distrigas and GDF SUEZ Energy North America, Inc. (**SUEZ**) in connection with the ARGA, the Non-Firm Gas Agreement and related agreements set forth on

Schedule I to the Distrigas Assumption Motion (as may have been or may be amended, restated, supplemented or otherwise modified from time to time, the "**Distrigas Contracts**"). Additionally, the Debtors request the scheduling of a final hearing to consider entry of the Final Order (a) granting the relief requested in the interim order, (b) authorizing the assumption of the Distrigas Contracts to the extent permitted by Sections 105(a), 363(b) and 365(a) of the Bankruptcy Code, (c) authorizing the payment of all amounts due under the Distrigas Contracts (the "**Cure Amounts**"), and (d) authorizing the Debtors to maintain the Distrigas Collateral (as defined below) for the benefit of Distrigas.

194.     The Debtors' obligations under certain of the Distrigas Contracts are secured by letters of credit in the amount of $76.5 million (the "**Distrigas Collateral**"), and some of Distrigas' obligations are guaranteed by SUEZ pursuant to that certain Irrevocable Guaranty, dated April 23, 2008, by SUEZ in favor of Mystic Development, LLC (the "**Guaranty**").

195.     Prior to the Petition Date, Distrigas asserted that some or all of the Distrigas Contracts are entitled to the protections provided in Sections 556, 560 and/or 561 of the Bankruptcy Code (the "**Safe Harbor Provisions**").   Although the Debtors dispute this contention, so as to ensure the continued and uninterrupted performance by Distrigas and SUEZ under the Distrigas Contracts and to eliminate any risk that any of the Distrigas Contracts may be terminated, on August 18, 2010, Mystic Development, LLC, Mystic I, LLC, Distrigas and SUEZ entered into the Prepetition Assurance and Amendment Agreement (the "**Distrigas Assurance Agreement**") which is attached to the Distrigas Assumption Motion as Exhibit C.  Pursuant to the terms of the Distrigas Assurance Agreement, the Debtors agreed to file the Distrigas Assumption Motion in order to assume the Distrigas Contracts as executory contracts under Section 365(a) of the Bankruptcy Code and Distrigas and SUEZ have agreed to defer the

CH\1168650.38

exercise of any right they may have to liquidate or terminate any of the Distrigas Contracts because of a condition of the kind specified in Section 365(e) of the Bankruptcy Code (the "**Delayed Remedies**") until the Final Order is entered provided that the Interim Order is entered within five business days of the Petition Date and the Final Order is entered within 55 days after entry of the Interim Order. Upon entry of the Final Order, Distrigas and SUEZ have agreed to waive any further utilization or enforcement of the Delayed Remedies, to the extent either of them are entitled to exercise any such remedies, during the Chapter 11 Cases.

196. The Distrigas Contracts are critical to the Debtors' operations. The entity selected to be the stalking horse bidder for the sale of substantially all of the Debtors' assets (the "**Stalking Horse Bidder**") has included the Distrigas Contracts in its list of contracts to be assumed and assigned upon the closing of the sale. Given the importance of the efficient and timely supply of gas to the Debtors' facilities, I believe that, in the event the Stalking Horse Bidder is not the prevailing party at an auction for the Debtors' assets, it is likely that the ultimate purchaser of the Debtors' assets will similarly request that the Distrigas Contracts be assumed and assigned to it upon the closing of a sale. Finally, the Distrigas Contracts are plainly necessary for the continuation of the Debtors' business, regardless of the intent of any purchaser to assume the Distrigas Contracts.

197. In addition, under the terms of the Distrigas Assurance Agreement, the Debtors agreed to request interim authorization from the Court (the "**Interim Order**") to:

      o  pay all amounts (other than termination payments) required by the Distrigas Contracts, including without limitation payments due for prepetition deliveries, postpetition deliveries on prepetition contracts, monthly settlement payments, or contract damages for failure to perform under the Distrigas Contracts, from encumbered or unencumbered assets;

- o pay for the postpetition performance of obligations at the prices and pursuant to the terms specified in the Distrigas Contracts with all such payments being free and clear of any prior liens, claims or encumbrances;

- o continue to maintain collateral, including the Distrigas Collateral, for the benefit of Distrigas in accordance with the Distrigas Contracts, which collateral shall not be subject to any prior liens, claims, or encumbrances;

- o permit Mystic to recognize, enforce, and allow any offset, netting, or cross-netting provisions in any of the Distrigas Contracts;

- o except as otherwise provided in the Distrigas Assurance Agreement, permit Distrigas and SUEZ the right to exercise any and all contractual remedies upon prospective defaults or terminations under the Distrigas Contracts;

- o in the event of the rejection of any Distrigas Contract pursuant to Section 365 of the Bankruptcy Code, provide that the determination of any settlement payments or termination payments owing under such Distrigas Contract shall be made pursuant to the terms of the Distrigas Contract as of the date such contract is actually terminated;

- o include findings and protections consistent with Section 364(e) of the Bankruptcy Code;

- o provide that the benefits and protections of the Interim Order shall also apply to all new transactions executed following entry of the Interim Order, regardless of whether the transaction matures after the expiration of the Interim Order; and

- o provide that the Interim Order shall remain in effect for a minimum of fifty-five (55) days or until entry of the Final Order.

198.  It is my belief that the assumption of the Distrigas Contracts is in the best interests of the Debtors and their estates.  Distrigas is the sole provider of natural gas to the Debtors' Mystic 8 and Mystic 9 facilities at a below market rate.  Because of Distrigas's significant investment in infrastructure, there are simply no alternative suppliers to whom the Debtors could turn if Distrigas ceased providing natural gas to the Mystic 8 and Mystic 9 facilities and the Debtors operations would grind to a halt.  Furthermore, the Stalking Horse Bidder has indicated its desire to have the Distrigas Contracts assigned to it upon the closing of a sale and has

CH\1168650.38

conditioned the closing on the Debtors' commitment to use their best efforts to assume the Distrigas Contracts at the outset of these Chapter 11 Cases.

199.    It is my understanding that the Debtors owe Distrigas approximately $50,700,00 pursuant to the Distrigas Contracts, as of the date hereof.  I believe that there are no other existing defaults under the Distrigas Contracts.  The Debtors intend to pay this amount to Distrigas upon entry of the final order approving the Distrigas Assumption Motion.  Moreover, in the Distrigas Assumption Motion, the Debtors are requesting authorization to maintain the Distrigas Collateral for the benefit of Distrigas pursuant to the terms of the Distrigas Contracts. Distrigas, therefore, has adequate assurance of future performance.

200.    Accordingly, with payment of all outstanding amounts and continued maintenance of the Distrigas Collateral, the Debtors will have cured all defaults existing under the Distrigas Contracts and will have provided adequate assurance of future performance, thereby satisfying the requirements of Section 365(b) of the Bankruptcy Code.  I believe that the relief requested in the Distrigas Assumption Motion is in the best interests of the Debtors and the Debtors' estates and should be granted.

**M.    <u>Cash Collateral</u>**

201.    The Debtors seek entry of an order (a) authorizing the Debtors to use Cash Collateral on an interim basis pursuant to Section 363(a) of the Bankruptcy Code; (b) approving pursuant to Section 361 of the Bankruptcy Code the form of adequate protection to be provided to the Debtors' prepetition secured lenders; (c) vacating the automatic stay imposed by Section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the Final Order; (d) waiving any applicable stay and providing for the immediate effectiveness of the Interim Order; (e) prescribing the form and manner of notice and scheduling the Final Hearing to consider entry of the Final Order; and (f)

granting related relief. As described below, I believe the relief sought in the Cash Collateral Motion is essential an in the best interests of the Debtors' estates.

202. I believe the use of Cash Collateral on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors pending the final hearing. Currently, the Debtors lack sufficient unencumbered funds with which to operate their business on an ongoing basis. The Debtors thus have an immediate postpetition need for the use of Cash Collateral and request authority to use Cash Collateral for the orderly continuation of the operation of the businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital.

203. The consenting first lien lenders have consented to the Debtors' use of Cash Collateral pursuant to the terms detailed in the Cash Collateral Motion in exchange for the Debtors' provision of the following adequate protection: (a) adequate protection replacement liens; (b) adequate protection super-priority claims; and (c) interest, professional fees and information. This consent was the result of good faith, arms' length negotiations between the first lien agent and the Debtors.

204. The Debtors have in good faith prepared a 32-week cash flow budget (the "**Approved Budget**"), reflecting the Debtors' weekly projected aggregate cash receipts, operating expenses and disbursements, capital expenditures and unrestricted cash on hand. The Debtors' use of Cash Collateral is subject to the Approved Budget. As part of complying with the Approved Budget, the Debtors agreed that, for each 4-week period set forth in the Approved Budget, (i) the Debtors' aggregate operating expenses and disbursements (excluding professional fees and fuel expenses) cannot exceed 115% of the aggregate amount budgeted for each such 4-week period pursuant to the Approved Budget; and (ii) the aggregate cumulative capital

94

expenditures by the Debtors during the period between the Petition Date and March 31, 2010 cannot exceed $17,500,000. The Debtors expect that they will be able to comply with the Approved Budget.

205. I believe that, absent authorization to use Cash Collateral, the Debtors all but certainly will be unable to sustain their businesses and, as a result, will have to terminate their operations and liquidate their assets, all to the material detriment of all parties in interest.

### III. OVERVIEW OF LOCAL BANKRUPTCY RULE 1007-2 SCHEDULES

206. Local Bankruptcy Rule 1007-2 requires that certain information about the Debtors be provided in this First Day Declaration. This required information is provided in the schedules attached to this First Day Declaration. Specifically, the schedules contain the following information with respect to the Debtors:[15]

- Pursuant to Local Bankruptcy Rule 1007-2(a)(3), Schedule 1 provides contact information for legal representatives of the Informal Group of First Lien Lenders and the Informal Group of Second Lien Lenders and Mezzanine Lenders organized prior to the commencement of the Debtors' chapter 11 cases.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(4), Schedule 2 provides information with respect to the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(5), Schedule 3 provides information with respect to the holders of the five largest secured claims against the Debtors on a consolidated basis.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(6), Schedule 4 provides a summary of the Debtors' assets and liabilities on a consolidated basis.

---

[15] The information contained in the schedules of this First Day Declaration shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. Unless otherwise indicated, the financial information contained in the schedules is unaudited. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. Capitalized terms used in the schedules that are not otherwise defined therein shall have the meanings ascribed to them in the preceding paragraphs of this declaration.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(7), Schedule 5 provides information on the Debtors' outstanding publicly held securities.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(8), Schedule 6 provides information on the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents or secured creditor or agent for any such entity.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(9), Schedule 7 provides information on the property or premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(10), Schedule 8 lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(11), Schedule 9 lists the nature and present status of each action or proceeding, pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(12), Schedule 10 provides the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

- Pursuant to Local Bankruptcy Rules 1007-2(b)(1)-(2)(A) and (C), Schedule 11 lists the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors and managers) and the estimated amount to be paid to officers, managers, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the filing of these cases.

- Pursuant to Local Bankruptcy Rule 1007-2(b)(3), Schedule 12 provides the Debtors' estimated cash receipts and disbursements.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

CH\1168650.38

## IV.     CONCLUSION

Accordingly, for the reasons states herein and in each of the First Day Pleadings, the Debtors request that the relief sought in the First Day Pleadings be approved.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: August 18, 2010

/s/ Jeff Hunter
Jeff Hunter
Manager, Executive Vice President and Chief
Financial Officer
EBG Holdings LLC

CH\1168650.38