D. J. Baker
Robert J. Rosenberg
Caroline A. Reckler (appearing *pro hac vice*)
Kimberly A. Posin (appearing *pro hac vice*)
Jason B. Sanjana
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

Proposed Counsel to the Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Boston Generating, LLC, <br> et al.,[1] | Case No. 10-10-14419 (SCC) |
| Debtors. | Joint Administration Requested |

**MOTION OF THE DEBTORS FOR ENTRY OF (I) AN ORDER APPROVING AND AUTHORIZING (A) BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS, (B) STALKING HORSE BID PROTECTIONS, (C) PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS, (D) THE FORM AND MANNER OF NOTICE OF THE SALE HEARING AND (E) RELATED RELIEF; AND (II) AN ORDER APPROVING AND AUTHORIZING (A) THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS FREE AND CLEAR OF CLAIMS, LIENS, LIABILITIES, RIGHTS INTERESTS AND ENCUMBRANCES, (B) THE DEBTORS TO ENTER INTO AND PERFORM THEIR OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT, (C) THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) THE TRANSITION SERVICES AGREEMENT AND (E) RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Boston Generating, LLC (0631); EBG Holdings LLC (3635); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC (7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

## Motion Contents

Jurisdiction and Venue ................................................................................................. 3

Introduction ................................................................................................................... 4

Relief Requested ........................................................................................................... 4

Factual Background ...................................................................................................... 6

    I.     The Debtors' Business and Operations ........................................................ 6

    II.    Decision to Sell the Debtors' Assets ............................................................ 6

    III.   Support of First Lien Lenders to Sell the Debtors' Assets and Sale Support
        Agreement ..................................................................................................... 8

Overview of the Proposed Sale ................................................................................... 9

    IV.   Material Terms of the APA ......................................................................... 10

    V.    "Extraordinary Provisions" Under the Sale Guidelines ............................. 13

Bidding Procedures Order .......................................................................................... 14

    VI.   Outline of the Bidding Procedures ............................................................. 14

    VII.  Summary of the Assumption Procedures .................................................... 16

Basis for Relief ............................................................................................................ 17

    VIII. The Bidding Procedures Order Should be Entered on the Terms Proposed ................. 17

        A.    The Bidding Procedures Are Fair, Appropriate and Should be Approved ........... 17

        B.    The Bid Protections Have A Sound Business Purpose and Should be Approved 19

        C.    The Assumption Procedures Are Appropriate and Should be Approved ............. 22

        D.    The Form and Manner of the Sale Notice, the Contract Notice, and the
            Assumption Notice Should be Approved ...................................................... 23

    IX.   The Sale Order Should be Entered on the Terms Proposed ......................... 25

        A.    The Sale Should be Approved as an Exercise of Sound Business Judgment ....... 25

        B.    The Sale Should be Approved "Free and Clear" Under § 363(f) ......................... 29

        C.    Assumption and Assignment of Contracts and Leases Should be Approved ...... 31

Motion Practice ........................................................................................................... 34

Notice ........................................................................................................................... 34

No Prior Request ......................................................................................................... 35

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), file this motion (the "**Motion**") for entry of the Bidding Procedures Order (as defined below) attached hereto as Exhibit A and the Sale Order (as defined below) attached hereto as Exhibit B. The facts and circumstances supporting this Motion are set forth in the Declaration of Carsten Woehrn in Support of the Debtors' Motion for Entry of (I) an Order Approving and Authorizing (A) Bidding Procedures in Connection With the Sale of Substantially All of the Assets of the Debtors, (B) Stalking Horse Bid Protections, (C) Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With the Sale of Substantially All of the Assets of the Debtors, (D) the Form And Manner of Notice of the Sale Hearing and (E) Related Relief; and (II) an Order Approving And Authorizing (A) the Sale Of Substantially All of the Assets of the Debtors Free and Clear of Claims, Liens, Liabilities, Rights Interests And Encumbrances, (B) the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement, (C) the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases, (D) the Transition Services Agreement, and (E) Related Relief (the "**Woehrn Declaration**") attached hereto as Exhibit C. In further support of this Motion, the Debtors respectfully state as follows:

**Jurisdiction and Venue**

1.     This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases (as defined below), and no official statutory committees have been appointed or designated by the Office of the United States Trustee.

CH\1171503.25

2.      The statutory bases for the relief requested herein are Sections 105(a), 363, 365, 503, 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 2002-1, 6004-1, 6006-1 and 9006-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**") and the Amended Guidelines for the Conduct of Asset Sales established and adopted by the United States Bankruptcy Court for the Southern District of New York pursuant to General Order M-383 (the "**Sale Guidelines**").

## Introduction

3.      On August 18, 2010 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The Debtors are operating their business and managing their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

## Relief Requested

4.      *First*, by this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"):

    a.      authorizing and approving bidding procedures, substantially in the form attached hereto as **Exhibit D** (the "**Bidding Procedures**"), in connection with the receipt and analysis of competing bids for the sale (the "**Sale**") of substantially all the Debtors' assets, including customary bid protections for the Stalking Horse Bidder (as defined below) pursuant to the Asset Purchase Agreement dated August 7, 2010, (the "**APA**"), attached hereto as **Exhibit E**, between the Debtors, as sellers, Constellation Holdings, Inc. or its designee, as buyer (the "**Buyer**" and "**Stalking Horse Bidder**"), and Constellation Energy Group Inc., as guarantor;

    b.      authorizing and approving procedures for the assumption and assignment of certain executory contracts and unexpired leases of the Debtors (collectively, the "**Assumed Contracts**") in connection with the Sale;

CH\1171503.25

c.      approving the form and manner of notice of the Sale and hearing thereon, substantially in the form attached hereto as **Exhibit F** (the "**Sale Notice**");

d.      approving the form and manner of (i) initial notice of the potential assumption and assignment of unexpired executory contracts and leases in connection with the Sale, substantially in the form attached hereto as **Exhibit G** (the "**Contract Notice**") and (ii) subsequent notice of assumption of unexpired executory contracts and leases upon designation of a successful bid and successful bidder (as defined in the Bidding Procedures, the "**Successful Bid**" and "**Successful Bidder**"), substantially in the form attached hereto as **Exhibit H** (the "**Assumption Notice**"); and

e.      establishing the following dates and deadlines, subject to modification as needed, relating to competitive bidding and approval of the Sale:

- Proposed Bidding Procedures Objection Deadline: September 9, 2010 at 4:00 p.m. prevailing Eastern Time, as the deadline to object to the Bidding Procedures and/or the Assumption Procedures (as defined below) (the "**Bidding Procedures Objection Deadline**");

- Proposed Bidding Procedures Hearing: September 16, 2010,[2] as the date and time the bidding procedures hearing (the "**Bidding Procedures Hearing**") to be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge for the Bankruptcy Court for the Southern District of New York, at: One Bowling Green, New York, NY 10004;

- Proposed Preliminary Bid Deadline: October 4, 2010, as the last date by which Potential Bidders may deliver the Preliminary Bid Documents required to participate in the auction pursuant to the Bidding Procedures;

- Proposed Sale Objection Deadline: October 25, 2010 at 4:00 p.m. prevailing Eastern Time, as the deadline to object to the Sale and/or the assumption and assignment of Assumed Contracts or cure amounts related thereto (the "**Sale Objection Deadline**");

- Proposed Bid Deadline: October 25, 2010 at 5:00 p.m. prevailing Eastern Time, as the deadline by which all binding bids must be actually received pursuant to the Bidding Procedures (the "**Bid Deadline**");

---

[2]    Or such other date as soon as possible thereafter that is convenient for the schedule of this Court.

- Proposed Auction:  October 29, 2010 as the date of the auction, if one is needed (the "**Auction**"), to be held at the offices of Latham & Watkins LLP, 885 Third Avenue, New York, NY 10004-4834; and

- Proposed Sale Hearing:  November 2, 2010,[3] as the date and time the sale hearing (the "**Sale Hearing**") to be held before the Honorable Shelley C. Chapman,, United States Bankruptcy Judge for the Bankruptcy Court for the Southern District of New York, at: One Bowling Green, New York, NY 10004.

5.      *Second*, by this Motion, the Debtors also seek entry of an order, substantially in the form attached hereto as **Exhibit B** (the "**Sale Order**"), authorizing and approving (a) the sale of the Acquired Assets free and clear of any and all Liens and Claims (as such terms are defined in the Sale Order); (b) the Debtors' entry into and performance under, and the terms and conditions of, the APA; (c) the assumption and assignment of Assumed Contracts in accordance with the Assumption Procedures (defined below) and the APA; (d) the Debtors' entry into and performance under the Transition Services Agreement; and (e) other relief.

**Factual Background**

## I.      The Debtors' Business and Operations

6.      A description of the Debtors' business, the reasons for commencing these Chapter 11 Cases, and the relief sought from this Court to allow for a smooth transition into chapter 11 (including the facts and circumstances supporting this motion) are set forth in the Declaration of Jeff Hunter, Manager, Executive Vice President and Chief Financial Officer of EBG Holdings LLC, in Support of Chapter 11 Petitions and First Day Pleadings (the "**First Day Declaration**").

## II.      Decision to Sell the Debtors' Assets

7.      In late April 2010, the Debtors retained J.P. Morgan Securities Inc. ("**JPM**") as their investment banker, and, in early June, 2010, the Debtors retained Perella Weinberg Partners

---

3       Or such other date as soon as possible thereafter that is convenient for the schedule of this Court.

LP ("**PWP**") as their financial advisor. Prior to filing these Chapter 11 Cases, the Debtors, with the assistance of PWP and JPM and in consultation with certain of the prepetition lenders, pursued a range of options to address the Debtors' concerns about their ability to service their debt going forward, including new financing, refinancing, and the sale of certain or all of the Debtors' assets or business. After exploring the strategic alternatives available to them, the Debtors have determined that the best way at this time to maximize the value of their assets for the benefit of their creditors is to seek a prompt conclusion to the Debtors' reorganization proceedings through an immediate sale of their assets.

8.     In late April 2010, JPM began an extensive marketing and sale process, aggressively canvassing the marketplace to locate potential financial or strategic partners. JPM contacted 199 potential buyers (81 strategic and 118 financial), and distributed a confidential information memorandum requesting preliminary letters of interest by May 18, 2010 to 36 of those parties (the "**CIM Recipients**"). Ten CIM Recipients (the "**Potential Purchasers**") responded with preliminary letters of interest.

9.     The preliminary letters of interest came from a variety of Potential Purchasers, including strategic buyers and financial buyers, with wide-ranging indicative bids. After evaluating these preliminary letters of interest, as well as the seriousness of the Potential Purchasers' interest and their ability to move expeditiously to consummate the transaction, the Debtors, in consultation with JPM, opted to pursue further discussions with six Potential Purchasers. Each of these Potential Purchasers (three strategic and three financial) received access to an electronic data room, a management presentation, site visits, extensive written Q&A with management and a draft asset purchase agreement. Two of the six Potential Purchasers submitted "final" bids, which were accompanied by marked purchase agreements.

10.     After considering these two proposals, the Debtors, in consultation with their advisors, engaged in parallel, but individual, arm's-length, good faith negotiations with such parties and their counsel and advisors.  Following extensive negotiations on the terms and conditions of each offer, the Debtors, with the assistance of JPM and their other advisors, conducted a side-by-side analysis of the proposals, and, ultimately, made the considered determination that the offer of Constellation Holdings, Inc. (the Stalking Horse Bidder) was the highest and best offer presented.  On August 7, 2010, the Debtors and the Stalking Horse Bidder entered into the APA.

11.     Accordingly, with a stalking horse bidding floor and the APA in place (the key terms of which have already been subject to a fulsome market test), the Debtors now seek to promptly effectuate the Sale to the Stalking Horse Bidder, subject to a competitive bidding process that is consistent with both the timing of these Chapter 11 Cases and the Debtors' fiduciary duties to maximize value for their estates, stakeholders and parties in interest.

## III.     Support of First Lien Lenders to Sell the Debtors' Assets and Sale Support Agreement

12.     Throughout the prepetition sale and marketing process, the Debtors and their advisors have worked diligently to keep the prepetition administrative agent to the first lien lenders and the prepetition administrative agent to the second lien lenders and certain first and second lien lenders who were willing to execute a confidentiality agreement informed about the sale process.  To that end, on August 17, 2010, the members of the steering committee[4] of first lien lenders together with certain other first lien lenders (the "**Consenting First Lien Lenders**"), who hold in excess of 50% of the outstanding first lien obligations under the First Lien Credit

---

[4]     The steering committee of first lien lenders is made up of: TCW Asset Management Company, Highland Capital Management, L.P., Avenue Investment, L.P., Silver Oak Capital, L.L.C., Strategic Value Special Situations Master Fund, L.P., Strategic Value Master Fund, Ltd., Franklin Mutual Advisers, LLC and Trilogy Capital.

Agreement (as defined in the APA), executed a sale support agreement (the "**Sale Support Agreement**")[5] evidencing their support of the sale to the Stalking Horse Bidder or Successful Bidder.

13.     In the Sale Support Agreement and subject to the terms and conditions set forth therein, the Consenting First Lien Lenders have agreed to both support the Sale (as defined below) and allow the Debtors to use First Lien Collateral comprised of cash ("**Cash Collateral**") to, among other things, permit the Debtors to operate in the ordinary course of business through the consummation of the Sale (defined below), fund the Chapter 11 Cases and confirm a plan of liquidation.  Under the Sale Support Agreement and subject to the terms and conditions set forth therein, the Debtors have agreed both to certain conditions regarding the use of Cash Collateral and to seek prompt approval of the Sale pursuant to various deadlines set forth in the Sale Support Agreement and which are consistent with the various deadlines set forth in the APA. The Sale Support Agreement recognizes the Debtors' fiduciary obligations to maximize value for all creditors, and, as such, does not impair the Debtors' ability to consider Alternative Transactions (as defined in the Sale Support Agreement), regardless of whether such Alternative Transaction results from the bid and auction procedures provided for in the APA or otherwise. Similarly, the Sale Support Agreement allows the Debtors to withdraw from the Sale Support Agreement in the event that the Board of Directors (as defined in the Sale Support Agreement) reasonably determines that proceeding with or consummating the Sale would be inconsistent with the exercise of their respective fiduciary duties.

14.     Prior to the Petition Date, the Debtors' management team discussed with certain of the Consenting First Lien Lenders the circumstances under which the Consenting First Lien

---

[5]     A copy of the Sale Support Agreement is attached as Exhibit B to the First Day Declaration.

Lenders would consent to the use of Cash Collateral or the use of Sale Proceeds to fund payments earned under a management incentive plan. Payments thereunder will not be made without notice and appropriate approval from this Court.

## Overview of the Proposed Sale

## IV. Material Terms of the APA

15. The principal terms of the APA are summarized in the following chart:[6]

| APA Provision | Summary Description |
|---|---|
| APA Parties | Sellers: EBG Holdings LLC; Boston Generating, LLC; Mystic I, LLC; Fore River Development, LLC; Mystic Development, LLC; BG Boston Services, LLC; and BG New England Power Services, Inc.<br><br>Buyer: Constellation Holdings Inc., or its designee<br><br>Guarantor: Constellation Energy Group, Inc. |
| Consideration | $1,100,000,000.00 (plus the Estimated Adjustment Amount, to be determined immediately prior to Closing and "trued-up" within forty-five days following the Closing). **See APA, at § 3.3.** |
| Adjustment Amounts | Variance at Closing above or below a Target Adjusted Net Working Capital amount of $26,777,000 will result in a dollar-for-dollar purchase price increase or decrease and the failure of Sellers to make $16,850,000 in certain capital expenditures from July 1, 2010 until the Closing will result in a dollar-for-dollar Purchase Price decrease. Each of these adjustments will be made at Closing and then "trued-up" forty-five days following the Closing. **See APA, at § 3.4.** |
| Acquired Assets | The APA sets forth the assets to be purchased by the Stalking Horse Bidder, including, without limitation, all of Sellers' right, title and interest, free and clear of all Liens (other than Liens included in the Assumed Liabilities and Permitted Liens) in and to all of Sellers' properties, assets and rights of every nature, kind and description, tangible and intangible, whether real or personal, whether now existing or hereafter acquired, whether or not reflected on the books or financial statements of Sellers that are used in the operation of the Business, other than the Excluded Assets (the "**Acquired Assets**"). **See APA, at § 2.1.** |
| Excluded Assets | The APA sets forth the assets that will be not purchased by the Stalking Horse Bidder, including assets of Sellers that are not Acquired Assets (the "**Excluded Assets**"). **See APA, at § 2.2.** |
| Assumed Liabilities | The APA sets forth the liabilities that will be assumed by the Stalking Horse Bidder (the "**Assumed Liabilities**"). **See APA, at § 2.3.** |
| Excluded Liabilities | The APA sets forth the liabilities that will be not be assumed by the Stalking Horse Bidder (the "**Excluded Liabilities**"). **See APA, at § 2.4.** |
| Assumption of Executory | Those unexpired leases and executory contracts (the "**Assumed Contracts**") that are |

---

[6] This summary is provided for the convenience of this Court and parties in interest. To the extent there is any conflict between this summary and the APA, the latter governs in all respects. Capitalized terms used but not defined in this chart have the meaning ascribed to them in the APA.

| APA Provision | Summary Description |
|---|---|
| **Contracts and Unexpired Leases and Assignment to the Stalking Horse Bidder** | proposed to be assigned to Buyer pursuant to Section 365 of the Bankruptcy Code are set forth in the APA on Schedule 2.1(c) to the APA; provided that Buyer may modify such Schedule to add or delete unexpired leases and executory contracts at any time prior to Closing. **See APA, § 2.1(c).** |
| **Payment of Cure Amounts** | The APA provides that Debtors are responsible for payment of cure costs (the "**Cure Amounts**") associated with the Assumed Contracts listed on Schedule 2.1(c) to the APA at the time of the signing of the APA. Buyer shall be responsible for the payment of Cure Amounts associated with Additional Contracts added to Schedule 2.1(c). **See APA, at § 6.12.** |
| **Employment Provisions** | Transfer. The APA provides that, prior to the Closing, but effective as of the Closing, Buyer shall make offers of employment to all employees of the Sellers who are employed in the operation of the Business as of the Closing Date. Such offers to Represented Employees will be made under the terms and conditions of and in accordance with the applicable Collective Bargaining Agreement. In the case of Non-Represented Employees, such offers will be made at aggregate levels of wages and overall compensation that is comparable or substantially similar in the aggregate, to the level of wages and overall compensation in effect for such employee as of the Closing Date. **See APA, at § 6.8.** |
| **Closing Conditions** | The APA includes closing conditions typical and customary for transactions of this kind, including, without limitation: <br><br> • Buyer/Guarantor: (i) each of the representations and warranties of the Sellers contained in the APA are true and correct in all respects, except to the extent that the failure of such representations and warranties to be true and correct does not constitute a Sellers Material Adverse Effect; (ii) Sellers shall have complied in all material respects with all applicable covenants under the APA; (iii) Buyer shall have received certificates from an executive officer of each of the Sellers certifying that the conditions in (i) and (ii) above have been fulfilled and/or waived; (iv) all Governmental Approvals shall have been obtained and there is no law or order restraining the transactions contemplated by the APA; (v) Sellers shall have successfully cured any defaults under the Assumed Contracts except for those Cure Amounts that are the responsibility of Buyer; (vi) Sellers shall have delivered the items listed in Section 3.1(b) of the APA; and (vii) the Bankruptcy Court shall have entered the Sale Order and no order staying, reversing, modifying or amending the Sale Order shall be in effect. <br><br> • Sellers: (i) each of the representations and warranties of the Sellers contained in the APA are true and correct in all respects, except to the extent that the failure of such representations and warranties to be true and correct does not constitute a Buyer Material Adverse Effect; (ii) Buyer shall have complied in all material respects with all applicable covenants under the APA; (iii) Sellers shall have received certificates from an executive officer of the Buyer certifying that the conditions in (i) and (ii) above have been fulfilled and/or waived; (iv) all Governmental Approvals shall have been obtained and there is no law or order restraining the transactions contemplated by the APA; (v) Buyer shall have successfully cured any defaults under the Assumed Contracts that are the responsibility of Buyer pursuant to Section 6.12 of the APA; (vi) Buyers shall have delivered the items listed in Section 3.1(c) of the APA; and (vii) the Bankruptcy Court shall have entered the Sale Order and no order staying, reversing, modifying or amending the Sale Order shall be in effect. <br><br> **See APA, at §§ 7.1, 7.2.** |

CH\1171503.25

| APA Provision | Summary Description |
|---|---|
| Representations, Warranties and Covenants | The APA includes representations, warranties and covenants made or agreed to by the parties typical and customary for transactions of this kind, including, without limitation, representations, warranties and covenants relating to (i) organization/good standing, (ii) authorization of transaction, (iii) non-contravention, (iv) title to and condition of Assets, (v) financial statements, (vi) employees and employee benefits, (vii) legal compliance, (viii) intellectual property, (ix) tax matters, (x) material contracts, (xi) litigation, (xii) brokers fees, (xiii) absence of changes, and (xiv) disclosure waiver. **See APA, at Article 4 & Article 5.** |
| Bid Protections | The APA provides for a Break-Up Fee equal to Thirty Million Dollars ($30,000,000). The Break-Up Fee is payable in the event that the Bankruptcy Court enters an order approving an Alternative Transaction. One half of the Break-Up Fee is also payable if Buyer is entitled to, and does, terminate the APA due to Sellers' willful breach (or breach prior to the execution of the APA), with the remaining one-half due if Sellers then consummate an Alternative Transaction within twelve months of the date of such termination. **See APA, at § 8.2(b)(ii).**<br><br>The APA further provides a cap for Reimbursable Expenses of Five Million Dollars ($5,000,000). Reimbursable Expenses are payable in the event that the Bankruptcy Court enters an order approving an Alternative Transaction or if Buyer terminates the APA due to Sellers' breach. **See APA, at § 8.2(b)(i).** |
| Deposit | Fifty Million Dollars ($50,000,000) to be held in escrow. **See APA, at § 3.2.** |
| Available Remedies | Each party is entitled to all available legal and equitable remedies, including specific performance. **See APA, at § 9.11(b).** |
| Transition Services Agreement | The Parties have agreed to enter into a Transition Services Agreement, to be in such form and covering such services as shall be mutually agreed by EBG Holdings LLC and Buyer prior to the Closing. **See APA, at §§ 1.1, 3.1.** The Transition Services Agreement will be filed on or prior to the Bidding Procedures Hearing. |
| Casualty/Condemnation | If there is a casualty or condemnation event resulting in damages (or condemnation value) in excess of 10% of the Base Purchase Price ($1,100,000,000), Sellers and Buyer shall each have the right to terminate the APA. **See APA, at § 6.14.** |
| No Solicitation | Sellers will be subject to a "no shop" provision until the Bankruptcy Court enters the Bidding Procedures Order. **See APA, at § 6.3.** |
| Termination Provisions | In addition to the "Casualty/Condemnation" provisions noted above, the APA includes termination provisions typical and customary for transactions of this kind, including a 120 day "drop dead" date from the Agreement Date. There are also termination provisions related to the bankruptcy timeline, including the occurrence of the Petition Date within ten days of the Agreement Date, the entry of the Bidding Procedures Order within 45 days of the Petition Date and the entry of the Sale Order within 90 days of the Petition Date. **See APA, at Article 8.** |

CH\1171503.25

## V. "Extraordinary Provisions" Under the Sale Guidelines

16.     The APA contains the following terms, conditions and provisions that may be considered "Extraordinary Provisions" under Section I.D of the Sale Guidelines:[7]

a.      **No Shop**.  The Stalking Horse Bidder required that the APA include a "no shop" provision.  The "no shop" provision is for a limited period of time and expires on the date that the Bidding Procedures Order is entered.  See APA, at § 6.3.  In light of the extensive marketing of this transaction and the limited period of time in which the "no shop" provision is in effect, the Debtors believe the inclusion of same is appropriate and reasonable when balanced against the Sale benefits.

b.      **Management Agreements**.  The APA contains provisions regarding post-Sale employment offers to be extended to certain employees whose duties relate to operation of the Debtors' facilities (the "**Business**").  See APA, at § 6.8.  The Debtors believe these provisions are typical and customary for transactions of this kind.  In any event, the marketing process and Sale negotiations were conducted in consultation with the Debtors' advisors in an appropriate manner and the Sale was approved by the board members as a sound discharge of their fiduciary duties to these estates and creditors.

c.      **Record Retention**.  The Debtors will have access to their books and records sufficient to administer the bankruptcy estate.  See APA, at § 6.13.

d.      **Interim Arrangements with Proposed Buyer**.  The APA requires the Debtors to operate the Business in the ordinary course prior to the closing (the "**Closing**") of the Sale (including honoring and performing under executory contracts and unexpired leases proposed to be assumed and assigned in connection with the sale) and to notify the Stalking Horse Bidder prior to the date of any scheduled payments due and payable under two Longer Term Service Agreements between various Debtors and Mitsubishi Heavy Industries America, Inc. (as defined in the APA, the "**LTSAs**").  In the event the Debtors fail to make such required payments, the Stalking Horse Bidder shall be entitled to do so on behalf of the Debtors.   Any payments by the Stalking Horse Bidder to Mitsubishi Heavy Industries America, Inc. are reimbursable in the event of an Alternative Transaction.  See APA at §§ 6.1, 6.19.

e.      **Successor Liability**.  The Stalking Horse Bidder required that the Sale Order include certain findings that the Acquired Assets are being sold free of successor or other similar liability as part of its offer to purchase the

---

[7]     This list of possible "Extraordinary Provisions" (as such term is defined in the Sale Guidelines) is not intended to be an admission that any of these provisions are unusual relief in sales transactions of this nature conducted pursuant to section 363 of the Bankruptcy Code.

Acquired Assets and enter into the APA. See APA, at § 6.11(e). In light of the extensive marketing of this transaction, sufficient notice of the Sale (which includes a disclosure regarding the successor liability findings in the Sale Order) to parties in interest and the non-voluminous nature of such findings, the Debtors believe the inclusion of same in the Sale Order is appropriate and reasonable when balanced against the Sale benefits.

f. **Use of Proceeds**. The Consenting First Lien Lenders required in the Sale Support Agreement that in connection with the Closing of the Sale, on the Closing Date, the Purchase Price from the Sale shall be paid directly by the Successful Bidder to the administrative agent under the First Lien Credit Agreement (the "**First Lien Administrative Agent**") for distribution to the Lenders (as defined in the First Lien Credit Agreement); provided, however, that the First Lien Administrative Agent shall be required to maintain Reserve Accounts (as defined in the Sale Order) that will be available to pay, among other things, administrative and priority claims, professional fees, United States Trustee fees, and other costs and expense associated with the completion of the Chapter 11 Cases. See Sale Order, at ¶ 31. In addition, on the Closing Date, a portion of the Purchase Price from the Sale will be either paid directly to JPM by the Successful Bidder if permitted by the Court or deposited into a segregated interest bearing account free and clear of all Liens, Claims, interests and encumbrances for distribution to JPM pending final approval of JPM's fees by the Court. See Sale Order, at ¶ 31.

g. **Relief from Bankruptcy Rule 6004(h)**. The Sale Order provides for a waiver of the 14-day stay of the Sale Order, including the parties' ability to close the Sale and assign the Assumed Contracts in connection therewith, arising under Bankruptcy Rules 6006(h) and 6006(d), respectively. See Sale Order at ¶ 42. The Court may grant this request if it "orders otherwise." See, e.g., Fed. R. Bankr. P. 6006(h) and 6006(d). Finally, the Sale was extensively marketed and notice of the Sale was adequately provided to all parties in interest. Thus, the Debtors respectfully submit that there are adequate grounds for the Court to "order otherwise" so the Sale Order is effective immediately.

## Bidding Procedures Order

## VI.    Outline of the Bidding Procedures

17.    The Bidding Procedures are intended to permit a fair and efficient competitive sale process, consistent with the timeline of these cases, to confirm that the Stalking Horse Bid is, indeed, the best offer, or promptly identify the alternative bid that is higher or otherwise

better. Because the Bidding Procedures are attached as **Exhibit D** hereto, they are not restated

herein. Generally speaking however, the Bidding Procedures establish, among other things:[8]

- certain bid protections, including the Break-Up Fee and the Reimbursable Expenses to be provided to the Stalking Horse Bidder in the event that any Person other than the Stalking Horse Bidder is approved to purchase substantially all of the Acquired Assets and in certain other situations (see Bid. Proc., at § B);

- the requirements Potential Bidders must satisfy in order to participate in the bidding process and become "Acceptable Bidders" (See Bid. Proc., at § C);

- the availability of and access to due diligence information and the required conduct by Acceptable Bidders during due diligence (See Bid. Proc., at § D);

- the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "Qualified Bids" sufficient to trigger an Auction, including the minimum consideration that must be provided and the terms and conditions that must be satisfied, by any Acceptable Bidder (other than the Stalking Horse Bidder) to be considered a "Qualified Bidder" (See Bid. Proc., at §§ E-G);

- the manner in which Qualified Bids will be evaluated by the Debtors to determine the Starting Bid for the Auction (See Bid. Proc., at § H);

- the procedures for conducting the Auction, if any (See Bid. Proc., at § J);

- the criteria by which the "Successful Bidder" will be selected by the Debtors, in consultation with their advisors and certain other parties (See Bid. Proc., at § K); and

- various other matters relating to the Sale process generally, including regarding the Sale Hearing, designation of a back-up bidder, payment of the Bid Protections, return of any good faith deposits and certain reservations of rights (See Bid. Proc., at §§ I, M-P).

18.     Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations

to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified

bid proposals and the Debtors' right to modify the Bidding Procedures as necessary or

appropriate to maximize value for their estates in consultation with key parties set forth therein.

---

[8]     Capitalized terms used but not defined in this Paragraph [16] shall have the meanings set forth in the Bid Procedures.

## VII. Summary of the Assumption Procedures

19.    The Debtors are also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Assumed Contracts in connection with the Sale (the "**Assumption Procedures**").  The Assumption Procedures are as set forth below:

a.    **Contract Notice**.  As soon as practicable after entry of the Bidding Procedures Order, the Debtors shall file with the Court and serve on all non-debtor counterparties (the "**Contract Notice Parties**") to any executory contract or unexpired lease that may be assumed by the Debtors and assigned to the Successful Bidder, a "**Contract Notice**" in the form attached hereto as **Exhibit G** that identifies, to the extent applicable (i) the contract that may be an Assumed Contract, (ii) the name of the counterparty to such contract, (iii) the cure amount for such contract if it becomes an Assumed Contract, and (iv) the deadline by which any such Contract Notice Party must file any Objection to the proposed assumption and assignment (which deadline shall be the Sale Objection Deadline); provided, however, that the presence of a contract on a Contract Notice does not constitute an admission that such contract is an executory contract.  As soon as practicable after the selection or designation of the Successful Bid, the Debtors shall file with the Court and serve on the Contract Notice Parties a further notice in the form attached hereto as **Exhibit H** (the "**Assumption Notice**") identifying the Successful Bidder and stating which executory contracts and unexpired leases will be Assumed Contracts, and no other or further notice will be required with respect to the Assumed Contracts.

b.    **Objections**.  Objections, if any, to the assumption and assignment of any contract or lease, proposed cure amount or adequate assurance of future performance proposed with respect thereto must:  (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules and Case Management Order; (iii) state with specificity the nature of the objection and, if to the cure amount proposed by the Debtors, the cure amount alleged by the objecting party, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with this Court and served upon so as to be *actually received* by the Objection Notice Parties listed on the Contract Notice on or before the Sale Objection Deadline; provided, that if, following the Auction, the Stalking Horse Bidder is not the Successful Bidder, the deadline for such counterparties shall be automatically extended through and until the conclusion of the Sale Hearing.

c.    **Dispute Resolution**.  If the parties are not able to consensually resolve any such objection prior to the Sale Hearing, the dispute will be heard at the Sale Hearing (or such other date as fixed by this Court).

CH\1171503.25

d. **Buyer Designation Rights**. From the time of entry of the Sale Order until the Closing of the Sale, Buyer shall have the right to (i) designate additional executory contracts and unexpired leases for assumption and assignment and (ii) exclude from assignment executory contracts and unexpired leases previously designated by Buyer for assumption and assignment (the "**Buyer Designation Rights**"). Upon Buyer's exercise of the Buyer Designation Rights, the Debtors shall notice each non-debtor counterparty to a contract or lease impacted by such exercise of the Buyer Designation Right. No later than 10 days after the service of such notice, the Debtors will seek a proposed order from this Court approving the assumption of the contract to be assumed pursuant to the Buyer Designation Rights and finding that the Success Bidder provided adequate assurance of future performance under Section 365(f)(2)(B) of the Bankruptcy Code.

20. Any party failing to timely file an objection to the assumption and assignment of any contract or lease or related cure amount listed on the Contract Notice will be barred from objecting thereto, including asserting any additional cure or other default amounts against the Debtors or any of the Debtors' estates, the Stalking Horse Bidder or other Successful Bidder with respect to such executory contract(s) or unexpired lease(s) and shall be deemed to consent to the Sale and the assumption and assignment of such executory contract(s) or unexpired lease(s) effectuated in connection therewith.

## Basis for Relief

## VIII. The Bidding Procedures Order Should be Entered on the Terms Proposed

### A. The Bidding Procedures Are Fair, Appropriate and Should be Approved

21. "When conducting an asset sale, the ultimate responsibility of the debtor, and the primary focus of the bankruptcy court, is the maximization of the value of the assets sold." John J. Jerome & Robert D. Drain, Bankruptcy Court Is Newest Arena for M&A Action, N.Y.L.J., June 3, 1991 at 8, col. 4. In furtherance of that goal, bidding procedures, such as those proposed here, may be used in court-supervised asset sales because they streamline the acquisition process, "help to provide an adequate basis by which to compare offers," and ultimately, maximize value.

See id.; see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) (break-up fees "are important tools to encourage bidding and to maximize the value of the debtor's assets"). In overseeing an asset sale subject to an auction process, the bankruptcy court walks a tightrope between:

> [O]n the one hand, providing for an orderly bidding process, recognizing the danger that absent such a fixed and fair process bidders may decline to participate in the auction; and, on the other hand, retaining the liberty to respond to differing circumstances so as to obtain the greatest return for the bankrupt estate.

In re Fin. News Network, Inc., 980 F.2d 165, 166 (2d. Cir. 1992). Because the court must perform this difficult balancing act, "a bankruptcy judge's broad discretionary power in conducting the sale of a debtor's assets should not be narrowed by technical rules mindlessly followed" that "reduce the broad discretion and flexibility a bankruptcy court must necessarily have to enhance the value of the estates before it." See id. at 169.

22.     Here, the Debtors submit that the Bidding Procedures are fair and appropriate under the circumstances, consistent with procedures routinely approved by courts in this district and in the best interest of the Debtors' estates. The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the net value realized from the Sale by these estates. In particular, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

23.     At the same time, the Bidding Procedures provide the Debtors with an adequate opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale. Entering into the APA with the Stalking Horse Bidder ensures the Debtors obtain fair market value by setting the minimum purchase price which will be tested in the marketplace. As such, the Debtors and their creditors can be assured that, taking into account

the financial condition of the business and the economy, the consideration obtained will be fair and reasonable and at or above market.

**B.     The Bid Protections Have A Sound Business Purpose and Should be Approved**

24.     The Debtors are also requesting approval of a break-up fee of Thirty Million Dollars ($30,000,000) (the "**Break-Up Fee**") and up to Five Million Dollars ($5,000,000) for reimbursement of expenses (the "**Reimbursable Expenses**," and together with the Break-Up Fee, the "**Bid Protections**"), in each case to be paid to the Stalking Horse Bidder upon the occurrence of certain "triggering events" typical and customary for transactions of this kind.  The Break-Up Fee is payable in the event that this Court enters an order approving an Alternative Transaction (as defined in the APA).  One half of the Break-Up Fee is also payable if Buyer is entitled to, and does, terminate the APA due to Sellers' willful breach (or breach prior to the execution of the APA), with the remaining one-half due if Sellers then consummate an Alternative Transaction (as defined in the APA) within twelve months of the date of such termination.  Reimbursable Expenses are payable in the event that this Court enters an order approving an Alternative Transaction (as defined in the APA) or if Buyer terminates the APA due to Sellers' breach. See APA at § 8.2.

25.     Bankruptcy courts in the Second Circuit analyze the appropriateness of bidding incentives such as these under the "business judgment rule" standard, and is it well established in this district that courts consider whether (i) the relationship of the parties who negotiated the break-up fee is tainted by self-dealing or manipulation, (ii) the fee hampers, rather than encourages, bidding and (iii) the amount of the fee is unreasonable relative to the proposed purchase price.  See Integrated Res., 147 B.R. at 657-8 (to evaluate bid protections, courts should employ the business judgment rule, which proscribes judicial second-guessing of the corporate

debtor's actions taken in good faith, absent self-dealing and in the exercise of honest judgment); see also In re Metaldyne Corp., 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009). The Debtors submit that the Bid Protections pass muster under each of these three factors.

26.     *First*, the Bid Protections are the product of good faith, arm's-length negotiations between the parties. The Debtors and their senior management have at all times acted not in their own self-interest but, rather, in the interest of the bankruptcy estates consistent with the fiduciary duties imposed in connection therewith. Further, the APA provisions relating to the Bid Protections (as well as the other APA provisions) were scrutinized by the Debtors' professionals, reviewed and vetted with outside advisors through the marketing process and approved by the Debtors' board of directors.

27.     *Second*, the Debtors believe, based on their reasoned business judgment, that the presence of the Bid Protections enhances their ability to maximize value without chilling bidding. The Bid Protections were a material inducement for, and a condition of, the Stalking Horse Bidder's agreement to enter into the APA. Indeed, granting these Bid Protections convinced the Stalking Horse Bidder to enter into the APA which, in turn, assures the Debtors of a Sale to a contractually-committed bidder at a price they believe is fair and reasonable and provides the upside opportunity that the Debtors could potentially receive a higher or otherwise better offer at the Auction which, absent such a bid floor, might not have otherwise been realized. See In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking.").

28.     *Third*, the Debtors believe, based on their reasoned business judgment, that the Bid Protections are reasonable and appropriate relative to the size, nature and complexity of this

transaction and the commitments made and resources expended by the Stalking Horse Bidder in connection therewith in view of:

- the substantial benefits already inured to the Debtors and their estates from having a stalking horse bid serving as a catalyst for other potential or actual bidders to confirm that the Debtors receive the highest or otherwise best offer by subjecting the Sale to an open auction and competitive bidding;

- the meaningful floor established by the APA for competitive bidding;

- the need of the Debtors to move forward with a transaction with a high likelihood of closure assured by a contractually committed party at a fair and reasonable price consistent with the confirmation timeline of these Chapter 11 Cases;

- the extensive due diligence, analysis and negotiations undertaken by the Stalking Horse Bidder in connection with the Sale; and

- the risks borne by the Stalking Horse Bidder for being the stalking horse in this transaction and any opportunity costs incurred as a result thereof.

29. The Debtors further believe, and are advised, that the amounts of each of the Bid Protections are comparable to market and bid protections approved by courts in this district. See, e.g., In re BearingPoint, Inc., Case No. 09-10691 (Bankr. S.D.N.Y. Apr. 7, 2009) (3% break-up fee); In re Silicon Graphics, Inc., Case No. 09-11701 (Bankr. S.D.N.Y. Apr. 3, 2009) (3% - 4% break-up fee and $750,000 - $1 million expense reimbursement); In re Bally Total Fitness of Greater NY, Inc., No. 07-12395 (Bankr. S.D.N.Y. Aug. 21, 2007) (4.3% termination fee); In re G+G Retail, Inc., Case No. 06-10152 (Bankr. S.D.N.Y. Jan. 30, 2006) (3% break-up fee); In re GT Brands Holdings LLC, Case No. 05-15167 (Bankr. S.D.N.Y. July 28, 2005) (3.13% break-up fee); In re Allegiance Telecom, Inc., Case No. 03-13057 (Bankr. S.D.N.Y. Jan. 15, 2004) (2.05% break-up fee, $5 million expense reimbursement); In re Twinlab Corp., Case No. 03-15564 (Bankr. S.D.N.Y. Sep. 26, 2003) (3.9% break-up fee and $1 million expense reimbursement ); In re Loral Space & Commnc's Ltd., Case No. 03-41710 (Bankr. S.D.N.Y. Aug. 18, 2003) (2% break-up fee and $8 million expense reimbursement).

30.     Accordingly, the Debtors submit that the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances and, because the standard used by courts in this district in approving similar protections has been satisfied here, the Debtors respectfully submit that the Bid Protections should be approved.

### C.     The Assumption Procedures Are Appropriate and Should be Approved

31.     In connection with the assumption and assignment of the Assumed Contracts, the Debtors believe it is necessary to establish a process by which (i) the Debtors and counterparties to Assumed Contracts can reconcile cure obligations, if any, in accordance with Section 365 of the Bankruptcy Code, and (ii) such counterparties can object to the assumption and assignment of Assumed Contracts and/or related cure amounts.

32.     As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assumed Contract be deemed to consent to the assumption and assignment of the applicable Assumed Contract pursuant to Section 365 of the Bankruptcy Code on the terms set forth in the Sale Order and notwithstanding any anti-alienation provision or other restriction on assignment.  See, e.g., Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

33.     The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to parties to the Assumed Contracts and provide certainty to all parties in interest regarding their obligations and rights in respect thereof.  Accordingly, the Debtors request the Court approve the Assumption Procedures set forth in the Bidding Procedures Order.

**D.    The Form and Manner of the Sale Notice, the Contract Notice, and the Assumption Notice Should be Approved**

34.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

35.    Within three (3) calendar days of entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice, substantially in the form annexed hereto as **Exhibit F**, upon the following parties in accordance with the Sale Guidelines: (i) the Master Service List (as such term is defined in the *Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007, Implementing Certain Notice and Case Management Procedures*, when entered, the "**Case Management Order**"),[9] (ii) all known creditors of the Debtors, (iii) any parties who have expressed a written interest in the Acquired Assets; (iv) parties who are known or reasonably believed to have asserted any lien, encumbrance, claim or other interest in the Acquired Assets, (v) all affected federal, state and local regulatory and taxing authorities, (vi) all parties to executory contracts or unexpired leases to be assumed and assigned or rejected as part of the Sale.

---

[9]    The Master Service List includes, among others: (a) the Office of the United States Trustee (the "**U.S. Trustee**"), (b) the Debtors, (c) counsel for the Debtors, (d) counsel for any official committee appointed in the Chapter 11 Cases, (e) counsel to the administrative agent for the lenders under the Debtors' prepetition first lien credit facility, (f) counsel to the administrative agent for the lenders under the Debtors' prepetition second lien credit facility, (g) counsel to the administrative agent for the lenders under the Debtors' prepetition unsecured mezzanine credit facility, (h) the Internal Revenue Service, (i) the Federal Energy Regulatory Commission, (j) the Environmental Protection Agency, (k) the Federal Communications Commission, (l) the United States Attorney's Office for the Southern District of New York, (m) the United States Attorney's Office for the District of Massachusetts, (n) those persons who have formally appeared and requested service in these cases pursuant to Bankruptcy Rule 2002, and (o) those creditors holding the five largest unsecured claims against the Debtors' estates (on a consolidated basis).  Once the U.S. Trustee appoints an official committee of unsecured creditors (the "**Committee**") and the Committee retains counsel, the Debtors shall replace the Debtors' five largest unsecured creditors (on a consolidated basis) with counsel to the Committee

36.     The Debtors believe that it is appropriate to supplement notice of the Sale Hearing and Auction by providing notice by publication consistent with Bankruptcy Rule 2002(l) ("The court may order notice by publication if it finds that notice by mail is impracticable or that it is desirable to supplement the notice").   Accordingly, the Debtors propose to publish the Sale Notice (with any necessary modifications for ease of publication) once in the national edition of USA Today, as soon as practicable after entry of the Bidding Procedures Order.   The Debtors also request authority, in their sole discretion, to publish the Sale Notice in other newspapers, trade journals, or similar publications.

37.     The Debtors submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order coupled with service of the Sale Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002, Local Bankruptcy Rule 2002-1 and the Sale Guidelines.   Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice proposed herein.

38.     Pursuant to the Sale Guidelines, the Debtors may provide "notice of proposed cure amounts and the right and deadline to object thereto and otherwise object to the proposed assumption and assignment, or rejection of executory contracts and unexpired leases" in a "separate schedule sent only to the parties to such agreements."   As soon as practicable after entry of the Bidding Procedures Order, the Debtors shall file the Contract Notice with the Court and serve the Contract Notice on all Contract Notice Parties.   The Contract Notice will provide the Contract Notice Parties with notice of the potential assumption of their contract, as well as any cure amount associated with such potential assumption.   In addition, as soon as practicable after the selection or designation of the Successful Bid (as defined in the Bid Procedures), the

Debtors shall file with the Court and serve on the Contract Notice Parties the Assumption Notice, identifying the Successful Bidder and stating which contracts will be Assumed Contracts. The notice provided by the Contract Notice and the Assumption Notice is in addition to the notice which will be provided to such parties by the Sale Notice. The Debtors submit that the Contract Notice, the Assumption Notice and the information to be provided therein satisfy any applicable requirement under Section 365 of the Bankruptcy Code and the Sale Guidelines. Accordingly, the Debtors request that this Court approve the form and manner of the Contract Notice and the Assumption Notice proposed herein.

## IX.  The Sale Order Should be Entered on the Terms Proposed

### A.  The Sale Should be Approved as an Exercise of Sound Business Judgment

39.     Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing. Section 363(b) does not, however, provide a standard for determining when such a sale should be authorized if proposed outside confirmation of a chapter 11 plan. Fortunately, that standard is well-established in the Second Circuit: a debtor's decision to sell assets outside the ordinary course of business must be based upon sound business judgment. See, e.g., Licensing By Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d Cir. 1997); Official Comm. of Unsecured Creditors of LTV Aerospace and Defense Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983).

40.     When determining whether to approve a proposed sale under Section 363 of the Bankruptcy Code, courts generally apply standards that, although stated various ways, represent essentially a business judgment test. See In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003). Courts in this District evaluate several (non-exhaustive) factors when

considering a Section 363(b) sale, including, for example, whether (i) a "sound business purpose" exists that justifies the sale, (ii) the sale process was fair and reasonable, (iii) the sale value obtained is fair and reasonable and (iv) the debtor acted in good faith.  See, e.g., Id. at 744-45.

(i)     A Sound Business Purpose Exists for the Sale

41.     The Debtors have a sound business justification for entering into this transaction, including the fact that the Debtors will face liquidity constraints in the upcoming months and have exhausted their options for addressing this issue.

42.     Notably, it was not without significant deliberation that the APA was executed. Indeed, the Debtors entered into, and agreed to be bound by, the APA only after (a) potential alternatives were evaluated, (b) the transaction was aggressively marketed, (c) multiple rounds of competing proposals were evaluated and analyzed and (d) all of the foregoing was presented to the Board of Directors of EBG Holdings LLC (who, in conjunction with advice from experienced professionals, discharged their fiduciary duties, exercised sound and appropriate business judgment and determined to pursue the Sale on the terms of the APA, subject to competitive bidding sanctioned by the Court).

43.     Thus, for the reasons set forth herein, as will be further shown at the Sale Hearing, because the APA (or any marked APA, as the case may be) constitutes (or will constitute) the highest or otherwise best offer and provides greater recovery for these estates than any known or practicably available alternative, the Debtors submit that the execution thereof represents sound business judgment.

CH\1171503.25

(ii)    <u>Adequate and Reasonable Notice of the Sale Will be Provided and the Proposed Sale Process is Fair and Reasonable</u>

44.    In addition to the due deliberation given by the Debtors in deciding to enter into the APA, adequate and reasonable notice of the sale will be provided. As described above, the Sale Notice (a) will be served in a manner that provides 21-days' notice of the date, time and location of the Sale Hearing, (b) informs interested parties of the deadlines for objecting to the Sale and (c) otherwise includes all information relevant to parties interested in or affected by the Sale in accordance with the Sale Guidelines. The Sale Notice will also be published in the national edition of USA Today. In addition, the Contract Notice will provide sufficient notice to interested parties of the deadline for objecting to the assumption and assignment of potentially Assumed Contracts and the Assumption Notice will notify parties if their contract has been selected for assumption by the Successful Bidder. Significantly, the form and manner of the Sale Notice, the Contract Notice and the Assumption Notice will have been approved by this Court after a hearing before they are served on parties in interest. As such, the Debtors are confident the Sale Notice, the Contract Notice and the Assumption Notice will be properly vetted by the time of service thereof.

(iii)    <u>The Sale and Purchase Price Reflects a Fair Value Transaction</u>

45.    It is a well-settled that, where there is a court-approved auction process, a full and fair price is presumed obtained for the assets sold, as the best way to determine value is exposure to the market. <u>See</u> <u>Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship</u>, 526 U.S. 434, 457 (1999); <u>see</u> <u>also</u> <u>In Re Trans World Airlines, Inc.</u>, No. 01-00056, 2001 Bankr. Lexis 980, at *13 (Bankr. D. Del. April 2, 2001) (while a "§ 363(b) sale transaction does not require an auction procedure…the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction"). This is especially true here, where the

Acquired Assets and related transaction have both been subjected to an extensive marketing process, reviewed by outside professionals and intensively scrutinized by the Debtors and their retained advisors.

46.     Moreover, even as the Debtors move forward with the Sale, after entry of the Bidding Procedures Order, JPM will continue to market the transaction and solicit other offers for the Acquired Assets consistent with the Bidding Procedures and subject to the APA, including, for example, by contacting previously solicited parties, providing acceptable bidders with data room access and requested information and otherwise assisting the Debtors with all efforts to increase transaction value.   In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary, the APA purchase price will, conclusively, be fair value.

(iv)     The Sale Has Been Proposed in Good Faith and Without Collusion and the Stalking Horse Bidder or Successful Bidder Is a "Good Faith Purchaser

47.     While the Bankruptcy Code does not define "good faith," the Second Circuit has held that the good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good faith finding may not be made.   See, e.g., Gucci, 126 F.3d at 390 (a purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders") (internal citations omitted); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

48.     The Debtors submit that the Stalking Horse Bidder, or other Successful Bidder arising from the Auction, is or would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and that the APA, or any marked version thereof, is or would be a good faith agreement on arm's-length terms entitled to the protections of section 363(m) of the

Bankruptcy Code.[10]  First, the consideration to be received by the Debtors pursuant to the APA is substantial, fair and reasonable.  Second, the parties entered into the APA in good faith, and after extensive, arm's-length negotiations, during which both parties were represented by competent counsel and had similar bargaining positions.  Third, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale or APA to be avoided under section 363(n) of the Bankruptcy Code.  Finally, the Stalking Horse Bidder's offer was evaluated and approved by the board in consultation with the Debtors' professionals. Accordingly, the Debtors believe that the Stalking Horse Bidder (or other Successful Bidder) and APA (or marked APA) should be entitled to the full protections of Section 363(m) of the Bankruptcy Code.

### B.     The Sale Should be Approved "Free and Clear" Under § 363(f)

49.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (i) applicable nonbankruptcy law permits such a free and clear sale; (ii) the holder of the interest consents; (iii) the interest is a lien and the sales price of the property exceeds the value of all liens on the property; (iv) the interest is in bona fide dispute; or (v) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  See 11 U.S.C. § 363(f); see also In re GMC, 407

---

[10]   Section 363(m) of the Bankruptcy Code provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

See 11 U.S.C. § 363(m).

B.R. 463 (Bankr. S.D.N.Y. 2009) ("Section 363(f) permits the bankruptcy court to authorize a sale free of "any interest" that an entity has in property of the estate).

50.    As noted above, in excess of 50% of the first lien lenders have executed the Sale Support Agreement evidencing their support for the Sale.

51.    The Debtors believe that any of the parties holding interests in the Acquired Assets could be compelled to accept a monetary satisfaction of such interests.  Moreover, the Debtors believe that the purchase price for the Acquired Assets will exceed the economic value of any liens.  This Court has adopted the view that the "aggregate value of all liens" referenced in Section 363(f)(3) of the Bankruptcy Code means the actual economic value of the liens, not their face amount.  See In re Beker Indus., Inc., 63 B.R. 474, 477 (Bankr. S.D.N.Y. 1986).  Thus, where the purchase price for a debtor's assets is the best available under the circumstances, a court may authorize the sale free and clear of existing liens, claims and encumbrances pursuant to Section 363(f)(3) of the Bankruptcy Code, even if the purchase price is less than the face amount of liens, claims and encumbrances.  See id. at 477-78.  In this instance, the procedures outlined herein, and the Debtors' extensive and continuing efforts to market their businesses, ensure that the purchase price paid for the Acquired Assets is the best available.  Therefore, the Sale should be approved free and clear of any and all liens, claims and encumbrances regardless of their face amount.

52.    Finally, the Sale Order provides that any lien, claim or encumbrance in the Acquired Assets will attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  Accordingly, the Debtors believe that the Sale will satisfy the statutory prerequisites of Section 363(f) of the Bankruptcy Code and the sale of their Assets should be approved free and clear of all liens, claims and encumbrances.

**C.**     **Assumption and Assignment of Contracts and Leases Should be Approved**

      (i)      The Assumption of the Contacts and Leases Reflects Business Judgment.

53.     As with the Sale itself, the Debtors must demonstrate that the assumption of the Assumed Contracts in connection with the Sale reflects sound business judgment. See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993) (purpose behind allowing assumption under section 365(a), is to permit the debtor, subject to the approval of the court, to use valuable property of the estate); COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co)., 524 F.3d 373, 383 (2d Cir. 2008) (business judgment test "rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage").

54.     In the Second Circuit, a motion to assume an executory contract is considered a summary proceeding, whereby courts efficiently review a "debtor's decision to adhere to a particular contract in the course of the swift administration of the bankruptcy estate." See Orion Pictures, 4 F.3d at 1099. In conducting such review, bankruptcy courts should "examine a contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it." Id. (the court "sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed"). In other words, the Court must place itself in the position of the Debtors and determine "whether assuming the contract would be a good business decision or a bad one." Penn Traffic, 524 F.3d at 383; see also, Orion Pictures, 4 F.3d 1099. If a debtor's business judgment has been exercised reasonably, the court should approve the assumption of an executory contact. See In re Ionosphere Clubs, Inc., 100 B.R. 670, 680 (Bankr. S.D.N.Y 1989).

55.     Here, a review of relevant facts shows that the Court should approve the Debtors' decision to assume the Assumed Contracts in connection with the Sale as a sound exercise of

their business judgment, consistent with the well-settled standard in this district governing same. First, the Assumed Contracts are necessary to run the Debtors' business; as such, they are essential to inducing the best offer for the Acquired Assets. Second, it is unlikely that any purchaser would want to acquire any company on a going-concern basis unless the contracts and leases needed to conduct the business and manage the day-to-day operations were included in the transaction. Third, the APA provides that the assumption of Assumed Contracts is integral to, and inextricably integrated in, the Sale. Finally, the Assumed Contracts will be assumed though the process approved by the Court by the Assumption Procedures contained in the Bidding Procedures Order and, thus, will likely have been reviewed by key constituents. Therefore, the assumption of the Assumed Contracts by way of the Assumption Procedures should be approved as an exercise of business judgment.

(ii) Defaults Under the Assumed Contracts Will be Cured Through the Sale

56. Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest if its estate, courts must then evaluate whether the assumption meets the requirements of Section 365(b) of the Bankruptcy Code: (a) that a debtor cure, or provide adequate assurance of prompt cure, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom and (c) provide adequate assurance of future performance thereunder.

57. The Debtors submit that the statutory requirements of Section 365(b)(1)(A) of the Bankruptcy Code will be satisfied (and promptly) because the APA requires as a condition to close the Sale, that the Seller cure all defaults associated with, or required to properly assume, the Assumed Contracts. Because the Bidding Procedures Order (once approved) provides a clear process by which to resolve disputes over cure or other defaults, the Debtors are confident that if

defaults exist that must be cured, such cure will be achieved fairly, efficiently and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

        (iii)     Non-Debtor Parties Will be Adequately Assured of Future Performance.

58.    Similarly, the Debtors submit that the third requirement of Section 365(b)(1)(C) of the Bankruptcy Code – adequate assurance of future performance – is also satisfied given the facts and circumstances present here. The phrase 'adequate assurance of future performance' adopted from Section 2-609(1) of the Uniform Commercial Code, is to be given a "practical, pragmatic construction" based upon the facts and circumstances of each case. Matter of U.L. Radio Corp., 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).

59.    Although no single solution will satisfy every instance, the required assurance falls short of an absolute guarantee of performance. See In re Embers 86th St., 184 B.R. 892, 902 (Bankr. S.D.N.Y. 1995) ("In assessing adequate assurance of future performance under § 365(b) (1) (C), the test is *not* one of guaranty, but simply whether it *appears* that the rent will be paid and other obligations met") (emphasis added, internal citations omitted). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has resources to perform and has expressed a willingness to devote sufficient funding to its business to do so).

60.    The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder (or other Successful Bidder) will be satisfied at the Sale Hearing. As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders prior to designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness and ability of the interested party

to perform under the Assumed Contracts). Further, all counterparties will be provided with notice of the proposed assumption and assignment and will have adequate time and opportunity to object to the assumption or proposed cure amount or otherwise be heard with respect thereto.

## Motion Practice

61. This motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York.

## Notice

62. The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee, (b) the creditors listed on the Debtors' consolidated list of 30 largest unsecured creditors, as filed with the Debtors' chapter 11 petitions, (c) counsel to the administrative agent for the lenders under the Debtors' prepetition first lien credit facility, (d) counsel to the administrative agent for the lenders under the Debtors' prepetition second lien credit facility, (e) counsel to the administrative agent for the lenders under the Debtors' prepetition unsecured mezzanine credit facility, (f) the Internal Revenue Service, (g) the Federal Energy Regulatory Commission, (h) the Environmental Protection Agency, (i) all entities known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in any of the assets offered for sale, (j) parties to executory contracts and unexpired leases proposed to be assumed and assigned, or rejected as part of the proposed transaction, and (k) to the extent not already included in clauses (a) – (j), the Master Service List (as defined in the Case Management Order,

when entered).[11]  In light of the nature of the relief requested and the notice requirements in the Sale Guidelines, the Debtors submit that no further notice is required or needed under the circumstances.

63.    A   copy   of   this   Motion   is   available   on   this   Court's   website: http://www.nysb.uscourts.gov/.  Additional copies of this Motion are available on the website of the   Debtors'   claims   and   noticing   agent,   The   Garden   City   Group,   Inc.,   at www.bgrestructuring.com or can be requested by calling 866-454-3498.

## No Prior Request

64.    No previous request for the relief sought herein has been made to this Court or any other court.

---

[11]    Certain exhibits annexed to this Motion were, due to their length, not served on the listed notice parties. However, all noticed parties were  provided with a copy of this Motion and instructed that all exhibits to the Motion are available on this Court's PACER system or at www.bgrestructuring.com.

WHEREFORE, the Debtors respectfully request that this Court enter the Bidding Procedures Order and the Sale Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested herein, and granting such other and further relief as is just and proper.

Dated:  August 18, 2010          Respectfully Submitted,
New York, New York

/s/ D.J. Baker
D. J. Baker
Robert J. Rosenberg
Caroline A. Reckler (appearing *pro hac vice*)
Kimberly A. Posin (appearing *pro hac vice*)
Jason B. Sanjana (No. 4522454)
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864

Proposed Counsel to the Debtors
and Debtors-in-Possession

CH\1171503.25