Bennett G. Young (admitted pro hac vice)
Paul S. Jasper (admitted pro hac vice)
**DEWEY & LEBOEUF LLP**
One Embarcadero Center, Suite 400
San Francisco, CA  94111
Telephone: (415) 951-1100
Facsimile:  (415) 951-1180

- and -

Irena M. Goldstein
**DEWEY & LEBOEUF LLP**
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

Attorneys for Algonquin Gas Transmission, LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Boston Generating, LLC,<br><u>et al.</u>,[1]<br><br>              Debtors. | Chapter 11<br><br>Case No. 10-14419 (SCC)<br><br>Jointly Administered |

<u>**NOTICE OF MOTION FOR WITHDRAWAL OF REFERENCE**</u>

PLEASE TAKE NOTICE that upon the Motion of Algonquin Gas Transmission, LLC

("<u>Algonquin</u>") for Withdrawal of Reference With Respect to First Omnibus Motion of Debtors

for Entry of Order Authorizing the Debtors to Reject Certain Executory Contracts *Nunc Pro*

*Tunc* to Their Respective Notice Dates (the "<u>Motion</u>"), the Declaration of Richard M. Paglia in

Support of the Motion, dated September 1, 2010, and the exhibits attached thereto, Algonquin

will move the United States District Court for the Southern District of New York (the "<u>District

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification number, include: Boston Generating, LLC (0631); EBG Holdings LLC (3635); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC (7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

Court") at the United States Courthouse, 500 Pearl Street, New York, New York 10007 for an

order pursuant to 28 U.S.C. § 157(d) and Federal Rule of Bankruptcy Procedure 5011

withdrawing the reference from the United States Bankruptcy Court for the Southern District of

New York to the District Court of the Motion of Debtors for Entry of Order Authorizing the

Debtors to Reject Certain Executory Contracts *Nunc Pro Tunc* to Their Respective Notice Dates

[Chapter 11 Docket No. 75] as well as for such other and further relief as the District Court

deems just and proper.  A hearing on the Motion shall be scheduled at a date and time that is

convenient for the District Court.

Dated:  September 1, 2010    **DEWEY & LEBOEUF LLP**


By:/s/ Irena M. Goldstein
    Irena M. Goldstein
    **DEWEY & LEBOEUF LLP**
    1301 Avenue of the Americas
    New York, New York 10019
    Tel: (212) 259-8000
    Fax: (212) 259-6333

    - and -

    Bennett G. Young (admitted pro hac vice)
    Paul S. Jasper (admitted pro hac vice)
    **DEWEY & LEBOEUF LLP**
    One Embarcadero Center, Suite 400
    San Francisco, CA  94111
    Tel:  (415) 951-1100
    Fax:  (415) 951-1180

    **Attorneys for Algonquin Transmission
    Company, LLC**

Bennett G. Young (admitted pro hac vice)
Paul S. Jasper (admitted pro hac vice)
**DEWEY & LEBOEUF LLP**
One Embarcadero Center, Suite 400
San Francisco, CA 94111
Telephone: (415) 951-1100
Facsimile: (415) 951-1180

- and -

Irena M. Goldstein
**DEWEY & LEBOEUF LLP**
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

Attorneys for Algonquin Gas Transmission, LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Boston Generating, LLC,<br><u>et al.</u>,[1]<br><br>                Debtors. | Chapter 11<br><br>Case No. 10-14419 (SCC)<br><br>Jointly Administered |

**MOTION OF ALGONQUIN GAS TRANSMISSION, LLC**
**FOR WITHDRAWAL OF REFERENCE WITH RESPECT TO**
**FIRST OMNIBUS MOTION OF DEBTORS FOR ENTRY OF ORDER**
**AUTHORIZING THE DEBTORS TO REJECT CERTAIN EXECUTORY**
**CONTRACTS *NUNC PRO TUNC* TO THEIR RESPECTIVE NOTICE DATES**

Algonquin Gas Transmission, LLC ("**Algonquin**"), by and through its undersigned

counsel, submits this memorandum in support of its motion, pursuant to 28 U.S.C. § 157(d),

Federal Rule of Bankruptcy Procedure 5011, and Rule 5011.1 of the Local Rules of Bankruptcy

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification number, include: Boston Generating, LLC (0631); EBG Holdings LLC (3635); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC (7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

Procedure for the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") for an order withdrawing the reference to the Bankruptcy Court of the First Omnibus Motion of Debtors for Entry of Order Authorizing the Debtors to Reject Certain Executory Contracts *Nunc Pro Tunc* to Their Respective Notice Dates (the "**Rejection Motion**") [Docket No. 75] with respect to the HubLine Service Agreement (as defined below).

## PRELIMINARY STATEMENT

Algonquin is a counterparty to a contract with Sithe Fore River Development LLC (now Fore River Development, LLC) ("**Fore River**"), one of the above-captioned debtors, under which Algonquin agreed to reserve capacity and provide transportation service for natural gas tendered by Fore River on a firm basis for a primary contract term of twenty years. On August 27, 2010, Boston Generating, LLC and its affiliated entities (collectively, the "**Debtors**") filed the Rejection Motion with the Bankruptcy Court seeking authorization to reject, among other executory contracts, the Service Agreement (Applicable to Rate Schedule AFT-1) (the "**HubLine Service Agreement**"), Contract No. 510008, dated as of January 31, 2001, by and among Fore River, Algonquin, and Sithe Power Marketing, L.P.[2]

Pursuant to 28 U.S.C. § 157(d), this Court must withdraw the reference to the Bankruptcy Court of the Rejection Motion with respect to the HubLine Service Agreement because resolution of this matter necessarily requires, as a threshold matter, consideration of the interrelationship between the Bankruptcy Code and federal non-bankruptcy laws regulating

---

[2] Sithe Power Marketing is a party to the HubLine Service Agreement solely for purposes of Article VIII thereof, which provides that the HubLine Service Agreement shall supersede certain other prior contracts. The Rejection Motion also seeks authority for the Debtors to reject an unrelated terminalling agreement with Sprague Energy Corp. (the "**Terminalling Agreement**"). Algonquin is not a party to the Terminalling Agreement and does not seek withdrawal of the reference of the Rejection Motion with respect to that agreement.

organizations or activities affecting interstate commerce, namely, the Natural Gas Act, 15 U.S.C. § 717, *et seq.* ("**Natural Gas Act**") and related case law.

Specifically, the Debtors' motion to reject the HubLine Service Agreement raises two fundamental legal issues, both of which require the District Court, as opposed to the Bankruptcy Court, to interpret the interplay between bankruptcy law and the body of federal law governing natural gas transportation contracts. First, this Court must determine whether the Debtors are authorized to reject an executory energy contract notwithstanding the vesting of exclusive authority over the rates, terms and conditions of natural gas transportation service agreements in the Federal Energy Regulatory Commission ("**FERC**") or whether FERC and the Bankruptcy Court each have concurrent jurisdiction under their governing statutes. Second, this Court must determine the appropriate standard for authorizing the rejection of natural gas transportation service agreements – *i.e.*, whether the public interest standard underlying the Natural Gas Act, as opposed to the traditional "business judgment" standard utilized for rejection of executory contracts, must be applied.

The expeditious resolution of these issues is necessary to clarify the respective authority of FERC and the Bankruptcy Court with respect to the HubLine Service Agreement and will dictate the proper standard to be applied by the District Court (or the Bankruptcy Court) in deciding the Rejection Motion. This Court's resolution of these fundamental issues at this early juncture will streamline future proceedings in the Debtors' bankruptcy and promote judicial economy.

## JURISDICTION

The Bankruptcy Court has jurisdiction over the Debtors' chapter 11 proceeding pursuant to 28 U.S.C. § 1334(a). The District Court has jurisdiction to consider this Motion under 28

U.S.C. §§ 157, 1334 and 1412. This matter is a core proceeding under 28 U.S.C. § 157(b). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

## MEMORANDUM OF LAW

This Motion includes citations to the applicable authorities and a discussion of their application to this Motion. Accordingly, Algonquin respectfully submits that such citations and discussion satisfy the requirement of Local Rule 9013-1 for the Bankruptcy Court of the Southern District of New York and Local Civil Rule 7.1 of the Southern District of New York that motions be accompanied by memoranda of law.

## STATEMENT OF FACTS

### A.     The Bankruptcy Proceedings, Sale Motion and Rejection Motion

On August 18, 2010, the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing these chapter 11 cases. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. Fore River is a debtor in possession whose bankruptcy case is being jointly administered in the chapter 11 cases.

On August 19, 2010, the Debtors filed their Motion of the Debtors for Entry of (I) an Order Approving and Authorizing (A) Bidding Procedures in Connection with the Sale of Substantially All of the Assets of the Debtors, (B) Stalking Horse Bid Protections, (C) Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with the Sale of Substantially All of the Assets of the Debtors, (D) the Form and Manner of Notice of the Sale Hearing and (E) Related Relief; and (II) an Order Approving and Authorizing (A) the Sale of Substantially all of the Assets of the Debtors Free and Clear of Claims, Liens, Liabilities, Rights Interests and Encumbrances, (B) the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement, (C) the Debtors to Assume and

SF 231170.1 314147 000005

Assign Certain Executory Contracts and Unexpired Leases, (D) the Transition Services Agreement and (E) Related Relief [Dkt. No. 24] (the "**Sale Motion**"). In the Sale Motion, the Debtors seek approval for the sale of their assets, including the Fore River Plant (defined below). In light of the Rejection Motion, the Debtors apparently seek to obtain a higher price for the Fore River Plant by stripping it of the HubLine Service Agreement.[3]

By letter dated August 24, 2010 (the "**Notice of Rejection Letter**"), Gary L. Schultz, Vice President of Boston Generating, LLC, notified Algonquin that the Debtors intended to file a motion to reject the HubLine Service Agreement. The Notice of Rejection Letter specified that the proposed rejection would not affect the rights and obligations of Algonquin and the Debtors under the 2004 OBA Agreement (defined below).

On August 27, 2010, the Debtors filed the Rejection Motion seeking authority, pursuant to 11 U.S.C. § 365(a), to reject two executory contracts - the HubLine Service Agreement and a terminalling agreement between Fore River and Sprague Energy Corp. The Rejection Motion is presently scheduled to be heard by the Bankruptcy Court on September 13, 2010.

**B.      Construction of the Fore River Plant, the Algonquin Interconnection, and the Prior Agreements**

On September 28, 1999, Algonquin and Sithe Power Marketing, L.P. ("**SPM**") entered into a Precedent Agreement (the "**1999 Lateral Precedent Agreement**") pursuant to which Algonquin agreed to construct a lateral pipeline facility to serve the Debtors' natural gas-fired electric power plant near Weymouth, Massachusetts (the "**Fore River Plant**"), which plant was still under construction at the time. The Fore River Plant is a 787 megawatt combined-cycle power plant that burns natural gas to generate power. *See* Declaration of Jeff Hunter, Manager,

---

[3] The Debtors' attempt to sell the Fore River Plant while rejecting the HubLine Service Agreement is a not-so-subtle attempt to circumvent the filed rate doctrine by obtaining a sale price for the Fore River Plant stripped of the rate, terms and conditions approved by the FERC. Algonquin reserves its right to seek an order withdrawing the reference to the Bankruptcy Court with respect to the Sale Motion.

Executive Vice President And Chief Financial Officer of EBG Holdings LLC, in Support of Chapter 11 Petitions and First Day Pleadings (the "**Hunter Declaration**"), ¶ 20 [Dkt. No. 2]. The Fore River Plant went into service in August 2003. *Id.* The facility is located on a 77-acre site in North Weymouth, Massachusetts, which is approximately 12 miles south of Boston. *Id.*

Contemporaneous with the 1999 Lateral Precedent Agreement, Algonquin and SPM entered into the Service Agreement (Applicable to Rate Schedule AFT-CL), Contract No. 99004 (the "**1999 Lateral Service Agreement**"), a firm transportation agreement governed by Rate Schedule AFT-CL of Algonquin's FERC Gas Tariff, and a letter agreement (the "**1999 Lateral Letter Agreement**") whereby the parties agreed to the rate that would be applicable to service under the firm transportation agreement as well as certain additional elements of the transaction.

On November 29, 1999, Algonquin filed an application with the FERC in Docket No. CP00-34-000 requesting a certificate of public convenience and necessity to construct a new lateral pipeline to provide service to the Fore River Plant. The 1999 Lateral Precedent Agreement, 1999 Lateral Service Agreement and 1999 Lateral Letter Agreement were evidence of market support for the proposed expansion project. On July 26, 2000, FERC issued an order authorizing Algonquin to construct and operate the proposed facilities. *See* 92 FERC ¶ 61,071 (2000).

On August 2, 2000, Algonquin and SPM entered into a Precedent Agreement (the "**2000 HubLine Precedent Agreement**" and, along with the 1999 Lateral Precedent Agreement, the "**Precedent Agreements**") whereby Algonquin agreed to construct an expansion of its pipeline system called the HubLine Expansion (the "**HubLine Project**"), which would connect Algonquin's facilities with the facilities of another interstate pipeline and provide additional natural gas transportation service in the New England region. Contemporaneous with the 2000

HubLine Precedent Agreement, Algonquin and SPM entered into the Service Agreement (Applicable to Rate Schedule AFT-1), Contract No. 99025 (the "**2000 HubLine Service Agreement**" and, along with the 1999 Lateral Service Agreement, the "**Prior Service Agreements**"), a firm transportation agreement governed by Rate Schedule AFT-1 of Algonquin's FERC Gas Tariff, and a letter agreement (the "**2000 HubLine Letter Agreement**" and, along with the 1999 Lateral Letter Agreement, the "**Letter Agreements**") whereby the parties agreed to the rates that would be applicable to service under the firm transportation agreement as well as certain additional elements of the transaction. SPM had the option under the 2000 HubLine Precedent Agreement to convert its firm transportation service from the existing lateral service agreement under Rate Schedule AFT-CL in the project approved by FERC in Docket No. CP00-34-000 to firm transportation service in the HubLine Project pursuant to a service agreement under Rate Schedule AFT-1 and SPM elected to do so per the terms of that agreement.

On October 10, 2000, Algonquin filed an application with the FERC in Docket No. CP01-5-000, requesting a certificate of public convenience and necessity to construct the HubLine Project facilities and provide transportation service to several shippers, including SPM. The 2000 Precedent Agreement, 2000 HubLine Service Agreement and 2000 Letter Agreement were evidence of market support for the HubLine project. As part of that application Algonquin proposed to include in the HubLine Project, on the in-service date of the HubLine Project, the facilities previously approved in Algonquin's Fore River Project in Docket No. CP00-34-000.

On January 31, 2001, Algonquin, SPM, and Fore River (then known as Sithe Fore River Development, LLC) entered into the Assignment and Assumption Agreement (Precedent Agreements) and the Assignment and Assumption Agreement (Letter Agreements) whereby

SPM assigned to Fore River its rights and duties under the Precedent Agreements and the Letter Agreements, respectively. Contemporaneously, Algonquin, SPM, and Fore River entered into the transportation service agreement governed by Rate Schedule AFT-CL of Algonquin's FERC Gas Tariff, Contract No. 510009 (the "**Lateral Service Agreement**"), which superseded the 1999 Lateral Service Agreement.

On December 21, 2001, FERC issued a certificate of public convenience and necessity to Algonquin authorizing it to construct the HubLine Project and provide transportation service to the project customers, including SPM. [4] The 2000 HubLine Letter Agreement, which established the negotiated rate applicable to service under the HubLine Service Agreement, was filed with the FERC on October 10, 2003 in Docket No. RP00-70-003 and approved by the FERC by letter order dated November 7, 2003.[5] Service to SPM under the HubLine Service Agreement commenced on November 23, 2003.

C.     **The HubLine Service Agreement at Issue**

Also on January 31, 2001, Algonquin, Fore River (then known as Sithe Fore River Development, LLC), and SPM entered into the HubLine Service Agreement that is the subject of the Rejection Motion, pursuant to which Algonquin agreed to reserve capacity and provide transportation service for natural gas tendered by Fore River on a firm basis for a primary term of twenty years. Pursuant to the HubLine Service Agreement, Algonquin reserves capacity for, and transports up to, 140,000 dekatherms ("**Dth**") of natural gas per day delivered at a single delivery point serving the Fore River Plant. The HubLine Service Agreement superseded both the 2000 HubLine Service Agreement and the 1999 Lateral Service Agreement. *See* HubLine

---

[4] Algonquin Gas Transmission Co., 97 FERC 61,345 (Dec. 21, 2001); amended order Algonquin Gas Transmission Co., 99 FERC 61,277 (June 4, 2002); preliminary determination order Algonquin Gas Transmission Co., 95 FERC 61,077 (Apr. 13, 2001).

[5] Algonquin Gas Transmission Co., Docket No. RP00-70-003 (Nov. 7, 2003) (unpublished letter order).

Service Agreement, §§ 8.1, 8.2. A true and accurate copy of the HubLine Service Agreement is attached as Exhibit A to the Declaration of Richard M. Paglia in Support of Motion of Algonquin Gas Transmission, LLC for Withdrawal of Reference With Respect to First Omnibus Motion of Debtors for Entry of Order Authorizing the Debtors to Reject Certain Executory Contracts *Nunc Pro Tunc* to Their Respective Notice Dates (the "**Paglia Declaration**"), filed herewith.

The applicable recourse rates for such service on Algonquin's HubLine facilities are established under Rate Schedule AFT-1 which is part of Algonquin's FERC-approved gas tariff (the "**Algonquin Tariff**"). Section 7 of Rate Schedule AFT-1 incorporates by reference the General Terms and Conditions of the Algonquin Tariff. The negotiated rates for shippers on the HubLine Project, including Fore River, were approved by the FERC in a Letter Order issued on November 7, 2003, in Docket No. RP00-70-003. The negotiated rate applicable to the HubLine Service Agreement was subsequently modified and approved by the FERC in a Letter Order dated February 21, 2008 in Docket No. RP00-70-018.

Pursuant to the terms of its FERC-approved negotiated rate, Fore River pays Algonquin a fixed monthly charge of approximately $719,000 and a variable charge based on usage. In the Rejection Motion, the Debtors assert that they owed Algonquin $1,149,729 on account of outstanding pre-petition charges. *See* Rejection Motion, ¶ 7.

> **D.    The Fore River Plant Receives All of Its Fuel Via Algonquin's Pipeline Facilities**

The only means for the Fore River Plant to obtain natural gas is through Algonquin's pipeline facilities. As the Debtors indicate in the Rejection Motion, when initially conceived, the Fore River Plant intended to use natural gas as its primary source of fuel and to have the option to use low sulfur diesel fuel as a backup fuel source. Rejection Motion, ¶ 11. However, the Debtors have never successfully implemented the ability to efficiently run the Fore River Plant

SF 231170.1 314147 000005

using low sulfur diesel fuel. *Id.* As a result, the Fore River Plant has solely been operated using natural gas. *Id.*

The Fore River Plant does not have access to natural gas except via Algonquin's pipeline facilities. No other natural gas pipeline serves the Fore River Plant. If a purchaser of the Fore River Plant does not assume the HubLine Service Agreement and desires to operate the plant using natural gas, the purchaser will need to enter into alternative arrangements for transportation of natural gas on the Algonquin pipeline, presumably at a rate different than the FERC-approved rate for service under the HubLine Service Agreement.

The Fore River Plant has a single delivery point where natural gas is delivered to the plant. Fore River has the right under its service agreement to receive gas on the Algonquin pipeline system at two primary receipt points for transport to the Fore River Plant. The first primary receipt point is the interconnection of the Algonquin pipeline with the Maritimes & Northeast Pipeline system in Beverly, Massachusetts, which can receive up to 70,000 Dth per day. The second primary receipt point is the interconnection of Algonquin's HubLine system with its Q and I-3 pipeline systems, which can likewise receive up to 70,000 Dth per day. Together, these two primary receipt points receive up to the maximum daily transportation quantity ("**MDTQ**") of 140,000 Dth reserved for Fore River pursuant to the HubLine Service Agreement. A diagram illustrating the receipt and delivery points is attached hereto as Exhibit B to the Paglia Declaration.

Under the HubLine Service Agreement, the Fore River Plant has primary (i.e., highest priority) access to capacity on Algonquin's pipeline for transportation of volumes of natural gas of up to 140,000 Dth per day. If the HubLine Service Agreement is rejected, there will be no transportation service agreements in place with Algonquin where a shipper will have the Fore

River delivery point as a primary point of delivery on its contract. In the absence of an alternate firm transportation service agreement with Algonquin establishing the Fore River delivery point as a primary point of delivery, the Fore River Plant owner will be dependent upon gas being delivered to the Fore River Plant under service agreements having a lower service priority, and, thus, subject to curtailment before service agreements with primary firm priority, like the service currently provided under the HubLine Service Agreement. Moreover, the HubLine Service Agreement gives the shipper certain delivery pressure assurances on Algonquin's HubLine System with respect to the natural gas that Algonquin delivers to the Fore River delivery point that will no longer be in place if the HubLine Service Agreement is rejected.

### E. Subsequent Related Agreements

On September 1, 2004, Fore River and Algonquin entered into the Operational Balancing Agreement Between Algonquin Gas Transmission, LLC and Fore River Development, LLC (the "**2004 OBA Agreement**"), establishing the terms for addressing imbalances between scheduled and actual deliveries of natural gas at the delivery point to the Fore River plant. The 2004 OBA Agreement replaced a prior operational balancing agreement entered into on August 1, 2002, between SPM and Algonquin.

By transmittal letter dated January 30, 2008, Algonquin and Fore River agreed to a new negotiated rate applicable to service under the HubLine Service Agreement (the "**2008 HubLine Negotiated Rate Agreement**"). The 2008 HubLine Negotiated Rate Agreement, which superseded and replaced the 2000 HubLine Letter Agreement, and the Statement of Negotiated Rates attached thereto, was filed with the FERC on January 30, 2008 in Docket No. RP00-70-018 and approved by unpublished letter order dated February 21, 2008.[6]

---

[6] Algonquin Gas Transmission, LLC, Docket No. RP00-70-018 (Feb. 21, 2008) (unpublished letter order).

<u>**ARGUMENT**</u>

I.   **THE REFERENCE MUST BE WITHDRAWN BECAUSE RESOLUTION OF THE REJECTION MOTION REQUIRES SUBSTANTIAL AND MATERIAL CONSIDERATION OF FEDERAL ENERGY LAW**

   A.   **Standard for Mandatory Withdrawal**

Under 28 U.S.C. § 1334(b), district courts have original jurisdiction of "all civil proceedings arising under Title 11, or arising in or related to cases under Title 11." Each district court may provide, however, that such proceedings will be "referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a). In this district, all such proceedings are automatically referred to the Bankruptcy Court pursuant to the "Standing Order of Referral of Cases to Bankruptcy Judges," dated July 10, 1984 (Ward, Acting C.J.).

Notwithstanding the automatic reference of bankruptcy cases and proceedings, a district court must withdraw the reference "if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d). The mandatory withdrawal provision in section 157(d) "require[s] withdrawal to the district court of cases or issues that would otherwise require a bankruptcy court judge to engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes." *City of New York v. Exxon Corp.,* 932 F.2d 1020, 1026 (2d Cir. 1991); *see also United States Gypsum Co. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.),* 145 B.R. 539, 541 (N.D. Tex. 1992).

Withdrawal of the reference is required when "'substantial and material' potential conflict exists between non-bankruptcy federal laws and Title 11." *Keene Corp. v. Williams Bailey & Wesner LLP (In re Keene Corp.),* 182 B.R. 379, 382 (S.D.N.Y. 1995) (citations omitted). Moreover, "[t]he 'substantial and material' standard is satisfied even where a non-

bankruptcy federal statute only 'arguably conflicts' with the Bankruptcy Code." *See In re Cablevision S.A.,* 315 B.R. 818, 821 (S.D.N.Y. 2004) (citations omitted). Thus, where a proceeding pending in the bankruptcy court requires the court to engage in "something more than the mere process of examining, thinking about or taking into account" federal laws other than the Bankruptcy Code, section 157(d) mandates withdrawal of the reference. *In re Horizon Air, Inc.,* 156 B.R. 369, 373 (N.D.N.Y. 1993) (citing *Am. Freight Sys., Inc. v. Interstate Commerce Comm'n (In re Am. Freight Sys., Inc.),* 150 B.R. 790, 792 (D. Kan. 1993)); *see also Envtl. Prot. Agency v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.),* 134 B.R. 188, 192 (N.D. Tex. 1991) (holding withdrawal of the reference to be mandatory because unresolved issues addressed the intersection of CERCLA and the Bankruptcy Code).

Where a non-bankruptcy federal law conflicts with the Bankruptcy Code, as it does here, courts have consistently held that withdrawal is mandatory. *See, e.g., California Department of Water Resources v. Calpine Corp. (In re Calpine Corp.)*, 337 B.R. 27, 35 (S.D.N.Y. 2006) ("Having determined that the Bankruptcy Code does not expressly limit FERC's jurisdiction, and that it contemplates agency action during the pendency of a reorganization, it is clear the bankruptcy court's authority cannot be exercised so as to interfere with the jurisdiction of a federal agency acting in its regulatory capacity."); *Cablevision,* 315 B.R. at 821 ("The 'substantial and material' standard is satisfied even where a non-bankruptcy federal statute only 'arguably conflicts' with the Bankruptcy Code."); *Enron Power Mktg., Inc. v. Cal. Power Exch. Corp. (In re Enron Corp.),* no. 04-cv-8177, 2004 WL 2711101, at *4 (S.D.N.Y. Nov. 23, 2004); *Bear, Stearns Secs. Corp. v. Gredd,* No. 01-4379, 2001 WL 840187, *3 (S.D.N.Y. July 25, 2001); *Pension Benefit Guaranty Corp. v. LTV Corp. (In re Chateaugay Corp.),* 86 B.R. 33, 37 (S.D.N.Y. 1988).

As demonstrated below, withdrawal of the reference is mandated here. First, in order to resolve the Rejection Motion, the court must determine, as a threshold issue, whether it can order the rejection of the HubLine Service Agreement notwithstanding FERC's exclusive jurisdiction over the rates, terms and conditions for the transportation of natural gas in interstate commerce. Second, assuming the court has the authority to authorize the rejection of the HubLine Service Agreement, the court must also determine whether the standard for rejection should include the consideration of the public interest so as to harmonize the federal bankruptcy standard with the federal Natural Gas Act requirement that a contract with fixed terms cannot be unilaterally modified absent a showing that the modification is in the public interest (as discussed below). These are precisely the types of issues Congress envisioned must be resolved by Article III courts when it enacted the mandatory withdrawal provisions of 28 U.S.C. § 157(d). Accordingly, the reference of the Rejection Motion must be withdrawn.

**B. Resolution Of The Rejection Motion Will Require Substantial And Material Consideration Of Title 11 And Federal Energy Law**

**1. A Conflict Exists Between FERC's Exclusive Jurisdiction Over Natural Gas Transportation Contracts And the Bankruptcy Court's Authority To Authorize the Rejection Of Executory Contracts**

The Rejection Motion raises issues that are the subject of FERC's exclusive jurisdiction under the Natural Gas Act. The Natural Gas Act governs the transportation of natural gas in interstate commerce and confers exclusive jurisdiction over such agreements in the FERC. *See* 15 U.S.C. §717(b). Sellers and transporters of natural gas must file their rates and charges with the FERC. *See* 15 U.S.C. §717c(c) and (d). Such rates are lawful only if they are "just and reasonable." *See* 15 U.S.C. §717c(a). Algonquin is a transporter of natural gas in interstate commerce, and therefore is defined as a "natural-gas company" under the Natural Gas Act. *See* 15 U.S.C. §717a(6). Accordingly, Algonquin, and the HubLine Service Agreement are subject

to the Natural Gas Act, 15 U.S.C. §717, *et seq.*

FERC's exclusive jurisdiction is not limited to natural gas rates but extends to "classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services." *See* 15 U.S.C. 717c(c). The Natural Gas Act grants FERC the power to "perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate" to carry out the provisions of the Natural Gas Act. *See* 15 U.S.C. §717o; 18 C.F.R. §375.101. Sections 4 and 5 of the Natural Gas Act, 15 U.S.C. §§717c and 717d, authorize FERC's "plenary review of the contracts and rate schedules established by [natural gas] companies." *Natural Gas Pipeline Company of America v. F.E.R.C.*, 904 F.2d 1469, 1470 (10th Cir. 1990) (citing *Colorado Interstate Gas Co. v. F.E.R.C.*, 791 F.2d 803, 806 (10th Cir. 1986), *cert. denied*, 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987)). The Supreme Court has similarly observed that FERC has exclusive jurisdiction over the prices charged for interstate power sales at wholesale. *Miss. Power & Light Co. v. Moore,* 487 U.S. 354, 371 (1988).

Under the "filed rate doctrine," as defined by the United States Supreme Court, transporters and sellers of natural gas are allowed to charge only those rates, and implement and enforce only those terms and conditions, that the FERC has approved. *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981); *see also East Tennessee Natural Gas Co. v. Federal Energy Regulatory Commission*, 863 F.2d 932, 941 (D.C. Cir. 1988). The analysis of the filed rate doctrine is identical under the Federal Power Act (the "**FPA**") and the Natural Gas Act. *See, e.g.*, *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 n.7 (1981) (noting that in Filed Rate Doctrine analysis, the Court "follow[s] our established

practice of citing interchangeably decisions interpreting the pertinent sections of the [NGA and FPA]," citing *Permian Basin Rate Cases*, 390 U.S. 747, 820-21 (1968), because "the relevant provisions of the two statutes are in all material respects substantially identical," quoting *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 353 (1956)); *see also E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1041 (9th Cir. 2007) (noting that filed rate doctrine analysis in FPA cases is applicable to rates under the NGA because the FPA and NGA are substantially identical).

FERC has exclusive jurisdiction over the rates, terms and conditions for natural gas transportation services. A natural gas transportation services agreement filed with, and/or approved by, the FERC must be respected by the courts. "No court may substitute its own judgment on reasonableness for the judgment of the Commission. The authority to decide whether the rates are reasonable is vested by … the Act solely in the Commission." *Arkansas Louisiana Gas Co.,* 453 U.S. at 577. "It has been widely recognized that the filed rate doctrine prohibits any collateral attack in the courts on the reasonableness of rates, and that the only forum for such a challenge is the FERC." *In re Calpine Corp.*, 337 B.R. at 32. Once FERC has approved a rate it has determined to be reasonable, a court "can assume no right to a different one on the ground that, in its opinion, it is the only, or the more reasonable one," unless it is reviewing a Commission order. *Id.* (quoting *Nantahala Power and Light Co. v. Thornberg,* 476 U.S. 953, 963-64 (1986)).

Absent a bankruptcy filing, FERC, by virtue of the power granted it by the Natural Gas Act, has the exclusive authority to approve any modification in the rates, terms or conditions of a natural gas transportation contract. *See Arkansas Louisiana Gas Co.*, 453 U.S. at 577; *see also East Tennessee Natural Gas Co.*, 863 F.2d at 941. Likewise, with respect to the FPA, FERC has specifically held that "even if a public utility files for bankruptcy, the utility must still meet its

obligations under the FPA." *Blumenthal v. NRG Power Mktg., Inc.*, 104 FERC ¶ 61,210 at ¶ 1 (2003).  In the seminal *Mobile* and *Sierra* cases, the Supreme Court made clear that Sections 205 and 206 of the FPA operate to preserve both private contractual rights and the paramount authority of FERC to ensure that rates to the public are just and reasonable.  *See United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.,* 350 U.S. 332, 338-339 (1956), and *FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 353 (1956).  Thus, outside of bankruptcy, if Fore River wished to alter the rates, terms or conditions of the HubLine Service Agreement, it would have to seek permission from FERC.

Nevertheless, the Debtor is seeking to utilize Sections 363 and 365 of the Bankruptcy Code to reject the HubLine Service Agreement in the Bankruptcy Court and sell the Fore River Plant without FERC's approval notwithstanding FERC's jurisdiction under the Natural Gas Act. In this case, the Rejection Motion and Sale Motion work in conjunction to circumvent the filed rate doctrine in order to maximize the sale price of the Fore River Plant by stripping it of the FERC-approved gas transportation rate, terms, and conditions set forth in the HubLine Service Agreement.   Thus, the Rejection Motion places FERC's jurisdiction over natural gas transportation contracts into direct conflict with the power of bankruptcy courts to approve rejection of executory contracts pursuant to Section 365 of the Bankruptcy Code.

> 2. **Courts Considering Motions to Reject Contracts that Implicate Federal Energy Laws Have Consistently Concluded that Withdrawal of the Reference Was Mandatory**

Where a debtor seeks to reject an executory contract that is subject to FERC's exclusive jurisdiction, courts have held that withdrawal is mandatory.  *California Department of Water Resources v. Calpine Corp. (In re Calpine Corp.)*, 337 B.R. 27, 32 (S.D.N.Y. 2006)*; NRG Power Mktg., Inc. v. Blumenthal (In re NRG Energy, Inc.)*, No. 03-3754, 2003 WL 21507685, at *3

SF 231170.1 314147 000005

(S.D.N.Y. June 30, 2003); *Mirant Corp. v. Potomac Power Co. (In re Mirant Corp.)*, 378 F.3d 511, 516 n.2 (5th Cir. 2004).

In *Calpine Corp.*, the District Court for the Southern District of New York held that the FERC has exclusive jurisdiction over power purchase agreements filed with, and regulated by, the FERC and that district courts lack subject matter jurisdiction to authorize rejection of such contracts. *In re Calpine*, 337 B.R. at 29-30. In *Calpine*, Calpine filed a motion seeking authority to reject certain energy contacts pursuant to 11 U.S.C. § 365(a) on the ground that they were the "most financially burdensome" of all of Calpine's energy contracts. *Id.* at 31. The district court ordered withdrawal of the reference to the bankruptcy court, finding that, pursuant to 28 U.S.C. § 157, resolution of the questions before it required substantial and material consideration of both federal law and bankruptcy law and that prior law, including the Fifth Circuit's decision in *Mirant* (discussed below) had not definitively resolved the issue. *Id.* After withdrawing the reference, the district court concluded that FERC had exclusive jurisdiction over the energy contracts Calpine sought to reject. *Id.* at 30.

In reaching its holding, the district court explained that "FERC's jurisdiction and the filed rate doctrine stretches past regulation of rates, 16 U.S.C. § 824d(c), and extends to the terms and conditions of wholesale energy contracts," including the duration of a filed rate energy contract. *Id.* at 32-33. Indeed, "[b]ecause, once filed with FERC, wholesale power contracts become the 'equivalent of a federal regulation, the duty to perform under those contracts may be required, 'not from the private law of contract,' but by FERC itself." *Id.* at 33 (internal citation citing *California ex rel. Lockyer v. Dynegy*, 375 F.3d 831, 839 (9th Cir. 2004) omitted). The court further found little evidence of congressional intent to limit FERC's regulatory authority, that "[t]here are no provisions in the Federal Power Act that specifically limit FERC jurisdiction in

the bankruptcy context" and that "[c]onversely, FERC's lack of authority to modify a filed contract solely because it is in the interest of a private utility, suggests Congress thought no forum ought have such authority." *Id.* at 33. "Absent overriding language, the Bankruptcy Code should not be read to interfere with FERC jurisdiction." *Id.*

Similarly, in the bankruptcy proceedings of Mirant Corporation, the District Court for the Northern District of Texas withdrew the reference to the Bankruptcy Court on the grounds that the resolution of Mirant's motion to reject a power purchase agreement would require more than *de minimis* consideration of the FPA. *See In re Mirant Corp.*, 378 F.3d at 516, n. 2. While the Fifth Circuit ultimately held that, on the facts in that case, the bankruptcy court could authorize the rejection of an energy contract so long as the debtor's reasons for rejection were not related to the rate at which the power was purchased, *see In re Mirant Corp*, 378 F.3d at 519, that holding flatly conflicts with the holding of Judge Casey of this Court in *Calpine Corp.*, 337 B.R. 27, and *NRG Power Mktg., Inc. v. Blumenthal (In re NRG Energy, Inc.)*, No. 03-3754, 2003 WL 21507685, at *3 (S.D.N.Y. June 30, 2003). In *NRG*, Judge Casey held that "given the unique regulatory framework for the business of selling electric energy the pending FERC proceeding," this Court lacked jurisdiction to authorize the rejection of the energy contract at issue in that case. *Id*. at *3. While the ability of Fore River to reject the HubLine Service Agreement and the appropriate standard to be applied are issues for another day, they are issues that must be decided by this Court.

Finally, withdrawal of the reference is supported by the decision of the District Court for the Southern District of New York in *Enron Power Mktg., Inc. v. Cal. Power Exch. Corp. (In re Enron Corp.),* no. 04-cv-8177, 2004 WL 2711101 (S.D.N.Y. Nov. 23, 2004), wherein Judge Casey of this Court held, under similar circumstances, that withdrawal of the reference was

SF 231170.1 314147 000005

mandatory where the Bankruptcy Court's jurisdiction potentially conflicted with FERC's jurisdiction. 2004 WL 2711101, at *4. In *Enron,* the debtor, Enron, sought a judgment from the Bankruptcy Court declaring that certain letter-of-credit proceeds held by defendants California Power Exchange Corp. ("**CalPX**") were property of the Enron bankruptcy estate and that CalPX lacked a valid, perfected security interest in the funds. *Id*. at *1. CalPX had filed a proof of claim asserting that the letter-of-credit proceeds secured a claim against Enron. Meanwhile, FERC had ordered that CalPX retain the collateral pending completion of certain FERC proceedings. *Id.* Thus, the threshold issue in the case was whether FERC or the Bankruptcy Court had jurisdiction over the collateral at issue. This court withdrew the reference to the Bankruptcy Court for determination of the issue, noting that "[s]uch a determination requires an examination of the interrelation between the bankruptcy and federal energy regulatory laws and the spheres of authority that enforce those laws." *Id.* at *4.

The same jurisdictional conflict found to require withdrawal of the reference in *Calpine*, *NRG Power*, *Mirant,* and *Enron* is presented here. Accordingly, the reference with respect to the Rejection Motion must be withdrawn.

## II. THE COURT MUST DETERMINE WHETHER THE NATURAL GAS ACT REQUIRES CONSIDERATION OF THE PUBLIC INTEREST BEFORE AUTHORIZING THE REJECTION OF ENERGY CONTRACTS

Assuming a court were to determine that it has the authority to grant the Rejection Motion, the court would nevertheless be required to determine whether in light of applicable federal energy laws, a heightened standard, including consideration of the public interest, must be applied before a natural gas transportation contract, such as the HubLine Service Agreement, can be rejected. Generally, bankruptcy courts utilize a "business judgment" standard in determining whether to approve or deny motions to reject executory contracts. *See, e.g., Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1099 (2d

20

Cir. 1993). The business judgment standard does not look to the impact rejection will have upon the public at large, focusing instead on the benefit of rejection to the debtor's estate. *Id.*

By contrast, when considering whether to permit modification or termination of wholesale power contracts, FERC must consider the public interest. *See, e.g., Mobile,* 350 U.S. at 344-45; *Sierra,* 350 U.S. at 355.; *see also In re Permian Basin Area Cases*, 390 U.S. 747, 822 (1968) ("The regulatory system created by the [Federal Power] Act is premised on contractual agreements voluntarily devised by the regulated companies; it contemplates abrogation of these agreements only in circumstances of unequivocal public necessity.*"); Pennsylvania Water & Power Co. v. Federal Power Comm'n*, 343 U.S. 414, 423 (1952) (holding that if an energy supplier "wishes to discontinue some or all of the services [the Federal Power Act] opens up a way provided [the supplier] can prove that its wishes are consistent with public interest"); *see also AT&T v. Cent. Office Tel., Inc.*, 524 U.S. 214, 223, 118 S.Ct. 1956, 1963, 141 L.Ed.2d 222 (1998) ("Rates, however, do not exist in isolation. They have meaning only when one knows the services to which they are attached.").

The public interest is similarly paramount under the Natural Gas Act. Section 717(b) of the Natural Gas Act, Congress provides that "the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest." *See* 15 U.S.C. §717(a). In sum, outside of bankruptcy, if Fore River wished to alter the rates, terms or conditions of natural gas transportation contracts to permit unilateral termination of the HubLine Service Agreement, it would have to seek permission from FERC. Moreover, pursuant to Section 717(b) of the Natural

Gas Act, FERC's review of such request would necessarily be guided by a consideration of the public interest.

In order to resolve the Rejection Motion, a court therefore must consider this significant interplay between Title 11 and federal energy law. Accordingly, withdrawal of the reference is mandatory.

## CONCLUSION

For all of the reasons stated above, Algonquin respectfully requests that the District Court withdraw the reference to resolve the conflict between federal bankruptcy law authorizing the rejection of executory contracts and federal energy law requiring FERC approval of termination or amendment of natural gas transportation agreements.

Respectfully submitted,

Dated: September 1, 2010          **DEWEY & LEBOEUF LLP**


By: /s/ Irena M. Goldstein
    Irena M. Goldstein
    **DEWEY & LEBOEUF LLP**
    1301 Avenue of the Americas
    New York, New York 10019
    Tel: (212) 259-8000
    Fax: (212) 259-6333

    - and -

    Bennett G. Young (admitted pro hac vice)
    Paul S. Jasper (admitted pro hac vice)
    **DEWEY & LEBOEUF LLP**
    One Embarcadero Center, Suite 400
    San Francisco, CA 94111
    Tel: (415) 951-1100
    Fax: (415) 951-1180

    **Attorneys for Algonquin Transmission Company, LLC**