Hearing Date and Time: October 4, 2010, at 8:30 a.m. (ET)
Objection Deadline: September 28, 2010, at 4:00 p.m. (ET)

DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
Allan S. Brilliant
Kevin J. O'Brien
Craig P. Druehl
Davin J. Hall

*Counsel to Wilmington Trust FSB,
as Second Lien Administrative Agent
and Second Lien Collateral Agent*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Boston Generating LLC,<br>et al.,[1]<br><br>                Debtors. | Chapter 11<br><br>Case No. 10-14419 (SCC)<br><br>Jointly Administered |

**OBJECTION OF SECOND LIEN AGENT TO MOTION OF THE DEBTORS FOR
ENTRY OF AN ORDER APPROVING AND AUTHORIZING (A) BIDDING
PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF
THE ASSETS OF THE DEBTORS, (B) STALKING HORSE BID PROTECTIONS, (C)
PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE OF
SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS, (D) THE FORM AND
MANNER OF NOTICE OF THE SALE HEARING AND (E) RELATED RELIEF**

Wilmington Trust FSB, as Second Lien Administrative Agent and Second Lien

Collateral Agent (the "Second Lien Agent"), under that certain $350,000,000 second lien credit

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, include: Boston Generating, LLC (0631); EBG Holdings LLC (3635)
("EBG"); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC
(7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

15880932

and guaranty agreement, dated as of December 21, 2006 (as amended or otherwise modified, the "Second Lien Credit Agreement"; and the lenders thereunder, the "Second Lien Lenders"), among Boston Generating, LLC, as Borrower, and the Guarantors and other parties named therein, hereby files this objection (this "Objection")[2] to the motion (the "Motion")[3] of the Debtors for an Order Approving and Authorizing (A) Bidding Procedures in Connection with the Sale of Substantially All of the Assets of the Debtors, (B) Stalking Horse Bid Protections, (C) Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with the Sale of Substantially All of the Assets of the Debtors, (D) the Form and Manner of Notice of the Sale Hearing and (E) Related Relief [Docket No. 24]. In support thereof, the Second Lien Agent respectfully represents as follows:

## PRELIMINARY STATEMENT

1.    Notwithstanding that they had sufficient cash on hand to continue to operate their business for a substantial period of time, positive EBITDA, and assets that were not diminishing in value, the Debtors filed for bankruptcy and immediately sought approval of a sale of substantially all of their assets under section 363 of the Bankruptcy Code, without affording the Second Lien Lenders the fundamental protections of section 1129 of the Bankruptcy Code. Moreover, the Debtors took this drastic action without adequately exploring alternatives to maximize value for their estates, even though they were neither in payment default nor covenant

---

[2]    The Collateral Agency and Intercreditor Agreement, dated as of December 21, 2006 (the "Intercreditor Agreement"), entered into by and among the Debtors and Credit Suisse, Cayman Islands Branch, in various capacitates, lacks any express provision precluding the Second Lien Agent or the Second Lien Lenders from objecting to a proposed sale of assets under section 363 of the Bankruptcy Code, notwithstanding the fact that many intercreditor agreements (including the model ABA intercreditor agreement) contain such provisions. The Second Lien Agent will be simultaneously filing a separate statement regarding its standing under the Intercreditor Agreement to file this Objection.

[3]    Capitalized terms not otherwise defined have the meanings ascribed to them in the Motion.

default at the time of the commencement of these chapter 11 cases, and there was no urgent business need compelling the Debtors to file these cases when they did. To make matters worse, the Debtors filed for a quick 363 sale prior to the conclusion of the pending docket before the Federal Energy Regulatory Commission, which is likely to result in increased pricing for the Debtors' capacity. While a sale at this time, prior to the conclusion of the pending regulatory review, will not likely maximize the value to the estates, the Debtors appear to be motivated by their own self interest, ██████████████████████████████████████████ management has negotiated a $10 million cash bonus with the First Lien Lenders, and the First Lien Lenders (many of whom own equity) will be paid in full or close to full under the Constellation sale depending on the final purchase price adjustments, thus motivating such parties to push the sale.

2.      Under controlling Second Circuit law, the Debtors cannot sell their assets under section 363 of the Bankruptcy Code unless they prove a sound business justification— other than the appeasement of certain creditors—to do so, including that they do not have the financial wherewithal to survive for a sufficient amount of time to consummate a plan. Since that is indisputably not the case here, the Court should not approve the proposed sale outside of a plan.

3.      Because there is no sound business reason for the Debtors to sell their assets under section 363 of the Bankruptcy Code, the Court should not approve the $35 million Break-Up Fee and Expense Reimbursement requested by the Debtors, which is a significant sum in the context of this case (amounting to 10% of the principal amount of the Second Lien indebtedness), and which would chill bidding and unfairly reduce the recoveries of the Second Lien Lenders. Moreover, the bid procedures contain numerous other provisions that are not

designed to enhance bidding. For these and the other reasons contained herein, the Court should

deny the relief sought in the entirety.[4]

## BACKGROUND

A.    Effect of Chapter 11 on Power and Energy Companies

4.    Bankruptcy does not adversely affect power producers' ability to generate

and sell power and serve their customers, and does not prevent them from fulfilling their

obligations to make energy and capacity available. Generally, filing for bankruptcy does not

adversely affect the operating cash flows of a power company, apart from expenses directly

attributable to the bankruptcy process. Moreover, power companies do not close plants as a

result of filing for bankruptcy. In fact, the Federal Power Act restricts the ability of the power

plants from closing, and as such, individual consumers and businesses' need for a constant flow

of power will not be affected by the Debtors' bankruptcy filing.[5]

B.    Debtors' Capital Structure and Cash Position

5.    As of the Petition Date, the Debtors had approximately $1,107,950,000 in

aggregate principal amount of first lien debt outstanding (such debt being incurred under the

"First Lien Credit Agreement"; and the lenders thereunder, the "First Lien Lenders"). First Day

Decl. ¶ 27.[6] Credit Suisse acts as the first lien administrative agent and collateral agent (the

"First Lien Agent") and letter of credit issuing bank under the First Lien Credit Agreement, and

---

[4]    Although counsel to the Second Lien Agent has received many documents, as of the time of this
filing, documents are still being produced by the Debtors, and all documents have not yet been
reviewed and depositions have not yet taken place. The Second Lien Agent reserves its right to
supplement its objection to the Sale after completion of discovery.

[5]    See generally 16 USC § 824a.

[6]    References to the "First Day Decl." or the "First Day Declaration" are to the Declaration of the
Debtors' Chief Financial Officer, Jeff Hunter, in Support of First Day Motions (the "First Day
Declaration") [Docket No. 2].

also serves as Constellation's financial advisor for the Sale.[7]  The Debtors also owe

approximately $350 million in principal amount under the Second Lien Credit Agreement, and

$422,578,510 in principal amount of unsecured mezzanine debt under their mezzanine credit

facility (the "Mezzanine Credit Agreement").  First Day Decl. ¶ 27.

        6.      Prior to the Petition Date, the Debtors did not have any payment or

covenant default under the First Lien Credit Agreement, Second Lien Credit Agreement, or the

Mezzanine Credit Agreement.  First Day Decl. ¶ 43. ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

        7.      As of the Petition Date, the Debtors had over $95 million in cash.  See

Debtors' Omnibus Response, Docket No. 117, Ex. A & Ex. 1 (Decl. of Jeff Hunter).  Based on

the Debtors' cash flow projections, there are sufficient cash flows over the next six months to

cover the Debtors' operating expenses, without any debtor in possession financing.  Indeed,

because they have sufficient cash, the Debtors have not sought approval of any debtor in

possession financing.  In addition, nothing in the Cash Collateral Order conditions the use of

cash collateral on the Court approving the Sale.

        8.      On September 21, 2010, the Debtors received final approval for the use of

cash collateral, subject to the rights of the Second Lien Agent to seek additional adequate

protection.  See Final Cash Collateral Order (the "Cash Collateral Order"), Docket No. 165.  The

budget attached to the Cash Collateral Order contains a line item for a $10 million management

incentive plan.  Id., Ex. C.

---

[7]   See First Day Decl. ¶ 28; see also Constellation Press Release, *available at:*
http://ir.constellation.com/releasedetail.cfm?releaseid=497503

[8]   ████████████████████████████████████████████

9.    The Debtors are wholly owned by USPG.  See First Day Decl. ¶ 11. Avenue Investment, L.P. ("Avenue") owns 15% of the equity of USPG.  See Corporate Ownership Statement, EBG Holdings LLC Voluntary Petition.  Upon information and belief, Avenue is one of the largest first lien lenders, a member of the first lien steering committee, and a party to the Sale Support Agreement.  See First Day Decl. ¶ 49 n. 5.

10.    USPG has two divisions:  (i) non-debtor "Astoria Generating" and (ii) the Debtors, which operate as "Boston Generating."  See First Day Decl. ¶ 11-15.  USPG and the Debtors share the same management.[9]

C.    

_____

[9]    See First Day Decl., Sch. 10; USPG S-1 Registration Statement at 127-29, *available at*: http://www.sec.gov/Archives/edgar/data/1412192/000095012308009383/e43251sv1.htm; see also USPG Team, *available at*:  http://www.uspowergen.com/the-uspg-team/

[10]    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  On July 26, 2010, USPG publicly announced its intention to sell the assets owned by the Astoria Generating division.  See USPG press release, *available at*: http://www.uspowergen.com/2010/07/30/astoria-generating-initiates-strategic-review-process.

[11]    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



D.    Debtors' Conflicted Professional Advisors

13.    The Debtors are seeking to retain JPM as their merger & acquisition advisor and Perella Weinberg Partners ("PW") as their financial advisor.

14.    JPM holds equity in USPG. See JPM Retention App., Docket No. 30, Ex. C, Annex 3, p. 16. JPM is also an equityholder, lender, and advisor to Constellation, although individuals working in such divisions are stated to be walled off from JPM's representation of the Debtors. Id.

15.    Pursuant to the engagement letter attached to the application to retain JPM as their financial advisor, JPM will receive at least $7.5 million if the Sale closes, but no fee if an



internal financial restructuring is effectuated, such as a debt for equity swap under a plan of reorganization. Furthermore, JPM would potentially receive a lower fee if the Debtors dispose of less than all of their plants in individual component sales.[15] Accordingly, JPM has every incentive to close this Sale rather than pursue a debt for equity swap or other restructuring that might maximize value to creditors.

16.    In addition to serving as the sole financial advisor to the Debtors in connection with the restructuring, PW provided the Debtors' parent, USPG, financial advisory services from September 15, 2008, to June 7, 2010, for which they received $3,675,000 in fees and $127,225 in expenses. See PW Retention App., Docket No. 31, Ex. C, n. 3. Moreover, a principal of PW, Michael Kramer, served on the board of USPG from June 1, 2007, to March 9, 2010. Id. ¶ 23.[16]

---

[15]    Under the JPM retention letter, JPM will receive a total of $7.5 million, subject to certain adjustments based on consideration received over a certain cap (of which they have already received a portion), if the Debtors effectuate a sale for substantially all of their assets. In the event the Debtors sell less than all of their power plants, then JPM will only receive $1.5 million per each facility sold. And while it is possible for JPM to receive the same consideration under the Sale if it sells the Debtors' assets in separate component bids, that would take more time and effort than closing the current Sale. Accordingly, JPM has every incentive to seek to sell all of the Debtors' assets to the buyer. See JPM Retention App., Docket No. 30, Ex. C, §2(b). Moreover, promptly following the Debtors' entry into the APA, the lead investment banker working on behalf of the Debtors ceased his employment with JPM.

[16]    Even Latham & Watkins LLP, proposed counsel to the Debtors, is not completely independent. See Latham & Watkins Retention App., Docket No. 29, Ex. B, ¶ 20. According to its retention application and publicly available reports, Latham & Watkins represents Credit Suisse in numerous bankruptcy matters, including in its capacity as first lien agent in the Bosque Power bankruptcy cases (another power and energy restructuring) currently pending in the Bankruptcy Court for the Western District of Texas. Id. at Annex 3, p.8; see also In re Bosque Power Co., Case No. 10-60348 (Bankr. W.D. Tex.), Docket No. 05 (notice of appearance). Credit Suisse is the First Lien Agent, a first lien lender, letter of credit issuing bank, contract counterparty, and significant equityholder of the Debtors. Id., p. 9-10 & Annex 3, p. 8, 10. According to Constellation's press release announcing the acquisition of Boston Generating, Credit Suisse is also the financial advisor to Constellation for the Sale. Constellation is itself a current or former client of Latham & Watkins LLP in matters unrelated to the Debtors. See Latham Supplemental Affidavit, Docket No. 184.

17.    The Debtors have not obtained a formal valuation of their assets or a fairness opinion to determine whether the sale contemplated by the APA or any other sale would be at a fair valuation.

E.    Misguided Prepetition Marketing Process

18.    In late April 2010, the Debtors began a marketing process to sell their entire business. First Day Decl. ¶ 45. Prior to the formal commencement of this marketing process, in March 2010, the Second Lien Agent's financial advisor requested access to various financial information (including with respect to taxes and letters of credit).



19.    During this process, upon information and belief, the Debtors did no analysis to determine whether value could be maximized by selling their power-generating plants separately or by selling some of the assets (and reorganizing around the remaining assets).

20.

_____

17
18



21.

22.

23.    After the Debtors received the bids, the Second Lien Agent's professionals and certain of the Second Lien Lenders requested that the Debtors and their advisors meet to discuss value-maximizing alternatives. See infra ¶ 38.



19
20
21

24.    ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ the Debtors

entered into a binding contract for the $1.1 billion bid of Constellation, and Constellation

publicly announced the terms of the sale and filed a copy of the APA with the Securities &

Exchange Commission on August 11, 2010.[22] The Second Lien Lenders took no part in the

determination to accept the bid and only learned that Constellation was selected as a stalking

horse bidder after the APA had been executed.

25.    Subsequently, the Second Lien Secured Parties then requested that the

Debtors delay filing for bankruptcy and meet with the Second Lien Secured Parties and their

advisors to explore alternatives. See infra ¶ 38. The Debtors refused.

F.    Proposed Sale of Debtors' Assets

26.    Constellation Bid; Significant Terms. The Motion contemplates the sale

of substantially all of the Debtors' assets to Constellation. See Motion ¶ 4. The purchase price

under the Constellation Sale is $1.1 billion, subject to certain working capital adjustments. Id.,

Ex. E, § 3.3-3.4. Under section 2.2(g) of the APA, "Excluded Assets" included all cash and cash

equivalents of the Debtors. The consideration under the Constellation bid would provide

payment in full to the First Lien Lenders with only a $16 million shortfall, after payment of

default interest and assuming a purchase price adjustment of $37 million. See Debtors' Omnibus

Response, Docket No. 117, Ex. A & Ex. 1 (Decl. of Jeff Hunter).

---

[22]    See Constellation Form 8-K, *available at*:
http://www.sec.gov/Archives/edgar/data/1004440/000110465910043744/0001104659-10-043744-index.htm

11

27.    As noted below, the APA also contains an expansive "no shop" clause obtained by Constellation and further lacks a "fiduciary" out that would allow the Debtors to terminate the agreement without paying the Break-Up Fee (discussed below), even in the event there is a higher and better bid or other value maximizing transaction prior to the approval of the bid procedures. See Motion, Ex. E, § 8.1 (no termination event for fiduciary out); 6.3 (no-shop provisions).

28.    Bid Procedures. The Motion contemplates appointing Constellation as the "stalking horse" bidder and seeks approval of payment of a Break-Up Fee in the amount of $30 million to Constellation under certain circumstances, along with an expense reimbursement fee of $5 million. See id. p. 12. Among other things, in the event the Debtors pursue an "Alternative Transaction" (which include a stand-alone financial restructuring, see id., Ex. E, p. 3), the Break-Up Fee would be payable. See id. p. 12.

29.    In addition, the Motion contemplates certain other protections for the Constellation bid, such as minimum bidding increments of $20 million. See id. Ex. D., § E(b). Among other things, the APA requires the Debtors to obtain bankruptcy court approval of bid procedures by October 4, 2010, and to obtain bankruptcy court approval of the sale by November 16, 2010. See id. Ex. E, 6.11(c), (e); 8.1(e).

30.    Credit Bid. Under section G of the proposed Bid Procedures, if the Second Lien Lenders desired to credit bid under section 363(k), they would be required to pay more than any other bidder. The bid procedures contemplate that the Second Lien Lenders would have to pay for all of the Debtors' administrative and priority expense claims, effectively forcing any party wishing to credit bid to fund a liquidating plan. See id. Ex. D, § G.

31.    <u>Sale Support Agreement.</u> 

32.    Accordingly, on August 17, 2010, the members of the steering committee of First Lien Lenders together with certain other first lien lenders (barely comprising 50% of the First Lien indebtedness) entered into the Sale Support Agreement, a copy of which is attached to the First Day Declaration. Pursuant to sections 4, 5, and 7 of the Sale Support Agreement, (i) the Consenting First Lien Lenders have consented to the use of cash collateral to fund the liquidation of the Debtors' estates and agreed not to take any steps to delay consummation of the Sale, and (ii) the Debtors have agreed to use commercially reasonable steps to have the Bidding Procedures Order entered by October 2, 2010, and the Sale Order entered by November 16, 2010. <u>See</u> First Day Decl., Ex. B, §§ 4-5, 7.

G.    <u>Lack of Financial Restructuring Efforts</u>

(i)    *No Valuation Analysis*

33.    Despite having two financial advisors, the Debtors have not received a formal valuation of the Debtors' business on a standalone basis. Nor have they requested either of their financial advisors to value the assets on a sum of the parts basis. Moreover, the Debtors have not asked nor received a fairness opinion in connection with the Sale to Constellation.

---

23

(ii)    *No Stand Alone Restructuring or Partial Sale*

34.    After the Debtors unsuccessfully sought to refinance their first and second lien debt in 2009, at no point thereafter—including during the sale process in 2010—did the Debtors adequately explore a possible stand-alone financial restructuring with the Second Lien Lenders.



Moreover, upon information and belief, at no point have the Debtors explored a sale of assets piecemeal in combination with a financial restructuring with the Second Lien Lenders.

H.    Regulatory Environment

35.    The Federal Energy Regulatory Commission ("FERC") is a federal agency that regulates the transmission of electricity and the Debtors' business. It is well recognized that the capacity market in New England is flawed and dramatically undercompensates New England's capacity resources. See Hibbard Decl., attached hereto as Ex. L, ¶ 11. In response to concerns over the capacity market design, and as required by prior decisions of FERC, industry stakeholders and state representatives met in a working group to redesign the forward capacity markets. Id. On April 23, 2010, FERC accepted certain proposed changes to the capacity market rules, and initiated a paper hearing to further certain of those proposed changes. Id. ¶ 12.

36.    In that decision, FERC accepted certain changes to the capacity market to go into effect immediately, but set many other critical components of proposed revisions for a paper hearing. Among those briefs filed, Boston Generating submitted briefing encouraging the Commission to adopt proposed rule changes that would significantly improve the economics of those generators bidding into the capacity markets. Id. ¶ 12. FERC stated its intention to issue an Order resolving these issues before March 1, 2011. Id. ¶ 12.

37.    A decision on these issues should have a material, positive impact on the market value of the Debtors' assets, and thus would likely influence bids offered by bidders for the assets.[24] While bidders may be aware of the issues still under consideration by FERC, the absence of a FERC decision on the merits of those issues means that bidders would discount the potential impact of FERC's forthcoming decision on the market value of the assets. Id. ¶ 13.

I.    Developments After Entry into APA

38.    Following public disclosure by Constellation of the APA, ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The Board, however, determined to move forward with the immediate filing and would not even hold a meeting to discuss alternatives.

39.    Less than one week after the letters were sent, on August 16, 2010, the Debtors sent a notice to Credit Suisse to reduce the Second Lien Agent's debt service letter of credit to $0.

---

[24]    See Confidential Information Memorandum, Ex. G.

[25]    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

40. 

## ARGUMENT

**I.    Because a Sale Outside of a Plan of Reorganization Cannot Be
Approved Under the Facts of These Cases, the Bid Procedures Should
Be Denied**

41.    The Court of Appeals for the Second Circuit has held that a proposed sale

under section 363(b) of the Bankruptcy Code outside of a plan of reorganization should only be

approved if the proponents of the sale present "some articulated business justification, other than

appeasement of major creditors." In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983)

("Lionel"). "In [the Second] Circuit, the sale of an asset of the estate under § 363(b) is

permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the

evidence presented before [him or her] at the hearing [that there is] a good business reason to

---

26

16

grant such an application.'" Motorola, Inc. v. Official Comm. of Unsecured Creditors, 478 F.3d

452, 466 (2d Cir. 2007) ("Iridium") (quoting Lionel, 722 F.2d at 1071).

42.     The Second Circuit Court of Appeals has repeatedly affirmed the factors

articulated in Lionel "that a judge might consider when determining whether there is a 'business

justification' for the asset's sale":

> The non-exclusive list include[s]: the proportionate value of the
> asset to the estate as a whole, the amount of elapsed time since the
> filing, the likelihood that a plan of reorganization will be proposed
> and confirmed in the near future, the effect of the proposed
> disposition on future plans of reorganization, *the proceeds to be*
> *obtained from the disposition vis-à-vis any appraisals of the*
> *property,* which of the alternatives of use, sale or lease the
> proposal envisions and, *most importantly perhaps, whether the*
> *asset is increasing or decreasing in value.*

Iridium, 478 F.3d at 466 (quoting Lionel, 722 F.2d at 1071) (emphasis added); see also Ind. State

Police Pension Trust v. Chrysler LLC, 576 F.3d 108, 117 (2d Cir. 2009) ("Chrysler") (finding

that, "Lionel's multi-factor analysis remains the proper, most comprehensive framework for

judging the validity of § 363(b) transactions.").

43.     In Lionel, the Second Circuit, after considering the relevant factors,

"reversed a bankruptcy court's approval of the sale of Lionel Corporation's equity stake in

another corporation, [Dale]. The Court relied heavily on… a financial expert's acknowledgment

that the value of the Dale stock was not decreasing. Since the Dale stock was not a wasting

asset, and the proffered justification for selling the stock was the desire of creditors, no sufficient

business reasons existed for approving the sale." Chrysler, 576 F.3d at 115 (internal citations

omitted).

44.     Consistent with Lionel, asset sales have been approved outside of a plan of

reorganization only when the debtor lacks sufficient cash flows to complete the reorganization

process under a chapter 11 plan. Thus, it has been recognized that a sale under section 363(b) of

the Bankruptcy Code is available to a debtor "when it is more advantageous for the debtor to begin to sell as many assets as quickly as possible in order to insure that the assets do not lose value." Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 43 (2008) (Breyer, J., dissenting); accord Chrysler, 576 F.3d at 118-19 ("To preserve resources, Chrysler factories had been shuttered, and the business was hemorrhaging cash. According to the bankruptcy court, Chrysler was losing going concern value. . . . Consistent with an underlying purpose of the Bankruptcy Code – maximizing the value of the bankruptcy estate – it was no abuse of discretion to determine that the Sale prevented further, unnecessary losses.").

45.    At the same time, under Lionel, if a debtor has sufficient cash flows to get through the plan process, a 363 sale cannot be approved. For example, in Young Broadcasting, Case No. 09-10645 (Bankr. S.D.N.Y. filed Feb. 13, 2009) (AJG), Chief Judge Gonzalez required the debtor to set forth evidence regarding why the debtor could not wait to sell its assets under a plan process as opposed to under a 363 sale. Id., Sale Hearing Tr. 17:12-14, July 22, 2009, attached hereto as Ex. O ("I'm still not clear on how you get through Lionel without evidence that you can't make it to the plan process without the sale."). Chief Judge Gonzalez recognized that if a debtor has sufficient cash to operate its business through a plan process, a debtor would be unable to satisfy the Lionel factors that authorize the sale of substantially all of the debtor's assets outside of the plan process. Id. at 27:9-16 (stating "that evidence would have to show what you're saying is the possibility that you couldn't close by the time you ran out [of cash] and needed DIP[.] But if you received FCC approval and in fact it was sufficient money in the process -- the plan process had proceeded to the point at which if it were to be approved, it would be approved in time, you wouldn't then have the basis for the Lionel finding.").

18

46.    For the reasons discussed below, the Sale cannot be approved under section 363(b) of the Bankruptcy Code outside of a plan of reorganization; therefore, the Court should deny proposed bid procedures in connection with the Sale.

**A.    *The Debtors Have Sufficient Liquidity to Confirm a Plan, So a Sale Outside of a Plan Cannot Be Approved in These Cases, and the Bid Procedures Likewise Should Not Be Approved***

47.    Prior to the Petition Date, the Debtors were not in default under the financial covenants in any of their credit agreements, and the Debtors did not expect to have a covenant default for several months at the very earliest.  First Day Decl. ¶ 43 The Debtors were not hemorrhaging cash or facing an imminent payment default.

48.    It is clear that the Debtors have sufficient cash to operate their business through a plan process, even absent any additional financing.[27] ██████████████████ ████████████████████████████████████ It is undisputed that the Debtors have significant EBITDA and cash on hand to operate their business, and the Debtors' business is not of the type that would diminish in value during a bankruptcy case.  In other words, as the ████████████████████████ their business is far from a "melting ice cube" and it is inappropriate to sell their assets outside of a plan of reorganization. ████████████

49.    Accordingly, under the facts of these cases and binding precedent in this Circuit, the Debtors should not be allowed to sell their assets under section 363 of the Bankruptcy Code, but any such sale must be under a plan of reorganization where creditors will have the benefits of the protections under Bankruptcy Code section 1129 and otherwise (as further discussed below).  Therefore, the bid procedures and sale should be denied.

---

[27] ████████████████████████

**B.    Because the Debtors' Business Judgment was Tainted, the Bid Procedures and the Sale Motion Should be Denied**

50.    Furthermore, given the conflicting loyalties of management and inherent conflicts of their financial advisors, the Debtors have not received disinterested advice.  The Debtors have sought to sell the Boston Generating assets at this time in a 363 sale ███████████ ████████████████████████████████████████ rather than as part of a process designed solely to maximize value for creditors.  ████████████████████ it is clear that there is no good business reason for the Sale other than to appease 50% of the First Lien Lenders (who will be substantially paid in full) ████████████████████████████████████████

51.    As discussed above, the Debtors' management is conflicted.  The same managers of the Debtors are the managers of USPG, ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

52.    Management stands to receive a $10 million bonus if the Sale is approved.[29]  Additionally, the Debtors appear not to have received independent professional advice in connection with the Sale.  The Debtors' financial advisor (PW) has served on the board of USPG and the Debtors.  JPM holds equity in USPG.  Moreover, JPM and management are not

---

[28]    ████████████████████████

[29]    Given that the Second Lien Lenders' $13 million letter of credit was improperly terminated by management, it is completely inappropriate that they pay themselves a $10 million bonus, although one can see how it is easier for the First Lien Lenders now to stomach.  Taking recoveries from creditors to benefit insiders is clearly inconsistent with management's duties to maximize value to creditors as officers of a debtor in possession.

20

incentivized to do anything other than support the current deal, as JPM receives a larger,

guaranteed fee if the Sale is approved over other alternatives (even if those alternatives maximize

value).

53.  There is no evidence to

suggest that the Debtors legitimately pursued a stand-alone financial restructuring, partial sale of

assets, or other alternatives in the last year.  In addition, the Debtors' financial advisors have not

performed a valuation analysis—and the Debtors have not obtained a fairness opinion—that

could have let the Debtors and other parties in interest test whether the Constellation bid (or any

other bid) provides fair value for the Debtors' assets.

54. In addition, the Sale clearly benefits conflicted insiders and First Lien

Lenders. And it is clear

that the Debtors have acceded to the wishes of certain First Lien Lenders in pursuing the sale that

would render the Second Lien Lenders "out of the money" in their view.[30]  When the APA was

---

[30]  Even assuming that the APA is the final word on value (and the Second Lien Agent disputes any such proposition), the Second Lien Lenders were "in the money" as of the Petition Date.  The purchase price under the APA is $1.1 billion, subject to working capital adjustments.  In addition, under section 2.3 of the asset purchase agreement, "Excluded Assets" included all cash and cash equivalents of the Debtors.  Under the budget attached to the Proposed Final Cash Collateral Order, the Debtors had cash on hand of $95,497,000 on the Petition Date.  See Docket No. 89, Ex. C.  Thus, the proposed purchase price, together with excluded cash under the asset purchase agreement as of the Petition Date, was $1,195,497,000.  The claims of the First Lien Lenders are only $1,107,950,000 as of the

executed, ███████████████ ██ ██ ███████████████████ (even now, the sale has the support of only a bare majority of the First Lien Lenders, many of whom are conflicted and have other motives), and the Debtors did not adequately explore stand-alone restructuring alternatives with the Second Lien Lenders. Nevertheless, the Debtors are pursuing a sale strategy ████████████████████ ████████████████████████████████████████████

C.    **Bid Procedures and Sale Should Be Denied Because**
      **Forcing Sale Under Present Conditions Does Not Maximize Value**

55.    It is clear that this is the wrong time for the Debtors to sell their business. Among other things, given certain regulatory considerations, it is not in the interest of the Debtors' estates to sell all of their assets at this time. As noted above, the proposed sale process is being run before knowing the outcome of the Federal Energy Regulatory Commission's ruling on a request by ISO New England for approval of proposed revisions to the capacity market structure, which is expected to lead to stronger capacity prices sooner and yield additional upside for the Borrower's future cash flows. In absence of this ruling, the bidders can not bid full value for the assets, as the bidders do not know how much this ruling will improve the projected cash flows. Cf. Chrysler, 576 F.3d at 115 (considering whether an asset is increasing or decreasing in value in determining whether to approve a section 363 sale). In short, the value of the Debtors' business will increase, not decrease, over time. Due to these anticipated changes in the

---

*footnote con't*

Petition Date. First Day Decl. ¶ 27. Thus as of the Petition Date there was more than $87 million in value in excess of the First Lien debt, before taking into account costs from the bankruptcy. Even under the Debtors calculations, after taking into account costs arising from the bankruptcy, there is only approximately a $16 million shortfall, which would mean the First Lien Lenders would receive approximately 98.5% of their claims, after receiving default interest or roughly par plus accrued at the non-default rate.

regulatory regime applicable to the Debtors' assets, rushing to sell the assets now does not maximize value for creditors.[31]

56.    If the Debtors were required to sell their assets or restructure under a plan, they would be required to perform an enterprise valuation (which they have not yet to date), which would require the Debtors to factor in the expected favorable FERC ruling, as well as applicable precedent transactions. However, the Debtors have obtained no such valuation, so creditors such as the Second Lien Lenders cannot test the adequacy of the Constellation consideration.

**D.    *The Second Lien Lenders Are Entitled to the Protections of a Chapter 11 Plan***

57.    Based on the foregoing, it is clear that the Debtors cannot satisfy the Lionel factors and sell substantially all of their assets under a 363 sale, rather than under a plan of reorganization. The Debtors and 50% of the First Lien Lenders, however, are seeking to have the Court approve the Sale under section 363 of the Bankruptcy Code in order to avoid the more exacting scrutiny, and heightened creditor protections, of a chapter 11 plan. Cf. Chrysler, 576 F.3d at 114 (noting that the Lionel court was concerned that "[p]ushed by a bullying creditor, a § 363(b) sale might evade such requirements as disclosure, solicitation, acceptance, and confirmation of a plan"). This is particularly obvious given that the Debtors could have had the sale approved under a plan of reorganization (assuming such a plan was confirmable) and still meet the November 16, 2010 outside date to have the Sale approved under the APA.

58.    If the Debtors sought to approve the Sale under a plan, then they would be required to seek approval of a disclosure statement under section 1125 of the Bankruptcy Code as containing information of a kind, and in sufficient detail, that would enable creditors to make

---

[31]    For a discussion of the request's impact on value, see the Declaration of Paul Hibbard, attached hereto as Exhibit L.

an informed judgment about the Plan. In re Phoenix Petroleum, 278 B.R. 385, 393 (E.D. Pa. 2001). Among other things, the Debtors would be required to disclose information regarding tax consequences under the plan as well financial projections and enterprise value. ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

59.    In addition, the Debtors would be required to meet the requirements of section 1129 of the Bankruptcy Code to confirm the plan, including complying with the best interests of creditors test under section 1129(a)(7), and the voting requirements under section 1129(a)(8) and/or the absolute priority rule under section 1129(b). Among other things, to the extent the Second Lien Lenders were deemed to reject under a proposed plan and not entitled vote, the Second Lien Lenders could test the Debtors' assumptions regarding value, ████

████████████████████████████████████████████████████████████

████████████████████████████████████

## II.    **Bid Procedures Themselves Are Flawed and Should Not Be Approved**

60.    The Bankruptcy Court for the Southern District of New York has adopted specific guidelines to address bid procedure provisions in sale motions. Among other things, under the Guidelines for the Conduct of Asset Sales adopted by this Court pursuant to General Order M-383 (Bankr. S.D.N.Y. Dec. 1, 2009) (amending General Order M-331) (the "Guidelines"):

> Limited no-shop or no-solicitation provisions may be permissible, in unusual circumstances, if they are necessary to obtain a sale, they are consistent with the debtor's fiduciary duties and they do not chill the receipt of higher or better offers. Such provisions must be prominently disclosed in the motion, with particularity. If the relevant documents do not include a "fiduciary out" provision,

24

the debtor must disclose the fact of and the reason for the exclusion
of the provision.

61.    With respect to the payment of break up fees in particular, courts in this

district generally evaluate such fees under a three-part test.  See In re Integrated Resources, 147

B.R. 650 (S.D.N.Y. 1992) ("Integrated Resources").  In Integrated Resources, the court

articulated a test that has been adopted by subsequent courts: "(1) is the relationship of the

parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee

hamper, rather than encourage, bidding; (3) is the amount of the fee unreasonable relative to the

proposed purchase price?"  Id. at 657.

62.    Notably, courts in this district have refused to approve bidding procedures

where there are multiple, competing bidders.  In Gey Assocs. Gen. P'Ship v. 310 Assocs., L.P.,

2002 U.S. Dist. LEXIS 20759 (S.D.N.Y. 2002), the district court, adopting the three-part test

established in Integrated Resources, affirmed the bankruptcy court's decision to deny a break-up

fee, finding that:

> [i]n making its final determination on the validity of the Gey
> breakup fee, the court found that prior to June 8 it had 'two buyers
> drooling to make this purchase.'  The breakup fee in this action did
> not encourage bidding.  Indeed, Judge Gerber found that in this
> context, a breakup fee to Gey was both unnecessary (as there were
> already multiple bidders) and inappropriate (in that it hampered
> 310's ability to sell the Property to Kramisen).  Thus, the court's
> determination not to authorize a breakup fee to Gey was
> reasonable.

63.    Moreover, in other circuits, courts have convincingly found that break-up

fees should be scrutinized under a more stringent standard.  For example, in Calpine Corp. v.

O'Brien Envtl. Energy, Inc., 181 F.3d 527, 532 (3d Cir. 1999) ("O'Brien"), the Court of Appeals

for the Third Circuit "decline[d] [an] invitation to develop a general common law of break-up

fees."  Instead, the court of appeals found that the "most likely source of authority for [break-up

25

fees] appear[ed] to be 11 U.S.C. § 503," and held that, "the determination whether break-up fees

or expenses are allowable under § 503(b) must be made in reference to general administrative

expense jurisprudence. In other words, the allowability of break-up fees, like that of other

administrative expenses, depends upon the requesting party's ability to show that the fees were

actually necessary to preserve the value of the estate." Id. at 535.

64.    The Third Circuit recently affirmed its holding in O'Brien in In re Reliant

Energy Channelview LP, 594 F.3d 200 (3d Cir. 2010) ("Reliant Energy"), a case in which the

Court of Appeals upheld the bankruptcy court's decision to decline to approve bid protections

that included a break-up fee where there was already a second bidder involved in the sale

process. In Reliant Energy, the Court of Appeals found that, as is the case here, the "stalking

horse" bidder was not induced to make its initial bid by the promise of a break-up fee.

65.    In Reliant Energy, the bankruptcy court had found that the break up fee

"would deter other possible purchasers from bidding for the plant and would outweigh any

possible benefit achieved for the estate by keeping [the "stalking horse"] committed to the

purchase through the provision for the break-up fee." Id. at 208. Based on a review of the

record, the Circuit Court concluded that this determination "was justified by (1) [the ultimately

successful bidder's] assertion that it planned to continue bidding, (2) the binding language of the

APA, and (3) the logical belief that [the "stalking horse"] would not abandon a fully negotiated

agreement if no other bidder materialized." Id.

66.    Here, the Motion contemplates appointing Constellation as the "stalking

horse" bidder and seeks approval of payment of a $30 million Break-Up Fee to Constellation in

the event the Debtors pursue an "Alternative Transaction" (as broadly defined therein), along

with an expense reimbursement fee of $5 million. The bid procedures would require the Break-

Up Fee and such expenses to be paid by the Second Lien Lenders if they wish to credit bid (and would constitute an unnecessary hurdle that would reduce the Second Lien Lenders' recovery). To the extent the Court were to allow the sale process to continue at all, the Court should not approve the Break-Up Fee and other value chilling aspects of the Debtors' proposed bid procedures, as they do not represent the sound business judgment of the Debtors.

### A.    *Court Should Deny the Break-Up Fee.*

67.    The Break-Up Fee is the product of a tainted and misguided process and an agreement that has already chilled bidding, and accordingly, it should not be approved.

68.    Among other things, the APA contains an expansive "no shop" clause obtained by Constellation and further lacks a "fiduciary out" that would allow the Debtors to terminate the agreement without paying the Break-Up Fee. Notably, the Sale Motion itself fails to disclose the lack of a "fiduciary out" provision in the APA and the reason for its omission, in violation of the Guidelines. This should not be overlooked. The "no shop" provision serves to "lock in" Constellation's Break-Up Fee since the Debtors are prohibited from pursuing in any way any alternative transaction that might result in a higher and better value prior to approval of the bid procedures. The Debtors have taken the position that under the "no shop" provision they cannot even allow parties to discuss alternatives with the Second Lien Lenders. Together with the lack of a "fiduciary out" these provisions clearly have had a chilling effect since the Debtors have refused to release potential bidders from confidentiality restrictions prior to the approval of the Break-Up Fee. In this context, therefore, the Break-Up Fee must be viewed as a deliberate attempt to chill competitive bidding. Because the Debtors have failed to comply with the Guidelines, for this reason alone, the Break-Up Fee and Constellation's bid protections should be denied.

69.      That notwithstanding, it is unclear why the Debtors consented to a $30 million Break-Up Fee when there were other bidders involved in the final rounds of the process at a similar purchase price, and there is no evidence that the Break-Up Fee was an inducement to Constellation's bid.[32]  According to the First Day Declaration, the Debtors had six entities in the final stage of the process and received two "final" bids. ██████████████████████████ ██████████████████████████████████████████████████████████ Thus, the Second Lien Agent submits that the Break-Up Fee is not warranted for this reason as well.  In any event, there should be no Break-Up Fee if no sale occurs.

### B.    *Bid Increments Should Be Lowered.*

70.      The proposed bid procedures require $20 million bid increments.  The bid increments should be lowered to $10 million or less to encourage competitive bidding.

### C.    *Rights to Credit Bid Should Not Be Limited.*

71.      The proposed bid procedures, while allowing the Second Lien Lenders to credit bid, require any credit bidder to pay administrative and priority claims in full, including the Break-Up Fee.  This requirement should be removed from the bid procedures.  Among other things, this requirement constitutes an impermissible surcharge and tax of the Second Lien Lenders' collateral without due process, will result in a lower recovery for the Second Lien Lenders, and further chills any efforts by the Second Lien Lenders to credit bid.  Moreover, the Second Lien Lenders should not be obligated to pay more than any other bidder would have to pay by paying the professional fees of the Debtors or the First Lien Lenders or proposed exorbitant management bonuses incurred in connection with a flawed process.

---

[32]      In announcing the Sale, Constellation stated that it "would expect this transaction to be accretive to earnings beginning in 2011."  See Constellation Press Release, *available at:* http://ir.constellation.com/releasedetail.cfm?releaseid=497503.  Thus, Constellation appears to be highly motivated to move forward with the transaction even without the Break-Up Fee.

**D.      *Confidentiality Restrictions Should Be Lifted*.**

72.      The Court should order the Debtors to release immediately all potential prepetition bidders and potential financing sources from any contractual confidentiality or standstill restrictions, so the Second Lien Lenders are able to pursue potential value maximizing alternatives.

## RESERVATION OF RIGHTS

73.      The Second Lien Agent expressly reserves all of its rights to object to the sale of the Debtors' assets at the sale hearing on any basis, including without limitation grounds not raised herein (e.g., that the Debtors cannot satisfy section 363(f) of the Bankruptcy Code), and seek discovery in connection therewith. If the Court moves forward with the Sale hearing, the Second Lien Agent submits that such the Sale motion and the hearing should be scheduled for the latest possible date.

[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]

WHEREFORE, the Second Lien Agent respectfully requests that the Court (a) sustain this Objection, (b) deny the Sale Motion and the bid procedures, and (c) grant such other and further relief as is just and proper.

Dated: September 28, 2010
New York, New York

DECHERT LLP

/s/  Allan S. Brilliant
Allan S. Brilliant
Kevin J. O'Brien
Craig P. Druehl
Davin J. Hall
1095 Avenue of the Americas
New York, New York  10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
allan.brilliant@dechert.com
kevin.obrien@dechert.com
craig.druehl@dechert.com
davin.hall@dechert.com

*Counsel to Wilmington Trust FSB,*
*as Second Lien Administrative Agent,*
*and Second Lien Collateral Agent*