Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 10-14419(SCC)

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    BOSTON GENERATING, LLC, et al.

9

10                   Debtors.

11

12    - - - - - - - - - - - - - - - - - - - -x

13

14                   United States Bankruptcy Court

15                   One Bowling Green

16                   New York, New York

17

18                   September 22, 2010

19                   11:25 AM

20

21

22    B E F O R E:

23    HON. SHELLY C. CHAPMAN

24    U.S. BANKRUPTCY JUDGE

25

Page 2

1

2    HEARING re Motion of the Debtors for Interim and Final Orders

3    (I) Authorizing Debtors to (A)Continue Their Workers'

4    Compensation, Liability, Property and Other Insurance Programs,

5    (B)Pay All Prepetition Obligations in Respect Thereof and

6    (C)Continue Grant of Security Interest to an Insurance Premium

7    Finance Company and (II) Directing Financial Institutions to

8    Honor and Process Checks and Transfers Related to Such

9    Obligations

10

11   HEARING re Motion of the Debtors for Entry of Interim and Final

12   Orders Pursuant to Sections 105(a) and 363(b) of the Bankruptcy

13   Code Authorizing Debtors to Pay Prepetition Taxes

14

15   HEARING re Motion of the Debtors for Interim and Final Orders

16   (I) Authorizing, but not Directing, the Debtors to (A)Pay

17   Prepetition Employee Obligations; and (B)Continue Employee

18   Benefit Plans and Programs Post-Petition; and (II)Authorizing

19   the Debtors to Pay Withholding and Payroll-Related Taxes; and

20   (III) Directing All Banks to Honor Pre-Petition Checks and

21   Transfers For Payment of Employee Obligations

22

23

24

25

Page 3

1

2    HEARING re Motion of the Debtors for Entry of Interim and Final

3    Orders Pursuant to Sections 105(a), 363(b), 364, 503(b)(9) and

4    507(a)(2) of the Bankruptcy Code Authorizing the Debtors to Pay

5    Prepetition Claims of Certain Essential Vendors

6

7    HEARING re Motion of the Debtors for Entry of Interim and Final

8    Orders Pursuant to Sections 105(a) and 363(b) of the Bankruptcy

9    Code Authorizing Payment of Certain Prepetition Warehousing

10   Charges, Lien Claims, and Maintenance Charges in the Ordinary

11   Course of Business

12

13   HEARING re Motion of the Debtors for Entry of an Order Pursuant

14   to Sections 105(a), 327, and 330 of the Bankruptcy Code

15   Authorizing the Debtors to Employ Professionals Utilized in the

16   Ordinary Course of Business Nunc Pro Tunc to the Petition Date

17

18   HEARING re Motion of the Debtors for an Order Pursuant to

19   Sections 105(a) and 331 of the Bankruptcy Code Establishing

20   Procedures for Interim Monthly Compensation and Reimbursement

21   of Expenses of Professionals and Members of Official Committees

22

23   HEARING re Motion of the Debtors for Order Establishing

24   Deadlines for Filing Proofs of Claim and Approving the Form and

25   Manner of Notice Thereof

Page 4

1

2    HEARING re Motion of the Debtors for Entry of an Order

3    Establishing Procedures for Settling Terminated Safe Harbor

4    Contracts

5

6    HEARING re First Omnibus Motion of the Debtors for Entry of

7    Order Authorizing the Debtors to Reject Certain Executory

8    Contracts Nunc Pro Tunc to Their Respective Notice Dates

9

10   HEARING re Motion of the Debtors for Entry of Interim and Final

11   Orders Providing Certain Protections in Connection With, and

12   Authorizing the Assumption of, Executory Contracts with

13   Distrigas of Massachusetts LLC and GDF SUEZ Energy North

14   America, Inc.

15

16   HEARING re Motion of the Debtors for Entry of an Order

17   Providing Certain Protections in Connection with, and

18   Authorizing the Assumption of, Executory Contracts with Sequent

19   Energy Management, L.P.

20

21   HEARING re Motion of the Debtors for Entry of an Order

22   Providing Certain Protections in Connection with, and

23   Authorizing the Assumption of, Executory Contracts with Credit

24   Suisse Energy LLC and Credit Suisse (USA), Inc.

25

Page 5

1

2    HEARING re Motion of the Debtors for Entry of an Order

3    Authorizing the Assumption of Executory Contracts with Sempra

4    Energy Trading LLC

5

6    HEARING re Emergency Motion of CarVal Investors, LLC and

7    Fortress Investment Group LLC to Adjourn Hearing on the Motion

8    of the Debtors for Entry of (I) An Order Approving and

9    Authorizing (A)Bidding Procedures in Connection with the Sale

10   of Substantially all of the Assets of the Debtors, (B)Stalking

11   Horse Bid Protections, (C)Procedures for the Assumption and

12   Assignment of Executory Contracts and Unexpired Leases in

13   Connection With the Sale of Substantially all of the Assets of

14   the Debtors, (D)the Form and Manner of Notice of the Sale

15   Hearing; and (E) Related Relief; and (II)an Order Approving and

16   Authorizing (A)the Sale of Substantially All of the Assets of

17   the Debtors Free and Clear of Claims, Liens, Liabilities,

18   Rights, Interests and Encumbrances, (B)the Debtors to Enter

19   Into and Perform Their Obligations Under the Asset Purchase

20   Agreement, (C)the Debtors to Assume and Assign Certain

21   Executory Contracts and Unexpired Leases, (D)the Transition

22   Services Agreement; and (E)Related Relief

23

24

25   Transcribed by:  Lisa Bar-Leib

Page 6

1

2   A P P E A R A N C E S:

3   LATHAM & WATKINS, LLP

4           Attorneys for the Debtors

5           53rd at Third

6           885 Third Avenue

7           New York, NY 10022

8

9   BY:   D.J. BAKER, ESQ.

10          ADRIENNE K. EASON WHEATLEY, ESQ.

11

12  LATHAM & WATKINS LLP

13          Attorneys for the Debtors

14          Sears Tower, Suite 5800

15          233 South Wacker Drive

16          Chicago, IL 60606

17

18  BY:   CAROLINE A. RECKLER, ESQ.

19          SARA E. BARR, ESQ. (TELEPHONICALLY)

20

21

22

23

24

25

Page 7

1

2    JAGER SMITH P.C.

3         Attorneys for the Official Committee of Unsecured

4          Creditors

5         485 Madison Avenue, 20th Floor

6         New York, NY 10022

7

8    BY:   BRUCE F. SMITH, ESQ.

9

10   DECHERT LLP

11        Attorneys for Wilmington Trust FSB, as Second Lien

12         Administrative Agent

13        1095 Avenue of the Americas

14        New York, NY 10036

15

16   BY:   ALLAN S. BRILLIANT, ESQ.

17         KEVIN J. O'BRIEN, ESQ.

18

19   WACHTELL, LIPTON, ROSEN & KATZ

20        Attorneys for Credit Suisse as First Lien Agent

21        51 West 52nd Street

22        New York, NY 10019

23

24   BY:   DAVID C. BRYAN, ESQ.

25         ALEXANDER B. LEES, ESQ.

1

2    DEWEY & LEBOEUF LLP

3         Attorneys for Algonquin Gas Transmission LLC

4         One Embarcadero Center

5         Suite 400

6         San Francisco, CA 94111

7

8    BY:   BENNETT G. YOUNG, ESQ.

9

10   STROOCK & STROOCK & LAVAN LLP

11        Attorneys for Distrigas of Massachusetts LLC, GDF SUEZ

12         Energy North America Inc.

13        180 Maiden Lane

14        New York, New York  10038

15

16   BY:   HAROLD A. OLSEN, ESQ.

17

18   MILBANK, TWEED, HADLEY & MCCLOY LLP

19        Attorneys for CarVal Investors, LLC and Fortress

20         Investment Group LLC

21        One Chase Manhattan Plaza

22        New York, NY 10005

23

24   BY:   ALAN J. STONE, ESQ.

25

1

2   MILBANK, TWEED, HADLEY & MCCLOY LLP

3        Attorneys for CarVal Investors, LLC and Fortress

4         Investment Group LLC

5        International Square Building

6        1850 K Street, NW

7        Washington, DC 20006

8

9   BY:   ANDREW M. LEBLANC, ESQ.

10

11  THOMPSON & KNIGHT LLP

12       Attorneys for Sequent Energy Management L.P.

13       900 Third Avenue

14       20th Floor

15       New York, NY 10022

16

17  BY:   JENNIFER A. CHRISTIAN, ESQ.

18

19  WINSTON & STRAWN LLP

20       Attorneys for Constellation

21       200 Park Avenue

22       New York, NY 10166

23

24  BY:   DAVID NEIER, ESQ.

25

1

2  PEPPER HAMILTON, LLP

3       Attorneys for ExxonMobil

4       3000 Two Logan Square

5       18th and Arch Streets

6       Philadelphia, PA 19103

7

8  BY:   FRANCIS LAWALL, ESQ.

9        (TELEPHONICALLY)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

10-14419-scc   Doc 260   Filed 10/07/10   Entered 10/07/10 17:07:33   Main Document
BOSTON GENERATING, LLC, et al.
Pg 11 of 81

Page 11

```
 1                     P R O C E E D I N G S

 2              THE COURT:  Good morning.  Please be seated.  I

 3     apologize for the delay.  The calendar this morning ran a

 4     little late.

 5              MR. BAKER:  Good morning, Your Honor.  Jan Baker for

 6     the debtors along with Adrienne Wheatley and Caroline Reckler.

 7     Your Honor, I'm pleased to say that, with one exception, all of

 8     the matters that were set for today have been resolved as a

 9     result of the diligence of Ms. Reckler, Ms. Wheatley and the

10     cooperation of the various parties.  We do not have resolution

11     yet on the discovery motion and the request to adjourn.  So

12     what I'd like to suggest is that, first, Ms. Reckler go through

13     quickly the final orders, Ms. Wheatley cover the matters that

14     were contested dealing with the assumptions since she did all

15     the work preparing for the --

16              THE COURT:  Okay.

17              MR. BAKER:  -- litigation.  And then we'll take up the

18     motion to adjourn.

19              THE COURT:  All right.  Before -- that sounds like an

20     excellent plan.  Before we get started, let me take the

21     appearances of folks on the phone.

22              MR. TAYLOR (TELEPHONICALLY):  Joshua Taylor on behalf

23     of Mitsubishi Power Systems Americas, Inc.

24              THE COURT:  All right.  Thank you, Mr. Taylor.

25              MR. LAWALL:  Frank Lawall, Pepper Hamilton, on behalf
```

Page 12

1    of ExxonMobil.

2            THE COURT:  All right.  Thank you.  Ms. Barr, are you

3    on the phone?  Okay.  Ms. Reckler?

4            MS. RECKLER:  Good morning, Your Honor.  Caroline

5    Reckler on behalf of the debtors.  Your Honor, we filed a

6    notice of amended agenda late last night reflecting that the

7    Algonquin matters were no longer contested.  And I can walk

8    through the matters that we do have on the agenda and answer

9    any questions that Your Honor may have.

10           THE COURT:  All right.  So I'm on the agenda that you

11   filed -- it's doc number .1?  The footer?

12           MS. RECKLER:  That's correct, Your Honor.

13           THE COURT:  Okay.

14           MS. RECKLER:  Your Honor, the first item on the agenda

15   is the debtors' insurance motion.  Your Honor granted an

16   interim order at the first day hearing and there were very few,

17   if any, changes to the form of order.  And I believe we

18   submitted a form of blackline showing the nonsubstantive

19   changes this morning.  I'm happy to answer any questions that

20   Your Honor has.  And I will note that there were no objections

21   received for this motion.

22           THE COURT:  All right.  And this has been reviewed

23   with Mr. Smith?

24           MS. RECKLER:  Yes, Your Honor.  And we --

25           MR. BAKER:  He has this one.

BOSTON GENERATING, LLC, et al.

Page 13

1          MS. RECKLER:  We did provide him information he

2     requested specifically with respect to this motion.

3          THE COURT:  All right.  All right.  The motion's

4     granted.

5          MS. RECKLER:  Would Your Honor -- I have the form of

6     orders.  Would you like me to hand them all up at the end?

7          THE COURT:  We can -- why don't you wait till the end

8     and we can take them all at the end.

9          MS. RECKLER:  Your Honor, the second item on the

10    agenda is the debtors' motion to pay pre-petition taxes.

11    Again, this was a motion that was granted on an interim basis

12    at the first day hearing.  We've been through this with the

13    committee as well and there were no comments received.

14          THE COURT:  All right.  That motion's approved.

15          MS. RECKLER:  The third item on the agenda, Your

16    Honor, is the debtors' wage -- what we call the wage motion.

17    We did make some changes to incorporate comments from the

18    committee on this motion.  Specifically, we clarified for the

19    avoidance of any last doubt that the debtors will not make

20    nonordinary course payments to insider or employees of the

21    nondebtor affiliates.  And that language has been approved by

22    Mr. Smith and his colleagues and built into the order.

23          THE COURT:  All right.  That motion's approved as

24    well.

25          MS. RECKLER:  Thank you, Your Honor.  The fourth item

BOSTON GENERATING, LLC, et al.

Page 14

1    on the agenda, Your Honor, is the debtors' critical vendor

2    motion.  We have incorporated Your Honor's comments from the

3    interim hearing into the form of order for the final hearing.

4            THE COURT:  Okay.

5            MS. RECKLER:  And we did not receive any further

6    comments from any other party in interest.

7            THE COURT:  All right.  And so, with respect to that,

8    we're clear that Distrigas is not being paid under that --

9            MS. RECKLER:  That's correct --

10           THE COURT:  -- order.

11           MS. RECKLER:  -- Your Honor.  Crystal clear.

12           THE COURT:  Okay.  All right.  That motion's approved.

13           MS. RECKLER:  Thank you, Your Honor.  Your Honor, item

14   number 5 is the debtors' warehousing motion.  Again, we haven't

15   received any comments from the committee or otherwise on this

16   motion.  And we have not made any substantive changes to the

17   form of order.

18           THE COURT:  All right.  That motion's approved, the

19   final, as well.

20           MS. RECKLER:  Thank you, Your Honor.  Item number 6 on

21   the agenda, Your Honor, is the debtors' motion to employ

22   professionals in the ordinary course of business.  These are

23   professionals who will not be working on the debtors'

24   restructuring efforts but provide services in the general

25   operation of the debtors' businesses.  And we have proposed a

10-14419-scc   Doc 260   Filed 10/07/10   Entered 10/07/10 17:07:33   Main Document
BOSTON GENERATING, LLC, et al.
Pg 15 of 81

Page 15

1    cap in consultation with the United States trustee.  And I

2    believe he's comfortable with the form of order as well.

3              THE COURT:  Okay.  That one's approved.

4              MS. RECKLER:  Thank you.  Your Honor, the next item or

5    motion on the agenda is the debtors' motion to establish

6    interim monthly compensation procedures for the professionals,

7    the debtor professionals, and the committee professionals.  I

8    understand that we'll be taking up the retentions, at least of

9    the debtors' professionals, on Monday.  But we thought it made

10   sense to proceed with interim compensation procedures at this

11   juncture.

12             THE COURT:  All right.  And there are no objections to

13   that?

14             MS. RECKLER:  No, Your Honor.

15             THE COURT:  All right.  So we'll enter that order.

16   Are the professional retentions going to be contested in any

17   meaningful way on Monday?

18             MS. RECKLER:  Your Honor, we have not received any

19   objections.  Other than with respect to the United States

20   trustee who we continue to discuss some of the retentions with,

21   we haven't received any objections.  And the objection deadline

22   has passed for everyone other than the United States trustee

23   and the committee.  We continue to talk to the United States

24   trustee and it's my hope that we will work out or resolve any

25   questions and concerns in advance of the hearing.  Or, if

Page 16

1    necessary, we may even discuss continuing those --

2              THE COURT:  Okay.

3              MS. RECKLER:  -- that we cannot resolve.

4              THE COURT:  All right.  Just keep us informed in that

5    regard.  Okay?  So that brings us up to the bar date motion?

6              MS. RECKLER:  Yes, Your Honor.  I understand it's

7    early in these cases.  But if Your Honor approves the sale in

8    mid-December -- or mid-November, early December, we're hoping

9    that thereafter we'll be able to quickly move forward with a

10   liquidating plan.  And so we've asked Your Honor to set a bar

11   date which is triggered to our -- the date on which we file our

12   schedules and statements just so that we take advantage of the

13   time we have now and give the creditors ample notice of the bar

14   date.

15             THE COURT:  All right.  Then let me ask Mr. Smith

16   specifically about this one.  Is this -- this is acceptable to

17   you?

18             MR. SMITH:  Yes, it is, Your Honor.  We did -- we

19   weren't so much concerned with it and yet, given the speed of

20   the case, we felt it might be a good idea to have a real good

21   idea who was leading here --

22             THE COURT:  Okay.

23             MR. SMITH:  -- so we have some idea of the numbers

24   assuming that that becomes relevant --

25             THE COURT:  All right.  I share your observation.  So

10-14419-scc   Doc 260   Filed 10/07/10   Entered 10/07/10 17:07:33   Main Document
                    Pg 17 of 81
BOSTON GENERATING, LLC, et al.

Page 17

1    on that basis, I'll approve this.

2         MS. RECKLER:  Thank you, Your Honor.  Your Honor, the

3    next item is a motion to establish procedures to settle

4    terminated safe harbor contracts.  And I recognize that at the

5    time we filed this motion, which is customary for cases of this

6    nature, we were faced with the potential of having a greater

7    number of terminated contracts.  If Your Honor approves the

8    four contracts that are up for assumption today, we may really

9    only have one contract that would be subject to these

10   provisions.  We think the motion will streamline the notice

11   procedures but at the same time still afford parties-in-

12   interest notice and proper protections of their rights to the

13   extent they object instead of going through the 9019 settlement

14   procedure.

15        THE COURT:  All right.  All right.  And again, I'm

16   going to ask Mr. Smith about this one because, as I understand

17   it under the procedures, it's primarily the agents who get the

18   most visibility into what the termination payment would be.

19        MS. RECKLER:  That is correct although the creditors'

20   committee certainly is afforded notice and an opportunity to

21   object.

22        THE COURT:  All right.  So you're good, Mr. Smith?

23        MR. SMITH:  I am.

24        THE COURT:  All right.  Okay.  That's approved.

25        MS. RECKLER:  Thank you, Your Honor.  Your Honor, I

BOSTON GENERATING, LLC, et al.

Page 18

1    believe that brings us to the debtors' motion to reject certain

2    executory contracts.  We have broken the order into two parts.

3    The first part deals with Sprague and the debtors are seeking

4    to reject the terminalling contract with Sprague.  The debtors

5    believe that it is in their best business judgment to reject

6    the contract at this juncture so that they do not continue to

7    incur the administrative expenses that they would be required

8    to pay going forward for services that they do not require.

9          THE COURT:  All right.  And there was no objection

10   filed, correct?

11         MS. RECKLER:  No.  There was no object.  With respect

12   to the Algonquin contract --

13         THE COURT:  Yes.

14         MS. RECKLER:  -- that was also the subject of this

15   motion, we have worked out a stipulation with Algonquin and

16   presented that to chambers to essentially wait until the

17   district court rules on the portion of the motion that would

18   withdraw the reference with respect to Algonquin.

19         THE COURT:  Right.

20         MS. RECKLER:  -- and then, if appropriate, would come

21   back to Your Honor.

22         THE COURT:  Right.  Now there's also -- there's a

23   second motion to withdraw the reference, is there not?

24         MS. RECKLER:  That is correct.  That is with respect

25   to the sale motion --

1          THE COURT:  Sale.

2          MS. RECKLER:  -- but not the bidding.  The papers were

3   clear on their face that it was not with respect to the bidding

4   procedures --

5          THE COURT:  Right.

6          MS. RECKLER:  -- just the ultimate sale.

7          THE COURT:  Okay.  All right.  So we have a

8   stipulation in the form that the parties want me to approve?

9          MS. RECKLER:  Yes.  And it's been executed by both of

10  the parties.

11         THE COURT:  All right.  I'm seeing someone else

12  nodding in the background.

13         MR. YOUNG:  Bennett Young for Algonquin.

14         THE COURT:  All right.

15         MR. YOUNG:  That's correct, Your Honor.

16         THE COURT:  Okay.  All right.  We'll enter the

17  stipulation later today.  And also do we have -- you'll give us

18  an appropriate order with respect to the rejection of the

19  Sprague?

20         MS. RECKLER:  That's correct, Your Honor.

21         THE COURT:  Okay.  Very well.

22         MS. RECKLER:  Your Honor, if I may, I will turn over

23  the podium to Ms. --

24         THE COURT:  Ms. Wheatley?

25         MS. RECKLER:  -- Wheatley for the remainder of the

Page 20

1   uncontested matters going forward.

2       THE COURT:  All right.  Thank you, Ms. Reckler.

3       MS. RECKLER:  Thank you.

4       MS. WHEATLEY:  Good morning, Your Honor.

5       THE COURT:  Good morning.

6       MS. WHEATLEY:  Adrienne Eason Wheatley for the

7   debtors.  The next four items on the agenda relate to

8   assumption of certain contracts.  I thought we could just take

9   them together.  Item 11 is for assumption of the Distrigas

10  contract.  There are no objections.  Item number 12 is for

11  assumption of the Sequent contracts.  There are no objections.

12  The debtors did receive informal comments in the form of an

13  order from Sequent Energy Management and that has been provided

14  to chambers.

15      The next motion is number 13.  That's the assumption

16  motion for Credit Suisse.  And the last one is number 14 on the

17  agenda, the assumption motion for Sempra Energy.

18      Those motions were contested until late yesterday

19  afternoon at which point Algonquin withdrew its opposition and

20  its objection in its entirety as to all four contracts.

21  Therefore, these motions are uncontested and we request entry

22  of a final order from Your Honor.

23      THE COURT:  All right.  Does anyone wish to be heard

24  with respect to the assumption of these four contracts?  All

25  right.  There being no response, I'll enter those orders.

Page 21

1          MS. WHEATLEY:  Thank you, Your Honor.

2          THE COURT:  Thank you, Ms. Wheatley.  And I appreciate

3     your working out the objection.

4          MS. WHEATLEY:  Thank you.

5          THE COURT:  Okay.  That was the easy part.  Before we

6     get to the CarVal and Fortress matters, let me pause to talk

7     about the final form of the cash collateral order which we

8     received, I believe, late yesterday.  I've gone through the

9     order and checked it against my recollection of the issues that

10    were raised.  And I just want to ask if everyone is satisfied

11    that it accurately reflects everybody's needs and concerns and

12    the resolutions that we reached at the last hearing.  Ms.

13    Reckler?

14         MS. RECKLER:  Your Honor, I did receive by e-mail from

15    Algonquin, counsel to the second lien agent and counsel to the

16    first lien agent that they were all satisfied with the form of

17    the order.

18         THE COURT:  All right.  Then we'll enter that later

19    today.  And thank you for working together to resolve that.

20         Okay.  So I think that brings us to the emergency

21    motion.

22         MR. LAWALL (TELEPHONICALLY):  Your Honor, excuse me.

23    This is Francis Lawall from ExxonMobil.  On the cash collateral

24    order, I have not seen the file form.  But the assumption is

25    that the stipulation that was placed on the record with respect

BOSTON GENERATING, LLC, et al.

Page 22

1    to Exxon's pre-petition possessory being for the warehousing.

2    While not expressly being put into the order, it is made part

3    of it as a result of the stipulation on the record yesterday.

4              THE COURT:  Yes.  Absolutely correct.

5              MR. LAWALL:  Thank you, Your Honor.

6              THE COURT:  Okay.

7              MR. LEBLANC:  Good morning, Your Honor.

8              THE COURT:  Good morning.

9              MR. LEBLANC:  Andrew Leblanc of Milbank, Tweed, Hadley

10   & McCloy representing CarVal and Fortress in this matter, Your

11   Honor.  And, Your Honor, just as a procedural matter, we -- I

12   filed a pro hac vice motion.  I've appeared many times in this

13   actual courtroom back in front of Judge Drain, of course.  But

14   it hasn't been acted on but I'd ask the Court's indulgence for

15   me to be heard today.

16             THE COURT:  All right.  Yes.  Welcome.

17             MR. LEBLANC:  Appreciate that.

18             THE COURT:  Before we get started, we have to talk

19   about your 2019.

20             MR. LEBLANC:  Yes.  I'm happy to, Your Honor.  I

21   think -- Your Honor, to be clear about our 2019, we are not a

22   committee.  We're not a group.  We're not a coalition.  We're

23   not a consortium.  We're not any of the fancy words people

24   affix to try to be something other than a committee or an

25   entity covered under 2019.  Milbank Tweed represents two

10-14419-scc   Doc 260   Filed 10/07/10   Entered 10/07/10 17:07:33   Main Document
BOSTON GENERATING, LLC, et al.
Pg 23 of 81

Page 23

 1   individual creditors in this matter.  We are the only entity

 2   that is representing more than one matter -- more than one

 3   entity.  We're not acting on behalf of anyone other than those

 4   two creditors.  So this is not the typical situation of an ad

 5   hoc group or an ad hoc committee or something like that where

 6   the membership is in flux or there's changes or might purport

 7   to represent other people's interests.  We are -- we, Milbank,

 8   represent two creditors.  If we represented one, nobody would

 9   have any issue with a 2019 at all.  And so, we submitted what

10   we believe the rule requires which is a 2019 on behalf of the

11   entity, Milbank Tweed, indicating what is required under the

12   rules, that the entity that represents more than one creditor

13   holds no interest -- holds no claims against this estate.

14        So we think we've complied with Rule 2019 with the

15   possible exception, Your Honor, of not having submitted our

16   engagement letters with our clients.  And I'm not sure that

17   that's really -- I can't think of a situation where that's what

18   is really intended under 2019.  So it's not a situation where

19   we would be disclosing -- because the rules are quite clear as

20   to who needs to disclose holdings information and dates of

21   purchase and things like that.  And that is the entity.  And

22   we, the entity, Milbank Tweed, representing multiple clients

23   have not -- do not have any claims against this estate.

24        THE COURT:  All right.  Mr. Baker, what do you think

25   about that?

10-14419-scc    Doc 260    Filed 10/07/10    Entered 10/07/10 17:07:33    Main Document
BOSTON GENERATING, LLC., et al.
Pg 24 of 81

Page 24

 1          MR. BAKER:  Well, Your Honor, as the Court's aware,

 2    there's a lot of ferment particularly in this district over

 3    that particular issue.  I respectfully disagree with Mr.

 4    Leblanc that that complies with what I had understood to be the

 5    requirements in this district.  I don't think any of the judges

 6    have specifically parsed through whether it's if you only

 7    represent two then you disclose only as to your law firm

 8    before.  But I think my sense of where the law in the southern

 9    district is headed is for a more expansive disclosure and

10    compliance with the rule than has been proposed.

11          THE COURT:  Well, you know, as I'm sure most of you in

12    the courtroom know and as Mr. Baker indicated, there's been a

13    lot of debate about 2019.  And there's not a lot of agreement

14    here, in Delaware, and there's a new rule that's about to come

15    out.  But I'm just looking simplistically at the simple words.

16    And I agree that the word "committee" does not appear and

17    you're not holding yourself out as a committee.  I get that.

18          MR. LEBLANC:  Right.  And --

19          THE COURT:  You're Milbank Tweed representing two

20    creditors.  But if you read the rule, it says "Every entity",

21    and that's what Milbank Tweed is here, "representing more than

22    one creditor", which you're doing, "and unless otherwise

23    directed, shall file a verified statement setting forth the

24    name and address of the creditor."  You did that.  "(2) the

25    nature and amount of the claim or interest and the time of

10-14419-scc   Doc 260   Filed 10/07/10   Entered 10/07/10 17:07:33   Main Document
BOSTON REPORTING, LLC, et al.
Pg 25 of 81

Page 25

1    acquisition thereof unless it is alleged to have been acquired

2    more than one year prior to the filing."

3         MR. LEBLANC:  Your Honor, and I think what you need --

4    what we need to do is then look at what (4) says because I

5    think what is intended in (2) is modified by (4) -- not

6    modified by (4) but there's additional information that is

7    required to be provided in (4).  And (4) says "with reference

8    to the time of employment of the entity, the organization or

9    formation of the committee or the appearance in the case of any

10   indenture trustee, the amounts of claims or interests owned by

11   the entity" and then it goes on from there.  The entity, again,

12   is Milbank Tweed.  We think -- and, Your Honor, I'm not trying

13   to hide the ball here.  I'll tell the Court exactly to the best

14   of my knowledge in approximate numbers what CarVal and Fortress

15   hold collectively.  And I'm  happy to do that.  And the answer

16   to that is we hold -- those two entities hold approximately

17   thirty percent of the first lien debt.  They are not consenting

18   holders in the words that it's been used in these pleadings.

19   They've not signed the sale support agreement.  But they hold

20   approximately thirty percent of the first lien debt.  In

21   addition to that, they hold approximately forty percent of the

22   second lien debt.  And they also hold positions in the

23   mezzanine debt.  And I apologize.  I can't give the Court --

24   it's a substantial amount in the mezzanine debt as well.  I

25   can't give the Court the exact numbers.  But I think it's

1   grossly misleading.  And I appreciate -- we filed our pleadings

2   saying we hold first lien debt.  But Latham's response or the

3   debtors' response to it said that we're just out of the money

4   second lienholders.  It's actually not true.

5        THE COURT:  Well, but that's exactly -- I mean, that's

6   exactly --

7        MR. LEBLANC:  Right.

8        THE COURT:  -- why I'm asking the question because --

9   and you don't have to come to a definitive resolution on the

10   cosmic issue of 2019.  You've now made a significant disclosure

11   that greatly moves you towards my view of what's required under

12   2019.  It's quite a different thing to know that you're

13   representing thirty percent of the first lien and forty percent

14   of the second lien than somebody who brought a couple of pieces

15   of paper --

16        MR. LEBLANC:  Understood.

17        THE COURT:  -- the other day.  And that's a

18   significant fact, I think, for everybody to know as we head

19   into the next important -- critical juncture in this case.  So

20   I appreciate your willingness to make that disclosure.  I'm not

21   interested in what you paid for it because my personal view --

22   that's not relevant to what's going to happen next.  But I

23   think knowing that you have the substantial positions that

24   you've just identified is exactly what I want to know so that I

25   can evaluate --

BOSTON GENERATING, LLC, et al.

Page 27

1           MR. LEBLANC:  Right.

2           THE COURT:  -- the positions that are taken.  So --

3           MR. LEBLANC:  Understood.  And, Your Honor, I would

4    have made that disclosure even if I was representing one

5    client.  We don't intend to hide the ball on that.  And

6    clearly, nobody could argue 2019 would apply if we represented

7    only CarVal --

8           THE COURT:  Abso -- well, that's --

9           MR. LEBLANC:  -- or Fortress.

10          THE COURT:  You know, we could have a very interesting

11   discussion sometime over that loophole in 2019, but that's

12   not --

13          MR. LEBLANC:  And we're certainly not trying to take

14   advantage of a loophole.  It's just we represent ad hoc groups

15   all the time and ad hoc committees.  And we struggle with these

16   issues when --

17          THE COURT:  Right.

18          MR. LEBLANC:  -- you identify and you seek to

19   represent a group as opposed to individual creditors in the

20   case.  So we didn't -- I don't think we struggled with the

21   question.  And we think it's quite clear that we complied with

22   the required disclosures.  But we weren't trying to hide the

23   ball that we are -- the two entities that we represent are some

24   of the most significant stakeholders in this case including

25   with respect to the first lien debt.  And again, they're not

10-14419-scc   Doc 260   Filed 10/07/10   Entered 10/07/10 17:07:33   Main Document
BOSTON GENERATING, LLC, et al.
Pg 28 of 81

Page 28

1    parties to the sale support agreement.  They are not consenting

2    lenders.  So when they tell you that they have over fifty

3    percent, you know that at least thirty percent of that is not

4    part of the consenting holders' group.

5              THE COURT:  Okay.  All right.  Well, based on your

6    additional disclosures, I'm going to put the 2019 issue to the

7    side.

8              MR. LEBLANC:  Okay.

9              THE COURT:  And let's move on.

10             MR. LEBLANC:  Your Honor, we have been -- and now I'm

11   referring to the entity of the 2019 --

12             THE COURT:  Okay.

13             MR. LEBLANC:  -- language.  We've been involved in the

14   case since it began.  But we've been representing these two

15   creditors with -- who have very significant interest in this.

16   And our focus has been on the process that's happening now and

17   the sale procedure that's being proposed to be approved on

18   Monday.  And the process for us began immediately upon the

19   filing of the case.  We served document requests related to

20   that motion the Friday after this case was filed on Monday.  On

21   the 23rd of August, we served document requests that refer

22   specifically to this motion.  Now we have not taken meaningful

23   part of -- taken meaningful part in any of the other things

24   that are going on.  Other people are handling those things.

25   The second lien agent obviously has an interest in it  The

BOSTON GENERATING, LLC, et al.

Page 29

1    first lien agent -- but we're -- our focus has been on this

2    sale process.  And we've been trying from the day the case was

3    filed to get as much information as we could to understand why

4    it was being done and to mount a reasonable objection to it

5    because we think it is objectionable.  And so we began our

6    process on August 23rd.  We served document requests.  We

7    negotiated with the debtor for a period of time.  They served

8    document -- I'm sorry -- responses to those requests on

9    September 3rd when the document requests were returnable.  And

10   they objected to any number of things.  It's the laundry list

11   of objections that one would typically expect to see.  But what

12   they said with respect to every item is we will produce these

13   documents subject to the objections that are asserted herein.

14   They raised every objection, Your Honor, even to the point of

15   objecting that we requested that they make the production in

16   Washington, D.C. where I live.  They objected because that's

17   inconsistent with Rule 34.

18        But what they didn't object to, Your Honor, was that

19   there was no contested matter.  They never said, under 9014,

20   there needs to be an objection before it's considered a

21   contested matter or make applicable 7026 and 7034 because,

22   frankly, notwithstanding what was said to us in an e-mail two

23   days ago, that really isn't the law in this circuit.  In fact,

24   I think it's quite clearly to the contrary.  It's just across

25   the hall -- across the atrium here in front of Judge Gerber.

10-14419-scc   Doc 260   Filed 10/07/10   Entered 10/07/10 17:07:33   Main Document
BOSTON GENERATING, LLC, et al.
Pg 30 of 81

Page 30

1    His standard case management order resolves any ambiguity about

2    that because he says every motion is a contested matter whether

3    an objection has been filed or not.

4           And in fact, while it's very influential to see -- I'm

5    sorry, Your Honor.

6           THE COURT:  You don't have to spend a lot of time on

7    the point.

8           MR. LEBLANC:  Okay.  Thank you, Your Honor.  And I'll

9    move on.  The first line of the debtors' response to our motion

10   is that our motion to adjourn is moot.  Your Honor, it's hardly

11   moot.  What the debtors then disclose is that over the last

12   approximately thirty days, they've had thirty lawyers pouring

13   over twenty million pages of documents and they began making

14   production to us yesterday of those documents.

15          Now, I want to be fair.  I don't want to be accused of

16   misrepresenting anything.  They did produce to us four

17   documents on Friday at 4:00, the 17th of September.  Those four

18   documents consisted of the confidential information memorandum

19   that was sent to debtors in May, of a letter that was sent to

20   debtors in May, of a second letter that was sent to debtors in

21   May.  And I believe, if my recollection serves me, of another

22   version of documents -- confidential information type

23   presentation made to bidders in a May or June time frame.  So

24   approximately 156 pages were produced to us on September 17th

25   twenty-six days after we served our discovery requests,

10-14419-scc   Doc 260   Filed 10/07/10   Entered 10/07/10 17:07:33   Main Document
BOSTON GENERATING, LLC, et al.
Pg 31 of 81

Page 31

1    fourteen days after, to the day, that responses were due to it.

2         And importantly, Your Honor, four days -- five days

3    after they told us they would begin a rolling production of

4    electronic documents.  They told us they would begin a rolling

5    production of electronic documents on September 13th.  And only

6    on that day did they then say well, you haven't objected, so

7    you're not getting documents.

8         So we began getting documents yesterday.  Out of the

9    apparently twenty million pages that they have reviewed, we

10   have received so far, as of the last tally when I walked over

11   to court, 13,333 pages of documents.  So apparently, over the

12   next twenty-four hours, we are at risk of getting 19,986,667

13   pages of documents.  And depositions are expected under their

14   proposed schedule to start on Friday and conclude on Sunday for

15   an objection on Monday.

16        Our objection, of course, is due this afternoon at

17   4:00 pursuant to the Court's schedule.  Now, in addition to

18   that, yesterday, the debtors served on us at 7:15 p.m. fourteen

19   document requests propounded on us returnable tomorrow

20   afternoon at 4:00.  So what the debtors would have us receive

21   whatever amount of documents they're going to produce to us

22   over the next twenty-four hours, prepare for depositions,

23   respond to fourteen document requests, serve an objection,

24   prepare for an objection hearing, and then come in on Monday

25   and decide what is probably the most important thing to happen

Page 32

1   in this case:  whether or not there's going to be a 363 sale

2   and, importantly, in that 363 sale, whether or not we're going

3   to sign away thirty-five million dollars of the estate's assets

4   in bidder protections all on four or five days' notice.  Now,

5   Your Honor, although we haven't been involved, we consciously

6   chose not to come in and burden the Court with our own views on

7   cash collateral and things like that.  We know that this is not

8   the first time that this has happened with these debtors.  They

9   apparently, modus operandi, appears to be wait until the last

10  minute, dump documents on people so they don't have time

11  meaningfully to object.  Now when you're dealing with cash

12  collateral issues about how people are going to get paid,

13  whether vendors are going to get paid, and truly whether the

14  lights stay on in Boston, maybe, and particularly when you're

15  dealing with cash collateral which has some effect on creditor

16  recoveries but is not the sign for non of the case.  Maybe

17  under those circumstances, you can jam people on discovery.

18  But when you're dealing with what is probably the single most

19  important thing to happen in this case, we just think it's

20  patently unfair and a violation of due process.  To force us to

21  try to respond and to deal with these issues in four or five

22  days, two of which, of course, are a weekend -- now, we suggest

23  -- and we suggest it in our motion, because at the time we

24  filed it, we hadn't received any meaningful production other

25  than the 156 pages that I referred to earlier.  We suggested

10-14419-scc   Doc 260   Filed 10/07/10   Entered 10/07/10 17:07:33   Main Document
BOSTON GENERATING, LLC, et al.
Pg 33 of 81

Page 33

1    just an adjournment until such time -- we can't predict when

2    the debtors' production will be done.  We can't predict how

3    many of the 19,866,000 -- 986,000 plus documents --

4              THE COURT:  You can round.

5              MR. LEBLANC:  -- the twenty million documents left to

6    come to us, we can't predict how long it's going to take for

7    the debtors to produce it.  And if it's millions and millions

8    of pages, we can't predict how long we're going to need to go

9    through it.  They took thirty days with thirty lawyers working

10   presumably around the clock to review it.  We should have some

11   meaningful amount of time to review it, prepare for the

12   objection and be able to come in and give Your Honor what I

13   think Your Honor deserves both in our pleadings and in our oral

14   presentation a meaningful response to a significant motion in a

15   very large case.  And particularly, an objection coming from

16   significant creditors and stakeholders in this case who have

17   very, very different views about what should happen here.

18             THE COURT:  All right.

19             MR. LEBLANC:  Now, the debtors say that there's

20   prejudice because there is a deadline -- there are deadlines in

21   their asset purchase agreement.

22             THE COURT:  Yeah.  The deadlines are forty-five days

23   from the petition date for the bid procedures.  The bid

24   procedures order to be entered except by reason of the Court's

25   schedule to --

BOSTON REPORTING, LLC, et al.

Page 34

1          MR. LEBLANC:  Right.

2          THE COURT:  -- summarize what the provision says.

3          MR. LEBLANC:  Yes.  And so, by our count, Your Honor -

4    - and someone could obviously correct us by a day or two, but

5    by our count, that's next weekend, the 2nd or 3rd of the month.

6    So --

7          THE COURT:  It is.  And under the interpretation

8    provisions of the document, that puts us out to October 4th.

9          MR. LEBLANC:  Right.  And so, there isn't any

10   prejudice if it can be heard by October 4th.

11         But, Your Honor, I, frankly, think there's a bigger

12   point here.  If these debtors are really going to tell the

13   Court that Constellation is going to walk from this deal before

14   the Court has approved its bid protections because the debtors

15   miss an interim deadline -- it doesn't require pushing out of

16   the absolute deadline.  But because the debtors miss an interim

17   deadline then I think the Court has to really think about

18   whether it's going to approve a thirty-five million dollar

19   payment.  If they're going to walk before that payment is

20   approved because of a foot fault and because the debtors are

21   required to give due process to the parties-in-interest in this

22   case then I don't know why we would approve -- why the Court

23   would approve any bid protection for them.  If they're looking

24   to walk, let them walk before they have thirty-five million

25   dollars in their pocket, if they do.  Because if that's

Page 35

1   approved, if the Court approves the bid protections of thirty-

2   five million dollars and there's a foot fault after, we know

3   what the debtor's going to say.  Don't make us miss this

4   deadline 'cause then they'll get thirty-five million dollars.

5   You don't have that -- we don't have that, Your Honor, hanging

6   over our head.

7           So I think, Your Honor, claims of prejudice really

8   should fall on deaf years.  And the debtors even admit that

9   they have cash sufficient to run into the first quarter of

10  2011.  And I think there's even a finer point to be made to

11  that.

12          At the end of the projection period in the cash

13  collateral order, Your Honor, the debtors have 16.7 million

14  dollars.  That's in March of 2011.

15          THE COURT:  2011, right.

16          MR. LEBLANC:  But it's important to remember, Your

17  Honor, when they have 16 --

18          THE COURT:  That's after fees.

19          MR. LEBLANC:  Well, that's after fees.  But it's also

20  when they're not doing anything.  They're not producing power

21  for the city of Boston.  So if they only had ten million

22  dollars to liquidate this estate, we may not have to have as

23  many lawyers on pleadings but it's going to get done for ten

24  million dollars, or even five million dollars.  At that point,

25  they're not operating a business.  And so, the only cash

BOSTON GENERATING, LLC, et al.

 1    projections that they've provided, show 16.7 million dollars at

 2    the end of Q3 -- I'm sorry -- Q1 '011.  And I just don't think

 3    that that could fairly serve as a basis for prejudice.

 4          Your Honor, I think that the minimum, bare minimum due

 5    process requirements here require the Court to adjourn this

 6    hearing and allow the debtors -- we've not moved to compel,

 7    Your Honor, because the debtors told us they were producing

 8    documents.  They haven't done so.  We think they're going to do

 9    so.  They now committed to do so.  But we need to get those

10    documents.  And we need to have an opportunity to provide the

11    Court with what it needs which is a meaningful objection that

12    responds to the issues and deals with what are very, very heavy

13    issues, whether a debtor should be permitted to sell itself --

14    sell substantially all of its assets in a 363 instead of

15    through a Chapter 11.  That's a significant issue.  And I think

16    the Court needs to know why that's being done.

17          And so, Your Honor, I'll rest unless the Court has any

18    questions.  Due process here requires, we think, an adjournment

19    of this hearing until such time as we can adequately prepare

20    for it.  And we have been anything but dilatory in our efforts.

21    We began this process immediately.  We have no ulterior motive

22    other than to prepare ourselves for what we view as the most

23    significant event in this case.  So unless the Court has any

24    questions, I would appreciate an opportunity to respond --

25          THE COURT:  Yes.  Let me hear from some of the other

BOSTON REPORTING, LLC, et al.

Page 37

```
 1    parties.  Thank you, Mr. Leblanc.

 2              MR. LEBLANC:  Thank you, Your Honor.

 3              THE COURT:  All right.  Mr. Baker, do you want to go

 4    next?  I also want to hear from Wachtell and Dechert if they

 5    wish to be heard -- and Mr. Smith.

 6              MR. BAKER:  I think maybe anyone supporting the

 7    objection might want to go next.

 8              THE COURT:  All right.  It's a good suggestion, Mr.

 9    Baker.  All right.  Anyone else who shares Mr. Leblanc's views

10    of the world?

11              MR. LEBLANC:  Your Honor --

12              THE COURT:  Well, let me --

13              MR. LEBLANC:  -- just on this motion, I assume, Your

14    Honor, right?

15              THE COURT:  Yes, just on this motion.

16              MR. LEBLANC:  Thank you.

17              THE COURT:  Maybe I'm going to improperly point to the

18    600 pound gorilla in the room.  And I don't even know if it is

19    the 600 pound gorilla in the room but I'm going to ask the

20    question.  There's an intercreditor agreement here.  Are the

21    provisions of that intercreditor agreement in play here?

22              MR. BRILLIANT:  We don't believe so, Your Honor.  We

23    believe we have the right to object.  As we pointed out to Your

24    Honor before, in connection with the --

25              THE COURT:  I'm not talking about cash collateral now.
```

BOSTON REPORTING, LLC, et al.

Page 38

```
 1              MR. BRILLIANT:  Yeah, I understand.

 2              THE COURT:  I'm talking about --

 3              MR. BRILLIANT:  I understand, Your Honor.

 4              THE COURT:  -- I'm talking about to the --

 5              MR. BRILLIANT:  I understand, Your Honor.

 6              THE COURT:  Yeah.

 7              MR. BRILLIANT:  There is no --

 8              THE COURT:  You need to identify yourself for the

 9    record.  I'm sorry.

10              MR. BRILLIANT:  Oh.

11              THE COURT:  Just because I know you doesn't mean --

12              MR. BRILLIANT:  Yes.

13              THE COURT:  -- the recorder knows you.

14              MR. BRILLIANT:  Your Honor, Alan Brilliant from

15    Dechert on behalf of Wilmington Trust, the administrative agent

16    for the second liens.  Your Honor, with respect to the

17    intercreditor, there is no expressed provisions that prohibits

18    the second lien agent from objecting to a 363 sale.  Now, at

19    this point in time, we're only talking about bid procedures.

20    We're not talking to the sale --

21              THE COURT:  Right.

22              MR. BRILLIANT:  -- itself.  But there is no provision

23    in the intercreditor with the -- that expressly deals with

24    objecting to a 363 sale at all.  Now, in the typical

25    intercreditor agreement and in the model ABA intercreditor
```

Page 39

1    agreement, there is a provision with respect to 363 sales.

2    There is not one in this intercreditor agreement which, from

3    our perspective, means that we are free to object to a 363

4    sale.  Again, what we're dealing with today is just the bid

5    procedures and not the sale.

6              THE COURT:  Right.

7              MR. BRILLIANT:  Now there are provisions, Your Honor,

8    in connection with the intercreditor which prohibit us from

9    taking any actions to object to or stay any actions that are

10   being taken by the first lien agent to --

11             THE COURT:  Enforce --

12             MR. BRILLIANT:  -- exercise --

13             THE COURT:  Right.  Exercise revenues.

14             MR. BRILLIANT:  -- revenues against the assets.  Now

15   we filed, as Your Honor is aware, an objection to cash

16   collateral on a cross-motion for adequate protection in

17   connection with this matter.  And the debtors, quite properly,

18   said that the provision that we point in the agreement with

19   respect to the payment of fees, deals with the enforcement of

20   remedies by the parties.  And they say that what's going on

21   now, a 363 sale by the debtors, is not an enforcement of

22   remedies by the first lien agent.  And we agree with that.  And

23   consequently, the only provisions in the intercreditor that

24   would prohibit us from objecting to a sale is if the first lien

25   agent were to be enforcing remedies which the debtors say they

Page 40

1   are not and which we agree that the first lien agent at this

2   point is not.  So we are not prohibited from objecting to a

3   sale.  And again, whether or not there's an enforcement of

4   remedies, at this point in time, all we're dealing with is bid

5   procedures which is clearly not the enforcement of remedies.

6   And so, we feel that we are free to object to that.  And we are

7   working on an objection and are hopeful that we will have

8   something filed by 4:00 if we're required to.

9          Now with the issue of discovery, Your Honor, I think

10  you know the frustration that we have had in connection with

11  this matter in getting discovery.  And I think that it's our

12  opinion that what's happening here is the debtors jammed us in

13  connection with the adequate protection and the cash

14  collateral.  They did not produce any discovery until after we

15  filed -- sought a hearing with Your Honor and had a telephone

16  conference with Your Honor.  And Your Honor required them --

17  ordered them to produce documents.  And at that time -- and

18  it's interesting because we're seeing the same fact pattern

19  being repeated here.  What Your Honor did was order them to

20  produce on a rolling basis information over a holiday weekend

21  so that we could take a deposition on Sunday with the

22  expectation that if we couldn't work things out for a

23  continuance that there would be potentially a hearing on

24  Monday.

25         Now, leaving aside the whole issue of discovery with

10-14419-scc   Doc 260   Filed 10/07/10   Entered 10/07/10 17:07:33   Main Document
BOSTON GENERATING, LLC, et al.
Pg 41 of 81

Page 41

1    the cash collateral, we were very cognizant of the fact that we

2    had another hearing scheduled on the 27th and that even if we

3    put it off, we were not going to be in a position to take

4    discovery this week while we had to file an objection on the

5    bid procedures.  Presumably, we're going to have the

6    opportunity to review discovery from the debtors in connection

7    with the bid procedures, prepare witnesses, take depositions

8    and prepare for a hearing on Monday.  That being said, Your

9    Honor -- and therefore, Your Honor, it was very important for

10   us that we get all the discovery in connection with the cash

11   collateral and the adequate protection issues done last week

12   regardless of whether or not we would be able to reach an

13   agreement with the first lien agent in connection with

14   continuing that hearing to some date past the hearing in

15   connection with the bid procedures.

16          We received some documents right before sundown on

17   Friday as required in connection with those few documents they

18   had agreed that were given to us.  But rather than getting them

19   Friday morning or any time during the day, we got them just at

20   the close of business.  And then we received no documents on

21   Saturday at all even though they agreed that there would be a

22   rolling production of documents.  And then on Sunday, in the

23   middle of the afternoon, a few hours before the deposition, we

24   received another 150 pages worth of documents from the debtors.

25   We have still not -- we asked them to confirm that that is

BOSTON GENERATING, LLC, et al.

Page 42

1    everything that they agreed to produce in connection with the

2    discovery conference we had with Your Honor.  We have not yet

3    received that.  We have not received a privilege log.  But the

4    bottom line is, their idea of rolling production is to give you

5    all the documents on the last day which is what's happening and

6    repeating itself again here.  And we do believe, Your  Honor --

7    when Mr. Leblanc said that this is the most important hearing

8    in the case, we do believe that that is true.  The debtors want

9    to put this company on a path to be sold in a 363 sale outside

10   of a plan of reorganization on a very short period of time for

11   a price they say we don't have the money.  Your Honor has seen

12   their chart.  We've talked about it before.  Even under their

13   analysis, we're sixteen million dollars out of the money in a

14   1.3 billion dollar sale when you take into account the

15   assumption of debt.  We're only sixteen million dollars out of

16   the money assuming they get default interest and assuming

17   there's a thirty-seven million dollar purchase price adjustment

18   which are -- and assuming what the date is and we just think

19   are big assumptions.  And what they want to do is burden the

20   estate with a thirty-five million dollar breakup fee next week

21   which is about ten percent of the 350 million dollars principal

22   amount of the second lien debt.  So it's a very significant

23   amount of money and fees that would be paid -- fees that would

24   be paid even if subsequently a plan of reorganization were

25   confirmed and no sale occurred.

Page 43

1          And we believe we have the right to explore whether or

2    not a 363 sale outside of plan of reorganization can be

3    confirmed in this case.  And we believe that it can't be -- I

4    mean, that a sale cannot be approved in this case outside of a

5    plan.  That is ultimately going to be the basis of this hearing

6    because if you can't approve the sale ultimately, there's no

7    reason to burden the estate with this large breakup fee.  And

8    that's going to be what the hearing's about.  And in order to

9    do that, we need to understand what their business

10   justification is.  We need to  understand -- get their

11   documents and depose their witnesses in a meaningful way.  And

12   we're not being given the opportunity to do that.

13          THE COURT:  Let me ask you a substantive question.  Am

14   I reading the bid procedures correctly?  And Mr. Baker can

15   chime in -- that not only is this a 363 sale but that it is

16   proposed that upon the closing, the proceeds go to the first

17   lien lenders.

18          MR. BRILLIANT:  Well, all of it except for a small

19   amount --

20          THE COURT:  Right.

21          MR. BRILLIANT:  -- that would be escrowed for the ten

22   million dollar management incentive plan, if Your Honor would

23   approve it, and to pay fees for a liquidating plan.  They

24   basically are giving all the money to the first lien lenders.

25   But then they want to spend, under their analysis, thirty-eight

10-14419-scc    Doc 260    Filed 10/07/10    Entered 10/07/10 17:07:33    Main Document
BOSTON GENERATING, LLC, et al.
Pg 44 of 81

Page 44

```
 1    million dollars to distribute some small amount of money to the

 2    second lien as an unsecured which seems an absurd business

 3    proposition.

 4          But that's right, Your Honor.  Other than escrowing a

 5    small amount, it is, under their procedures, they would be

 6    giving the money all to the first lien lenders.

 7          And the other thing -- and you'll hear about this more

 8    at the hearing.  I don't expect that Your Honor wants

 9    discussion or argument about the bid procedures.  But --

10          THE COURT:  No.  But a preview is what I'm looking

11    for.

12          MR. BRILLIANT:  But one of the things that's really

13    interesting about the bid procedures is they modify or take

14    away our right to credit bid as second lien lenders.  If we

15    were to credit bid, we have to pay more than anybody else in

16    the case because they say that we have to basically fund the

17    liquidating plan just as the first lien lenders have agreed to

18    do which is, Your Honor, with all due respect, absurd, that

19    somebody who's already a party in the case who has lent the

20    debtor 350 million dollars, in order to exercise its rights,

21    has to fund expenses that they haven't agreed to and without

22    adequate protection or any rationale.

23          Your Honor, I think we've made it very clear what we

24    think has been going on.  We're being jammed.  They took away

25    the thirteen million dollars we were supposed to get.  They
```

Page 45

1    refuse to pay our fees.  They refuse to give us documents on a

2    timely basis.  And basically, Your Honor, what they're trying

3    to do is jam us and run over us.  And a lot of that as Your

4    Honor has seen in their pleadings and in court -- you know,

5    threats that they're going to sue us for violating the

6    intercreditor.  And, ultimately, Your Honor, we don't see that

7    they have any claims.  That's all just a distraction in trying

8    to move things away from what's really going on here which is

9    that they've come up with a sale which provides the first

10   lenders', effectively, payment in full and they don't want

11   anyone to oppose it.

12          And you'll hear testimony, Your Honor, if we ever get

13   to do discovery and see the documents, that there's ulterior

14   motives.  Not just the ten million dollars.  I mean, that's

15   obvious from that.  But there's ulterior motives for the

16   shareholders here in doing the sale.  And before we talk to

17   Your Honor about them, we would like to test them in discovery

18   and make sure that what we believe is really going on here.

19   And why they need to do this this year is, in fact, the reason

20   that they're doing it.

21          THE COURT:  All right.  Thank you.  Mr. Bryan?

22          MR. BRYAN:  Your Honor, I'm David Bryan from Wachtell

23   Lipton for the first lien agent.  I just rise to say that we

24   disagree with the second lien agent's position with respect to

25   standing.  We do intend to raise standing as a basis for

10-14419-scc   Doc 260   Filed 10/07/10   Entered 10/07/10 17:07:33   Main Document
BOSTON GENERATING, LLC, et al.
Pg 46 of 81

Page 46

1    disallowing any objection that they file to the bid procedures.

2    We'll fully brief that to Your Honor.

3            I would just note a couple of things.  First of all,

4    they contend in their adequate protection brief that there has

5    been an exercise of remedies, and therefore the waterfall under

6    Section 4.1 of the intercreditor agreement -- and if they're

7    correct about that, Your Honor, then they are required to be

8    silent with respect to that exercise of remedies.  That's going

9    to be in play with respect to the adequate protection motion --

10            THE COURT:  Right.  Can I --

11            MR. BRYAN:  -- on October 5.

12            THE COURT:  -- can I ask you to pause for a second.

13    Because there was another question that I need to ask both of

14    you.  Because based on Mr. Leblanc's disclosure with respect to

15    his client's holdings, they have a substantial position in both

16    the first lien and the second lien.  So in addition to the

17    intercreditor issue, there's the issue of whether it's going to

18    be either of your views that he shouldn't be allowed to speak

19    because the agent's the only one who's supposed to speak?

20            MR. BRYAN:  I -- Your Honor, I bel --

21            THE COURT:  So that's not a 600 pound gorilla, maybe

22    it's a 200 pound gorilla.  But I just want to know who's all in

23    the room on this issue.  I don't want to be surprised down the

24    road in any way.  So I'm just trying to tease out all of these

25    issues that I think precede my ability to get to the merits,

10-14419-scc    Doc 260    Filed 10/07/10    Entered 10/07/10 17:07:33    Main Document
BOSTON GENERATING, LLC, et al.
Pg 47 of 81

Page 47

1    so.

2            MR. BRYAN:  Yes, I believe that will be an issue that

3    we will raise, that only the agent has standing.

4            I do have a question that requires further disclosure,

5    I believe, from the Milbank firm.  He said -- Mr. Leblanc

6    represented that they're not consenting lenders and that

7    they're not bound by the sale support agreement.  And I would

8    like you, Your Honor, please, to require a representation as to

9    whether any of the first lien debt that they've acquired was

10   subject to the sale support agreement.  Because subsequent

11   purchasers are bound -- are required, in order to take transfer

12   of first lien claims, to sign an acknowledgement to be bound by

13   that.  So I don't think the disclosure that Your Honor has is

14   complete on that subject.

15           THE COURT:  All right.

16           MR. BRYAN:  But we do have our standing problems that

17   we'll brief for you.

18           THE COURT:  All right.  Mr. Brilliant, are you -- you

19   can respond to that, Mr. Leblanc, but Mr. Brilliant, can I go

20   back to you for a moment and ask you your view of the question

21   of whether or not Mr. Leblanc gets to speak vis-a-vis your

22   client?  He's in your group too.

23           MR. BRILLIANT:  Yes, Your Honor.  They're parties-in-

24   interest in this case.  And they have a right to speak.  We are

25   the administrative --

BOSTON REPORTING, LLC, et al.

Page 48

1           THE COURT:  Agent.

2           MR. BRILLIANT:  -- agent.  It is secured debt.  But

3    there's nothing that prohibits the second lien -- individual

4    second lien --

5           THE COURT:  Okay.

6           MR. BRILLIANT:  -- lenders from appearing in this case

7    and participating.  There's nothing -- I don't believe there's

8    anything in the first lien credit agreement that does that

9    either.  You know, under the Bankruptcy Code, under Section

10   1109, all parties-in-interest can --

11          THE COURT:  All right.

12          MR. BRILLIANT:  -- be heard.  As for this issue, Your

13   Honor, that Mr. Bryan raised with respect to our cash

14   collateral cross motion, we were very clear in that.  We did

15   not concede that they were exercising remedies.  We just --

16          THE COURT:  All right.  We're --

17          MR. BRILLIANT:  -- pointed out what the --

18          THE COURT:  -- that's --

19          MR. BRILLIANT:  -- waterfall was in the document.

20          THE COURT:  -- that's a detour for the purposes of

21   right now.  And with respect to your question about the

22   conditions pursuant to which his client's positions were

23   acquired, you two can discuss that without involving me, I

24   think.

25          MR. LEBLANC:  Your Honor, that's fine.  Andrew Leblanc

10-14419-scc   Doc 260   Filed 10/07/10   Entered 10/07/10 17:07:33   Main Document
BOSTON GENERATING, LLC, et al.
Pg 49 of 81

Page 49

1    again.  Do you want me to respond to the question of whether

2    the agent can preclude the principal from speaking or?

3            THE COURT:  No, let him finish, and then you address

4    that.

5            MR. BRYAN:  Your Honor, I do think it's important to

6    know whether, for purposes of your decision on this subject,

7    it's going to be important for the Milbank firm to disclose

8    whether their client's alleged holdings of second lien --

9    excuse me, of first lien debt, are or are not acquired from

10   holders.  I don't mean to put the Court on the spot.  But I,

11   right now, don't know that, and it's hard to brief that in a

12   vacuum.

13           MR. LEBLANC:  Your Honor, let me just try to respond

14   to that this way.  We'll certainly have discussions with the

15   first lien agent.  We asked -- there's an ambiguity in the

16   document.  I think the answer is no.  Certainly our client's

17   holdings -- pre-petition holdings -- they didn't sign the sale

18   support agreement.  They certainly have been in the

19   marketplace.

20           I don't know the answer to the question.  I don't

21   believe they have.  But there is an ambiguity in the document

22   as to whether, after-acquired debt taints the entirety of the

23   rest of your debt.  We asked for clarification on that question

24   from the two parties that proposed -- that worked on that, and

25   they refused to give it to us.  So I'm happy to discuss with

```
 1   Wachtell the answer to their question, to the extent that it's

 2   relevant, and I'm not sure that it is.

 3           And if it is relevant, we may have to have another

 4   discussion with the Court with respect to an interpretation of

 5   the sale support agreement, because it's an ambiguity that we

 6   don't think was -- we think the Court's going to need to

 7   resolve it if somebody wants to assert that by buying some slug

 8   of debt that's signed up to it, it taints the balance of it.

 9           THE COURT:  I got you.

10           MR. BRYAN:  I think that's a serious issue --

11           THE COURT:  I got you.

12           MR. BRYAN:  -- that the Court would have to address if

13   it comes to that.  And I just don't --

14           THE COURT:  I'm not sure, based on what I've heard,

15   that it's going to come to that.  But I'm just trying to, as I

16   said, tease out all of these issues that are embedded in the

17   credit documents that may have -- that parties may tell me next

18   week, have a bearing on whether or not I can consider the

19   objections that are being made.

20           So I'm going to reiterate what I said, which is to ask

21   you to talk to each other and attempt to work it out.  And to

22   the extent that you don't, you're going to file more paper, so

23   you can tell me to what extent you think I need to resolve that

24   before I can get to the merits.  Okay, so --

25           MR. BRYAN:  Because to be clear, Your Honor, we don't
```

Page 51

1    agree that there's an ambiguity.  We think the language of the

2    sale support agreement is clear, that if you buy "slugs of

3    debt" that are subject to the sale support agreement, and you

4    provide the required agreement to be bound by the terms of that

5    document as a condition of buying the debt, I don't agree with

6    the word "taint", but you're bound.  That's our position.

7             THE COURT:  Right.  Well, you know -- and again, this

8    is all -- we're doing this in real time, because Mr. Leblanc

9    just made his disclosures once we went on the record.  But this

10   might all be academic inasmuch as he's got forty percent in the

11   second lien.  Mr. Brilliant's not telling him he can't talk.

12   And I think he's also got a piece in the mez.  So I think he's

13   here, and it's going to kind of be a question of what hat he

14   tells me he has on when he says what he says.

15            MR. BRYAN:  Right.  But, Your Honor, I think that that

16   will be a very serious standing point regardless, because,

17   again, if he's wearing the hat of a second lien lender, then --

18            THE COURT:  Then you're into the intercreditor.

19            MR. BRYAN:  -- he has an intercreditor agreement

20   standing problem.  And if he's got a problem speaking as a

21   first lien lender, because he's bound by the sale support

22   agreement, then he's got a different standing problem.  And I

23   just need to know the facts --

24            THE COURT:  Right.  Right.

25            MR. BRYAN:  -- relevant to briefing.

10-14419-scc   Doc 260   Filed 10/07/10   Entered 10/07/10 17:07:33   Main Document
BOSTON GENERATING, LLC, et al.
Pg 52 of 81

Page 52

1          THE COURT:  And that's exactly why I asked all the

2      questions, because I wasn't sure that you all were going to

3      raise it.  But I didn't want to be surprised.  Okay.  So I

4      distracted you.  I'll let you get back to anything else you

5      were going to say.

6          MR. BRYAN:  No.  I rose solely to speak to the

7      standing point.  Other than to tell Your Honor that we are

8      obviously gravely concerned with respect to -- I didn't hear

9      any specifics with respect to an adjournment.  But the first

10     lien lenders are obviously gravely concerned with anything that

11     might jeopardize the drop-dead date on the sale, because, as

12     Your Honor is well aware from having read the documents,

13     Constellation could terminate the agreement and walk.  And we

14     don't think that those terms -- we don't think that's a risk

15     that the first lien lenders' money should be gambled on.

16          So we just -- I guess that's the only other concern

17     that I rise to raise.  But I'm getting ahead of the horse.  I'm

18     putting -- as the cart here, I think.

19          THE COURT:  All right.

20          MR. BRYAN:  So I think I should turn to Mr. Baker

21     or/and the Latham firm.

22          THE COURT:  All right.  Let me hear from Mr. Baker,

23     Please.

24          MR. BRYAN:  Thank you for --

25          THE COURT:  I'm sorry, let me hear from Mr. Smith,

1    first.

2          MR. SMITH:  Thank you, Your Honor.  Attorney Bruce

3    Smith of the committee.  Good afternoon, Your Honor.  The

4    committee's position is that they would join with the concerns

5    of the second lien agent and CarVal and Fortress.  There were a

6    number of issues.  Your Honor can expect an objection to

7    numerous issues on the bid procedures which have already been

8    alluded to.  We also share the concerns with regard to the 363

9    process as compared to a plan process.  We also are somewhat

10   concerned with some of the motives of the sale process and the

11   rush to judgment in the case.

12         So that our concerns would be to slow the process down

13   and give us an opportunity to review much of this discovery,

14   which also, we are being inundated with, and to be able to

15   better understand what's going on, and our financial advisors

16   be able to do that.

17         THE COURT:  All right.

18         MR. SMITH:  Thank you, Your Honor.

19         THE COURT:  Thank you, Mr. Smith.

20         Okay, Mr. Baker.  Can I ask, before you start, Mr.

21   Baker, is Constellation here?

22         MR. BAKER:  Constellation is here.

23         THE COURT:  How are you?

24         MR. NEIER:  Hi.

25         THE COURT:  We're old friends.

10-14419-scc   Doc 260   Filed 10/07/10   Entered 10/07/10 17:07:33   Main Document
BOSTON GENERATING, LLC, et al.
Pg 54 of 81

Page 54

1           MR. BAKER:  Your Honor, Jan Baker of Latham for the

2    debtors.

3           Judge, I think it's important for the Court to know

4    that in our opinion, virtually all of the production that's

5    been requested and that's in dispute related to the merits of

6    the sale and had little or nothing to do with the actual

7    bidding procedures.

8           THE COURT:  You know, Mr. Baker, I have to stop you,

9    because I know that that's the position that was taken in the

10   papers.  But I'm being told -- and I think there's substantial

11   merit to what I'm being told -- this is basically the whole

12   ball of wax.  Not that I wouldn't have the ability to not

13   approve the sale after we got through the bid procedures; but

14   this is more than the usual bid procedures hearing where the

15   parties are really simply focused on the amount of the breakup

16   fee, the bidding increments, the timing, et cetera.

17          I think this is a fast-track -- which is what it is --

18   case, that's going to have enormous consequences for the

19   parties-in-interest, and that to approve the bid procedures and

20   to have the auction commence -- and the reason I asked whether

21   Constellation was here, is because I have a concern to not do

22   anything that prompts or sets the stage for Constellation to

23   leave.  And I don't want to do anything or say anything that

24   prejudices the ability of an auction, were it to be approved,

25   to realize more value for the parties-in-interest in this case.

1          That being said, I think I can agree with your

2     statement in the pleading that was filed this morning, that

3     this is just -- well, you say something that's accurate but I

4     think there's more to it.  You say a decision on the procedures

5     to govern the auction process is not a decision on the merits

6     of the sale itself.  I agree with that.  But it will create

7     substantial momentum in that direction.  There will be an

8     approval of a breakup fee.

9          And we did have several hearings, some of them on the

10    record, some of them in the back room, where we discussed

11    production.  And I think it's fair to say that I gave the

12    debtors every benefit of the doubt and every measure of leeway

13    that I thought was appropriate with respect to the production.

14    But I'm hearing a chorus of people who are telling me that it

15    hasn't gone as quickly as it might have, and we are barreling

16    toward a hearing on Monday in which I have a very serious

17    concern that the parties do not have adequate time to prepare

18    for what I think they appropriately view as perhaps the most

19    important hearing in the case.

20          MR. BAKER:  Well, Your Honor, I certainly understand

21    the Court's comments.  And if I could respond to them?  There

22    have been serious allegations made in the pleadings and in some

23    of the comments today about improper motives that have infected

24    the sale, that the parties say -- the objecting parties say

25    raise very serious questions as to whether the sale should

BOSTON GENERATING, LLC, et al.

Page 56

1    occur.

2            I think the issue before the Court is, none of those

3    parties has proposed an alternative.  None of them has stood up

4    and say, we understand that there's a real possibility the

5    debtors might run out of money in the first quarter of next

6    year, and if that happens, we're prepared to provide

7    subordinated DIP financing behind the first and second lien

8    lenders.  So I think first the objecting parties, when you cut

9    to the chase, they want the debtors, they want the first lien

10   lenders, and they want the people who get the electric power,

11   to take the risk that this worst-case scenario might happen.

12           Now, if we had understood ourselves what the volume of

13   production was, I assure Your Honor, we would have done things

14   very differently.  I don't think anybody on our team had any

15   idea that we were going to have to process twenty million

16   pages.  It surprised us as much as it did our opponents today.

17   Once we realized it, we tried to put the resources on it to do

18   it.  And I frankly think we did a good job.

19           In order to just quantify for the Court, you know,

20   even the 13,000 or so pages that have actually been produced

21   sounds like a stupendous number of documents.  That's about

22   four boxes full of documents, Your Honor.  I don't think that's

23   an insurmountable burden for firms with the resources that are

24   before the Court today.  If we'd known it, I completely agree,

25   we would have done it sooner.  We didn't.

10-14419-scc   Doc 260   Filed 10/07/10   Entered 10/07/10 17:07:33   Main Document
BOSTON REPORTING, LLC, et al.
Pg 57 of 81

Page 57

1          I'm frankly sorry, even though we have applied the

2     rule in many other cases, and seen it approved in many other

3     cases, that there's no production unless and until someone

4     files an objection.  I think if we'd known the brain damage

5     that that was going to cause here, we wouldn't have done it and

6     we're not going to do it again in this case.

7          But having said that, I think the issue is what really

8     is fair under the circumstances when the Court looks at where

9     we are and tries to balance the equities.  Your Honor can

10    assume, even though I have a hundred percent confidence level

11    it's wrong, that we have bad motives and --

12         THE COURT:  I don't assume you have bad motives.

13         MR. BAKER:  -- no, no.  But I'm just saying, for

14    purposes of hypothetical, that we have bad motives, we've acted

15    improperly, and that the depositions and the discovery during

16    the next month will abundantly prove that to be the case, and

17    that this Court should never consider and would not consider,

18    in that event, approving the sale.  What seems to us, however,

19    to be the most dangerous and least attractive route is to say,

20    let's say the debtors screwed up on the discovery, they

21    underestimated -- even if in good faith -- how long it would

22    take, they didn't get the documents to them.  Is the right

23    remedy to pass the October 4th deadline and put all of the

24    parties at risk of there not being a Constellation sale?

25         The downside, if the Court were to do that, is there

Page 58

1   is absolutely liability for a breakup fee.  It's actually not

2   thirty-five million dollars.  The way the asset purchase

3   agreement works is, if the Court approves the bidding

4   procedures, we go forward to a sale, and Your Honor determines

5   for any reason not to approve that sale, then Constellation

6   is -- assuming it's the --

7          THE COURT:  Right.

8          MR. BAKER:  -- the stalking-horse bidder, is entitled

9   to fifty percent of the thirty million dollar breakup fee,

10  which is fifteen million dollars, and it's entitled to up to

11  five million dollars for its expense reimbursement.  And in the

12  event we consummate an alternative transaction within the next

13  twelve months, they're entitled to the other half of their

14  breakup fee.  So it's twenty million for sure, and fifteen

15  million possibly.

16         And parties may say it's outrageous that the estate

17  would be exposed to depleting its assets in the amount of

18  twenty million dollars.  And frankly, I don't think anybody

19  likes that possibility, i.e., that Your Honor might conclude

20  any one of the really awful suggestions that have been made

21  about motives or background or timing or anything else proves

22  to be true, and concludes that the Court has no alternative but

23  to disapprove the sale.  But I think --

24         THE COURT:  Does that attach -- and this is not an

25  expression of a view on the merits at all -- but does that

BOSTON GENERATING, LLC, et al.

Page 59

```
 1   alternative set of payments to Constellation apply in the event

 2   that the bid procedures were to go forward but that the sale --

 3   it's ultimately held that the sale has to be done through a

 4   plan?

 5           MR. BAKER:  In other words, we went forward with the

 6   auction.  And when we got to the sale hearing, Your Honor

 7   concluded you didn't want to approve it under a 363, but were

 8   willing to approve it under a plan?

 9           THE COURT:  Willing to have it be considered for a --

10           MR. BAKER:  Were willing to consider it under --

11           THE COURT:  -- yes.

12           MR. BAKER:  -- a plan, but not through a 363.  I'm

13   going to ask Mr. Neier for an opinion on that, as

14   Constellation's lawyer.

15           THE COURT:  Mr. Neier, good to see you again.

16           MR. NEIER:  Good morning, Your Honor.  I think it

17   depends whether the transaction approved under a plan is an

18   alternative transaction.  So, if for some reason, Constellation

19   became a plan sponsor or something like that, there would not,

20   obviously, be an earning of a breakup fee.  I think that's the

21   way it works.

22           MR. BAKER:  That was my recollection, Your Honor.  But

23   since I figured the person with the best --

24           THE COURT:  Exactly.

25           MR. BAKER:  -- knowledge in the room --
```

BOSTON GENERATING, LLC, et al.

Page 60

1          THE COURT:  All right.

2          MR. BAKER:  -- was likely to be Mr. Neier.

3          THE COURT:  All right.  Very well.

4          MR. BAKER:  So --

5          THE COURT:  So let's talk about what we should do.

6          MR. BAKER:  Okay.  Could I make one more comment --

7          THE COURT:  Certainly.

8          MR. BAKER:  -- just to close the loop on discovery?  I

9    am sorry to report that we can envision no circumstances under

10   which twenty million pages or nineteen million, will be

11   produced.  I'm told by Ms. Wheatley that all of the remaining

12   documents will continue to be produced on a rolling production.

13   That will conclude tomorrow.  And she anticipates it will be

14   less than the total number of pages already produced.

15         THE COURT:  I'm sorry.  I just didn't follow what you

16   said.

17         MR. BAKER:  We've produced about 13,000 pages --

18         THE COURT:  Okay.

19         MR. BAKER:  -- according to Mr. Leblanc, which I think

20   is approximately correct.

21         THE COURT:  Okay.

22         MR. BAKER:  Ms. Wheatley tells me that the rolling

23   production that is continuing will be completed tomorrow, and

24   that the total amount of remaining pages to be produced is some

25   number less than the 13,000 that's already been produced.

BOSTON GENERATING, LLC, et al.

Page 61

1    We're not --

2            THE COURT:  So then --

3            MR. BAKER:  -- sure --

4            THE COURT:  -- the nineteen million have been reviewed

5    and determined that they're not responsive to the request?  Is

6    that --

7            MR. BAKER:  Yes --

8            THE COURT:  -- the point?

9            MR. BAKER:  -- Your Honor.

10           THE COURT:  Okay.

11           MR. BAKER:  So what actually happened was something

12   about a little less than a million pages ended up having to be

13   reviewed based upon the very broad search terms that were

14   requested by Milbank and Dechert.  That million pages was

15   boiled down and has resulted in 13,000 page so far, and

16   something less than 13,000 projected yet to be produced.  So it

17   could be a total of another 7,000, 10,000, but it's not going

18   to be nineteen million pages that are dropped on them.

19           THE COURT:  Okay.

20           MR. BAKER:  So we're saying there are four boxes to be

21   reviewed yesterday and today, and there are up to four boxes

22   remaining to be reviewed by Milbank and Dechert.

23           THE COURT:  Okay.  All right.  Thank you, Mr. Baker.

24           All right, Mr. Leblanc or Mr. Brilliant, anyone else

25   want to --

BOSTON REPORTING, LLC, et al.

Page 62

1          MR. BRILLIANT:  Your Honor, Allan Brilliant.  I just

2    wanted to respond to one issue.  And I guess I'd point out that

3    Mr. Neier is an old friend of mine as well.

4          THE COURT:  He was -- let me be clear.  Mr. Neier and

5    I are not old friends.  He appeared before me in a matter

6    yesterday, and that's the basis of my banter with him.  And

7    that's the sum total of it.

8          MR. BRILLIANT:  Sure.  Your Honor, I wasn't -- you

9    know.  But in any event, Mr. Neier and I are old friends, and

10   I'm not impugning his integrity.  But one thing I would point

11   out is I think he did give you potentially the right answer.

12   If ultimately Constellation acquires the assets through a plan

13   of reorganization, even if it occurs after November 16th or

14   even after the outside date, they wouldn't be entitled to a

15   breakup fee.  I've no doubt that that's probably right.

16          THE COURT:  Okay.

17          MR. BRILLIANT:  But I think that's not the whole

18   answer.  I think the whole answer to the question would be, if

19   Your Honor does not approve -- enter an order by, I think it's

20   November 16th or thereabouts, which is the last date, they have

21   the right to walk.

22          THE COURT:  Right.

23          MR. BRILLIANT:  And then if there's any other

24   transaction, an internal plan of reorganization, anyone else

25   becomes the bidder within a certain period of time --

Page 63

1              THE COURT:  Right.

2              MR. BRILLIANT:  -- they would be entitled --

3              THE COURT:  I got that.

4              MR. BRILLIANT:  -- the thirty-five million dollars.

5              THE COURT:  Right.  Okay.  All right, Mr. Leblanc,

6       anything else?

7              MR. LEBLANC:  Briefly.

8              THE COURT:  Uh-oh.  Mr. Neier's getting up to tell you

9       that you're wrong.

10             MR. NEIER:  I'm going to directly.

11             THE COURT:  Okay.

12             MR. BAKER:  Andrew Leblanc, Milbank Tweed, Your Honor.

13      I just want to address two points that were raised by Mr.

14      Baker.

15             The first is, I think he began to suggest that what we

16      haven't done is come in with an alternative transaction or

17      alternative proposal.  I'm not sure that that is the standard

18      that will apply to the application of the motion.  So I don't

19      think that that's a fair criticism.

20             I also think it's unfair for another pretty

21      substantial reason.  They're not really engaged with us.  We're

22      not -- we've tried -- that's one of our main complaints in this

23      is that a sales process was put in motion and then it was a

24      fait accompli at that point.  And so I think it's important,

25      Your Honor.  And there's two other elements that I think are

10-14419-scc    Doc 260    Filed 10/07/10    Entered 10/07/10 17:07:33    Main Document
BOSTON GENERATING, LLC, et al.
Pg 64 of 81

Page 64

1    necessary for the Court to understand, and we'll raise these if

2    and when they -- it becomes relevant.

3            But we've sought to engage with bidders, people who

4    are in the industry, to have discussions with them about

5    alternatives.  But everyone who was involved in the prior

6    process is covered by a nondisclosure agreement that they're

7    not willing to run afoul of.  So it's -- we're cut out.

8            The debtor is also subject, pursuant to the pre-

9    petition APA to a no-shop provision until the bid procedures

10   are ordered.  So trying to provide an alternative means two --

11   a group of creditors without interaction with anybody in the

12   industry, because there were a lot of people talked to in this

13   pre-petition process -- two creditors coming up with --

14   essentially writing a check, is what they're looking for.

15           There are ways to get to alternatives.  And that's

16   what the plan process provides, is the opportunity to negotiate

17   towards an alternative, whether it's a third-party investing

18   funds, whether it is a sale -- maybe that's the right outcome.

19   But there are ways to get to alternatives.  What they're doing

20   now, foreclosing third parties from speaking to us and

21   foreclosing themselves from talking to third parties, that's

22   not the way that one gets to alternatives.

23           So to the extent that that was the standard, we'd have

24   another issue here.  But it really isn't the standard that the

25   Court's going to apply in considering the motion that's before

1    it when it does get heard.

2           Secondly, there's one point that I think can't be

3    missed.  The only number we have from the debtors is a number

4    we got at about 8:37 this morning when we received a courtesy

5    copy of their objection, that they reviewed twenty million

6    pages.  If they only reviewed a million pages, that's fine too,

7    and we don't have a problem with that, after application of the

8    search terms.

9           But if they're producing from that only 25,000 pages,

10   we're going to have a different set of issues to discuss with

11   them.  Because 25,000 -- I'm a litigator by training.  I spend

12   a lot of time in this courtroom.  But 25,000 pages sounds like

13   an awful little production.  It is about ten boxes of

14   documents.  We may have an issue there.  And that's one of the

15   purposes of getting documents when we asked for them, on

16   September 3rd, even if they'd begun on a rolling production.

17   Because there may be holes in this production, things that they

18   didn't look for.  Because what -- one thing that needs to be

19   recognized, Your Honor, is that they've agreed to produce not

20   only for their clients, for the debtors, but also from their

21   investment banker's files, from their financial advisor's

22   files, from their law firm's files.

23          And so to the extent that the totality of the

24   documents comes in response to our requests -- and this is the

25   case, it's the whole ball of wax -- is 25,000 pages, we're

Page 66

1    going to have a different set of issues that we will have to

2    bring in a motion to compel.  And that too -- we're not saying,

3    Your Honor, that we want to push this to the brink of failing,

4    but we're entitled to have the bare minimum due process.

5          And we have been diligent in pursuing our discovery,

6    and we think that we're entitled to that before we have to

7    respond to the entire case.

8          THE COURT:  All right.  Mr. Bryan, one more time, and

9    then I'm going to tell you what I'd like you to do.

10          MR. BRYAN:  Yes, Your Honor.  And I'll be very brief,

11    because at some point, it does get to the merits rather than

12    procedure.  But I just want the Court, in applying the equities

13    here with respect to this request for a stay -- there's been

14    sort of a suggestion that this was all -- this whole process is

15    coming as a surprise to the second lien holders.  And around

16    10:30 at night, the second lien lenders turned to asking Mr.

17    Hunter, the CFO, a series of questions in his deposition.

18          I'm not going to read it the Court, but the essence of

19    the testimony, Your Honor, is that the Constellation sale

20    process was commenced as a result of a February meeting between

21    Fortress and other members of the steering committee and the

22    debtors and the Houlihan Lokey advisors and the Perella

23    advisors, and the debtors, in which they were asked -- the

24    debtors were asked to determine the value by commencing a sale

25    process.  So the notion that there's --

BOSTON REPORTING, LLC, et al.

Page 67

```
 1              THE COURT:  All right.

 2              MR. BRYAN:  -- some surprise ambush going on here --

 3              THE COURT:  All right.  You know what --

 4              MR. BRYAN:  -- Your Honor --

 5              THE COURT:  -- we're not -- I don't want to get into

 6    he-said-she-said.  I'm really not interested in this.  Let

 7    me -- here's what I want to do.  All right?  My recollection is

 8    that we agreed to come back on October 5th for the continued

 9    hearing on the adequate protection issues.  Correct?  Is that

10    correct?

11              MR. BAKER:  That's right, Your Honor.

12              THE COURT:  All right.  All right.  And that we agreed

13    to do it on the 5th and not the 4th, because I think Mr.

14    Rosenberg told me that there were issues pertaining to client

15    travel.  And I see Mr. Rosenberg has joined us.

16              MR. ROSENBERG:  That's correct, Your Honor.

17              THE COURT:  All right.  I've listened to what

18    everybody had to say today.  And I have a concern that not only

19    is there an issue with respect to the parties having a

20    sufficient time to collect, review, digest, process, and take

21    depositions with respect to the documents, but I need more

22    paper.  I think that there's not going to be a sufficient time

23    period between now and Monday, frankly, for the debtors to put

24    together an additional memorandum in support of the bid

25    procedures.  There's a motion, but there's not a fulsome
```

Page 68

```
1    discussion anticipating what the parties are going to say by

2    way of objection, which haven't even been filed yet.  I'm going

3    to need to hear from the debtors why this should be approved.

4           We've gone through the -- I've gone through the APA.

5    I think everybody agrees that a fair reading of the APA -- and

6    Mr. Neier can tell me if I'm wrong -- is that the first

7    deadline is October 4th.

8           MR. NEIER:  That's correct, Your Honor.

9           THE COURT:  Correct?

10          MR. NEIER:  Yes.

11          THE COURT:  Even if -- so we're not putting anything

12   at risk if we were to come back here on October 4th and spend a

13   very full day trying this case, and if we had to, go over onto

14   the 5th.  And I would ask Mr. Brilliant for his agreement that

15   we would briefly adjourn, subject to my calendar, the remaining

16   cash collateral issues --

17          MR. BRILLIANT:  Agreed, Your Honor.

18          THE COURT:  -- let me get everything out before

19   everyone tells me -- people tell me they don't like this.  And

20   I'm guessing and hoping that Mr. Neier would tell me that if

21   for some reason we couldn't conclude on the 4th, and we went on

22   to the 5th, and I told you that I would rule in real time, that

23   Constellation would not walk away over a twenty-four hour

24   delay.  That's my best way of accommodating all of the

25   conflicting concerns that I've heard here today.
```

10-14419-scc   Doc 260   Filed 10/07/10   Entered 10/07/10 17:07:33   Main Document
BOSTON GENERATING, LLC, et al.
Pg 69 of 81

Page 69

1          MR. NEIER:  Once again, David Neier on behalf of

2    Constellation.  Your Honor, I don't have an answer for you.  I

3    obviously will go to the client and make the parties aware as

4    to what their position is.  Constellation wants the assets.

5    So --

6          THE COURT:  I would imagine so.

7          MR. NEIER: -- so that's the good news, if you will.

8          THE COURT:  Right.

9          MR. NEIER:  The bad news is --

10          THE COURT:  You're not going to hang around forever.

11   I understand that.

12          MR. NEIER:  -- well, from Constellation's perspective,

13   there are a lot of problems with delay, the most important of

14   which is the fact that, as the debtors said in their first-day

15   affidavit, the natural gas prices work against them.  And their

16   value --

17          THE COURT:  I understand.

18          MR. NEIER:  -- is declining.

19          THE COURT:  Right.

20          MR. NEIER:  And that value has declined

21   significantly -- significantly, since we signed the APA.  And

22   it's continuing to decline.  And it's expected to further

23   continue.

24          THE COURT:  Understood.

25          MR. NEIER:  So the problem --

```
 1            THE COURT:  But we're -- but if we started at 8:30 in

 2    the morning --

 3            MR. NEIER:  Right.

 4            THE COURT:  -- on the 4th, and we finished at 11

 5    o'clock, we have not breached the APA?

 6            MR. NEIER:  Absolutely not.  And but more -- what I

 7    was going to say is, it's really when the closing or the --

 8            THE COURT:  I'm not touching that date.

 9            MR. NEIER: -- right.

10            THE COURT:  And I think that because the marketing

11    process -- and let's assume for the moment that we go through

12    that exercise and I approve it -- because the marketing process

13    was so fulsome before we got here today, that taking a week

14    away from the auction period would not prejudice the situation,

15    because the parties are all out there.  So I'm not at all

16    suggesting we touch the true outside date.  What I'm merely

17    suggesting is that we push things back by a week, so that there

18    can be an organized process:  briefing, depositions and a

19    trial, that determine what I view as probably the most

20    important -- not probably -- the most important issue in this

21    case.

22            MR. NEIER:  Understood, Your Honor.

23            MR. BAKER:  Your Honor, Jan Baker again for the

24    debtors.  We agree with the Court's ruling.  We think that --

25    we read the APA as saying that there is no question but that as
```

1    long as Your Honor rules at some point on the 4th, we're in

2    full compliance with the agreement.  We think that the "subject

3    to the Court's calendar" language might even give us some

4    breathing room on the 5th.  But I have -- were that to be

5    required, and I hope it's not -- I have great, great confidence

6    in Mr. Neier's powers of persuasiveness with Constellation.

7              THE COURT:  All right.

8              MR. BAKER:  I think if we do this, Your Honor, and we

9    agree it's a good resolution to the issues --

10             THE COURT:  Okay.

11             MR. BAKER:  -- before we leave the court today, we

12   should endeavor to have perfect clarity --

13             THE COURT:  Yes we should, on --

14             MR. BAKER:  -- on issues such as papers --

15             THE COURT:  -- exactly.

16             MR. BAKER:  -- are due to be filed from the parties.

17   We need to get those deadlines scheduled, get a cutoff for

18   depositions, so that everyone is on the same page and has a

19   common understanding.

20             THE COURT:  All right.  What's the most efficient way

21   to accomplish that?  My instinct always is to let you try to

22   work it out among yourselves rather than having my impose them

23   on you.  But I would ask you, because I think the papers are

24   going to be voluminous, and to the extent that there's going to

25   be a paper -- a pleading submitting on the standing issues and

10-14419-scc   Doc 260   Filed 10/07/10   Entered 10/07/10 17:07:33   Main Document
BOSTON GENERATING, LLC, et al.
Pg 72 of 81

Page 72

1   anything else that you think is appropriate for me to look at,

2   that you -- that it not be 8:30 in the morning on the 4th.  I'd

3   like to have the weekend to have every -- to have all of your

4   submissions for my review.

5           MR. BAKER:  Yeah, we agree, Your Honor.  And I think

6   that means some date --

7           THE COURT:  All right.  Well, why don't I leave it to

8   you.  Unless -- Mr. Leblanc?

9           MR. LEBLANC:  I'm fine with you leaving it to us, with

10  one caveat that I'd ask for the Court's indulgence.  And that

11  is, if the Court could require the debtors to complete their

12  production --

13          THE COURT:  I think we have a represent --

14          MR. LEBLANC:  -- at some time --

15          THE COURT:  -- we have a representation that that's

16  going to happen.

17          MR. BAKER:  That is absolutely correct, Your Honor.

18  That's not an issue.

19          THE COURT:  And when will that -- when will that

20  occur?

21          MR. BAKER:  That'll be completed by the end of the day

22  tomorrow.

23          MR. LEBLANC:  Okay.

24          THE COURT:  All right?

25          MR. LEBLANC:  Then I think we can work from there.  As

BOSTON GENERATING, LLC, et al.

Page 73

1   long as that's --

2         THE COURT:  Then I think you can work --

3         MR. LEBLANC:  -- the representation.

4         THE COURT:  -- from there with respect to depositions.

5   And we did have the issue as to Monday, that Mr. Rosenberg

6   raised.  So I am, just to be clear -- we're talking about

7   Monday October 4th, right?

8         MR. BAKER:  Yes, Your Honor.  And that we've resolved

9   those issues.

10         THE COURT:  Thank you.  Okay.

11         MR. BAKER:  I would -- I think we can work out

12   depositions, Your Honor.  I would suggest, since everybody's

13   here today, and Your Honor has expressed a desire to have all

14   of the submissions prior to the weekend, we probably should

15   just ask Your Honor to set a deadline for the objecting parties

16   to file their pleadings the prior week, and then a period for

17   the debtors and the first lien lenders to respond.  All --

18         THE COURT:  All right.  So --

19         MR. BAKER:  -- to be to you by Friday.

20         THE COURT:  -- all right.  So production's going to be

21   complete --

22         MR. BAKER:  Tomorrow.

23         THE COURT:  -- tomorrow.  Tomorrow is the -- is

24   Thursday.

25         MR. BAKER:  Excuse me, Your Honor.  We also need a

BOSTON GENERATING, LLC, et al.

Page 74

1   deadline for their document production as well.

2          THE COURT:  Well, why do I think you're going to tell

3   me that you're going to object to having to produce documents?

4          MR. LEBLANC:  Well, we are going to object.  We

5   also -- I mean, in fairness, Your Honor, we honestly haven't

6   had a chance to even discuss it with our clients.  We got them

7   at 7:15 last night was the first request for production of

8   documents propounded on us.  So I -- we haven't had a chance.

9          But I am certain that we are not a movant on this.  We

10  will produce documents to the extent that we're calling

11  witnesses, which I don't believe we are.  That we are not -- I

12  know that the second lien agent has identified witnesses.  And

13  to the extent we're using documents at the hearing, we would

14  obviously make those available --

15         THE COURT:  Right.

16         MR. LEBLANC:  -- but we're not a movant in this.  So

17  you should expect that we will object to the production,

18  generally, of documents.

19         Now, Your Honor, I would make a proposal on the

20  objection deadline.  I think -- understanding that I think

21  depositions are going to cross this date, and I haven't

22  consulted with Mr. Brilliant -- I think if we had till Tuesday

23  of next week, if we get the documents by tomorrow, that

24  probably --

25         THE COURT:  Right.

BOSTON REPORTING, LLC, et al.

1          MR. LEBLANC:  -- would be sufficient.

2          THE COURT:  Tuesday was what I thought -- Tuesday

3   makes sense.

4          MR. LEBLANC:  Tuesday, Friday.

5          THE COURT:  And then end of the day on Friday for

6   anything that the debtors and the first lien agent wants to put

7   in.

8          MR. LEBLANC:  Now, the one -- with the one caveat,

9   Your Honor, that I expect, if we get the documents by the end

10  of the day tomorrow, we probably will begin depositions Monday.

11  And so our objection will not contain all of the --

12         THE COURT:  And --

13         MR. LEBLANC:  -- excerpts of the depositions --

14         THE COURT:  -- right.

15         MR. LEBLANC:  -- you would otherwise expect.

16         THE COURT:  But you can supplement it as the

17  depositions unfold.

18         MR. LEBLANC:  Right.  And we would endeavor to

19  supplement before Friday --

20         THE COURT:  All right.

21         MR. LEBLANC:  -- so it's useful to the Court.

22         THE COURT:  All right.  And I'm just going to ask

23  you -- but I think you would do so anyway -- to be transparent

24  with each other as to witnesses that you're going to call,

25  documents that you're going to put into evidence and the like.

1          MR. LEBLANC:  We certainly will be, Your honor.

2          MR. BAKER:  And we've already -- we've already

3     disclosed to all of the parties the witnesses that we expect to

4     call.

5          THE COURT:  All right.

6          MR. BAKER:  And we had times proposed over the

7     weekend.  We'll just shift that to this coming week.

8          THE COURT:  All right.  So I'm going to let the record

9     of this hearing stand as an order with respect to the emergency

10    motion and not separately enter any other order.  And I will

11    tell you that to the extent that you hit speed bumps as this

12    process unfolds in the next ten days, don't hesitate to call my

13    chambers and we'll be available to assist you.

14         MR. BAKER:  Thank you, Your Honor.

15         MR. LEBLANC:  Thank you.

16         MR. ROSENBERG:  Your Honor, could you just clarify the

17    time on Monday?

18         THE COURT:  The time on Monday?

19         MR. ROSENBERG:  Yes.

20         THE COURT:  The time on Monday.  How early can I make

21    you come?

22         MR. BAKER:  As early as you like, Judge.

23         THE COURT:  8:30 in the morning.  8:30 in the morning?

24         MR. BAKER:  Fine.

25         THE COURT:  All right.  And we'll go till as long as

Page 77

1   it takes

2          MR. BAKER:  And Your Honor, there were -- as a

3   housekeeping matter, there were several other unrelated matters

4   set for the morning of the 27th.  I think all relating to

5   retentions.  Do you want to go forward with those?

6          THE COURT:  We'll go forward with whatever's

7   uncontested.  To the extent that they are contested, let's kick

8   them over and let's talk about what we should do about the 5th.

9          MR. BRILLIANT:  That's right, Your Honor.  As much as

10  we would like to go forward and get the additional adequate

11  protection hearing over with, because as Your Honor knows, it's

12  very important to our clients.

13         THE COURT:  Right.  Of course.

14         MR. BRILLIANT:  I think as a practical matter --

15         THE COURT:  Right.

16         MR. BRILLIANT:  -- it's going to be impossible for us

17  to prepare for a hearing --

18         THE COURT:  Agreed.

19         MR. BRILLIANT:  -- and also prepare for another trial

20  for the second day.  So we would ask that if it's okay with

21  Your Honor that we'll confer with the debtors and --

22         THE COURT:  Please.

23         MR. BRILLIANT:  -- and your clerks and we'll come up

24  with --

25         THE COURT:  Excellent.

10-14419-scc   Doc 260   Filed 10/07/10   Entered 10/07/10 17:07:33   Main Document
Pg 78 of 81
BOSTON GENERATING, LLC, et al.

Page 78

1           MR. BRILLIANT:  -- with another date.

2           THE COURT:  And your rights are fully reserved under

3    the cash collateral order that I'm going to enter today.  So I

4    appreciate that flexibility on your part.

5           MR. BRILLIANT:  Thank you, Your Honor.

6           THE COURT:  I think we're done.

7           MR. BAKER:  Thank you, Your Honor.

8           THE COURT:  All right.

9           MR. YOUNG:  May I ask a question, Your Honor?

10          THE COURT:  Yes.

11          MR. YOUNG:  Bennett Young, Dewey LeBoeuf.  I just want

12   to clarify that under the Court's order, the deadline for all

13   parties to object to the bid procedures is continued from today

14   to next Tuesday?

15          THE COURT:  To next Tuesday.  Correct.

16          MR. YOUNG:  Thank you, Your Honor.

17          THE COURT:  All right.  Thank you, folks.  We're

18   adjourned.

19       (Whereupon these proceedings were concluded at 12:50 p.m.)

20

21

22

23

24

25

Page 79

1

2                          I N D E X

3

4                        R U L I N G S

5    DESCRIPTION                                    PAGE      LINE

6    Debtors' insurance motion granted              13         4

7    Debtors' motion to pay pre-petition taxes      13         14

8    approved

9    Debtors' wage motion approved                  13         24

10   Debtors' critical vendor motion granted        14         12

11   Debtors' warehousing motion granted            14         18

12   Debtors' motion to employ professionals in the 15         3

13   ordinary course of business approved

14   Debtors' motion to establish interim monthly   15         15

15   compensation procedures for the professionals

16   in the case granted

17   Debtors' bar date motion approved              17         1

18   Debtors' motion to establish procedures to     17         24

19   settle terminated safe harbor contracts approved

20   Stipulation between Algonquin Gas Transmission, 19        17

21   LLC and the debtors approved

22   Debtors' motion to reject certain executory    19         21

23   contracts approved

24

25

Page 80

I N D E X, cont'd


R U L I N G S

DESCRIPTION                                      PAGE      LINE

Assumption of certain contracts with              20        25

Distrigas, Sequent, Credit Suisse and

Sempra Energy approved

Final form of the cash collateral order entered   21        18

1

2                        C E R T I F I C A T I O N

3

4      I, Lisa Bar-Leib, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7      _____

8      LISA BAR-LEIB (CET**D-486)

9      AAERT Electronic Certified Transcriber

10

11     Veritext

12     200 Old Country Road

13     Suite 580

14     Mineola, New York 11501

15

16     Date:  September 24, 2010

17

18

19

20

21

22

23

24

25