**Exhibit A:  APA**

*EXECUTION COPY*

ASSET PURCHASE AGREEMENT


dated as of August 7, 2010


by and among


CONSTELLATION HOLDINGS, INC., or its designee, as Buyer,

CONSTELLATION ENERGY GROUP, INC.,
as Guarantor,


and

EBG HOLDINGS LLC,
BOSTON GENERATING, LLC,
MYSTIC I, LLC,
FORE RIVER DEVELOPMENT, LLC,
MYSTIC DEVELOPMENT, LLC,
BG BOSTON SERVICES, LLC
and
BG NEW ENGLAND POWER SERVICES, INC.,
as Sellers

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS ................................................................................1
    1.1    Defined Terms. ...........................................................................1
    1.2    Interpretation. ..........................................................................15

ARTICLE 2 TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES ....................16
    2.1    Assets to be Acquired. ................................................................16
    2.2    Excluded Assets. .......................................................................18
    2.3    Liabilities to be Assumed by Buyer. ..............................................19
    2.4    Excluded Liabilities. ..................................................................20
    2.5    Non-Assignment of Assumed Contracts...........................................20

ARTICLE 3 CLOSING; PURCHASE PRICE ...............................................................21
    3.1    Closing; Transfer of Possession; Certain Deliveries. ...........................21
    3.2    Deposit Escrow. ........................................................................22
    3.3    Purchase Price. .........................................................................23
    3.4    Net Working Capital Adjustment. ..................................................23
    3.5    Allocation of Purchase Price..........................................................25

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLERS...............................26
    4.1    Organization.............................................................................26
    4.2    Due Authorization, Execution and Delivery; Enforceability................26
    4.3    Consents.................................................................................26
    4.4    No Conflicts.............................................................................27
    4.5    Financial Statements .................................................................27
    4.6    Title to Acquired Real Property ....................................................27
    4.7    Title to Acquired Assets other than Acquired Real Property; Sufficiency ...........28
    4.8    Litigation................................................................................28
    4.9    Labor and ERISA Matters ..........................................................29
    4.10    Environmental..........................................................................30
    4.11    Taxes. ...................................................................................30
    4.12    Compliance with Laws; Permits. ...................................................31
    4.13    Contracts. ...............................................................................31
    4.14    Insurance Claims.......................................................................31

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER .................................31
    5.1    Organization.............................................................................32
    5.2    Due Authorization, Execution and Delivery; Enforceability................32
    5.3    Governmental Approvals. ............................................................32
    5.4    No Conflicts. ...........................................................................32
    5.5    Availability of Funds. .................................................................32
    5.6    Adequate Assurances Regarding Executory Contracts.........................32
    5.7    Condition and Location of Acquired Assets.......................................32

5.8     Ownership. ........................................................................................................33

ARTICLE 6 COVENANTS OF THE PARTIES .....................................................................33
6.1     Conduct of Business Pending the Closing. .........................................................33
6.2     Notification of Certain Matters. ..........................................................................34
6.3     No Solicitation of Alternative Transactions. .......................................................34
6.4     Access. .................................................................................................................35
6.5     Public Announcements. .......................................................................................35
6.6     Tax Matters. ........................................................................................................36
6.7     Approvals; Commercially Reasonable Efforts; Notification; Consent.................36
6.8     Employee Matters. ..............................................................................................37
6.9     Further Assurances..............................................................................................39
6.10    Post-Closing Wind-Up. .......................................................................................39
6.11    Bankruptcy Court Filings. ...................................................................................39
6.12    Cure Amounts. ....................................................................................................42
6.13    Preservation of Records. .....................................................................................42
6.14    Risk of Loss. .......................................................................................................43
6.15    No Reliance. ........................................................................................................44
6.16    Bulk Transfer Laws.............................................................................................45
6.17    Satisfaction of Assumed Liabilities. ...................................................................45
6.18    Replacement Credit Support Requirements.........................................................45
6.19    LTSA Matters. ....................................................................................................45
6.20    Certain Disclosures. ............................................................................................46

ARTICLE 7 CONDITIONS TO OBLIGATIONS OF THE PARTIES ....................................46
7.1     Conditions Precedent to Obligations of Buyer. ...................................................46
7.2     Conditions Precedent to the Obligations of Sellers. ............................................47

ARTICLE 8 TERMINATION ................................................................................................48
8.1     Termination of Agreement...................................................................................48
8.2     Consequences of Termination..............................................................................49

ARTICLE 9 MISCELLANEOUS ...........................................................................................50
9.1     Expenses. ............................................................................................................50
9.2     Assignment. ........................................................................................................50
9.3     Parties in Interest.................................................................................................51
9.4     Releases...............................................................................................................51
9.5     Notices. ...............................................................................................................51
9.6     Choice of Law. ....................................................................................................53
9.7     Entire Agreement; Amendments and Waivers. ....................................................53
9.8     Counterparts; Facsimile and Electronic Signatures. ............................................53
9.9     Severability. ........................................................................................................53
9.10    Headings. ............................................................................................................53
9.11    Exclusive Jurisdiction and Specific Performance................................................53
9.12    WAIVER OF RIGHT TO TRIAL BY JURY.......................................................54
9.13    Guaranty..............................................................................................................54
9.14    Survival. ..............................................................................................................56

9.15    Computation of Time.............................................................................................56
9.16    Time of Essence....................................................................................................56
9.17    Non-Recourse. ......................................................................................................56
9.18    Sellers' Representative; Dealings Among Sellers. ...............................................56
9.19    Mutual Drafting. ...................................................................................................56

EXHIBITS

Exhibit A        Assignment and Assumption Agreement
Exhibit B        Bidding Procedures
Exhibit C        Bidding Procedures Order
Exhibit D        Deposit Escrow Agreement
Exhibit E        Sale Order
Exhibit F        Bill of Sale

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of  August 7, 2010 (the "Agreement Date"), by and among EBG Holdings LLC, a Delaware limited liability company ("Holdings"), Boston Generating, LLC, a Delaware limited liability company ("BGen"), Mystic I, LLC, a Delaware limited liability company ("Mystic I"), Fore River Development, LLC, a Delaware limited liability company ("FRD"), Mystic Development, LLC, a Delaware limited liability company ("Mystic Development"), BG Boston Services, LLC, a Delaware limited liability company ("BGBS"), and BG New England Power Services, Inc., a Delaware corporation ("BGNE" and together with Holdings, BGen, Mystic I, FRD, Mystic Development and BGBS, "Sellers" and each a "Seller"), Constellation Holdings, Inc., a Maryland corporation ("Buyer"), and Constellation Energy Group, Inc., a Maryland corporation ("Guarantor").  Sellers, Buyer and Guarantor are referred to herein individually as a "Party" and collectively as the "Parties".

WITNESSETH:

WHEREAS, Sellers are currently engaged in the Business;

WHEREAS, shortly following the Agreement Date, each Seller intends to file a voluntary petition and commence a case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court (the date of such filing, the "Petition Date");

WHEREAS, Sellers wish to sell to Buyer, and Buyer wishes to purchase from Sellers, the Business as a going concern as of the Closing on the terms and subject to the conditions set forth herein and subject to the approval of the Bankruptcy Court and, in furtherance of the foregoing, (a) Sellers wish to sell to Buyer, and Buyer wishes to purchase from Sellers, the Acquired Assets as of the Closing, and (b) Buyer is willing to assume from Sellers the Assumed Liabilities as of the Closing, in the case of clause (a) and (b) above, on the terms and subject to the conditions set forth herein; and

WHEREAS, Buyer is an indirect wholly owned Subsidiary of Guarantor, and Guarantor wishes to irrevocably and unconditionally guarantee to Sellers the due and punctual payment and performance of all obligations of Buyer under this Agreement on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises, and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    Defined Terms.  As used herein, the terms below shall have the following respective meanings:

"Acquired Assets" shall have the meaning specified in Section 2.1.

"Acquired Real Property" shall mean collectively the Owned Real Property, the Leased Real Property and the Entitled Real Property.

"Additional Contracts" has the meaning set forth in Section 6.12.

"Adjusted Net Working Capital" shall mean, as of any date of determination, (a) an amount equal to the current assets of Sellers included in the Acquired Assets, including (i) accounts receivable related to electricity and trade receivables, (ii) Inventory, and (iii) prepaid Taxes and other prepaid expenses, in each case as of such date of determination less (b) an amount equal to the current liabilities of Sellers included in the Assumed Liabilities, including (i) accounts payable related to fuel, asset management services and other trade payables, (ii) payroll liabilities, including benefits, withholdings, payroll Taxes, accrued but unpaid Property Taxes, pension and employee contributions, and (iii) salaries, vacation, bonus and other accrued expenses, in each case as of the date of such determination.  For the avoidance of doubt, (i) no purchases of capital spares, (ii) no payment of amounts for capital spares (including under the LTSAs), (iii) no prepaid expenses related to LTSAs and (iv) no assets or Liabilities related to Air Emissions Credits and Allowances, shall in any case be included in the calculation of "Adjusted Net Working Capital".  Adjusted Net Working Capital shall be determined in accordance with the principles and methodologies used in the preparation of the sample calculation of Aggregate Net Working Capital set forth in Schedule 3.4, and otherwise in accordance with GAAP.

"Adjustment Amount" shall mean, as of any date of determination, the amount (which may be a positive or negative number) equal to (i) the Adjusted Net Working Capital minus the Target Net Working Capital Amount (which may be a positive or negative number), minus (ii) the Specified Forecasted Capital Expenditures Adjustment Amount.

"Adjustment Escrow Agreement" shall mean the Adjustment Escrow Agreement, dated the Closing Date, entered into by and among Buyer, Holdings, as representative of Sellers, and the Escrow Agent, which shall be substantially in the same form as the Deposit Escrow Agreement, modified only to give effect to the disbursement mechanism set forth in Section 3.4 hereof.

"Adjustment Escrow Amount" shall mean an amount equal to $10,000,000.

"Affiliate" shall, with respect to any Person, mean any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through ownership of voting securities or rights, by contract, as trustee, executor or otherwise.

"Agreement" shall mean this Asset Purchase Agreement, together with the exhibits and the Disclosure Schedule, in each case as amended, restated, supplemented or otherwise modified from time to time.

"Agreement Date" shall have the meaning specified in the preamble.

"<u>Air Emissions Credit</u>" shall mean a reduction of carbon dioxide (CO2), nitrogen oxides (NOx) or mercury that is certified by a Governmental Entity as real, quantifiable, surplus, permanent and enforceable, and is recorded, inventoried, or approved as such.

"<u>Allocation</u>" shall have the meaning specified in Section 3.5.

"<u>Allowance</u>" shall mean an authorization by the United States Environmental Protection Agency under the Clean Air Act, 42 U.S.C. §7401 et seq. or any other similar Environmental Law (including applicable state Laws and the Regional Greenhouse Gas Initiative) to emit up to one ton of sulfur dioxide ($SO_2$) during or after a specific calendar year, or the limited authorization to emit up to one ton of nitrogen oxide (NOx) or up to one ton of carbon dioxide ($CO_2$) during a specified control period.

"<u>Alternative Transaction</u>" shall mean any of the following transactions: (a) a plan of reorganization or other financial and/or corporate restructuring of any Seller, (b) the sale or disposition by Sellers of greater than fifty percent (50%) of the outstanding equity interests of any Seller, or the sale or disposition of assets constituting greater than fifty percent (50%) of the fair market value of the assets held by Sellers, (c) a merger, consolidation, business combination, liquidation or recapitalization of any or all Sellers or (d) any similar transaction involving any or all Sellers; <u>provided</u>, <u>however</u> that any of the transactions with Buyer contemplated by this Agreement shall not be considered an Alternative Transaction.

"<u>Asset Sale Guidelines</u>" shall mean the Guidelines for the Conduct of Asset Sales, as adopted by the Bankruptcy Court pursuant to General Order M-383.

"<u>Assignment and Assumption Agreement</u>" shall mean the assignment and assumption agreement to be entered into by Sellers and Buyer concurrently with the Closing, substantially in the form attached hereto as <u>Exhibit A</u>.

"<u>Assumed Contracts</u>" shall have the meaning specified in Section 2.1(c).

"<u>Assumed Liabilities</u>" shall have the meaning specified in Section 2.3.

"<u>Auction</u>" shall have the meaning ascribed to it in the Bidding Procedures.

"<u>Back-Up Bidder</u>" shall have the meaning specified in Section 6.3(b).

"<u>Bankruptcy Code</u>" shall have the meaning specified in the recitals.

"<u>Bankruptcy Court</u>" shall mean the United States Bankruptcy Court for the Southern District of New York.

"<u>Bankruptcy Rules</u>" shall mean the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

"<u>Base Purchase Price</u>" shall have the meaning specified in Section 3.3.

"Benefit Plan" shall mean any employee benefit plan (as defined in Section 3(3) of ERISA) or any deferred compensation, bonus, pension, retirement, profit sharing, savings, incentive compensation, stock purchase, stock option or other equity or equity-based compensation, disability, death benefit, hospitalization, medical, dental, life, severance, vacation, sick leave, holiday pay, fringe benefit, personnel, reimbursement, incentive, insurance, welfare or any similar plan, program, policy, practice or arrangement (including any funding mechanism therefor now in effect or required in the future as a result of the transaction contemplated by this Agreement or otherwise), written or oral, whether or not subject to ERISA, or any employment, retention, consulting, change in control, termination or severance plan, program, policy, practice, arrangement or agreement, sponsored, maintained or contributed to, or required to be maintained or contributed to, by Sellers for the benefit of any present or former officer, Employee or director, retiree or spouse, dependent or other beneficiary of any of the foregoing.

"BGBS" shall have the meaning specified in the preamble.

"BGen" shall have the meaning specified in the preamble.

"BGNE" shall have the meaning specified in the preamble.

"Bidding Procedures" shall mean the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order, substantially in the form attached hereto as Exhibit B.

"Bidding Procedures Order" shall mean an Order of the Bankruptcy Court approving the Bidding Procedures (i) substantially in the form attached hereto as Exhibit C, (ii) in form and substance reasonably satisfactory to Buyer, (iii) providing for approval of the Break-Up Fee and the Reimbursable Expenses pursuant to Section 8.2(b) and (iv) providing that if Sellers consummate an Alternative Transaction, the reimbursement to Buyer of any amounts paid by Buyer pursuant to Section 6.19 hereof.

"Break-Up Fee" shall have the meaning specified in Section 8.2(b).

"Business" shall mean the operation of the Facilities as currently conducted by Sellers.

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the State of New York are not required to open.

"Buyer" shall have the meaning specified in the preamble.

"Buyer Material Adverse Effect" shall mean a material adverse effect on the ability of Buyer to consummate the transactions contemplated hereby in accordance with the terms hereof.

"Buyer Released Parties" shall have the meaning specified in Section 9.4(b).

"Chapter 11 Cases" shall have the meaning specified in the recitals.

"Claim" shall mean "claim" (as defined in section 101(5) of the Bankruptcy Code) against any Seller, whether such claim arose, was incurred or accrued before or after the Petition Date.

"Closing" shall have the meaning specified in Section 3.1(a).

"Closing Date" shall have the meaning specified in Section 3.1(a).

"Close-out Amount" shall have the meaning specified in Section 3.5.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreements" shall mean, collectively, that certain agreement between BGBS, the Utility Workers Union of America, AFL-CIO and Local No. 369, dated as of February 28, 2007, and that certain agreement between BGNE, the Utility Workers Union of America, AFL-CIO and Local No. 369, dated as of September 30, 2005, in each case, as in effect on the Agreement Date, as it may be renewed or extended pursuant to Section 6.1(e).

"Condemnation Value" shall have the meaning specified in Section 6.14(a).

"Confidentiality Agreement" shall mean that certain Confidentiality Agreement, dated as of February 3, 2010, between Holdings and the Guarantor.

"Contract" shall mean any contract, lease, license, purchase order, sales order or other agreement, arrangement, understanding or commitment, whether or not in written form, that is binding upon a Person or its property.

"Credit Support Requirements" shall mean standby letters of credit, guarantees, indemnity bonds and other credit support instruments issued by third parties on behalf of Sellers regarding the Business.

"Cure Amounts" shall have the meaning specified in Section 6.12.

"Cure Costs" shall mean all monetary liabilities, including pre-petition monetary liabilities, of Sellers that must be paid or otherwise satisfied to cure all of Sellers' monetary defaults under the Assumed Contracts, and any other amounts that must be paid pursuant to section 365 of the Bankruptcy Code, at the time of the assumption thereof and assignment to Buyer or an Affiliate of Buyer as provided hereunder, in each case as such amounts are determined by the Bankruptcy Court.

"Deeds" shall have the meaning specified in Section 3.1(b)(vi).

"Deposit Escrow" shall have the meaning specified in Section 3.2(a).

"Deposit Escrow Agreement" shall mean the Deposit Escrow Agreement of even date herewith entered into by and among Buyer, Holdings, as representative of Sellers, and the Escrow Agent, substantially in the form attached hereto as Exhibit D.

"Disclosure Schedule" shall have the meaning specified in the first paragraph of Article 4.

"Distrigas" shall mean Distrigas of Massachusetts LLC.

"Distrigas Agreement" shall mean the Amended and Restated Firm Gas Sales and Purchase Agreement, dated as of December 3, 2007, between Distrigas and Mystic Development.

"Distrigas Agreement Guaranty" shall mean the Guaranty, dated April 23, 2008, by the Distrigas Guarantor in favor of Mystic Development with respect to the Distrigas Agreement.

"Distrigas Guarantor" shall mean SUEZ Energy North America, Inc.

"Employees" shall mean, collectively, the Represented Employees and the Non-Represented Employees.

"Entitled Real Property" shall have the meaning specified in Section 2.1(a).

"Environmental Laws" shall mean all Laws relating to pollution, Hazardous Materials, or protection of the environment, natural resources, or human health (to the extent related to exposure to Hazardous Materials).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean any Person that, by reason of its relationship with a Seller, is required to be aggregated with that Seller under Section 414(b), (c), or (m) of the Code.

"Escrow Agent" shall mean Wells Fargo Bank, N.A.

"Estimated Adjustment Amount" shall have the meaning specified in Section 3.3.

"Event of Loss" shall have the meaning specified in Section 6.14.

"Excluded Assets" shall have the meaning specified in Section 2.2.

"Excluded Liabilities" shall have the meaning specified in Section 2.4.

"Facilities" shall mean, collectively, Mystic 8&9, Fore River and Mystic Station.

"FERC" shall mean the Federal Energy Regulatory Commission.

"Final Adjustment Amount" shall have the meaning specified in Section 3.4(a).

"Final Settlement Date" shall have the meaning specified in Section 3.4(b).

"First Lien Credit Agreement" shall mean the $1,450,000,000  First Lien Credit and Guaranty Agreement, dated as of December 21, 2006, by and among BGen, as borrower, the

guarantors party thereto, the lenders party thereto, the Fronting Bank (as defined in the First Lien Credit Agreement), the Synthetic Issuing Bank (as defined in the First Lien Credit Agreement), and Credit Suisse, Cayman Islands Branch, as first lien collateral agent and administrative agent.

"Fore River" shall mean the approximately 787 megawatt natural gas-fired combined cycle power plant located in North Weymouth, Massachusetts, together with all auxiliary equipment, ancillary and associated facilities and equipment, electrical transformers, pipeline and electrical interconnection and metering facilities used for the receipt of fuel and water and the delivery of the electrical output of said generating plant, and all other improvements relating to the ownership, operation and maintenance of said generating plant and associated equipment.

"Fore River Site" means all parcels of land included in the Owned Real Property of Fore River, as described in Section 2.1(a)-1 of the Disclosure Schedule.

"FRD" shall have the meaning specified in the preamble.

"GAAP" shall mean generally accepted accounting principles as in effect from time to time in the United States.

"Governmental Approvals" shall mean, in each case to the extent applicable to the acquisition of the Acquired Assets by Buyer as contemplated by this Agreement, (a) any required filings under the HSR Act and the expiration or termination of the applicable waiting period (and any extension thereof) under the HSR Act, (b) any required approvals by FERC or notifications to FERC (whether required prior to or following the Closing), and (c) any required consents from the Federal Communications Commission or notifications to the Federal Communications Commission.

"Governmental Entity" shall mean any federal, state, local, municipal, foreign or other (a) government; (b) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (c) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitration tribunal; or (d) governmental, quasi–governmental or non-governmental body administering, regulating or having general oversight over gas, electricity, power or other markets, or over reliability matters..

"Guarantied Obligations" shall have the meaning specified in Section 9.13(a).

"Guarantor" shall have the meaning specified in the preamble.

"Hazardous Materials" shall mean any material, substance or waste defined, listed or regulated as "hazardous" or "toxic" (or words of similar meaning or intent) under any applicable Environmental Law, including materials exhibiting the characteristics of ignitability, corrosivity, reactivity or toxicity, as such terms are defined in connection with hazardous materials or hazardous wastes or hazardous or toxic substances in any applicable Environmental Law.

"Holdings" shall have the meaning specified in the preamble.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any successor law and the rules and regulations thereunder or under any successor law.

"Intellectual Property" shall mean all intellectual property and proprietary rights of Sellers, including (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all provisionals, reissuances, continuations, continuations-in-part, divisions, revisions, extensions and reexaminations thereof, (b) all Trademarks, (c) all works of authorship and other copyrightable works, all copyrights, any and all website content, and all applications, registrations, and renewals in connection therewith, (d) all industrial designs and mask works, and all applications, registrations, and renewals in connection therewith and (e) all trade secrets and confidential business information (including technical data, designs, drawings, specifications, research records, records of inventions, test information, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals).

"Interim Period" shall have the meaning specified in Section 6.1.

"Inventory" shall have the meaning specified in Section 2.1(e).

"IT Assets" shall mean computers, software, servers, workstations, associated data, routers, hubs, switches, circuits, networks, data communications lines and all other information technology equipment owned by Sellers.

"Knowledge" shall mean, with respect to Sellers, the actual knowledge of Mark Sudbey, Jeff Hunter, David Sheffey, Paul Hamilton, Craig Hart and Jon Reese.

"Law" shall mean any federal, state, provincial, local or foreign statute, law, ordinance, regulation, rule, code, Order, principle of common law, judgment or decree enacted, promulgated, issued, enforced or entered by any Governmental Entity, or court of competent jurisdiction, or other requirement or rule of law.

"Leased Machinery and Equipment" shall have the meaning specified in Section 2.1(b).

"Leased Real Property" shall have the meaning specified in Section 2.1(a).

"Liabilities" shall mean, as to any Person, all debts, adverse claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct or indirect, absolute or contingent, whether accrued, vested or otherwise, whether known or unknown and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records.

"Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code and shall include any Claim, pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust, defect of title, restriction on transferability, restriction on use or other encumbrance, in each case whether imposed by agreement, law, equity or otherwise.  For the avoidance of doubt, "Lien" shall not include any license (or sublicense) of Intellectual Property.

"Local Bankruptcy Rules" shall mean the Local Bankruptcy Rules for the Southern District of New York applicable to all cases in such district governed by the Bankruptcy Code.

"LTSAs" shall mean (A) the Long Term Service Agreement, dated as of November 6, 2000, between Mystic Development and Mitsubishi Heavy Industries America, Inc., (B) the Long Term Service Agreement, dated May 25, 2010, between Mystic Development and Mitsubishi Power Systems Americas, Inc. and (C) the Long Term Service Agreement, dated as of December 8, 2000, between Sithe Fore River Development LLC and Mitsubishi Heavy Industries America, Inc.

"Machinery and Equipment" shall have the meaning specified in Section 2.1(b).

"Major Loss" shall have the meaning specified in Section 6.14(b).

"Material Licenses and Permits" shall have the meaning specified in Section 4.12.

"Mezzanine Credit Agreement" shall mean the $300,000,000 Mezzanine Credit Agreement, dated as of December 21, 2006, by and among Holdings, the lenders party thereto and Credit Suisse, Cayman Islands Branch, as administrative agent.

"Minimum Employment Period" shall have the meaning specified in Section 6.8(b).

"Multiemployer Plan" shall mean a "multiemployer plan" as defined in Section 3(37) of ERISA.

"Mystic Development" shall have the meaning specified in the preamble.

"Mystic I" shall have the meaning specified in the preamble.

"Mystic 8&9" shall mean the approximately 1,580 megawatt natural gas-fired combined cycle intermediate load power plant located in Everett, Massachusetts, together with all auxiliary equipment, ancillary and associated facilities and equipment, electrical transformers, pipeline and electrical interconnection and metering facilities used for the receipt of fuel and water and the delivery of the electrical output of said generating plant, and all other improvements relating to the ownership, operation and maintenance of said generating plant and associated equipment.

"Mystic Station" shall mean (a) the approximately 566 megawatt oil and natural gas-fired steam turbine generating unit located in Everett, Massachusetts and (b) the approximately 9 megawatt oil-fired gas turbine located in Everett, Massachusetts, in each case, together with all auxiliary equipment, ancillary and associated facilities and equipment, electrical transformers, pipeline and electrical interconnection and metering facilities used for the receipt of fuel and water and the delivery of the electrical output of said generating units, and all other improvements relating to the ownership, operation and maintenance of said generating units and associated equipment.

"Mystic Site" means all parcels of land included in the Owned Real Property of Mystic 8&9 and Mystic Station, as described in Section 2.1(a)-1 of the Disclosure Schedule.

"<u>Necessary Consent</u>" shall have the meaning specified in Section 2.5.

"<u>Neutral Arbitrator</u>" shall mean Grant Thornton LLP, or if Grant Thornton LLP is not willing to so serve, a national independent accounting firm selected by Buyer and reasonably acceptable to Sellers.

"<u>No-Shop Period</u>" shall have the meaning specified in Section 6.3(a).

"<u>Non-Represented Employees</u>" shall have the meaning specified in Section 6.8(b).

"<u>Notice of Disagreement</u>" shall have the meaning specified in Section 3.4(b).

"<u>Notices</u>" shall have the meaning specified in Section 9.5.

"<u>Order</u>" shall mean any judgment, order, injunction, writ, ruling, decree, stipulation or award of any Governmental Entity or private arbitration tribunal.

"<u>Ordinary Course of Business</u>" means that an action taken by a Person will be deemed to have been taken in the **"Ordinary Course of Business"** only if that action:

(i)        is consistent in nature, scope and magnitude with the past practices of such Person, recognizing that Sellers have filed the Chapter 11 Cases, and is taken in the ordinary course of the normal day-to-day operations of such Person; and

(ii)        does not require authorization by the shareholders of such Person (or by any Person or group of Persons exercising similar authority).

"<u>Outside Back-Up Date</u>" shall mean the date of closing of an Alternative Transaction with the Successful Bidder.

"<u>Owned Machinery and Equipment</u>" shall have the meaning specified in Section 2.1(b).

"<u>Owned Real Property</u>" shall have the meaning specified in Section 2.1(a).

"<u>Party</u>" or "<u>Parties</u>" shall have the meaning specified in the preamble.

"<u>Permits</u>" shall mean permits, licenses, registrations, certificates of occupancy, approvals, consents, clearances and other authorizations issued by any Governmental Entity.

"<u>Permitted Liens</u>" shall mean: (a) Liens for Taxes not yet due and payable or being contested in good faith by appropriate proceedings; (b) covenants, conditions, easements, licenses or similar non-monetary liens or non-monetary matters (collectively, "<u>Item B Encumbrances</u>")  disclosed in any of the following (i) as to Mystic Station, the First American Title Insurance Company title insurance commitment effective February 22, 2010, Number NCS-429682-NY (the "<u>Mystic Station Title Insurance Commitment</u>"); (ii) as to Mystic 8&9, the First American Title Insurance Company title insurance commitment effective February 22, 2010, Number NCS-429673-NY(the "<u>Mystic 8&9 Title Insurance Commitment</u>"); (iii) as to Fore River, the First American Title Insurance Company title insurance commitment effective

February 22, 2010, Number NCS-429689-NY(the "<u>Fore River Title Insurance Commitment</u>"); or (iv) the Gas Facilities Easement Agreement entered into with Distrigas of Massachusetts LLC dated July 1, 2001; provided however (with respect to Items (i) – (iii)) that any such Item B Encumbrance created or recorded with respect to the Fore River Site on or after October 11, 2005 or the Mystic Site on or after December 15, 2006 shall not constitute a Permitted Lien if such Item B Encumbrance (i) materially and adversely interferes with the use and enjoyment of the Acquired Real Property at the Closing Date, or (ii) materially prejudices the anticipated future uses to which the Acquired Real Property could be put, (c) any zoning and other land-use restrictions imposed by a Governmental Entity on or before the Agreement Date, (d) encumbrances arising under leases or subleases of Acquired Real Property, which do not materially detract from the value of such Acquired Real Property or interfere with the use of or conduct of the Business on the Acquired Real Property; (e) such other Liens or title exceptions as Buyer may approve in writing in its reasonable discretion; (f) Liens arising from the filing of precautionary financing statements under the Uniform Commercial Code by lessors with respect to operating leases; (g) Liens that are contractual rights of setoff (i) relating to the establishment of depository relations with banks not given in connection with the issuance of indebtedness, (ii) relating to pooled deposit or sweep accounts of any Seller to permit satisfaction of overdraft or similar obligations incurred in the Ordinary Course of Business of Sellers or (iii) relating to purchase orders and other agreements entered into with customers of Sellers in the Ordinary Course of Business; (h) variations between fences, retaining walls, curbs, steps, hedges, shrubs, trees and record lines of title; (i) provider, utility and telephone company rights and easements to maintain, install or remove poles, wires, cables, pipes, pipelines, boxes and other facilities and equipment in, over and upon the Acquired Real Property and rights and easements for the installation, maintenance and replacement of water mains and sewer lines and facilities and equipment in, over and upon the Acquired Real Property, and (ii) do not materially prejudice the anticipated future uses to which the Acquired Real Property could be put; (j) any minor encumbrances and other minor matters that do not require the payment of money, provided the same (i) do not materially and adversely interfere with the use and enjoyment of the Acquired Real Property at the Closing Date, and (ii) do not materially prejudice the anticipated future uses to which the Acquired Real Property could be put; or (k) liens or encumbrances that arise solely by reason of acts of or with the approval of Buyer.  For the avoidance of doubt, Permitted Liens do not include Liens in respect of the First Lien Credit Agreement, Second Lien Credit Agreement and Mezzanine Credit Agreement.

"<u>Person</u>" shall mean an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Entity or any other entity.

"<u>Petition Date</u>" shall have the meaning specified in the recitals.

"<u>Proceeding</u>" shall mean any action, arbitration, audit, known investigation (including a notice of preliminary investigation or formal investigation), notice of violation, hearing, litigation or suit (whether civil, criminal or administrative), other than the Chapter 11 Cases, commenced, brought, conducted or heard by or before any Governmental Entity or arbitrator.

"<u>Properties</u>" shall have the meaning specified in Section 4.10.

"Property Taxes" shall mean all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"Purchase Price" shall have the meaning specified in Section 3.3.

"Records" shall have the meaning specified in Section 2.1(g).

"Reimbursable Expenses" shall have the meaning specified in Section 8.2(b).

"Representative" shall mean, with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf of such Person or its Subsidiaries).

"Represented Employees" shall have the meaning specified in Section 6.8(a).

"Restoration Costs" shall have the meaning specified in Section 6.14(a).

"Sale Motion" shall mean the motion of Sellers, in form and substance reasonably acceptable to Buyer and Sellers, seeking entry of the Bidding Procedures Order and Sale Order.

"Sale Order" shall mean an Order or Orders of the Bankruptcy Court, substantially in the form attached hereto as Exhibit E and reasonably satisfactory in form and substance to Buyer, (i) approving, without limitation, this Agreement and all of the terms and conditions hereof and authorizing Sellers to consummate the transactions contemplated hereby pursuant to sections 363, 365 and 1146(c) of the Bankruptcy Code, and (ii) containing, at a minimum, those provisions set forth in Section 6.11(e).

"Second Lien Credit Agreement" shall mean the $350,000,000 Second Lien Credit and Guaranty Agreement, dated as of December 21, 2006, by and among BGen, as borrower, the guarantors party thereto, the lenders party thereto and Wilmington Trust, as second lien collateral agent and administrative agent

"Seller" or "Sellers" shall have the meaning specified in the preamble.

"Seller Financial Statements" shall have the meaning specified in Section 4.5.

"Seller Released Party" shall have the meaning specified in Section 9.4(a).

"Sellers Material Adverse Effect" shall mean a material adverse effect on the Acquired Assets or the Business or results of operations of the Business, but any effect of the following shall not be taken into account in determining whether a "Material Adverse Effect" has occurred: (a) any change generally affecting the international, national or regional electric generating, transmission or distribution industry; (b) any change generally affecting the international, national or regional wholesale or retail markets for electric power or capacity; (c) any change generally affecting the international, national or regional wholesale or retail markets for the natural gas industry; (d) any change in markets for commodities or supplies, including electric power, natural gas or fuel and water, as applicable, used in connection with the Business; (e) any

change in market design and pricing; (f) any change in general macroeconomic, financial market, regulatory or political conditions, including any engagements of hostilities, acts of war or terrorist activities or changes imposed by a Governmental Entity associated with additional security; (g) changes in Law, GAAP or official interpretations of the foregoing; (h) compliance with this Agreement, including any effect on the Business resulting from failure to take any action to which Buyer unreasonably refused consent under this Agreement; (i) the transactions contemplated hereby or any announcement hereof or the identity of Buyer; or (j) the pendency of the Chapter 11 Cases and any action approved by, or motion made before, the Bankruptcy Court; it being understood that the failure of Sellers to achieve internal or external financial forecasts or projections, by itself, will not constitute a Sellers Material Adverse Effect.

"Sellers' Representative" shall have the meaning specified in Section 9.18.

"Specified Actual Capital Expenditures" shall mean such expenditures actually incurred and paid by Sellers during the period from July 1, 2010 through the Closing Date for the following items: (i)the purchase of additional spare parts under the Long Term Service Agreements by and among Mitsubishi Heavy Industries America, Inc. and Mystic Development, dated as of November 6, 2000 and May 25, 2010, as amended, for four M501G gas turbines (GT 81, GT 82, GT 93, GT 94), (ii) the purchase of a spare gas turbine rotor from Mitsubishi Power Systems America for use at the above gas turbines at Fore River and (iii) the "Capital Parts and Buyer's Inventory of New Spares" identified in Exhibit 7 of the Long Term Service Agreement dated May 25, 2010 including: fuel nozzles, combustor swirler holders, combustion liners, combustion liner seals, R1 vanes (G1 type), R2 vanes (G1 type), R3 vanes, R4 vanes, R1 blades (G1 type), R2 blades, R3 blades, R4 blades, R1 ring segments, R2 ring segments, R3 ring segments, R4 ring segments, and L-0 blades for ST85.

"Specified Contracts" means those Contracts set forth on Schedule 1.2.

"Specified Forecasted Capital Expenditures" shall mean $16,850,000.

"Specified Forecasted Capital Expenditures Adjustment Amount" shall mean the excess (if any) of (i) the amount of the Specified Forecasted Capital Expenditures over (ii) the amount of the Specified Actual Capital Expenditures.

"Subsidiary" shall mean, with respect to any Person (a) a corporation, a majority of whose capital stock with voting power, under ordinary circumstances, to elect directors is at the time, directly or indirectly, owned by such Person, by a subsidiary of such Person, or by such Person and one or more subsidiaries of such Person, (b) a partnership in which such Person or a subsidiary of such Person is, at the date of determination, a general partner of such partnership, or (c) any other Person (other than a corporation) in which such Person, a subsidiary of such Person or such Person and one or more subsidiaries of such Person, directly or indirectly, at the date of determination thereof, has (i) at least a majority ownership interest thereof or (ii) the power to elect or direct the election of a majority of the directors or other governing body of such Person.

"Successful Bidder" shall have the meaning specified in Section 6.3(b).

"Taking" shall have the meaning specified in Section 6.14.

"<u>Target Net Working Capital Amount</u>" shall mean an amount equal to $26,777,000.

"<u>Tax</u>" or "<u>Taxes</u>" shall mean any and all taxes, assessments, levies, duties or other governmental charge imposed by any Governmental Entity, including any income, alternative or add-on minimum, accumulated earnings, franchise, capital stock, environmental, profits, windfall profits, gross receipts, sales, use, value added, transfer, registration, stamp, premium, excise, customs duties, severance, real property, personal property, ad valorem, occupancy, license, occupation, unclaimed property liabilities, employment, payroll, social security, disability, unemployment, withholding, corporation, inheritance, value added, stamp duty reserve, estimated or other similar tax, assessment, levy, duty (including duties of customs and excise) or other governmental charge of any kind whatsoever, including any payments in lieu of taxes or other similar payments, chargeable by any Tax Authority together with all penalties, interest and additions thereto, whether disputed or not.

"<u>Tax Authority</u>" shall mean any taxing or other authority (whether within or outside the U.S.) competent to impose Tax.

"<u>Tax Return</u>" shall mean any and all returns, declarations, reports, documents, claims for refund, or information returns, statements or filings which are required to be supplied to any Tax Authority or any other Person, including any schedule or attachment thereto, and including any amendments thereof.

"<u>Trademarks</u>" shall mean all trademarks, service marks, trade names, trade dress, corporate names, company names, business names, Internet domain names, logos, certification marks, collective marks, and other indicia of origin, together with all translations, adaptations, derivations and combinations thereof, all registrations, applications and renewals in connection therewith, and all of the goodwill connected with the use of, and symbolized by any of, the foregoing.

"<u>Transfer Tax</u>" or "<u>Transfer Taxes</u>" shall mean any sales, use, transfer, conveyance, documentary transfer, stamp, recording or other similar Tax imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto, but such term shall not include any Tax on, based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.

"<u>Transferable Permits</u>" shall have the meaning specified in Section 2.1(d).

"<u>Transition Services Agreement</u>" shall mean the Transition Services Agreement to be entered into concurrently with the Closing, in such form and covering such services as shall be mutually agreed to by Holdings and Buyer.

"<u>Willful Breach</u>" shall mean, with respect to any representation, warranty, agreement or covenant, an action or omission (including a failure to cure circumstances) taken or omitted to be taken after the date hereof that the breaching Person intentionally takes (or fails to take) and knows or should reasonably have known that such action (or inaction) would constitute a breach of such representation, warranty, agreement or covenant.

"Wind-Up" shall have the meaning specified in Section 6.10.

1.2    Interpretation.

(a)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)    Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(c)    A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(d)    A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(e)    All references to "$" and dollars shall be deemed to refer to United States currency.

(f)    All references to any financial or accounting terms shall be defined in accordance with GAAP.

(g)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Disclosure Schedule and exhibit references are to this Agreement unless otherwise specified.  All article, section, paragraph, schedules and exhibit references used in this Agreement are to articles, sections, paragraphs, schedules and exhibits to this Agreement unless otherwise specified.

(h)    The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(i)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(j)    If a word or phrase is defined, its other grammatical forms have a corresponding meaning.

(k)    A reference to any agreement or document (including a reference to this Agreement) is to the agreement or document as amended or supplemented, except to the extent prohibited by this Agreement or that other agreement or document.

(l)    Exhibits, Schedules, Annexes and other documents to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  Any

capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

## ARTICLE 2
## TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES

2.1     Assets to be Acquired.  Subject to the entry of the Sale Order, and the terms and conditions of this Agreement and the Sale Order, and on the basis of the representations, warranties, covenants and agreements herein contained, at the Closing, Sellers shall sell, convey, assign, transfer and deliver to Buyer (or one or more Subsidiaries of Buyer, as designated by Buyer in writing to Holdings prior to the submission of the Sale Order), and Buyer (or one or more Subsidiaries of Buyer, as designated by Buyer in writing to Holdings prior to the submission of the Sale Order) shall purchase, acquire and accept, all of the right, title and interest, free and clear of all Liens (other than Liens included in the Assumed Liabilities and Permitted Liens), of Sellers in each and all of the Acquired Assets.  "Acquired Assets" shall mean all properties, assets and rights of every nature, tangible and intangible, of Sellers, real or personal, now existing or hereafter acquired, whether or not reflected on the books or financial statements of Sellers as the same shall exist on the Closing Date that are used in the operation of the Business, other than the Excluded Assets but including the following assets:

(a)     (i) all right, title and interest of Sellers in the real property set forth on Schedule 2.1(a)-1, together with all buildings, structures, fixtures, and improvements erected thereon, and all rights, privileges, easements, licenses and other appurtenances relating thereto (the "Owned Real Property"), (ii) all right, title and leasehold interest of Sellers in the real property set forth on Schedule 2.1(a)-2, together with all buildings, structures, fixtures, and improvements erected thereon, and all rights, privileges, easements, licenses and other appurtenances relating thereto (the "Leased Real Property"), and (iii) all right, title and interest of Sellers under the appurtenant easements, rights of way, real property licenses, and other real property entitlements set forth on Schedule 2.1(a)-3 (the "Entitled Real Property");

(b)     all (i) Sellers' owned equipment (including cars, trucks, fork lifts and other industrial vehicles), machinery, furniture, fixtures and improvements and tooling used or held for use in the Business (the "Owned Machinery and Equipment"), (ii) rights of Sellers to the equipment (including cars, trucks, fork lifts and other industrial vehicles), machinery, furniture, fixtures and improvements and tooling which are leased pursuant to an Assumed Contract (the "Leased Machinery and Equipment" and collectively with the Owned Machinery and Equipment, the "Machinery and Equipment"), and (iii) rights of Sellers to the warranties, express or implied, and licenses received from manufacturers and sellers of the Machinery and Equipment;

(c)     those leases (including leases and subleases of Acquired Real Property and of Machinery and Equipment) and other Contracts (together with all of Seller's deposits thereunder) entered into by any Seller that are executory and unexpired as of the Closing Date and that will be assigned to Buyer pursuant to section 365 of the Bankruptcy Code in connection with the transactions contemplated in this Agreement, in each case listed on Schedule 2.1(c); provided that Buyer may modify such Schedule to add or delete leases and other Contracts at any time prior to the Closing, subject to Section 6.12 (collectively, the "Assumed Contracts");

16

(d)      all Permits relating to the ownership or operation of a Facility, including, those Permits listed on Schedule 2.1(d), but only if and to the extent that such Permits are transferable by Sellers to Buyer by assignment or otherwise (including, without limitation, upon request or application to a Governmental Entity, or which will pass to Buyer as successor in title to the Acquired Assets by operation of Law) (the "Transferable Permits")

(e)      all inventories of spare parts set forth on Schedule 2.1(e) other than those used in Ordinary Course of Business prior to Closing, all office and other supplies used or held for use in the Business and all fuel inventory (collectively, "Inventory");

(f)      all accounts receivable relating to the Facilities;

(g)      except as set forth in Section 2.2(c) and (i), and subject to the right of Sellers to retain copies (at their expense) for their use, all books, operating records, engineering designs, blueprints, as-built plans, specifications, procedures, studies, reports and equipment repair, safety, maintenance or service records of any Seller relating primarily to the operation of the Business ("Records") and all files relating to compliance with Environmental Laws, environmental Permits, Air Emissions Credits and Allowances and files related to the environmental condition of the Properties;

(h)      all right, title or interest in and to (i) all Intellectual Property relating to the Business and (ii) the IT Assets relating to the Business;

(i)      all goodwill associated with the Business, the Acquired Assets and the Assumed Liabilities;

(j)      all deposits and prepaid expenses of Sellers, including (i) security deposits with third party suppliers, vendors, service providers or landlord and lease and rental payments, (ii) tenant reimbursements, (iii) prepaid Property Taxes, and (iv) pre-payments;

(k)      all Benefit Plans (other than equity and equity-based plans and arrangements) and the Collective Bargaining Agreements, and any associated funding media, assets, reserves, credits and service agreements and all documents created, filed or maintained in connection with such Benefit Plans and Collective Bargaining Agreement and any applicable insurance policies related thereto;

(l)      all rights, claims, credits, causes of action or rights of set off against third parties, including rights under vendors' and manufacturers' warranties, indemnities and guaranties (other than any claims contemplated by Section 2.2(e));

(m)      all Air Emissions Credits and Allowances set forth on Schedule 2.1(m) and all rights to future Air Emissions Credits and Allowances allocated with respect to the Facilities;

(n)      any claims, counterclaims, setoffs, rights of recoupment, equity rights or defenses that Sellers may have with respect to any Assumed Liabilities; and

17

(o)    cash and cash equivalents related to the expiration or termination of any Specified Contract.

2.2    <u>Excluded Assets</u>.  The Acquired Assets do not include Sellers' right, title or interest in or to any of the following properties and assets of Sellers (collectively, the "<u>Excluded Assets</u>"):

(a)    each Seller's rights under this Agreement (including the right to receive the Purchase Price);

(b)    all of Sellers' or any of their respective Affiliates' certificate of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Seller or any of its Affiliates as a corporation, limited liability company or other entity;

(c)    all Records related to Taxes paid or payable by any Seller or any of its Affiliates;

(d)    all shares of capital stock or other equity interests of any Seller or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller;

(e)    all avoidance claims or causes of action under the Bankruptcy Code or applicable state Law, including all such rights and avoidance claims of any Seller arising under chapter 5 of the Bankruptcy Code;

(f)    any refunds or credits of Taxes paid or payable by any Seller or any of its Affiliates, except for refunds or credits of Taxes for which Buyer is liable pursuant to Section 2.3(f);

(g)    all cash and cash equivalents, securities, security entitlements, instruments and other investments of Sellers (other than any cash and cash equivalents related to the expiration or termination of any Specified Contract) and all bank accounts and securities accounts, including any cash collateral that is collateralizing any letters of credit, or any obligation with respect thereto;

(h)    all insurance policies and binders and all claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders;

(i)    any (i) confidential personnel and medical records pertaining to any employees of Sellers and (ii) other Records that Sellers are required by Law to retain, including Tax Returns, taxpayer and other identification numbers, financial statements and corporate or other entity filings; <u>provided</u> that Buyer shall have the right to make copies of any portions of such retained Records to the extent that such portions relate exclusively to the Business or any Acquired Asset and are necessary for Buyer to comply with applicable Law;

(j)      any documents and agreements relating to the Chapter 11 Cases or to the sale or other disposition of the Business, the Acquired Assets or any other asset of any Seller or any of its Affiliates other than those to be delivered to Buyer in accordance with this Agreement; and

(k)      all claims that Sellers may have against any third Person solely with respect to any Excluded Assets or Excluded Liabilities.

2.3    <u>Liabilities to be Assumed by Buyer</u>.  Subject to the terms and conditions of this Agreement and on the basis of the representations, warranties, covenants and agreements herein contained, at the Closing, Sellers shall assign to Buyer (or one or more Subsidiaries of Buyer, as designated by Buyer in writing to Holdings prior to the submission of the Sale Order) and Buyer (or one or more Subsidiaries of Buyer, as designated by Buyer in writing to Holdings prior to the submission of the Sale Order) shall assume from Sellers and pay when due, perform and discharge, in due course, without duplication, each of the Assumed Liabilities.  "<u>Assumed Liabilities</u>" shall mean solely the following other than the Excluded Liabilities:

(a)      all Liabilities of Sellers under each of the Assumed Contracts listed on <u>Schedule 2.1(c)</u>, including the Cure Costs, exclusive of any Liability arising from or related to a violation of Law occurring prior to the Closing Date;

(b)      all trade and vendor accounts payables;

(c)      all Liabilities relating to any environmental matter arising out of or relating to Sellers' operation of the Business or their leasing, ownership or operation of the Facilities or the Acquired Real Property, except any Excluded Liabilities;

(d)      all Liabilities related to (i) the termination of any Employees on or following the Closing Date, and (ii) earned but unpaid salary, bonuses, accrued but unpaid vacation days, accrued but unpaid medical and dental expenses, accrued and unpaid other forms of compensation and all other accrued welfare benefits of all Employees;

(e)      all Liabilities with respect to Benefit Plans and the Collective Bargaining Agreements assumed pursuant to Section 2.1(k);

(f)      all Liabilities related to Property Taxes and all Liabilities related to Transfer Taxes arising out of the transfer of the Acquired Assets as provided in Section 6.6 hereof;

(g)      all Liabilities relating to or arising out of any claim or threatened claim against any Seller relating to the Business or the Acquired Assets arising on or after the Closing Date, including any such claim or threatened claim that the conduct of the Business infringes any Intellectual Property of any Person or that relates to the Intellectual Property included in the Acquired Assets (including any challenge to the validity, enforceability, ownership or use of any such Intellectual Property);

(h)      all Liabilities related to Air Emissions Credits and Allowances; and

(i)      for avoidance of doubt, all Liabilities relating to or arising out of the ownership or operation of the Business or any Acquired Asset from and after the Closing, except any Excluded Liabilities.

2.4      Excluded Liabilities.  Buyer shall not and does not assume any Liability of Sellers whatsoever relating to or arising out of any of the following (collectively, the "Excluded Liabilities"):

(a)      all Liabilities related to the First Lien Credit Agreement, the Second Lien Credit Agreement and the Mezzanine Credit Agreement;

(b)      all costs and expenses incurred or to be incurred by Sellers in connection with this Agreement and the consummation of the transactions contemplated hereby;

(c)      all Liabilities relating to or arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(d)      all (i) fines or penalties assessed as a result of any noncompliance with Environmental Law by Sellers prior to Closing and (ii) Liabilities arising out of, relating to, in respect or connection with disposal or release of Hazardous Materials prior to Closing  by Sellers at any location that is not Acquired Real Property, including any location previously-owned, operated or leased by Sellers, whether any such Liability described in clauses (i) – (ii) first arises prior to or after Closing;

(e)      all third party Liabilities for toxic torts arising as a result of or in connection with loss of life or injury to Persons (whether or not such loss or injury was made manifest on or after the Closing Date) caused or allegedly caused by exposure, prior to the Closing Date, to Hazardous Materials present at, on, in, under adjacent to or migrating from the Acquired Assets; and

(f)      all liabilities for any and all Taxes of Sellers (including any Liability of Sellers for the Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise) except for Taxes for which Buyer is liable pursuant to Section 2.3(f).

2.5      Non-Assignment of Assumed Contracts.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Assumed Contract if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach thereof or in any way adversely affect the rights of Buyer thereunder and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required.  In such event, Sellers and Buyer will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Assumed Contract or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer or an Affiliate of Buyer as Buyer may reasonably request; provided, however, that Sellers shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval.

If such Necessary Consent is not obtained, or if an attempted assignment of any Assumed Contract would be ineffective or would adversely affect the rights of any Seller thereunder so that Buyer or an Affiliate designated by Buyer would not in fact receive all such rights, such Seller and Buyer or the applicable Affiliate of Buyer will cooperate in a mutually agreeable arrangement, to the extent feasible and at no expense to such Seller, under which Buyer or such Affiliate of Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including subcontracting, sub-licensing, or sub-leasing to Buyer or such Affiliate of Buyer, or under which such Seller would enforce for the benefit of Buyer or such Affiliate of Buyer with Buyer or such Affiliate of Buyer assuming such Seller's Liabilities in respect of the applicable Assumed Contract and any and all rights of such Seller against a third party thereto.  Nothing in this Section 2.5 shall prohibit Sellers from ceasing operations or winding up their affairs following the Closing.

**ARTICLE 3**
**CLOSING; PURCHASE PRICE**

3.1     <u>Closing; Transfer of Possession; Certain Deliveries</u>.

(a)     The consummation of the transactions contemplated herein (the "<u>Closing</u>") shall take place on the second Business Day after the satisfaction of all of the conditions set forth in Article 7 (or the waiver thereof by the Party entitled to waive that condition) or on such other date as the Parties hereto shall mutually agree.  The Closing shall be held at the offices of Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022, at 10:00 a.m., local time, unless the Parties hereto otherwise agree.  The actual date of the Closing is herein called the "<u>Closing Date</u>."  For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:01 A.M. on the Closing Date.

(b)     At the Closing, Sellers shall deliver to Buyer:

(i)     a certified copy of the Sale Order;

(ii)     a duly executed bill of sale, substantially in the form attached hereto as <u>Exhibit F</u>, transferring the Acquired Assets to Buyer;

(iii)     the duly executed Assignment and Assumption Agreement;

(iv)     the duly executed Adjustment Escrow Agreement;

(v)     the duly executed Transition Services Agreement;

(vi)     a properly executed affidavit of each Seller, prepared in accordance with Treasury Regulations section 1.1445-2(b), certifying as to such Seller's non-foreign status in a form reasonably satisfactory to Sellers and Buyer;

(vii)     duly executed quitclaim deeds (the "<u>Deeds</u>") in a form reasonably satisfactory to Sellers and Buyer containing such covenants, if any, as may be required by statute, so as to convey to Buyer fee simple absolute title to the Owned Real Property, free of all

title exceptions other than Permitted Liens, all as required by this Agreement.  The Deeds shall be in recordable form, duly executed and acknowledged;

(viii)    duly executed lease assignments in a form reasonably satisfactory to Sellers and Buyer or Sale Order or Orders of the Bankruptcy Court as shall be required to convey to Buyer all of Sellers' interests in respect of the Leased Real Property.  Such lease assignments shall be in recordable form, duly executed and acknowledged;

(ix)    duly executed assignments in a form reasonably satisfactory to Sellers and Buyer or Sale Order or Orders of the Bankruptcy Court as shall be required to convey to Buyer all of Sellers' interests in respect of the Entitled Real Property.  Such assignments shall be in recordable form, duly executed and acknowledged;

(x)    the Records to be delivered pursuant to Section 2.1(g), it being understood that any Records located at the Facilities need not be physically delivered, but shall be deemed delivered at the Closing;

(xi)    all other previously undelivered certificates, agreements and other documents required to be delivered by Sellers at or prior to the Closing in connection with the transactions contemplated by this Agreement and

(xii)    such other documents, instruments and certificates as Buyer may reasonably request.

(c)    At the Closing, Buyer shall deliver to Sellers:

(i)    the Purchase Price in accordance with the provisions of Section 3.3 less the aggregate amount of funds in the Deposit Escrow (all of which shall be transferred directly to Sellers by the Escrow Agent);

(ii)    the duly executed Assignment and Assumption Agreement;

(iii)    the duly executed Transition Services Agreement;

(iv)    the duly executed Adjustment Escrow Agreement;

(v)    all other previously undelivered certificates, agreements and other documents required to be delivered by Buyer at or prior to the Closing in connection with the transactions contemplated by this Agreement; and

(vi)    such other documents, instruments and certificates as Sellers may reasonably request.

3.2    Deposit Escrow.

(a)    On the next Business Day following the Agreement Date, Buyer shall execute and deliver to Sellers the Deposit Escrow Agreement and deposit with the Escrow Agent fifty million dollars ($50,000,000) (the "Deposit Escrow").

(b)    The Deposit Escrow shall be held and disbursed pursuant to the terms of the Deposit Escrow Agreement and this Agreement, including:

(i)    if the Closing shall occur, then the Deposit Escrow, together with all accrued investment income or interest thereon, shall be applied towards the Purchase Price;

(ii)    if this Agreement is terminated pursuant to and in accordance with Section 8.1(a), Section 8.1(b), Section 8.1(c), Section 8.1(d)(ii), Section 8.1(e) or Section 8.1(f), then the Deposit Escrow, together with all accrued investment income or interest thereon, shall be returned to Buyer; or

(iii)    if this Agreement is terminated by Sellers pursuant to and in accordance with Section 8.1(d), then the Deposit Escrow, together with all accrued investment income or interest thereon, shall be delivered to Sellers.

(c)    Unless this Agreement has been validly terminated in accordance with its terms (in which case Section 3.2(b) shall control), in the event that Buyer is not the Successful Bidder or the Back-Up Bidder following the Auction, the Escrow Agent shall return the Deposit Escrow to Buyer within fifteen (15) Business Days after the entry of the sale order by the Bankruptcy Court with respect to the Alternative Transaction involving the Successful Bidder. In the event that Buyer is the Back-Up Bidder following the Auction, the Escrow Agent shall return the Deposit Escrow to Buyer within two (2) Business Days of the Outside Back-Up Date.

3.3    Purchase Price.  In consideration for the Acquired Assets, and subject to the terms and conditions of this Agreement, Buyer shall assume the Assumed Liabilities as provided in Section 2.3 and at the Closing shall pay to Sellers an aggregate cash purchase price of (a) $1,100,000,000.00 (the "Base Purchase Price") plus (b) the estimated Adjustment Amount as of immediately prior to Closing (the "Estimated Adjustment Amount", and the sum of clause (a) and clause (b), as the same may be reduced pursuant to Section 3.5, the "Purchase Price").  The calculation of the Estimated Adjustment Amount shall be prepared by Sellers in good faith and delivered to Buyer no later than two (2) Business Days prior to the Closing Date.  On the Closing Date, a portion of the Base Purchase Price equal to the Adjustment Escrow Amount shall be deposited with the Escrow Agent to be held and disbursed pursuant to the terms of the Adjustment Escrow Agreement and Section 3.4.

3.4    Net Working Capital Adjustment.

(a)    Within sixty (60) days following the Closing, Buyer shall prepare and deliver to Sellers the calculation of the final Adjustment Amount as of immediately prior to the Closing (the "Final Adjustment Amount").  The Final Adjustment Amount shall be calculated in accordance with the principles and methodologies set forth in Schedule 3.4.  Buyer shall, in a timely manner, provide Sellers such data and information as Sellers may reasonably request in writing to support such calculation of the Final Adjustment Amount.

(b)    The calculation of the Final Adjustment Amount shall become final and binding on the date (the "Final Settlement Date") that is thirty (30) days following receipt thereof by Sellers unless Sellers give written notice of disagreement ("Notice of Disagreement") to

Buyer prior to such date; provided that all such items that are not disputed shall be final and binding upon the Parties.  In order to be effective, a Notice of Disagreement must specify in reasonable detail the dollar amount, nature and basis of any disagreement so asserted.  If a Notice of Disagreement is received by Buyer in a timely manner, then the calculation of the Final Adjustment Amount (as revised in accordance with paragraph (d) below, if applicable) shall become final and binding on, and the Final Settlement Date shall be, the earlier of (i) the date upon which Sellers and Buyer agree in writing with respect to all matters specified in the Notice of Disagreement and (ii) the date upon which the calculation of the Final Adjustment Amount is issued by the Neutral Arbitrator.

(c)    During the first twenty (20) days following the date upon which Buyer receives a Notice of Disagreement, Sellers and Buyer shall attempt in good faith to resolve in writing any differences that they may have with respect to all matters specified in the Notice of Disagreement.  If at the end of such twenty (20) day period (or earlier by mutual agreement to arbitrate) Buyer and Sellers have not reached agreement on such matters, the matters that remain in dispute shall be submitted to the Neutral Arbitrator for review and resolution. The terms of appointment and engagement of the Neutral Arbitrator shall be as agreed upon in good faith between the Parties and any associated engagement fees shall initially be borne fifty percent (50%) by Sellers and fifty percent (50%) by Buyer; provided that such fees shall ultimately be allocated in accordance with the fee sharing provisions set forth below in this Section 3.4(c). The hearing date will be scheduled by the Neutral Arbitrator as soon as reasonably practicable, and shall be conducted on a confidential basis.  Each of Buyer and Sellers shall, not later than seven (7) days prior to the hearing date set by the Neutral Arbitrator, submit a brief (to include such Party's calculations with regard to amounts in dispute in  the calculation of the Final Adjustment Amount) for settlement of any amounts set forth in the Notice of Disagreement that remain in dispute.  The Neutral Arbitrator shall render a decision resolving the matters in dispute on the basis of the principles and methodologies set forth in Schedule 3.4 (which decision shall include a written statement of findings and conclusions) within ten (10) Business Days after the conclusion of the hearing, unless the Parties reach agreement prior thereto and withdraw the dispute from arbitration.  The Neutral Arbitrator shall provide to the Parties explanations in writing of the reasons for its decisions regarding the Final Adjustment Amount and shall issue the calculation of the Final Adjustment Amount reflecting such decisions.  The decision of the Neutral Arbitrator shall be final and binding on the Parties.  If the Neutral Arbitrator resolves all disputes presented to it entirely in the manner proposed by either Sellers or Buyer, as the case may be, the fees and expenses of the Neutral Arbitrator shall be borne by the non-prevailing Party.  In all other events, the fees and expenses of the Neutral Arbitrator shall be shared based on the difference between Sellers' position, on the one hand, and Buyer's position, on the other hand, initially presented to the Neutral Arbitrator (based on the aggregate of all differences taken as a whole) and the final resolution as determined by the Neutral Arbitrator in proportion to the total difference between Sellers' and Buyer's initial positions.  The fees and disbursements of Buyer's independent public accountants incurred in connection with the procedures performed with respect to the calculation of the Final Adjustment Amount shall be borne by Buyer and the fees and disbursements of Sellers' independent public accountants incurred in connection with their preparation of the Notice of Disagreement shall be borne by Sellers.

(d)    If the Final Adjustment Amount is less than the Estimated Adjustment Amount, the Purchase Price shall be decreased by the amount of such difference, and Buyer and

Holdings shall deliver joint written instructions to the Escrow Agent to pay to Buyer an amount equal to the absolute value of such difference from the Adjustment Escrow Amount not later than three (3) Business Days after the Final Settlement Date by wire transfer of immediately available funds to an account or accounts specified by Buyer; and (x) in the event that the amount due to Buyer exceeds the Adjustment Escrow Amount, Sellers shall pay such excess amount to Buyer not later than three (3) Business Days after the Final Settlement Date by wire transfer of immediately available funds to an account or accounts specified by Buyer or (y) in the event that the Adjustment Escrow Amount exceeds the amount due to Buyer pursuant to this Section 3.4, such excess amount shall be released to Sellers not later than three (3) Business Days after the Final Settlement Date by wire transfer of immediately available funds to an account or accounts specified by Holdings.

(e)    If the Final Adjustment Amount is more than the Estimated Adjustment Amount, the Purchase Price shall be increased by the amount of such difference and (x) Buyer and Holdings shall deliver joint written instructions to the Escrow Agent to pay to Sellers the entire Adjustment Escrow Amount not later than three (3) Business Days after the Final Settlement Date by wire transfer of immediately available funds to an account or accounts specified by Holdings and (y) Buyer shall pay the amount by which the Final Adjustment Amount is more than the Estimated Adjustment Amount to Sellers not later than three (3) Business Days after the Final Settlement Date by wire transfer of immediately available funds to an account or accounts specified by Holdings.

3.5    <u>Allocation of Purchase Price</u>.  The sum of the Purchase Price and the value of the Assumed Liabilities (to the extent properly taken into account under the Code) shall be allocated among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (and any similar provision of state or local Law, as appropriate) (the "<u>Allocation</u>").  The Allocation shall be delivered by Buyer to Sellers within sixty (60) days after the Closing Date.  Sellers will have the right to raise reasonable objections to the Allocation within thirty (30) days after Buyer's delivery thereof, in which event Buyer and Sellers will negotiate in good faith to resolve such dispute.  If Buyer and Sellers cannot resolve such dispute within fifteen (15) days after Sellers notify Buyer of such objections, such dispute with respect to the Allocation shall be resolved promptly by a nationally recognized accounting firm selected by Buyer and reasonably acceptable to Sellers, the costs of which shall be shared in equal amounts by Buyer, on the one hand, and Sellers on the other hand.  The decision of the accounting firm in respect of the Allocation shall be final and binding upon Buyer and Sellers.  Buyer and Sellers shall file all Tax Returns (including, but not limited to, Internal Revenue Service Form 8594) consistent with the Allocation; <u>provided</u>, <u>however</u>, that nothing contained herein shall prevent Buyer or any Seller from settling any proposed deficiency or adjustment by any Tax Authority based upon or arising out of the Allocation, and neither Buyer nor any Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Tax Authority challenging such Allocation.  Except as otherwise provided herein, Buyer and Sellers agree to provide the other with any information required to complete IRS Form 8594 within fourteen (14) days of the request for such information.  Buyer and Sellers shall notify and provide the other with reasonable assistance in the event of an examination, audit, or other proceeding relating to Taxes regarding the allocation of the Purchase Price pursuant to this section.  Notwithstanding any other provisions of this Agreement, the foregoing agreement shall survive the Closing Date without limitation.

# ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLERS

In connection with the following representations and warranties, attached to this Agreement is a disclosure schedule (the "Disclosure Schedule") arranged in numbered parts corresponding to the Section numbering in this Agreement of the following representations and warranties. The information disclosed in any numbered part of the Disclosure Schedule shall be deemed to relate to and to qualify only the particular representation or warranty set forth in the corresponding numbered Section in this Agreement and shall not be deemed to relate to or qualify any other representation or warranty unless such relation or qualification is reasonably apparent. No reference to or disclosure of any item in the Disclosure Schedule shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in the Disclosure Schedule. Sellers jointly and severally hereby represent and warrant to Buyer, as of the Agreement Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date), except as set forth on the Disclosure Schedule, as follows:

4.1    Organization

(a)    Each Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.

(b)    Each Seller (i) is duly qualified or licensed to do business as a foreign corporation or limited liability company, as applicable, and is in good standing under the Laws of each jurisdiction where the nature of the property owned or leased by it or the nature of the Business makes such qualification or license necessary, except where any such failure to be so qualified or licensed, individually in the aggregate, would not result in a Sellers Material Adverse Effect; and (ii) pursuant to Sections 1107 and 1108 of the Bankruptcy Code and the Orders of the Bankruptcy Court, has all necessary corporate or limited liability company power and authority to own and operate its properties, to lease the property it operates under lease and to conduct the Business as debtor in possession.

4.2    Due Authorization, Execution and Delivery; Enforceability. Subject to the Sale Order having been entered by the Bankruptcy Court, each Seller has the requisite corporate or limited liability company power and authority to enter into, execute and deliver this Agreement and the other agreements contemplated hereby and to perform its obligations hereunder and has taken all necessary corporate or limited liability company action required for the due authorization, execution, delivery and performance by it of this Agreement and the transactions contemplated hereby. Subject to the Sale Order having been entered by the Bankruptcy Court, this Agreement constitutes the legally valid and binding obligation of each Seller, enforceable against it in accordance with its terms.

4.3    Consents. Subject to the receipt of the Governmental Approvals set forth on Schedule 4.3 and the Necessary Consents set forth on Schedule 4.3, and the Sale Order having been entered by the Bankruptcy Court, none of the execution, delivery or performance of this

Agreement by any Seller will require any consent of, authorization by, exemption from, filing with, or notice to any Governmental Entity or any other Person.

4.4     No Conflicts.  Subject to the receipt of the Governmental Approvals set forth on Schedule 4.3 and the Necessary Consents set forth on Schedule 4.3 and the Sale Order having been entered by the Bankruptcy Court, the execution, delivery and performance of this Agreement by each Seller and the consummation of the transactions contemplated hereby does not and will not (a) conflict with or result in any breach of any provision of its certificate of incorporation or bylaws or comparable governing documents, (b) conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give rise to any right with termination, acceleration or cancellation under, any Assumed Contract, or (c) result in a violation of any Law or Order applicable to it, except, in the case of clause (c), as would not, individually or in the aggregate, result in a Sellers Material Adverse Effect.

4.5     Financial Statements. Holdings has delivered or made available to Buyer a true, correct and complete copy of (a) the audited consolidated balance sheets of Sellers as of December 31, 2009, 2008 and 2007, and audited consolidated statements of operations, changes in stockholders' equity (deficit) and cash flows for the years then ended and (b) the unaudited consolidated balance sheet of Sellers as of March 31, 2010, and unaudited consolidated statements of operations, changes in stockholders' equity (deficit) and cash flows for the three months then ended (clauses (a) and (b), collectively, the "Seller Financial Statements").  The Seller Financial Statements are consistent in all material respects with the books and records of the Business.  The Seller Financial Statements (including the related notes) have been prepared in accordance with GAAP consistently applied (except, in the case of the unaudited financial statements, for normal recurring year-end adjustments and the lack of notes thereto) and fairly present, in all material respects, the results of operations, changes in stockholders' equity, cash flows, and financial condition of Sellers for the periods covered thereby.

4.6     Title to Acquired Real Property

(a)     Schedule 2.1(a)-1 sets forth a complete and correct list of all material real property owned in whole or in part (and states the ownership percentage of all partially owned real property) by Sellers and used in connection with the Business.  With respect to the Owned Real Property:  (i) the applicable Seller has good and marketable title, free and clear of all Liens other than Permitted Liens; (ii) Sellers have not leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any material portion thereof which is still in effect, other than the granting of Permitted Liens; and (iii) Sellers' have not granted any outstanding options, rights of first refusal, rights of first offer, rights of reverter or other third party rights to purchase such Owned Real Property, other than the granting of Permitted Liens.

(b)     Schedule 2.1(a)-2 sets forth a complete and correct list of all material leases, ground leases, subleases, licenses, options or other agreements related to Leased Real Property.  Each lease, ground lease, sublease, license, option or other agreement related to the Leased Real Property to which any Seller is a party is a legal, valid, binding and enforceable obligation of the applicable Seller and, to the Knowledge of Sellers, each such lease, ground lease, sublease, license, option or other agreement is in full force and effect.  Sellers are not in

material default under any such leases, ground leases, subleases, licenses, options or other agreements, and no condition exists which (with notice or lapse of time or both) would constitute a default by any Seller thereunder or (to the Knowledge of Sellers) by the other parties thereto, in each case, other than such defaults as would not, individually or in the aggregate, have a Sellers Material Adverse Effect.  Sellers have not subleased or otherwise granted any Person the right to use or occupy any Leased Real Property which is still in effect.  Sellers have not collaterally assigned or granted any other security interest in the Leased Real Property or any interest therein which is still in effect.  Except for the Permitted Liens, there exist no Liens affecting the Leased Real Property created by, through or under Sellers, and to the Knowledge of Sellers, there exists no other Liens affecting any leasehold interest with respect to the Leased Real Property.

(c)     Each instrument related to the Entitled Real Property to which any Seller is a party is a legal, valid, binding and enforceable obligation of the applicable Seller except where the failure to be a legal, valid, binding or enforceable obligation would not, individually or in the aggregate, have a Sellers Material Adverse Effect and, to the Knowledge of Sellers, each such instrument is in full force and effect.  Sellers are not in material default under any such instruments, and no condition exists which (with notice or lapse of time or both) would constitute a default by any Seller thereunder or (to the Knowledge of Sellers) by the other parties thereto, in each case, other than such defaults as would not, individually or in the aggregate, have a Sellers Material Adverse Effect.  Sellers have not granted any Person the exclusive right to use or occupy any Entitled Real Property which is still in effect.  Sellers have not collaterally assigned or granted any other security interest in the Entitled Real Property or any interest therein which is still in effect.  Except for the Permitted Liens, there exist no Liens affecting the Entitled Real Property created by, through or under Sellers.

(d)     Except as would not, individually or in the aggregate, have a Sellers Material Adverse Effect, and subject to receipt of the Necessary Consents set forth on Schedule 4.3 and compliance with Section 6.12, (i) no Seller is in breach or default in any material respect under any of the easements or other exceptions to title disclosed in the Mystic Station Title Insurance Commitment, the Mystic 8&9 Title Insurance Commitment, or the Fore River Title Insurance Commitment (collectively, "Easements"), and, to the Knowledge of Sellers, the other parties to such Easements are not in breach or default in any material respect thereunder (and in each such case no event exists that with the passage of time or the giving of notice would constitute such material breach or default), and (ii) no Seller has received notice from any other party to any Easement of any threatened termination of any such Easement.

4.7     Title to Acquired Assets other than Acquired Real Property; Sufficiency.  Except for Permitted Liens, Sellers have good and valid title to the Acquired Assets (other than the Acquired Real Property, which is addressed in Section 4.6).  The Acquired Assets constitute all assets used or held for use by Sellers and their Affiliates in, and necessary and sufficient for, the operation of the Business as presently operated, except as would not, individually or in the aggregate, have a Sellers Material Adverse Effect.

4.8     Litigation.  Except as set forth on Schedule 4.8, as of the date hereof, there are no Proceedings pending or, to the Knowledge of Sellers, threatened in writing against or affecting any Seller, the Acquired Assets or the Business (other than the Chapter 11 Cases), which would

reasonably be expected to have, individually or in the aggregate, a Sellers Material Adverse Effect.

4.9    <u>Labor and ERISA Matters</u>

(a)    The Collective Bargaining Agreements are the only collective bargaining agreements that govern the terms and conditions of employment of any employees at the Facilities.  True and correct copies of the Collective Bargaining Agreements have heretofore been made available to Buyer.  Except as set forth on <u>Schedule 4.9(a)</u>, (i) no Seller has experienced any labor strikes or work stoppages by such employees during the two-year period preceding the Closing Date and to the Knowledge of Sellers, none is currently pending or threatened; (ii) no Seller has received written notice from any Governmental Entity of any charge, complaint or Proceeding against Seller pending or threatened before or by the National Labor Relations Board or any other Governmental Entity with respect to such employees; (iii) no arbitration, grievance or Proceeding arising out of or under the Collective Bargaining Agreements or any Law pertaining to employment is pending against Sellers or their respective Affiliates or, to the Knowledge of Sellers, threatened; and (iv) each Seller is in compliance in all material respects with the Collective Bargaining Agreement applicable to such Seller, as well as all Laws pertaining to employment.

(b)    <u>Schedule 4.9(b)</u> sets forth a true and complete list of all Benefit Plans. With respect to each Benefit Plan, Seller has delivered or made available to Buyer true and complete copies of the plan documents and any amendments thereto (or if the plan is not written, a written description thereof), any related trust or other funding vehicle, annual reports required to be filed with any Governmental Entity with respect to such plan, actuarial reports, funding and financial information returns and statements, plan summaries or summary plan descriptions, summary annual reports, booklets and personnel manuals, and any other reports or summaries required under ERISA, the Code, or other Laws and the most recent determination letter or approval letter received from the Internal Revenue Service with respect to each such plan intended to qualify under Section 401(a) or 501(c)(9) of the Code.

(c)    Each Benefit Plan is and has been operated in material compliance with the applicable provisions of ERISA, the Code and any other applicable federal or state Law, and no event or condition is occurring that would constitute such material non-compliance nor is there any present intent to cause any such event or condition to occur with respect to any Benefit Plan.

(d)    To the Knowledge of Sellers, neither the Sellers nor any ERISA Affiliate (i) has ever been required to contribute to any Benefit Plan that is or was a Multiemployer Plan within the last six years or (ii) has incurred any materiality liability under Title IV of ERISA that has not been paid in full.

(e)    Except as set forth on Schedule 4.9(e), with respect to any Benefit Plan that is subject to Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, none of the following has occurred or existed within the last six years, nor will any of the following occur or exist as a result of the transactions contemplated by this Agreement: (i) a failure to make any contribution (including, without limitation, any installment) required under Section

302 or 303 of ERISA or Section 412 of the Code; (ii) the filing of an application for a waiver described in Section 412(c) of the Code and Section 303 of ERISA; (iii) a "reportable event" within the meaning of ERISA Section 4043, for which the notice requirement is not waived by the regulations thereunder; (iv) an event or condition which presents a material risk of a plan termination or any other event that may cause the Sellers or any ERISA Affiliate to incur liability or have a lien imposed on its assets under Section 303(k) of ERISA; or (v) "unfunded benefit liabilities" within the meaning of ERISA Section 4001(a)(18).

4.10    <u>Environmental</u>.

(a)    None of the real properties currently or formerly owned, leased or operated by any Seller (including groundwater under such real properties) (the "<u>Properties</u>") is the subject of federal or state investigation regarding a release of any Hazardous Materials into the environment, nor, to the Knowledge of Sellers, have any Hazardous Materials been stored, used, or released, in a quantity or manner at or on the Properties or at any off-site location, which would reasonably be expected to result in any obligations to pay for or perform any remedial action, that would, individually or in the aggregate, have a Sellers Material Adverse Effect.

(b)    Sellers have not received any written or other notice from any Governmental Entity or any other Person regarding any pending or threatened Proceedings or other liability regarding the disposal of Hazardous Materials or any alleged violation of or other liability under Environmental Laws where such actions or proceedings would, individually or in the aggregate, have a Sellers Material Adverse Effect.

(c)    To the Knowledge of Sellers, no Seller has any liability in connection with any release of any Hazardous Materials into the environment or related to compliance with Environmental Laws, except where such liability would not, individually or in the aggregate, have a Sellers Material Adverse Effect.

(d)    The Air Emissions Credits and Allowances identified on <u>Schedule 2.1(m)</u> have been validly obtained by Sellers in compliance with applicable Environmental Laws.

(e)    Sellers have delivered or made available to Buyer complete and accurate copies of all material environmental reports, audits, and assessments prepared by or for the Sellers that are in the Sellers' possession, as well as all material correspondence with Governmental Authorities or other Persons relating to environmental conditions or environmental compliance matters at the Facilities and the Properties and concerning the operation of the Business.

4.11    <u>Taxes</u>.  Except as would not, individually or in the aggregate, have a Sellers Material Adverse Effect, each Seller has timely filed all Tax Returns required to be filed with the appropriate Tax Authority in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted, or to be obtained on behalf of, such Seller), and all such Tax Returns are complete and accurate.  Except as would not, individually or in the aggregate, have a Sellers Material Adverse Effect, all Taxes due and payable by each Seller have been paid.  Except as would not, individually or in the aggregate, have a Sellers Material Adverse Effect, (a) no audit of any such Tax Return of Seller is currently in progress by

any Tax Authority; and (b) no Tax deficiencies of any Seller are being claimed, proposed or assessed by any Tax Authority.

4.12    Compliance with Laws; Permits.  Sellers are in compliance with all applicable Laws, and no Seller has received any notice of any alleged violation of applicable Law, in each case, except where such failures to comply or violations would not, individually or in the aggregate, have a Sellers Material Adverse Effect.  Sellers hold all Permits necessary or required pursuant to applicable Law (including Environmental Laws) for the operation of the Business as presently conducted and for the ownership, lease or operation of the Business and the construction of any improvements currently under construction on the Acquired Real Property ("Material Licenses and Permits"), except for failures to hold or have such Material Licenses and Permits that would not, individually or in the aggregate, have a Sellers Material Adverse Effect.  All such Material License and Permits are listed on Schedule 2.1(d).  Except as set forth on Schedule 4.12, each such Material License and Permit is valid and in full force and effect, is not subject to any pending or, to the Knowledge of Sellers, threatened, Proceeding to revoke, cancel, suspend or declare such Material License and Permit invalid in any respect.  Holdings has delivered or made available to Buyer true, correct and complete copies of all Material Licenses and Permits.

4.13    Contracts.  Subject to receipt of the Necessary Consents set forth on Schedule 4.3 and compliance with Section 6.12, (i) each of the Assumed Contracts constitutes a valid and binding obligation of the applicable Seller and, to the Knowledge of Sellers, each other party thereto, (ii) no Seller is in breach or default in any material respect under any of the Assumed Contracts and, to the Knowledge of Sellers, the other parties to the Assumed Contracts are not in breach or default in any material respect thereunder (and in each such case no event exists that with the passage of time or the giving of notice would constitute such material breach or default), (iii) the Assumed Contracts may be transferred to Buyer or one of Buyer's Affiliates pursuant to this Agreement and will continue in full force and effect thereafter, in each case without breaching the terms thereof or resulting in the forfeiture or impairment of any material rights thereunder and (iv) no Seller has received notice from any other party to any Assumed Contract of any threatened termination of such Assumed Contract.  Holdings has delivered or made available to Buyer true, correct and complete copies of all Assumed Contracts.

4.14    Insurance Claims.  Sellers have within the past three (3) years reported all known material claims or incidences to the respective insurers that have issued current and prior insurance policies insuring the Facilities (either specifically or as part of a master insurance policy and whether relating to property, liability or workers' compensation) to the extent that any such claims or incidences would reasonably be expected to create a covered event under the terms and conditions of such policies.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Each of Guarantor and Buyer jointly and severally hereby represent and warrant to Sellers, as of the Agreement Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date), as follows:

5.1    Organization.  Each of Guarantor and Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.  Each of Guarantor and Buyer has all necessary corporate power and authority to own and operate its properties, to lease the property it operates under lease and to conduct its business.

5.2    Due Authorization, Execution and Delivery; Enforceability.  Each of Guarantor and Buyer has the requisite corporate power and authority to enter into, execute and deliver this Agreement and the other agreements contemplated hereby and to perform its obligations hereunder and has taken all necessary corporate action required for the due authorization, execution, delivery and performance by it of this Agreement.  This Agreement constitutes the legally valid and binding obligation of each of Guarantor and Buyer, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

5.3    Governmental Approvals.  Subject to the receipt of the Governmental Approvals set forth on Schedule 5.3 and the Sale Order having been entered by the Bankruptcy Court, none of the execution, delivery or performance of this Agreement by Guarantor or Buyer will require any consent of, authorization by, exemption from, filing with, or notice to any Governmental Entity or any other Person.

5.4    No Conflicts.  Subject to the receipt of the Governmental Approvals set forth on Schedule 5.3, the execution, delivery and performance of this Agreement by each of Guarantor and Buyer and the consummation of the transactions contemplated hereby, does not and will not (a) conflict with or result in any breach of any provision of its certificate of incorporation or bylaws or comparable governing documents, (b) conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give rise to any right of termination, acceleration or cancellation under, any material Contract of Buyer or Guarantor, or (c) result in a violation of any Law or Order applicable to it, except, in the case of clause (c), as would not, individually or in the aggregate, result in a Buyer Material Adverse Effect.

5.5    Availability of Funds.  Guarantor, as of the date hereof, has and Buyer, as of the Closing, will have sufficient funds available to it to pay the Purchase Price on the Closing Date and to enable Buyer to perform all of its obligations under this Agreement.

5.6    Adequate Assurances Regarding Executory Contracts.  Each of Buyer (or such of Buyer's Affiliates which will be assuming any Assumed Contract) and Guarantor is and will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

5.7    Condition and Location of Acquired Assets.  Except as otherwise expressly set forth in this Agreement, Buyer understands and agrees that the Acquired Assets are furnished "as is", "where is" and, subject only to the representations and warranties contained in Article 4, with all faults, limitations and defects (hidden and apparent) and, subject to the representations and warranties contained in Article 4, without any other representation or warranty of any nature whatsoever and without any guarantee or warranty (whether express or implied) as to their title,

quality, merchantability or their fitness for Buyer's intended use or a particular purpose or any use or purpose whatsoever.

5.8    Ownership.  Except as set forth in Schedule 5.8, neither of Guarantor or Buyer nor any of their respective Affiliates owns, directly or indirectly, a 10% or greater interest in any electricity generation facility overseen by ISO New England.

**ARTICLE 6**
**COVENANTS OF THE PARTIES**

6.1    Conduct of Business Pending the Closing.  During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement in accordance with its terms or the Closing (the "Interim Period"), Sellers shall, taking into account business exigencies arising as a result of Sellers' financial condition and status as filers under Chapter 11 of the Bankruptcy Code, carry on the Business in the ordinary course and, to the extent consistent therewith, use commercially reasonable efforts to preserve the Business intact and preserve the goodwill of and relationships with Governmental Entities, customers, suppliers, employees and others having business dealings with the Business.  Notwithstanding the first sentence of this Section 6.1, during the Interim Period, Sellers shall not, without the prior written consent of Buyer (not to be unreasonably withheld, delayed or conditioned):

(a)    modify, amend or terminate any Assumed Contract;

(b)    abandon any rights under any Assumed Contract or fail to honor or perform any Assumed Contract;

(c)    lease, license, surrender, relinquish, sell, transfer, convey, assign or otherwise dispose of any interest in any Acquired Assets other than a *de minimis* part thereof in the Ordinary Course of Business;

(d)    mortgage, pledge or subject to Liens (other than Permitted Liens) any of the Acquired Assets;

(e)    except as required pursuant to the terms of any written agreements in effect on the Agreement Date or any Benefit Plan or as otherwise required by applicable Law, (i) enter into any new, or amend, terminate or renew any existing, employment, severance, consulting or salary continuation agreements with or for the benefit of any officers, directors or employees, in each case, other than  (A) in the Ordinary Course of Business or (B) the renewal or extension of the Collective Bargaining Agreement with BGNE without modification for one year; (ii) accelerate the vesting or payment of the compensation payable or the benefits provided or to become payable or provided to any of the employees, or any current or former directors, officers, consultants or service providers of Sellers, or otherwise pay any amounts not due to such individual, including with respect to severance; (iii) adopt, amend or terminate any Benefit Plan (including any employment, severance, consulting or other individual agreement) or adopt or enter into any other employee benefit plan or arrangement that would be considered a Benefit Plan if it were in existence on the date of this Agreement;

(f)    institute, settle or agree to settle any material Proceeding before any Governmental Entity relating to the Acquired Assets, or modify in any manner that is adverse to the Business or the Acquired Assets, rescind or terminate a Transferable Permit (or application therefor) relating to the Acquired Assets;

(g)    modify any existing rights under, or enter into any settlement regarding the breach, infringement, misappropriation or dilution of, any material Intellectual Property;

(h)    fail to maintain in full force and effect insurance policies covering the Acquired Assets, in form and amount consistent with past practice;

(i)    utilize, trade, sell or otherwise transfer any Allowances or Air Emissions Credit other than the surrender thereof to the extent required for the operation of the Facilities in compliance with applicable Law; or

(j)    enter into any Contract to do any of the foregoing.

Additionally, if Distrigas or the Distrigas Guarantor attempt or purport to terminate the Distrigas Agreement or the Distrigas Agreement Guaranty, or otherwise object to the assumption thereof by Sellers or the assignment thereof to Buyer, Sellers shall use commercially reasonable efforts to negotiate and litigate to cause the Distrigas Agreement and/or the Distrigas Guaranty Agreement to be assumed by Sellers and assigned to Buyer without modification

6.2    <u>Notification of Certain Matters</u>.  During the Interim Period, Holdings, on the one hand, and Buyer, on the other hand, shall notify such other Party of any event which would reasonably be expected to cause any of the conditions in Section 7.1 and Section 7.2, as applicable, not to be satisfied.

6.3    <u>No Solicitation of Alternative Transactions</u>.

(a)    Solely during the period commencing on the Agreement Date and continuing until the earlier of (x) the date that the Bankruptcy Court has entered the Bidding Procedures Order and (y) the termination of this Agreement in accordance with Article 8 (the "<u>No-Shop Period</u>"), Sellers shall not (and shall cause their respective Representatives not to) directly or indirectly (i) solicit, initiate, intentionally encourage, respond to, or take any other action designed to solicit an Alternative Transaction, (ii) enter into negotiations with respect to, or execute, any letter of intent, agreement in principle, acquisition agreement or other similar agreement related to any Alternative Transaction or (iii) furnish non-public information to any Person or entity with respect to an Alternative Transaction.  From and after the date the Bidding Procedures Order is entered by the Bankruptcy Court and until the entry of the Sale Order, Sellers are permitted, and are permitted to cause their Affiliates and Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with any Alternative Transaction.  In addition, Sellers may supply information relating to the Business and the Acquired Assets to prospective purchasers; <u>provided</u>, that no non-public information may be furnished until Sellers receive an

executed confidentiality agreement from any such Person containing terms and provisions as described in the Bidding Procedures.

(b)      If an Auction is conducted, and Buyer is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Successful Bidder"), Buyer shall be required to serve as the back-up bidder if Buyer is the next highest or otherwise best bidder at the Auction (such party that is the next highest or otherwise best bidder at the Auction, the "Back-Up Bidder") and, if Buyer is the Back-Up Bidder, Buyer shall, notwithstanding Section 8.1(b)(iii), be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by the Buyer in the Auction) open and irrevocable until the Outside Back-Up Date.  Following the Auction, if the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, then Buyer, if Buyer is the Back-Up Bidder, will be deemed to have the new prevailing bid, and Sellers will be authorized, without further order of the Bankruptcy Court, to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by the Buyer in the Auction) with the Back-Up Bidder.

6.4      Access.  Subject to applicable Law, during the Interim Period, Sellers (a) shall give Buyer and its Representatives reasonable access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel and other representatives, books and records of Sellers, (b) shall furnish to Buyer and its Representatives such financial, operating and property data related to the Acquired Assets and other information as Buyer and its Representatives reasonably request, and (c) shall cooperate reasonably with Buyer in its investigation of the Business.  It is acknowledged and understood that no investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or other agreement given or made by Sellers hereunder.  Buyer agrees that any on-site inspections of any Acquired Real Property shall be conducted in the presence of Sellers or their Representatives.  All inspections shall be conducted so as not to interfere unreasonably with the use of the Acquired Real Property by Sellers.  Buyer agrees to indemnify and hold Sellers and their Affiliates and their respective Representatives harmless of and from all actions, suits, claims, investigations, fines, judgments, damages, losses, deficiencies, liabilities, costs and expenses (including attorneys' fees and expenses) that arise out of or relate to physical injuries arising from Buyer's inspection of the Acquired Assets (other than to the extent any of the foregoing results from the gross negligence or the willful misconduct of the Person seeking such indemnification), and notwithstanding anything to the contrary in this Agreement, such obligation to indemnify shall survive Closing or any termination of this Agreement.  All information obtained pursuant to this Section 6.4 shall be subject to the terms and conditions of the Confidentiality Agreement.

6.5      Public Announcements.  Buyer and Sellers will consult with each other before issuing, and provide each other the opportunity to review and comment upon, any press release or public announcement of this Agreement and the transactions contemplated hereby, and neither Buyer nor any Seller shall issue any such press release or public announcement without the prior approval of the other Party, in each case except as may be required by Law, court process (including the filing of this Agreement with the Bankruptcy Court as an exhibit to the Sale

Motion) or by obligations pursuant to any listing agreement with any national securities exchange.  Buyer and each Seller shall cause its Affiliates and Representatives to comply with this Section 6.5.

6.6    Tax Matters.

(a)    All Transfer Taxes arising out of the transfer of the Acquired Assets pursuant to this Agreement shall be borne by Buyer.  Sellers and Buyer shall cooperate to timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes.  Buyer or Sellers, as applicable, shall file all necessary documentation and returns with respect to such Transfer Taxes when due, and shall promptly, following the filing thereof, furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax to the other Parties hereto.  Buyer shall pay all such Transfer Taxes when due.  Notwithstanding the foregoing, the Parties shall petition the Bankruptcy Court to provide that the sale, transfer, assignment and conveyance of the Acquired Assets to Buyer hereunder shall be entitled to the protections afforded under Section 1146(a) of the Bankruptcy Code, and Buyer shall either be reimbursed by Sellers with respect to any Transfer Taxes paid by Buyer and reimbursed to Sellers that are not required to be paid as a result of the Bankruptcy Code Section 1146(a) or that are refunded to Sellers.

(b)    All Property Taxes with respect to the Acquired Assets shall be borne by Buyer.  Buyer shall file all Tax Returns relating to Property Taxes with respect to the Acquired Assets that are required to be filed after the Closing Date.

(c)    Each of Buyer, on the one hand, and Sellers, on the other hand, shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Business as is reasonably necessary for filing of all Tax Returns, including any claim for exemption or exclusion from the application or imposition of any Taxes, the preparation for any audit by any Tax Authority and the prosecution or defense of any Proceeding relating to any Tax Return.

6.7    Approvals; Commercially Reasonable Efforts; Notification; Consent.

(a)    Subject to the terms and conditions of this Agreement, each Party shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable under applicable Law to consummate and make effective the transactions contemplated by this Agreement.  Without limiting the generality of the foregoing, the Parties will use their respective commercially reasonable efforts to (i) prepare and file as soon as practicable all forms, registrations and notices relating to the Governmental Approvals set forth on Schedule 4.3 and Schedule 5.3 that are required by applicable Law to be filed in order to consummate the transactions contemplated hereby (in each case within than ten (10) days following the date of this Agreement), and take such actions as are reasonably necessary to obtain any consents from, or to avoid any action or proceeding by, any Governmental Entity relating to the Governmental Approvals, including any Notification and Report Forms in connection with the HSR Act, any application pursuant to Section 203 of the Federal Power Act,

36

any application by Buyer to obtain market-based rate authorization under Section 205 of the Federal Power Act and any notifications or approvals required under Environmental Law, including notifications and approvals necessary to transfer permits, licenses and other authorizations required under Environmental Law, (ii) take all actions necessary to cause all conditions set forth in Article 7 to be satisfied as soon as practicable and (iii) execute and deliver any additional instruments necessary to fully carry out the purposes of this Agreement. Buyer agrees to use its commercially reasonable efforts to defend through litigation on the merits any claim asserted in court by any party in order to avoid entry of, or to have vacated or terminated, any decree, order or judgment (whether temporary, preliminary or permanent) that would prevent the Closing from occurring as promptly as practicable. Buyer and Sellers shall not, and shall cause their respective Affiliates not to, take any action that could reasonably be expected to adversely affect the approval of any Governmental Entity of any of the filings referred to in this Section 6.7(a).

(b)    Each Party shall (i) respond as promptly as reasonably practicable to any inquiries or requests for additional information and documentary material received from any Governmental Entity relating to the Governmental Approvals, (ii) not extend any waiting period or agree to refile under the HSR Act (except with the prior written consent of the other Parties hereto, which consent shall not be unreasonably withheld, conditioned or delayed) and (iii) not enter into any agreement with the any Governmental Entity agreeing not to consummate the transactions contemplated by this Agreement.

(c)    In connection with and without limiting the foregoing, each Party shall, subject to applicable Law and except as prohibited by any applicable representative of any applicable Governmental Entity: (i) promptly notify the other Parties of any material written communication to that Party from any Governmental Entity concerning this Agreement or the transactions contemplated hereby, and permit the other Parties to review in advance (and to consider any comments made by the other Parties in relation to) any proposed written communication to any of the foregoing, (ii) not participate in or agree to participate in any substantive meeting, telephone call or discussion with any Governmental Entity in respect of any filings, investigation or inquiry concerning this Agreement or the transactions contemplated hereby unless it consults with the other Parties in advance and, to the extent permitted by such Governmental Entity, gives the other Parties the opportunity to attend and participate in such meeting, telephone call or discussion and (iii) subject to the attorney-client and similar applicable privileges, furnish outside legal counsel for the other Parties with copies of all correspondence, filings, and written communications (and memoranda setting forth the substance thereof) between such Party and its Affiliates and their respective Representatives, on the one hand, and any Governmental Entity or its members or their respective staffs, on the other hand, with respect to this Agreement and the transactions contemplated hereby.

6.8    <u>Employee Matters</u>.

(a)    <u>Represented Employees</u>.  Buyer shall offer employment, commencing on the Closing Date, to all employees of Sellers who are covered by the Collective Bargaining Agreements and who are employed in the operation of the Business as of the Closing Date, in each case as set forth on <u>Schedule 6.8(a)</u> to be delivered by Sellers to Buyer no later than five (5) days prior to the Closing Date, under terms and conditions in accordance with the applicable

Collective Bargaining Agreement.  For the avoidance of doubt, Buyer shall recognize all increases in wages made in the ordinary course of business and in accordance with the Collective Bargaining Agreement between the Agreement Date and the Closing Date.  Those employees who accept such offer of employment are hereinafter referred to as the "Represented Employees."  All such offers of employment shall be made in accordance with all applicable Laws and the terms of the applicable Collective Bargaining Agreement.  Effective as of the Closing Date, Buyer shall agree to be bound by the Collective Bargaining Agreements, and to thereafter comply with all applicable obligations thereunder.

(b)    Non-Represented Plant Employees.  Buyer shall offer employment, commencing on the Closing Date, to each employee of Sellers employed in the operation of the Business as of the Closing Date who is not represented by a Collective Bargaining Agreement, in each case as set forth on Schedule 6.8(a) to be delivered by Sellers to Buyer no later than five (5) days prior to the Closing Date, for a period of at least twelve months (the "Minimum Employment Period"), at aggregate levels of wages and overall compensation that is comparable or substantially similar, in the aggregate, to the level of wages and overall compensation in effect for such employee as of the Closing Date; provided that Buyer shall recognize all increases in wages made in the ordinary course of business between the Agreement Date and the Closing Date.  Those employees who accept such offer of employment are hereinafter referred to as the "Non-Represented Employees."  All such offers of employment shall be made in accordance with all applicable Laws.

(c)    With respect to its employee benefit plans, programs and policies, Buyer shall recognize for purposes of participation, eligibility and vesting the service of any Non-Represented Employee with Sellers prior to the Closing Date.  Buyer shall waive pre-existing condition requirements, evidence of insurability provisions, waiting period requirements or any similar provisions under any employee benefit plan or compensation arrangements maintained or sponsored by or contributed to by Buyer for such Non-Represented Employees after the Closing Date to the extent that such requirements or provisions were waived or satisfied under the applicable plan or arrangement of Sellers as of the Closing Date.  Buyer shall apply toward any deductible requirements and out-of-pocket maximum limits under its employee welfare benefit plans any deductibles or co-insurance paid by each Non-Represented Employee under Sellers' welfare benefit plans during the current plan year.

(d)    Nothing in this Section 6.8 shall create any third party beneficiary right in any Person other than the parties to this Agreement, including any current or former Employee, any participant in any Benefit Plan, or any dependent or beneficiary thereof, or any right to continued employment with any Seller, Buyer or any of their respective Affiliates.  Nothing in this Section 6.8 shall constitute an amendment to any Benefit Plan or any other plan or arrangement covering any Employees.  Sellers and Buyer shall each cooperate with the others and shall provide to the others such documentation, information and assistance as is reasonably necessary to effect the provisions of this Section 6.8.

(e)    Buyer and Sellers shall cooperate with each other in transitioning the Employees from Sellers to Buyer or one of its Affiliates pursuant to this Section 6.8.

6.9     _Further Assurances_.  Subject to the terms and conditions herein provided, following the Closing Date, Sellers shall execute and deliver to Buyer such bills of sale, endorsements, assignments and other good and sufficient instruments of assignment, transfer and conveyance, in form and substance reasonably satisfactory to Buyer, and take such additional actions as Buyer may reasonably request to vest in Buyer all of Sellers' right, title and interest in and to the Acquired Assets.  Seller and Buyer shall also cooperate in the transition of operational matters in respect of the Facilities.

6.10     _Post-Closing Wind-Up_.  As promptly as reasonably practicable after the Closing, Sellers shall take such actions as may be required or advisable (which may involve the formation of a liquidation trust or similar vehicle) to avoid the use of any trade names or other property that is an Acquired Asset (including amending their organization documents to change their names) and to accomplish the liquidation and winding-up of their estates (the "_Wind-Up_") as expeditiously and as efficiently as reasonably possible.  At the request of Buyer, Sellers will keep Buyer apprised of all material developments with respect to the Acquired Assets and Assumed Liabilities in the course of the Wind-Up and will promptly comply with any reasonable requests by Buyer for information relating thereto.

6.11     _Bankruptcy Court Filings_.

(a)     Sellers shall use commercially reasonable efforts to pursue the entry of the Bidding Procedures Order and the Sale Order.  Sellers shall use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules and the Asset Sale Guidelines in connection with obtaining approval of the Bidding Procedures Order and the Sale Order.  Sellers shall consult with Buyer and its Representatives concerning the Bidding Procedures Order, the Sale Order, any other Orders of the Bankruptcy Court relating to the transactions contemplated herein, and the bankruptcy proceedings in connection therewith, and provide Buyer with copies of applications, pleadings, notices, proposed Orders and other documents relating to such proceedings as soon as reasonably practicable.

(b)     Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bidding Procedures Order and the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code; _provided_, _however_, in no event shall Buyer or Sellers be required to agree to any amendment of this Agreement.

(c)     No later than ten (10) Business Days after the Agreement Date, Sellers shall file a motion seeking entry by the Bankruptcy Court of the Sale Motion, including all supporting pages, and shall use their commercially reasonable efforts to have the Bankruptcy Court enter the Bidding Procedures Order within forty-five (45) days from the filing date of the Sale Motion, subject to availability of the Bankruptcy Court (and only to the extent permitted by

the Asset Sale Guidelines and the relevant provisions of the Bankruptcy Rules and Local Bankruptcy Rules).

(d)      Sellers acknowledge and agree that Buyer has expended considerable time and expense in connection with this Agreement, and the negotiation thereof, and the identification and quantification of assets to be included in the Acquired Assets.  In consideration therefor, the Sale Motion shall include a request from Sellers that the Bankruptcy Court approve the Break-Up Fee and Reimbursable Expenses as administrative priority expenses under sections 503(b) and 507(a)(1) of the Bankruptcy Code pursuant to the Bidding Procedures Order.

(e)      Sellers shall use their commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order no later than ninety (90) days after the Petition Date (or as soon thereafter as the Bankruptcy Court's schedule permits in the event that Sellers timely moved the Bankruptcy Court to enter the Sale Order by the aforementioned deadline).  The Sale Order will provide, among other things, that pursuant to sections 105, 363 and 365 of the Bankruptcy Code:

(i)      the Acquired Assets shall be sold to Buyer free and clear of all liens, claims, interests, and encumbrances, including without limitation, Liens as defined herein, of any type whatsoever (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, Law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability) (except for Permitted Liens), and the Assumed Liabilities shall be assumed by Buyer, in each case, pursuant to this Agreement;

(ii)      Sellers shall assign to Buyer, or to such Affiliates of Buyer as Buyer shall designate prior to Closing with respect to certain of the Assumed Contracts, all of the Assumed Contracts as of the Closing Date pursuant to such Order;

(iii)      Sellers and Buyer (to the extent provided in Section 6.12) shall, on or before the Closing Date or such other date ordered by the Bankruptcy Court, pay the Cure Amounts to the appropriate parties as ordered by the Bankruptcy Court so as to permit the assumption and assignment of each applicable Assumed Contract;

(iv)      Buyer or the applicable Affiliate of Buyer shall be found to have demonstrated and established any adequate assurance of future performance before the Bankruptcy Court with respect to the Assumed Contracts;

(v)      the transactions contemplated by this Agreement were negotiated at arm's length, that Buyer acted in good faith in all respects and Buyer shall be found to be a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code;

(vi)      the terms and conditions of the sale of the Acquired Assets to Buyer as set forth herein are approved;

(vii)    Sellers hold good and indefeasible title to the Acquired Assets;

(viii)    that the total consideration provided by Buyer hereunder constitutes fair value for the Acquired Assets;

(ix)    Buyer is acquiring none of the Excluded Assets;

(x)    notice of the transactions contemplated hereby was adequate and proper under the circumstances and to the extent possible was provided to all creditors and parties in interest required to receive such notice pursuant to the Bankruptcy Rules or Order of the Bankruptcy Court, including any and all creditors holding claims, Liens, interests or encumbrances on the Acquired Assets or any of them;

(xi)    Sellers are authorized and directed to consummate the transactions contemplated by this Agreement and to comply in all respects with the terms of this Agreement;

(xii)    the sale process conducted by Sellers and/or its agents (including any auction or bid solicitation process) was non-collusive, fair and reasonable and was conducted in good faith;

(xiii)    Buyer and Sellers did not engage in any conduct which would allow the transactions contemplated by this Agreement to be set aside pursuant to Section 363(n) of the Bankruptcy Code;

(xiv)    Buyer shall have no liability or responsibility for any liability or other obligation of Sellers arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor Law, de facto merger or substantial continuity, and to the fullest extent permissible under the Bankruptcy Code and applicable Law, that Buyer is not a successor to, or otherwise liable for, the debts or obligations of Seller, including without limitation, any Claims for injuries or losses suffered to any persons or property for incidences or circumstances that occurred before the Closing, any environmental Claims or any labor or employment Claims other than as specifically set forth in this Agreement with respect to the Assumed Liabilities, and that any action threatened or commenced or claim made against Buyer in respect of the Excluded Liabilities of Seller is and shall be enjoined;

(xv)    the Bankruptcy Sale Order is binding upon any successors to Sellers, including any trustees in respect of Sellers or the Acquired Assets in the case of any proceeding under Chapter 7 of the Bankruptcy Code;

(xvi)    Seller shall be authorized to enter into the Transition Services Agreement;  and

(xvii)    Buyer shall have no liability for any Excluded Liability.

In the event the Sale Order is appealed, Sellers and Buyer shall use their respective commercially reasonable efforts to defend such appeal at their own cost and expense.

41

(f)     Sellers further covenant and agree that, after the entry of the Sale Order, the terms of any reorganization or liquidation plan it submits to the Bankruptcy Court, or any other court for confirmation or sanction, shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

6.12    <u>Cure Amounts</u>.  Sellers shall transfer and assign all Assumed Contracts to Buyer or an Affiliate of Buyer designated by Buyer, and Buyer or such designated Affiliate of Buyer shall assume all Assumed Contracts from Sellers, as of the Closing Date pursuant to section 365 of the Bankruptcy Code and the Sale Order.  As promptly as practicable following the date hereof, Buyer and Sellers shall use commercially reasonable efforts to cooperate and determine the amounts required to cure all defaults under each Assumed Contract so as to permit the assumption and assignment of each such Assumed Contract pursuant to section 365 of the Bankruptcy Code in connection with the transactions contemplated in this Agreement (as ultimately determined by the Bankruptcy Court, the "<u>Cure Amounts</u>").  In connection with the assignment and assumption of the Assumed Contracts, Sellers shall cure any defaults under the Assumed Contracts by payment of any Cure Amounts (or create reserves therefor) as ordered by the Bankruptcy Court ; <u>provided</u>, <u>however</u>, that Buyer shall be responsible for the payment of any Cure Amounts or other costs that arise as a result of Buyer modifying <u>Schedule 2.1(c)</u> after the signing of this Agreement to add other Contracts to <u>Schedule 2.1(c)</u> (the "<u>Additional Contracts</u>").  Buyer shall be additionally responsible for any and all the expenses incurred by the Sellers from the date the Sale Order is entered through and including the date on which an order is entered rejecting the Additional Contracts.  Notwithstanding the payment of the Cure Amounts by Sellers or Buyer (if applicable), Buyer or its designated Affiliate shall be responsible for demonstrating and establishing adequate assurance of future performance before the Bankruptcy Court with respect to the Assumed Contracts.  For the avoidance of doubt, neither Buyer nor any Affiliate of Buyer shall have any Liability for any Cure Amounts related to any Assumed Contract except as provided in this Section 6.12.

6.13    <u>Preservation of Records</u>.  After the Closing Date, Buyer shall provide to Sellers (including, any trust established under a chapter 11 plan of Sellers or any other successors of Sellers) and their respective Affiliates and Representatives (after reasonable notice and during normal business hours and without charge to Sellers other than the costs of copying, if any) access to, including the right to make copies of, all Records included in the Acquired Assets for periods prior to the Closing and shall preserve such Records until the later of (i) such period as shall be consistent with Guarantor's records retention policy in effect from time to time, (ii) the required retention period required by applicable Law, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (iv) in the case of Records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes.  Such access shall include access to any information in electronic form to the extent reasonably available.  Buyer acknowledges that Sellers have the right to retain originals or copies of all of Records included in the Acquired Assets for periods prior to the Closing.  With respect to any Claims related to Excluded Liabilities, Buyer shall render all reasonable assistance that Sellers may request in defending such Claim (at Sellers' expense) and shall make available to Sellers personnel most knowledgeable about the matter in question.

6.14    Risk of Loss.  Except as otherwise provided in this Section 6.14, during the Interim Period all risk of loss or damage to the property included in the Acquired Assets shall, as between Buyer and Sellers, be borne by Sellers.  If during the Interim Period the Acquired Assets are damaged by fire or other casualty (each such event, an "Event of Loss"), or are taken by a Governmental Entity by exercise of the power of eminent domain (each, a "Taking"), then the following provisions of this Section 6.14 shall apply:

(a)    In the case of the occurrence of (i) any one or more Events of Loss, as a result of which the aggregate costs to restore, repair or replace the Facilities or the Acquired Assets subject to such Event of Loss to a condition substantially equivalent to their prior condition, and the amount of any lost profits reasonably expected to accrue after Closing as a result of such Event of Loss, less any insurance proceeds received by Sellers in connection with such Event or Events of Loss (provided that any insurance proceeds received in connection with an Event or Events of Loss are either used to restore, repair or replace such Event or Events of Loss or made available to Buyer) and less any Tax benefits actually realized by Buyer in connection with such Event or Events of Loss, such amount pursuant to this clause (i) to be determined by an independent third party appraiser selected by Buyer and reasonably acceptable to Sellers (collectively, "Restoration Costs") and/or (ii) any one or more Takings, as a result of which the value of the property subject to such Taking and the amount of any lost profits reasonably expected to accrue after Closing as a result of such Taking, less any condemnation award received by Buyer (provided that any such condemnation award is made available to Buyer) and less any Tax benefits actually realized by Buyer in connection with such Taking, such amount pursuant to this clause (ii) to be determined by an independent third party appraiser selected by Buyer and reasonably acceptable to Sellers (collectively, the "Condemnation Value"), if the sum of all Restoration Costs and Condemnation Value, in the aggregate, is less than or equal to one percent (1%) of the Base Purchase Price, such Event of Loss and/or Takings shall have no effect on the transactions contemplated hereby.

(b)    Subject to the termination right of Buyer and Sellers set forth in clause (d) below, upon the occurrence of any one or more Events of Loss and/or Takings involving aggregate Restoration Costs and Condemnation Value in excess of one percent (1%) of the Base Purchase Price (a "Major Loss"), Sellers shall have, in the case of a Major Loss relating solely to one or more Events of Loss, the option, exercised by notice to Buyer, to restore, repair or replace the damaged Acquired Assets prior to Closing to a condition substantially equivalent to their prior condition.  If Sellers elect to so restore, repair or replace the Acquired Assets relating to a Major Loss, which election shall be made by notice to Buyer prior to the Closing Date and as soon as practicable following the occurrence of the Major Loss, Sellers will complete or cause to be completed the repair, replacement or restoration of the damaged Acquired Assets prior to the Closing and the Closing Date shall be postponed for the amount of time reasonably necessary to complete the restoration, repair or replacement of such Acquired Assets as reasonably agreed among Buyer and Sellers (including, if necessary, the extension of the date contemplated by Section 8.1(b)(i) to allow for the restoration, repair or replacement of such Acquired Assets).  If Sellers elect not to cause the restoration, repair or replacement of the Acquired Assets affected by a Major Loss, or such Major Loss is the result in whole or in part of one or more Takings or is otherwise not capable of being restored, repaired or replaced, the provisions of Section 6.14(c) will apply.

43

(c)    Subject to the termination right of Buyer and Sellers set forth in clause (d) below, in the event that Sellers elect not to cause the restoration, repair or replacement of a Major Loss, or in the event that Sellers, having elected to cause repair, replacement or restoration of the Major Loss, fail to cause its completion within the period of time agreed upon by the Parties pursuant to Section 6.14(b), or in the event that a Major Loss is the result in whole or in part of one or more Takings or is otherwise not capable of being restored, repaired or replaced, then the Parties shall, within thirty (30) days following Sellers' election not to cause the restoration, repair or replacement, failure to complete, or the occurrence of such Major Loss, as the case may be, adjust the Purchase Price by the aggregate Restoration Cost and Condemnation Value related thereto, as mitigated by any repair, replacement or restoration work actually completed by Sellers, on the Acquired Assets being sold to Buyer, and proceed to Closing (in which case all insurance proceeds and/or condemnation awards related to such Major Loss shall be assigned to Buyer).  To assist Buyer in its evaluation of any and all Events of Loss, Sellers shall provide Buyer such access to the Acquired Assets and such information as Buyer may reasonably request in connection therewith.

(d)    In the event that the aggregate Restoration Costs and Condemnation Value with respect to one or more Events of Loss and/or Takings equals an amount in excess of ten percent (10%) of the Base Purchase Price, then either Buyer or Sellers shall have the right to terminate this Agreement upon Notice to the other Parties.

6.15    No Reliance.

(a)    Buyer acknowledges that it has conducted to its satisfaction an independent investigation of the business, operations, technology, assets, prospects, financial condition, liabilities, results of operations and projected operations of the Business and the nature and condition of Sellers' properties, assets and businesses and, in making the determination to proceed with the transactions contemplated by this Agreement, has relied solely on the results of its own independent investigation and the representations and warranties set forth in this Agreement.  Buyer acknowledges that Sellers have provided Buyer with access to the personnel, properties, premises and books and records of the Business.  In entering into this Agreement, Buyer has relied solely upon its own investigation and analysis, and Buyer acknowledges that none of Sellers, their respective Affiliates or any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information (including any projections, estimates or other forward-looking information) regarding Sellers, the Acquired Assets, the Business or other matters that is not expressly and specifically included in this Agreement (including in any management presentations, information memorandum, supplemental information or other materials or information with respect to any of the above).  Without limiting the generality of the foregoing, none of Sellers, their respective Affiliates or any other Person has made a representation or warranty to Buyer with respect to (a) any projections, estimates or budgets for the Business or (b) any material, documents or information relating to Sellers, the Acquired Assets, the Business or other matters that is not expressly and specifically included in this Agreement made available to Buyer or its Representatives in any "data room", offering memorandum or otherwise, except as expressly and specifically covered by a representation or warranty set forth in Article 4.  Buyer agrees, to the fullest extent permitted by Law, that Sellers and their respective Affiliates and Representatives shall not have any liability or responsibility whatsoever to Buyer or its Affiliates or any of their respective

Affiliates or Representatives on any basis (including in contract or tort, under federal or state securities laws or otherwise) based upon any information provided or made available, or statements made (or any omissions therefrom), to Buyer or its Affiliates or any of their respective Affiliates or Representatives, except as and only to the extent expressly set forth in Article 4 with respect to such representations and warranties and subject to the limitations and restrictions contained in this Agreement.

(b)    In connection with Buyer's and Guarantor's investigation of the Business, Buyer and Guarantor have received from Sellers and their respective Affiliates, agents and Representatives certain projections and other forecasts, including certain business plan information of the Business.  Buyer acknowledges that there are uncertainties inherent in attempting to make such projections and other forecasts and plans and accordingly is not relying on them, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections and other forecasts and plans so furnished to it, and that Buyer and its Affiliates and Representatives shall have no claim against any Person with respect thereto.  Accordingly, Buyer acknowledges that, none of Sellers or their respective Representatives or Affiliates have made any representation or warranty with respect to such projections and other forecasts and plans.

6.16    Bulk Transfer Laws.  Each of Buyer and Guarantor acknowledge that Sellers will not comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waives all claims related to the non-compliance therewith.

6.17    Satisfaction of Assumed Liabilities.  Buyer agrees to pay, perform and discharge, or cause an Affiliate to pay, perform and discharge, the Assumed Liabilities as they become due, including the discharge and performance when due of each and every obligation of Sellers to be satisfied or performed on or after the Closing Date, under the Assumed Contracts (it being understood and agreed that the Assumed Liabilities shall not include any Cure Amounts other than as set forth in Section 6.12), and Buyer shall indemnify and hold the Seller Released Parties harmless with respect to the Assumed Liabilities.  Buyer shall not renew or extend, and shall cause its Affiliates to not renew or extend, (by action or inaction) any Assumed Contract unless Sellers have been released from all of their obligations under such Assumed Contract by all parties to such Assumed Contract.

6.18    Replacement Credit Support Requirements.  On or prior to the Closing Date, Buyer agrees to provide replacement guarantees, standby letters of credit or other assurances of payment with respect to the Credit Support Requirements set forth on Schedule 6.18, in form and substance reasonably satisfactory to Sellers and the respective banks or other counterparties, and Buyer and Sellers shall cooperate to obtain a release in form and substance reasonably satisfactory to Buyer and Sellers with respect to all Credit Support Requirements.

6.19    LTSA Matters.  Sellers shall give Notice to Buyer at least five (5) Business Days prior to the date that any scheduled payments are due and payable by Sellers under the LTSAs, and in the event Sellers fail to make such payments by such due date, Buyer shall be entitled to do so on behalf of Sellers.  Any such payments shall be reimbursed by Sellers to Buyer upon the

consummation of an Alternative Transaction, which reimbursement shall be included in the Bidding Procedures Order.

6.20   <u>Certain Disclosures</u>.  Sellers acknowledge and agree that within five (5) Business Days following the expiration or termination of any Specified Contract, Sellers shall provide to Buyer any information related to the termination value of such Specified Contract provided to Sellers by the counterparty or counterparties to such Specified Contract and Sellers and Buyer shall use their commercially reasonable efforts to agree on the appropriate cash amount related to such Specified Contract and the expiration or termination thereof.

## ARTICLE 7
## CONDITIONS TO OBLIGATIONS OF THE PARTIES

7.1   <u>Conditions Precedent to Obligations of Buyer</u>.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Buyer in Buyer's sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)   <u>Accuracy of Representations and Warranties</u>.  Each of the representations and warranties of Sellers contained herein shall be true and correct in all respects on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except to the extent that any such representation or warranty is expressly made as of a specified date, in which case such representation or warranty shall have been true and correct as of such date; <u>provided</u>, <u>however</u>, that the failure of any such representations or warranties to be true and correct on and as of the Closing Date shall not constitute a basis for Buyer to refuse to consummate the transactions contemplated hereby unless such failure, either individually or in the aggregate, has resulted in or would reasonably be expected to result in a Sellers Material Adverse Effect; <u>provided</u>, <u>further</u>, that for the purposes of this Section 7.1(a), all references to materiality or Sellers Material Adverse Effect in Article 4 shall be disregarded.

(b)   <u>Performance of Obligations</u>.  Sellers shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Closing Date.

(c)   <u>Officer's Certificate</u>.  Buyer shall have received a certificate, dated the Closing Date, of an executive officer of each Seller to the effect that the conditions specified in Sections 7.1(a) and (b) above have been fulfilled and/or waived.

(d)   <u>Approvals</u>.  (i) All Governmental Approvals required prior to Closing set forth on <u>Schedule 4.3</u> and <u>Schedule 5.3</u> shall have been obtained and (ii) there shall be no Law or Order that restrains or prevents the transactions contemplated by this Agreement.

(e)   <u>Bankruptcy Court Order</u>.  The Bankruptcy Court shall have entered the Sale Order and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

(f)    Cure Amounts.  Except with respect to those Cure Amounts that are the responsibility of Buyer pursuant to Section 6.12, Sellers shall have successfully cured any defaults under the Assumed Contracts that are being assumed and assigned at Closing by payment of any Cure Amounts (or shall have created reserves therefor) as ordered by the Bankruptcy Court, and Sellers shall have provided Buyer evidence thereof.

(g)    Sellers' Deliveries.  Sellers shall have delivered to Buyer all of the items set forth in Section 3.1(b).

7.2    Conditions Precedent to the Obligations of Sellers.  The obligation of Sellers to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Sellers) at or prior to the Closing Date of each of the following conditions:

(a)    Accuracy of Representations and Warranties.  Each of the representations and warranties of Buyer contained herein shall be true and correct in all respects on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except to the extent that any such representation or warranty is expressly made as of a specified date, in which case such representation or warranty shall have been true and correct as of such date; provided, however, that the failure of any such representations or warranties to be true and correct on and as of the Closing Date shall not constitute a basis for Sellers to refuse to consummate the transactions contemplated hereby unless such failure, either individually or in the aggregate, has resulted in or would reasonably be expected to result in a Buyer Material Adverse Effect; provided, further, that for the purposes of this Section 7.2(a), all references to materiality and Buyer Material Adverse Effect in Article 5 shall be disregarded.

(b)    Performance of Obligations.  Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Closing Date.

(c)    Officer's Certificate.  Sellers shall have received a certificate, dated the Closing Date, of an executive officer of Buyer to the effect that the conditions specified in Sections 7.2(a) and (b) above have been fulfilled and/or waived.

(d)    Approvals. (i) All Governmental Approvals required prior to Closing set forth on Schedule 4.3 and Schedule 5.3 shall have been obtained and (ii) there shall be no Law or Order that restrains or prevents the transactions contemplated by this Agreement.

(e)    Cure Amounts. Buyer shall have successfully cured any defaults under the Assumed Contracts that it is required to cure pursuant to Section 6.12 that are being assumed and assigned at Closing by payment of any Cure Amounts (or shall have created reserves therefor) as ordered by the Bankruptcy Court, and Buyer shall have provided Sellers evidence thereof.

(f)    Bankruptcy Court Order.  The Bankruptcy Court shall have entered the Sale Order and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

(g)    Buyer's Deliveries.  Buyer shall have delivered to Sellers all of the items set forth in Section 3.1(c).

# ARTICLE 8
# TERMINATION

8.1    Termination of Agreement.  This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)    by written agreement of Sellers and Buyer;

(b)    by either Sellers or Buyer:

(i)    if the Closing shall not have occurred on or before the date that is one hundred twenty (120) days after the date hereof; provided, however, that the terminating Party is not in material and willful breach of any of its representations and warranties contained in this Agreement and has not failed in any material respect to perform any of its obligations hereunder;

(ii)    if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or if any Order permanently restraining, prohibiting or enjoining Buyer or Sellers from consummating the transactions contemplated hereby is entered and such Order shall become final;

(iii)    subject to Section 6.3(b), upon the Bankruptcy Court's entry of an order approving an Alternative Transaction; or

(iv)    pursuant to, and in accordance with, Section 6.14(d);

(c)    by Buyer if (i) there shall have been a breach by any Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.1, or (ii) any other event or condition shall result in any Seller being incapable of satisfying one or more conditions set forth in Section 7.1, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within 30 days after written Notice thereof shall have been received by Sellers; provided, that Buyer is not in material breach of this Agreement as of such date;

(d)    by Sellers, if (i) there shall have been a breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.2, or (ii) any other event or condition shall result in Buyer being incapable of satisfying one or more conditions set forth in Section 7.2, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within 30 days after written Notice thereof shall have been received by Buyer; provided that any Seller is not in material breach of this Agreement as of such date;

(e)    by Buyer if the Bankruptcy Court shall not have:

(i)       issued the Bidding Procedures Order on or before the date that is forty-five (45) days following the Petition Date; provided, however, that this Agreement may not be terminated pursuant to this Section 8.1(e)(i) (A) in the event that Sellers timely moved the Bankruptcy Court to enter the Bidding Procedures Order, and the Bankruptcy Court's schedule is the reason that the entry of the Bidding Procedures Order has not occurred on or before said date or (B) the terminating party's breach of any of its representations and warranties contained in this Agreement and failure to perform any of its obligations hereunder is the reason that the entry of the Bidding Procedures Order has not occurred on or before said date; or

(ii)       issued the Sale Order on or before the date that is ninety (90) days following the Petition Date; provided, however, that this Agreement may not be terminated pursuant to this Section 8.1(e)(ii) (A) in the event that Sellers timely moved the Bankruptcy Court to enter the Sale Order, and the Bankruptcy Court's schedule is the reason that the entry of Sale Order has not occurred on or before said date or (B) the terminating party's breach of any of its representations and warranties contained in this Agreement and failure to perform any of its obligations hereunder is the reason that the entry of the Sale Order has not occurred on or before said date; or

(f)       by Buyer if the Petition Date does not occur on or before the date that is ten (10) Business Days after the date hereof.

8.2    Consequences of Termination.

(a)       In the event of any termination of this Agreement by either or both of Buyer and Sellers pursuant to Section 8.1, written Notice thereof shall be given by the terminating Party to the other Parties hereto, specifying the provision hereof pursuant to which such termination is made, this Agreement shall thereupon terminate and become void and of no further force and effect (other than Section 3.2(b), the last two sentences of Section 6.4, Section 6.5, Section 8.2 and Article 9 and to the extent applicable in respect of such Sections and Article, Article 1), and the transactions contemplated hereby shall be abandoned without further action of the Parties hereto, except that, subject to Section 8.2(b), such termination shall not relieve any Party of any Liability for willful breach of this Agreement.

(b)       Break-Up & Expense Reimbursement Amount.

(i)       Sellers shall, within two (2) Business Days after any termination of this Agreement pursuant to Section 8.1(b)(iii) or Section 8.1(c), reimburse Buyer for all of the reasonable out of pocket costs, fees and expenses incurred or to be incurred by Buyer or its Affiliates, including reasonable fees, costs and expenses of any professionals (including financial advisors, outside legal counsel, accountants, experts and consultants) retained by Buyer or its Affiliates in connection with or related to the authorization, preparation, investigation, negotiation, execution and performance of this Agreement, the transactions contemplated hereby, including the Chapter 11 Cases and other judicial and regulatory proceedings related to such transactions (such fees, costs and expenses, the "Reimbursable Expenses"); provided, that Buyer shall present reasonable supporting documentation with respect to all Reimbursable Expenses for which it desires reimbursement and provided, further, that in no event shall Sellers be required to pay Reimbursable Expenses in an amount greater than $5,000,000 in the aggregate.

(ii)     Sellers shall (A) within two (2) Business Days after any termination of this Agreement pursuant to Section 8.1(b)(iii), pay to Buyer a cash amount equal to $30,000,000 (the "Break-Up Fee"), (B) within two (2) Business Days after any termination of this Agreement pursuant to Section 8.1(c), pay to Buyer a cash amount equal to one half of the Break-Up Fee, solely to the extent that the breach or breaches of Sellers that formed the basis for such termination are each Willful Breaches or breaches that occurred prior to the date hereof and (C) after any termination of this Agreement pursuant to Section 8.1(c), pay to Buyer a cash amount equal to one half of the Break-Up Fee, solely to the extent (x) that the portion of the Break-Up Fee contemplated by clause (B) of this Section 8.2(b)(ii) has been paid and (y) within 12 months after the date of such termination, Sellers consummate an Alternative Transaction.

(iii)     Upon termination of this Agreement pursuant to Section 8.1, the Deposit Escrow, together with all accrued investment income or interest thereon, shall be delivered to any applicable Party as provided in Section 3.2(b).

(iv)     Sellers acknowledge and agree that (A) the payment of the Break-Up Fee (or a portion thereof, as the case may be) and the Reimbursable Expenses are integral parts of the transactions contemplated by this Agreement, (B) in the absence of Sellers' obligations to make these payments, Buyer would not have entered into this Agreement, (C) time is of the essence with respect to the payment of the Break-Up Fee (or a portion thereof, as the case may be) and the Reimbursable Expenses and (D) the Break-Up Fee (or a portion thereof, as the case may be) and the Reimbursable Expenses shall constitute an administrative expense of the Sellers' estates under Section 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code.  To the extent that all amounts due in respect of the Break-Up Fee (or a portion thereof, as the case may be) and the Reimbursable Expenses pursuant to this Section 8.2(b) have actually been paid by Sellers to Buyer, Buyer shall not have any additional recourse against any Seller or its Affiliates for any Liabilities relating to or arising from this Agreement.  Further, in connection with the payment of all amounts due in respect of the Break-Up Fee and the Reimbursable Expenses pursuant to this Section 8.2(b), Buyer shall execute and deliver to Sellers a general release of Sellers and their Affiliates, which shall fully discharge and release the others from any further Liability in respect of this Agreement and the transactions contemplated hereby.

# ARTICLE 9
## MISCELLANEOUS

9.1     Expenses.  Except as set forth in this Agreement and whether or not the transactions contemplated hereby are consummated, each Party hereto shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation of the transactions contemplated hereby.

9.2     Assignment.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Sellers without the prior written consent of Buyer, or by Buyer without the prior written consent of Sellers; provided, that Buyer may assign its rights and obligations to any Subsidiary so long as Buyer remains primarily liable for its obligations. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns including any liquidating

trustee, responsible Person or similar representative for Sellers or Sellers' estate appointed in connection with the Chapter 11 Cases.

9.3     Parties in Interest.  This Agreement shall be binding upon and inure solely to the benefit of Sellers and Buyer, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein.

9.4     Releases.

(a)     Effective as of the Closing, Buyer hereby releases and causes its Affiliates to release each Seller's respective Affiliates, and each of their respective officers, directors, managers and employees (in their capacity as such and for services provided to Sellers and their Affiliates), direct or indirect equityholders and non-employee agents and representatives (collectively, the "Seller Released Parties") from any and all Liabilities, actions, rights of action, contracts, indebtedness, obligations, claims, causes of action, suits, damages, demands, costs, expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time, in all circumstances arising prior to Closing, that any Buyer or its Affiliates and all such Persons' respective successors and assigns, have or may have against any of the Seller Released Parties; provided, that the foregoing shall not release any rights under this Agreement and other agreements contemplated hereby which expressly survive Closing.  Each Seller Released Party that is not a Party shall be considered a third party beneficiary of this Agreement with respect to any rights of indemnity or release provided herein.

(b)     Effective as of the Closing,  Sellers hereby release Buyer and its Affiliates, equityholders, directors, managers, officers, employees, agents and representatives of Buyer and its Affiliates (collectively, the "Buyer Released Parties") from any and all Liabilities, actions, rights of action, contracts, indebtedness, obligations, claims, causes of action, suits, damages, demands, costs, expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time, in all circumstances arising prior to Closing, that any Seller or its respective Affiliates and all such Persons' respective successors and assigns, have or may have against any of the Buyer Released Parties; provided, that the foregoing shall not release any rights under this Agreement and other agreements contemplated hereby which expressly survive Closing.

9.5     Notices.  All notices, demands, requests, consents, approvals or other communications (collectively, "Notices") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery, or facsimile or electronic mail, addressed as set forth below, or to such other address as such Party shall have specified most recently by written Notice.  Notice shall be deemed given on the date of service or transmission if personally served or transmitted by facsimile or electronic mail with confirmation of receipt; provided, that if delivered or transmitted on a day other than a Business Day or after 5:00 p.m. New York time, notice shall be deemed given on the next Business Day.  Notice otherwise sent as provided herein shall be

deemed given on the next Business Day following timely deposit of such Notice with an overnight delivery service:

|  |  |
|---|---|
| If to any Seller: | EBG Holdings LLC / Boston Generating, LLC<br>505 Fifth Avenue, 21st Floor<br>New York, NY 10017<br>Attention:  David Sheffey, Esq.<br>Email:  DSheffey@uspowergen.com |
| With copies to: | Latham & Watkins LLP<br>885 Third Avenue<br>New York, NY 10022<br>Attention: D.J. Baker, Esq.<br>         Robert Rosenberg, Esq.<br>         David Kurzweil, Esq.<br>Email:  dj.baker@lw.com<br>      robert.rosenberg@lw.com<br>      david.kurzweil@lw.com |
| If to Buyer: | CONSTELLATION HOLDINGS, INC.<br>100 Constellation Way<br>Baltimore, MD 21202<br>Attention: Andrew L. Good<br>Email: andrew.good@constellation.com |
| If to Guarantor: | CONSTELLATION ENERGY GROUP, INC.<br>100 Constellation Way<br>Baltimore, MD 21202<br>Attention: Andrew L. Good<br>Email: andrew.good@constellation.com |
| With copies:<br>(in either case) to: | CONSTELLATION ENERGY GROUP, INC.<br>100 Constellation Way<br>Baltimore, MD 21202<br>Attention: Charles A. Berardesco, Esq.<br><br>      and<br><br>Winston & Strawn LLP<br>200 Park Avenue<br>New York, NY 10166<br>Attention: Jonathan Birenbaum, Esq.<br>        David Neier, Esq.<br>Email: jbirenbaum@winston.com<br>      dneier@winston.com |

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

9.6    Choice of Law.  This Agreement shall be construed and interpreted, and the rights of the Parties shall be determined, in accordance with the Laws of the State of New York, without giving effect to any provision thereof that would require the application of the substantive laws of any other jurisdiction, except to the extent that such Laws are superseded by the Bankruptcy Code.

9.7    Entire Agreement; Amendments and Waivers.  This Agreement, the Confidentiality Agreement and all agreements entered into pursuant hereto and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement among the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties.  This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Buyer and Sellers, or in the case of a waiver, by the Party waiving compliance.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

9.8    Counterparts; Facsimile and Electronic Signatures.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Counterparts to this Agreement may be delivered via facsimile or electronic mail.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

9.9    Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

9.10    Headings.  The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

9.11    Exclusive Jurisdiction and Specific Performance.

(a)    Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all Proceedings related to the foregoing shall be filed and maintained only in the

Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive Notices at such locations as indicated in Section 9.5.

(b)    The Parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by Buyer in accordance with the specific terms contained herein or were otherwise breached by Buyer.  It is accordingly agreed that Sellers shall be entitled to an injunction or injunctions to prevent breaches or termination of this Agreement by Buyer and to enforce specifically the terms and provisions of this Agreement. The Parties further agree that Buyer shall not be entitled to an injunction or injunctions to prevent breaches or termination of this Agreement by Sellers or to enforce specifically the terms and provisions of this Agreement and that Buyer's sole and exclusive remedy with respect to any such breach shall be the remedy available to Buyer set forth in Section 8.2(b).

9.12    WAIVER OF RIGHT TO TRIAL BY JURY.  SELLERS AND BUYER HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

9.13    Guaranty.

(a)    Subject to the conditions and limitations as set forth below, Guarantor hereby absolutely, irrevocably and unconditionally guarantees, as principal and not as surety, to Sellers and their Affiliates and successors thereof, the due and punctual payment and performance of all obligations of Buyer under this Agreement (the guaranty obligations under this Section 9.13, collectively, the "Guarantied Obligations").

(b)    Guarantor guarantees that the Guarantied Obligations will be duly and punctually paid and fully and completely performed (in the case of performance, as if Guarantor were the primary obligor) in accordance with the terms of this Agreement.  If for any reason Buyer shall fail or be unable duly and punctually to pay or fully and completely to perform any Guarantied Obligation as and when the same shall become due or otherwise required, then Guarantor shall, subject to the terms and conditions of this Agreement, forthwith duly and punctually pay or fully and completely perform such Guarantied Obligation (in the case of performance, as if Guarantor was the primary obligor).  Guarantor further agrees that this Agreement, to the extent it requires the payment of money, constitutes a guaranty of payment when due and not of collection and is in no way conditioned or contingent upon any attempt to collect from Buyer.  Guarantor's liability under this Agreement shall be absolute, unconditional, irrevocable and continuing irrespective, without limitation, of:

(i)    any lack of validity or enforceability of this Agreement as a result of the application of any bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity to Buyer;

(ii)    any modification, amendment, consent, extension, forbearance or waiver of or any consent to departure from this Agreement that may be agreed to by Buyer;

(iii)    any action or inaction by Sellers under or in respect of this Agreement, or any failure, lack of diligence, omission or delay on the part of any Seller to enforce, assert or exercise any right, power or remedy conferred on any Seller in this Agreement;

(iv)    any merger or consolidation of the Parties or any other Person into or with any Person, or any sale, lease or transfer of any of the assets of the Parties or any other Person to any other Person;

(v)    any change in the ownership of any of the Parties or any Person; or

(vi)    any other occurrence, circumstance, happening or event, whether similar or dissimilar to the foregoing and whether foreseen or unforeseen, which otherwise might constitute a legal or equitable defense or discharge of the Liabilities of a guarantor or surety or which otherwise might limit recourse against Guarantor or any other Person;

provided, however, that in any event Guarantor shall in all events have the benefit of any rights (including any defenses) to which Buyer would be entitled in respect of the Guarantied Obligations.

(c)    Guarantor hereby unconditionally waives (i) any and all notices, including promptness, diligence, notice of acceptance of this Agreement and any other notice with respect to any of the Guarantied Obligations and this Agreement, (ii) any presentment, demand, performance, protest, notice of nonpayment as the same pertains to Buyer, suit or the taking of other action by any Seller against, and any other notice to, Buyer, Guarantor or others with respect to any of the Guarantied Obligations, (iii) any right to require any Seller to proceed against Buyer or to exhaust any security held by any Seller or to pursue any other remedy with respect to any of the Guarantied Obligations, (iv) any defense based upon an election of remedies by Sellers, unless the same would excuse performance by Buyer under this Agreement with respect to any of the Guarantied Obligations and (v) any duty of Sellers to advise Guarantor of any information known to Sellers regarding Buyer or its ability to perform under this Agreement with respect to any of the Guarantied Obligations.  Each Seller may at any time, and from time to time, without notice to, or consent of, Guarantor and without impairing or releasing the obligations of Guarantor hereunder, with respect to any of the Guarantied Obligations, (1) agree with Buyer to make any change in the terms of the Guarantied Obligations, (2) take or fail to take any action of any kind in respect of any security for the Guarantied Obligations, (3) exercise or refrain from exercising any rights against Buyer or others, or (4) compromise or subordinate the Guarantied Obligations, including any security therefor.  Any other suretyship defenses are hereby waived by Guarantor with respect to any of the Guarantied Obligations.

(d)    The provisions of this Section 9.13 shall continue to be effective or be reinstated, as the case may be, if (i) at any time and to the extent that any payment of any of the Guarantied Obligations is rescinded or must otherwise be returned by the payee thereof upon the insolvency, bankruptcy, reorganization or similar event of Buyer or Guarantor, all as though such payment had not been made, or (ii) the obligations of Guarantor under this Section 9.13 with respect to any of the Guarantied Obligations are released in consideration of a payment of money or transfer of property by Buyer or any other Person and to the extent that such payment, transfer or grant is rescinded or must otherwise be returned by the recipient thereof upon the insolvency,

bankruptcy, reorganization or similar event of Buyer, Guarantor or such other Person, all as though such payment, transfer or grant had not been made.

9.14    Survival.  Each and every representation and warranty contained in this Agreement shall expire and be of no further force and effect as of the Closing.  Each and every covenant and agreement contained in this Agreement (other than the covenants contained in this Agreement which by their terms are to be performed (in whole or in part) by the Parties following the Closing) shall expire and be of no further force and effect as of the Closing.

9.15    Computation of Time.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

9.16    Time of Essence.  Time is of the essence of this Agreement.

9.17    Non-Recourse.  No past, present or future director, manager, officer, employee, incorporator, member, partner or equity holder of any Seller shall have any Liability for any Liabilities of such Seller under this Agreement or for any claim based on, in respect of, or by reason of the transactions contemplated hereby and thereby.

9.18    Sellers' Representative; Dealings Among Sellers.  By its execution and delivery of this Agreement, each Seller hereby irrevocably constitutes and appoints Holdings as its true and lawful agent and attorney-in-fact (the "Sellers' Representative"), with full power of substitution to act in such Seller's name, place and stead with respect to all transactions contemplated by and all terms and provisions of this Agreement, and to act on such Seller's behalf in any Proceeding, and to do or refrain from doing all such further acts and things, and execute all such documents as the Sellers' Representative shall deem necessary or appropriate in connection with the transactions contemplated by this Agreement.  The appointment of the Sellers' Representative shall be deemed coupled with an interest and shall be irrevocable, and Buyer, its Affiliates and any other Person may conclusively and absolutely rely, without inquiry, upon any action of the Sellers' Representative on behalf of Sellers in all matters referred to herein or contemplated hereby including any direction regarding the amount of any payment to any Seller.  Buyer shall have no obligation of any nature whatsoever for determining any allocation of any payments among Sellers.  Without limiting the generality of the foregoing, absent specific direction by the Sellers' Representative, Buyer shall be deemed to have fulfilled its obligations hereunder absolutely with respect to any amounts payable by it under or pursuant to this Agreement or the delivery of any instruments if Buyer shall pay any such amounts or deliver such instruments to the Sellers' Representative.   All Notices delivered by Buyer (whether prior to or following the Closing) to the Sellers' Representative (whether pursuant hereto or otherwise) for the benefit of Sellers shall constitute valid and timely Notice to all of the Sellers.

9.19    Mutual Drafting.  This Agreement is the result of the joint efforts of Buyer and Sellers, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the Parties and there is to be no construction against any Party based on any presumption of that Party's involvement in the drafting thereof.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of Sellers and Buyer as of the date first above written

**BUYER**:

CONSTELLATION HOLDINGS, INC.

By: _____

Name:

Title:


**GUARANTOR**:

CONSTELLATION ENERGY GROUP, INC.

By: _____

Name:

Title:

**SELLERS**:

EBG HOLDINGS LLC

By: _____
Name:
Title:

BOSTON GENERATING, LLC

By: _____
Name:
Title:

MYSTIC I, LLC

By: _____
Name:
Title:

FORE RIVER DEVELOPMENT, LLC
By: _____
Name:
Title:

MYSTIC DEVELOPMENT, LLC

By: _____
Name:
Title:

BG BOSTON SERVICES, LLC

By: _____
Name:
Title:

BG NEW ENGLAND POWER SERVICES, INC.

By: _____
Name:
Title:

**[EXHIBIT B]**

LW TEAM DRAFT 8/10/2010 9:33 AM
SUBJECT TO F.R.E. 408
DO NOT FILE

D. J. Baker
Robert J. Rosenberg
Caroline A. Reckler (appearing *pro hac vice*)
Kimberly A. Posin (appearing *pro hac vice*)
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864

Proposed Counsel to the Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| EBG Holdings LLC, | Chapter 11 |
| <u>et al.</u>,[1] | Case No. 10-_____ (_____) |
| Debtors. | Joint Administration Requested |

**BIDDING PROCEDURES FOR THE SUBMISSION, RECEIPT
AND ANALYSIS OF BIDS IN CONNECTION WITH THE
<u>SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS</u>**

(the "**<u>Bidding Procedures</u>**")

These Bidding Procedures have been approved by the United States Bankruptcy Court for the Southern District of New York (the "**<u>Court</u>**") in connection with the above-captioned jointly administered cases of EBG Holdings LLC and certain of its affiliates (collectively, the "**<u>Debtors</u>**" or the "**<u>Company</u>**"), dated as of [_____], 2010 [Docket No. ___] (the "**<u>Bidding Procedures Order</u>**").

These Bidding Procedures set forth the process by which the Debtors are authorized to conduct the sale (the "**<u>Sale</u>**") by auction (the "**<u>Auction</u>**") of substantially all of the assets of the Debtors (defined as the "**<u>Acquired Assets</u>**" in the Asset Purchase Agreement dated as of August [_____], 2010 (the "**<u>Stalking Horse APA</u>**"), by and among the Debtors and Constellation Holdings, Inc. (the "**<u>Stalking Horse Bidder</u>**")) pursuant to the terms and conditions substantially in the form of the Stalking Horse APA.  <u>Please take notice that</u> all capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Stalking Horse APA.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: EBG Holdings LLC (3635); Boston Generating, LLC (0631); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC (7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

> Copies of the Bidding Procedures Order, Stalking Horse APA or other documents related thereto are available upon request to The Garden City Group, Inc. by calling 866-454-3498, emailing upgteam@gardencitygroup.com or visiting www.bgrestructuring.com.

**A.      Assets to be Sold.**

These Bidding Procedures set forth the terms by which prospective bidders, if any, may qualify for and participate in the Auction, thereby competing to make the highest or otherwise best offer for all of the Acquired Assets and all of the Assumed Liabilities, as identified in further detail and defined in the Stalking Horse APA.

**B.      Stalking Horse Bidder**

On August [_____], 2010, the Debtors, the Stalking Horse Bidder and Constellation Energy Group, Inc. entered into the Stalking Horse APA for the sale of substantially all of the Acquired Assets pursuant to which: (i) the Stalking Horse Bidder agreed to pay One Billion and One Hundred Million Dollars ($1,100,000,000.00) in cash, prior to adjustment of such amount in accordance with the terms of the Stalking Horse APA (the "**Cash Purchase Price**"), and to assume the Assumed Liabilities (together with the Cash Purchase Price, the "**Stalking Horse Bid**") for the Acquired Assets, subject to the outcome of the Auction and Court approval; and (ii) the Debtors agreed in the event that the Court approves the purchase of substantially all of the Acquired Assets by any Person other than the Stalking Horse Bidder to (a) pay the Stalking Horse Bidder a break-up fee in the amount of Thirty Million Dollars ($30,000,000) (the "**Break-Up Fee**") and (b) reimburse the Stalking Horse Bidder's reasonable out-of-pocket expenses up to an aggregate amount not to exceed Five Million ($5,000,000) (the "**Reimbursable Expenses**" and together with the Break-Up Fee, the "**Break-Up & Expense Reimbursement Amount**").

**C.      Participation Requirements.**

To participate in the bidding process or otherwise be considered for any purpose hereunder, a Person (other than the Stalking Horse Bidder) interested in purchasing the Acquired Assets (a "**Potential Bidder**") must, on or before October 26, 2010, deliver (unless previously delivered) to each of (i) Boston Generating, LLC, 505 Fifth Avenue, 21st Floor, New York, NY 10017, Attn: Mark Sudbey, Chief Executive Officer (msudbey@uspowergen.com), Jeff Hunter, Chief Financial Officer and Executive Vice President (jhunter@uspowergen.com) or such other person designated by the Debtors; and (ii) Latham & Watkins LLP, 885 Third Avenue, New York NY 10022-4834, Attn: D. J. Baker, Esq. (dj.baker@lw.com) and Robert J. Rosenberg, Esq. (robert.rosenberg@lw.com), counsel to the Debtors, the following documents (the "**Preliminary Bid Documents**"):

      a.      an executed confidentiality agreement (the "**Confidentiality Agreement**") reasonably acceptable to the Company and containing terms in the aggregate no less favorable to the Company in any material respect (other than with respect to the effective periods and the non-disclosure and non-solicitation provisions contained therein, all of which terms shall be commercially reasonable) than those contained in the confidentiality

<center>2</center>

agreement by and among the Stalking Horse Bidder, the Company and certain of their respective affiliates;

b.  a non-binding indication of interest with respect to the purchase of all of the Acquired Assets and the assumption of all of the Assumed Liabilities; and

c.  preliminary proof by the Potential Bidder of its financial capacity to close a proposed transaction, which may include current unaudited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets, the party that will bear liability for a breach), the adequacy of which the Debtors and their advisors will determine.

Within two (2) calendar days after a Potential Bidder delivers the Preliminary Bid Documents, the Debtors shall determine and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents so that the Potential Bidder may conduct a due diligence review with respect to the Debtors.  Only those Potential Bidders that have submitted acceptable Preliminary Bid Documents (each, an "**Acceptable Bidder**") may submit bids to purchase all of the Acquired Assets and assume all of the Assumed Liabilities. The Stalking Horse Bidder shall at all times be deemed an Acceptable Bidder.

**D.    Obtaining Due Diligence Access.**

After receipt of an executed Confidentiality Agreement and notification of Acceptable Bidder status, the Debtors shall provide each Acceptable Bidder reasonable due diligence information, as requested, as soon as reasonably practicable after such request, which information shall be commensurate with that information given to the Stalking Horse Bidder.  To the extent the Debtors give any information to any Acceptable Bidder that they had not previously provided to the Stalking Horse Bidder, the Debtors shall promptly provide such information to the Stalking Horse Bidder.  The due diligence period will end on the Bid Deadline (as defined herein).

In connection with the provision of due diligence information to Acceptable Bidders, the Debtors shall not furnish any confidential information relating to the Debtors, the Acquired Assets, or the Sale to any person except an Acceptable Bidder or such Acceptable Bidder's duly-authorized representatives to the extent provided in the applicable Confidentiality Agreement.

The Debtors along with their advisors shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided, however*, the Debtors may decline to provide such information to Acceptable Bidders who, in the Debtors' reasonable business judgment, have not established that such Acceptable Bidders intend in good faith to or have the capacity to consummate the purchase of all of the Acquired Assets.  No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline.

The Debtors designate J.P. Morgan Securities Inc. ("**JPM**") to coordinate all reasonable requests for additional information and due diligence access. The contact information for JPM is:

| David Feierstein | Kevin Shin |
|---|---|
| Tel: (212) 622-2086<br>Fax: (917) 463-0245<br>Cell: (516) 851-4924<br>E-mail: david.s.feierstein@jpmorgan.com | Tel: (212) 622-3432<br>Fax: (917) 546-2351<br>Cell: (917) 751-4332<br>E-mail: kevin.h.shin@jpmorgan.com |

**E.      Bid Requirements.**

To participate in the Auction, an Acceptable Bidder (other than the Stalking Horse Bidder) must deliver no later than the Bid Deadline (defined below) to the Debtors, their advisors, the Stalking Horse Bidder and the advisors to the Consulting Parties (defined below) at the addresses set forth in Paragraph F below an irrevocable offer that must:

a.      be in writing;

b.      at a minimum, exceed the aggregate sum of the following: (i) the Cash Purchase Price; (ii) the Assumed Liabilities; (iii) the Break-Up & Expense Reimbursement Amount (in the amount of $35,000,000); (iv) any amount required to be reimbursed to the Stalking Horse Bidder pursuant to Section 6.19 of the Stalking Horse APA; and (v) the minimum bid increment of Twenty Million Dollars ($20,000,000) (such aggregate sum, the "**Minimum Initial Bid Increment**") (all of which must be in cash and the assumption of administrative expense liabilities);

c.      constitute a good faith, bona fide offer to purchase all of the Acquired Assets and to assume all of the Assumed Liabilities;

d.      be accompanied by a clean and a duly executed copy of the Stalking Horse APA and the documents set forth as schedules and exhibits thereto, along with copies that are marked to reflect the amendments and modifications from the Stalking Horse APA executed with the Stalking Horse Bidder, which may not be materially more burdensome to the Debtors or inconsistent with these Bidding Procedures, including with respect to scope of the Acquired Assets and Assumed Liabilities;

e.      identify with particularity each and every condition to closing;

f.      identify with particularity the executory contracts and unexpired leases for which assumption and assignment is required;

g.      not be conditioned on any contingency, including, among others, on obtaining any of the following: (i) financing, (ii) shareholder, board of directors or other approval, (iii) regulatory contingencies of any kind

4

(other than a condition that (A) any applicable waiting period under HSR (defined below) shall have expired or been terminated and (B) required authorization of (I) the Federal Energy Regulatory Commission ("**FERC**")[2] pursuant to Section 203 of the Federal Power Act for disposition of the Acquired Assets, (II) the Federal Communications Commission ("**FCC**") for the transfer of control of the radio authorizations to the Potential Bidder, and (III) if applicable, any other governmental entity whose approval is identified by the Potential Bidder as required for the transaction as set forth in such Potential Bidder's bid, shall, in the case of each of (I), (II) and (III), have been obtained) and/or (iv) the outcome or completion of a due diligence review by the Potential Bidder.  Any required governmental approvals identified by the Potential Bidder in addition to the FERC and FCC approvals described herein may impact the evaluation of a Qualified Bid (defined below);

h.    remain irrevocable until 48 hours after the conclusion of the Sale Hearing (as defined below) or such longer period of time as set forth below if the Potential Bidder is selected as the Back-Up Bidder (defined below).

i.    provide for a covenant (i) to close within the later of (A) fourteen (14) days after the entry of the Sale Order, (B) the expiration or termination of the applicable HSR (defined below) waiting period, (C) authorization of FERC pursuant to Section 203 of the Federal Power Act for disposition of the Acquired Assets, (D) authorization by any other governmental entity whose approval is identified by the Potential Bidder as required for the transaction as set forth in such Potential Bidder's bid, and (E) the receipt of approval of the FCC for the transfer of control of the radio authorizations to the Potential Bidder; and (ii) that the Potential Bidder will (A) make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended ("**HSR**"), and pay the fees associated with such filings within two (2) calendar days following the entry of the Sale Order; and (B) make all necessary filings to FERC pursuant to Section 203 of the Federal Power Act for disposition of the Acquired Assets, the FCC for the transfer of control of the radio authorizations to the Potential Bidder, and any other governmental entity whose approval is identified by the Potential Bidder as required for the transaction as set forth in such Potential Bidder's bid, and pay any fees

---

[2]    Notwithstanding the fact that the Debtors and the Stalking Horse Bidder have jointly filed an application with FERC pursuant to Section 203 of the Federal Power Act seeking authorization for disposition of the Acquired Assets to the Stalking Horse Bidder, the Debtors will assist and cooperate with the preparation and filing of an application by a Potential Bidder seeking similar authorization pursuant to Section 203 of the Federal Power Act to the extent reasonably possible and to the extent any Potential Bidder is pursuing such application with an honest and legitimate business purpose and whose actions in the Debtors' reasonable business judgment are not designed to impede or interfere with the sale process contemplated by these Bidding Procedures and provided that the Potential Bidder agrees not to file protests of, or comments opposing the joint application of the Debtors and the Stalking Horse Bidder or an application filed by another Potential Bidder.

associated with such filings, in each case within two (2) calendar days following the entry of the Sale Order;

j.      provide the Debtors, on or before the Bid Deadline, with sufficient and adequate information to demonstrate, to the satisfaction of the Company, that such Potential Bidder has the financial wherewithal and ability to consummate the acquisition of the Acquired Assets and the assumption of the Assumed Liabilities;

k.      fully disclose the identity of each entity that will be bidding for or purchasing all of the Acquired Assets and assuming all of the Assumed Liabilities or otherwise participating in connection with such bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties;

l.      be accompanied, on or before the Bid Deadline, by a cash deposit equal to Fifty Million Dollars ($50,000,000), by wire transfer of immediately available funds to an account or accounts designated by the Debtors (the "**Good Faith Deposit**");

m.      state that the offering party or parties consents to the jurisdiction of the Court; and

n.      not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, termination or similar type of fee or payment and shall include an acknowledgement and representation of the Potential Bidder that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guarantees, express, implied, statutory or otherwise, regarding the Acquired Assets, the financial performance of the Acquired Assets or the physical condition of the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or the Stalking Horse APA.

Bids that the Debtors and their advisors determinate fulfill all of the preceding requirements shall be deemed to be "**Qualified Bids**," and those parties submitting Qualified Bids shall be deemed to be "**Qualified Bidders**."  Within two (2) days after the Bid Deadline, the Debtors shall determine which Acceptable Bidders are Qualified Bidders after consultation with their advisors and the advisors to the agent for the first lien lenders (the "**First Lien Lenders**"), the agent for the second lien lenders (the "**Second Lien Lenders**") and the agent for the mezzanine lenders (together with the First Lien Lenders and the Second Lien Lenders, the

6

"**Lenders**" and each a "**Lender**") and the official committee of unsecured creditors (the "**Creditors' Committee**" and together with the Lenders, the "**Consulting Parties**"), and the Debtors will notify the Acceptable Bidders and the Stalking Horse Bidder whether bids submitted constitute Qualified Bids so as to enable such Qualified Bidders to bid at the Auction. Any bid that is not deemed a "Qualified Bid" shall not be considered by the Debtors. The Stalking Horse Bidder shall be deemed to be a Qualified Bidder. The Stalking Horse APA submitted by the Stalking Horse Bidder and any additional bids timely submitted by the Stalking Horse Bidder (to the extent such bids are generally consistent with the terms of the Stalking Horse APA) shall be deemed Qualified Bids, qualifying the Stalking Horse Bidder to participate in the Auction.

**F.**    **Bid Deadline.**

**Binding written bids must be received by each of the Debtors, the Stalking Horse Bidder, their respective advisors, and the legal advisors to each of the Consulting Parties at the addresses set forth below, in each case so as to be actually received no later than 5:00 p.m. (prevailing Eastern Time) on November 12, 2010 (the "Bid Deadline").**

| Debtors | Counsel to Debtors |
|---|---|
| EBG Holdings LLC<br>505 Fifth Avenue, 21st Floor, New York, NY 10017,<br>Attn: Mark Sudbey, CEO and Jeff Hunter, CFO and<br>Executive Vice President or such other person as the<br>Debtors designate prior to the Bid Deadline<br>Email: msudbey@uspowergen.com;<br>    jhunter@uspowergen.com | Latham & Watkins LLP<br>885 Third Avenue<br>New York NY 10022-4834<br>Attn: D. J. Baker, Esq. and Robert J. Rosenberg, Esq.<br>Email: dj.baker@lw.com<br>    robert.rosenberg@lw.com |
| **Counsel to the Agent for the First Lien Lenders** | **Counsel to the Stalking Horse Bidder** |
| Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York NY 10019<br>Attn: Scott K. Charles, Esq. and Michael S. Benn, Esq.<br>Email: SKCharles@wlkr.com<br>    MSBenn@wlrk.com | Winston & Strawn LLP<br>200 Park Avenue<br>New York, NY 10166-4193<br>Attn: David Neier, Esq.<br>Email: dneier@winston.com |
| **Counsel to the Agent for the Second Lien Lenders** | **Counsel to the Creditors' Committee** |
| Dechert LLP<br>1095 Avenue of the Americas<br>New York, NY 10036-6797<br>Attn: Allan S. Brilliant, Esq. and Craig P. Druehl, Esq.<br>Email: allan.brilliant@dechert.com<br>    craig.druehl@dechert.com | [TO COME] |

**G.**    **Credit Bidding**

The First Lien Lenders and Second Lien Lenders may make a credit bid for all of the collateral securing their claims to the full extent permitted by Section 363(k) of the Bankruptcy Code; *provided*, *however*, that the conditions set forth in this Paragraph G must be satisfied before the credit bid of a First Lien Lender or a Second Lien Lender is deemed to be a Qualified Bid. To be a Qualified Bid, a credit bid must also comply with each of the requirements set forth in Paragraph E above other than E(b). In addition, to be a Qualified Bid, a credit bid must, on or

7

prior to the Bid Deadline, (i) include a cash amount as part of the purchase price for all Acquired Assets upon which such First Lien Lenders and Second Lien Lenders do not have a first priority security interest, (ii) provide for payment in cash at closing and/or the assumption of the administrative and priority expense claims of the Debtors that own the Acquired Assets, and (iii) include a cash amount as part of the purchase price sufficient to pay the Break-Up & Expense Reimbursement Amount (e.g., $35,000,000) plus any amount required to be reimbursed to the Stalking Horse Bidder pursuant to Section 6.19 of the Stalking Horse APA.

**H.    Evaluation of Qualified Bids.**

Prior to the Auction, the Debtors shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' judgment, the highest or otherwise best bid (the "**Starting Bid**").  No later than two (2) calendar days prior to the date of the Auction, the Debtors shall notify the Stalking Horse Bidder as to which Qualified Bid is the Starting Bid.  The Debtors shall thereafter distribute copies of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid.

**I.    No Qualified Bids.**

If no Qualified Bids are received by the Bid Deadline, then the Auction will not occur, the Stalking Horse APA will be deemed the Successful Bid (as defined herein) and, subject to the Debtors' termination rights under the Stalking Horse APA, the Debtors will immediately pursue entry of an order by the Court approving the Stalking Horse APA and authorizing the sale of the Acquired Assets and the transfer of the Assumed Liabilities to the Stalking Horse Bidder.

**J.    Auction.**

If one or more Qualified Bids are received by the Bid Deadline, then the Debtors shall conduct the Auction.  The Auction shall commence on November 17, 2010 at the offices of Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022-4834, or such later time or other place as the Debtors shall timely notify the Stalking Horse Bidder and all other Qualified Bidders following consultation with the advisors to the Consulting Parties.

The Auction will be conducted in accordance with the following procedures (the "**Auction Procedures**"):

- a.    only Qualified Bidders and their legal and financial advisors, including the Stalking Horse Bidder, shall be entitled to bid at the Auction;

- b.    the Qualified Bidders, including the Stalking Horse Bidder, shall appear in person or through duly-authorized representatives at the Auction;

- c.    only such authorized representatives of each of the Qualified Bidders, the Stalking Horse Bidder, the Debtors, their respective advisors, and the advisors to the Consulting Parties shall be permitted to attend the Auction;

- d.    bidding at the Auction shall begin at the Starting Bid;

8

e.    subsequent bids at the Auction, including any bids by the Stalking Horse Bidder, shall be made in minimum increments of Twenty Million Dollars ($20,000,000);

f.    the Stalking Horse Bidder shall receive a credit equal to the sum of the Break-Up & Expense Reimbursement Amount (e.g., $35,000,000) in each round of bidding at the Auction and any amount required to be reimbursed to the Stalking Horse Bidder pursuant to Section 6.19 of the Stalking Horse APA;

g.    each Qualified Bidder will be informed of the terms of the previous bids;

h.    the bidding will be transcribed to ensure an accurate recording of the bidding at the Auction;

i.    each Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale;

j.    absent irregularities in the conduct of the Auction, the Court will not consider bids made after the Auction is closed; and

k.    the Auction shall be governed by such other Auction Procedures as may be announced by the Debtors, after consultation with their advisors as well as the advisors to the Consulting Parties, from time to time on the record at the Auction; *provided*, that any such other Auction Procedures shall not be inconsistent with any order of the Court.

## K.    Acceptance of the Successful Bid.

Upon the conclusion of the Auction (if such Auction is conducted), the Debtors, in the exercise of their reasonable, good-faith business judgment, and after consulting with their advisors, shall identify the highest or otherwise best bid (the "**Successful Bid**").  The Qualified Bidder having submitted the Successful Bid will be deemed the "**Successful Bidder**." The Successful Bidder and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which such Successful Bid was made.

The Debtors will present the results of the Auction to the Court at the Sale Hearing (as defined below), at which certain findings will be sought from the Court regarding the Auction, including, among other things, that (a) the Auction was conducted, and the Successful Bidder was selected, in accordance with these Bidding Procedures, (b) the Auction was fair in substance and procedure, (c) the Successful Bid was a Qualified Bid (as defined in these Bidding Procedures), and (d) consummation of the Sale contemplated by the Successful Bid will provide the highest or otherwise best value for all of the Acquired Assets and all of the Assumed Liabilities and is in the best interests of the Debtors.

If an Auction is held, the Debtors shall be deemed to have accepted a Qualified Bid only when (a) such bid is declared the Successful Bid at the Auction and (b) definitive documentation has been executed in respect thereof.  Such acceptance is conditioned upon approval by the Court of the Successful Bid and the entry of an Order approving such Successful Bid.

**L.    Sale Hearing.**

A hearing to consider approval of the Sale of all of the Acquired Assets and the transfer of all of the Assumed Liabilities to the Successful Bidder (or to approve the Stalking Horse APA if no Auction is held) (the "**Sale Hearing**") is presently scheduled to take place on [_____] at [_____ a.m.] prevailing Eastern Time, or as soon thereafter as counsel may be heard, before the Honorable [_____], United States Bankruptcy Judge at [One Bowling Green, New York, NY 10004].

**The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party.**

At the Sale Hearing, the Debtors shall present the Successful Bid to the Court for approval.

**M.    Designation of Back-Up Bidder.**

Following the approval of the Sale of all of the Acquired Assets to any Successful Bidder at the Sale Hearing, if the Successful Bidder fails to consummate an approved Sale within the later of (1) fourteen (14) days after the entry of the Sale Order, (2) the expiration or termination of the applicable HSR waiting period, (3) the receipt of approval of FERC pursuant to Section 203 of the Federal Power Act, (4) the receipt of approval of the FCC for the transfer of control of the radio authorizations, (5) the receipt of approval by any other governmental entity whose approval is identified by the Potential Bidder as required for the transaction as set forth in such Potential Bidder's bid, and (6) December [___], 2010, the Debtors shall be authorized, but not required, to deem the next highest or otherwise best Qualified Bid (the "**Back-Up Bid**" and the party submitting the Back-Up Bid, the "**Back-Up Bidder**"), as disclosed at the Sale Hearing, the Successful Bid, and the Debtors in consultation with the Consulting Parties shall be authorized, but not required, to consummate the Sale with the Back-Up Bidder submitting such bid without further order of the Court.  The Back-Up-Bid shall remain open until the first business day following the consummation of a Sale of the Acquired Assets to the Successful Bidder.

**N.    Break-Up & Expense Reimbursement Amount.**

The Debtors shall be obligated to pay to the Stalking Horse Bidder, by wire transfer in immediately available funds to an account designated by the Stalking Horse Bidder, all amounts due to the Stalking Horse Bidder, including the Break-Up Fee and Reimbursable Expenses, in each instance in accordance with the applicable provisions of the Stalking Horse APA.

**O.      Return of Good Faith Deposit.**

The Good Faith Deposit of the Successful Bidder shall, upon consummation of the purchase of all of the Acquired Assets and transfer of all of the Assumed Liabilities, be credited to the purchase price paid for all of the Acquired Assets and all of the Assumed Liabilities.  If the Successful Bidder fails to consummate the purchase of all of the Acquired Assets and the assumption of all of the Assumed Liabilities due to a breach by the Successful Bidder, then the Good Faith Deposit shall be forfeited to, and retained irrevocably by, the Debtors.

The Good Faith Deposit of any unsuccessful Qualified Bidders (except for the Stalking Horse Bidder) will be returned within fifteen (15) days after the entry of the Sale Order by the Bankruptcy Court or upon the permanent withdrawal of the proposed Sale of all of the Acquired Assets and all of the Assumed Liabilities.  The Good Faith Deposit of the Stalking Horse Bidder shall be returned in accordance with the terms of the Stalking Horse APA.

**P.      Reservation of Rights.**

The Debtors reserve their rights, following consultation with their advisors and the advisors to the Consulting Parties and with the consent of the Stalking Horse Bidder (whose consent shall not be unreasonably withheld), to modify these Bidding Procedures in any manner that will best promote the goals of the bidding process and to impose, at or prior to the Auction, additional customary terms and conditions on the Sale of all of the Acquired Assets and the transfer of all of the Assumed Liabilities, including, without limitation, modifying the requirements for a Qualified Bid, extending the deadlines set forth in these Bidding Procedures, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice, canceling the Auction, and rejecting any or all Qualified Bids (excluding, for the avoidance of doubt, the Stalking Horse Bidder's offer pursuant to the Stalking Horse APA) if, in the Debtors' business judgment, following consultation with their advisors, the Debtors determine that such Qualified Bid is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code or any related rules or the terms set forth herein, or (c) contrary to the best interests of the Debtors; _provided_, that if the Debtors cancel the Auction, or reject all Qualified Bids other than Stalking Horse Bidder's, the Debtors shall promptly pursue entry of an order by the Court authorizing consummation of the Sale of all of the Acquired Assets and the transfer of all of the Assumed Liabilities to the Stalking Horse Bidder; and _provided further_, that the Debtors shall not extend the deadlines set forth in these Bidding Procedures beyond seven days, adjourn the Auction at the Auction and/or adjourn the Sale Hearing beyond seven days without the prior consent of the Stalking Horse Bidder which consent will not be unreasonably withheld.  In the event that a Consulting Party or other insider or affiliate of the Debtors participates in this auction process as a Potential Bidder or a Qualified Bidder, as applicable, such party will be treated like and given no greater or better rights than any other Potential Bidder or Qualified Bidder, as applicable.

The Debtors shall provide to the Stalking Horse the information and documents specified in the Stalking Horse APA relating to the Auction and other bids within the time period and on the terms and conditions set forth in the Stalking Horse APA.

**[EXHIBIT C]**

LW TEAM DRAFT 8/10/10
SUBJECT TO F.R.E. 408
<u>DO NOT FILE</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>EBG Holdings LLC,<br><u>et al</u>.,[1]<br><br>               Debtors. | Chapter 11<br><br>Case No. 10-_____ (_____)<br><br>Joint Administration Requested<br><br>**Related Docket No. ___** |

### ORDER APPROVING AND AUTHORIZING (A) BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL THE ASSETS OF THE DEBTORS, (B) STALKING HORSE BID PROTECTIONS, (C) FORM AND MANNER OF NOTICE OF THE SALE HEARING, AND (D) RELATED RELIEF

Upon the portion of the motion (the "**Motion**")[2] of EBG Holdings LLC and the other above-captioned debtors, as debtors and debtors-in-possession (collectively, the "**Debtors**"), for entry of an order approving and authorizing (a) bidding procedures, including stalking horse bidder protections, in connection with the receipt and analysis of competing bids for substantially all of the assets of the Debtors, (b) procedures for the assumption and assignment of executory contracts and unexpired leases in connection with the Sale, (c) the form and manner of notice of the Sale and scheduling the sale hearing and setting related dates and deadlines and (d) other related relief, pursuant to Sections 105(a), 363 and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 2002-1, 6004-1, 6006-1 and 9006-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**") and the Amended Guidelines for the Conduct of Asset Sales established and adopted by the United

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: EBG Holdings LLC (3635); Boston Generating, LLC (0631); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC (7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

[2]    Unless otherwise stated, all capitalized terms not defined herein shall have the same meanings as set forth in the Motion.

**Error! Unknown document property name.**
NY\1671112.4

EXHIBIT A TO SALE ORDER, PAGE 82

States Bankruptcy Court for the Southern District of New York pursuant to General Order M-383 (the "**Sale Guidelines**"); and this Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.); and this Court having found that the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and a hearing having been held on [_____], 2010 (the "**Bidding Procedures Hearing**"); and this Court having reviewed the Motion and the exhibits thereto and the arguments of counsel made and the evidence proffered or adduced, as applicable, at the Hearing; and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest; and this Court having found the form and manner of notice of the Hearing is good, sufficient and appropriate under the circumstances and that no other or further notice need be provided or is necessary; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, this Court FINDS AND DETERMINES THAT:

A.    **Bidding Procedures**.  The Debtors have articulated good and sufficient reasons for authorizing and approving the Bidding Procedures attached as **Exhibit D** to the Motion (the "**Bidding Procedures**"), which are fair, reasonable and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of, the Acquired Assets.

B.    **Stalking Horse Bid Protections**.  The Debtors have demonstrated a compelling and sound business justification for authorizing the payment of the Break-Up Fee and the

2

Error! Unknown document property name.
NY\1671112.4

EXHIBIT A TO SALE ORDER, PAGE 83

Reimbursable Expenses (the "**Bid Protections**") to the Stalking Horse Bidder under the circumstances, including, without limitation, that:

     i.    the Bid Protections are the product of negotiations among the Debtors and the Stalking Horse Bidder conducted in good faith and at arm's-length, and the APA (including the Bid Protections) is the culmination of a process undertaken by the Debtors and their professionals to negotiate a transaction with a bidder who was prepared to pay the highest or otherwise best purchase price to date for the Acquired Assets in order to maximize the value of the Debtors' estates;

     ii.    the Bid Protections are an actual and necessary cost and expense of preserving the respective Debtors' estates;

     iii.    the Bid Protections are fair, reasonable and appropriate in light of, among other things, the size and nature of the proposed Sale under the APA, the substantial efforts that have been and will be expended by the Stalking Horse Bidder, notwithstanding that the proposed sale is subject to higher or better offers, and the substantial benefits the Stalking Horse Bidder has provided to the Debtors, their estates and creditors and all parties in interest herein, including, among other things, by increasing the likelihood that the best possible price for the Acquired Assets will be received;

     iv.    the protections afforded to the Stalking Horse Bidder by way of the Bid Protections were material inducements for, and express conditions of, the Stalking Horse Bidder's willingness to enter into the APA, and were necessary to ensure that the Stalking Horse Bidder would continue to pursue the proposed acquisition on terms acceptable to the Debtors in their sound business judgment, subject to competitive bidding; and

     v.    the assurance of the payment of the Bid Protections has promoted more competitive bidding by inducing the Stalking Horse Bidder's bid, which may be the highest and best available offer for the Acquired Assets, and which induced the Stalking Horse Bidder to submit a bid that will serve as a minimum or floor bid on which all other bidders can rely and increases the likelihood that the final purchase price reflects the true value of the Acquired Assets.

    **C.**    **Assumption and Assignment Procedures**.  The Motion, the Contract Notice and the Assumption Notice are reasonably calculated to provide counterparties to the Assumed Contracts with proper notice of the potential and actual assumption and assignment of their executory contracts or unexpired leases, any Cure Amounts relating thereto and the Assumption

3

**Error! Unknown document property name.**
NY\1671112.4

EXHIBIT A TO SALE ORDER, PAGE 84

and Assignment Procedures.    The Assumption and Assignment Procedures are reasonably

calculated to facilitate the fair and orderly assumption and assignment of the Assumed Contracts.

D.    **Sale Notice**.  The Sale Notice is reasonably calculated to provide all interested

parties with timely and proper notice of the proposed Sale, including, without limitation:

(i) the date, time and place of the Auction (if one is held); (ii) the Bidding Procedures and the

dates and deadlines related thereto; (iii) the objection deadline for the sale Motion and the date,

time and place of the Sale Hearing; (iv) reasonably specific identification of the Acquired Assets;

(v) instructions for promptly obtaining a copy of the APA; (vi) representations describing the

Sale as being free and clear of liens, claims, interests and other encumbrances, with all such

liens, claims, interests and other encumbrances attaching with the same validity and priority to

the sale proceeds; (vi) the commitment by the Stalking Horse Bidder to assume certain liabilities

of the Debtors; and (vii) notice of the proposed assumption and assignment of contracts and

leases to the Stalking Horse Bidder pursuant to the APA (or to another Successful Bidder arising

from the Auction, if any), the proposed cure amounts relating thereto and the right, procedures

and deadlines for objecting thereto, and no other or further notice of the Sale shall be required.

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:

1.    The Motion is granted to the extent set forth herein.

# I.    <u>Important Dates and Deadlines</u>

2.    **<u>Sale Hearing</u>**.  [_____] [___], 2010, at [___:__0 __.m.] prevailing Eastern

Time, is the date and time the sale hearing (the "**<u>Sale Hearing</u>**") will be held before the

Honorable [_____], United States Bankruptcy Judge for the Bankruptcy Court for the

Southern District of New York, at: [One Bowling Green, New York, NY 10004].    Any

obligations of the Debtors set forth in the APA that are intended to be performed prior to the Sale

4

**Error! Unknown document property name.**
NY\1671112.4

EXHIBIT A TO SALE ORDER, PAGE 85

Hearing and/or entry of the Sale Order pursuant to the APA are authorized as set forth herein and are fully enforceable as of the date of entry of this order.  **Please take notice that:** the Sale Hearing may be adjourned by this Court or the Debtors from time to time without further notice other than by announcement in open court or on this Court's calendar.

3.      **Sale Objection Deadline**.  [_____], 2010 at 4:00 p.m. prevailing Eastern Time, is the deadline to object to entry of the proposed Sale Order (the "**Sale Objection Deadline**"). Objections, if any, **must**:   (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules and the *Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures* [Docket No. ___] (the "**Case Management Order**"); (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (iv) be filed with this Court and served so *actually received* no later than the Sale Objection Deadline by the following parties (the "**Objection Notice Parties**"):

| Debtors | Counsel to Debtors |
|---|---|
| EBG Holdings LLC<br>505 Fifth Avenue, 21st Floor, New York, NY 10017,<br>Attn: Mark Sudbey, Chief Executive Officer and Jeff Hunter, Manager, Executive Vice President, and Chief Financial Officer | Latham & Watkins LLP<br>885 Third Avenue<br>New York NY 10022-4834<br>Attn: D. J. Baker, Esq. and Robert J. Rosenberg, Esq. |
| **Counsel to the Agent for the First Lien Lenders** | **United States Trustee** |
| Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York NY 10019<br>Attn: Scott K. Charles, Esq. and Michael S. Benn, Esq. | Office of the United States Trustee<br>for the Southern District of New York<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br>Attn: [_____] |
| **Counsel to the Agent for the Second Lien Lenders** | **Counsel to the Creditors' Committee** |
| Dechert LLP<br>1095 Avenue of the Americas<br>New York, NY 10036-6797<br>Attn: Allan S. Brilliant, Esq. and Craig P. Druehl, Esq. | [TO COME] |
| **Counsel to the Stalking Horse Bidder** | |
| Winston & Strawn LLP<br>200 Park  Avenue<br>New York, NY 10538 | |

5

Error! Unknown document property name.
NY\1671112.4

EXHIBIT A TO SALE ORDER, PAGE 86

Attn: David Neier, Esq.

**The failure to timely file an objection in accordance with this order shall forever bar the assertion of any objection to the Motion, entry of the Sale Order and/or consummation of the Sale, including the assumption and assignment of contracts and leases to the Successful Bidder pursuant to the APA, and shall be deemed to constitute any such party's consent to entry of the Sale Order and consummation of the Sale and all transactions related thereto.**

4.      **Response Deadline**.  [_____], 2010, is the deadline for filing a response to any timely-filed objection to entry of the Sale Order with this Court; *provided*, that such deadline may be extended by agreement of the Debtors and the affected objecting party.

5.      **Competitive Bidding**.  The following dates and deadlines regarding competitive bidding are hereby established (subject to modification as needed):

a.      **Preliminary Bid Deadline**: [_____], 2010, is the deadline by which anyone interested in participating in the bidding process must deliver the "**Preliminary Bid Documents**" (as defined in the Bidding Procedures);

b.      **Qualified Bid Deadline**:  [_____], 2010 at 5:00 p.m. prevailing Eastern Time, is the deadline by which all "**Qualified Bids**" (as defined in the Bidding Procedures) must be *actually received* by the parties specified in the Bidding Procedures (the "**Bid Deadline**"); and

c.      **Auction**: [_____], 2010 at __:_0 a.m. prevailing Eastern Time, is the date and time the Auction, if one is needed, will be held at the offices of counsel to the Debtors:  Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022-4834.

## II.      **Bidding Procedures and Related Relief**

### A.      **Bidding Procedures**

6.      The Bidding Procedures, substantially in the form annexed to the Motion as **Exhibit D** and incorporated by reference as though fully set forth herein, are hereby approved to the extent set forth herein.  The Bidding Procedures shall govern the submission, receipt and analysis of all bids relating to the proposed Sale, and any party desiring to submit a higher or

6

**Error! Unknown document property name.**
NY\1671112.4

EXHIBIT A TO SALE ORDER, PAGE 87

better offer for the Acquired Assets shall do so strictly in accordance with the terms of the Bidding Procedures and this order.

7.    The Bid Protections described in the Motion are hereby approved to the extent set forth herein.  The Debtors are authorized to pay any and all amounts owing to the Stalking Horse Bidder in accordance with the terms of the APA, including the Break-up Fee and the Reimbursable Expenses, without further order of this Court, except as otherwise provided herein.

8.    As described in the Bidding Procedures, if the Debtors do not receive any Qualified Bids other than from the Stalking Horse Bidder or if no Qualified Bidder other than the Stalking Horse Bidder indicates its intent to participate in the Auction, the Debtors will not hold the Auction, the Stalking Horse Bidder will be named the Successful Bidder and the Debtors will seek approval of the APA at the Sale Hearing.  If one or more Qualified Bids is timely received from a Qualified Bidder (other than the Stalking Horse Bidder) in accordance with the Bidding Procedures, the Debtors shall conduct the Auction as set forth herein.

9.    If the Auction is conducted, each Qualified Bidder participating in the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding process or the Sale.  The Auction will be conducted openly and shall be transcribed or videotaped.

**III.    Assumption and Assignment Procedures**

10.    The following procedures regarding the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale are hereby approved to the extent set forth herein, and shall govern the assumption and assignment of all executory contracts and unexpired leases proposed to be assumed by the Debtors pursuant to Section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder (or other successful bidder

Error! Unknown document property name.
NY\1671112.4

following the Auction, if any) pursuant to Section 365(f) of the Bankruptcy Code under the

APA:

a.  **Contract Notice**.  As soon as practicable after the entry of this Order, the Debtors shall file with the Court and serve on all non-debtor counterparties (the "**Contract Notice Parties**") to any executory contract or unexpired lease that may be assumed by the Debtors and assigned to the Successful Bidder, a "**Contract Notice**" in the form attached to the Motion as **Exhibit G** that identifies, to the extent applicable (i) the contract that may be an Assumed Contract, (ii) the name of the counterparty to such contract, (iii) the cure amount for such contract if it becomes an Assumed Contract, and (iv) the deadline by which any such Contract Notice Party must file any Objection to the proposed assumption and assignment; provided, however, that the presence of a contract on a Contract Notice does not constitute an admission that such contract is an executory contract.  As soon as practicable after the selection or designation of the Successful Bid, the Debtors shall file with the Court and serve on the Contract Notice Parties a further notice in the form attached to the Motion as **Exhibit H** (the "**Assumption Notice**") identifying the Successful Bidder and stating which executory contracts and unexpired leases will be Assumed Contracts, and no other or further notice will be required with respect to the Assumed Contracts.

b.  **Objections**.  Objections, if any, to the assumption and assignment of any contract or lease, proposed cure amount or adequate assurance of future performance proposed with respect thereto must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules and Case Management Order; (iii) state with specificity the nature of the objection and, if to the cure amount proposed by the Debtors, the cure amount alleged by the objecting party, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with this Court and served upon so as to be *actually received* by the Contract Notice Parties on or before the Sale Objection Deadline; provided, that if, following the Auction, the Stalking Horse Bidder is not the Successful Bidder, the deadline for such counterparties shall be automatically extended through and until the commencement of the Sale Hearing.

c.  **Dispute Resolution**.  If the parties are not able to consensually resolve any such objection prior to the Sale Hearing, the dispute will be heard at the Sale Hearing (or such other date as fixed by this Court).

11.    Any party failing to timely file an objection to the assumption and assignment of

any contract or lease or related cure amount listed on the Contract Notice shall be forever barred

8

Error! Unknown document property name.
NY\1671112.4

EXHIBIT A TO SALE ORDER, PAGE 89

from objecting thereto, including asserting any additional cure or other default amounts against the Debtors or any of the Debtors' estates, the Stalking Horse Bidder or other Successful Bidder with respect to such executory contract(s) or unexpired lease(s) and shall be deemed to consent to the Sale and the assumption and assignment of such executory contract(s) or unexpired lease(s) effectuated in connection therewith.

## IV.    Sale Hearing Notice and Related Relief

12.    The Sale Notice, substantially in the form annexed as **Exhibit F** to the Motion, is hereby approved.  Within three (3) calendar days of the entry of this order, the Debtors shall cause the Sale Notice to be served upon, without limitation, (i) the Master Service List (as defined in the Case Management Order), (ii) all entities known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in any of the Acquired Assets, (iii) all parties to executory contracts or unexpired leases to be assumed and assigned or rejected as part of the Sale, (iv) all affected federal, state and local regulatory and taxing authorities and (v) all entities known or reasonably believed to have expressed an interest in acquiring any of the Acquired Assets.

13.    As soon as practicable after entry of this order, the Debtors shall cause the Sale Notice, substantially in the form annexed hereto as **Exhibit F** to the Motion (with any necessary modifications for ease of publication), once in the national edition of USA Today.  The Debtors are also authorized, in their sole discretion, to publish the Sale Notice in other newspapers, trade journals, or similar publications.

14.    The Debtors are authorized to execute and deliver all instruments and documents, and take such other action as may be necessary or appropriate to implement and effectuate the transactions contemplated by this order.

<center>9</center>

Error! Unknown document property name.
NY\1671112.4

EXHIBIT A TO SALE ORDER, PAGE 90

15.     The Motion is granted to the extent set forth herein, and all objections or other responses to the Motion are overruled or resolved on the terms set forth herein.

16.     The requirements set forth in Local Bankruptcy Rule 9013-1(b) are satisfied by the contents of the Motion.

17.     This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from, based upon or related to this order.

Date: _____, 2010       _____

                                            United States Bankruptcy Judge

10

**Error! Unknown document property name.**
NY\1671112.4

                                            EXHIBIT A TO SALE ORDER, PAGE 91

**[EXHIBIT D]**

DEPOSIT ESCROW AGREEMENT

DEPOSIT ESCROW AGREEMENT (this "Escrow Agreement"), dated as of August 7, 2010, by and between EBG Holdings LLC ("Seller"), a Delaware limited liability company and debtor-in-possession under chapter 11 of title 11 of the United States Code in a case pending in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"), and Constellation Holdings, Inc., a Maryland corporation ("Buyer"), and Wells Fargo Bank, National Association, as escrow agent (the "Escrow Agent"). Capitalized terms used herein and not otherwise defined in this Escrow Agreement shall have the meanings ascribed to them in the Asset Purchase Agreement referred to below.

## WITNESSETH

WHEREAS, Buyer, Seller, and certain of Seller's subsidiaries (collectively with Seller, "Seller Entities") have entered into an Asset Purchase Agreement, dated as of August 7, 2010 (the "Asset Purchase Agreement"), involving the sale of certain assets and the assignment of certain liabilities of Seller Entities to Buyer;

WHEREAS, pursuant to Section 3.2 of the Asset Purchase Agreement, Buyer and Seller Entities have agreed that Buyer will deliver a deposit in the amount of $50,000,000 (the "Escrowed Funds") by wire transfer in immediately available funds into an escrow account on the next Business Day after the date hereof;

WHEREAS, Buyer and Seller desire to appoint the Escrow Agent to act as escrow agent hereunder in the manner hereinafter set forth and the Escrow Agent is willing to act in such capacity;

NOW THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer, Seller and the Escrow Agent hereby agree as follows:

1.    Appointment of Escrow Agent; Establishment of Escrow Account.  Buyer and Seller hereby appoint the Escrow Agent to act as escrow agent hereunder and the Escrow Agent agrees to act as such. The Escrow Agent shall establish and maintain on behalf of the parties hereto a segregated escrow account (the "Escrow Account") to which there shall be immediately credited and held all amounts received by the Escrow Agent from Buyer in accordance with Section 2 hereof.  The funds credited to the Escrow Account shall be applied, invested and disbursed only as provided herein.  The Escrow Agent shall, to the extent required by law, segregate the funds credited to the Escrow Account from its other funds held as an agent or in trust.

2.    Deposit to the Escrow Account; Investment.

(a) Buyer shall deliver to the Escrow Agent for deposit in the Escrow Account the sum of $50,000,000 as required pursuant to Section 3.2 of the Asset Purchase Agreement and the terms set forth herein.

(b) All amounts to be deposited with the Escrow Agent shall be transferred by wire transfer of immediately available funds to the following account of the Escrow Agent (or to such other account of the Escrow Agent as the Escrow Agent shall notify Seller and Buyer in writing prior to the transfer of funds and which account Seller and Buyer approve):

> Wells Fargo Bank, NA
>
> Swift Code: WFBIUS6S
>
> ABA #121-000-248
>
> Credit Acct: Corporate Trust Clearing
>
> Acct: #0001038377
>
> F/F/C: EBG Hldgs/Constellation Hldg Escrow
>
> Account #: 80486000
>
> Attn: Timothy P. Martin

(c) The Escrow Agent shall confirm in writing to Seller and Buyer the deposit received by it pursuant to Section 2(a) above and the amount of such deposit and of any other amounts that may be deposited with the Escrow Agent in connection with the Asset Purchase Agreement.

(d) The Escrowed Funds on deposit in the Escrow Account shall be invested in short-term United States government securities, money-market funds, interest bearing depository accounts or short-term certificates of deposit of a bank or trust company having combined capital, surplus and retained earnings of at least $500 million; provided that any such investment can be liquidated upon two Business Days notice. The Escrow Agent shall not be accountable or liable for any losses resulting from the sale or depreciation in the market value of such investments thereof.

(e) Interest and other earnings on permitted investments shall be added to the Escrow Account. Any loss or expense incurred as a result of an investment will be borne by the Escrow Account. Buyer shall be entitled to direct the investment of the Escrow Funds in the manner provided in paragraph (d) above. In the event that the Escrow Agent does not receive written direction to invest funds held in the Escrow Account, the Escrow Agent shall invest such funds in the Wells Fargo Bank Money Market Deposit Account ("MMDA"), or a successor or similar fund or account offered by the Escrow Agent. Amounts on deposit in the MMDA are insured up to a total of $250,000 per depositor, per insured bank (including principal and accrued interest) by

the Federal Deposit Insurance Corporation ("FDIC"), subject to the applicable rules and regulations of the FDIC.  The parties understand that deposits in the MMDA are not secured.

(f) The Escrow Agent is hereby authorized to execute purchases and sales of permitted investments through the facilities of its own trading or capital markets operations or those of any affiliated entity.  The Escrow Agent shall send statements to each of the parties hereto on a monthly basis reflecting activity in the Escrow Account for the preceding month.  Although Buyer and Seller each recognizes that it may obtain a broker confirmation or written statement containing comparable information at no additional cost, Buyer and Seller hereby agree that confirmations of permitted investments are not required to be issued by the Escrow Agent for each month in which a monthly statement is rendered.  No statement need be rendered for the Escrow Account if no activity occurred for such month.

(g) Buyer and Seller acknowledge and agree that the delivery of the escrowed property is subject to the sale and final settlement of permitted investments.  Proceeds of a sale of permitted investments will be delivered on the Business Day on which the appropriate instructions are delivered to the Escrow Agent if received prior to the deadline for same day sale of such permitted investments.  If such instructions are received after the applicable deadline, proceeds will be delivered on the next succeeding Business Day.

(h) All interest and other income earned from the investment of the Escrowed Funds shall be allocated and reported to Buyer for tax purposes.  Buyer shall provide the Escrow Agent with a certified tax identification number by signing and returning a Form W-9 (or Form W-8, in the case of non-U.S. persons) to the Escrow Agent prior to the date on which any income earned on the investment of the Escrowed Funds is credited.  Buyer understands that, in the event its tax identification number is not certified to the Escrow Agent, the Internal Revenue Code, as amended from time to time, may require withholding of a portion of any interest or other income earned on the investment of the Escrowed Funds.

3.    Distributions from Escrow Account.

(a) Funds on deposit in the Escrow Account shall be withdrawn and disbursed by the Escrow Agent only in accordance with this Section 3.

(b) If the Escrow Agent receives joint written instructions signed by Seller and Buyer to the effect that the Asset Purchase Agreement has been terminated pursuant to Section 8.1(d) of the Asset Purchase Agreement, the Escrow Agent shall disburse the Escrowed Funds, together with all accrued investment income or interest thereon, to Seller within two Business Days of receipt of notice of such termination.

(c) If the Escrow Agent receives joint written instructions signed by Seller and Buyer to the effect that the Asset Purchase Agreement has been terminated pursuant to Section 8.1(a), 8.1(b), 8.1(c), 8.1(d)(ii), 8.1(e) or 8.1(f) of the Asset

Purchase Agreement, the Escrow Agent shall disburse the Escrowed Funds, together
with all accrued investment income or interest thereon, to Buyer within two Business
Days of receipt of notice of such termination.

(d) Either Buyer or Seller (the "Notifying Party") may notify the Escrow
Agent and the other party hereto (the "Recipient") that it believes it is entitled to the
Escrowed Funds.  Any such notice (the "Notice") shall state the reason that the
Notifying Party believes it is entitled to the Escrowed Funds. The Notifying Party shall
provide the Escrow Agent with a delivery receipt promptly following delivery of the
Notice to the Recipient, in the form of an overnight delivery receipt from Express Mail,
Federal Express or other reputable overnight delivery service or a facsimile
confirmation receipt. The Recipient shall have five Business Days from its receipt of
the Notice to provide notice to the Escrow Agent and the Notifying Party disputing the
Notifying Party's entitlement to the Escrowed Funds.  If the Escrow Agent does not
receive notice disputing such entitlement to the Escrowed Funds within five Business
Days after the Escrow Agent receives the Notice, the Escrow Agent shall pay, on the
next Business Day, the Escrowed Funds as directed by the Notifying Party.  If the
Escrow Agent receives notice disputing such entitlement to the Escrowed Funds within
five Business Days after the Recipient receives the Notice, the Escrow Agent shall not
pay the Escrowed Funds until the Escrow Agent receives either (i) an Order of the
Bankruptcy Court, which order has become final and not subject to appeal and has been
certified by the clerk of the Bankruptcy Court or other appropriate official, along with
an opinion of counsel to the effect that such Order is final, nonappealable and from a
court of competent jurisdiction, or (ii) joint written notice signed by Buyer and Seller
indicating that the dispute has been resolved and directing the Escrow Agent to whom
to pay the Escrowed Funds and income earned thereon and in what amounts, (each, a
"Final Resolution").  The Escrow Agent shall pay the Escrowed Funds, together with
all accrued investment income and interest thereon, within two Business Days of its
receipt of the written evidence of a Final Resolution as required above in this
Section 3(d).   The Escrow Agent shall be entitled to rely, exclusively, on any
representation jointly made by Buyer and Seller in writing in relation to the release of
funds from the Escrow Account, and shall release funds from the Escrow Account from
time to time as directed in any such joint written instruction from Buyer and Seller or
pursuant to a Final Resolution.

(e) Upon the Escrow Agent receiving joint written notice, signed by
Buyer and Seller, that pursuant to the Asset Purchase Agreement the Closing has
occurred or will simultaneously occur, the Escrow Agent shall disburse on the Closing
Date to the order of Seller Entities the Escrowed Funds, together with all accrued
investment income and interest thereon.

4.  Termination of Escrow Account and Escrow Agreement.   The Escrow
Account shall be deemed dissolved and this Escrow Agreement shall terminate upon the
earlier of (i) written agreement of the parties hereto, (ii) disbursement of all of the funds
in the Escrow Account, or  (iii) transfer of all amounts in the Escrow Account then in the
possession of the Escrow Agent to the Bankruptcy Court or such other party as the parties

hereto may jointly agree upon in writing in accordance with the terms of this Escrow Agreement.

     5.   <u>Escrow Agent</u>.

       (a) The Escrow Agent's fees for acting as escrow agent hereunder shall be reasonable compensation for its services, as listed on Schedule A annexed hereto, and shall be paid promptly upon request therefor. In addition, the Escrow Agent shall be entitled for all reasonable expenses of or reasonable disbursements incurred by the Escrow Agent in the performance of its duties hereunder, including the reasonable fees, expenses and disbursements of counsel to the Escrow Agent. Each of Buyer and Seller shall bear 50% of the fees, costs and expenses of the Escrow Agent and of any indemnity obligation pursuant to Section 6(c) hereof, except that if the Closing occurs all such fees, costs, expenses and indemnities shall be paid by Buyer.

       (b) The Escrow Agent may retain that portion of the Escrow Account equal to any such unpaid reasonable costs, expenses and fees incurred by the Escrow Agent as contemplated by Section 5(a) above and any indemnification rights under Section 6(c) below until such time as such costs, expenses and fees and indemnity have been paid.

     6.   <u>Rights, Duties and Immunities of Escrow Agent</u>. Acceptance by the Escrow Agent of its duties under this Escrow Agreement is subject to the following terms and conditions, which all parties to this Escrow Agreement hereby agree shall govern and control the rights, duties and immunities of the Escrow Agent:

       (a) The duties and obligations of the Escrow Agent shall be determined solely by the express provisions of this Escrow Agreement and the Escrow Agent shall not be liable, except for the performance of such duties and obligations as are specifically set out in this Escrow Agreement. The Escrow Agent shall not be required to inquire as to the performance or observation of any obligation, term or condition under any agreement or arrangement by Buyer and Seller. The Escrow Agent is not a party to, and is not bound by, any agreement or other document out of which this Escrow Agreement may arise. The Escrow Agent shall be under no liability to any party hereto by reason of any failure on the part of any other party hereto or any maker, guarantor, endorser or other signatory of any document or any other person to perform such person's obligations under any such document. The Escrow Agent shall not be bound by any waiver, modification, termination or rescission of this Escrow Agreement or any of the terms hereof, unless evidenced by a writing delivered to the Escrow Agent signed by the proper party or parties and, if the duties or rights of the Escrow Agent are affected, unless it shall give its prior written consent thereto. This Escrow Agreement shall not be deemed to create a fiduciary relationship between the parties hereto under state or federal law.

       (b) The Escrow Agent shall not be responsible in any manner for the validity or sufficiency of this Escrow Agreement or of any property delivered hereunder, or for the value or collectibility of any note, check or other instrument, if

any, so delivered, or for any representations made or obligations assumed by any party other than the Escrow Agent. Nothing herein contained shall be deemed to obligate the Escrow Agent to deliver any cash, instruments, documents or any other property referred to herein, unless the same shall have first been received by the Escrow Agent pursuant to this Escrow Agreement.

(c) Buyer and Seller will, jointly and severally, reimburse and indemnify the Escrow Agent for, and hold it harmless against, any loss, liability or expense, including but not limited to reasonable counsel fees, incurred without bad faith, willful misconduct or gross negligence on the part of the Escrow Agent arising out of or in conjunction with its acceptance of, or the performance of its duties and obligations under this Escrow Agreement, as well as the costs and expenses of defending against any claim or liability arising out of or relating to this Escrow Agreement.

(d) The Escrow Agent shall be fully protected in acting on and relying upon any written notice direction, request, waiver, consent, receipt or other paper or document which the Escrow Agent in good faith believes to have been signed and presented by the proper party or parties.

(e) The Escrow Agent shall not be liable for any error of judgment, or for any act done or step taken or omitted by it in good faith or for any mistake in act or law, or for anything which it may do or refrain from doing in connection herewith, except its own gross negligence or willful misconduct.

(f) The Escrow Agent may seek the advice of legal counsel in the event of any dispute or question as to the construction of any of the provisions of this Escrow Agreement or its duties hereunder, and it shall incur no liability and shall be fully protected in respect of any action taken, omitted or suffered by it in good faith in accordance with the written advice or opinion of such counsel.

(g) The parties hereto agree that should any dispute arise with respect to the payment, ownership or right of possession of the Escrow Account, the Escrow Agent is authorized and directed to retain in its possession, without liability to anyone, except for its bad faith, willful misconduct or gross negligence, all or any part of the Escrow Account until such dispute shall have been settled either by mutual agreement by the parties concerned or by the final order, decree or judgment of the Bankruptcy Court and a notice executed by the parties to the dispute or their authorized representatives shall have been delivered to the Escrow Agent setting forth the resolution of the dispute, which notice Buyer and Seller hereby agree to so execute and deliver to the Escrow Agent in the event that such an order, decree or judgment is obtained from or issued by the Bankruptcy Court. The Escrow Agent shall be under no duty whatsoever to institute, defend or partake in such proceedings.

(h) The agreements set forth in this Section 6 shall survive the resignation or removal of the Escrow Agent, the termination of this Escrow Agreement and the payment of all amounts hereunder.

7.  <u>Resignation of Escrow Agent</u>.  The Escrow Agent shall have the right to resign upon 30 days written notice to Seller and Buyer.   In the event of such resignation, Seller and Buyer shall mutually agree upon and appoint a successor escrow agent hereunder by delivering to the Escrow Agent a written notice of such appointment.  Upon receipt of such notice, the Escrow Agent shall deliver to the designated successor escrow agent all money and other property held hereunder and shall thereupon be released and discharged from any and all further responsibilities whatsoever under this Escrow Agreement;  <u>provided</u>,  <u>however</u>, that the Escrow Agent shall not be deprived of its compensation earned prior to such time.

If no successor escrow agent shall have been designated by the date specified in the Escrow Agent's notice, all obligations of the Escrow Agent hereunder shall nevertheless cease and terminate.  The Escrow Agent may appoint a successor or petition any court of competent jurisdiction for the appointment of a successor escrow agent.  Its sole responsibility thereafter shall be to keep safely all property then held by it and to deliver the same to a person designated by the other parties hereto or in accordance with the direction of a final Order of the Bankruptcy Court.

8.  <u>Notices</u>.  All claims, notices, consents, objections and other communications under this Escrow Agreement shall be in writing and shall, except as otherwise provided herein, be deemed to have been duly given and received when (i) delivered by hand, (ii) sent by facsimile (with receipt confirmed), or (iii) when received by the addressee, if sent by Express Mail, Federal Express or other reputable overnight delivery service, in each case, at the appropriate addresses and facsimile numbers as set forth below:

<div style="padding-left:2em">

Escrow Agent:     Wells Fargo Bank, National Association  
           230 W. Monroe Street  
           Corporate Trust Dept., 29th Floor  
           Chicago, IL 60606  
           Attention:  Timothy P. Martin  
           Facsimile:  (312) 726-2158

Buyer:        Constellation Holdings, Inc.  
           100 Constellation Way  
           Baltimore, MD 21202  
           Attention: Andrew L. Good  
           Facsimile:  (410) 470-6200

</div>

With copies (which shall not constitute notice) to:

<div style="padding-left:4em">

Constellation Energy Group, Inc.  
100 Constellation Way  
Baltimore, MD 21202  
Attention: Charles A. Berardesco, Esq.  
Facsimile: (410) 470-5766

</div>

and

Winston & Strawn LLP
200 Park Avenue
New York, NY 10166
Attention: Jonathan Birenbaum, Esq.
            David Neier, Esq.
Facsimile: (212) 294-4700

SELLER:

EBG Holdings LLC
505 Fifth Avenue, 21st Floor
New York, NY 10017
Attention:  David Sheffey, Esq.
Facsimile:  (212) 792-0899
Telephone:  (212) 792-0875

With a copy (which shall not constitute notice) to:

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Attention:  D.J. Baker, Esq.
           Robert Rosenberg, Esq.
           David Kurzweil, Esq.
Facsimile:  212-751-4864

(or to such other addresses and facsimile numbers as a party may designate as to itself by notice to the other parties).  Notwithstanding any of the foregoing, any computation of a time period which is to begin after receipt of a notice by the Escrow Agent shall run from the date of receipt by it.

9. <u>Successors</u>.  This Escrow Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, <u>provided</u> that this Escrow Agreement may not be assigned by any party without the prior written consent of the other parties, which consent shall not be unreasonably withheld.

10. <u>Severability</u>.  If any portion or provision of this Escrow Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Escrow Agreement shall be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.  The provisions hereof are severable, and in the event any

provision hereof should be held invalid or unenforceable in any respect, it shall not invalidate, render unenforceable or otherwise affect any other provision hereof.

11. <u>Amendments</u>.  This Escrow Agreement may be amended or modified at any time or from time to time in writing executed by the parties to this Escrow Agreement.

12. <u>Governing Law</u>.  This Escrow Agreement shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the substantive laws of the State of New York, without regard to the conflict of laws principles thereof or of any other jurisdiction.

13. <u>JURISDICTION</u>.    THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO RESOLVE ANY AND ALL DISPUTES ARISING UNDER THIS ESCROW AGREEMENT AND EACH OF THE PARTIES HERETO HEREBY EXPRESSLY CONSENTS TO SUCH EXCLUSIVE JURISDICTION; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT IF THE BANKRUPTCY CASE HAS CLOSED, THE PARTIES AGREE TO UNCONDITIONALLY AND IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK SITTING IN NEW YORK COUNTY OR THE COMMERCIAL DIVISION, CIVIL BRANCH OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND ANY APPELLATE COURT FROM ANY THEREOF, FOR THE RESOLUTION OF ANY SUCH CLAIM OR DISPUTE.   THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH DISPUTE BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE.  EACH OF THE PARTIES HERETO AGREES THAT A JUDGMENT IN ANY SUCH DISPUTE MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. EACH OF THE PARTIES HERETO HEREBY CONSENTS TO PROCESS BEING SERVED BY ANY PARTY TO THIS AGREEMENT IN ANY SUIT, ACTION OR PROCEEDING BY DELIVERY OF A COPY THEREOF IN ACCORDANCE WITH THE PROVISIONS OF <u>SECTION 8</u>.

14. <u>Waiver</u>.  No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving party.  The failure of any party to require the performance of any term or obligation of this Escrow Agreement, or the waiver by any party of any breach of this Escrow Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

15. <u>Headings</u>.  The headings and captions in this Escrow Agreement are for convenience of reference only and shall not in any way affect the meaning or interpretation of this Escrow Agreement.

16. <u>Counterparts</u>.  This Escrow Agreement may be executed in any number of counterparts and by each of the parties hereto in separate counterparts, each of which

when so executed shall be deemed to be an original and all of which together shall constitute one and the same agreement.

17. <u>Entire Agreement</u>. This Agreement and the Asset Purchase Agreement and the agreements referenced therein comprise the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, whether written or oral, relating to such subject matter in any way.

18. <u>Specific Duties</u>.    The Escrow Agent shall have only those duties as are specifically provided herein, which shall be deemed purely ministerial in nature, and shall under no circumstance be deemed a fiduciary for any of the parties to this Agreement. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument or document between the other parties hereto, in connection herewith, including without limitation the Asset Purchase Agreement.  This Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of the Escrow Agent shall be inferred from the terms of this Agreement or any other Agreement.   IN NO EVENT SHALL THE ESCROW AGENT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (i) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED FROM THE ESCROW AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR (ii) SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

19. <u>Merger</u>.    Any banking association or corporation into which the Escrow Agent may be merged, converted or with which the Escrow Agent may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Escrow Agent shall be a party, or any banking association or corporation to which all or substantially all of the corporate trust business of the Escrow Agent shall be transferred, shall succeed to all the Escrow Agent's rights, obligations and immunities hereunder without the execution or filing of any instrument or any further act, deed or conveyance on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

IN WITNESS WHEREOF, the undersigned have executed this Escrow Agreement as of the date first written above.

EBG HOLDINGS LLC

By: _____
Name:
Title:

CONSTELLATION HOLDINGS, INC.

By: _____
Name:
Title:

WELLS FARGO BANK, NATIONAL ASSOCIATION, as Escrow Agent

By: _____
Name:
Title:

**Signature Pages to Deposit Escrow Agreement**

IN WITNESS WHEREOF, the undersigned have executed this Escrow Agreement as of the date first written above.

EBG HOLDINGS LLC

By: _____
    Name:
    Title:

CONSTELLATION HOLDINGS, INC.

By: _____
    Name:
    Title:

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Escrow Agent

By: _____
    Name:    TIMOTHY P. MARTIN
    Title:    Vice President

11

<u>SCHEDULE OF FEES</u>

To act as an Escrow Agent


Annual Charge                              $2,500


Any out-of-pocket expenses, or extraordinary fees or expenses such as attorney's fees or messenger costs, are additional and are not included in the above schedule.

These fees cover a full year, or any part thereof, and thus are not prorated in the year of termination.  The annual fee is billed in advance and payable prior to that year's service.

**[EXHIBIT E]**

CEG TEAM DRAFT 8/10/10
SUBJECT TO F.R.E. 408
<u>DO NOT FILE</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>EBG Holdings LLC,<br><u>et al.</u>,[1]<br><br>                       Debtors. | Chapter 11<br><br>Case No. 10-_____ (_____)<br><br>Joint Administration Requested<br><br>**Related Docket No. ____** |

**ORDER AUTHORIZING (A) THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS FREE AND CLEAR OF ALL CLAIMS, LIENS, LIABILITIES, RIGHTS, INTERESTS AND ENCUMBRANCES; (B) THE DEBTORS TO ENTER INTO AND PERFORM THEIR OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT; (C) THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; [(D) APPROVING THE TRANSITION SERVICES AGREEMENT]; AND (E) GRANTING RELATED RELIEF**

Upon the portion of the motion (the "**Motion**")[2] of EBG Holdings LLC and the other above-captioned debtors, as debtors and debtors-in-possession (collectively, the "**Debtors**") for entry of orders, pursuant to Sections 105(a), 363, 365, 503 and 507 of the United States Bankruptcy Code (the "**Bankruptcy Code**"), and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") authorizing and approving the following:

    (a)    the sale of substantially all of the assets of the Debtors;

    (b)    the entry into, performance under and terms and conditions of the Asset Purchase Agreement dated as of [●], 2010 (collectively with all related agreements, documents or instruments and all exhibits, schedules and addenda to any of the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: EBG Holdings LLC (3635); Boston Generating, LLC (0631); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC (7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

[2] Unless otherwise stated, all capitalized terms not defined herein shall have the same meaning as set forth in the APA and the Motion, as applicable.

foregoing, the "**APA**"), substantially in the form attached hereto as **Exhibit A**, whereby the Debtors have agreed to sell, and Constellation Holdings, Inc. (the "**Buyer**") has agreed to buy, substantially all of the Debtors' assets (specifically as set forth and defined in the APA, the "**Acquired Assets**"), free and clear of all Claims (as defined below), Liens (defined below), liabilities rights, interests and encumbrances except where the Debtors have agreed to transfer and Buyer has expressly agreed to assume certain of the Debtors' liabilities (specifically as set forth and defined in the APA, the "**Assumed Liabilities**") (collectively, and including all actions taken or required to be taken in connection with the implementation and consummation of the APA, the "**Transactions**");

(c)     authorizing the assumption and assignment to Buyer or an affiliate of (as defined in the APA, an "**Affiliate**") of Buyer of certain executory contracts and unexpired leases of the Debtors designated for assumption and assignment as Acquired Contracts in accordance with this Order, the Bidding Procedures Order (defined below) and the APA (collectively, the "**Assumed Contracts**");

(d)     [the entry into a transition services agreement (the "**Transition Services Agreement**") between the Debtors and Buyer;] and

(e)     other related relief;

and the Court having entered an order approving the bidding procedures and granting certain related relief on [●], 2010 [Docket No. [●]] (the "**Bidding Procedures Order**"); [and an auction conducted in accordance with the Bidding Procedures Order (the "**Auction**") having been held on [●], 2010 pursuant to the Bidding Procedures Order]; [and Buyer having submitted the highest or otherwise best offer at the Auction]; and the Court having conducted a hearing on the Motion on [●], 2010 (the "**Sale Hearing**") at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered the Motion, the APA, the Bidding Procedures Order, the record of the hearing before the Court on [_____ no later than the earlier of September 1, 2010 or 30 days after the Petition Date], 2010 at which the Bidding Procedures Order was approved and all objections to the Transactions and the APA filed in accordance with the Bidding Procedures Order; and the appearance of all interested parties and all responses and objections to the Sale Motion having

2

**Error! Unknown document property name.**

been duly noted in the record of the Sale Hearing; and upon the record of the Sale Hearing, and having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Sale Hearing; and upon all of the proceedings had before the Court, and all objections and responses to the relief requested in the Motion having been heard and overruled or resolved on the terms set forth in this Order, and it appearing that due notice of the Motion, the APA, the Bidding Procedures Order [and the Auction has been provided]; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their stakeholders and all other parties-in-interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

**THE COURT EXPRESSLY FINDS AS FOLLOWS:[3]**

**<u>Jurisdiction, Venue and Final Order</u>**

A.      This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. § 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just

---

[3]All findings of fact and conclusions of law announced by the Bankruptcy Court at the Sale Hearing in relation to the Sale Motion are hereby incorporated to the extent not inconsistent herewith.

3

**Error! Unknown document property name.**

reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

### Notice of the Transactions, APA, Sale Hearing, Auction and the Cure Amounts

C.      As evidenced by the affidavits of service previously filed with this Court, proper, timely, adequate and sufficient notice of the Motion, the Auction, the Sale Hearing, the APA and the Transactions has been provided in accordance with Sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.   The Debtors have complied with all obligations to provide notice of the Motion, [the Auction], the Sale Hearing, the APA and the Transactions as required by the Bidding Procedures Order.  The aforementioned notices are good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, [the Auction], the Sale Hearing, the APA or the Transactions is required for the entry of this Order.

D.      A reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities.

E.      In accordance with the Bidding Procedures Order, the Debtors have served a notice of their intent to assume and assign the Assumed Contracts and of the Cure Amounts upon each non-Debtor counterparty to an Assumed Contract.  The service and provision of such notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of assumption and assignment of the Assumed Contracts or establishing a Cure Amount for the respective Assumed Contracts.   Non-Debtor counterparties to the Assumed Contracts have had an adequate opportunity to object to assumption and assignment of the applicable Assumed Contracts and the Cure Amount set forth in the notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the non-Debtor counterparty from accepting performance by, or

4

**Error! Unknown document property name.**

rendering performance to, Buyer for purposes of Section 365(c)(1) of the Bankruptcy Code).

[No objections, responses or requests for adequate assurance were made.]

### Highest or Otherwise Best Offer

F.      As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtors conducted an Auction process in accordance with, and have otherwise complied in all respects with, the Bidding Procedures Order.  The Auction was duly noticed and conducted in a non-collusive, fair and good faith manner and the Auction process set forth in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase all of the Acquired Assets and assume all of the Assumed Liabilities.

G.      The Acquired Assets were adequately marketed by the Debtors, and the consideration provided by Buyer under the APA constitutes the highest or otherwise best offer and provides fair and reasonable consideration to the Debtors for the sale of all Acquired Assets and the assumption of all Assumed Liabilities.

H.      Approval of the Motion and the APA and the consummation of the Transactions contemplated thereby are in the best interests of the Debtors, their respective creditors, estates and other parties in interest.  The Debtors have demonstrated good, sufficient and sound business reasons and justifications for entering into the Transactions and the performance of their obligations under the APA.

I.      Entry of an order approving the APA and all the provisions thereof is a necessary condition precedent to Buyer's consummation of the Transactions.

J.      The APA was not entered into, and none of the Debtors or Buyer, have entered into the APA or propose to consummate the Transactions, for the purpose of hindering, delaying

5

**Error! Unknown document property name.**

or defrauding the Debtors' present or future creditors.  None of the Debtors or Buyer is entering into the APA, or proposing to consummate the Transactions, fraudulently, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

K.     The offer of Buyer, upon the terms and conditions set forth in the APA, including the form and total consideration to be realized by the Debtors pursuant to the APA: (i) is the highest and/or best offer received by the Debtors; (ii) is fair and reasonable; (iii) is in the best interests of the Debtors' creditors and estates and (iv) constitutes fair value, fair, full and adequate consideration, reasonably equivalent value and reasonable market value for the Acquired Assets.  The value of the Acquired Assets is maximized by a sale in one lot, as contemplated by the APA, as opposed to piecemeal sales.

L.     The Buyer is the Successful Bidder for the Acquired Assets in accordance with the Bidding Procedures Order.  The Buyer has complied in all respects with the Bidding Procedures Order and any other applicable order of this Court in negotiating and entering into the APA, and the sale, [the Transition Services Agreement] and the APA likewise comply with the Bidding Procedures Order and any other applicable order of this Court. [NOTE TO CONSTELLATION:  PLEASE CONSIDER WHETHER PARAGRAPHS K, L, AND M CAN BE MERGED WITH PARAGRAPH F ABOVE. STANDING ORDER M-383 BARS REDUNDANT FINDINGS].

6

**Error! Unknown document property name.**

## **Good Faith of Debtors and Buyer**

M.      The sales process conducted by the Debtors, including without limitation, the Bidding Procedures set forth in the Bidding Procedures Order, was at arms' length, non-collusive, in good faith, and substantively and procedurally fair to all parties.

N.      The Debtors and their professionals have complied, in good faith, in all respects with the Bidding Procedures Order.  As demonstrated by (i) any testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, substantial marketing efforts and a competitive sale process were conducted in accordance with the Bidding Procedures Order, the Debtors (a) afforded interested potential purchases a full, fair and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase all of the Debtors' assets, (b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Acquired Assets, and (c) considered any bids submitted on or before the Bid Deadline.

O.      The APA and the Transactions contemplated thereunder were proposed, negotiated and entered into by and among the Debtors and Buyer without collusion, in good faith and at arms' length.  None of the Debtors or the Buyer has engaged in any conduct that would cause or permit the APA or the Transactions to be avoided under Section 363(n) of the Bankruptcy Code.

P.      Neither the Buyer nor any of their respective affiliates, present or contemplated members, officers, directors, shareholders or any of their respective successors and assigns is an "insider" of any of the Debtors, as that term is defined in Section 101(31) of the Bankruptcy Code.  Buyer is entering into the Transactions in good faith and is a good faith buyer within the meaning of Section 363(m) of the Bankruptcy Code, and is therefore entitled to the full

7

protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding.  Neither the Debtors nor the Buyer have engaged in any action or inaction that would cause or permit the APA to be avoided or impose any costs or damages under Section 363(n) of the Bankruptcy Code.

### Section 363 is Satisfied

Q.      The Debtors have demonstrated a sufficient basis and compelling circumstances requiring them to (i) enter into the APA, (ii) sell the Acquired Assets and assume and assign the Assumed Contracts, and [(iii) enter into the Transition Services Agreement], and such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their estates and their creditors.  Such business reasons include, but are not limited to, the fact that (i) the APA constitutes the highest or otherwise best offer for the Acquired Assets; (ii) the APA presents the best opportunity to realize the value of the Debtors on a going concern basis and avoid any potential decline and devaluation of the Debtors' business; and (iii) unless the sale is concluded expeditiously as provided for in the Motion and pursuant to the APA [and the Transition Services Agreement], recoveries of creditors may be diminished.

R.      The Debtors have, to the extent necessary, satisfied the requirements of Bankruptcy Code sections 363(b)(1).  Accordingly, appointment of a consumer privacy ombudsman pursuant to Bankruptcy Code sections 363(b)(1) or 332 is not required with respect to the relief requested in the Sale Motion.

S.      The Acquired Assets constitute property of the Debtors' estates and title thereto is presently vested in the Debtors' estates within the meaning of Bankruptcy Code section 541(a).

T.      The sale of all Acquired Assets to Buyer under the terms of the APA meets the applicable provisions of Section 363(f) of the Bankruptcy Code such that the sale of the Acquired Assets will be free and clear of any and all Claims, and except as expressly provided in

8

**Error! Unknown document property name.**

the APA with respect to the Assumed Liabilities, the (i) transfer of the Acquired Assets to Buyer

and (ii) assumption and/or assignment to Buyer or an Affiliate of Buyer of the Assumed

Contracts and Assumed Liabilities will be free and clear of all Claims and will not subject the

Buyer or any of the Buyer's assets to any liability for any Claims whatsoever (including, without

limitation, under any theory of equitable law, antitrust, or successor or transferee liability).  All

holders of Claims who did not object, or withdrew their objections to the Transactions, are

deemed to have consented to the Transactions pursuant to Section 363(f)(2) of the Bankruptcy

Code, and all holders of Claims are adequately protected — thus satisfying Section 363(e) of the

Bankruptcy Code — by having their Claims, if any, attach to the proceeds of the Transactions

ultimately attributable to the property against or in which they assert a Claim or other

specifically dedicated funds, in the same order of priority and with the same validity, force and

effect that such Claim holder had prior to the Transactions, subject to any rights, claims and

defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.

U.      Buyer would not have entered into the APA and would not consummate the sale

of all Acquired Assets, thus adversely affecting the Debtors, their estates, creditors, employees

and other parties in interest, if the sale of the Acquired Assets was not free and clear of all

Claims or if the Buyer could be liable for any Claims, including, without limitation and as

applicable, certain liabilities that expressly are not assumed by Buyer as set forth in the APA or

in this Order.  Buyer asserts that it will not consummate the Transactions unless the APA

specifically provides and this Court specifically orders that none of the Buyer, its assets or the

Acquired Assets will have any liability whatsoever with respect to, or be required to satisfy in

any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or

9

**Error! Unknown document property name.**

indirectly, any (i) Claim or (ii) any successor or transferee liability for any of the Debtors other than with respect to the Assumed Liabilities.

V.      The transfer of the Acquired Assets to Buyer under the APA will be a legal, valid and effective transfer of all of the legal, equitable and beneficial right, title and interest in and to the Acquired Assets free and clear of all Claims.  The Debtors may sell their interests in the Acquired Assets free and clear of all Claims because, in each case, one or more of the standards set forth in Section 363(f) has been satisfied.  The transfer of the Acquired Assets to Buyer will vest Buyer with good and marketable title to the Acquired Assets.

W.      The Buyer is not a continuation of the Debtors or their respective estates and there is no continuity between Buyer and the Debtors.  Buyer is not holding itself out to the public as a continuation of the Debtors or their respective estates and the Transactions do not amount to a consolidation, merger or *de facto* merger of Buyer and the Debtors.

<div align="center">**Assumption and Assignment of the Assumed Contracts**</div>

X.      The assumption and assignment of the Assumed Contracts (as such Assumed Contracts may be amended, supplemented or otherwise modified prior to assumption and assignment without further order of the Court with the consent of the Debtors, the contract counterparty and the Buyer) that are designated for assumption and assignment pursuant to the terms of this Order and the APA are integral to the APA, are in the best interests of the Debtors and their respective estates, creditors and other parties in interest, and represent the reasonable exercise of sound and prudent business judgment by the Debtors.

Y.      No section of any Assumed Contract which purports to prohibit, restrict, or condition the use, consideration or assignment of any such Assumed Contract in connection with the Transactions shall have any force or effect.

<div align="center">10</div>

**Error! Unknown document property name.**

Z.      The Debtors have met all requirements of Section 365(b) of the Bankruptcy Code for each of the Assumed Contracts.  The Debtors and/or Buyer, as applicable under the APA, have (a) cured and/or provided adequate assurance of cure of any default existing prior to the Closing under all of the Assumed Contracts, within the meaning of Section 365(b)(1)(A) of the Bankruptcy Code; and (b) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from a default prior to the Closing under any of the Assumed Contracts, within the meaning of Section 365(b)(1)(B) of the Bankruptcy Code.  Each of the Assumed Contracts is free and clear of all Claims against Buyer.

AA.      Buyer has demonstrated adequate assurance of its future performance under the relevant Assumed Contracts within the meaning of Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  Pursuant to Section 365(f) of the Bankruptcy Code, the Assumed Contracts to be assumed and assigned under the APA shall be assigned and transferred to, and remain in full force and effect for the benefit of, Buyer notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer.

BB.      No defaults exist in the Debtors' performance under the Assumed Contracts as of the date of this Sale Order other than the failure to pay amounts equal to the Cure Amounts or defaults that are not required to be cured as contemplated in Section 365(b)(1)(A) of the Bankruptcy Code.

CC.      There is no legal or equitable reason to delay the Transactions.  Cause exists to waive the automatic fourteen (14) day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

**THEREFORE, ITS IS HEREBY ORDERED THAT:**

**General Provisions**

1.      The Motion is granted in its entirety and approved in all respects.

11

**Error! Unknown document property name.**

2.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court or as resolved in this Order, and all reservations of rights included therein, are, except as provided in other orders of the Court, hereby overruled on the merits with prejudice.  All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein including without limitation all non-debtor parties to the Assumed Contracts.

3.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

### Approval of the APA

4.      The APA, all of the terms and conditions thereof, and all of the Transactions contemplated therein are approved in all respects.  The failure specifically to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.  The transfer of the Acquired Assets by the Debtors to Buyer shall be a legal, valid and effective transfer of the Acquired Assets.  The closing of the Transactions is hereby approved and authorized under Section 363(b) of the Bankruptcy Code.

5.      The Debtors are authorized and, to the extent not already done, directed to (a) take any and all actions necessary or appropriate to perform, consummate, implement and close the Transactions, including the sale to Buyer of all Acquired Assets, in accordance with the terms and conditions set forth in the APA and this Order, including without limitation executing,

12

**Error! Unknown document property name.**

acknowledging and delivering such corporate name change certificates, deeds, assignments, conveyances and other assurance, documents and instruments of transfer and taking any action for purposes of assigning, transferring, granting, conveying, and confirming to Buyer, or reducing to possession, any or all of the Acquired Assets and (b) to assume and assign any and all Assumed Contracts.  The Debtors are further authorized to pay, whether before, at or after the closing, any expenses or costs that are required to be paid in order to consummate the Transactions or perform their obligations under the APA.

6.      All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to transfer the Acquired Assets to Buyer in accordance with the APA and this Order.

7.      All amounts, if any, to be paid by Debtors to Buyer pursuant to the APA, including, without limitation, any allowed claims for breach thereof and the Final Adjustment Amount, if any, shall (a) constitute allowed administrative expenses of the estates pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) be protected as provided in the APA, (c) not be altered, amended, discharged or affected by any plan proposed or confirmed in these cases without the prior written consent of Buyer, and (d) be due and payable if and when any Debtors' obligations arise under the APA without further order of the Court.

8.      Nothing contained in any chapter 11 plan confirmed in the Chapter 11 Cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the APA or this Order, and to the extent of any conflict or derogation between this Order or the APA and such future plan or order, the terms of this Order and the APA shall control.

## Sale and Transfer Free and Clear of Claims

9.      Except as otherwise expressly provided in the APA and the terms of this Order with respect to Assumed Liabilities, the Acquired Assets shall be sold free and clear of all

13

claims, Liens, liabilities, interests, rights and encumbrances, including, without limitation, the following: all mortgages, restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments; demands, rights of first refusal, consent rights, offsets, contract rights, recoupment rights, rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations by any governmental entity, decrees of any court or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, obligation claims, demands, guaranties, option rights or claims, rights, contractual or other commitment rights and claims, and all other matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under any theory, law or doctrine of successor liability (all of the foregoing collectively being referred to in this Order as "**Claims**", and, as used in this Order such term includes, without limitation, any and all "claims" as that term is defined and used in the Bankruptcy Code, including section 101(5) thereof) with all such

14

**Error! Unknown document property name.**

Claims to attach to the consideration to be received by the Debtors with the same validity, force and effect which they now have as against the Acquired Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto.  As used in this Order, the term "**Liens**" includes, without limitation, any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code, including section 101(37) thereof.

10.    At Closing, all of the Debtors' right, title and interest in and to, and possession of, the Acquired Assets shall be immediately vested in Buyer pursuant to Sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code free and clear of any and all Claims except for Assumed Liabilities.  Such transfer shall constitute a legal, valid, binding and effective transfer of such Acquired Assets.  All person or entities, presently or on or after the Closing, in possession of some or all of the Acquired Assets are directed to surrender possession of the Acquired Assets to Buyer or its respective designees on the Closing or at such time thereafter as Buyer may request.

11.    This Order (a) shall be effective as a determination that, as of the Closing, (i) no Claims (other than Assumed Liabilities) will be capable of being asserted against the Buyer or any of its respective assets (including the Acquired Assets), (ii) the Acquired Assets shall have been transferred to Buyer free and clear of all Claims and (iii) the conveyances described herein have been effected; and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record

15

or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.  The Acquired Assets are sold free and clear of any reclamation rights.

12.    Except as otherwise provided in the APA, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors holding Claims arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets, the ownership, sale or operation of the Acquired Assets and the business prior to Closing or the transfer of the Acquired Assets to Buyer, are hereby forever barred, estopped and permanently enjoined from asserting such Claims against the Buyer, its property or the Acquired Assets.  Following the Closing, no holder of any Claim shall interfere with Buyer's title to or use and enjoyment of the Acquired Assets based on or related to any such Claim, or based on any action the Debtor may take in their Chapter 11 cases.

13.    If any person or entity that has filed financing statements, mortgages, mechanic's Claims, *lis pendens* or other documents or agreements evidencing Claims against or in the Acquired Assets shall not have delivered to the Debtors prior to the Closing of the Transactions, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Claims that the person or entity has with respect to the Acquired Assets or otherwise, then only with regard to the Acquired Assets that are purchased by Buyer pursuant to the APA and this Order (a) the Debtors are hereby authorized and directed to

16

**Error! Unknown document property name.**

execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets and (b) Buyer is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Buyer and the applicable Acquired Assets; and (c) the Buyer may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction, and releases of all Claims with respect to the Acquired Assets other than Assumed Liabilities. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office.

14.    To the maximum extent permitted under applicable law, Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Acquired Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to Buyer as of the Closing Date.

15.    To the extent permitted by Bankruptcy Code section 525, no governmental unit may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred, assigned or conveyed to Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Transactions.

16.    For the avoidance of doubt, only Acquired Assets that are part of the estates of the Debtors are being sold to Buyer free and clear of Claims pursuant to Section 363(f) of the Bankruptcy Code.

## No Successor or Transferee Liability

17.    The Buyer shall not be deemed, as a result of any action taken in connection with the APA, the consummation of the Transactions contemplated by the APA, or the transfer or

17

**Error! Unknown document property name.**

operation of the Acquired Assets to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for Buyer, with respect to any obligations as an assignee under the Assumed Contracts arising after the Closing); (b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors including, without limitation, within the meaning of any foreign, federal, state or local revenue, pension, the Employee Retirement Income Security Act ("**ERISA**"), the Consolidated Omnibus Budget Reconciliation Act **("COBRA**"), WARN (defined below), CERCLA (defined below), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act, environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under CERCLA, any liabilities, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

18.     The Buyer shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the Acquired Assets other than as expressly set forth in the APA with respect to Assumed Liabilities or (b) any Claims against the Debtors or any of their predecessors or affiliates.  Except as expressly provided in the APA with respect to Buyer, the Buyer shall have no liability whatsoever with respect to the Debtors, (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates')

**Error! Unknown document property name.**

obligations (as described herein, "**Successor or Transferee Liability**") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, *de facto* merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing.  Except to the extent expressly included in the Assumed Liabilities with respect to Buyer, the Buyer shall have no liability or obligation under the WARN Act (29 U.S.C. §§ 2101 et seq.) ("**WARN**") or the Comprehensive Environmental Response Compensation and Liability Act ("**CERCLA**"), or any foreign, federal, state or local labor, employment, or environmental law whether of similar import or otherwise by virtue of Buyer's purchase of the Acquired Assets or assumption of the Assumed Liabilities by Buyer or an Affiliate of Buyer.

19.     Except as expressly provided in the APA for the Assumed Liabilities, with respect to Buyer, nothing in this Order or the APA shall require the Buyer to (a) continue or maintain in effect, or assume any liability in respect of any employee, collective bargaining agreement, pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other agreements to which the Debtors are a party or have any responsibility therefor including, without limitation, medical, welfare and pension benefits payable after retirement or other termination of employment; or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any

19

employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.

20.    Effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, or its assets (including the Acquired Assets), with respect to any (a) Claim or (b) Successor or Transferee Liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien, claim, interest or encumbrance; (iv) asserting any setoff, right of subrogation or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with such assets.

## **Good Faith of Buyer**

21.    The Transactions contemplated by the APA are undertaken by Buyer (and the Buyer) without collusion and in good faith, as that term is defined in Section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the Transactions (including the assumption and assignment of the Assumed Contracts), unless such authorization and consummation of such sale are duly and properly stayed pending such appeal.

**Error! Unknown document property name.**

22.     Neither the Debtors nor Buyer (nor the Buyer) have engaged in any action or inaction that would cause or permit the Transactions to be avoided or costs or damages to be imposed under Section 363(n) of the Bankruptcy Code.  The consideration provided by Buyer for the Acquired Assets under the APA is fair and reasonable and the sale may not be avoided under Section 363(n) of the Bankruptcy Code.

### Assumption and Assignment of Assumed Contracts

23.     The Debtors are authorized and directed at the Closing to assume and assign each of the Assumed Contracts to Buyer or an Affiliate of Buyer free and clear of all Claims pursuant to Sections 105(a), 363(b) and 365 of the Bankruptcy Code free and clear of all Claims and to execute and deliver to Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to Buyer.  The payment of the applicable Cure Amounts shall (a) effect a cure of all defaults existing thereunder as of the Closing, (b) compensate for any actual pecuniary loss to such non-Debtor counterparty resulting from such default, and (c) together with the assumption of the Assumed Contracts by the Debtors and the assignment of the Assumed Contracts to Buyer or an Affiliate of Buyer, constitute adequate assurance of future performance thereof.

24.     Any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the counterparty to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect.  All other requirements and conditions under Sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to Buyer or an Affiliate of Buyer of the Assumed Contracts have been satisfied.  Upon the Closing, in accordance with Sections 363 and 365 of the Bankruptcy Code,

21

**Error! Unknown document property name.**

Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Contracts, and such Assumed Contracts shall remain in full force and effect for the benefit of Buyer. Each non-Debtor counterparty to the Assumed Contracts shall be forever barred, estopped, and permanently enjoined from (a) asserting against the Debtors or Buyer or their respective property any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing or arising by reason of the Closing, including any breach related to or arising out of change-in-control in such Assumed Contracts, or any purported written or oral modification to the Assumed Contracts and (b) asserting against Buyer (or its property, including the Acquired Assets) any claim, counterclaim, defense, breach, condition, setoff asserted or capable of being asserted against the Debtors existing as of the Closing or arising by reason of the Closing except for the Assumed Liabilities.

25. Until Closing, [including during the period when the Transition Services Agreement is in effect] (the "**Designation Period**"), Buyer shall be permitted to designate additional Contracts ("**Buyer Designation Rights**") that will be (i) assumed by the Debtors and assigned to Buyer and become Assumed Contracts (the "**Proposed Assumed Contracts**") or (ii) excluded by the Buyer from the Assumed Contracts set forth in Schedule 2.1 of the APA. Prior to the expiration of the Designation Period, the Debtors shall not reject any contracts, other than in accordance with this Order and the APA. Within three (3) Business Days of receipt by the Debtors of prior written notice by Buyer of an exercise of Designation Rights requiring assumption by the Debtors and assignment to Buyer or an Affiliate of Buyer of any Proposed Assumed Contract, the Debtors shall file a notice of assumption and assignment ("**Assumption and Assignment Notice**") with the Bankruptcy Court and serve a copy of such notice on each

22

**Error! Unknown document property name.**

non-Debtor party to the subject Proposed Assumed Contract (each, a "**Contract
Counterparty**"), setting forth a description of each Proposed Assumed Contract.  No later than
ten (10) days after the date that the Debtors serve an Assumption and Assignment Notice, the
Debtors will file with the Court an order authorizing the assumption/assignment of the Assumed
Contracts listed in the Assumption and Assignment Notice which provides (1) that the
assumption of such Assumed Contracts are approved, final and effective, pursuant to Section 365
of the Bankruptcy Code and (2) the Successful Bidder provided adequate assurance of future
performance under the applicable contract in accordance with Section 365(f)(2)(B).  For the
avoidance of doubt, the assumption and assignment of and provision of adequate assurance of
future performance under Assumed Contracts for which the non-debtor counterparty has been
previously noticed pursuant to the Bidding Procedures Order is hereby approved without the
need for further notice or hearing.

26.    Until a Contract is assumed and assigned as set forth herein, it shall not be
considered to be either assumed or assigned and shall remain subject to designation in
accordance with the Designation Rights.  During the Designation Period, the Debtors shall be
responsible for all costs (and Cure Amounts if Assumed) with respect to all Contracts listed on
Schedule 2.1 of the APA as of the Agreement Date until the later of (i) the Closing or (ii) when
the Court enters an order rejecting such Contract.  Except with respect to Contracts discovered
after the Agreement Date, with respect to Contracts that Buyer does not list on Schedule 2.1(c)
on the Agreement Date, the Debtors shall not have any liability with respect to any Contract that
is not listed on Schedule 2.1 of the APA as of the Agreement Date regardless of whether such
Contract is an Assumed Contract, and during the Designation Period, the Buyer shall be
responsible for all costs (and Cure Amounts if Assumed) with respect to all Contracts not listed

**Error! Unknown document property name.**

on Schedule 2.1 of the APA as of the Agreement Date until the later of (i) the Closing or (ii) when the Court enters an order rejecting such Contract; provided, however, solely with respect to Contracts that Debtors do not provide notice of to Buyer prior to the Agreement Date, during the Designation Period, the shall be responsible for all costs (and Cure Amounts if Assumed) with respect to all Contracts not listed on Schedule 2.1 of the APA as of the Agreement Date until the later of (i) the Closing or (ii) when the Court enters an order rejecting such Contract.

27.    Upon the Closing and the payment of the relevant Cure Amounts by Debtors or Buyer as set forth in the APA, Buyer shall be deemed to be substituted for the Debtors as a party to the applicable Assumed Contracts and the Debtors shall be released, pursuant to Section 365(k) of the Bankruptcy Code, from any liability under the Assumed Contracts.  There shall be no rent accelerations, assignment fees, increases or any other fees charged to Buyer or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

28.    Each non-debtor party to an Assumed Contract is forever barred, estopped and permanently enjoined from asserting against Buyer, or its property (including without limitation the Acquired Assets), any default existing as of the date of the Sale Hearing, or any counterclaim, defense, setoff or other claim asserted or capable of being asserted against the Debtors.  Other than the Assumed Contracts, Buyer assumed none of the Debtors' other contracts and leases and shall have no liability whatsoever thereunder.

29.    The assignments of each of the Assumed Contracts are made in good faith under Sections 363(b) and (m) of the Bankruptcy Code.

### Other Provisions

30.    Notwithstanding anything to the contrary in the Motion, if the APA is terminated prior to Closing and the Buyer is entitled to the Break-Up and Expense Reimbursement Amount pursuant to the APA, then, (i) the Debtors shall promptly return the Buyer's Deposit and (ii) the

24

**Error! Unknown document property name.**

Debtors also shall pay to Buyer any portion of the Break-Up and Expense Reimbursement Amount owed to Buyer pursuant to the APA; provided, however, that, pending such payment, the Break-Up and Expense Reimbursement Amount shall constitute, and Buyer shall have, an allowed administrative expense claim for the amount of the Break-Up and Expense Reimbursement Amount pursuant to Bankruptcy Code sections 503(a) and (b) and 507(a)(2).

31.    In connection with the Closing of the Transactions, the Purchase Price from the Sale shall be paid directly by the Successful Bidder to the administrative agent under the First Lien Credit Agreement on the Closing Date for distribution to the Lenders (as defined in the First Lien Credit Agreement), except that (a) $[•] shall be funded into a segregated interest bearing account to be maintained at the First Lien Collateral Agent (as defined in the Sale Support Agreement, dated as of August [•], 2010 (the "**Sale Support Agreement**")) on account of the Debtor Professionals' Carve-Out (as defined in the Sale Support Agreement), (b) $[•] shall be funded into a segregated interest bearing account to be maintained at the First Lien Collateral Agent on account of the Creditors' Committee's Professionals' Carve-Out (as defined in the Sale Support Agreement) (provided, however, that no portion of the Creditors' Committee's Professionals' Carve-Out may be used by the Committee (as defined in the Sale Support Agreement) to prosecute the extent, validity and priority of the First Lien Loan Claims (as defined in the Sale Support Agreement) and the liens and other security interests securing the First Lien Loan Claims or any other claims against the First Lien Lenders (as defined in the Sale Support Agreement), First Lien Administrative Agent (as defined in the Sale Support Agreement) or First Lien Collateral Agent), (c) $[•] shall be funded into a segregated interest bearing account to be maintained at the First Lien Collateral Agent on account of the UST Carve-Out (as defined in the Sale Support Agreement), (d) $[•] shall be funded into a segregated

25

**Error! Unknown document property name.**

interest bearing account to be maintained at the First Lien Collateral Agent on account of the Chapter 7 Trustee Carve-Out (as defined in the Sale Support Agreement), (e) a cash amount sufficient for the payment in full in cash of holders of priority claims and administrative claims (including, without limitation, claims arising under section 503(b)(9) of the Bankruptcy Code) shall be funded into a segregated interest bearing account to be maintained at the First Lien Collateral Agent for distribution to holders of priority claims and administrative claims and (f) five percent (5%) of the gross Purchase Price shall be funded into a segregated interest bearing account to be maintained at the First Lien Collateral Agent to be paid to the First Lien Administrative Agent upon the effective date of a plan of liquidation in these Chapter 11 Cases (the segregated interest bearing accounts described above, collectively the "**Reserve Accounts**" and all funds contained therein, collectively the "**Reserve Funds**").

32.    Without limiting any provision hereunder, it is hereby acknowledged and agreed that the liens of the First Lien Collateral Agent, for the benefit of the First Lien Lenders and other secured creditors, if any, shall attach in the same priority and to the same extent as existed prior to the consummation of the transactions contemplated by the Asset Purchase Agreement to each of the Reserve Accounts and the Reserve Funds; it being understood that (a) distributions of the Reserve Funds in accordance with Paragraph 4(b) of the Sale Support Agreement shall be free and clear of any liens, claims, interests or encumbrances of the First Lien Collateral Agent and (b) any Reserve Funds (and any interest accruing thereon) remaining in any Reserve Account (i) after payment in full of the Debtors' professionals in accordance with an order(s) of the Bankruptcy Court, (ii) after payment in full of the Creditors' Committee's professionals in accordance with an order(s) of the Bankruptcy Court, (iii) after payment in full to the Office of the United States Trustee in accordance with the Bankruptcy Rules and any applicable guidelines

26

**Error! Unknown document property name.**

and/or procedures of the Office of the United States Trustee, (iv) in the event the Debtors' Chapter 11 Cases are not converted to cases under chapter 7 of the Bankruptcy Code prior to confirmation of a plan of reorganization or liquidation, and (v) after payment in full of all priority claims and administrative claims, shall be paid to the First Lien Administrative Agent for prompt distribution to the First Lien Lenders.[4]

33.     The Debtors are authorized and directed pursuant to sections 105 and 363 of the Bankruptcy Code, to enter into and perform the Transition Services Agreement by and between the Debtors and Buyer.  The Debtors are authorized and directed to take all actions contemplated in the Transition Services Agreement.

34.     The requirements set forth in Rule 6003(b) of the Bankruptcy Rules are satisfied by the contents of the Motion or otherwise deemed waived.

35.     Buyer shall not be required to seek or obtain relief from the automatic stay under Section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other sale-related document.  The automatic stay imposed by Section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence, provided however that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

36.     Except as otherwise provided in the APA, this Order does not approve or provide for the transfer to Buyer of any avoidance claims of the Debtors' estates.

37.     Buyer is not and will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the

---

[4] NOTE TO DRAFT:  Debtors and First Lien Lenders to discuss dollar amounts.

27

**Error! Unknown document property name.**

transaction contemplated by the APA based upon any arrangement made by or on behalf of the Debtors.

38.     This Order is binding upon and inures to the benefit of any successors and assigns of the Debtors or Buyer, including any trustee appointed in any subsequent case of the Debtors under chapter 7 of the Bankruptcy Code.

39.     The provisions of this Order and the APA are non-severable and mutually dependent.

40.     The APA may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

41.     The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the sale.  This Court retains jurisdiction to compel delivery of the Acquired Assets, to protect the Buyer and its assets, including the Acquired Assets, against any Claims and Successor and Transferee Liability and to enter orders, as appropriate, pursuant to Sections 105, 363 or 365 (or other applicable provisions) of the Bankruptcy Code necessary to transfer the Acquired Assets and the Assumed Contracts to Buyer.

42.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062 and 9014 or otherwise, the terms and conditions of this Order shall be effective

**Error! Unknown document property name.**

immediately upon entry and the Debtors and Buyer are authorized to close the sale immediately upon entry of this Order.

43.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

44.    To the extent any provisions of this Order conflict with, or are otherwise inconsistent with, the terms and conditions of the APA or the Bidding Procedures Order, this Order shall govern and control, and to the extent the Motion conflicts with, or is otherwise inconsistent with, the terms and conditions of the APA, the terms and conditions of the APA shall govern and control.


New York, New York
Date: _____, 2010

_____
United States Bankruptcy Judge


29

**Error! Unknown document property name.**