**Exhibit 5**

**Exhibit C (Bidding Procedures Order)**

-11-

EXHIBIT A TO SALE ORDER, PAGE 281

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Boston Generating, LLC, <br> et al.,[1] | Case No. 10-14419 (SCC) |
| Debtors. | Jointly Administered |
| | **Related Docket No. 24** |

### ORDER APPROVING AND AUTHORIZING (A) BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL THE ASSETS OF THE DEBTORS, (B) STALKING HORSE BID PROTECTIONS, (C) PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS (D) THE FORM AND MANNER OF NOTICE OF THE SALE HEARING AND (E) RELATED RELIEF

Upon the portion of the motion (the "**Motion**")[2] of Boston Generating, LLC and the other above-captioned debtors, as debtors and debtors-in-possession (collectively, the "**Debtors**"), for entry of an order approving and authorizing (a) bidding procedures, including stalking horse bidder protections, in connection with the receipt and analysis of competing bids for substantially all of the assets of the Debtors, (b) procedures for the assumption and assignment of executory contracts and unexpired leases in connection with the Sale, (c) Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With the Sale of Substantially All of the Assets of the Debtors, (d) the form and manner of notice of the Sale and scheduling the sale hearing and setting related dates and deadlines and (e) other related relief, pursuant to Sections 105(a), 363 and 365 of title 11 of the United States Code (the "**Bankruptcy**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Boston Generating, LLC (0631); EBG Holdings LLC (3635); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC (7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

[2]    Unless otherwise stated, all capitalized terms not defined herein shall have the same meanings as set forth in the Motion.

**Code**"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 2002-1, 6004-1, 6006-1 and 9006-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**") and the Amended Guidelines for the Conduct of Asset Sales established and adopted by the United States Bankruptcy Court for the Southern District of New York pursuant to General Order M-383 (the "**Sale Guidelines**"); and this Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.); and this Court having found that the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and hearings having been held on October 4-7 and 9, 2010 (collectively, the "**Hearing**"); and this Court having reviewed the Motion and the exhibits thereto and the arguments of counsel made and the evidence proffered or adduced, as applicable, at the Hearing; and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest; and this Court having found the form and manner of notice of the Hearing is good, sufficient and appropriate under the circumstances and that no other or further notice need be provided or is necessary; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, this Court FINDS AND DETERMINES THAT:[3]

---

[3] The Court's opinion that was read into the record at the conclusion of the Hearing is attached hereto as Schedule 1.

A.       **Bidding Procedures.** The Debtors have articulated good and sufficient reasons

for authorizing and approving the Bidding Procedures annexed as **Exhibit A** hereto (the

"**Bidding Procedures**"), which are fair, reasonable and appropriate under the circumstances and

designed to maximize the recovery on, and realizable value of, the Acquired Assets.

B.       **Stalking Horse Bid Protections.** The Debtors have demonstrated a compelling

and sound business justification for authorizing the payment of the Break-Up Fee and the

Reimbursable Expenses (the "**Bid Protections**") to the Stalking Horse Bidder under the

circumstances, including, without limitation, that:

i.       the Bid Protections are the product of negotiations among the Debtors and
the Stalking Horse Bidder conducted in good faith and at arm's-length,
and the APA (including the Bid Protections) is the culmination of a
process undertaken by the Debtors and their professionals to negotiate a
transaction with a bidder who was prepared to pay the highest or otherwise
best purchase price to date for the Acquired Assets in order to maximize
the value of the Debtors' estates;

ii.       the Bid Protections are an actual and necessary cost and expense of
preserving the respective Debtors' estates;

iii.       the Bid Protections are fair, reasonable and appropriate in light of, among
other things, the size and nature of the proposed Sale under the APA, the
substantial efforts that have been and will be expended by the Stalking
Horse Bidder, notwithstanding that the proposed sale is subject to higher
or better offers, and the substantial benefits the Stalking Horse Bidder has
provided to the Debtors, their estates and creditors and all parties in
interest herein, including, among other things, by increasing the likelihood
that the best possible price for the Acquired Assets will be received;

iv.       the protections afforded to the Stalking Horse Bidder by way of the Bid
Protections were material inducements for, and express conditions of, the
Stalking Horse Bidder's willingness to enter into the APA, and were
necessary to ensure that the Stalking Horse Bidder would continue to
pursue the proposed acquisition on terms acceptable to the Debtors in their
sound business judgment, subject to competitive bidding; and

v.       the assurance of the payment of the Bid Protections has promoted more
competitive bidding by inducing the Stalking Horse Bidder's bid, which
may be the highest and best available offer for the Acquired Assets, and
which induced the Stalking Horse Bidder to submit a bid that will serve as

a minimum or floor bid on which all other bidders can rely and increases the likelihood that the final purchase price reflects the true value of the Acquired Assets.

C.    **Assumption and Assignment Procedures**.  The Motion, the Contract Notice annexed as **Exhibit B** hereto (the "**Contract Notice**") and the Assumption Notice annexed as **Exhibit C** hereto (the "**Assumption Notice**") are reasonably calculated to provide counterparties to the Assumed Contracts with proper notice of the potential and actual assumption and assignment of their executory contracts or unexpired leases, any Cure Amounts relating thereto and the Assumption and Assignment Procedures.  The Assumption and Assignment Procedures are reasonably calculated to facilitate the fair and orderly assumption and assignment of the Assumed Contracts.

D.    **Sale Notice**.  The Sale Notice annexed as **Exhibit D** hereto (the "**Sale Notice**") is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including, without limitation:  (i) the date, time and place of the Auction (if one is held); (ii) the Bidding Procedures and the dates and deadlines related thereto; (iii) the objection deadline for the sale Motion and the date, time and place of the Sale Hearing; (iv) reasonably specific identification of the Acquired Assets; (v) instructions for promptly obtaining a copy of the APA; (vi) representations describing the Sale as being free and clear of liens, claims, interests and other encumbrances, with all such liens, claims, interests and other encumbrances attaching with the same validity and priority to the sale proceeds; (vi) the commitment by the Stalking Horse Bidder to assume certain liabilities of the Debtors; and (vii) notice of the proposed assumption and assignment of contracts and leases to the Stalking Horse Bidder pursuant to the APA (or to another Successful Bidder arising from the Auction, if any), the proposed cure amounts relating thereto and the right, procedures and deadlines for objecting thereto, and no other or further notice of the Sale shall be required.

**DOCKET 268**

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:

1.    The Motion is granted to the extent set forth herein.

2.    For the reasons stated on the record in open court on Monday, October 4, 2010,[4] none of (i) the pleadings filed by the Second Lien Administrative Agent, Second Lien Collateral Agent, any Second Lien Lender (in each case, as defined in that certain Collateral Agency and Intercreditor Agreement, dated as of December 21, 2006 (the "**Intercreditor Agreement**")), MatlinPatterson Global Advisers LLC (as investment advisor for one or more of its managed funds, accounts and/or affiliates that are parties in interest in the above-captioned matter, "**MatlinPatterson**"), CarVal Investors, LLC (on behalf of one or more of its managed funds, accounts and/or affiliates that are parties in interest in the above-captioned matter, "**CarVal**"), and Fortress Investment Group LLC (on behalf of one or more of its managed funds, accounts and/or affiliates that are parties in interest in the above-captioned matter, "**Fortress**"), in each case acting in such capacities as permitted by the Bankruptcy Court on the record, in support of an objection to the Motion or (ii) the prosecution thereof is a violation of the Intercreditor Agreement. Accordingly, the Second Lien Administrative Agent, Second Lien Collateral Agent, each Second Lien Lender, MatlinPatterson, CarVal and Fortress each in its capacity as such, has standing to be heard in connection with the Motion. Notwithstanding the foregoing, nothing in this order shall be deemed as determining whether the Second Lien Administrative Agent, Second Lien Collateral Agent or any Second Lien Lender has standing to object to anything other than the Debtors' request for approval of Bidding Procedures, including without limitation whether the Second Lien Administrative Agent, Second Lien Collateral Agent or the Second

---

[4] The Court's opinion that was read into the record on October 4, 2010 is attached hereto as Schedule 2.

Lien Lenders may object to a sale of the Debtors' assets under section 363 of the Bankruptcy Code, or may do so without violating the Intercreditor Agreement.

**I.**     **Important Dates and Deadlines**

3.     **Sale Hearing**.  November 17, 2010, at 10:00 a.m. prevailing Eastern Time, is the date and time the sale hearing (the "**Sale Hearing**") will be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge for the Bankruptcy Court for the Southern District of New York, at: One Bowling Green, Courtroom 610, New York, NY 10004.  Any obligations of the Debtors set forth in the APA that are intended to be performed prior to the Sale Hearing and/or entry of the Sale Order pursuant to the APA are authorized as set forth herein and are fully enforceable as of the date of entry of this order.  **Please take notice that:** the Sale Hearing may be adjourned by this Court or the Debtors from time to time without further notice other than by announcement in open court or on this Court's calendar.

4.     **Sale Objection Deadline**.  November 9, 2010 at 4:00 p.m. prevailing Eastern Time, is the deadline to object to entry of the proposed Sale Order (the "**Sale Objection Deadline**").  Objections, if any, **must**: (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules and the *Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures* [Docket No. 46] (the "**Case Management Order**"); (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (iv) be filed with this Court and served so *actually received* no later than the Sale Objection Deadline by the following parties (the "**Objection Notice Parties**"):

| Debtors | Counsel to Debtors |
| --- | --- |
| Boston Generating, LLC<br>505 Fifth Avenue, 21st Floor, New York, NY 10017,<br>Attn: Mark Sudbey, Chief Executive Officer and Jeff | Latham & Watkins LLP<br>885 Third Avenue<br>New York NY 10022-4834 |

DOCKET 268

| Hunter, Manager, Executive Vice President, and Chief Financial Officer | Attn: D. J. Baker, Esq. and Robert J. Rosenberg, Esq. |
|---|---|
| **Counsel to the Agent for the First Lien Lenders** | **United States Trustee** |
| Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York NY 10019<br>Attn: Scott K. Charles, Esq. and Michael S. Benn, Esq. | Office of the United States Trustee<br>for the Southern District of New York<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br>Attn: Andrea Schwartz, Esq. and Paul Schwartzberg, Esq. |
| **Counsel to the Agent for the Second Lien Lenders** | **Counsel to the Creditors' Committee** |
| Dechert LLP<br>1095 Avenue of the Americas<br>New York, NY 10036-6797<br>Attn: Allan S. Brilliant, Esq. and Craig P. Druehl, Esq. | Jager Smith P.C.<br>485 Madison Avenue, 20th Floor<br>New York, NY 10022<br>Attn: Bruce F. Smith, Esq. and Steven C. Reingold, Esq. |
| **Counsel to the Stalking Horse Bidder** | |
| Winston & Strawn LLP<br>200 Park Avenue<br>New York, NY 10166<br>Attn: David Neier, Esq. | |

> **The failure to timely file an objection in accordance with this order shall forever bar the assertion of any objection to the Motion, entry of the Sale Order and/or consummation of the Sale, including the assumption and assignment of contracts and leases to the Successful Bidder pursuant to the APA, and shall be deemed to constitute any such party's consent to entry of the Sale Order and consummation of the Sale and all transactions related thereto.**

5.      **Response Deadline.**  November 15, 2010 at 9:00 a.m., is the deadline for filing a response to any timely-filed objection to entry of the Sale Order with this Court; *provided*, that such deadline may be extended by agreement of the Debtors and the affected objecting party.

6.      **Competitive Bidding**.  The following dates and deadlines regarding competitive bidding are hereby established (subject to modification as needed):

a.      **Preliminary Bid Deadline:**  November 1, 2010, is the deadline by which anyone interested in participating in the bidding process must deliver the "**Preliminary Bid Documents**" (as defined in the Bidding Procedures);

b.    **Qualified Bid Deadline:**  November 13, 2010[5] at 12:00 p.m. prevailing Eastern Time, is the deadline by which all "**Qualified Bids**" (as defined in the Bidding Procedures) must be *actually received* by the parties specified in the Bidding Procedures (the "**Bid Deadline**"); and

c.    **Auction:**  November 15, 2010 at 10:00 a.m. prevailing Eastern Time, is the date and time the Auction, if one is needed, will be held at the offices of counsel to the Debtors:  Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022-4834.

II.    **Bidding Procedures and Related Relief**

    A.    **Bidding Procedures**

7.    The Bidding Procedures, substantially in the form annexed hereto as **Exhibit A** and incorporated by reference as though fully set forth herein, are hereby approved to the extent set forth herein.  The Bidding Procedures shall govern the submission, receipt and analysis of all bids relating to the proposed Sale, and any party desiring to submit a higher or better offer for the Acquired Assets shall do so strictly in accordance with the terms of the Bidding Procedures and this order.

8.    The Bid Protections described in the Motion are hereby approved to the extent set forth herein.  The Debtors are authorized to pay any and all amounts owing to the Stalking Horse Bidder in accordance with the terms of the APA, including the Break-up Fee and the Reimbursable Expenses, without further order of this Court, except as otherwise provided herein.

9.    As described in the Bidding Procedures, if the Debtors do not receive any Qualified Bids other than from the Stalking Horse Bidder or if no Qualified Bidder other than the Stalking Horse Bidder indicates its intent to participate in the Auction, the Debtors will not hold the Auction, the Stalking Horse Bidder will be named the Successful Bidder and the Debtors will seek approval of the APA at the Sale Hearing.  If one or more Qualified Bids is timely received

---

[5]    Notwithstanding the fact November 13, 2010 is a Saturday, Qualified Bids are actually due on November 13, 2010 at 12:00 p.m. (Eastern Time).

from a Qualified Bidder (other than the Stalking Horse Bidder) in accordance with the Bidding

Procedures, the Debtors shall conduct the Auction as set forth herein.

10.     If the Auction is conducted, each Qualified Bidder participating in the Auction

shall be required to confirm that it has not engaged in any collusion with respect to the bidding

process or the Sale.    The Auction will be conducted openly and shall be transcribed or

videotaped.    Absent irregularities in the conduct of the Auction, or reasonable and material

confusion during the bidding, the Court will not consider bids made after the Auction has been

closed.

**III.    Assumption and Assignment Procedures**

11.     The following procedures regarding the assumption and assignment of certain

executory contracts and unexpired leases in connection with the Sale are hereby approved to the

extent set forth herein, and shall govern the assumption and assignment of all executory contracts

and unexpired leases proposed to be assumed by the Debtors pursuant to Section 365(b) of the

Bankruptcy Code and assigned to the Stalking Horse Bidder (or other successful bidder

following the Auction, if any) pursuant to Section 365(f) of the Bankruptcy Code under the

APA:

a.     **Contract Notice.**  As soon as practicable after the entry of this Order, the
Debtors shall file with the Court and serve on all non-debtor
counterparties (the "**Contract Notice Parties**") to any executory contract
or unexpired lease that may be assumed by the Debtors and assigned to the
Successful Bidder, a "**Contract Notice**" in the form annexed hereto
**Exhibit B** that identifies, to the extent applicable (i) the contract that may
be an Assumed Contract, (ii) the name of the counterparty to such
contract, (iii) the cure amount for such contract if it becomes an Assumed
Contract, and (iv) the deadline by which any such Contract Notice Party
must file any Objection to the proposed assumption and assignment;
provided, however, that the presence of a contract on a Contract Notice
does not constitute an admission that such contract is an executory
contract.  As soon as practicable after the selection or designation of the
Successful Bid, the Debtors shall file with the Court and serve on the
Contract Notice Parties a further notice in the form annexed hereto as

DOCKET 266

**Exhibit C** (the "**Assumption Notice**") identifying the Successful Bidder and stating which executory contracts and unexpired leases will be Assumed Contracts, and no other or further notice will be required with respect to the Assumed Contracts.

b.    **Objections**.  Objections, if any, to the assumption and/or assignment of any contract or lease, proposed cure amount or adequate assurance of future performance proposed with respect thereto must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules and Case Management Order; (iii) state with specificity the nature of the objection and, if to the cure amount proposed by the Debtors, the cure amount alleged by the objecting party, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with this Court and served upon so as to be *actually received* by the Objection Notice Parties on or before the Sale Objection Deadline; provided, that if, following the Auction, the Stalking Horse Bidder is not the Successful Bidder, the deadline for such counterparties shall be automatically extended through and until the commencement of the Sale Hearing.

c.    **Dispute Resolution**.  If the parties are not able to consensually resolve any such objection prior to the Sale Hearing, the dispute will be heard at the Sale Hearing (or such other date as fixed by this Court).

12.    Any party failing to timely file an objection to the assumption and assignment of any contract or lease or related cure amount listed on the Contract Notice shall be forever barred from objecting thereto, including asserting any additional cure or other default amounts against the Debtors or any of the Debtors' estates, the Stalking Horse Bidder or other Successful Bidder with respect to such executory contract(s) or unexpired lease(s) and shall be deemed to consent to the Sale and the assumption and assignment of such executory contract(s) or unexpired lease(s) effectuated in connection therewith.

**IV.    Sale Hearing Notice and Related Relief**

13.    The Sale Notice, substantially in the form annexed hereto as **Exhibit D**, is hereby approved.  Within three (3) calendar days of the entry of this order, the Debtors shall cause the Sale Notice to be served upon, without limitation, (i) the Master Service List (as such term is defined in the Case Management Order), (ii) all known creditors of the Debtors, (iii) all parties

contacted as potential bidders during the pre-petition marketing of the Acquired Assets; (iv) parties who are known or reasonably believed to have asserted any lien, encumbrance, claim or other interest in the Acquired Assets, (v) all affected federal, state and local regulatory and taxing authorities and (vi) all parties to executory contracts or unexpired leases to be assumed and assigned or rejected as part of the Sale.

14.    As soon as practicable after entry of this order, the Debtors shall cause the Sale Notice, substantially in the form annexed hereto as **Exhibit D** (with any necessary modifications for ease of publication), to be published once in the Boston Globe.  The Debtors are also authorized, in their sole discretion, to publish the Sale Notice in other newspapers, trade journals, or similar publications.

15.    The Debtors are authorized to execute and deliver all instruments and documents, and take such other action as may be necessary or appropriate to implement and effectuate the transactions contemplated by this order.

16.    The Motion is granted to the extent set forth herein, and all objections or other responses to the Motion are overruled or resolved on the terms set forth herein.

17.    The requirements set forth in Local Bankruptcy Rule 9013-1(b) are satisfied by the contents of the Motion.

18.    Nothing herein shall preclude a bidder from submitting a competing bid in the form of a plan of reorganization and it being understood that such bid may be determined by the Debtors not to be a Qualified Bid.

19.     This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from, based upon or related to this order.

Date: October 12, 2010                          /s/Shelley C. Chapman
         New York, New York                     Honorable Shelley C. Chapman
                                                 United States Bankruptcy Judge

**Schedule 1**

**Opinion**

**[To follow and will be filed under separate cover]**

DOCKET 268

**<u>Schedule 2</u>**

**Opinion**

NY\1688986.9

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x    Case No. 10-14419 (scc)
In re:                                   New York, New York
    BOSTON GENERATING, LLC,              October 4, 2010
            Debtors.          8:49 a.m.
------------------------------------x

TRANSCRIPT OF CHAP 11 HEARING RE DOC #168 SUPPLEMENTAL NOTICE
OF HEARING (RELATED DOCUMENTS 32, 34, 29, 30, 33, 31).
DOC. #29, DEBTORS' APPLICATION FOR AN ORDER AUTHORIZING THE
EMPLOYMENT AND RETENTION OF LATHAM & WATKINS LLP AS BANKRUPTCY
COUNSEL NUNC PRO TUNC TO THE PETITION DATE.  DOC #30,
APPLICATION OF THE DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING THE
RETENTION AND EMPLOYMENT OF J.P. MORGAN SECURITIES AS INVESTMENT
BANKER FOR THE DEBTORS NUNC PRO TUNC TO THE PETITION DATE.  DOC.
#32, APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE RETENTION
AND EMPLOYMENT OF BROWN RUDNICK LLP AS SPECIAL COUNSEL FOR THE
DEBTORS NUNC PRO TUNC TO THE PETITION DATE.  DOC. #33, DEBTORS'
APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE EMPLOYMENT AND
RETENTION OF ANDERSON KILL & OLICK, P.C. AS CONFLICTS COUNSEL
FOR THE DEBTORS, NUNC PRO TUNC TO THE PETITION DATE.  DOC. #24
MOTION OF THE DEBTORS FOR ENTRY OF (I) AN ORDER APPROVING AND
AUTHORIZING (A) BIDDING PROCEDURES IN CONNECTION WITH THE SALE
OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS, (B) STALKING
HORSE BID PROTECTIONS, (C) PROCEDURES FOR THE ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN
CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF
THE DEBTORS, (D) THE FORM AND MANNER OF NOTICE OF THE SALE
HEARING, AND (E) RELATED RELIEF; AND (II) AN ORDER APPROVING AND
AUTHORIZING (A) THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF
THE DEBTORS FREE AND CLEAR OF CLAIMS, LIENS, LIABILITIES, RIGHTS
INTERESTS AND ENCUMBRANCES, (B) THE DEBTORS TO ENTER INTO AND
PERFORM THEIR OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT,
(C) THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, (D) THE TRANSITION SERVICES AGREEMENT AND
(E) RELATED RELIEF.  DOC #31, APPLICATION OF THE DEBTORS FOR
ENTRY OF AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF
PERELLA WEINBERG PARTNERS LP AS FINANCIAL ADVISOR FOR THE
DEBTORS NUNC PRO TUNC TO THE PETITION DATE.  DOC. #34,
APPLICATION OF THE DEBTORS FOR ENTRY OF AN ORDER
AUTHORIZING THE RETENTION AND EMPLOYMENT OF
FTI CONSULTING, INC. AS RESTRUCTURING ADVISORS
TO THE DEBTORS, NUNC PRO TUNC TO THE PETITION DATE.
BEFORE THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

In re Boston Generating - 10/4/10                    51

1        THE COURT:  Mr. Kirpalani, you're allowed to sit down
2   even though you didn't file a pleading.
3        MR. KIRPALANI:  Thank you.
4        (Laughter.)
5        THE COURT:  All right, let me give you my ruling on
6   the standing issue.  And because of the time imperatives, you
7   know this is not a Law Review article.  But it hopefully pretty
8   clearly explains what my thinking is.
9        The essence of the second lien agent's objection at
10  this juncture is whether the Debtors have fulfilled their
11  fiduciary duties to all creditors in teeing up the 363 sale of
12  the Boston Generating assets, in executing a pre-petition
13  marketing process and in proposing the bid procedures.
14       Notwithstanding the inter-creditor agreement, which I
15  will parse through in a moment, I believe as a general matter,
16  and a quite obvious one, that the Debtors are not permitted to
17  abdicate their fiduciary duties to their creditors collectively
18  or individually.  We are here today at One Bowling Green, not in
19  the state law foreclosure proceeding, but in a bid procedure's
20  hearing in the bankruptcy court.
21       The first lien lenders are consenting to and
22  encouraging this process, but this is the Debtor's motion.  At
23  this threshold stage, all parties in interest have a right to
24  assert substantial concerns that if meritorious, would suggest
25  fundamental defects in the Debtor's process to date.  In the

EXHIBIT A TO SALE ORDER, PAGE 297

In re Boston Generating - 10/4/10                              52

1   absence of explicit language in the inter-creditor agreement and

2   the type of specific prohibition that is now, for example, in

3   the ABA model inter-creditor agreement, I decline to find that I

4   must entirely silence the second lien agent simply because the

5   Debtor's proposed course of action is supported by the first

6   lien lenders.  Unlike the situation in *Ion*, we have here an

7   entire tranche of debt on the cusp of a recovery.  Not one

8   holder, who is far out of the money.  We have $300 million of

9   debt, among others, voicing concerns with a process that may

10  conclude with their getting no recovery.

11       As a preliminary matter, we all agree that the inter-

12  creditor agreement is strictly enforceable in accordance with

13  its terms and that general New York contract law applies.  I

14  have interpreted the inter-creditor agreement in accordance with

15  the plain meaning of its terms and I do not find the agreement

16  to be ambiguous.  I would note that I find the arguments made in

17  the second lien agent's reply, dated October 3, to be

18  particularly persuasive.  The first lien agent's pleading,

19  however, provides a view of the inter-creditor agreement that

20  conflates silence with subordination.

21       Section 3 is generally concerned with the exercise of

22  remedies and leads subordination and enforcement.  The first

23  lien lenders have senior liens; they get paid first; and have

24  virtually unfettered rights with respect to the disposition of

25  the proceeds of the collateral.  The sections referred to by the

DOCKET 268

In re Boston Generating - 10/4/10                                    53

1   first lien agent discuss the first lien agent's exclusive right

2   to make determinations about the "sale of collateral without

3   consultation" with the second lien lenders.  That's Section

4   3.1(b)(1).  The first lien agent also points to the second lien

5   lender's passive role in enforcement situations.  There they say

6   the second lien's sole right is to hold a lien on the collateral

7   under Section 3.1(c).

8            To be clear, the current hearing is a bid procedure's

9   hearing.  It is not a sale hearing.  My ruling therefore with

10  respect to standing to object to the bid procedures is limited

11  to just that for now.  If necessary I will deal with standing to

12  object to the sale another day.

13           The first lien agent does not have to do anything,

14  however, until the sale hearing when I anticipate they will

15  either consent under 363(f)(2) or perhaps get paid the aggregate

16  value of all their debt under 363(f)(3).  There is no exercise

17  of remedies here or determinations regarding collateral

18  occurring at this stage of the hearing that I believe implicate

19  3.1(b)(1).

20           The deemed consent to various actions of the first

21  lien agent does not without more mean that the second lien agent

22  has promised to be silent.  For example, in the adequate

23  protection context, the second lien agent cannot contest the

24  first lien agent's request for adequate protection.  The second

25  lien lenders, however, are expressly permitted to request

In re Boston Generating - 10/4/10                          54

1   subordinated adequate protection, which they did.

2          The plain language of the inter-creditor agreement

3   says the seconds are silent in certain circumstances, but I do

4   not read any express prohibition against objection to bidding

5   procedures anywhere in the inter-creditor agreement.

6          This case is distinguishable from *Ion Media*.   In *Ion*

7   Media a single second lien lender made arguments about whether

8   FCC licenses were "purported collateral" that were -- to put it

9   colloquially, a bit too cute when read against the inter-

10  creditor agreement.   The objecting second lien lender had also

11  expressly agreed not to object to the plan.   409 BR 597.

12  Nonetheless, the creditor barreled ahead and objected to the

13  plan.

14         Judge Peck ruled that the express prohibition in the

15  inter-creditor agreement deprived the second lien creditor of

16  standing.   In this case, there is no such expressed prohibition

17  against objecting to bid procedures.   And unlike in *Ion*, the

18  objection here posed by the second lien agent on behalf of $300

19  million of debt at the threshold of the case is simply not of

20  the same marginal nature as that of the objecting creditor in

21  *Ion*.   The first lien agent also relies heavily on *In re Erickson*

22  *Retirement*.   *Erickson*, of course is not binding on me and I

23  think it is also distinguishable.

24         The *Erickson* court again, relied heavily on its view

25  that the motion to appoint an examiner was obstructionist

EXHIBIT A TO SALE ORDER, PAGE 300

In re Boston Generating - 10/4/10                                    55

1   behavior by a junior creditor.  The _Erickson_ court held that the

2   examiner motion was commencement of action ultimately aimed at

3   collecting on claims that was prohibited by the inter-creditor

4   agreement.  A bid procedure's hearing does not implicate any

5   collection or enforcement and is thus distinguishable from

6   _Erickson_.

7             I also do not find that there is any basis to conclude

8   that the second lien agent at this juncture is engaging in

9   obstructionist behavior.  The second lien lenders are very close

10  to the money and they want to make sure the Debtors have

11  discharged their fiduciary duty to get the highest price for

12  their assets.  At this juncture, therefore, it is my

13  determination that they have standing to be heard.  That's it.

14            UNKNOWN:  Thank you, Your Honor.

15            THE COURT:  All right.  Thank you.  We're going to

16· have opening arguments now?

17            MR. KIRPALANI:  Your Honor, may I be excused.  I think

18  that was all I was supposed to be here for.

19            (Laughter.)

20            THE COURT:  Yes, thank you.

21            MR. SIEGEL:  May I be excused?

22            THE COURT:  Yes, you too.  I always like to see

23  lawyers with high hourly rates leave.

24            (Laughter.)

25            MR. KIRPALANI:  I won't take it personally.

EXHIBIT A TO SALE ORDER, PAGE 301

**<u>Exhibit A</u>**

**Bidding Procedures**

NY\1688986.9

DOCKET 266

D. J. Baker
Robert J. Rosenberg
Caroline A. Reckler (appearing *pro hac vice*)
Kimberly A. Posin (appearing *pro hac vice*)
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

Proposed Counsel to the Debtors and Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>Boston Generating, LLC,<br>et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 10-14419 (SCC)<br><br>Jointly Administered |

## BIDDING PROCEDURES FOR THE SUBMISSION, RECEIPT AND ANALYSIS OF BIDS IN CONNECTION WITH THE SALE OF DEBTORS' ASSETS

These Bidding Procedures have been approved by the United States Bankruptcy Court for the Southern District of New York (the "**Court**") in connection with the above-captioned jointly administered cases of Boston Generating, LLC and certain of its affiliates (collectively, the "**Debtors**" or the "**Company**"), dated as of [_____], 2010 [Docket No. ___] (the "**Bidding Procedures Order**").

These Bidding Procedures set forth the process by which the Debtors are authorized to conduct the sale (the "**Sale**") by auction (the "**Auction**") of the assets of the Debtors (defined as the "**Acquired Assets**" in the Asset Purchase Agreement dated as of August 7, 2010 (the "**Stalking Horse APA**"), by and among the Debtors and Constellation Holdings, Inc. (the "**Stalking Horse Bidder**") pursuant to the terms and conditions substantially in the form of the Stalking Horse APA. Please take notice that all capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Stalking Horse APA.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Boston Generating, LLC (0631); Boston Generating, LLC (0631); EBG Holdings LLC (3635); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC (7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

EXHIBIT A TO SALE ORDER, PAGE 303

> Copies of the Bidding Procedures Order, Stalking Horse APA or other documents related thereto are available upon request to The Garden City Group, Inc. by calling 866-454-3498, emailing EBGrestructuring@gcginc.com or visiting www.bgrestructuring.com.

**A.    Assets to be Sold.**

These Bidding Procedures set forth the terms by which prospective bidders, if any, may qualify for and participate in the Auction, thereby competing to make the highest or otherwise best offer for all or certain of the Acquired Assets and the Assumed Liabilities, as identified in further detail and defined in the Stalking Horse APA.

**B.    Stalking Horse Bidder**

On August 7, 2010, the Debtors, the Stalking Horse Bidder and Constellation Energy Group, Inc. entered into the Stalking Horse APA for the sale of substantially all of the Acquired Assets pursuant to which: (i) the Stalking Horse Bidder agreed to pay One Billion and One Hundred Million Dollars ($1,100,000,000.00) in cash, prior to adjustment of such amount in accordance with the terms of the Stalking Horse APA (the "**Cash Purchase Price**"), and to assume the Assumed Liabilities (together with the Cash Purchase Price, the "**Stalking Horse Bid**") for the Acquired Assets, subject to the outcome of the Auction and Court approval; and (ii) the Debtors agreed in the event that the Court approves the purchase of any of the Acquired Assets by any Person other than the Stalking Horse Bidder to (a) pay the Stalking Horse Bidder a break-up fee in the amount of Thirty Million Dollars ($30,000,000) (the "**Break-Up Fee**") and (b) reimburse the Stalking Horse Bidder's reasonable out-of-pocket expenses up to an aggregate amount not to exceed Five Million ($5,000,000) (the "**Reimbursable Expenses**" and together with the Break-Up Fee, the "**Break-Up & Expense Reimbursement Amount**").

**C.    Participation Requirements.**

To participate in the bidding process or otherwise be considered for any purpose hereunder, a Person (other than the Stalking Horse Bidder) interested in purchasing the Acquired Assets, or a subset of the Acquired Assets, (a "**Potential Bidder**") must, on or before **November 1, 2010,**[2] deliver (unless previously delivered) to each of (i) Boston Generating, LLC, 505 Fifth Avenue, 21st Floor, New York, NY 10017, Attn: Mark Sudbey, Chief Executive Officer (msudbey@uspowergen.com), Jeff Hunter, Chief Financial Officer and Executive Vice President (jhunter@uspowergen.com) or such other person designated by the Debtors; (ii) Latham & Watkins LLP, 885 Third Avenue, New York NY 10022-4834, Attn: D. J. Baker, Esq. (dj.baker@lw.com) and Robert J. Rosenberg, Esq. (robert.rosenberg@lw.com), counsel to the Debtors and (iii) Jager Smith P.C., 485 Madison Avenue, 20th Floor, New York, NY 10022, Attn: Bruce F. Smith, Esq. (bsmith@jagersmith.com) the following documents (the "**Preliminary Bid Documents**").    Counsel to the Debtors will share the Preliminary Bid Documents with the Consulting Parties (as defined below) if such Consulting Parties confirm in

---

[2]    November 1, 2010 is the outside deadline for Potential Bidders to deliver Preliminary Bid Documents. To the extent that Preliminary Bid Documents are received prior to that date, they will be considered as quickly as is reasonably possible.

NY\1688986.9

EXHIBIT A TO SALE ORDER, PAGE 304

writing to the Debtors that they will not be participating in the Auction process as a bidder (via a credit bid or otherwise).

a.  an executed confidentiality agreement (the "**Confidentiality Agreement**") reasonably acceptable to the Company;

b.  a non-binding indication of interest with respect to the purchase of all or certain of the Acquired Assets and the assumption of all or certain of the Assumed Liabilities; and

c.  preliminary proof by the Potential Bidder of its financial capacity to close a proposed transaction, which may include current unaudited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets, the party that will bear liability for a breach), the adequacy of which the Debtors and their advisors will determine.

Within two (2) calendar days after a Potential Bidder delivers the Preliminary Bid Documents, the Debtors, in consultation with the official committee of unsecured creditors (the "**Creditors' Committee**"), shall determine and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents so that the Potential Bidder may conduct a due diligence review with respect to the Debtors. Only those Potential Bidders that have submitted acceptable Preliminary Bid Documents (each, an "**Acceptable Bidder**") may submit bids to purchase the Acquired Assets and assume the Assumed Liabilities. The Stalking Horse Bidder shall at all times be deemed an Acceptable Bidder.

**D.    Obtaining Due Diligence Access.**

After receipt of an executed Confidentiality Agreement and notification of Acceptable Bidder status, the Debtors shall provide each Acceptable Bidder reasonable due diligence information, as requested, as soon as reasonably practicable after such request, which information shall be commensurate with that information given to the Stalking Horse Bidder. To the extent the Debtors give any information to any Acceptable Bidder that they had not previously provided to the Stalking Horse Bidder, the Debtors shall promptly provide such information to the Stalking Horse Bidder. The due diligence period will end on the Bid Deadline (as defined herein).

In connection with the provision of due diligence information to Acceptable Bidders, the Debtors shall not furnish any confidential information relating to the Debtors, the Acquired Assets, or the Sale to any person except an Acceptable Bidder or such Acceptable Bidder's duly-authorized representatives to the extent provided in the applicable Confidentiality Agreement.

The Debtors along with their advisors shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided, however,* the Debtors may decline to provide such information to Acceptable Bidders who, in the Debtors' reasonable business judgment, have not established that such Acceptable Bidders intend in good

3

faith to or have the capacity to consummate the purchase of all or certain of the Acquired Assets. No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline.

The Debtors designate J.P. Morgan Securities Inc. ("**JPM**") to coordinate all reasonable requests for additional information and due diligence access. The contact information for JPM is:

| David Feierstein | Kevin Shin |
|---|---|
| Tel: (212) 622-2086<br>Fax: (917) 463-0245<br>Cell: (516) 851-4924<br>E-mail: david.s.feierstein@jpmorgan.com | Tel: (212) 622-3432<br>Fax: (917) 546-2351<br>Cell: (917) 751-4332<br>E-mail: kevin.h.shin@jpmorgan.com |

**E.    Bid Requirements.**

To participate in the Auction, an Acceptable Bidder (other than the Stalking Horse Bidder) must deliver no later than the Bid Deadline (defined below) to the Debtors, their advisors, the Stalking Horse Bidder and the advisors to the Consulting Parties (defined below) at the addresses set forth in Paragraph F below an irrevocable offer that must:

a.    be in writing;

b.    at a minimum, exceed the aggregate sum of the following: (i) the Cash Purchase Price; (ii) the Assumed Liabilities; (iii) the Break-Up & Expense Reimbursement Amount (in the amount of $35,000,000); (iv) any amount required to be reimbursed to the Stalking Horse Bidder pursuant to Section 6.19 of the Stalking Horse APA; and (v) the minimum bid increment of Ten Million Dollars ($10,000,000) (such aggregate sum, the "**Minimum Bid Increment**") (all of which must be in cash and the assumption of administrative expense liabilities);

c.    constitute a good faith, bona fide offer to purchase all or certain of the Acquired Assets and to assume all or certain of the Assumed Liabilities;

d.    be accompanied by a clean and a duly executed copy of the Stalking Horse APA and the documents set forth as schedules and exhibits thereto, along with copies that are marked to reflect the amendments and modifications from the Stalking Horse APA executed with the Stalking Horse Bidder, which may not be materially more burdensome to the Debtors or inconsistent with these Bidding Procedures, including with respect to scope of the Acquired Assets and Assumed Liabilities;

e.    identify with particularity each and every condition to closing;

f.    identify with particularity the executory contracts and unexpired leases for which assumption and assignment is required;

4

g.    not be conditioned on any contingency, including, among others, on obtaining any of the following: (i) financing, (ii) shareholder, board of directors or other approval, (iii) regulatory contingencies of any kind (other than a condition that (A) any applicable waiting period under HSR (defined below) shall have expired or been terminated and (B) required authorization of (I) the Federal Energy Regulatory Commission ("**FERC**")[3] pursuant to Section 203 of the Federal Power Act for disposition of the Acquired Assets, (II) the Federal Communications Commission ("**FCC**") for the transfer of control of the radio authorizations to the Potential Bidder, and (III) if applicable, any other governmental entity whose approval is identified by the Potential Bidder as required for the transaction as set forth in such Potential Bidder's bid, shall, in the case of each of (I), (II) and (III), have been obtained) and/or (iv) the outcome or completion of a due diligence review by the Potential Bidder.  Any required governmental approvals identified by the Potential Bidder in addition to the FERC and FCC approvals described herein may impact the evaluation of a Qualified Bid (defined below);

h.    remain irrevocable until 48 hours after the conclusion of the Sale Hearing (as defined below) or such longer period of time as set forth below if the Potential Bidder is selected as the Back-Up Bidder (defined below).

i.    provide for a covenant (i) to close within the later of (A) fourteen (14) days after the entry of the Sale Order, (B) the expiration or termination of the applicable HSR (defined below) waiting period, (C) authorization of FERC pursuant to Section 203 of the Federal Power Act for disposition of the Acquired Assets, (D) authorization by any other governmental entity whose approval is identified by the Potential Bidder as required for the transaction as set forth in such Potential Bidder's bid, and (E) the receipt of approval of the FCC for the transfer of control of the radio authorizations to the Potential Bidder; and (ii) that the Potential Bidder will (A) make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended ("**HSR**"), and pay the fees associated with such filings within two (2) calendar days following the entry of the Sale Order; and (B) make all necessary filings to FERC pursuant to Section 203 of the Federal Power Act for disposition of the Acquired Assets, the FCC for the transfer of control of the radio

---

[3]    Notwithstanding the fact that the Debtors and the Stalking Horse Bidder have jointly filed an application with FERC pursuant to Section 203 of the Federal Power Act seeking authorization for disposition of the Acquired Assets to the Stalking Horse Bidder, the Debtors will assist and cooperate with the preparation and filing of an application by a Potential Bidder seeking similar authorization pursuant to Section 203 of the Federal Power Act to the extent reasonably possible and to the extent any Potential Bidder is pursuing such application with an honest and legitimate business purpose and whose actions in the Debtors' reasonable business judgment are not designed to impede or interfere with the sale process contemplated by these Bidding Procedures and provided that the Potential Bidder agrees not to file protests of, or comments opposing the joint application of the Debtors and the Stalking Horse Bidder or an application filed by another Potential Bidder.

5

DOCKET 268

authorizations to the Potential Bidder, and any other governmental entity whose approval is identified by the Potential Bidder as required for the transaction as set forth in such Potential Bidder's bid, and pay any fees associated with such filings, in each case within two (2) calendar days following the entry of the Sale Order;

j.    provide the Debtors, on or before the Bid Deadline, with sufficient and adequate information to demonstrate, to the satisfaction of the Company, that such Potential Bidder has the financial wherewithal and ability to consummate the acquisition of the Acquired Assets and the assumption of the Assumed Liabilities;

k.    fully disclose the identity of each entity that will be bidding for or purchasing all or certain of the Acquired Assets and assuming all or certain of the Assumed Liabilities or otherwise participating in connection with such bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties;

l.    be accompanied, on or before the Bid Deadline, by a cash deposit equal to Fifty Million Dollars ($50,000,000), by wire transfer of immediately available funds to an account or accounts designated by the Debtors (the "**Good Faith Deposit**");

m.    state that the offering party or parties consents to the jurisdiction of the Court; and

n.    not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, termination or similar type of fee or payment and shall include an acknowledgement and representation of the Potential Bidder that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guarantees, express, implied, statutory or otherwise, regarding the Acquired Assets, the financial performance of the Acquired Assets or the physical condition of the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or the Stalking Horse APA.

Nothing herein shall preclude a bidder from submitting a competing bid in the form of a plan of reorganization and it being understood that such bid may be determined by the Debtors not to be a Qualified Bid.

6

Bids that the Debtors and their advisors determine fulfill all of the preceding requirements shall be deemed to be "**Qualified Bids**," and those parties submitting Qualified Bids shall be deemed to be "**Qualified Bidders**." As soon as practicable after the Bid Deadline, the Debtors shall determine which Acceptable Bidders are Qualified Bidders after consultation with their advisors and the advisors to the agent for the first lien lenders (the "**First Lien Lenders**") and the agent for the second lien lenders (the "**Second Lien Lenders**," together with the First Lien Lenders, the "**Lenders**" and each a "**Lender**") and the Creditors' Committee (together with the Lenders, the "**Consulting Parties**"), and the Debtors will notify the Acceptable Bidders and the Stalking Horse Bidder whether bids submitted constitute Qualified Bids so as to enable such Qualified Bidders to bid at the Auction. Any bid that is not deemed a "Qualified Bid" shall not be considered by the Debtors. The Stalking Horse Bidder shall be deemed to be a Qualified Bidder. The Stalking Horse APA submitted by the Stalking Horse Bidder and any additional bids timely submitted by the Stalking Horse Bidder (to the extent such bids are generally consistent with the terms of the Stalking Horse APA) shall be deemed Qualified Bids, qualifying the Stalking Horse Bidder to participate in the Auction.

F.    **Bid Deadline.**

**Binding written bids must be received by each of the Debtors, the Stalking Horse Bidder, their respective advisors, and the legal advisors to each of the Consulting Parties at the addresses set forth below, in each case so as to be actually received no later than 12:00 p.m. (prevailing Eastern Time) on Saturday November 13, 2010 (the "Bid Deadline").**

| Debtor | Counsel to Debtor |
|---|---|
| Boston Generating, LLC<br>505 Fifth Avenue, 21st Floor, New York, NY 10017,<br>Attn: Mark Sudbey, CEO and Jeff Hunter, CFO and Executive Vice President or such other person as the Debtors designate prior to the Bid Deadline<br>Email: msudbey@uspowergen.com;<br>    jhunter@uspowergen.com | Latham & Watkins LLP<br>885 Third Avenue<br>New York NY 10022-4834<br>Attn: D. J. Baker, Esq. and Robert J. Rosenberg, Esq.<br>Email: dj.baker@lw.com<br>    robert.rosenberg@lw.com |
| **Counsel to the Agent for the First Lien Lenders** | **Counsel to the Stalking Horse Bidder** |
| Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York NY 10019<br>Attn: Scott K. Charles, Esq. and Michael S. Benn, Esq.<br>Email: SKCharles@wlrk.com<br>    MSBenn@wlrk.com | Winston & Strawn LLP<br>200 Park Avenue<br>New York, NY 10166-4193<br>Attn: David Neier, Esq.<br>Email: dneier@winston.com |
| **Counsel to the Agent for the Second Lien Lenders** | **Counsel to the Creditors' Committee** |
| Dechert LLP<br>1095 Avenue of the Americas<br>New York, NY 10036-6797<br>Attn: Allan S. Brilliant, Esq. and Craig P. Druehl, Esq.<br>Email: allan.brilliant@dechert.com<br>    craig.druehl@dechert.com | Jager Smith P.C.<br>485 Madison Avenue, 20th Floor<br>New York, NY 10022<br>Attn: Bruce F. Smith, Esq. and Steven C. Reingold, Esq.<br>Email:  bsmith@jagersmith.com<br>    sreingold@jagersmith.com |

NY\1688986.9

DOCKET 266

EXHIBIT A TO SALE ORDER, PAGE 309

**G.      Credit Bidding**

The First Lien Lenders and Second Lien Lenders may make a credit bid for all of the collateral securing their claims to the full extent permitted by Section 363(k) of the Bankruptcy Code; *provided, however,* that the conditions set forth in this Paragraph G must be satisfied before the credit bid of a First Lien Lender or a Second Lien Lender is deemed to be a Qualified Bid. To be a Qualified Bid, a credit bid must also comply with each of the requirements set forth in Paragraph E above other than E(b). In addition, to be a Qualified Bid, a credit bid must, on or prior to the Bid Deadline, (i) include a cash amount as part of the purchase price for all or certain of the Acquired Assets upon which such First Lien Lenders and Second Lien Lenders do not have a first priority security interest, (ii) provide for payment in cash at closing and/or the assumption of the administrative and priority expense claims of the Debtors that own the Acquired Assets, and (iii) include a cash amount as part of the purchase price sufficient to pay the Break-Up & Expense Reimbursement Amount (e.g., $35,000,000) plus any amount required to be reimbursed to the Stalking Horse Bidder pursuant to Section 6.19 of the Stalking Horse APA.

**H.      Evaluation of Qualified Bids.**

Prior to the Auction, the Debtors shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' judgment, the highest or otherwise best bid (the "Starting Bid"). As soon as practicable prior to the date of the Auction, the Debtors shall notify the Stalking Horse Bidder as to which Qualified Bid is the Starting Bid. The Debtors shall thereafter distribute copies of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid.

**I.      No Qualified Bids.**

If no Qualified Bids are received by the Bid Deadline, then the Auction will not occur, the Stalking Horse APA will be deemed the Successful Bid (as defined herein) and, subject to the Debtors' termination rights under the Stalking Horse APA, the Debtors will immediately pursue entry of an order by the Court approving the Stalking Horse APA and authorizing the sale of the Acquired Assets and the transfer of the Assumed Liabilities to the Stalking Horse Bidder.

**J.      Auction.**

If one or more Qualified Bids are received by the Bid Deadline, then the Debtors shall conduct the Auction. The Auction shall commence at 10:00 a.m. on **November 15, 2010** at the offices of Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022-4834, or such later time or other place as the Debtors shall timely notify the Stalking Horse Bidder and all other Qualified Bidders following consultation with the advisors to the Consulting Parties.

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

> a.    only Qualified Bidders and their legal and financial advisors, including the Stalking Horse Bidder, shall be entitled to bid at the Auction;

8

b.    the Qualified Bidders, including the Stalking Horse Bidder, shall appear in person or through duly-authorized representatives at the Auction;

c.    only such authorized representatives of each of the Qualified Bidders, the Stalking Horse Bidder, the Debtors, their respective advisors, and the advisors to the Consulting Parties shall be permitted to attend the Auction;

d.    bidding at the Auction shall begin at the Starting Bid;

e.    subsequent bids at the Auction, including any bids by the Stalking Horse Bidder, shall be made in minimum increments of Ten Million Dollars ($10,000,000);

f.    the Stalking Horse Bidder shall receive a credit equal to the sum of the Break-Up & Expense Reimbursement Amount (e.g., $35,000,000) in each round of bidding at the Auction and any amount required to be reimbursed to the Stalking Horse Bidder pursuant to Section 6.19 of the Stalking Horse APA;

g.    each Qualified Bidder will be informed of the terms of the previous bids;

h.    the bidding will be transcribed to ensure an accurate recording of the bidding at the Auction;

i.    each Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale;

j.    absent irregularities in the conduct of the Auction, or reasonable and material confusion during the bidding, the Court will not consider bids made after the Auction is closed; and

k.    the Auction shall be governed by such other Auction Procedures as may be announced by the Debtors, after consultation with their advisors as well as the advisors to the Consulting Parties, from time to time on the record at the Auction; *provided,* that any such other Auction Procedures shall not be inconsistent with any order of the Court.

**K.    Acceptance of the Successful Bid.**

Upon the conclusion of the Auction (if such Auction is conducted), the Debtors, in the exercise of their reasonable, good-faith business judgment, and after consulting with their advisors and the advisors to the Consulting Parties, shall identify the highest or otherwise best bid (the "Successful Bid"). The Qualified Bidder having submitted the Successful Bid will be deemed the "Successful Bidder." The Successful Bidder and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which such Successful Bid was made.

9

The Debtors will present the results of the Auction to the Court at the Sale Hearing (as defined below), at which certain findings will be sought from the Court regarding the Auction, including, among other things, that (a) the Auction was conducted, and the Successful Bidder was selected, in accordance with these Bidding Procedures, (b) the Auction was fair in substance and procedure, (c) the Successful Bid was a Qualified Bid (as defined in these Bidding Procedures), and (d) consummation of the Sale contemplated by the Successful Bid will provide the highest or otherwise best value for all or certain of the Acquired Assets and all or certain of the Assumed Liabilities and is in the best interests of the Debtors.

If an Auction is held, the Debtors shall be deemed to have accepted a Qualified Bid only when (a) such bid is declared the Successful Bid at the Auction and (b) definitive documentation has been executed in respect thereof. Such acceptance is conditioned upon approval by the Court of the Successful Bid and the entry of an Order approving such Successful Bid.

**L.    Sale Hearing.**

A hearing to consider approval of the Sale of all or certain of the Acquired Assets and the transfer of all or certain of the Assumed Liabilities to the Successful Bidder (or to approve the Stalking Horse APA if no Auction is held) (the "**Sale Hearing**") is presently scheduled to take place on **November 17, 2010** at 10:00 a.m. prevailing Eastern Time, or as soon thereafter as counsel may be heard, before the Honorable Shelley C. Chapman, United States Bankruptcy Judge for the Bankruptcy Court for the Southern District of New York, at: One Bowling Green, Courtroom 610, New York, NY 10004.

**The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.**

At the Sale Hearing, the Debtors shall present the Successful Bid to the Court for approval.

**M.    Designation of Back-Up Bidder.**

Following the approval of the Sale of all or certain of the Acquired Assets to any Successful Bidder at the Sale Hearing, if the Successful Bidder fails to consummate an approved Sale within the later of (1) fourteen (14) days after the entry of the Sale Order, (2) the expiration or termination of the applicable HSR waiting period, (3) the receipt of approval of FERC pursuant to Section 203 of the Federal Power Act, (4) the receipt of approval of the FCC for the transfer of control of the radio authorizations, (5) the receipt of approval by any other governmental entity whose approval is identified by the Potential Bidder as required for the transaction as set forth in such Potential Bidder's bid, and (6) December 6, 2010, the Debtors shall be authorized, but not required, to deem the next highest or otherwise best Qualified Bid (the "**Back-Up Bid**" and the party submitting the Back-Up Bid, the "**Back-Up Bidder**"), as disclosed at the Sale Hearing, the Successful Bid, and the Debtors in consultation with the Consulting Parties shall be authorized, but not required, to consummate the Sale with the Back-Up Bidder submitting such bid without further order of the Court. The Back-Up-Bid shall

10

remain open until the first business day following the consummation of a Sale of the Acquired Assets to the Successful Bidder.

**N.    Break-Up & Expense Reimbursement Amount.**

The Debtors shall be obligated to pay to the Stalking Horse Bidder, by wire transfer in immediately available funds to an account designated by the Stalking Horse Bidder, all amounts due to the Stalking Horse Bidder, including the Break-Up Fee and Reimbursable Expenses, in each instance in accordance with the applicable provisions of the Stalking Horse APA.

**O.    Return of Good Faith Deposit.**

The Good Faith Deposit of the Successful Bidder shall, upon consummation of the purchase of all or certain of the Acquired Assets and transfer of all or certain of the Assumed Liabilities, be credited to the purchase price paid for all or certain of the Acquired Assets and all or certain of the Assumed Liabilities. If the Successful Bidder fails to consummate the purchase of all or certain of the Acquired Assets and the assumption of all or certain of the Assumed Liabilities due to a breach by the Successful Bidder, then the Good Faith Deposit shall be forfeited to, and retained irrevocably by, the Debtors.

The Good Faith Deposit of any unsuccessful Qualified Bidders (except for the Stalking Horse Bidder and the Back-Up Bidder) will be returned within fifteen (15) days after the entry of the Sale Order by the Bankruptcy Court or upon the permanent withdrawal of the proposed Sale of all or certain of the Acquired Assets and all or certain of the Assumed Liabilities. The Good Faith Deposit of the Stalking Horse Bidder shall be returned in accordance with the terms of the Stalking Horse APA. The Good Faith Deposit of the Back-Up Bidder shall be returned upon the earlier of (i) the first day after consummation of the Sale of all or certain of the Acquired Assets and all or certain of the Assumed Liabilities by the Successful Bidder or (ii) the permanent withdrawal of the proposed Sale of all or certain of the Acquired Assets and all or certain of the Assumed Liabilities.

**P.    Reservation of Rights.**

The Debtors reserve their rights, following consultation with their advisors and the advisors to the Consulting Parties and with the consent of the Stalking Horse Bidder (whose consent shall not be unreasonably withheld), to modify these Bidding Procedures in any manner that will best promote the goals of the bidding process and to impose, at or prior to the Auction, additional customary terms and conditions on the Sale of all or certain of the Acquired Assets and the transfer of all or certain of the Assumed Liabilities, including, without limitation, modifying the requirements for a Qualified Bid, extending the deadlines set forth in these Bidding Procedures, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice, canceling the Auction, and rejecting any or all Qualified Bids (excluding, for the avoidance of doubt, the Stalking Horse Bidder's offer pursuant to the Stalking Horse APA) if, in the Debtors' business judgment, following consultation with their advisors, the Debtors determine that such Qualified Bid is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code or any related rules or the terms set forth herein, or (c) contrary to the best interests of the Debtors; *provided*, that if the Debtors cancel the

11

Auction, or reject all Qualified Bids other than Stalking Horse Bidder's, the Debtors shall promptly pursue entry of an order by the Court authorizing consummation of the Sale of all of the Acquired Assets and the transfer of all of the Assumed Liabilities to the Stalking Horse Bidder; and *provided further*, that the Debtors shall not extend the deadlines set forth in these Bidding Procedures beyond seven days, adjourn the Auction at the Auction and/or adjourn the Sale Hearing beyond seven days without the prior consent of the Stalking Horse Bidder which consent will not be unreasonably withheld. In the event that a Consulting Party or other insider or affiliate of the Debtors participates in this auction process as a Potential Bidder or a Qualified Bidder, as applicable, such party will be treated like and given no greater or better rights than any other Potential Bidder or Qualified Bidder, as applicable.

The Debtors shall provide to the Stalking Horse the information and documents specified in the Stalking Horse APA relating to the Auction and other bids within the time period and on the terms and conditions set forth in the Stalking Horse APA.

12

**Exhibit B**

**Contract Notice**

D. J. Baker
Robert J. Rosenberg
Caroline A. Reckler (appearing *pro hac vice*)
Kimberly A. Posin (appearing *pro hac vice*)
Jason B. Sanjana
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

Proposed Counsel to the Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Boston Generating, LLC,<br><u>et al.</u>,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 10-14419 (SCC)<br><br>Jointly Administered |

**NOTICE OF (I) POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY**
**CONTRACTS AND UNEXPIRED LEASES; (II) CURE AMOUNT WITH RESPECT TO**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**
**TO BE POTENTIALLY ASSUMED AND ASSIGNED**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") have entered into an asset purchase agreement, dated August 7, 2010 (the "**APA**"), with Constellation Holdings, Inc. (the "**Stalking Horse Bidder**") to sell substantially all of the assets of the Debtors free and clear of all liens, claims, encumbrances and other interests to the Stalking Horse Bidder, subject to the submission of higher or better offers in an auction process (the "**Auction**").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the *Order Approving and Authorizing (A) Bidding Procedures in Connection with the Sale of Substantially All of the Assets of the Debtors, (B) Stalking Horse Bid Protections, (D) Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With the Sale of Substantially All of the Assets of the Debtors (D) the Form and Manner of Notice of the Sale*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Boston Generating, LLC (0631); EBG Holdings LLC (3635); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC (7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

1

DOCKET 268

EXHIBIT A TO SALE ORDER, PAGE 316

*Hearing, and (E) Related Relief* [Docket No. __] (the "**Bidding Procedures Order**")[2] entered by the United States Bankruptcy Court for the District of New York (the "**Bankruptcy Court**") on [____], 2010, the Debtors hereby provide notice that they are a party to various executory contracts and unexpired leases as set forth on Exhibit 1 attached hereto (individually, a "**Potentially Assumed Contract**", collectively, the "**Potentially Assumed Contracts**") and they intend to seek to assume and assign some or all of the Potentially Assumed Contracts to the Successful Bidder in connection with the proposed sale of the Debtors' assets (the "**Sale**"). You have been identified as a party to a Potentially Assumed Contract.

        **PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures, the Bidding Procedures Order, as well as all related exhibits, including the APA, have been electronically filed with the Bankruptcy Court and may be examined and inspected by interested parties by (i) accessing the Bankruptcy Court's website at www.nysb.uscourts.gov/ or (ii) accessing the website maintained by the Debtors in connection with their chapter 11 cases at www.bgrestructuring.com. Note that a PACER password is needed to access documents on the Bankruptcy Court's website.

        **PLEASE TAKE FURTHER NOTICE** that the Potentially Assumed Contract with respect to which you have been identified as a non-Debtor counterparty, and the corresponding proposed amount the Debtors' records reflect is owing for all arrearages due prior to the closing of the Sale (the "**Cure Amount**"), have been set forth on Exhibit 1, as attached hereto (the "**Contract Notice**"). The Debtors' records reflect, as of the date hereof, that all postpetition amounts owing under your Potentially Assumed Contract have been paid and will continue to be paid and that there are no other defaults under the Potentially Assumed Contract. Amounts due and owing under the contracts with respect to the period after the closing date of the Sale are not included in the calculation of the Cure Amounts.

        **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the assumption and assignment of any contract or lease, proposed cure amount or adequate assurance of future performance proposed with respect thereto **must**: (i) conform to the applicable provisions of the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York and the *Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedure*, upon entry, and (ii) be filed with the Court and served so as to be **actually received no later than 4:00 p.m. prevailing Eastern Time on November 9, 2010** (the "**Objection Deadline**") by the following parties (the "**Objection Notice Parties**"):

| Debtors | Counsel to Debtors |
| --- | --- |
| Boston Generating, LLC<br>505 Fifth Avenue, 21st Floor, New York, NY 10017,<br>Attn: Mark Sudbey, Chief Executive Officer; Jeff Hunter, Manager, Executive Vice President, and Chief | Latham & Watkins LLP<br>885 Third Avenue<br>New York NY 10022-4834<br>Attn: D. J. Baker, Esq. and Robert J. Rosenberg, Esq. |

---

[2]        All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Bidding Procedures approved as part of the Bidding Procedures Order.

2

EXHIBIT A TO SALE ORDER, PAGE 317

| Financial Officer | |
|---|---|
| **Counsel to the Agent for the First Lien Lenders** | **United States Trustee** |
| Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York NY 10019<br>Attn: Scott K. Charles, Esq. and Michael S. Benn, Esq. | Office of the United States Trustee<br>for the Southern District of New York<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br>Attn: Paul Schwartzberg |
| **Counsel to the Agent for the Second Lien Lenders** | **Counsel to the Creditors' Committee** |
| Dechert LLP<br>1095 Avenue of the Americas<br>New York, NY 10036-6797<br>Attn: Allan S. Brilliant, Esq. and Craig P. Druehl, Esq. | Jager Smith P.C.<br>485 Madison Avenue, 20th Floor<br>New York, NY 10022<br>Attn: Bruce F. Smith, Esq. and Steven C. Reingold, Esq. |
| **Counsel to the Stalking Horse Bidder** | |
| Winston & Strawn LLP<br>200 Park Avenue<br>New York, NY 10166-4193<br>Attn: David Neier, Esq. | |

**PLEASE TAKE FURTHER NOTICE** the Debtors will seek approval of the Sale and the assumption and assignment of unexpired leases and executory contracts to be assumed and assigned in connection with the Sale before the Honorable Shelley C. Chapman, United States Bankruptcy Judge for the Bankruptcy Court for the Southern District of New York (the "**Court**") at One Bowling Green, Room 610 New York, NY 10004 on November 17, 2010 at 10:00 a.m. prevailing Eastern Time (the "**Sale Hearing**"). A hearing regarding the Cure Amount, if any, may be continued at the sole discretion of the Debtors.

**PLEASE TAKE FURTHER NOTICE** that regardless of whether a Potentially Assumed Contract will be assumed and assigned at the closing of the Sale, unless a non-debtor party to any Potentially Assumed Contract files an objection to the Cure Amount by the Objection Deadline, then such counterparty shall be (i) forever barred from objecting to the Cure Amount; and (ii) forever barred and estopped from asserting or claiming any amounts under the contracts outstanding as of the effective date of assumption and assignment to the Successful Bidder, other than the Cure Amount on Exhibit 1, against the Debtors, any Successful Bidder or any other assignee of the relevant contract. The Debtors will file and serve a further notice that identifies any Successful Bidder and provides notice of the particular Potentially Assumed Contracts that the Debtors will seek to assume and assign at the Sale Hearing (the "**Assumption Notice**"). At the Sale Hearing, the Debtors shall present evidence necessary to demonstrate adequate assurance of future performance by the Successful Bidder. You will have the opportunity to evaluate and, if necessary, challenge, at the Sale Hearing, the ability of any Successful Bidder to provide adequate assurance of future performance under the Assumed Contacts.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to section 365(b)(1)(C) of the Bankruptcy Code, adequate assurance of future performance will be provided by the Stalking Horse Bidder, Successful Bidder or assignee, as applicable, which Stalking Horse Bidder, Successful Bidder or assignee has confirmed or will confirm that the assignee of any Assumed

EXHIBIT A TO SALE ORDER, PAGE 318

Contract has the ability to fully perform under each such contract to the extent required under the Bankruptcy Code, and, where applicable and to the extent required under the Bankruptcy Code, the Stalking Horse Bidder, Successful Bidder or assignee will provide collateral if required by the terms of the contract.

**PLEASE TAKE FURTHER NOTICE** that if the parties are not able to consensually resolve any such objection prior to the Sale Hearing, the dispute will be heard at the Sale Hearing (or such other date as fixed by the Court).

**PLEASE TAKE FURTHER NOTICE** that the presence of a contract, lease or other agreement on the Contract Notice does not constitute an admission that such contract, lease or other agreement is an executory contract or unexpired lease or that such contract or lease will be assumed by the Debtors and assigned to any Successful Bidder. The Debtors reserve all of their rights, claims and causes of action with respect to the contracts, leases and other agreements listed on the Contract Notice.

## CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION

**ANY PARTY FAILING TO TIMELY FILE AN OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF ANY CONTRACT OR LEASE OR RELATED CURE AMOUNT LISTED ON THE CONTRACT NOTICE SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS EFFECTED THEREUNDER.**

> **IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE, PLEASE CONTACT THE RESTRUCTURING HOTLINE AT 866-454-3498**

NY\1688986.9

4

DOCKET 266

EXHIBIT A TO SALE ORDER, PAGE 319

**<u>Exhibit 1 to Contract Notice</u>**

**Potentially Assumed Contracts**

NY\1688986.9

EXHIBIT A TO SALE ORDER, PAGE 320

**Exhibit C**

**Assumption Notice**

D. J. Baker
Robert J. Rosenberg
Caroline A. Reckler (appearing *pro hac vice*)
Kimberly A. Posin (appearing *pro hac vice*)
Jason B. Sanjana
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

Proposed Counsel to the Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Boston Generating, LLC, et al.,[1] | Case No. 10-14419 (SCC) |
| Debtors. | Jointly Administered |

**NOTICE OF (I) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES (II) CURE AMOUNT WITH RESPECT TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE ASSUMED AND ASSIGNED**

      **PLEASE TAKE NOTICE** that, pursuant to the *Order Approving and Authorizing (A) Bidding Procedures in Connection with the Sale of Substantially All of the Assets of the Debtors, (B) Stalking Horse Bid Protections, (D) Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With the Sale of Substantially All of the Assets of the Debtors (D) the Form and Manner of Notice of the Sale Hearing, and (E) Related Relief* [Docket No. ___] (the "**Bidding Procedures Order**")[2] entered by the United States Bankruptcy Court for the District of New York (the "**Bankruptcy Court**") on [___, 2010], the Debtors have accepted the bid of [_____] (the "**Successful Bidder**") for the purchase of substantially all of the assets (the "**Assets**") related to the Debtors' business (the "**Sale**"). The terms of the bid are set forth in that certain asset purchase agreement (the "**APA**"), dated as of

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Boston Generating, LLC (0631); EBG Holdings LLC (3635); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC (7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

[2]    All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Bidding Procedures approved as part of the Bidding Procedures Order.

1

August 7, 2010 between the Debtors and the Successful Bidder which [has been / will be] filed with the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that the Bidding Procedures Order, among other things, authorized procedures for the Debtors to assume and assign certain executory contracts and unexpired leases (the "**Assumed Contracts**") to the Successful Bidder. Attached hereto as Exhibit 1 is a list of the Assumed Contracts that the Debtors will assign to the Successful Bidder in connection with the closing of the Sale and the cure amount, if any, with respect to each Assumed Contract.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to section 365(b)(1)(C) of the Bankruptcy Code, adequate assurance of future performance will be provided by the Stalking Horse Bidder, Successful Bidder or assignee, as applicable, which Stalking Horse Bidder, Successful Bidder or assignee has confirmed or will confirm that the assignee of any Assumed Contract has the ability to fully perform under each such contract to the extent required under the Bankruptcy Code, and, where applicable and to the extent required under the Bankruptcy Code, the Stalking Horse Bidder, Successful Bidder or assignee will provide collateral if required by the terms of the contract.

**PLEASE TAKE FURTHER NOTICE** that, as set forth in the Bidding Procedures Order, the hearing to approve the Sale will be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge for the Bankruptcy Court for the Southern District of New York (the "**Court**") at One Bowling Green, Room 610 New York, NY 10004 on November 17, 2010 at 10:00 a.m. prevailing Eastern Time (the "**Sale Hearing**"). A hearing regarding the Cure Amount, if any, may be continued at the sole discretion of the Debtors.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures, the Bidding Procedures Order, as well as all related exhibits including the APA, are available by (i) accessing the Bankruptcy Court's website at www.nysb.uscourts.gov/ or (ii) accessing the website maintained by the Debtors in connection with their chapter 11 cases at www.bgrestructuring.com. Note that a PACER password is needed to access documents on the Bankruptcy Court's website.

**Exhibit 1 to Assumption Notice**

**Assumption Notice**

[TO COME]

| Contract Counterparty | Debtor(s) Entity | Description | Cure Amount (in $US) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**Exhibit D**

**Sale Notice**

D. J. Baker
Robert J. Rosenberg
Caroline A. Reckler (appearing *pro hac vice*)
Kimberly A. Posin (appearing *pro hac vice*)
Jason B. Sanjana
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

Proposed Counsel to the Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Boston Generating, LLC,<br><u>et al.</u>,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 10-14419 (SCC)<br><br>Jointly Administered |

<u>**NOTICE OF PUBLIC AUCTION AND SALE HEARING**</u>

   **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors-in-possession (collectively, the "<u>**Debtors**</u>"), have entered into an asset purchase agreement, dated August 7, 2010 (the "<u>**APA**</u>")[2], with Constellation Holdings, Inc. (the "<u>**Stalking Horse Bidder**</u>") to sell substantially all of the assets of the Debtors free and clear of all liens, claims, encumbrances and other interests to the Stalking Horse Bidder, subject to the submission of higher or better offers in an auction process (the "<u>**Auction**</u>").

   **PLEASE TAKE FURTHER NOTICE** that in connection with the proposed sale (the "<u>**Sale**</u>") to the Stalking Horse Bidder, on August 18, 2010, the Debtors filed the *Debtors' Motion for Entry of (I) an Order Approving and Authorizing (A) Bidding Procedures in Connection With the Sale of Substantially All of the Assets of the Debtors, (B) Stalking Horse Bid Protections, (C) Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With the Sale of Substantially All of the Assets of the Debtors, (D) the Form And Manner of Notice of the Sale Hearing and (E) Related Relief; and (II) an Order Approving And*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Boston Generating, LLC (0631); EBG Holdings LLC (3635); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC (7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

[2]    All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the APA.

*Authorizing (A) the Sale Of Substantially All of the Assets of the Debtors Free and Clear of
Claims, Liens, Liabilities, Rights Interests And Encumbrances, (B) the Debtors to Enter Into and
Perform Their Obligations Under the Asset Purchase Agreement, (C) the Debtors to Assume and
Assign Certain Executory Contracts and Unexpired Leases, (D) the Transition Services
Agreement, and (E) Related Relief* [Docket No. 24] (the, "**Motion**").

**PLEASE TAKE FURTHER NOTICE** that, on [_____], 2010, the United States
Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered an
order (the "**Bidding Procedures Order**") [Docket No. ___] approving the bidding procedures
(the "**Bidding Procedures**"), which set key dates and times related to the Sale. All interested
bidders should carefully read the Bidding Procedures. To the extent that there are any
inconsistencies between the Bidding Procedures and the summary description of its terms and
conditions in this Notice, the terms of the Bidding Procedures shall control.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion, the Bidding
Procedures and the Bidding Procedures Order, as well as all related exhibits, including the APA,
have been electronically filed with the Bankruptcy Court and may be examined and inspected by
interested parties by (i) accessing the Bankruptcy Court's website at www.nysb.uscourts.gov/ or
(ii) accessing the website maintained by the Debtors in connection with their chapter 11 cases at
www.bgrestructuring.com. Note that a PACER password is needed to access documents on the
Bankruptcy Court's website.

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing
bids within the requirements and time frame specified by the Bidding Procedures, the Debtors
will conduct an Auction on November 15, 2010 at 10:00 a.m. prevailing Eastern Time at the
offices of Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022, or at any such
other location as the Debtors may hereafter designate.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale
before the Honorable Shelley C. Chapman, United States Bankruptcy Judge for the Bankruptcy
Court for the Southern District of New York (the "**Court**") at One Bowling Green, Room 610
New York, NY 10004 on November 17, 2010 at 10:00 a.m. prevailing Eastern Time.

**PLEASE TAKE FURTHER NOTICE THAT** objections, if any, to the Motion or Sale,
together with proof of service, **must**: (i) conform to the applicable provisions of the Federal
Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New
York and the *Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules
1015(c) and 9007 Implementing Certain Notice and Case Management Procedure* [Docket No.
46], and (ii) be filed with the Court and served so as to be **actually received no later than 4:00
p.m. prevailing Eastern Time on November 9, 2010** (the "**Objection Deadline**") by the
following parties (the "**Notice Parties**"):

| Debtors | Counsel to Debtors |
|---|---|

2

NY\1688986.9

| | |
|---|---|
| Boston Generating, LLC<br>505 Fifth Avenue, 21st Floor, New York, NY 10017,<br>Attn: Mark Sudbey, Chief Executive Officer and Jeff<br>Hunter, Manager, Executive Vice President, and Chief<br>Financial Officer | Latham & Watkins LLP<br>885 Third Avenue<br>New York NY 10022-4834<br>Attn: D. J. Baker, Esq. and Robert J. Rosenberg, Esq. |
| **Counsel to the Agent for the First Lien Lenders** | **United States Trustee** |
| Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York NY 10019<br>Attn: Scott K. Charles, Esq. and Michael S. Benn, Esq. | Office of the United States Trustee<br>for the Southern District of New York<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br>Attn: Andrea Schwartz, Esq. and Paul Schwartzberg,<br>Esq. |
| **Counsel to the Agent for the Second Lien Lenders** | **Counsel to the Creditors' Committee** |
| Dechert LLP<br>1095 Avenue of the Americas<br>New York, NY 10036-6797<br>Attn: Allan S. Brilliant, Esq. and Craig P. Druehl, Esq. | Jager Smith P.C.<br>485 Madison Avenue, 20th Floor<br>New York, NY 10022<br>Attn: Bruce F. Smith, Esq. and Steven C. Reingold,<br>Esq. |
| **Counsel to the Stalking Horse Bidder** | |
| Winston & Strawn LLP<br>200 Park Avenue<br>New York, NY 10166<br>Attn: David Neier, Esq. | |

## CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS EFFECTED THEREUNDER.**

| NO SUCCESSOR OR TRANSFEREE LIABILITY |
|---|
| The proposed Sale Order provides that the Buyer will have no responsibility for, and the assets will be sold free and clear of, any successor liability, including the following:<br>Other than as expressly set forth in the APA with respect to Assumed Liabilities, the Buyer shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the Acquired Assets or (b) any remaining Claims against the Debtors or any of their predecessors or affiliates. Except as expressly provided in the APA with respect to Assumed Liabilities, the Buyer shall have no liability whatsoever with respect to the Debtors, (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor |

3

EXHIBIT A TO SALE ORDER, PAGE 328

or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, *de facto* merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing. Except to the extent expressly included in the Assumed Liabilities with respect to Buyer, the Buyer shall have no liability or obligation under the WARN Act (29 U.S.C. §§ 2101 et seq.) or the Comprehensive Environmental Response Compensation and Liability Act, or any foreign, federal, state or local labor, employment, or environmental law whether of similar import or otherwise by virtue of Buyer's purchase of the Acquired Assets or assumption of the Assumed Liabilities by Buyer or an Affiliate of Buyer. Nothing in the proposed Sale Order shall be held to limit any bargaining or other obligations that may arise from and after the Closing pursuant to the National Labor Relations Act, 29 U.S.C. § 151, et seq. (the "NLRA"), or the Employee Retirement Income Security Act, as amended, 29 USC § 1001 et seq. ("ERISA").

> **IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE, PLEASE CONTACT THE RESTRUCTURING HOTLINE AT 866-454-3498**

4

DOCKET 268

EXHIBIT A TO SALE ORDER, PAGE 329

LATHAM & WATKINS LLP
D. J. Baker
Robert J. Rosenberg
Caroline A. Reckler (appearing *pro hac vice*)
Kimberly A. Posin (appearing *pro hac vice*)
885 Third Avenue
New York, New York 10022-4834
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

Proposed Counsel to the Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Boston Generating, LLC, et al.,[1] | Case No. 10-14419 (SCC) |
| Debtors. | Jointly Administered |

## NOTICE OF FILING OF SCHEDULE 1 TO BIDDING PROCEDURES ORDER

**PLEASE TAKE NOTICE** that on October 12, 2010, the United States Bankruptcy Court for the Southern District of New York entered the *Order Approving and Authorizing (A) Bidding Procedures in Connection with the Sale of Substantially all the Assets of the Debtors, (B) Stalking Horse Bid Protections, (C) Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with the Sale of Substantially all of the Assets of the Debtors, (D) the Form and Manner of Notice of the Sale Hearing and (E) Related Relief* (the "Bidding Procedures Order") [Docket No. 268]. The Bidding Procedures

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Boston Generating, LLC (0631); EBG Holdings LLC (3635); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC (7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

DOCKET 285

Order indicated that Schedule 1 thereto, the transcript of the October 9, 2010 hearing (the "October 9th Hearing Transcript"), would be filed under separate cover once it became available.

**PLEASE TAKE FURTHER NOTICE** that Schedule 1 to the Bidding Procedures Order, the October 9th Hearing Transcript, is attached hereto as Exhibit 1.

Dated:  October 13, 2010                    Respectfully Submitted,
        New York, New York
                                            /s/ D. J. Baker

                                            D.J. Baker
                                            Robert J. Rosenberg
                                            Caroline A. Reckler (appearing *pro hac vice*)
                                            Kimberly A. Posin (appearing *pro hac vice*)
                                            LATHAM & WATKINS LLP
                                            885 Third Avenue
                                            New York, New York 10022-4834
                                            Telephone:  (212) 906-1200
                                            Facsimile:  (212) 751-4864

                                            Proposed Counsel to the Debtors and Debtors-in-Possession

DOCKET 285

EXHIBIT A TO SALE ORDER, PAGE 331

**Exhibit 1**

October 9th Hearing Transcript

DOCKET 283

EXHIBIT A TO SALE ORDER, PAGE 332

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------x     Case No. 10-14419 (scc)
In re:                                New York, New York
      BOSTON GENERATING, LLC,         October 9, 2010
                      Debtors.        3:00:05 p.m.
--------------------------------x
```

TRANSCRIPT OF CONTINUED CHAP 11 HEARING
ON DEBTORS BID PROCEDURES MOTION (RELATED DOCUMENT 24)
BEFORE THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

A P P E A R A N C E S :

| | |
|---|---|
| For the Debtor: | D.J. BAKER, ESQ.<br>ROBERT J. ROSENBERG, ESQ.<br>ADRIENNE EISEN WHEATLEY, ESQ.<br>CAROLINE A. RECKLER, ESQ.<br>CHRISTOPHER HARRIS, ESQ.<br>Latham & Watkins LLP<br>53rd at Third, 885 Third Avenue<br>New York, New York 10022-4834<br>(212) 906-1200; (212) 751-4864 fax |
| For Wilmington Trust: | ALLAN F. BRILLIANT, ESQ.<br>Dechert, LLP<br>1095 Avenue of the Americas<br>New York, New York 10036-6797<br>(212) 698-3500; (212) 698-3599 fax |
| For Constellation<br>Energy Group, Inc.: | DAVID NEIER, ESQ.<br>Winston & Strawn LLP<br>200 Park Avenue<br>New York, New York 10166-4193<br>(212) 294-5318; (212) 294-4700 fax |
| For CarVal Investors<br>LLC & Fortress<br>Investment Group, LLC: | ANDREW M. LEBLANC, ESQ.<br>Milbank, Tweed, Hadley & McCloy LLP<br>One Chase Manhattan Plaza<br>New York, New York 10005-1413<br>(202) 835-7500; (202) 263-7586 fax |
| Transcriber: | AA Express Transcripts<br>(888) 456-9716; (800) 860-5722 |

Proceedings recorded by electronic sound recording
Transcript produced by transcription service.

In re Boston Generating - 10/9/10                                    2

1          THE COURT:  Please be seated.  Okay.  I saw Mr.

2    LeBlanc.  There he is.

3          MR. LEBLANC:  Here I am.  Sorry, Your Honor.

4          THE COURT:  No Problem.

5          (Pause.)

6          THE COURT:  Okay.  It's just about three o'clock.  So,

7    we can get started.  We are connected via telephone, but not via

8    Court-Call.  We have a regular dial-in number, which it's my

9    understanding was circulated by the Debtors to the interested

10   parties and was also posted on the docket, so that anyone who

11   wanted to join us today could be here.  But because we are

12   connected via a dial-in number, as opposed to Court-Call we're

13   going to keep hearing these beeps.  So, I just wanted everybody

14   to know and for the court reporter to know.  But I'm not going

15   to take any sort of attendance.

16          I think there is one preliminary matter that we need

17   to address, and that's the exchange of letters that began I

18   believe at 9:49 p.m. last night, although I will tell you that I

19   did not see it until I woke up this morning.  But I have seen an

20   email from Mr. Peter Newman, that was at 9:45 last night; that

21   was covering a letter on Milbank letterhead to Mr. Rosenberg at

22   Latham & Watkins.  And then I also saw -- I'm trying to see when

23   I got it.  At 12:42 p.m. a letter was sent by Ms. Reckler on

24   behalf of Mr. Rosenberg showing a letter dated October 9 back to

25   the folks at Milbank.

EXHIBIT A TO SALE ORDER, PAGE 334

In re Boston Generating - 10/9/10                                    3

1          I want to talk first because there's a statement in

2     the cover email -- this forms no part of my decision.  This is

3     preliminary just to be clear.  There's a statement in the letter

4     -- in the email from Mr. Newman to Mr. Schneiderman of my office

5     and copying various others that I read to implicate the Court in

6     this exchange of letters.  And I want to address that head-on.

7     And the statements are as follows:

8          We're advising the Court of this offer directly

9     because it is responsive to an argument raised by the movants in

10    closing argument.  We believe that this is fully consistent with

11    the actions of the Debtors in advising the Court in a sidebar

12    with all parties present of certain changes that would be made

13    to respond to an argument made by counsel to the objectors.  The

14    second statement is a little cryptic, but I think everybody --

15    at least most people in this room, knows what it refers to.

16         So, first of all, with respect to the notion that they

17    were advising the Court of this offer directly because it's

18    responsive to an argument made by the movants in closing

19    argument, I just have to say that this has been an issue from

20    the get-go in these cases.  This was not raised by the movants

21    for the first time in closing argument.

22         Would everybody on the phone please keep your phones

23    on mute?  We are not with Court-Call, so I don't have the

24    ability to cut you off.  But I'm going to ask you as a courtesy

25    to keep your phones on mute.  Thank you.

**DOCKET 288**

In re Boston Generating - 10/9/10                                    4

1        Secondly, to the extent that there's a since that

2   somehow the record was opened on account of something that Mr.

3   Neier said with respect to an aspect of the APA, the record was

4   closed, and the record remains closed.

5        And the development that Mr. Neier informed us of was

6   not made part of the record.  And just to kind of compare this,

7   apples to apples, the Debtors didn't say, "We want to open the

8   record again, Your Honor, because the objectors identified a

9   failure of proof, and we would like to put in new evidence."

10  Mr. Neier brought something to our attention.  I think he did so

11  in an appropriate fashion.  And it was not made part of the

12  record.  So, that's kind of one level of observation that I want

13  to make.

14       Secondly, the notion that this letter would be

15  submitted at ten o'clock at night, last night, after we've been

16  at this in trial for this entire week; and after we've been at

17  this generally for the last several weeks at a thoroughly

18  exhausting pace, I find incredible.

19       I went back, as I've been coming to my decision.  I

20  reviewed the testimony of Mr. Crawford; I reviewed a lot of

21  things.  As I hope you can imagine, I've given this a lot of

22  thought.  And it is crystal clear to me that CarVal for quite

23  some time, has had the ability and the wherewithal to make a

24  financing proposal if it so chose.  And it so chose at ten

25  o'clock last night.

EXHIBIT A TO SALE ORDER, PAGE 336

In re Boston Generating - 10/9/10                               5

1    So, procedurally -- and I'll talk about substantively

2    in a moment -- I find this incredible to say the least.  And I

3    can cite to you portion of Mr. Crawford's deposition to support

4    my observations.  I can also cite to Mr. Hardie's correspondence

5    with Derron Slonecker, in which he makes clear that the second

6    lien group was available to discuss financing.  So, the notion

7    that the timing for this was appropriate, I just can't agree

8    with.  So, that's kind of the procedural aspect of this.

9    On the substance to the extent that I read the letter,

10   and I did, and I read Mr. Rosenberg's response; one, there

11   appears on its face to be a mac (ph).  And I came to these

12   conclusions before I even read Mr. Rosenberg's response.

13   Secondly, there's no consent to priming.  There's no consent to

14   51 percent of the lenders.  And the commitment terminates on the

15   12th of October.  So, I think that it's words on a page, but

16   it's really not much more than that.

17   The third level is, based on the correspondence of Mr.

18   Rosenberg, the Board considered it and rejected it for some of

19   the same reasons that I just articulated to you, but I say to

20   you that I formed my views before I even read the correspondence

21   from Mr. Rosenberg, which I note came in from Ms. Reckler at

22   12:42 p.m.

23   So, I'm saying all of this because I don't want this

24   to in any way infect the record procedurally or substantively.

25   And I'm happy to hear arguments to the contrary.  Mr. LeBlanc?

EXHIBIT A TO SALE ORDER, PAGE 337

In re Boston Generating - 10/9/10                                    6

1       MR. LEBLANC:  Yes, Your Honor.  Your Honor --

2       THE COURT:  By the way, I appreciate all of you making

3   yourselves available today.

4       MR. LEBLANC:  Your Honor, we certainly didn't mean to

5   upset the Court with the proposal by any stretch.  That wasn't

6   the proposal.  In fact our clients have made an offer, a

7   commitment to finance this Debtor with $200 million of

8   financing.

9       Now, Your Honor, you are absolute correct that we have

10  sought discussions.  You've seen in the record, the August 10

11  letter from Mr. Crawford seeking discussions with the Debtor.

12  But it's hard, frankly, for a creditor to lob in a financing

13  proposal without engaging in discussions with the potential

14  borrower.  That's not an easy thing --

15      THE COURT:  Mr. LeBlanc, I have to stop you.  I mean

16  there were months and months of an opportunity where the second

17  lien lenders could have sat down and made a proposal.  They

18  didn't do it.  And they may not have done it because they were

19  restricted or they chose to be restricted.  But the facts on the

20  ground are that they didn't do it.

21      MR. LEBLANC:  Your Honor, I think we -- I mentioned

22  this in my closing.  There were a series of -- actually if you

23  look just at Mr. Hunter's declaration, I think it lays it out

24  quite clearly; a series of offers from the company, and back and

25  forth in 2009 with the lenders.

In re Boston Generating - 10/9/10                                    7

1          In 2010, he recites a series of offers from the second

2     lien lenders; doesn't recite a single response from the company.

3     Not a single offer from the company.  There's a series of offers

4     in 2010 from the lenders; not a single response cited from him

5     by the company.  And Your Honor I think the easiest illustration

6     of this is in the months of KPMG analysis, not once did they

7     analyze what the tax implications of a standalone restructure

8     would be.  So, it isn't --

9               THE COURT:  I think we're getting far afield.

10              MR. LEBLANC:  Well, Your Honor --

11              THE COURT:  We're getting --

12              MR. LEBLANC:  I'm sorry, Your Honor, you had said that

13    there was lots of opportunity to do this.  There were proposals

14    from the second lien lenders.

15              Now, it isn't, Your Honor, the case that it's an easy

16    thing to do to come up with $200 million of financing when we

17    don't think that they have a liquidity crisis in the near term.

18    Now, based upon -- Mr. Crawford certainly testified that based

19    upon the information to which he had access, that he thought

20    they would have a liquidity concern in 2011 -- in the mid of

21    2011.  The facts on the ground today appear to be quite

22    different.  That was not them operating as a debtor in

23    possession.  We don't know whether they are.

24              THE COURT:  All right, but now -- you know, now what

25    I'm hearing is re-argument of what we've already covered.  And I

EXHIBIT A TO SALE ORDER, PAGE 339

In re Boston Generating - 10/9/10                                    8

1   don't want to go there, and I'm not going to entertain it and

2   the record is close.

3         MR. LEBLANC:  I understand, Your Honor.  And I don't

4   want to re-argue it.  What I'm trying to do Your Honor is

5   explain what we were trying to do which is address the concern

6   raised by the Debtor that they didn't have liquidity.  We put it

7   out there.  We can't --

8         THE COURT:  Okay.  You could have put it out there a

9   month ago.  You could have put it out there two weeks ago.  You

10  could have put it out there on October 1.  You put it out there

11  at ten o'clock last night.  So, it's out there.  I frankly -- I

12  think procedurally and on the merits, I'm not making it part of

13  this record.  Mr. Rosenberg has communicated back that Board in

14  fact convened itself and took certain -- you know came to a

15  conclusion in that regard.  And you know if the financing is

16  available that's good news, because I think as you're about to

17  hear, there's going to be a process and maybe that financing

18  availability can be used in the context of the process that's

19  going to follows.

20        MR. LEBLANC:  Your Honor, we think -- we wanted the

21  Debtors to seriously consider this.  It's a serious offer and in

22  our view should have led as we suggested.  And the reason it

23  expires on October 12 is because we anticipated if they withdrew

24  this that we'd engage in discussions that were necessary to

25  consummate a financing transaction over the next couple of days.

EXHIBIT A TO SALE ORDER, PAGE 340

In re Boston Generating - 10/9/10                                    9

1          So, it wasn't intended -- it's not short lived for any

2    reason other than the fact that we knew we were coming here

3    today.  But we expected the Debtors to take seriously.  We

4    disagree with many of the things in there.

5          THE COURT:  All right, let me make one thing clear,

6    because I don't want to be led into a game of gotcha, because I

7    don't want to get to a sale hearing if and when we get there and

8    then I'm going to hear and argument that oh look, we proposed

9    financing on whatever day it is today, October 8, October 9, and

10   the Debtors refused.  That's what you're' going to tell me.

11         MR. LEBLANC:  Your Honor, what I will tell you is we

12   are ready today to engage in dialogue with the Debtors about

13   financing.  Be it on a priming basis -- if people are released

14   from the SSA, the first lien lenders, and the market --

15         THE COURT:  That's a big if.

16         MR. LEBLANC:  -- is re-opened --

17         THE COURT:  That's a big if.

18         MR. LEBLANC:  If the market is re-opened and we can

19   acquire debt, then there's an opportunity to do it on a priming

20   basis with the consent to the first lien lenders.  If that

21   doesn't happen we're willing to engage in negotiations with the

22   Debtor on subordinated, a junior to the first lien debt, senior

23   to the second lien debt, which we could deliver the consent for.

24         So, Your Honor, we're prepared -- we and others.  I

25   don't want to suggest that we've changed the holdings in the

EXHIBIT A TO SALE ORDER, PAGE 341

In re Boston Generating - 10/9/10                              10

1   second lien.  So, what you'll hear Your Honor when we get to the

2   end of that process is that if the Debtors have -- they either

3   will have engaged with us, in which case you'll hopefully that

4   there's financing.  Or they won't have engaged with us.  In

5   which case you'll that from today forward, we tried and they

6   weren't interested.

7        THE COURT:  Okay.

8        MR. LEBLANC:  And that's what you'll hear.  You're not

9   going to hear that because they rejected our proposal of last

10  night in an email in 12 hours later or 14 hours later.

11  Admittedly -- understandably, before the Court sat today to

12  render a decision, I completely understand why they would have

13  convened and responded as quickly as they did.

14       But you will hear that the offer is out there to

15  engage in a dialogue about financing for this Debtor to give it

16  the liquidity, to get it to a plan process which we think is

17  going to be a necessary component of the Court's consideration

18  of a sale order in this case.

19       THE COURT:  Well, I will -- you know, as and when we

20  get there, I'll consider all that.  But I will not forget that

21  the first time this surfaced on a piece of paper was at 9:49

22  last night.  So, it is what it is.

23       MR. LEBLANC:  The first time a commitment surfaced was

24  at 9:49, but the first time an offer to engage in this

25  discussion happened in writing was August 10, Your Honor.

EXHIBIT A TO SALE ORDER, PAGE 342

In re Boston Generating - 10/9/10                                    11

1   That's when it happened, Your Honor.'

2          THE COURT:  All right.

3          MR. LEBLANC:  And there hasn't been dialogue between -

4   - dialogue is a two-way street.  And there hasn't been dialogue

5   since that time either.  And so you'll likely hear about that as

6   well.

7          THE COURT:  Well, one thing I hope y'all go away from

8   today with is my desire that there be dialogue.  So, let me hear

9   briefly from anyone else who wishes to be heard and then I'm

10  going to give me my decision.

11         MR. ROSENBERG:  Your Honor, I'll be extremely brief.

12  The record is not only closed, the record is clear.  And my

13  closing argument stands.  At it not been ten o'clock at night or

14  nine o'clock at night, and been six at night, I suspect it would

15  have been a whole lot better.  I spent the last 48 hours

16  remembering the things I meant to say.  But that's neither here

17  nor there.

18         I thought that was a fascinating dialogue you just had

19  with Mr. LeBlanc.  Last night at 10 p.m. as Your Honor noted, we

20  get this commitment proposal.  Now, Mr. LeBlanc is saying throw

21  it out, ignore it, we'll do much better, right?  We will talk

22  about a subordinated financing.  Well, that's not in that

23  letter.  Maybe we'll talk about a longer term.  Well, that's not

24  in that letter.  And by the way, the condition of even talking,

25  not agreeing, but talking is walk away from the Constellation

In re Boston Generating - 10/9/10                                    12

1    bid.  Your Honor, I hope you get the picture.  I think you do.

2    Thank you.

3            THE COURT: · All right.  All right, I'm going to give

4    you my decision now.  This is going to take awhile, consistent

5    with everything else in this case.

6            (Laughter.)

7            THE COURT:  So, bear with me, please.

8            Before the Court is the Debtor's motion seeking

9    approval of bidding procedures in connection with the proposed

10   sale of substantially all of their assets pursuant to Section

11   363 of the Bankruptcy Code.  Various forms of related relief are

12   also requested, including the approval of so-called stalking

13   horse bid protections.  Objections to the requested relief and

14   to the propriety of the Debtor's decision to pursue a 363 sale

15   as opposed to a Chapter 11 Plan have been filed by numerous

16   parties.

17           The objectors are led by the second lien agent,

18   Wilmington Trust, FSB, speaking for some $350 million in secured

19   second debt.  Strenuous objections have also been interposed by

20   the Official Committee of Unsecured Creditors, CarVal Investors

21   and Fortress Investment Group, MatlinPatterson Global Advisors

22   and Algonquin Gas Transmission LLC.

23           Each of the objectors filed an objection to the

24   Debtor's Motion and participated in the lengthy hearings that

25   took place in this court on October 4, 5, 6, and 7.  The record

In re Boston Generating – 10/9/10                               13

1    is quite voluminous and includes the following:

2           The declaration of Mr. Jeff Hunter, the supplemental

3    declaration of Jeff Hunter, the declaration of Mr. Sean

4    O'Donnell, the declaration of Mr. Carsten Woehrn, the

5    supplemental declaration of Mr. Carsten Woehrn, the declaration

6    of Mr. Kevin M. Cofsky, the declaration of Mr. John P. Reese,

7    all submitted by the Debtors.

8           The declaration of Mr. Mark Crawford submitted by the

9    CarVal objector, the declaration of Mr. Paul Hibbard was

10   submitted by the Algonquin objector.  Live testimony was taken

11   from Mr. O'Donnell, Mr. Woehrn, Mr. Cofsky, Mr. Reese, Mr.

12   Hibbard, Mr. Wolf, and Mr. Hunter.  The record also includes

13   designated portions of deposition transcripts, counter

14   designations, and five volumes of documentary exhibits.

15          The proceedings have been beset with discovery

16   disputes and indeed were adjourned from September 27 to October

17   4 to allow the objectors additional time to prepare their case.

18   The delay was necessitated by the failure of the Debtors and the

19   Debtor's non-debtor parent, US Power Generating Company, or USPG

20   to produce in a timely fashion the documents properly requested

21   by the objectors.

22          In addition on the morning of the second day of trial,

23   the Debtor's non-debtor parent company, USPG, produced for the

24   first time certain documents which were obviously germane to one

25   of the keystones of the objectors' belief, namely that the

EXHIBIT A TO SALE ORDER, PAGE 345

1   Debtor's pursuit of a 363 sale was driven not by an appropriate

2   exercise of the Debtor's business judgment vis-à-vis the

3   Debtor's creditors, but rather by the alleged opportunity to

4   realize a sizeable tax benefit by USPG, which would be available

5   under a certain set of circumstances allegedly including a 2010

6   sale of the Boston Gen assets.

7          The hearing thus proceeded in fits and starts to allow

8   the objectors the opportunity to review the newly produced

9   documents and resume certain depositions.

10          Under other circumstances, it would have been wholly

11   appropriate to adjourn the hearing entirely.  And I may have

12   done so, but for the deadlines imposed by the proposed asset

13   purchase agreement with the stalking horse bidder,

14   Constellation.  To its credit, the stalking horse bidder has

15   been accommodating and has at least at this juncture been

16   flexible with respect to the APA milestone related to the date

17   for approval of the bidding procedures.

18          It has been extremely difficult to dictate a course of

19   action in these proceedings that affords the objectors the fair

20   process to which they are indisputably entitled; does not

21   jeopardize the over one billion dollars in value represented by

22   the Constellation bid.

23          Whether or not additional time and discovery and

24   depositions would have yielded additional probative evidence and

25   arguments is unclear at best, and may not become clearer until

In re Boston Generating – 10/9/10                                    15

1    the next phase of these cases.  Nonetheless, it is incumbent

2    upon me to see through the fog of this litigation war today and

3    render a decision.

4            I believe the parties have been given a meaningful and

5    ample opportunity to present and develop their positions.

6    Before I give you my decision on the merits, I want to make it

7    very clear that while it is not substantially unlikely, it is

8    far from certain at this juncture that I will ultimately approve

9    the 363 sale proposed by the Debtors.  And to the extent that

10   additional evidence is adduced at the sale hearing, as and when

11   it proceeds, my findings of fact, as expressed in this decision,

12   should be considered preliminary in the sense that they are not

13   findings of fact for the purpose of the sale order.  Against

14   that backdrop, let me now give you my decision.

15           The standards applicable to a motion of this character

16   appear in numerous decisions issued by the Courts in this

17   circuit.  Those which factor most significantly into my analysis

18   today are one, the second circuit's decision in *In re Lionel*,

19   722 F2d 1063.  The District Court's opinion in *In re Integrated*

20   *Resources*, 147 B.R. 650, and three, the Bankruptcy Court's

21   decision in *In re Global Crossing*, 295 BR. 726 in which Judge

22   Gerber discussed the court's decisions in *Lionel* and *Integrated*

23   *Resources*.

24           In each of these decisions, the Courts have applied a

25   business judgment test to evaluate whether a sound business

In re Boston Generating - 10/9/10                                    16

1   purpose justifies the use, sale or lease of property under

2   Section 363 of the Bankruptcy Code.

3           I have also considered Judge Gonzalez's ruling in *In*

4   *re Young Broadcasting, Inc.*  Specifically as cited at Paragraph

5   38, the CarVal objection.  For the reason I will discuss, I do

6   not believe *Young Broadcasting* is at all inconsistent with my

7   decision today.

8           In *Lionel*, the Court of Appeals for the Second Circuit

9   held that a proposed sale under Section 363(b) of the Bankruptcy

10  Code, outside of a plan of reorganization should only be

11  approved if the proponents of the sale present "some articulated

12  business justification other than appeasement of major

13  creditors."  In *Integrated Resources*, in affirming the

14  bankruptcy court's approval of a breakup fee, Judge McKazy (ph)

15  concluded that the business judgment rules presumption shields

16  corporate decision makers and their decisions from judicial

17  second guessing only when the following elements are present.

18  (1) A business decision, (2) disinterestedness, (3) due care,

19  (4) good faith, and (5) according to some courts and

20  commentators no abusive discretion or waste of corporate assets.

21          While none of the objectors have argued that the

22  inapplicability of the business judgment test to the Debtor's

23  decision to seek approval of the bid protections, they have

24  urged that the test be applied with heightened scrutiny.  The

25  thrust of the opposing arguments has been that the determination

In re Boston Generating - 10/9/10                              17

1   of the Board of Managers of the parent-debtor, EBG Holdings, LLC

2   or EBG to embark on the sale process and to agree to the

3   proposed breakup fee was an unreasonable one and indeed a

4   tainted one even when weighed against the benefit of securing a

5   $1.1 billion purchase price for the Debtor's assets.

6        I note that today I evaluate only the Debtor's

7   business decision in seeking approval of the bid procedures.  As

8   and when I hold a sale hearing at some point in the future, I

9   will take a fresh look at business judgment in connection with

10  any proposed sale.

11       In considering the business decision of whether to

12  approve the proposed breakup fee and related bid protections, I

13  must therefore examine whether the board was appropriately

14  disinterested and acted in good faith in making it's decision.

15  Overall, the relationship between the Debtors and U.S. Power

16  Generating, the non-debtor parent of the Debtors provides a

17  basis for close scrutiny.  The evidence in the record shows that

18  some EBG officers and board members are also officers of and

19  equity owners of U.S. Power Generating, the non-debtor parent of

20  the debtors.

21       As such, the objectors presented evidence that under

22  certain circumstances, EBG Officers and board members stand to

23  gain personally from tax benefits accruing to USPG.  The

24  objectors showed that USPG has the ability to influence the

25  Debtor's management and board decisions.  As the Debtors are

In re Boston Generating - 10/9/10                      18

1   wholly owned by USPG, USPG provides management services to the

2   Debtors and the majority of the Board and management also work

3   for USPG.

4        Specifically the objectors argue that the Debtors were

5   not motivated to pursue a sale on account of an impending

6   liquidity crisis, but rather that their true motivation was to

7   secure tax benefits for their non-debtor parent.  And in the

8   case of the Debtor's CFO, Mr. Hunter, to enable him to cash in

9   his approximately $5 million equity interest in USPG.

10       Thus the objectors assert that the Debtor's liquidity

11  argument is a pretext for improper motives with the resulting

12  implication that the Debtors have not acted in good faith

13  notwithstanding (1), the possible existence of this potential

14  tax benefit, and (2), the close relationship between the

15  entities and their officers and directors.

16       In making the business decisions that are before me

17  today with respect to the bidding procedures, I conclude that

18  the board of managers of EBG, the parent-debtor showed

19  appropriate loyalty and exercise of fiduciary duties to EBG and

20  that it acted in good faith and in a disinterested manner in

21  electing to move forward with the stalking horse bidder and seek

22  approval of the bid protections.

23       The tax analysis conducted by KPMG, the accountant for

24  both USPG and the Debtors, illustrates that under certain

25  circumstances USPG could benefit from a sale of the Debtor's

EXHIBIT A TO SALE ORDER, PAGE 350

1    assets in 2010.  The record reflects that USPG considered tax

2    implications of the pending Boston Generating and Astoria sales.

3    Various KPMG presentations and internal emails reveal that the

4    corporate tax strategy was fluid.  The tax results changed on

5    different interpretations of the recourse rules, on when the

6    consolidation may occur, on what structures were used to create

7    a tax event that would recognize gain from Astoria in 2010, and

8    on the varied but the possible results of each of the Astoria

9    and Boston Generating sales.

10            One discrete advantage of 2010 appears to be that the

11    capital gains tax rate will be 15 percent.  In 2011, the capital

12    gains tax rate maybe 20 percent unless the Bush tax cuts are

13    extended.

14            Even if USPG was motivated to close a Boston

15    Generating sale in 2010, I do not conclude that this motivation

16    infected the Debtor's decision making process.  Indeed there was

17    credible evidence that a Boston Generating sale or plan of

18    reorganization in 2011 would also be advantageous from a tax

19    standpoint to USPG.

20            THE COURT:  Can I have everyone put their phones on

21    mute, please?  Thank you.

22            Thus I do not believe that there is or ever was a

23    clear plan or tax strategy that required a quick sale of EBG for

24    the benefit of USPG.  I find credible the testimony of Mr.

25    Hunter, the Chief Financial Officer of EBG and a member of its

In re Boston Generating – 10/9/10                          20

1    Board of Managers, and Mr. Wolf, an Independent Manager of EBG,

2    that the Board of Managers of EBG appropriately exercised its

3    fiduciary duties in seeking to pursue a sale of the Debtor's

4    assets.

5              I also find that the Debtor's management with the

6    advise of independent lawyers and financial advisors worked

7    tirelessly first to internally restructure and then to attempt

8    to sell the Debtor's assets at what they believe was an

9    opportune time.  The testimony of three witnesses supports my

10   conclusions in this regard.  First, Mr. Wolf's testimony

11   illustrates that he gave appropriate consideration to all the

12   facts and circumstances in the discharge of his fiduciary duty

13   to and only to the Debtors.  Mr. Wolf's vote was required by the

14   Debtor's organizational documents before filing for bankruptcy

15   to launch the 363 sale process.

16             Mr. Wolf has several decades of experience with

17   corporate governance with large companies, and appears to have

18   been fully engaged with the Debtors and the process.  Board

19   minutes related that he actively participated in board meetings,

20   and occasionally disagreed with board members affiliated with

21   USPG.

22             Mr. Wolf had an appropriate level of knowledge about

23   the Debtors, including knowledge of the Debtor's pre-petition

24   financial information and the liquidity position.  He supported

25   taking immediate action to begin a sale process as he was aware

In re Boston Generating - 10/9/10                    21

1   of the Debtor's decreasing cash flow a trend he believed had the

2   potential to accelerate beginning 2011.  He knew a sale process

3   would take months and he wanted to begin the process well in

4   advance of a liquidity crisis, which he referred to as the

5   Debtor's "Rendezvous with Destiny."

6            Mr. Wolf testified that all information, including the

7   rules of the Federal Energy Regulatory Commission and FERC, that

8   might influence the Debtor's future revenues, was publicly

9   available in the vigorous auction conducted by JPMorgan, the

10  company's investment banker, and he felt confident that all

11  information was factored into the final bid selected at the pre-

12  petition auction.  His testimony was that the sales process

13  conducted by JPMorgan couldn't have been done better.

14           Second, Mr. O'Donnell, the led investment banker for

15  JPMorgan gave credible testimony regarding his believe and

16  resulting advice to the Debtor's that the best course of action

17  to maximize the value of the Debtor's assets was to begin the

18  sale process in April 2010.

19           I find that Mr. O'Donnell's recommendation was not

20  influenced by USPG tax considerations, but instead by the goal

21  of selling the Debtor's assets for the highest price on the best

22  terms possible.  And JPMorgan's incentive fee arrangement, which

23  was triggered at a sale of the assets for $1.2 billion, leaves

24  little doubt that like any banker worth their salt, JPMorgan

25  would leave no money on the table.

In re Boston Generating - 10/9/10                                22

1    Mr. O'Donnell gave multiple persuasive reasons for his
2    recommendation to begin the sale process in April 2010.  Reasons
3    which included his belief that (1), the best seller M&A process
4    takes place when the seller "need not transact"; (2), that
5    beginning the process earlier would provide the Debtor's more
6    flexibility to evaluate offers before EBG's cash ran out; and
7    (3), that early 2010, was the most supportive environment in the
8    last two years for M&A process because the financing market was
9    substantially improved thus reducing the cost of capital for the
10   while energy market, and buyers were actively interested in
11   generation assets.

12       Mr. O'Donnell stated that he felt there was no
13   guarantee that this positive M&A market would continue.  In
14   fact, he believed that the market would likely worsen because
15   many generation assets were coming to market in late 2010.

16       This information was conveyed to the company and its
17   management and informed the Debtor's business judgment to move
18   forward with the sale process on the timetable proposed.

19       Third, even though the evidence reveals that Mr.
20   Hunter has a sizeable financial interest in USPG, I find that he
21   worked tirelessly and in good faith to maximize the value of the
22   Debtor's assets and acted in a disinterested manner.

23       I found Mr. Hunter to be a persuasive, thoughtful and
24   honest witness.  While Mr. Hunter admitted that there may be tax
25   benefits to USPG from the sale of the Debtor's assets, it is

In re Boston Generating - 10/9/10                              23

1    clear to me that he believed that a sale process was the best

2    way to maximize the value of the Debtor's assets.

3            He believed there was a looming liquidity crisis that

4    would be exacerbated by the roll-off of hedges at the end of

5    2010.  He considered and dismissed the idea of seeking financing

6    that would extend liquidity further.  He believed that DIP

7    financing was not viable and not in the best interest of the

8    estates although he mistakenly believed that 100 percent first

9    lien lender consent was required for a priming debt.  He

10   believed that it was not prudent to delay the sale until a

11   possible March FERC ruling because the results, timing and

12   effect of the FERC action were unclear to him.  Further, Mr.

13   Hunter knew that the FERC docket was public and felt that

14   possible positive regulatory news was understood by the market

15   and would be factored into the sale price for the EBG assets.

16           Based on the testimony of Mr. Wolf, Mr. O'Donnell and

17   Mr. Hunter, I conclude that the Debtor's decision to pursue the

18   sale of their assets when and how they did was a disinterested

19   decision made in good faith.  It was not based on improper

20   motivations such as the desire to secure tax benefits for the

21   Debtor's non-debtor parent.

22           I next turn to the issue of whether the Board of

23   Managers of EBG considered its options with due care acting in

24   an informed manner.  _Lionel_ teaches that a Chapter 11 Debtor

25   should not take an action simply because a particular

In re Boston Generating - 10/9/10                               24

1   constituency, even an important one such as the first lien

2   lenders in this case wants it.  Particular relevant to my

3   analysis here are the issues of (1) whether the Debtor's

4   considered the risk that they might not be able to consummate

5   the stalking horse transaction, and (2) whether the Debtors

6   exercised due care in weighing this consideration against the

7   potential value which could flow from an eventual sale to the

8   stalking horse bidder if consummated.

9           I find that under the standard articulated in *Lionel*,

10  the Debtor's have articulated a good business reason to grant

11  approval of the bid procedures under Section 363 of the

12  Bankruptcy Code, and that they exercised due care and decided to

13  move forward with the sale at this time.  The Debtors clearly

14  understood the *Lionel* standard and considered the risk that I

15  will not approve a 363 sale.  Mr. Rosenberg's arguments about

16  the "insurance policy" reflect as much.  I decline to second

17  guess their business to assume that risk.

18          First; in support of their decision, the Debtor's

19  submitted evidence that they will run out of cash in

20  approximately April 2011, which would impinge on their ability

21  to run the best possible marketing process at that time.  The

22  evidence presented shows that the Debtors had a potential

23  covenant breach in 2010, which would have crossed defaulted

24  hedges.  But the covenant default was cured by a revolver pay

25  down.  Further evidence shows that all things being equal, the

EXHIBIT A TO SALE ORDER, PAGE 356

In re Boston Generating - 10/9/10                              25

1    Debtor's operating business would produce substantially less

2    cash in 2011 because Ecreative hedges expire in December 2010.

3            The Debtors also introduced evidence that early 2010

4    was a prudent time to come to market because the financing

5    market dramatically improved in the first half of 2010 and there

6    were buyers interested in generation assets.  There was

7    substantial improvement over the last two years and there was no

8    way to know whether this window would continue.

9            Finally, the Debtors submit that based on the advice

10   of their investment banker, they believed they could secure a

11   higher price for their assets if they held an auction to obtain

12   a stalking horse bidder long before any liquidity crisis and

13   that this timing would permit a robust bankruptcy auction in

14   November 2010, and also leave over 90 days for the winning

15   bidder to obtain FERC approval.

16           I believe that each of these considerations supports

17   the Debtor's decision to proceed with the sale at the current

18   time.  I also find that the Debtors appropriately considered the

19   presence of regulatory uncertainty in deciding to proceed with

20   the sale at the current time.  Stated differently, I am not

21   convinced that the Debtor should have decided to tread water

22   while waiting for a FERC order that may, but may not add value

23   to the bottom line in 2014 at the very earliest.  While multiple

24   objectors argue that the Debtors should have waited to sell

25   their assets because pending FERC regulatory assets may

In re Boston Generating - 10/9/10                                26

1   materially increase revenues.  I defer to the Debtor's business

2   judgment on this point.

3           As Judge Gerber stated in his *Global Crossing* decision

4   in which he upheld the Debtor's business judgment to enter into

5   a transaction where they took informed regulatory risks, "A

6   bankruptcy court has neither the role, nor the expertise (A) to

7   predict the outcome of regulatory proceedings, or (B) to

8   substitute its own views as to the optimum business decision for

9   the views of the Debtor's Boards and their advisors."  I concur

10  with Judge Gerber in this regard.

11          In support of its argument, one objector, Algonquin,

12  submitted the testimony of Mr. Paul Hibbard, a FERC Regulatory

13  Expert, that positive regulatory news may occur in March 2011

14  and that these changes may increase revenue as early as 2014.

15  There is no dispute that the ISO and FERC proceedings were

16  public and that everyone in the market was aware of them.

17          The testimony of Mr. Reese, the Senior Vice President

18  of Regulatory and Government Affairs of the Debtor's non-debtor

19  parent, believed that the final two bidders had the expertise to

20  analyze the regulatory environment and factor it into their

21  bids.  Moreover, I find credible the testimony of Mr. Reese that

22  (1) the regulatory environment is always uncertain, (2) the

23  timing of the FERC ruling is not fixed, and (3) prices may

24  actually decrease substantially in the short-term as a result of

25  reductions in the floor price.

EXHIBIT A TO SALE ORDER, PAGE 358

In re Boston Generating - 10/9/10                                    27

1         Although at least one witness stated that he did not

2    know whether Constellation included the net present value of

3    possible FERC-related upside in its bid, it seems clear to me

4    that any other interested bidder, including the second lien

5    lenders, can do their own calculation in that regard, and did

6    accordingly.

7         In addition, multiple objectors argue that the Debtors

8    did not consider other options to extend their liquidity so they

9    could wait for positive regulatory changes.  Mr. Hunter's

10   response to this notion was compelling.  He simply could see no

11   responsible way to bridge for an uncertain time, in an uncertain

12   amount, to an uncertain FERC ruling, of uncertain value to the

13   Debtors.

14        These objectors also suggest that they would be

15   willing to fund the Debtors going forward.  Secondly, lenders

16   did not present term sheet or even a financing proposal.  That

17   is until 10 p.m. last night after the conclusion of these

18   hearings.  I find there was no reason for the Debtors to believe

19   that they could finance a non-consensual plan process with new

20   cash from these parties.  The Debtor's decision not to pursue

21   financing, but rather to fund their operations with cash

22   collateral and proceed with the sale was a valid exercise of

23   their business judgment.

24        I next turn to the bid protections themselves.

25   Specifically, the breakup fee, expense reimbursement and no-shop

In re Boston Generating - 10/9/10                    28

1   provisions provided for in the asset purchase agreement with the

2   stalking horse bidder.  I will evaluate the breakup fee under

3   the three-part test set forth in this court's decision in

4   *Integrated Resources*, 147 B.R. 650, which asks, (1) is the

5   relationship or the parties, who negotiated the breakup fee

6   tainted by self-dealing or manipulation, (2) does the fee

7   hamper, rather than encourage bidding, and (3) is the amount of

8   the fee unreasonable relative to the proposed purchase price.

9        As a preliminary matter, I find that prongs (1) and

10  (3) of the test have been satisfied.  The stalking horse bidder

11  and the Debtors negotiated their asset purchase agreement on an

12  arms-length basis and there is no evidence in the record, nor

13  any allegations of self-dealing.  I also find that the amounts

14  of the proposed breakup fee and expense reimbursement are

15  reasonable relative to the proposed purchase price based on (1)

16  the declaration of Mr. Cofsky of Perella Weinberg, and (2)

17  comparable fees approved in similar cases of this size in this

18  jurisdiction and elsewhere.  The breakup fee amounts to

19  approximately 2.7 percent of the cash purchase price to be

20  realized by the sale.  And when the expense reimbursement is

21  included, approximately 3.2 of the proposed purchase price.

22        I now turn to the question of whether the fee hampers,

23  rather than encourages bidding and find that the breakup fee

24  enhances, rather than detracts from bidding in this case, and

25  should be approved.

In re Boston Generating - 10/9/10                          29

1      Based on the negotiation history as described by Mr.

2    Hunter and others, the breakup fee and expenses reimbursement

3    were necessary to create a vibrant pre-petition auction that led

4    to the execution of then stalking horse asset purchase

5    agreement.  Mr. Woehrn, an Executive Director at JPMorgan, the

6    Debtor's investment banker, testified that all bidders expected

7    market bid protections and that they included such protections

8    in draft asset purchase agreements they submitted.  Mr. Cofsky,

9    of Perella Weinberg, also echoed the view that bid protections

10   were material inducements to the stalking horse bid.

11      Based on the evidence presented, in particular the

12   testimony of Mr. Woehrn, I find that the breakup fee encouraged

13   bidding and that awarding the breakup fee here was and is

14   necessary to have created the pre-petition auction, and to have

15   attracted the stalking horse bidder, and to induce it to remain

16   at the table while the sale process continues.  While there is

17   always a risk in agreeing to a breakup fee, I believe the

18   Debtors appropriately considered that risk when faced with the

19   alternative of losing the bird in the hand, and moving forward

20   without a stalking horse in place.

21      The objectors continued to urge in closing argument

22   that there is no need for a breakup fee because Bidder-B and

23   another strategic buyer, will still be interested in the Boston

24   Generating assets.  Time will tell, but there is no evidence in

25   the record on which I can conclude that to be the case.

In re Boston Generating - 10/9/10                              30

1          Next I turn to the no-shop provisions.  The no-shop

2     provision in Section 6.3 of the asset purchase agreement which

3     is the focus of several of the objections prevents the Debtor

4     from having any discussions, including responding to unsolicited

5     requests from the execution date of the asset purchase agreement

6     until the Court's approval of the bid procedures.  The asset

7     purchase agreement contains no fiduciary out during that time

8     period.  And violation of the no-shop provision constitutes a

9     termination event under the agreement.

10          The objectors argue that the no-shop provision chilled

11     bidding during the post-petition and prevented the Debtors from

12     conducting a full marketing process during the pendency of these

13     cases.  They further argue that it prevented the Debtors from

14     fulfilling their fiduciary obligations.

15          I find that although restrictive the no-shop provision

16     and the related bid protections in the asset purchase agreement

17     were necessary to induce the stalking horse bidder to execute

18     the asset purchase agreement with the Debtors.  In addition,

19     because once the bid procedures are approved the Debtors will no

20     longer be bound by such restrictions on marketing their assets,

21     I find that on balance the decision of the Debtors to agree to

22     agree to the no-shop provision was a valid exercise of their

23     business judgment and should be upheld.  I do not believe that

24     the no-shop provision prevented the Debtors from discharging

25     their fiduciary obligations.

EXHIBIT A TO SALE ORDER, PAGE 362

In re Boston Generating - 10/9/10                                31

1          In this case, the pre-petition marketing process was

2    so broad, that most, if not all potential bidders knew that the

3    Debtor's assets were for sale, and they had the opportunity to

4    conduct diligence.  Mr. O'Donnell's testimony reveals his

5    extensive knowledge of the universe of parties with the capacity

6    and interest to purchase one billion dollars in generating

7    assets, and I believe that he appropriately canvassed those

8    potential buyers during the pre-petition marketing period.

9          I find it unlikely that there exists an interested

10   party who was unaware until now that the Debtor's assets were

11   for sale, and who would need to start its diligence from

12   scratch.  Thus, I believe that the thirty plus days -- 30 day

13   go-shop period is a sufficient period of time to permit the

14   Debtors to seek a higher and better offer for their assets than

15   that of the stalking horse bidder.  The moment the bidding

16   procedures are approved, the Debtors will unleash their bankers

17   to market their assets and all interested bidders, including the

18   second lien lenders, will, I believe, have a sufficient time to

19   formulate a topping bid.

20          With respect to a topping bid, I now turn to the final

21   component of the bid protections to which substantial objections

22   have been raised, namely the initial minimum overbid amount and

23   the minimum bid increment amount, each of which is $20 million.

24          Several of the objectors have urged that the $20

25   million amount will chill, rather than encourage bidding.  I

In re Boston Generating – 10/9/10                                32

1    agree.  Accordingly, the bid procedures should be revised to

2    reduce each of these amounts to $10 million.

3                I now turn to certain additional arguments raised by

4    the objectors.  I will address them one by one.  Notwithstanding

5    the arguments of the objectors and the deposition testimony of

6    Mr. Crawford, a Director of CarVal Investors, a second lien

7    lender, the overwhelming evidence leads me to conclude that the

8    second lien lenders were not shut out of the process.

9                Based on the testimony of Mr. Hunter and Mr. Cofsky, a

10   Managing Director at Perella Weinberg, financial advisor for the

11   Debtors, I find that the second lien agent and its advisors were

12   involved in the company's restructuring process from 2009

13   through the sale process in 2010.  During that time I also note,

14   that Boston Generating voluntarily paid millions of dollars in

15   fees and expenses of the second lien agent in order to

16   facilitate its involvement in the process.  It is clear that the

17   second lien lenders were engaged in the sale process.

18               Mr. William Hardie of Houlihan Lokey, financial

19   advisor to the second lien lenders, even sent an email to

20   Perella Weinberg the day before selection of the stalking horse

21   bidder, which stated that he appreciated their willingness to

22   keep the lines of communication open.  This course of conduct

23   further substantiates the conclusion that the second lien

24   lenders were actively engaged.

25               Despite their claims of being shut out, the second

EXHIBIT A TO SALE ORDER, PAGE 364

In re Boston Generating - 10/9/10                                33

1  lien lenders have not demonstrated that they pursued or

2  suggested other concrete viable options to the Debtors in lieu

3  of proceeding with the stalking horse bid.  The second lien

4  lenders never submitted their own bid, never offered financing,

5  until 10 p.m. last night that is, and never introduced valuation

6  testimony that would show that $1.1 billion does not represent a

7  fair market price for the Debtor's assets.

8         They did not present evidence supporting the

9  possibility of a viable standalone plan, did not refute

10  testimony that the Debtors can only support about $400 million

11  of debt compared to the $1.1 billion of existing first lien

12  debt, did not present any evidence that the first lien debt

13  could be reinstated, and did not make any concrete restructuring

14  proposals that would lead to a higher or better recovery for

15  creditors.

16         Next, I find no merit in the argument raised by

17  multiple objectors that the 363 sale amounts to a sub-rosa plan

18  of reorganization and thus could not be approved because it

19  dictates the terms of any future plan of reorganization or

20  otherwise short circuits the plan confirmation requirements.

21  The proposed asset purchase agreement does not call for any

22  determination of rights as between classes; merely brings cash

23  into the Debtor's estates.

24         If a sale is consummated, any plan for distribution of

25  the assets will be subject to my approval.  Although the

EXHIBIT A TO SALE ORDER, PAGE 365

In re Boston Generating - 10/9/10                                    34

1    proposed sale order contemplates immediate distribution of sale

2    proceeds to the first lien lenders, I am not today giving that

3    provision my stamp of approval.

4           Certain of the objectors argue that the provisions

5    contained in the proposed bidding procedures which require any

6    bid, including credit bids to pay the proposed breakup fee in

7    cash and to fund other administrative expenses are improper.

8           In light of the Section 506 fee waivers that have been

9    granted, I find these provisions are not inconsistent with

10   Section 363(k).  The purchase of the Debtor's assets in these

11   cases includes these costs, which can also be viewed as part of

12   the first lien lender's claims which would have to be paid under

13   a plan.

14           Stated differently, it is reasonable to expect that a

15   secured creditor who stands to benefit from the sale of its

16   collateral should pay for the cost of administering a case

17   designed to efficiently effectuate that sale.  To hold otherwise

18   would mean that there could never been a bid protected stalking

19   horse bidder in a 363 sale in a case in which secured creditors

20   have credit bid rights.

21           To the extent not specifically addressed, all other

22   objections to the bidding procedures are overruled.  And the

23   Debtor's motion for approval of the bidding procedures is

24   granted.  I am prepared to entertain an order reflecting this

25   decision as promptly as the parties are in a position to submit

EXHIBIT A TO SALE ORDER, PAGE 366

In re Boston Generating - 10/9/10                              35

1  it.  What I would like to do eventually is to attach a cleaned

2  up version of the transcript of this ruling to the order as an

3  exhibit.

4          Before we adjourn today, let me add that it is my hope

5  and expectation that during the next 30 to 45 days before the

6  sale hearing, the Debtors will conduct a process that has all of

7  the hallmarks of not just a robust sale process, but also an

8  exemplary Chapter 11 plan process.  In my view, those hallmarks

9  are transparency, inclusiveness, dialogue and negotiation.  A

10  wholly consensual process is of value to all stakeholders here.

11  And I am sure you will all work diligently to realize that

12  value.

13          That's it.  What should we do next?

14          MR. ROSENBERG:  Your Honor?

15          THE COURT:  Mr. Rosenberg?

16          MR. ROSENBERG:  Yes.  Your Honor, I think the one

17  piece of housekeeping that's left that I think Your Honor needs

18  to be involved in one way --

19          THE COURT:  Is the order.

20          MR. ROSENBERG:  -- is choosing dates.

21          THE COURT:  Right.  Choosing dates and the order.  I

22  don't know exactly how we would do this, but I am prepared to

23  so-order the record today so the no-shop falls away.

24          MR. ROSENBERG:  Excellent, which is the point that the

25  reason I made all of you give me part of your Saturday,

In re Boston Generating - 10/9/10                              36

1    including, it is noted that Mr. LeBlanc came up from Washington,

2    which I appreciate.

3              MR. ROSENBERG:  Your Honor, we're happy to have that

4    happen, certainly.

5              THE COURT:  All right.  So, let's talk about dates,

6    because to the extent that -- and I see Mr. Neier is here, of

7    course.  To the extent that we can play with some of the dates

8    to maximize the period of time until the auction, we should do

9    that.

10             I think Latham's -- the proposed schedule was that

11   sale objection deadline and the qualified bid deadline were

12   November 5 and the deadline for the Debtors to announce the

13   starting bid was November 8.

14             MR. ROSENBERG:  That's correct, Your Honor.

15             THE COURT:  So, is there any push in those dates?

16             (No response.)

17             THE COURT:  I'm going to look at Ms. Reckler since

18   she's --

19             MR. ROSENBERG:  Yeah (chuckling).  She's much

20   better --

21             THE COURT:  She knows more about this than you do.

22             MR. ROSENBERG:  -- at this than I am.

23             THE COURT:  Yes.

24             MR. ROSENBERG:  For absolutely certain.

25             THE COURT:  Sit down, Mr. Rosenberg.

In re Boston Generating - 10/9/10                               37

1          (Laugher.)

2          MR. ROSENBERG:  Yes, ma'am.

3          MS. RECKLER:  Your Honor, good afternoon, Caroline

4   Reckler, on behalf of the Debtors.  Your Honor, I think it may

5   make sense to start at the end and then work backwards --

6          THE COURT:  Sure.

7          MS. RECKLER:  -- since all the dates are teed off the

8   final date.

9          THE COURT:  Right.

10          MS. RECKLER:  I think it might make sense to hear from

11   Mr. Neier about the outside date in terms of sale -- the date by

12   which we need a sale order, because it's my understanding that

13   the December 6 date for consummation of the sale is not going to

14   change.

15          THE COURT:  Right.  But he may not want to move the

16   other dates.

17          MS. RECKLER:  That's correct.

18          THE COURT:  Right.

19          MR. NEIER:  Good afternoon, Your Honor --

20          THE COURT:  Hello.

21          MR. NEIER:  -- David Neier, on behalf of

22   Constellation.  Your Honor, you know, we've -- I guess we've had

23   some communication with respect to December 6.  And if only FERC

24   approval is outstanding, what we intend to do is hedge on that

25   date, and therefore remove any volatility, if you will, that

In re Boston Generating - 10/9/10                    38

1   would affect --

2          THE COURT:  Okay.

3          MR. NEIER:  -- our price.  So, that's why we were able

4   to get to January 14 after negotiations with the Debtors and

5   making it reciprocal with the Debtors --

6          THE COURT:  Okay.

7          MR. NEIER:  -- so that neither one of us could

8   terminate --

9          THE COURT:  Right.

10          MR. NEIER:  -- if only FERC approval was necessary.

11          THE COURT:  Right.

12          MR. NEIER:  And we believe, by the way, that we will

13   have FERC approval within that time period.

14          THE COURT:  Well, I believe that you do too, otherwise

15   I wouldn't have ruled as I did.

16          MR. NEIER:  Understood.

17          THE COURT:  Okay.

18          MR. NEIER:  Understood, Your Honor.  With respect to

19   December 6, what we were thinking of is that it's probably

20   prudent to have 14 days --

21          THE COURT:  Okay.

22          MR. NEIER:  -- between the date you enter the sale

23   order and the date that we close, which means that we could

24   extend November 16 to November 22.

25          THE COURT:  Okay.  And where does that put us with

In re Boston Generating - 10/9/10                          39

1    respect to Thanksgiving?

2              MR. NEIER:  It's the Monday of that week.

3              THE COURT:  It's the Monday before Thanksgiving?

4              MR. NEIER:  It's the Monday before Thanksgiving.

5              THE COURT:  Okay.

6              MR. NEIER:  And that way, the 14 days would take us to

7    December 6 after that.

8              THE COURT:  Okay.

9              MR. NEIER:  We obviously could close --

10             THE COURT:  So that gives us some --

11             MR. NEIER:  We could close within the 14 days, but

12   we're just trying to be prudent at this stage --

13             THE COURT:  Right.

14             MR. NEIER:  -- since you haven't (A) considered the

15   sale order --

16             THE COURT:  Right.

17             MR. NEIER:  -- and (B) --

18             THE COURT:  Exactly.

19             MR. NEIER:  -- entered the appropriate relief with

20   respect to closing.

21             THE COURT:  Right.  Right.  So if we -- if that

22   deadline moved to November --

23             MR. NEIER:  It would give an extra week or so.

24             THE COURT:  -- 22, that would give us an extra week,

25   and that would also give us an extra day or two since it seems

In re Boston Generating - 10/9/10                              40

1    to be the case in this case that things take longer than we all

2    think that they're going to take.  Okay.  So, if that's the

3    case, then how much more time can we give the parties for the

4    auction period, Ms. Reckler?

5              MR. NEIER:  Those dates, by the way -- other than the

6    November 16 date, which we're asking you to so-order whatever

7    your decision is --

8              THE COURT:  Okay.

9              MR. NEIER:  -- with respect to November since that's

10   another milestone.

11             THE COURT:  Right.

12             MR. NEIER:  But the other dates between those, I don't

13   believe are milestones.

14             THE COURT:  They're not milestones.

15             MR. NEIER:  They're not milestones.

16             THE COURT:  No.

17             MR. NEIER:  So, they're within the Debtor's

18   discretion.

19             THE COURT:  So, if you're giving the Debtor's relief

20   from the November 16 date to the 22nd we make up six days right

21   there.  And then there are some internal deadlines that the

22   Debtors themselves may be able to fiddle with.

23             MR. NEIER:  Yes.  I'll leave that to Ms. Reckler.

24             THE COURT:  You know, for example, the sale objection

25   deadline and qualified bid deadline, there's three days between

In re Boston Generating - 10/9/10                    41

1    that, and your proposed deadline for the Debtors to announce the

2    starting bid.  I'm not sure you need three days.  So, you can

3    maybe compress that.  What I'm trying to do is give these folks

4    and other bidders as much time as possible.  And I very much

5    appreciate Mr. Neier and his client's flexibility in that

6    regard.

7            So, I'm hearing at least that we're getting six days

8    back from what we lost.  And maybe you can shave off a day or

9    two between the qualified bid deadline and the deadline for the

10   Debtors to announce the starting bid.  It probably makes sense

11   to have to two days between that deadline and the auction.

12           So, maybe it makes sense to just end the hearing and

13   allow you to have some time to work this out and bake it into

14   the order.  And, I don't know if you've already made changes to

15   the order, but do you want to try to get it entered today?  Or

16   are you comfortable with my so-ordering this record so that you

17   can lift the no-shop and get the bankers working?

18           MS. RECKLER:  I --

19           THE COURT:  They're nodding at you.  I don't know if

20   you read their nods, but --

21           (Laugher.)

22           MS. RECKLER:  Yes, I think we're comfortable if it's

23   so-ordered.

24           THE COURT:  Okay.

25           MS. RECKLER:  And if Your Honor can just give us a

EXHIBIT A TO SALE ORDER, PAGE 373

In re Boston Generating - 10/9/10                           42

1  date for the sale hearing, we will work with the other parties

2  to fill in the rest of the dates.

3          THE COURT:  A date for the sale hearing.  I'm looking

4  at the calendar.

5          (Pause.)

6          THE COURT:  I'm struggling because of course I have a

7  Chapter 13 calendar on November 18, and I swore that this was

8  the last time I was going to have a major hearing when I had a

9  Chapter 13 calendar.

10         So, these are the options.  The options are that we

11  could start it -- we could have the hearing starting on the

12  17th.  We could start at two o'clock on the 18th.

13         (Pause.)

14         THE COURT:  I'm just trying to balance giving -- you

15  know extending the period, give as much time.

16         MR. ROSENBERG:  Your Honor, may I rise?

17         THE COURT:  Yeah, please.

18         (Laughter.)

19         THE COURT:  I'll take anyone's help at this point.

20  I'm just trying to --

21         MR. ROSENBERG:  Even mine, okay.

22         (Laughter.)

23         MR. ROSENBERG:  I guess we're just being admittedly

24  slightly cynical here to think that the hearing, we have to plan

25  at least on it being longer, rather than shorter.

EXHIBIT A TO SALE ORDER, PAGE 374

In re Boston Generating - 10/9/10                    43

1          THE COURT:  I agree.

2          MR. ROSENBERG:  So, if Your Honor could see fit to

3    start on the 17th, we think that would be better.

4          THE COURT:  Right.  So, if we were start on the 17th

5    that still gives us some additional headroom.

6          MR. ROSENBERG:  It does.

7          THE COURT:  Right?

8          MR. ROSENBERG:  It does.

9          THE COURT:  All right.  Mr. Brilliant, you've been

10   quiet.  Maybe you're still just exhausted.

11         MR. BRILLIANT:  A little bit exhausted, Your Honor.

12   And you know just trying to take it all in figure out what this

13   means and where we go from here.  You know, whatever date Your

14   Honor sets --

15         THE COURT:  Okay.

16         MR. BRILLIANT:  -- can make it work for us.

17         THE COURT:  Well, I think the 17th makes sense.  And

18   just when you're putting in the rest of the dates in the order,

19   just try to make the auction period be as long as you possibly

20   can to the extent that you can squeeze the other dates.

21         Oh, yeah.  And you have an omnibus hearing date on the

22   16th also.  So, is that the only thing I have on for that date?

23         LAW CLERK:  Yeah.

24         THE COURT:  Yeah, but that doesn't really help,

25   because then that cuts into the period and I'm trying to have

In re Boston Generating - 10/9/10                                    44

1   the period be extended.  So, I think that starting on the 17th

2   is the most prudent thing if this is any indication of how long

3   a hearing it would be, that would give us you know four or so

4   days unless I made you come for the weekend, which I really

5   don't want to have to do.  All right?

6         MR. ROSENBERG:  Mr. Charles wants me to make you

7   understand that that would leave -- I think that would then

8   contemplate having the auction itself on the 15th; Monday, the

9   15th.

10        THE COURT:  Right.

11        MR. ROSENBERG:  Yeah.

12        THE COURT:  Yeah.  No, I think you have to have the

13  auction two days before the hearing starts.

14        MR. ROSENBERG:  Yes.

15        THE COURT:  Right.  But that still gives you a couple

16  of days.  It still gives 30 plus days before the -- more than 30

17  days before the deadline to announce a starting bid.  I can't do

18  the math right now, I'm too tired frankly.

19        MS. RECKLER:  Thank you, Your Honor.

20        THE COURT:  All right?  Mr. Neier, anything else?

21        MR. NEIER:  I hate to be technical, Your Honor, but if

22  you're going to so-order the record --

23        THE COURT:  I'm going to count on you to be technical.

24        MR. NEIER:  If you're going to so-order the record to

25  allow the Debtors to shop, then I'd ask you to so-order the

EXHIBIT A TO SALE ORDER, PAGE 376

In re Boston Generating - 10/9/10                    45

1    record to allow our breakup fee to go into place.

2              THE COURT:  Yes.

3              MR. NEIER:  Okay.

4              THE COURT:  It is in that regard.  And --

5              MR. NEIER:  In that regard.

6              THE COURT:  And in all regards.  And just to make

7    clear what I said about attaching a transcript, I did the ruling

8    this way to accommodate the timeframe rather than issue a

9    written opinion which of course takes more time and finessing.

10   And the concept of attaching an amended transcript to the order

11   is not that I am amending what I actually said here today, but

12   it's just in the nature of cleanup and making it look nicer.

13   So, that's what my thought was.

14             Anything further before I let you go enjoy the day?

15             MR. BRILLIANT:  Your Honor, I guess I would like to

16   say one thing.  You know obviously you can imagine we're very

17   disappointed in the ruling, but I do want you to know that we

18   are very grateful for all your hard work.  And as much as I know

19   that I did not want to be here today after all the work that we

20   did, I know that Your Honor and the people from your chambers/

21   staff did not want to be here today.  And we very much

22   appreciate all your effort and diligence.  And we'll see where

23   we go from here, Your Honor.

24             THE COURT:  We'll see what happens.  Hope springs

25   eternal.  I'm an optimistic person, but I appreciate all of your

EXHIBIT A TO SALE ORDER, PAGE 377

In re Boston Generating - 10/9/10                                    46

1   hard work, and I appreciate your coming in here today and it's

2   our pleasure to do this.  That's what we're here for.  So, with

3   that I'll say good afternoon.  Enjoy the rest of the holiday

4   weekend.  And you know where I am if you need me.

5             MR. BRILLIANT:  Thank you.

6             THE COURT:  Thank you.

7                           - oOo -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A TO SALE ORDER, PAGE 378

1                                   CERTIFICATION

2

3          I, Rochelle Grant, certify that the foregoing is a

4    correct transcript from the official electronic sound recording

5    of the proceedings in the above-entitled matter.

6    Dated:  October 12, 2010

7

8

9    _____

10   Approved Transcriber

11   AA Express Transcripts

12   (888) 456-9716

13

14

15

16

17

18

19

20

21

22

23

24

25