**Exhibit 6**

**Exhibit E (Sale Order)**

-12-

165

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Boston Generating, LLC,<br>et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 10-14419 (SCC)<br><br>Joint Administration Requested<br><br>**Related Docket No.** |

**ORDER AUTHORIZING (A) THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS FREE AND CLEAR OF ALL CLAIMS, LIENS, LIABILITIES, RIGHTS, INTERESTS AND ENCUMBRANCES; (B) THE DEBTORS TO ENTER INTO AND PERFORM THEIR OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT; (C) THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; [(D) APPROVING THE TRANSITION SERVICES AGREEMENT]; AND (E) GRANTING RELATED RELIEF**

Upon the portion of the motion (the "**Motion**")[2] of EBG Holdings LLC and the other above-captioned debtors, as debtors and debtors-in-possession (collectively, the "**Debtors**") for entry of orders, pursuant to Sections 105(a), 363, 365, 503 and 507 of the United States Bankruptcy Code (the "**Bankruptcy Code**"), and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") authorizing and approving the following:

(a)     the sale of substantially all of the assets of the Debtors;

(b)     the entry into, performance under and terms and conditions of the Asset Purchase Agreement dated as of [●], 2010 (collectively with all related agreements, documents or instruments and all exhibits, schedules and addenda to any of the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Boston Generating, LLC (0631); EBG Holdings LLC (3635); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC (7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

[2] Unless otherwise stated, all capitalized terms not defined herein shall have the same meaning as set forth in the APA, the Motion and the Sale Support Agreement, as applicable.

foregoing, the "**APA**"), substantially in the form attached hereto as **Exhibit A**, whereby the Debtors have agreed to sell, and Constellation Holdings, Inc. (the "**Buyer**") has agreed to buy, substantially all of the Debtors' assets (specifically as set forth and defined in the APA, the "**Acquired Assets**"), free and clear of all Claims (as defined below), Liens (defined below), liabilities rights, interests and encumbrances except where the Debtors have agreed to transfer and Buyer has expressly agreed to assume certain of the Debtors' liabilities (specifically as set forth and defined in the APA, the "**Assumed Liabilities**") (collectively, and including all actions taken or required to be taken in connection with the implementation and consummation of the APA, the "**Transactions**");

(c)     the assumption and assignment to Buyer or an affiliate of (as defined in the APA, an "**Affiliate**") of Buyer of certain executory contracts and unexpired leases of the Debtors designated for assumption and assignment as Acquired Contracts in accordance with this Order, the Bidding Procedures Order (defined below) and the APA (collectively, the "**Assumed Contracts**");

(d)     [the entry into a transition services agreement (the "**Transition Services Agreement**") between the Debtors and Buyer;] and

(e)     other related relief;

and the Court having entered an order approving the bidding procedures and granting certain related relief on [●], 2010 [Docket No. [●]] (the "**Bidding Procedures Order**"); [and an auction conducted in accordance with the Bidding Procedures Order (the "**Auction**") having been held on [●], 2010 pursuant to the Bidding Procedures Order]; [and Buyer having submitted the highest or otherwise best offer at the Auction]; and the Court having conducted a hearing on the Motion on [●], 2010 (the "**Sale Hearing**") at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered the Motion, the APA, the Bidding Procedures Order, the record of the hearing before the Court on [_____ no later than the earlier of September 1, 2010 or 30 days after the Petition Date], 2010 at which the Bidding Procedures Order was approved and all objections to the Transactions and the APA filed in accordance with the Bidding Procedures Order; and the appearance of all interested parties and all responses and objections to the Sale Motion having

NY\1671051.14

2

been duly noted in the record of the Sale Hearing; and upon the record of the Sale Hearing, and having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Sale Hearing; and upon all of the proceedings had before the Court, and all objections and responses to the relief requested in the Motion having been heard and overruled or resolved on the terms set forth in this Order, and it appearing that due notice of the Motion, the APA, the Bidding Procedures Order [and the Auction has been provided]; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their stakeholders and all other parties-in-interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

**THE COURT EXPRESSLY FINDS AS FOLLOWS:[3]**

<u>**Jurisdiction, Venue and Final Order**</u>

A.       This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. § 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.       Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just

---

[3]All findings of fact and conclusions of law announced by the Bankruptcy Court at the Sale Hearing in relation to the Sale Motion are hereby incorporated to the extent not inconsistent herewith.

EXHIBIT A TO SALE ORDER, PAGE 383

reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

### Notice of the Transactions, APA, Sale Hearing, Auction and the Cure Amounts

C.    As evidenced by the affidavits of service previously filed with this Court, proper, timely, adequate and sufficient notice of the Motion, the Auction, the Sale Hearing, the APA and the Transactions has been provided in accordance with Sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014. The Debtors have complied with all obligations to provide notice of the Motion, [the Auction], the Sale Hearing, the APA and the Transactions as required by the Bidding Procedures Order. The aforementioned notices are good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, [the Auction], the Sale Hearing, the APA or the Transactions is required for the entry of this Order.

D.    A reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities.

E.    In accordance with the Bidding Procedures Order, the Debtors have served a notice of their intent to assume and assign the Assumed Contracts and of the Cure Amounts upon each non-Debtor counterparty to an Assumed Contract. The service and provision of such notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of assumption and assignment of the Assumed Contracts or establishing a Cure Amount for the respective Assumed Contracts. Non-Debtor counterparties to the Assumed Contracts have had an adequate opportunity to object to assumption and assignment of the applicable Assumed Contracts and the Cure Amount set forth in the notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the non-Debtor counterparty from accepting performance by, or

4

rendering performance to, Buyer for purposes of Section 365(c)(1) of the Bankruptcy Code).
[No objections, responses or requests for adequate assurance were made.]

### Highest or Otherwise Best Offer

F.    As demonstrated by the evidence proffered or adduced at the Sale Hearing and the
representations of counsel made on the record at the Sale Hearing, the Debtors conducted an
Auction process in accordance with, and have otherwise complied in all respects with, the
Bidding Procedures Order.  The Auction was duly noticed and conducted in a non-collusive, fair
and good faith manner and the Auction process set forth in the Bidding Procedures Order
afforded a full, fair and reasonable opportunity for any interested party to make a higher or
otherwise better offer to purchase all of the Acquired Assets and assume all of the Assumed
Liabilities.

G.    The Acquired Assets were adequately marketed by the Debtors, and the
consideration provided by Buyer under the APA constitutes the highest or otherwise best offer
and provides fair and reasonable consideration to the Debtors for the sale of all Acquired Assets
and the assumption of all Assumed Liabilities.

H.    Approval of the Motion and the APA and the consummation of the Transactions
contemplated thereby are in the best interests of the Debtors, their respective creditors, estates
and other parties in interest.  The Debtors have demonstrated good, sufficient and sound business
reasons and justifications for entering into the Transactions and the performance of their
obligations under the APA.

I.    Entry of an order approving the APA and all the provisions thereof is a necessary
condition precedent to Buyer's consummation of the Transactions.

J.    The APA was not entered into, and none of the Debtors or Buyer, have entered
into the APA or propose to consummate the Transactions, for the purpose of hindering, delaying

5

or defrauding the Debtors' present or future creditors. None of the Debtors or Buyer is entering into the APA, or proposing to consummate the Transactions, fraudulently, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

K.    The offer of Buyer, upon the terms and conditions set forth in the APA, including the form and total consideration to be realized by the Debtors pursuant to the APA: (i) is the highest and/or best offer received by the Debtors; (ii) is fair and reasonable; (iii) is in the best interests of the Debtors' creditors and estates and (iv) constitutes fair value, fair, full and adequate consideration, reasonably equivalent value and reasonable market value for the Acquired Assets. The value of the Acquired Assets is maximized by a sale in one lot, as contemplated by the APA, as opposed to piecemeal sales.

L.    The Buyer is the Successful Bidder for the Acquired Assets in accordance with the Bidding Procedures Order. The Buyer has complied in all respects with the Bidding Procedures Order and any other applicable order of this Court in negotiating and entering into the APA, and the sale, [the Transition Services Agreement] and the APA likewise comply with the Bidding Procedures Order and any other applicable order of this Court.

### Good Faith of Debtors and Buyer

M.    The sales process conducted by the Debtors, including without limitation, the Bidding Procedures set forth in the Bidding Procedures Order, was at arms' length, non-collusive, in good faith, and substantively and procedurally fair to all parties.

N.    The Debtors and their professionals have complied, in good faith, in all respects with the Bidding Procedures Order. As demonstrated by (i) any testimony and other evidence

EXHIBIT A TO SALE ORDER, PAGE 386

proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, substantial marketing efforts and a competitive sale process were conducted in accordance with the Bidding Procedures Order, the Debtors (a) afforded interested potential purchases a full, fair and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase all of the Debtors' assets, (b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Acquired Assets, and (c) considered any bids submitted on or before the Bid Deadline.

O.     The APA and the Transactions contemplated thereunder were proposed, negotiated and entered into by and among the Debtors and Buyer without collusion, in good faith and at arms' length. None of the Debtors or the Buyer has engaged in any conduct that would cause or permit the APA or the Transactions to be avoided under Section 363(n) of the Bankruptcy Code.

P.     Neither the Buyer nor any of their respective affiliates, present or contemplated members, officers, directors, shareholders or any of their respective successors and assigns is an "insider" of any of the Debtors, as that term is defined in Section 101(31) of the Bankruptcy Code. Buyer is entering into the Transactions in good faith and is a good faith buyer within the meaning of Section 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding. Neither the Debtors nor the Buyer have engaged in any action or inaction that would cause or permit the APA to be avoided or impose any costs or damages under Section 363(n) of the Bankruptcy Code.

7

### Section 363 is Satisfied

Q.    The Debtors have demonstrated a sufficient basis and compelling circumstances requiring them to (i) enter into the APA, (ii) sell the Acquired Assets and assume and assign the Assumed Contracts, and [(iii) enter into the Transition Services Agreement], and such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their estates and their creditors.  Such business reasons include, but are not limited to, the fact that (i) the APA constitutes the highest or otherwise best offer for the Acquired Assets; (ii) the APA presents the best opportunity to realize the value of the Debtors on a going concern basis and avoid any potential decline and devaluation of the Debtors' business; and (iii) unless the sale is concluded expeditiously as provided for in the Motion and pursuant to the APA [and the Transition Services Agreement], recoveries of creditors may be diminished.

R.    The Debtors have, to the extent necessary, satisfied the requirements of Bankruptcy Code sections 363(b)(1).    Accordingly, appointment of a consumer privacy ombudsman pursuant to Bankruptcy Code sections 363(b)(1) or 332 is not required with respect to the relief requested in the Sale Motion.

S.    The Acquired Assets constitute property of the Debtors' estates and title thereto is presently vested in the Debtors' estates within the meaning of Bankruptcy Code section 541(a).

T.    The sale of all Acquired Assets to Buyer under the terms of the APA meets the applicable provisions of Section 363(f) of the Bankruptcy Code such that the sale of the Acquired Assets will be free and clear of any and all Claims, and except as expressly provided in the APA with respect to the Assumed Liabilities, the (i) transfer of the Acquired Assets to Buyer and (ii) assumption and/or assignment to Buyer or an Affiliate of Buyer of the Assumed Contracts and Assumed Liabilities will be free and clear of all Claims and will not subject the Buyer or any of the Buyer's assets to any liability for any Claims whatsoever (including, without

8

limitation, under any theory of equitable law, antitrust, or successor or transferee liability). All
holders of Claims who did not object, or withdrew their objections to the Transactions, are
deemed to have consented to the Transactions pursuant to Section 363(f)(2) of the Bankruptcy
Code, and all holders of Claims are adequately protected — thus satisfying Section 363(e) of the
Bankruptcy Code — by having their Claims, if any, attach to the proceeds of the Transactions
ultimately attributable to the property against or in which they assert a Claim or other
specifically dedicated funds, in the same order of priority and with the same validity, force and
effect that such Claim holder had prior to the Transactions, subject to any rights, claims and
defenses of the Debtors or their estates, as applicable, or as otherwise provided herein. Nothing
herein shall be held to limit any bargaining or other obligations that may arise from and after the
Closing pursuant to the National Labor Relations Act, 29 U.S.C. § 151, *et seq.* (the "**NLRA**"), or
the Employee Retirement Income Security Act, as amended, 29 USC § 1001 *et seq.* ("**ERISA**").

U.    Buyer would not have entered into the APA and would not consummate the sale
of all Acquired Assets, thus adversely affecting the Debtors, their estates, creditors, employees
and other parties in interest, if the sale of the Acquired Assets was not free and clear of all
Claims or if the Buyer could be liable for any Claims, including, without limitation and as
applicable, certain liabilities that expressly are not assumed by Buyer as set forth in the APA or
in this Order. Buyer asserts that it will not consummate the Transactions unless the APA
specifically provides and this Court specifically orders that none of the Buyer, its assets or the
Acquired Assets will have any liability whatsoever with respect to, or be required to satisfy in
any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or
indirectly, any (i) Claim or (ii) any successor or transferee liability for any of the Debtors other
than with respect to the Assumed Liabilities.

NY\1671051.14

174

EXHIBIT A TO SALE ORDER, PAGE 389

V.    The transfer of the Acquired Assets to Buyer under the APA will be a legal, valid and effective transfer of all of the legal, equitable and beneficial right, title and interest in and to the Acquired Assets free and clear of all Claims.  The Debtors may sell their interests in the Acquired Assets free and clear of all Claims because, in each case, one or more of the standards set forth in Section 363(f) has been satisfied.  The transfer of the Acquired Assets to Buyer will vest Buyer with good and marketable title to the Acquired Assets.  Nothing herein shall be held to limit any bargaining or other obligations that may arise from and after the Closing pursuant to the NLRA or ERISA.

W.    The Buyer is not a continuation of the Debtors or their respective estates and there is no continuity between Buyer and the Debtors.  Buyer is not holding itself out to the public as a continuation of the Debtors or their respective estates and the Transactions do not amount to a consolidation, merger or *de facto* merger of Buyer and the Debtors.

## Assumption and Assignment of the Assumed Contracts

X.    The assumption and assignment of the Assumed Contracts (as such Assumed Contracts may be amended, supplemented or otherwise modified prior to assumption and assignment without further order of the Court with the consent of the Debtors, the contract counterparty and the Buyer) that are designated for assumption and assignment pursuant to the terms of this Order and the APA are integral to the APA, are in the best interests of the Debtors and their respective estates, creditors and other parties in interest, and represent the reasonable exercise of sound and prudent business judgment by the Debtors.

Y.    No section of any Assumed Contract which purports to prohibit, restrict, or condition the use, consideration or assignment of any such Assumed Contract in connection with the Transactions shall have any force or effect.

NY\1671051.14

Z.    The Debtors have met all requirements of Section 365(b) of the Bankruptcy Code for each of the Assumed Contracts.  The Debtors and/or Buyer, as applicable under the APA, have (a) cured and/or provided adequate assurance of cure of any default existing prior to the Closing under all of the Assumed Contracts, within the meaning of Section 365(b)(1)(A) of the Bankruptcy Code; and (b) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from a default prior to the Closing under any of the Assumed Contracts, within the meaning of Section 365(b)(1)(B) of the Bankruptcy Code.  Each of the Assumed Contracts is free and clear of all Claims against Buyer.

AA.    Buyer has demonstrated adequate assurance of its future performance under the relevant Assumed Contracts within the meaning of Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  Pursuant to Section 365(f) of the Bankruptcy Code, the Assumed Contracts to be assumed and assigned under the APA shall be assigned and transferred to, and remain in full force and effect for the benefit of, Buyer notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer.

BB.    No defaults exist in the Debtors' performance under the Assumed Contracts as of the date of this Sale Order other than the failure to pay amounts equal to the Cure Amounts or defaults that are not required to be cured as contemplated in Section 365(b)(1)(A) of the Bankruptcy Code.

CC.    There is no legal or equitable reason to delay the Transactions.  Cause exists to waive the automatic fourteen (14) day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

**THEREFORE, ITS IS HEREBY ORDERED THAT:**

<u>General Provisions</u>

1.    The Motion is granted in its entirety and approved in all respects.

11

2.    All objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court or as resolved in this Order, and all reservations of rights included therein, are, except as provided in other orders of the Court, hereby overruled on the merits with prejudice.  All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein including without limitation all non-debtor parties to the Assumed Contracts.

3.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

## Approval of the APA

4.    The APA, all of the terms and conditions thereof, and all of the Transactions contemplated therein are approved in all respects.  The failure specifically to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.  The transfer of the Acquired Assets by the Debtors to Buyer shall be a legal, valid and effective transfer of the Acquired Assets.  The consummation of the Transactions is hereby approved and authorized under Section 363(b) of the Bankruptcy Code.

5.    The Debtors are authorized and, to the extent not already done, directed to (a) take any and all actions necessary or appropriate to perform, consummate, implement and close the Transactions, including the sale to Buyer of all Acquired Assets, in accordance with the terms and conditions set forth in the APA and this Order, including without limitation executing,

12

EXHIBIT A TO SALE ORDER, PAGE 392

acknowledging and delivering such corporate name change certificates, deeds, assignments, conveyances and other assurance, documents and instruments of transfer and taking any action for purposes of assigning, transferring, granting, conveying, and confirming to Buyer, or reducing to possession, any or all of the Acquired Assets and (b) to assume and assign any and all Assumed Contracts. The Debtors are further authorized to pay, whether before, at or after the Closing, any expenses or costs that are required to be paid in order to consummate the Transactions or perform their obligations under the APA.

6.       All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to transfer the Acquired Assets to Buyer in accordance with the APA and this Order.

7.       All amounts, if any, to be paid by Debtors to Buyer pursuant to the APA, including, without limitation, any allowed claims for breach thereof and the Final Adjustment Amount, if any, shall (a) constitute allowed administrative expenses of the estates pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) be protected as provided in the APA, (c) not be altered, amended, discharged or affected by any plan proposed or confirmed in these cases without the prior written consent of Buyer, and (d) be due and payable if and when any Debtors' obligations arise under the APA without further order of the Court.

8.       Nothing contained in any chapter 11 plan confirmed in the Chapter 11 Cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the APA or this Order, and to the extent of any conflict or derogation between this Order or the APA and such future plan or order, the terms of this Order and the APA shall control.

### Sale and Transfer Free and Clear of Claims

9.       Except as otherwise expressly provided in the APA and the terms of this Order with respect to Assumed Liabilities, the Acquired Assets shall be sold free and clear of all – prior

to the Closing – claims, Liens, liabilities, interests, rights and encumbrances, including, without

limitation, the following: all mortgages, restrictions (including, without limitation, any restriction

on the use, voting rights, transfer rights, claims for receipt of income or other exercise of any

attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments,

leases, licenses, options, deeds of trust, security interests, equity interests, conditional sale rights

or other title retention agreements, pledges, judgments; demands, rights of first refusal, consent

rights, offsets, contract rights, recoupment rights, rights of recovery, reimbursement rights,

contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego

claims, environmental rights and claims (including, without limitation, toxic tort claims), labor

rights and claims, employment rights and claims, pension rights and claims, tax claims,

regulatory violations by any governmental entity, decrees of any court or foreign or domestic

governmental entity, charges of any kind or nature, debts arising in any way in connection with

any agreements, acts, or failures to act, reclamation claims, obligation claims, demands,

guaranties, option rights or claims, rights, contractual or other commitment rights and claims,

and all other matters of any kind and nature, whether known or unknown, choate or inchoate,

filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded,

perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or

unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether

arising prior to or subsequent to the commencement of these Chapter 11 Cases (but, for the

avoidance of doubt, in each case prior to the Closing), and whether imposed by agreement,

understanding, law, equity or otherwise, including claims otherwise arising under any theory,

law or doctrine of successor liability (all of the foregoing collectively being referred to in this

Order as "**Claims**", and, as used in this Order such term includes, without limitation, any and all

14

"claims" as that term is defined and used in the Bankruptcy Code, including section 101(5) thereof) with all such Claims to attach to the consideration to be received by the Debtors with the same validity, force, priority and effect which they now have as against the Acquired Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto. As used in this Order, the term "**Liens**" includes, without limitation, any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code, including section 101(37) thereof. Nothing herein shall be held to limit any bargaining or other obligations that may arise from and after the Closing pursuant to the NLRA or ERISA.

10.    At Closing, all of the Debtors' right, title and interest in and to, and possession of, the Acquired Assets shall be immediately vested in Buyer pursuant to Sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code free and clear of any and all Claims except for Assumed Liabilities. Such transfer shall constitute a legal, valid, binding and effective transfer of such Acquired Assets. All person or entities, presently or on or after the Closing, in possession of some or all of the Acquired Assets are directed to surrender possession of the Acquired Assets to Buyer or its respective designees on the Closing or at such time thereafter as Buyer may request.

11.    This Order (a) shall be effective as a determination that, as of the Closing, (i) no Claims (other than Assumed Liabilities) will be capable of being asserted against the Buyer or any of its respective assets (including the Acquired Assets), (ii) the Acquired Assets shall have been transferred to Buyer free and clear of all Claims and (iii) the conveyances described herein have been effected; and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of

NY\1671051.14

state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA. The Acquired Assets are sold free and clear of any reclamation rights.

12.    Except as otherwise expressly provided in the APA with respect to the Assumed Liabilities, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors holding Claims arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets, the ownership, sale or operation of the Acquired Assets and the business prior to Closing or the transfer of the Acquired Assets to Buyer, are hereby forever barred, estopped and permanently enjoined from asserting such Claims against the Buyer, its property or the Acquired Assets. Following the Closing, no holder of any Claim shall interfere with Buyer's title to or use and enjoyment of the Acquired Assets based on or related to any such Claim, or based on any action the Debtor may take in their Chapter 11 cases. Nothing herein shall be held to limit any bargaining or other obligations that may arise from and after the Closing pursuant to the NLRA or ERISA.

13.    If any person or entity that has filed financing statements, mortgages, mechanic's Claims, *lis pendens* or other documents or agreements evidencing Claims against or in the Acquired Assets shall not have delivered to the Debtors prior to the Closing of the Transactions,

16

in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Claims that the person or entity has with respect to the Acquired Assets or otherwise, then only with regard to the Acquired Assets that are purchased by Buyer pursuant to the APA and this Order (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets and (b) Buyer is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Buyer and the applicable Acquired Assets; and (c) the Buyer may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction, and releases of all Claims with respect to the Acquired Assets other than Assumed Liabilities. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office.

14.     To the maximum extent permitted under applicable law, Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Acquired Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to Buyer as of the Closing Date.

15.     To the extent permitted by Bankruptcy Code section 525, no governmental unit may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred, assigned or conveyed to Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Transactions.

NY\1671051.14

16..    For the avoidance of doubt, only Acquired Assets that are part of the estates of the

Debtors are being sold to Buyer free and clear of Claims pursuant to Section 363(f) of the

Bankruptcy Code.

### No Successor or Transferee Liability

17.    Except as expressly provided in the APA with respect to Assumed Liabilities, the

Buyer shall not be deemed, as a result of any action taken in connection with the APA, the

consummation of the Transactions contemplated by the APA, or the transfer or operation of the

Acquired Assets to (a) be a legal successor, or otherwise be deemed a successor to the Debtors

(other than, for Buyer, with respect to any obligations as an assignee under the Assumed

Contracts arising after the Closing); (b) have, *de facto* or otherwise, merged with or into the

Debtors; or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors

including, without limitation, within the meaning of any foreign, federal, state or local revenue,

pension, ERISA, the Consolidated Omnibus Budget Reconciliation Act ("**COBRA**"), WARN

(defined below), CERCLA (defined below), the Fair Labor Standard Act, Title VII of the Civil

Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as

amended), the Federal Rehabilitation Act of 1973 (as amended), the NLRA, environmental

liabilities, debts, claims or obligations arising from conditions first existing on or prior to Closing

(including, without limitation, the presence of hazardous, toxic, polluting, or contaminating

substances or wastes), which may be asserted on any basis, including, without limitation, under

CERCLA, any liabilities, debts or obligations of or required to be paid by the Debtors for any

taxes of any kind for any period, labor, employment, or other law, rule or regulation (including

without limitation filing requirements under any such laws, rules or regulations), or under any

products liability law or doctrine with respect to the Debtors' liability under such law, rule or

18

regulation or doctrine; provided, however nothing herein shall be held to limit any bargaining or other obligations that may arise from and after the Closing pursuant to the NLRA or ERISA.

18.     Other than as expressly set forth in the APA with respect to Assumed Liabilities, the Buyer shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the Acquired Assets or (b) any remaining Claims against the Debtors or any of their predecessors or affiliates.  Except as expressly provided in the APA with respect to Assumed Liabilities, the Buyer shall have no liability whatsoever with respect to the Debtors, (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as described herein, "**Successor or Transferee Liability**") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, *de facto* merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing.  Except to the extent expressly included in the Assumed Liabilities with respect to Buyer, the Buyer shall have no liability or obligation under the WARN Act (29 U.S.C. §§ 2101 et seq.) ("**WARN**") or the Comprehensive Environmental Response Compensation and Liability Act ("**CERCLA**"), or any foreign, federal, state or local labor, employment, or environmental law whether of similar import or otherwise by virtue of Buyer's purchase of the Acquired Assets or assumption of the Assumed Liabilities by Buyer or an Affiliate of Buyer.  Nothing herein shall be held to limit any

19

bargaining or other obligations that may arise from and after the Closing pursuant to the NLRA or ERISA.

19.    Except as expressly provided in the APA for the Assumed Liabilities, with respect to Buyer, nothing in this Order or the APA shall require the Buyer to (a) continue or maintain in effect, or assume any liability in respect of any employee, collective bargaining agreement, pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other agreements to which the Debtors are a party or have any responsibility therefor including, without limitation, medical, welfare and pension benefits payable after retirement or other termination of employment; or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement. Nothing herein shall be held to limit any bargaining or other obligations that may arise from and after the Closing pursuant to the NLRA or ERISA.

20.    Effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, or its assets (including the Acquired Assets), with respect to any (a) Claim or (b) Successor or Transferee Liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien, claim, interest or encumbrance; (iv) asserting any setoff, right of subrogation or recoupment of any kind; (v) commencing or

NY\1671051.14

EXHIBIT A TO SALE ORDER, PAGE 400

continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with such assets.

## Good Faith of Buyer

21.    The Transactions contemplated by the APA are undertaken by Buyer without collusion and in good faith, as that term is defined in Section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the Transactions (including the assumption and assignment of the Assumed Contracts), unless such authorization and consummation of such sale are duly and properly stayed pending such appeal.

22.    Neither the Debtors nor Buyer have engaged in any action or inaction that would cause or permit the Transactions to be avoided or costs or damages to be imposed under Section 363(n) of the Bankruptcy Code.  The consideration provided by Buyer for the Acquired Assets under the APA is fair and reasonable and the sale may not be avoided under Section 363(n) of the Bankruptcy Code.

## Assumption and Assignment of Assumed Contracts

23.    The Debtors are authorized and directed at the Closing to assume and assign each of the Assumed Contracts to Buyer or an Affiliate of Buyer free and clear of all Claims (other than the Assumed Liabilities) pursuant to Sections 105(a), 363(b) and 365 of the Bankruptcy Code and to execute and deliver to Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to Buyer.  The payment of the applicable Cure Amounts shall (a) effect a cure of all defaults existing thereunder as of the Closing,

21

(b) compensate for any actual pecuniary loss to such non-Debtor counterparty resulting from such default, and (c) together with the assumption of the Assumed Contracts by the Debtors and the assignment of the Assumed Contracts to Buyer or an Affiliate of Buyer, constitute adequate assurance of future performance thereof.

24.    Any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the counterparty to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect.  All other requirements and conditions under Sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to Buyer or an Affiliate of Buyer of the Assumed Contracts have been satisfied.  Upon the Closing, in accordance with Sections 363 and 365 of the Bankruptcy Code, Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Contracts, and such Assumed Contracts shall remain in full force and effect for the benefit of Buyer.  Each non-Debtor counterparty to the Assumed Contracts shall be forever barred, estopped, and permanently enjoined from (a) asserting against the Debtors or Buyer or their respective property any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing or arising by reason of the Closing, including any breach related to or arising out of change-in-control in such Assumed Contracts, or any purported written or oral modification to the Assumed Contracts and (b) asserting against Buyer (or its property, including the Acquired Assets) any claim, counterclaim, defense, breach, condition, setoff asserted or capable of being asserted against the

NY\1671051.14

EXHIBIT A TO SALE ORDER, PAGE 402

Debtors existing as of the Closing or arising by reason of the Closing except for the Assumed Liabilities.

25.     Until Closing, including during the period when the Transition Services Agreement is in effect (the "**Designation Period**"), Buyer shall be permitted to designate additional Contracts ("**Buyer Designation Rights**") that will be (i) assumed by the Debtors and assigned to Buyer and become Assumed Contracts (the "**Proposed Assumed Contracts**") or (ii) excluded by the Buyer from the Assumed Contracts set forth in Schedule 2.1 of the APA (the "**Proposed Rejected Contracts**").  Prior to the expiration of the Designation Period, the Debtors shall not reject any contracts, other than in accordance with this Order and the APA.  Buyer shall make any payments that would otherwise be required to be made by the Debtors pursuant to a plan of liquidation (so long as such plan of liquidation shall provide for distributions in accordance with the absolute priority rule) that arise from obligations (including rejection damages claims) incurred by the Debtors as the result of the Buyer's decision to, during the period from the entry of this order until the Closing, exercise the buyer designation rights to remove a Proposed Rejected Contract from Schedule 2.1 of the APA.  Within three (3) Business Days of receipt by the Debtors of prior written notice by Buyer of an exercise of Buyer Designation Rights requiring assumption by the Debtors and assignment to Buyer or an Affiliate of Buyer of any Proposed Assumed Contract, the Debtors shall file a notice of assumption and assignment ("**Assumption and Assignment Notice**") with the Bankruptcy Court and serve a copy of such notice on each non-Debtor party to the subject Proposed Assumed Contract (each, a "**Contract Counterparty**"), setting forth a description of each Proposed Assumed Contract.  No later than ten (10) days after the date on which the Debtors serve an Assumption and Assignment Notice, the Debtors will file with the Court an order authorizing the assumption/assignment of

NY\1671051.14

the Assumed Contracts listed in the Assumption and Assignment Notice which provides (1) that the assumption of such Assumed Contracts are approved, final and effective, pursuant to Section 365 of the Bankruptcy Code and (2) the Successful Bidder provided adequate assurance of future performance under the applicable contract in accordance with Section 365(f)(2)(B). For the avoidance of doubt, the assumption and assignment of and provision of adequate assurance of future performance under Assumed Contracts for which the non-debtor counterparty has been previously noticed pursuant to the Bidding Procedures Order is hereby approved without the need for further notice or hearing.

26.    Until a Contract is assumed and assigned as set forth herein, it shall not be considered to be either assumed or assigned and shall remain subject to designation in accordance with the Buyer Designation Rights. During the Designation Period, the Debtors shall be responsible for all costs (and Cure Amounts if Assumed) with respect to all Contracts listed on Schedule 2.1 of the APA as of the Agreement Date until the later of (i) the Closing or (ii) when the Court enters an order rejecting such Contract. Except with respect to Contracts discovered after the Agreement Date, with respect to Contracts that Buyer does not list on Schedule 2.1(c) on the Agreement Date, the Debtors shall not have any liability with respect to any Contract that is not listed on Schedule 2.1 of the APA as of the Agreement Date regardless of whether such Contract is an Assumed Contract, and during the Designation Period, the Buyer shall be responsible for all costs (and Cure Amounts if Assumed) with respect to all Contracts not listed on Schedule 2.1 of the APA as of the Agreement Date until the later of (i) the Closing or (ii) when the Court enters an order rejecting such Contract; provided, however, solely with respect to Contracts that Debtors do not provide notice of to Buyer prior to the Agreement Date, during the Designation Period, the Debtors shall be responsible for all costs (and Cure Amounts

24

if Assumed) with respect to all Contracts not listed on Schedule 2.1 of the APA as of the Agreement Date until the later of (i) the Closing or (ii) when the Court enters an order rejecting such Contract.

27.    Upon the Closing and the payment of the relevant Cure Amounts by Debtors or Buyer as set forth in the APA, Buyer shall be deemed to be substituted for the Debtors as a party to the applicable Assumed Contracts and the Debtors shall be released, pursuant to Section 365(k) of the Bankruptcy Code, from any liability under the Assumed Contracts. There shall be no rent accelerations, assignment fees, increases or any other fees charged to Buyer or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

28.    Each non-debtor party to an Assumed Contract is forever barred, estopped and permanently enjoined from asserting against Buyer, or its property (including without limitation the Acquired Assets), any default existing as of the date of the Sale Hearing, or any counterclaim, defense, setoff or other claim asserted or capable of being asserted against the Debtors. Other than the Assumed Contracts, Buyer assumed none of the Debtors' other contracts and leases and shall have no liability whatsoever thereunder.

29.    The assignments of each of the Assumed Contracts are made in good faith under Sections 363(b) and (m) of the Bankruptcy Code.

## Other Provisions

30.    Notwithstanding anything to the contrary in the Motion, if the APA is terminated prior to Closing and the Buyer is entitled to the Break-Up and Expense Reimbursement Amount pursuant to the APA, then, (i) the Debtors shall promptly return the Buyer's Deposit and (ii) the Debtors also shall pay to Buyer any portion of the Break-Up and Expense Reimbursement Amount owed to Buyer pursuant to the APA; provided, however, that, pending such payment, the Break-Up and Expense Reimbursement Amount shall constitute, and Buyer shall have, an

NY\1671051.14

190

EXHIBIT A TO SALE ORDER, PAGE 405

allowed administrative expense claim for the amount of the Break-Up and Expense Reimbursement Amount pursuant to Bankruptcy Code sections 503(a) and (b) and 507(a)(2).

31.    In connection with the Closing of the Transactions, the Purchase Price from the Sale shall be paid directly by the Successful Bidder to the First Lien Administrative Agent on the Closing Date for distribution to the First Lien Lenders, except that (i) an amount of the cash proceeds of the Sale sufficient to pay the success fee due and owing to JPM pursuant to that certain engagement letter, dated April 12, 2010, between EBG Holdings, LLC, Boston Generating, LLC and JPM (the "**JPM Success Fee**") shall be paid directly by the Successful Bidder to JPM on the Closing Date if permitted by the Court or, if not so permitted on the Closing Date deposited into a segregated interest bearing account (the "**JPM Account**") to be maintained at, and at all time under the control of, the First Lien Collateral Agent pending approval by the Court for distribution to JPM, (ii) an amount of the gross cash proceeds of the Sale equal to $10,000,000 (the "**Adjustment Escrow Amount**") shall be deposited into a segregated interest bearing account (the "**Adjustment Escrow Account**") with the Escrow Agent to be held and disbursed pursuant to the terms of the Adjustment Escrow Agreement, which agreement shall be in form and substance reasonably acceptable to the First Lien Collateral Agent and the Required Supporting Lenders and shall provide that (A) the liens of the First Lien Collateral Agent, for the benefit of the First Lien Lenders and other secured creditors, if any, shall attach in the same priority and to the same extent as existed prior to the consummation of the Sale to such account and the funds contained therein and (B) any portion of such amount not distributed in accordance with the Asset Purchase Agreement shall be paid to the First Lien Administrative Agent for prompt distribution to the First Lien Lenders, (iii) an amount equal to two and one-half percent (2.5%) of the gross cash proceeds of the Sale shall be

26

funded into a segregated interest bearing account to be maintained at, and at all time under the control of, the First Lien Collateral Agent and the liens of the First Lien Collateral Agent, for the benefit of the First Lien Lenders and other secured creditors, if any, shall attach in the same priority and to the same extent as existed prior to the consummation of the Sale to such account and the funds contained therein and such funds shall be paid to the First Lien Administrative Agent for prompt distribution to the First Lien Lenders upon the earlier of the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases and June 18, 2011, and (iv) an amount of the cash proceeds of the Sale equal to 45,000,000 minus any Cash Collateral on hand immediately prior to the Closing of the Sale (or $0 if the amount of Cash Collateral on hand immediately prior to the Closing of the Sale is greater than or equal to $45,000,000) shall be deposited into a separate interest bearing account (the "**Shortfall Account**" and together with the JPM Account and the Adjustment Escrow Account, the "**Reserve Accounts**" and any funds contained therein "**Reserve Funds**") to be maintained at the First Lien Collateral Agent for purposes of funding any shortfall with respect to (A) the Carve-Out and (B) solely to the extent a Carve-Out Trigger Notice has not been delivered or a plan of reorganization or liquidation in the Chapter 11 Cases is confirmed, distributions on account of allowed priority claims and allowed administrative claims (including, without limitation, claims arising under section 503(b)(9) of the Bankruptcy Code) not to exceed in the aggregate $4,000,000 (excluding any amounts approved under Section 330 of the Bankruptcy Code to the extent of the Carve-Out); provided, however, that nothing contained herein shall be construed as prohibiting the Debtors from paying any allowed priority claims and allowed administrative claims incurred in the ordinary course of business prior to delivery of a Carve-Out Trigger Notice. Notwithstanding anything in the Cash Collateral Order to the contrary, during the month of the Closing of the Sale, the adequate

NY\1671051.14

protection interest payment required to be paid under the Cash Collateral Order for that period

through and including the Closing Date shall be made from Sale proceeds and for the period

commencing the day after the Closing Date through the end of such month and for all other

subsequent periods, payments shall be made in accordance with subparagraph 4(c)(ii)(A)(II) of

the Cash Collateral Order on the new principal balance.

32.    Without limiting any provision hereunder, it is hereby acknowledged and agreed

that the liens of the First Lien Collateral Agent, for the benefit of the First Lien Lenders and

other secured creditors, if any, shall attach in the same priority and to the same extent as existed

prior to the consummation of the transactions contemplated by the Asset Purchase Agreement to

each of the Reserve Accounts and the Reserve Funds; it being understood that (a) distributions of

the Reserve Funds in accordance with Paragraph 4(b) of the Sale Support Agreement and this

Order shall be free and clear of any liens, claims, interests or encumbrances of the First Lien

Collateral Agent, (b) any Reserve Funds (and any interest accruing thereon) remaining in any

Reserve Account (i) after payment in full of the Debtors' professionals in accordance with an

order(s) of the Bankruptcy Court (including, without limitation, the JPM Success Fee), (ii) after

payment in full of the Creditors' Committee's professionals in accordance with an order(s) of the

Bankruptcy Court, (iii) after payment in full to the Office of the United States Trustee in

accordance with the Bankruptcy Rules and any applicable guidelines and/or procedures of the

Office of the United States Trustee, (iv) after the release of that portion of the Adjustment

Escrow Amount required to be released in accordance with the Adjustment Escrow Agreement

and (v) after payment in full of all priority claims and administrative claims (subject to the

limitations described above), shall, in each case, be paid to the First Lien Administrative Agent

for prompt distribution to the First Lien Lenders.

NY\1671051.14

33.    The Debtors are authorized and directed pursuant to sections 105 and 363 of the Bankruptcy Code, to enter into and perform the Transition Services Agreement by and between the Debtors and Buyer.  The Debtors are authorized and directed to take all actions contemplated in the Transition Services Agreement.

34.    The requirements set forth in Rule 6003(b) of the Bankruptcy Rules are satisfied by the contents of the Motion or otherwise deemed waived.

35.    Buyer shall not be required to seek or obtain relief from the automatic stay under Section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other sale-related document.  The automatic stay imposed by Section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence, provided however that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

36.    This Order does not approve or provide for the transfer to Buyer of any avoidance claims of the Debtors' estates.

37.    Buyer is not and will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transaction contemplated by the APA based upon any arrangement made by or on behalf of the Debtors.

38.    This Order is binding upon and inures to the benefit of any successors and assigns of the Debtors or Buyer, including any trustee appointed in any subsequent case of the Debtors under chapter 7 of the Bankruptcy Code.

39.    The provisions of this Order and the APA are non-severable and mutually dependent.

29

40.    The APA may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

41.    Nothing in this Order or any Asset Purchase Agreement entered into under this Order releases, nullifies, precludes or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property from and after the Closing. Nothing in this Order or any Asset Purchase Agreement authorizes the transfer to the Buyer of any licenses, permits, registrations, or governmental authorizations and approvals that would require government approval prior to such transfer without the Buyer's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

42.    The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the sale. This Court retains jurisdiction to compel delivery of the Acquired Assets, to protect the Buyer and its assets, including the Acquired Assets, against any Claims and Successor and Transferee Liability and to enter orders, as appropriate, pursuant to Sections 105, 363 or 365 (or other applicable provisions) of the Bankruptcy Code necessary to transfer the Acquired Assets and the Assumed Contracts to Buyer.

NY\1671051.14

43.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062 and 9014 or otherwise, the terms and conditions of this Order shall be effective immediately upon entry and the Debtors and Buyer are authorized to close the sale immediately upon entry of this Order.

44.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

45.     To the extent any provisions of this Order conflict with, or are otherwise inconsistent with, the terms and conditions of the APA or the Bidding Procedures Order, this Order shall govern and control, and to the extent the Motion conflicts with, or is otherwise inconsistent with, the terms and conditions of the APA, the terms and conditions of the APA shall govern and control.

New York, New York
Date: _____, 2010                    _____
                                              United States Bankruptcy Judge

NY\1671051.14

EXHIBIT A TO SALE ORDER, PAGE 411

**Exhibit 7**

**Exhibit G (Transition Services Agreement)**

-13-

197

EXHIBIT A TO SALE ORDER, PAGE 412

TRANSITION SERVICES AGREEMENT, dated as of [ _____ ], 2010 (together with all Schedules hereto, as the same may from time to time be amended, modified, supplemented or restated in accordance with the terms hereof, this "Agreement"), by and among USPG Power Services, Inc. (the "Seller Provider"), [ _____ ], a [ _____ ] ("Buyer") and [Buyer affiliates] ("Buyer Affiliates", and together with the Seller, the "Buyer Group"). The Seller Provider and the Buyer Group are referred to individually herein as a "Party" and collectively herein as the "Parties".

WHEREAS, pursuant to the Asset Purchase Agreement dated as of August 7, 2010 (as the same has been, and may from time to time be amended, modified, supplemented or restated in accordance with its terms, the "Asset Purchase Agreement"), by and among Buyer, Constellation Energy Group, Inc., EBG Holdings LLC, a Delaware limited liability company ("EBG"), Boston Generating, LLC, a Delaware limited liability company ("BG LLC"), Mystic I, LLC, a Delaware limited liability company ("Mystic I"), Fore River Development, LLC, a Delaware limited liability company ("FRD"), Mystic Development, LLC, a Delaware limited liability company ("Mystic Development"), BG Boston Services, LLC, a Delaware limited liability company ("BGBS"), and BG New England Power Services, Inc., a Delaware corporation ("BGNE" and together with EBG, BG LLC, Mystic I, FRD, Mystic Development and BGBS, the "Sellers"), the Sellers have agreed to sell to Buyer, and Buyer has agreed to purchase from the Sellers, the Acquired Assets, as provided in the Asset Purchase Agreement.

WHEREAS, the Buyer Group desire to purchase from the Seller Provider, and the Seller Provider is willing to provide (and to cause its Affiliates and third party service providers to provide) to the Buyer Group, transitional services on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings contained herein, and subject to and on the terms and conditions herein set forth, the Parties hereby agree as follows:

## ARTICLE I

### Definitions

Section 1.01    Definitions. Each term used and not defined in this Agreement shall have the meaning assigned to such term in the Asset Purchase Agreement. For purposes of this Agreement, the following words and phrases shall have the following meanings:

"Agreement" shall have the meaning set forth in the preamble to this Agreement.

NY\1689871.2

198

"Asset Purchase Agreement" shall have the meaning set forth in the recitals of this Agreement.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of New York.

"breaching party" shall have meaning set forth in Section 4.03.

"Buyer" shall have the meaning set forth in the preamble to this Agreement.

"Buyer Affiliates" shall have the meaning set forth in the preamble to this Agreement.

"Buyer Group" shall have the meaning set forth in the preamble to this Agreement.

"Force Majeure Event" shall have the meaning set forth in Section 5.03.

"Losses" shall have the meaning set forth in Section 5.02(a).

"non-breaching party" shall have meaning set forth in Section 4.03.

"Party" or "Parties" shall have the meaning set forth in the preamble to this Agreement.

"Prime Rate" shall mean the prime rate published in the eastern edition of The Wall Street Journal or a comparable newspaper if The Wall Street Journal shall cease publishing the prime rate.

"Proceeding" shall mean any action, arbitration, audit, hearing, litigation or suit (whether civil, criminal or administrative), other than the Chapter 11 Cases, commenced, brought, conducted or heard by or before any Governmental Entity or arbitrator.

"Representative" of a Person shall mean any director, officer, employee, agent, consultant, accountant, auditor, attorney or other representative of such Person.

"Seller" or "Sellers" shall have the meaning set forth in the recitals of this Agreement.

"Seller Provider" shall have the meaning set forth in the preamble to this Agreement.

"Service Fee" shall have the meaning set forth in Section 2.04.

"Service Period" shall have the meaning set forth in Section 2.05.

"Services" shall have the meaning set forth in Section 2.01.

2

"Termination Charges" shall mean (i) any and all fees and expenses payable by the Seller Provider or any of its Affiliates to any unaffiliated, third-party provider as a result of any early termination or significant reduction of any Service(s), and (ii) the cost to the Seller Provider (including time and materials of the Seller Provider and one or more of its Affiliates and including any fees and expenses charged by third parties) of performing its obligations under Section 4.04.

## ARTICLE II

### Services; Service Fees

Section 2.01   Services.   On the terms and subject to the conditions set forth in this Agreement, Seller Provider agrees to provide to Buyer Group, directly, or indirectly through one or more of its Affiliates or through third party Service providers, the services set forth on Schedule A hereto (each a "Service" and collectively the "Services").  All the Services shall be for the sole use and benefit of the Buyer Group.

Section 2.02   Scope of Services; Third Party Service Providers.  Notwithstanding any provision of this Agreement to the contrary, (i) the Seller Provider shall only be required to perform, or to cause its Affiliates and third party Service providers to perform, the Services for the benefit of the Business and to provide, or to cause its Affiliates or third party Service providers to provide, a volume of Services to the Business that is not substantially greater than the volume of Services used by the Business immediately prior to the Closing Date, and (ii) the Services under this Agreement are furnished as is, where is, and without warranty or condition of any kind, express or implied, including any warranty or condition of noninfringement, merchantability or fitness for any particular purpose, other than as expressly set forth in Section 2.03.

Section 2.03   Standard of Performance; Standard of Care.  Except as otherwise provided in this Agreement, the Seller Provider shall perform, or shall cause its Affiliates or third party Service providers to perform, each Service in a manner and at a level of usage consistent with that provided to the Business prior to the Closing Date. Furthermore, subject to Section 2.07(b), in the event there is any restriction on the Seller Provider (or any of its Affiliates or third party Service providers) by an existing contract with a third party that would restrict the nature, quality or standard of care applicable to delivery of the Services to be provided by the Seller Provider (or the applicable Affiliate or third party Service provider) to the Buyer Group, the Seller Provider shall use its commercially reasonable efforts to cause such Services to be provided in a manner as closely as possible to the standards described in this Section 2.03.

Section 2.04   Services Fees.  Each Service provided pursuant to this Agreement shall be charged at a price relating to such Service determined as set forth in Schedule A hereto (the "Service Fee").  For the avoidance of doubt, each Service Fee shall be adjusted to reflect any increase after the Closing Date in the costs actually incurred by the Seller Provider in providing such Services, including as a result of (i) an increase in the amount of such Services being provided to the Buyer Group (as compared

NY\1689871.2

EXHIBIT A TO SALE ORDER, PAGE 415

to the amount of the Services underlying the determination of a Service Fee as contemplated on Schedule A) and/or (ii) any increase in costs relating to any changes in the quality or nature of the Services provided or how the Services are provided (including relating to newly-installed products or equipment or any upgrades to existing products or equipment). In the case of an increase of the Service Fee, the Seller Provider shall provide to the Buyer Group such information as shall be reasonably required to demonstrate the basis for such increase.

Section 2.05    Service Period. Each Service shall be provided for a period (the "Service Period") commencing on the Closing Date and ending on the earliest of (i) the expiration date (measured as the time period from the Closing Date or indicated by reference to a specific date) specified with respect to such Service on Schedule A hereto (or if no such expiration date is specified, one year from the Closing Date), (ii) the date on which the Buyer Group terminates the provision of such Service pursuant to Section 4.02, and (iii) the date on which such Service is terminated in accordance with Section 4.03; provided, however, that to the extent that the Seller Provider's ability to provide a Service is dependent on the continuation of another Service (and such dependence has been made known to the Buyer Group), the Seller Provider's obligation to provide such dependent Service shall terminate automatically with the termination of such supporting Service; and provided, further that the Buyer Group shall use its commercially reasonable efforts to transition each Service to itself or a third party service provider during the period after the Closing Date. Upon the conclusion of the Service Period with respect to any Service in the manner set forth in the preceding sentence, the Seller Provider shall have no further obligation to provide such Service.

Section 2.06    Transitional Nature of Services; Changes. The Parties acknowledge the transitional nature of the Services and agree that Seller Provider may make changes from time to time in the manner of performing any Service(s) if it is making similar changes in performing similar services for its own Affiliates.

Section 2.07    Consents.

(a)    Buyer Group Consents. If and to the extent reasonably requested by the Buyer Group, the Seller Provider shall use commercially reasonable efforts to assist the Buyer Group in its efforts to obtain any third party consents, approvals, licenses, or other appropriate rights to receive the benefit of, use, duplicate or distribute, as necessary, any third-party services, software, tools, or other materials necessary for the Buyer Group to receive the Services; provided that the Buyer Group identifies the specific types and quantities of any such services, software, tools, or other materials; and provided further that the Seller Provider (i) shall not be required to pay any fees or other payments or incur any obligations to enable the Buyer Group to obtain any such consents, approvals, licenses or other rights, (ii) shall only be required to introduce the Buyer Group to the applicable vendors, and (iii) shall not be required to negotiate on the Buyer Group's behalf. The Parties acknowledge and agree that there can be no assurance that the Buyer Group's efforts will be successful or that the Buyer Group will be able to obtain such consents, approvals, licenses or other rights on acceptable terms or at all and, where the Seller Provider enjoys rights under any enterprise, site or similar license grant,

4

EXHIBIT A TO SALE ORDER, PAGE 416

the Parties acknowledge that such license typically precludes partial transfers or assignments or operation of a service bureau on behalf of unaffiliated entities.

(b)     <u>Seller Provider Consents</u>. The Buyer Group acknowledges that the Seller Provider may need to obtain certain third party consents, approvals, licenses, or other appropriate rights in order to provide the Services to the Buyer Group. The Seller Provider shall use commercially reasonable efforts to obtain such consents, approvals, licenses, or other rights; <u>provided, however</u>, that (i) the Seller Provider shall not be required to pay any fees or other payments or incur any obligations to obtain any such consents, approvals, licenses, or other rights, and the Buyer Group shall be responsible for paying any such fees or other payments, and (ii) if any such consents, approvals, licenses, or other rights are not obtained by the Closing Date, the Seller Provider shall, notwithstanding anything to the contrary in this Agreement, be relieved of its obligation to provide the applicable Service(s) until such time as such consents, approvals, licenses or other rights are obtained. The Parties acknowledge and agree that there can be no assurance that the Seller Provider's efforts to obtain such consents, approvals, licenses or other rights will be successful. In the event that any such consents, approvals, licenses, or other rights are not obtained by the Closing Date, upon the Buyer Group's written request, the Seller Provider will reasonably cooperate with the Buyer Group to identify, and if commercially feasible, to implement, a work-around or other alternative arrangement for any affected Service(s); <u>provided</u> that (i) the Buyer Group shall be responsible for all fees and other costs associated with any such work-around or alternative arrangement, and (ii) the Seller Provider (or its applicable Affiliate or third party service provider) shall not be required to undertake any activities that increase, in any material respect, the resources required of it to perform the Service(s). The Buyer Group acknowledges and agrees that (x) any such work-around or alternative arrangement may adversely impact the standards for the Services set forth in <u>Section 2.03</u>, and (y) the Seller Provider shall not be liable for any breach of <u>Section 2.03</u> to the extent such breach results from the adoption of any such work-around or alternative arrangement.

Section 2.08    <u>Computer-Based and other Resources</u>. Pursuant to the terms of the Asset Purchase Agreement, the Seller Provider will cooperate with the Buyer Group in the transition of operational matters in respect of the Facilities including, without limitation, the transition of information technology matters. Unless required in connection with the performance of or delivery of a Service or otherwise provided in the Asset Purchase Agreement, the Seller Provider shall not, however, have an obligation to provide owned or licensed computer software, networks, hardware or technology of the Seller Provider, and the Buyer Group and its Affiliates shall have no access to, and the Seller Provider shall have no obligation to otherwise provide, computer-based resources (including e-mail and access to the Seller Provider's or its Affiliates' computer networks and databases). From and after the Closing Date, the Buyer Group and its Affiliates shall cause all of their personnel having access to the Seller Provider's owned and licensed computer software, networks, hardware, technology or computer-based resources in connection with performance, receipt or delivery of a Service to comply with all security guidelines (including physical security, network access, internet security, confidentiality and personal data security guidelines) of the Seller Provider and its Affiliates (of which

5

EXHIBIT A TO SALE ORDER, PAGE 417

the Seller Provider provides the Buyer Group notice).  The Buyer Group shall ensure that
such access shall be used by such personnel only for the purposes contemplated by, and
on the terms and subject to the conditions set forth in, this Agreement.  The Buyer Group
agrees to use its reasonable best efforts to cooperate and fully implement the terms of this
Section 2.08 promptly.

## ARTICLE III

### Billing Procedure; Payment

        Section 3.01    Procedure.  Except as otherwise provided in Schedule A
hereto, the Service Fees in respect of any Service shall be invoiced to the Buyer Group on
a monthly basis and shall be due thirty (30) days from the date of invoice.

        Section 3.02    Payment.  Except as otherwise provided in Schedule A
hereto, the Buyer Group shall pay the amount of such invoice by wire transfer in
immediately available funds to the Seller Provider within thirty (30) days of the date of
such invoice as instructed by the Seller Provider.  If the Buyer Group fails to pay such
amount by such date, the Buyer Group shall be obligated to pay to the Seller Provider, in
addition to the amount due, interest at an interest rate of 1-1/2% per month over the
Prime Rate, compounded monthly, accruing from the date the payment was due through
the date of actual payment.

        Section 3.03    No Right to Set-Off.  The Buyer Group shall pay the full
amount of Service Fees and shall not set-off, counterclaim or otherwise withhold any
amount owed to the Seller Provider under this Agreement on account of any obligation
owed by the Seller Provider or any of its Affiliates to the Buyer Group or any of its
Affiliates that has not been finally adjudicated, settled or otherwise agreed upon by the
Parties in writing.

## ARTICLE IV

### Termination

        Section 4.01    Termination Dates.  Unless the Parties have otherwise
agreed in writing to an extension or shortening of the applicable Service Period, this
Agreement will terminate with respect to each Service at the close of business on the last
day of the Service Period for such Service.  This Agreement shall terminate in its entirety
on the date on which all Service Periods have expired or been terminated.

        Section 4.02    Early Termination of Services.  Upon thirty days prior
written notice, the Buyer Group may terminate the provision of any Service, subject to
the obligation to pay Termination Charges as provided for under Section 4.05; provided,
however, that to the extent that the Seller Provider's ability to provide a Service is
dependent on the continuation of another Service (and such dependence has been made
known to the Buyer Group), the Seller Provider's obligation to provide such dependent
Service shall terminate automatically with the termination of such supporting Service.

6

EXHIBIT A TO SALE ORDER, PAGE 418

Section 4.03    Termination Due to Breach. Upon the occurrence or during the continuance of a material breach of this Agreement by any Party (the "breaching party") or conduct by the breaching party that has caused a material breach or material default under any third party Service provider contract, the other Party (the "non-breaching party") may give written notice of such breach or conduct to the breaching party. If such breach or conduct remains uncured or continues for 30 days after delivery of such written notice, the non-breaching party may terminate the obligation to provide or purchase any Service related to such breach upon written notice to the breaching party; provided, however, that, (i) if such termination is due to conduct that caused a material breach or material default under a third party Service provider contract, the non-breaching party may only terminate any Service related to such third party Service provider contract, and (ii) if such termination is due a failure to pay Service Fees or other sums owed to the Seller Provider hereunder, the Seller Provider may terminate this Agreement in its entirety.

Section 4.04    Data Transmission. On or prior to the last day of the Service Period for each Service or as promptly as practicable thereafter, the Seller Provider shall, shall cause its Affiliates to, and shall use commercially reasonable efforts to cause its third party Service providers to, cooperate to support the transfer of data concerning such Service to the Buyer Group, in each case at the cost and expense of the Buyer Group. If requested in writing by the Buyer Group, the Seller Provider shall, shall cause its Affiliates to, and shall use commercially reasonable efforts to cause its third party Service providers to, deliver to the Buyer Group as promptly as practicable after the last day of the Service Period for such Service all records, data, files and other information received or computed for the benefit of the Business or the Buyer Group during the applicable Service Period, in electronic (if available) or hard copy form (as requested by Buyer Group) and at the cost and expense of the Buyer Group.

Section 4.05    Effect of Termination. Upon termination of any Service pursuant to this Agreement, the Seller Provider will have no further obligation to provide the terminated Service, and the Buyer Group will have no obligation to pay any future Service Fees relating to any such Service; provided that the Buyer Group shall remain obligated to the Seller Provider for (i) the Service Fees and any other fees, costs and expenses not yet paid in respect of the Services provided prior to the effective date of termination and (ii) the Termination Charges. Upon termination of any Service pursuant to this Agreement, the Seller Provider shall reduce for the next monthly billing period the amount of the Service Fee for the category of Services in which the terminated Service was included (such reduction to reflect the elimination of all costs incurred in connection with the terminated Service to the extent the same are not required to provide other Services to the Buyer Group), and, upon the written request of the Buyer Group, the Seller Provider shall provide the Buyer Group with documentation and/or information regarding the calculation of the amount of the reduction. In connection with the termination of any Service, the provisions of this Agreement not relating solely to such terminated Service shall survive any such termination, and in connection with a termination of this Agreement in its entirety, Article I, Section 2.02(ii), Section 2.04,

7

EXHIBIT A TO SALE ORDER, PAGE 419

Section 2.07, Section 2.08, Section 3.02, Section 3.03, Section 4.04, Section 4.05, Section 5.02, and Sections 5.04 through 5.14 shall continue to survive indefinitely.

## ARTICLE V

### Miscellaneous

Section 5.01    Mutual Cooperation.  The Seller Provider, the Buyer Group and their respective Affiliates shall cooperate with each other in connection with the performance of the Services hereunder, including producing on a timely basis all information that is reasonably requested with respect to the performance of Services and the transition at the end of the term of this Agreement; provided that such cooperation does not unreasonably disrupt the normal operations of the Seller Provider, the Buyer Group or their respective Affiliates.  The Buyer Group shall, and shall cause its Affiliates to, allow the Seller Provider (and its Affiliates or third party service providers who provide Services hereunder) reasonable access to the facilities, information systems, infrastructure and personnel of the Buyer Group as reasonably necessary for the Seller Provider to fulfill its obligations under this Agreement.

Section 5.02    Indemnity.

(a)    Subject to the limitations set forth in Section 5.04, the Seller Provider shall, jointly and severally, indemnify Buyer Group and its Affiliates for, and hold Buyer Group and its Affiliates harmless from, all claims, demands, complaints, liabilities, losses damages, and all costs and expenses, including reasonable legal fees (collectively, "Losses") that such Persons may suffer to the extent arising out of, resulting from or otherwise in connection with the gross negligence or willful misconduct of the Seller Provider or its Affiliates or third party Service providers in connection with the provision of Services to the Buyer Group.

(b)    Subject to the limitations set forth in Section 5.04, the Buyer Group shall, jointly and severally, indemnify the Seller Provider and its Affiliates and their respective Representatives for, and hold the Seller Provider and its Affiliates and their respective Representatives harmless from, all Losses that such Persons may suffer arising out of, resulting from or otherwise in connection with the provision of the Services to the Buyer Group; provided that the Buyer Group shall not be responsible for any such Losses to the extent that caused by, resulting from, or arising out of or in connection with the Seller Provider's gross negligence or willful misconduct.

Section 5.03    Force Majeure.  In case performance of any terms or provisions hereof (other than terms or provisions relating to the payment of fees or expenses) shall be delayed or prevented, in whole or in part, because of or related to compliance with any law, decree, request or order of any Governmental Entity, either local, state, federal or foreign, or because of riots, war, public disturbance, fire, explosion, storm, flood, acts of God, acts of terrorism, major breakdown or failure of transportation, transmission, manufacturing, distribution or storage facilities, or for any other reason that is not within the reasonable control of the Party whose performance is

8

NY\1689871.2

interfered with and which by the exercise of reasonable diligence such Party is unable to prevent (each, a "Force Majeure Event"), then the Party suffering shall be excused from its obligations hereunder during the period such Force Majeure Event continues, and no liability shall attach against either Party on account thereof. The Party whose performance is affected by the Force Majeure Event shall use reasonable diligence to remedy the situation and remove the cause and effect of the Force Majeure Event.

Section 5.04    Limitations of Liability and Warranties.

(a)    Limited Liability of the Seller Provider.  Notwithstanding anything to the contrary in this Agreement, no member of the Seller Provider or any of their Affiliates, or any of their respective Representatives shall have any liability in contract, tort or otherwise, for or in connection with any Services rendered or to be rendered under this Agreement, the transactions contemplated by this Agreement, or any actions or inactions in connection with any such Services, to the Buyer Group or its Affiliates or any of their respective Representatives, except to the extent that the Buyer Group or its Affiliates or any of their respective Representatives suffer any Losses that result from the gross negligence or willful misconduct of the Seller Provider or its Affiliates or their respective Representatives in connection with any such Services, transactions, actions or inactions.

(b)    Additional Limitation on Liability.  Notwithstanding anything to the contrary in this Agreement, no Party or any of such Party's Affiliates or any Representatives of such Party or its Affiliates will be liable to the other Party or its Affiliates, or any Representatives of such other Party or its Affiliates for any special, incidental, indirect, punitive or consequential damages or lost profits, however caused, under any theory of liability, arising from the performance of, or relating to, this Agreement regardless of whether such Party has been notified of the possibility of, or the foreseeability of, such damages.  Furthermore, notwithstanding any other provision contained in this Agreement to the contrary, the Seller Provider's total liability with respect to this Agreement shall not exceed, in the aggregate, the aggregate amount of Service Fees paid hereunder to the Seller Provider except to the extent any such liability results from the gross negligence or willful misconduct of the Seller Provider or its Affiliates.

(c)    Liability for Payment Obligations.  Nothing in this Section 5.04 shall be deemed to eliminate or limit, in any respect, the Buyer Group's express obligation in this Agreement to pay Termination Charges or Service Fees for Services rendered in accordance with this Agreement.

(d)    Disclaimer of Warranties.  Except as expressly set forth herein, the Parties acknowledge and agree that the Services are provided as-is, that the Buyer Group assumes all risks and liability arising from or relating to their use of and reliance upon the Services and neither the Seller Provider, nor its Affiliates nor any Representatives of the Seller Provider or its Affiliates makes any representation or warranty, express or implied, with respect thereto. EXCEPT AS EXPRESSLY SET FORTH HEREIN, THE SELLER PROVIDER AND ITS AFFILIATES, AND ALL OF THEIR REPRESENTATIVES

9

HEREBY EXPRESSLY DISCLAIM ALL REPRESENTATIONS AND WARRANTIES REGARDING THE SERVICES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY REPRESENTATION OR WARRANTY WITH REGARD TO QUALITY, PERFORMANCE, NONINFRINGEMENT, COMMERCIAL UTILITY, MERCHANTABILITY OR FITNESS OF THE SERVICES FOR ANY PARTICULAR PURPOSE.

Section 5.05    Independent Contractors. Each Party acknowledges that it has entered into this Agreement for independent business reasons. The relationship of the Parties hereunder are those of independent contractors and nothing contained herein shall be deemed to create a joint venture, partnership or any other relationship. Neither the Seller Provider nor the Buyer Group shall have any power or authority to negotiate or conclude any agreement, or to make any representation or to give any understanding on behalf of the other in any way whatsoever.

Section 5.06    Confidentiality.

(a)    The Buyer Group shall maintain, and shall cause its Affiliates to maintain, in strict confidence and not disclose to any third party (except to its Representatives and those of its Affiliates in connection with the receipt of the Services who are themselves bound by similar nondisclosure restrictions) all information of the Seller Provider that is known by the Buyer Group to be confidential or proprietary and received, held or otherwise obtained by the Buyer Group in connection with the receipt of the Services by reason of this Agreement, except (i) as may be necessary in order to comply with any applicable Law or court process, in which case the Buyer Group shall, if permissible, promptly notify the Seller Provider of any such requirement and the Seller Provider shall be permitted to seek confidential treatment for such information or (ii) for such information which (A) is or becomes generally available to the public other than as a result of a disclosure by the Buyer Group or its Affiliates or their respective Representatives in violation of this Section 5.06(a) or (B) is or becomes available to the Buyer Group on a non-confidential basis from a source other than the Seller Provider or its Representatives, provided that such source is not known to the Buyer Group at the time of disclosure to be bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the Seller Provider or any other party with respect to such information.

(b)    The Seller Provider shall maintain, and shall cause its Affiliates to maintain, in strict confidence and not disclose to any third party (except to its Representatives and those of its Affiliates and third party Service providers in connection with the provision of the Services who are themselves bound by similar nondisclosure restrictions) all information of the Buyer Group that is known by the Seller Provider to be confidential or proprietary and received, held or otherwise obtained by the Seller Provider in connection with the provision of the Services by reason of this Agreement, except (i) as may be necessary in order to comply with any applicable Law or court process, in which case the Seller Provider shall, if permissible, promptly notify the Buyer Group of any such requirement and the Buyer Group shall be permitted to seek confidential treatment for such information or (ii) for such information which (A) is or

10

becomes generally available to the public other than as a result of a disclosure by the Seller Provider or its Affiliates or their respective Representatives in violation of this Section 5.06(b) or (B) is or becomes available to the Seller Provider on a non-confidential basis from a source other than the Buyer Group or its Representatives, provided that such source is not known to the Seller Provider at the time of the disclosure to be bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the Buyer Group or any other party with respect to such information.

(c)    With respect to any such confidential information, each of the Parties agrees as follows:  (i) it shall use the same degree of care in safeguarding the confidential information as it uses to safeguard its own information which is proprietary and/or treated as confidential; and (ii) upon the discovery of any inadvertent disclosure or unauthorized use of said information, or upon obtaining notice of such disclosure of use from the other Party, it shall take or cause to be taken all necessary actions to prevent any further inadvertent disclosure or unauthorized use, and the first Party shall be entitled to pursue any other remedy at law or in equity which may be available to it (including, without limitation, specific performance).

Section 5.07    No Third Party Beneficiaries.  The provisions of this Agreement are solely for the benefit of the Parties and their successors and permitted assigns (and their Affiliates to the extent contemplated by Section 5.02) and are not intended to confer any rights or remedies to any person, other than the Parties and such successors and permitted assigns (and their Affiliates to the extent contemplated by Section 5.02).  Except to the extent contemplated by Section 5.02, (a) there are no third party beneficiaries of this Agreement and (b) this Agreement shall not provide any third person with any remedy, claim, liability, reimbursement, cause of action or other right in excess of those existing without reference to this Agreement.

Section 5.08    Interpretation.  When a reference is made in this Agreement to an Article, Section, Annex, Exhibit or Schedule, such reference shall be to an Article or Section of, or an Annex, Exhibit or Schedule to, this Agreement, unless otherwise indicated.  All Annexes, Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made part of this Agreement as if set forth in full herein and any terms, conditions, covenants or agreements set forth in any such Annexes, Exhibits and Schedules shall be binding on the Parties as if set forth in full herein.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  Whenever the words "include", "includes", "including" or "such as" are used in this Agreement, they shall be deemed to be followed by the words "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The word "or" when used in this Agreement is not exclusive.  The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if".  Whenever used in this Agreement, any noun or

NY\1689871.2

11

EXHIBIT A TO SALE ORDER, PAGE 423

pronoun shall be deemed to include the plural as well as the singular and to cover all genders. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting or causing any instrument to be drafted. Any agreement, instrument or statute defined or referred to herein means such agreement, instrument or statute as from time to time amended, supplemented or modified, including (x) (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and (y) all attachments thereto and instruments incorporated therein. References to a Person are also to its permitted successors and assigns.

Section 5.09    Amendments. This Agreement may not be amended, supplemented or otherwise modified except by an instrument in writing signed on behalf of each of the Parties. By an instrument in writing, the Buyer Group or the Seller Provider, as the case may be, may waive compliance by the other Party with any term or provision of this Agreement that such other Party was or is obligated to comply with or perform. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement. The failure of either Party to assert any of its rights hereunder shall not constitute a waiver of any such rights.

Section 5.10    Notices. All notices hereunder shall be given as set forth in Section 9.5 of the Asset Purchase Agreement.

Section 5.11    Assignment. Neither this Agreement nor any of the rights and obligations of the Parties hereunder may be assigned by any Party without the prior written consent of the other Party; provided, however, that any member of the Seller Provider shall be permitted to freely assign its rights and obligations under this Agreement to any of its Affiliates and to any Person acquiring assets used in or necessary for the provision of the Services hereunder. This Agreement shall be binding upon and inure to the benefit of the Parties and their successors and permitted assigns. Any attempted assignment or transfer in violation of this Section 5.11 shall be void.

Section 5.12    Severability. If any term or provision of this Agreement is invalid, illegal or incapable of being enforced by any applicable Law or public policy, all other conditions and provisions of this Agreement shall nonetheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to either Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the fullest extent possible.

Section 5.13    Applicable Law; Jurisdiction; Waiver of Jury Trial.

(a)    This Agreement shall be construed and interpreted, and the rights of the Parties shall be determined, in accordance with the Laws of the State of New York,

12

without giving effect to any provision thereof that would require the application of the substantive laws of any other jurisdiction, except to the extent that such Laws are superseded by the Bankruptcy Code.

(b)    Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive Notices at such locations as indicated in Section 9.5 of the Asset Purchase Agreement. The Parties agree that a final judgment in any such suit, action or other Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)    Each Party irrevocably and unconditionally waives, to the fullest extent permitted by applicable Law, any objection which it may now or hereafter have to the laying of venue of any suit, action or other Proceeding arising out of or relating to this Agreement or any transaction contemplated by this Agreement in any court referred to in the first sentence of paragraph (b) of this Section 5.13. Each Party irrevocably and unconditionally waives, to the fullest extent permitted by applicable Law, the defense of an inconvenient forum to the maintenance of any suit, action or other Proceeding arising out of or relating to this Agreement or any transaction contemplated by this Agreement in any court referred to in the first sentence of paragraph (b) of this Section 5.13.

(d)    Each Party consents, to the fullest extent permitted by applicable Law, to service of any process, summons, notice or document in the manner provided for notices in Section 9.5 of the Asset Purchase Agreement. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by applicable Law.

Section 5.14    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Counterparts to this Agreement may be delivered via facsimile or electronic mail. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

13

EXHIBIT A TO SALE ORDER, PAGE 425

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and year first above written.

[BUYER GROUP]

By:_____
Name:
Title:


[SELLER PROVIDER]

By:_____
Name:
Title:


*[Signature Page to Transition Services Agreement]*

EXHIBIT A TO SALE ORDER, PAGE 426

## SCHEDULE A[1]

### Services

[Service]

1.    <u>Description of Service</u>:

2.    <u>Service Fee</u>:

3.    <u>Term of Service</u>:

---

[1]    Parties to discuss requirements of Buyer on services to be provided, USPG contemplates providing services similar in scope to those provided by USPG pursuant to the Asset Management Agreement contained in folder 2.6.1.1 of the electronic data room.

NY\1689871.2

EXHIBIT A TO SALE ORDER, PAGE 427