**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:                                          Chapter 11

      BOSTON GENERATING, LLC, *et al.*,[1]          Case No. 10-14419

                    Debtors.

------------------------------------------------------------x

**OPINION GRANTING DEBTORS' MOTION SEEKING AUTHORITY TO SELL,
PURSUANT TO 11 U.S.C. § 363, SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**

APPEARANCES:

    LATHAM & WATKINS LLP
    *Attorneys for the Debtors*
    885 Third Avenue
    New York, New York 10022
    By:    D.J. Baker, Esq.
            Robert J. Rosenberg, Esq. (argued)
            James E. Brandt, Esq.
            Christopher Harris, Esq.
            Adrienne K. Eason Wheatley, Esq.


    233 South Wacker Drive
    Chicago, Illinois 60606
    By:    Caroline A. Reckler, Esq.

    BRACEWELL & GIULIANI LLP
    *Attorneys for MatlinPatterson Global Advisers LLC*
    1251 Avenue of the Americas
    New York, New York 10020
    By:    Jennifer Feldsher, Esq. (argued)
            Gregory W. Nye, Esq.

    DECHERT LLP
    *Attorneys for Wilmington Trust FSB*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Boston Generating, LLC (0631); EBG Holdings LLC (3635); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC (7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

1095 Avenue of the Americas
New York, New York 10036
By:    Allan S. Brilliant, Esq. (argued)
       Kevin J. O'Brien, Esq.
       Robert Topp, Esq.
       Davin J. Hall, Esq.

DEWEY & LEBOEUF LLP
*Attorneys for Algonquin Gas Transmission, LLC*
One Embarcadero Center, Suite 400
San Francisco, California 94111
By:    Bennett G. Young, Esq. (argued)

1000 Main Street, Suite 2550
Houston, Texas 77002
By:    Charles A. Moore, Esq.

JAGER SMITH P.C.
*Attorneys for the Official Committee of Unsecured Creditors*
One Financial Center
Boston, Massachusetts 02111
By:    Bruce F. Smith, Esq. (argued)
       Steven C. Reingold, Esq.

MILBANK, TWEED, HADLEY & MCCLOY LLP
*Attorneys for CarVal Investors, LLC and Fortress Investment Group, LLC*
One Chase Manhattan Plaza
New York, New York 10005
By:    Peter K. Newman, Esq. (argued)

WACHTELL, LIPTON, ROSEN & KATZ
*Attorneys for Credit Suisse AG*
51 West 52nd Street
New York, New York 10019
By:    David C. Bryan, Esq. (argued)
       Scott K. Charles, Esq.
       Amy R. Wolf, Esq.

WINSTON & STRAWN LLP
*Attorneys for Constellation Energy Group, Inc. and Constellation Holdings, Inc.*
200 Park Avenue
New York, New York 10166
By:    David Neier, Esq. (argued)

YOUNG CONAWAY STARGATT & TAYLOR, LLP
*Attorneys for the Special Committee*
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
By:    James L. Patton, Esq. (argued)
        Bruce L. Silverstein, Esq.
        Rolin P. Bissell, Esq.
        David R. Hurst, Esq.

SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

Before the Court is the Debtors' motion seeking authority to sell substantially all of the

Debtors' assets, free and clear of liens, claims, and encumbrances to Constellation Holdings, Inc.

("Constellation") and to authorize the assumption and assignment of certain executory contracts

and unexpired leases in connection with the sale, as well as certain other related relief (the "Sale

Motion").  By the Sale Motion, the Debtors submit that they have a good business reason for

selling their assets prior to confirmation of a plan and that they meet the standard articulated by

the Second Circuit in *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722

F.2d 1063 (2d Cir. 1983), and in subsequent decisions of courts in this District.

Objections to the sale were filed by: (i) MatlinPatterson Global Advisers LLC ("Matlin"),

one of the Second Lien Lenders (as defined below), (ii) Wilmington Trust FSB, as Second Lien

Administrative Agent and Second Lien Collateral Agent under the Second Lien Credit

Agreement (the "Second Lien Agent"), (iii) the Official Committee of Unsecured Creditors (the

"UCC"), (iv) Algonquin Gas Transmission, LLC ("Algonquin"), and (v) other objectors whose

objections were largely resolved prior to or during the hearing.  CarVal Investors, LLC

("CarVal") and Fortress Investment Group, LLC ("Fortress"), whose affiliated funds own both

First Lien Debt and Second Lien Debt (each as defined below), joined in the objections of the

Second Lien Agent and Matlin.  Additionally, numerous objections to assumption and

assignment of executory contracts were filed, and these objections were either resolved or adjourned until December 7, 2010.  The Court has been advised that the objection filed by Algonquin has also been resolved.

Specifically, Matlin and the Second Lien Agent have argued, *inter alia*, that the Debtors did not properly exercise their fiduciary duties in moving forward with the Sale Motion; the Second Circuit standard for approving sales of substantially all assets outside of a plan has not been met; section 363(f) of title 11 of the United States Code (the "Bankruptcy Code") has not been satisfied; and the Sale Transaction should be evaluated under an entire fairness standard.

The Debtors and the Special Committee (as defined below) responded to the objections. Credit Suisse AG, Cayman Islands Branch (the "First Lien Agent"), as First Lien Collateral Agent under the First Lien Credit and Guaranty Agreement (the "First Lien Credit Agreement") filed a statement in support of the Sale Motion.  U.S. Power Generating ("USPG"), the Debtors' non-debtor ultimate parent, also filed a response to the objectors' submissions.

The Court requested additional briefing on Algonquin's objection and the Debtors, CarVal, Fortress, Constellation, and Algonquin filed additional submissions.

In addition to those declarations submitted and introduced in connection with the Bid Procedures Hearing (as defined below), the Debtors submitted the declarations of: (i) Jeff Hunter, Manager, Executive Vice President and Chief Financial Officer of the Debtors; (ii) Carsten Woehrn, Executive Director of J.P. Morgan Securities LLC ("JPM"); and (iii) Adrienne K. Eason Wheatley, member of Latham & Watkins LLP.  The Second Lien Agent introduced the declaration of Judah Rose, Managing Director of ICF International, Inc. ("ICF").  Algonquin introduced the declarations of: (i) Greg McBride, the Vice President of Rates and Certificates of Spectra Energy Corp., Algonquin's parent, and (ii) Richard Paglia, Algonquin's Vice President

of Marketing.  Messrs. McBride and Paglia's declarations and testimony were the subject of a motion *in limine* filed by the Debtors which was subsequently withdrawn.  Kevin M. Cofsky, Managing Director of Perella Weinberg Partners, LP ("Perella"), also submitted a declaration which was subsequently withdrawn.

Additional declarations were filed by (i) William Howard Wolf, member of the board of managers (the "Board") of the parent Debtor EBG Holdings LLC ("EBG") and the sole member of a special committee of the Board (the "Special Committee") and (ii) Islam (Sam) Zughayer, Managing Director and the head of the restructuring group at Berenson & Company, LLC ("Berenson").  Constellation filed the declaration of Dayan Abeyaratne, Constellation's Vice President of Corporate Strategy & Development, on the issue of its ability to provide adequate assurance of future performance with respect to the assumed contracts and in support of a finding that it meets the standard for a good faith purchaser.

Live testimony was given by Messrs. Abeyaratne, Cofsky, Hunter, McBride, Paglia, Rose, Woehrn, Wolf, and Zughayer.

The parties submitted deposition designations and counter-designations for:  (i) Dayan Abeyaratne; (ii) Kevin Cofsky; (iii) Leslie Dedrickson, managing director for portfolio management at Constellation; (iv) Jeff Hunter; (v) Wesley Kern, Senior Vice President, Finance, of USPG; (vi) Scott Moresco, a tax partner at KPMG;[2] (vii) Greg McBride; (viii) Richard Paglia; (ix) Ryan Roberts, a director of Madison Dearborn Partners (a USPG equity owner); (x) Carsten Woehrn; (xi) William Howard Wolf; and (xii) Sam Zughayer.  Approximately six volumes of exhibits were introduced, containing many dozens of trial exhibits.

In addition, by agreement of the parties, the record of the hearing held on October 4-7 and on October 9, 2010 (the "Bid Procedures Hearing") and the Court's October 9, 2010 bench

---

[2]        KPMG served as tax advisors to the Debtors and to USPG prior to the Petition Date.

ruling with respect thereto (the "Bid Procedures Decision") have also been made part of the

record of the evidentiary hearing held by this Court on November 17, 18, 19, 21, 22, and 23,

2010 to consider the sale of substantially all of the Debtors' assets (the "Sale Hearing").

## FINDINGS OF FACT

After an evidentiary hearing, the Court makes the following findings of fact.[3]

### I.    Background

On August 18, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition

for relief under chapter 11 of the Bankruptcy Code.  The Debtors' cases are being jointly

administered pursuant to an order dated August 20, 2010, and the Debtors continue to operate

their respective businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code.  The Debtors employ some 148 persons of whom 107 are members of the

Utility Workers Union of America.  Maintenance of the Debtors' facilities is primarily conducted

by third-party vendors.

The Debtors operate power plants that provide wholesale electricity to the Boston area,

and they own the third largest generation fleet in New England.  The Debtors generate revenue

by selling electricity, receiving capacity payments, and providing ancillary services.  In order to

manage the various risks and market price fluctuations inherent in the conversion of fossil fuels

(primarily natural gas) into electricity, the Debtors utilize a variety of derivative instruments and

other long-term contracts.

The Debtors' non-debtor ultimate parent, USPG, provides energy management and

general asset management services to the Debtors.  In addition to owning, indirectly, 100% of the

---

[3]    The findings of fact and conclusions of law herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

Debtors' equity, USPG owns Astoria Generating ("Astoria").  Astoria owns power generation

assets that provide wholesale electricity to the New York area.  Astoria is not a Debtor.

As noted in the Declaration of Jeff Hunter in Support of the Debtors' Chapter 11

Petitions and First Day Pleadings, over the last several years, low fuel prices, eroding demand,

and a significant surplus of supply have put downward pressure on margins in the energy,

capacity, and ancillary service markets in New England.  Additionally, a significant amount of

new uneconomic supply is expected to come online over the next three to five years.  The

Debtors define "uneconomic supply" as supply that may be subsidized or is otherwise below a

hypothetical market price.  This new uneconomic supply, combined with eroding demand, has

created a significant surplus of future capacity which is depressing market prices and reducing

revenue.

The Debtors have approximately $2 billion in prepetition debt.  The Debtors' operations

are financed by two tranches of secured debt: (i) a $1.45 billion first lien term credit facility

pursuant to the First Lien Credit Agreement, of which approximately $1.13 billion is currently

outstanding (the "First Lien Debt," held by the "First Lien Lenders"), secured by first-priority

liens on substantially all of the Debtors' assets (the "Collateral") and (ii) a $350 million second-

lien term loan facility (the "Second Lien Debt," held by the "Second Lien Lenders"), secured by

second-priority liens on the same Collateral.  The Second Lien Lenders together with the First

Lien Lenders may be referred to herein as the "Secured Parties."  The Debtors also have

approximately $422 million of unsecured debt at the parent-Debtor level, pursuant to a term-loan

facility advanced to EBG (the "Mezzanine Facility").  Neither USPG nor Astoria is a guarantor

of any of these facilities.

Although the Debtors' First Lien Credit Agreement, Second Lien Credit Agreement, and Mezzanine Facility were not in default prior to the Petition Date, given the Debtors' liquidity position and projected ongoing liquidity needs, the Debtors believed they had insufficient liquidity to continue to service their debt and fund ongoing operations.

The Debtors are participants in the electric energy markets administered by ISO-New England ("ISO-NE"). ISO-NE is the regional transmission organization designated by the Federal Energy Regulatory Commission ("FERC"). ISO-NE administers the day-ahead and real-time energy markets as well as capacity and ancillary service markets in accordance with FERC's market rules. Pursuant to ISO-NE's rules, utilities that provide electricity to end-use customers must demonstrate that they have capacity equal to the peak load forecast plus a margin for any relevant period. These companies can fulfill their capacity obligation by buying forward contracts in the forward capacity market from the Debtors or their competitors. The objective of the forward capacity market is to purchase sufficient capacity for reliable system operation for a future year at competitive prices where all resources, both new and existing, can participate. Forward capacity prices are the most important component of the Debtors' asset value and are known several years in advance.

Current pricing in the forward capacity market points to flat or declining capacity revenue through 2014. The February 2008 auction for the 2010/2011 capacity year cleared at the regulatory floor price of $4.50 per kW-month. Prices in the second auction (for the 2011/2012 capacity year), the third auction (for the 2012/2013 capacity year), and the fourth auction (for the 2013/2014 capacity year) cleared at the regulatory administered floor of $3.60 per kW-month, $2.95 per kW-month, and $2.95 per kW-month, respectively. Certain of the parties who have objected to the Sale Transaction (as defined below) believe that pricing is not competitive and

FERC will issue regulations at the end of the first quarter of 2011 that will increase prices.  As

Mr. Rose testified, regulatory changes may increase revenue after 2014 and revenues might

increase substantially in 2018.  However, removing the price floor could cause material future

declines in revenue after 2014.  There was substantial testimony regarding the pending FERC

docket during the Bid Procedures Hearing; the Court's preliminary findings in the Bid

Procedures Decision regarding the FERC docket insofar as it relates to the Debtors are

specifically incorporated by reference herein and require no modification in light of evidence

adduced during the Sale Hearing.

As a means to reduce their exposure to energy commodity price risk, the Debtors entered

into accretive energy hedges.  These hedges, which will expire on December 31, 2010, accounted

for about 50% of the Debtors' earnings before interest, taxes, depreciation and amortization

("EBITDA") over the last eight quarters.

## II.    The Debtors' Restructuring Efforts

The Debtors engaged in an eighteen-month long restructuring process which began over a

year prior to the Debtors' August 18, 2010 petition date and eventually led to a heavily marketed

sale for substantially all of the Debtors' assets.  The process has involved a multitude of steps, a

bevy of professionals, and enormous amounts of information exchange and diligence, not to

mention extensive litigation.

In September 2008, in an effort to address issues with its consolidated balance sheet,

USPG retained Perella as its financial advisor.  USPG and the Debtors first attempted a balance

sheet restructuring, including attempted issuance of new equity securities.  In the middle of 2010,

it became clear that a balance sheet restructuring was unlikely to be successful, and Perella

signed a new engagement letter with the Debtors (and terminated its engagement with USPG) in

June 2010.  The Debtors determined that a sale of substantially all assets would be the best way to maximize the value of their assets.  They retained JPM to run a sale process while Perella continued working on the Debtors' balance sheet restructuring and assisting on due diligence.

In late April 2010, JPM began an extensive marketing and sale process.  It contacted 199 potential buyers (81 strategic and 118 financial) and distributed a confidential information memorandum to 36 of those parties (the "CIM Recipients"), requesting preliminary letters of interest by May 18, 2010.  The Second Lien Lenders' financial advisor, Houlihan Lokey Howard & Zukin; their energy industry expert, Mr. Rose's firm ICF; and their legal advisors were fully engaged in this restructuring and sale process.  The Debtors paid certain of the fees of the Second Lien Lenders' advisors in an attempt to foster a process in which a consensual transaction could be achieved.  Ten CIM Recipients (the "Potential Purchasers") responded with preliminary letters of interest.  The Debtors opted to pursue further discussion with six of the Potential Purchasers.  These six Potential Purchasers received access to the Debtors' management, went on site visits, and received access to an extensive electronic data room.  Two of the six Potential Purchasers submitted "final" bids, which were accompanied by marked purchase agreements.  The Debtors negotiated extensively with the two bidders.  Through this negotiation, the Debtors were able to secure improved terms and conditions and achieve an approximately $100 million increase in the purchase price from the "final" bid.

On August 7, 2010, the Debtors and Constellation signed a pre-petition asset purchase agreement (the "Asset Purchase Agreement") for the sale of substantially all of the assets of the Debtors for $1.1 billion cash (the "Sale Transaction").  The $1.1 billion cash purchase price is subject to working capital adjustments.  The Asset Purchase Agreement requires the Debtors to seek approval of a sale pursuant to section 363 of the Bankruptcy Code and to obtain the entry of

a sale order by this Court no later than 90 days after the Debtors' Petition Date (which date has

been subsequently extended by Constellation to November 24, 2010). Based on the Debtors'

estimate, the net proceeds of the Sale Transaction combined with the Debtors' cash on hand will

be sufficient to pay approximately 98.5% of the First Lien Debt but will leave no recovery for

the Second Lien Debt or unsecured creditors.

On August 17, 2010, a group of First Lien Lenders who hold in excess of 50% of the

outstanding first lien obligations under the First Lien Credit Agreement executed a sale support

agreement with the Debtors. The First Lien Credit Agreement permits a sale of Collateral with

the consent of over 50% of the First Lien Lenders (who are defined in the agreement as

"Required Lenders"). Thus, the sale support agreement assured the Debtors that the First Lien

Lenders would consent to the proposed sale even if they were not paid in full. By its terms, the

sale support agreement permits the Debtors to pursue alternative transactions that the Debtors

believe would result in a higher and better offer.

## III.    The Debtors' Chapter 11 Cases, the FERC Proceedings, and the Post-Petition Sale Process

On August 19, 2010, one day after the Petition Date, the Debtors filed the Sale Motion,

seeking entry of (i) an order approving and authorizing (a) bid procedures in connection with the

proposed sale of substantially all of their assets, (b) stalking horse bid protections, (c) procedures

for the assumption and assignment of executory contracts and unexpired leases in connection

with the sale, (d) the form and manner of notice of the sale hearing and (e) certain related relief;

and (ii) an order approving and authorizing (a) the sale of substantially all of the Debtors' assets

free and clear of claims, liens, liabilities, rights, interests and encumbrances, (b) the Debtors to

enter into and perform their obligations under the Asset Purchase Agreement, (c) the Debtors to

assume and assign certain executory contracts and unexpired leases, (d) the Transition Services

Agreement and (e) related relief.

Concurrently with the filing of the Sale Motion, the Debtors and Constellation sought

FERC approval of the proposed sale of the Debtors' power plants, including a power plant in

Massachusetts owed by one of the Debtors, Fore River Development, LLC (the "Fore River

Plant"), to Constellation pursuant to section 203 of the Federal Power Act, 16 U.S.C. § 824b (the

"FPA"). Thus, on August 18, 2010, the Debtors and Constellation filed with FERC their Joint

Application for Authorization of Disposition of Jurisdictional Facilities, Request for Waivers of

Certain Filing Requirements, and Request for Shortened Comment Period and Expedited

Consideration (the "203 Application").

On August 27, 2010, the Debtors filed the First Omnibus Motion of Debtors for Entry of

Order Authorizing the Debtors to Reject Certain Executory Contracts *Nunc Pro Tunc* to Their

Respective Notice Dates (the "Rejection Motion") seeking authorization to reject, among other

executory contracts, the 2001 HubLine Service Agreement, dated as of January 31, 2001,

between the Debtors and Algonquin (the "HSA"). The Debtors seek to reject the HSA because

they believe, in their business judgment, that the HSA does not provide a substantial benefit to

the estate and, moreover, imposes a burden on the estate.

On September 1, 2010, Algonquin filed its Motion for Withdrawal of Reference With

Respect to the Rejection Motion (the "Motion for Withdrawal of Reference of Rejection

Motion"), requesting that the United States District Court for the Southern District of New York

(the "District Court") withdraw the reference of the Rejection Motion only with respect to the

HSA to resolve an alleged conflict between federal bankruptcy law authorizing the rejection of

executory contracts and federal energy law under the Natural Gas Act, 15 U.S.C. § 717 et seq.

("NGA") requiring FERC approval of the termination or amendment of natural gas transportation agreements.

On September 8, 2010, Algonquin filed with FERC its Motion to Intervene and Protest of Algonquin Gas Transmission, LLC (the "FERC Protest") with respect to the 203 Application.  In the FERC Protest, Algonquin argued, *inter alia*, that if FERC were to approve the 203 Application, which contemplates the sale of the Fore River Plant *without* the HSA, FERC would be using the exclusive delegation of authority granted by Congress under the FPA to preempt an equal but separate exclusive delegation of authority under the NGA in violation of the filed rate doctrine and the public interest.  Algonquin also argued that any change or alteration by FERC of the HSA must be done only after notice and due process under the NGA, which has yet to be initiated with FERC.

On September 17, 2010, Algonquin filed its Motion to Withdraw the Reference with Respect to the Sale Motion (the "Motion for Withdrawal of Reference of Sale Motion") on grounds similar to the Motion for Withdrawal of Reference of Rejection Motion.  The Motion for Withdrawal of Reference of Rejection Motion and Motion for Withdrawal of Reference of Sale Motion were assigned to the Honorable Denise L. Cote, United States District Judge.

On October 4-7 and on October 9, 2010, the Court held the Bid Procedures Hearing to consider approval of the bid procedures, approval of the stalking horse bid protections to Constellation, and other requested relief (the "Bid Procedures").  After substantial testimony and argument, on October 9, 2010, the Court issued the Bid Procedures Decision approving the relief requested.  The Court found that the Debtors properly exercised their business judgment in moving forward with the sale process and seeking approval of the bid procedures because they believed that the sale process was the best way to maximize the value of their estates.  On

October 12, 2010, the Court entered an order approving the Bid Procedures and granting related relief.

After approval of the Bid Procedures, JPM contacted (i) the approximately 200 potential bidders it had contacted prepetition and (ii) over 40 additional potential bidders who had not been previously contacted.   JPM aggressively sought out interested buyers and encouraged them to participate in the process.   JPM oversaw an electronic due diligence data site with tens of thousands of pages of information.  CarVal, Fortress, and Matlin, including their advisors, accessed some 36,306 documents in the data site.  JPM facilitated the flow of information to and the answers to questions from Matlin and other Second Lien Lenders.  JPM updated the data site during the post-petition auction process and responded to dozens of written questions posed by potential bidders.  JPM set up bidder-specific data sites to post-bidder specific information that might compromise an individual bidder's competitive position if placed on the broader data site. Potential bidders received, at their election, daily emails announcing the availability of the new information as it was added to the data site.

On November 1, 2010, Judge Cote issued an Opinion and Order (the "November 1 Opinion") granting the Motion for Withdrawal of Reference of Rejection Motion and denying the Motion for Withdrawal of Reference of Sale Motion.  The District Court withdrew the reference of the Rejection Motion because "[i]n order to decide the Rejection Motion, a court will have to decide whether Congress has, through the Bankruptcy Code, given the district court power to authorize the Debtors to reject the HSA, or if instead, doing so would run afoul of FERC's exclusive jurisdiction over filed rate contracts under the NGA."[4]

In conjunction with the November 1 Opinion, Judge Cote issued an order to show cause (the "OSC") ordering Algonquin and the Debtors to show cause by noon on November 5, 2010

---

[4]       *In re Boston Generating, LLC, et al.,* 1:10-cv-06528-DLC (S.D.N.Y. 2010) (Docket No. 21) at 12.

"why the Court should not transfer the Rejection Motion back to the Bankruptcy Court for it to decide the Rejection Motion pursuant to 11 U.S.C. § 365, on the condition that the Debtors must also obtain approval from FERC pursuant to the NGA to reject the HSA."[5]

On November 4, 2010, the Board voted to establish the Special Committee[6] and appointed William Howard Wolf as its sole member. As discussed more fully in the Bid Procedures Decision, Mr. Wolf was the sole independent board member of EBG, and his vote was required by the Debtors' organizational documents before filing for bankruptcy to launch the 363 sale process. Mr. Wolf has several decades of experience with corporate governance with large companies, and he was fully engaged with the Debtors and the process.

The Special Committee was delegated the full power of the Board to evaluate all possible options available to EBG to maximize the value of the Debtors' estates. Specifically, the Board resolution establishing the Special Committee delegates to the Special Committee the authority of the full Board to (i) review and evaluate a possible sale pursuant to section 363 of the Bankruptcy Code or other strategic alternative; (ii) discuss and negotiate possible restructuring alternatives with any party the Special Committee deemed or deems appropriate; (iii) approve a possible restructuring alternative, if appropriate; and (iv) assist with any other matter which could present an actual or potential conflict between the interests of EBG and its parent. As the sole member of the Special Committee, Mr. Wolf considered whether to proceed with the Sale Transaction.

The Board vested the Special Committee with authority to retain its own independent legal and financial advisors. Mr. Wolf selected Young Conaway Stargatt & Taylor, LLP as the Special Committee's independent legal counsel and Berenson as the Special Committee's

---

[5]    *In re Boston Generating, LLC, et al.,*1:10-cv-06528-DLC (S.D.N.Y. 2010) (Docket No. 22).
[6]    For purposes of this decision, the term "Special Committee" refers to actions taken by Mr. Wolf after November 4, 2010.

independent financial advisor.  In addition to taking advantage of the broad knowledge base of the Debtors' advisors, the Special Committee also received advice from its own independent advisors.

On November 9, 2010, the Debtors submitted an amendment ("Amendment No. 1") to the Asset Purchase Agreement, which contained certain revisions related to collective bargaining agreements and other employee matters.  It also extended the parties' termination deadline in the Asset Purchase Agreement to January 14, 2011, in the event that the only outstanding unsatisfied closing condition is FERC approval.  Lastly, it clarified language related to payment of the break-up fee upon consummation of an Alternative Transaction (as defined in the Asset Purchase Agreement) to eliminate certain potential drafting ambiguities that were discussed on the record at the Bid Procedures Hearing.  In a supplemental objection filed on November 14, 2010, Matlin objected to the changes to the break-up fee provision in the Asset Purchase Agreement implemented by Amendment No. 1.  It argued that the changes were overbroad and rendered the break-up fee payable in circumstances beyond those agreed to on the record at the Bid Procedures Hearing.  The Debtors and Constellation agreed that Amendment No. 1 would not be enforceable to the extent that it exceeded the scope of the changes set forth on the record.  Matlin concurred with this approach as resolving its concerns with respect to Amendment No. 1.

Per the Bid Procedures, "Qualified Bids" (which, as defined in the Bid Procedures, must, *inter alia*, (a) exceed the value of the Sale Transaction plus the break-up fee plus the $10 million bid increment, (b) not be conditioned on obtaining financing, and (c) include a $50 million good faith deposit) were due on or before November 13, 2010 at 12 p.m. (the "Bid Deadline") from parties desiring to participate in an auction for the sale of substantially all of the Debtors' assets.  However, the Bid Procedures stated that, "Nothing herein shall preclude a bidder from

submitting a competing bid in the form of a plan of reorganization and it being understood that

such bid may be determined by the Debtors not to be a Qualified Bid." An auction, if needed,

was scheduled for November 15, 2010 at 10 a.m.

On November 12, 2010, Judge Cote issued another order with respect to the Motion for

Withdrawal of Reference of Rejection Motion (the "November 12 Opinion," and, together with

the November 1 Opinion, the "District Court Opinions"). In this opinion, Judge Cote said, "In

order to reject the [HSA], the Debtors must also obtain a ruling from FERC that abrogation of

the contract does not contravene the public interest."[7] Judge Cote ordered that Fore River obtain

a determination from FERC pursuant to the NGA whether it may reject the HSA.[8] Judge Cote

also noted that, "[w]hether the bankruptcy court and FERC review the proposed rejection

concurrently or serially is of no consequence."[9]

On Saturday, November 13, 2010 at 3 p.m., the Special Committee reviewed the sole bid

received, which was a proposal that had been submitted by Matlin. The Special Committee,

with the assistance of its advisors and the Debtors' advisors, analyzed the value differences and

qualitative differences between the Sale Transaction and the Matlin proposal. After the receipt

of the bid, the Special Committee (through his professionals and the Debtors' professionals)

continued to provide diligence and feedback to Matlin on its plan proposal. The Debtors

extended the Bid Deadline through November 15, 2010 in order to give Matlin feedback and to

permit Matlin to improve on the clearly articulated shortcomings in the Matlin proposal. Mr.

Wolf's lengthy and extremely detailed declaration filed in support of the Sale Transaction

reflects an almost minute-by-minute account of what transpired in the critical days leading up to

the scheduled auction on November 15. Mr. Wolf's account was largely unchallenged, and the

---

[7]    *In re Boston Generating, LLC, et al.,*1:10-cv-06528-DLC (S.D.N.Y. 2010) (Docket No. 25) at 2.
[8]    *Id.* at 7.
[9]    *Id.*

Court adopts his declaration as an accurate record of the events that transpired and who

participated.  Mr. Wolf's declaration also identified with specificity numerous reasons why the

Matlin "proposal" could not be considered a "Qualified Bid," let alone a confirmable plan, and

he explained these points in more detail in his live testimony.  I find his testimony and

declaration credible; it plays an important role in my decision.

Matlin's objection questions the Debtors' decision to move forward with the Sale

Transaction rather than with Matlin's proposal.  After Matlin made its initial submission to the

Debtors on November 13, Matlin continued to amend its proposal until the Debtors determined

not to hold a formal auction on November 15.  Based on representations and evidence introduced

at the Sale Hearing, Matlin's bid appears to have continued to evolve even after November 15.

Matlin's proposal, as reflected in Exhibits 518 and 520 and as supplemented at the Sale Hearing,

in summary, involves recapitalizing the Debtors with $700 million of debt (which amount was

eventually increased to $750 million), $200 million of accreting preferred stock invested by

Matlin, and several hundred million shares of common equity (par value $1.00 per share) as well

as certain warrants that would be distributed to holders of First Lien Debt and Second Lien Debt.

Matlin represents that the enterprise value of the Debtors, as reflected in its proposal, is some

$1.35 billion.  Matlin's proposal includes a so-called "cash out option" for the stock distributed

to the holders of the First Lien Debt at up to 75 cents on the dollar.  As a result, Matlin's

proposal lacks a fully backstopped offering that would pay 100 cents on the dollar in cash to

First Lien Lenders who did not wish to accept a portion of their recovery in stock.

The Debtors' liquidity position was a hotly contested issue during the Bid Procedures

Hearing as well as during the Sale Hearing.  Mr. Hunter testified at the Bid Procedures Hearing

and likewise at the Sale Hearing that the Debtors' liquidity was an issue of concern to him.  His

judgment was and remains that the Debtors will run out of cash in April 2011.  The Debtors'

liquidity analysis annexed as Exhibit A to the Supplemental Declaration of Jeff Hunter in

Support of the Sale Motion and the Debtors' latest variance report, all introduced into evidence,

bear out this conclusion.  The objecting parties did not cross-examine Mr. Hunter with respect to

his projection that the Debtors will run out of cash in April 2011.  They did, however, elicit

testimony from Mr. Hunter confirming the already-established fact that, although he took certain

steps to extend the Debtors' liquidity runway, he did not take steps to obtain DIP financing for

the Debtors.  Based on the entirety of the record on the issue of the Debtors' liquidity, the Court

finds that the Debtors would have a negative cash balance as of April 2011 if they were to

continue to operate and did not receive an additional infusion of cash, through DIP financing or

otherwise.

The Court conducted the evidentiary portion of the Sale Hearing on November 17, 18,

19, 21, and 22, and heard six hours of closing arguments on November 23, 2010.

## IV.    Ultimate Facts

Based on all of the foregoing, the Court makes the following findings of ultimate facts:

1.  There is a good business reason for proceeding with the Sale Transaction as opposed to
    pursuing the formulation and confirmation of a chapter 11 plan.
2.  There is an articulated business justification for proceeding with the Sale Transaction
    now.
3.  The Sale Transaction reflects an appropriate exercise of business judgment and
    fulfillment of the Debtors' fiduciary duties.
4.  There is no viable higher and better existing alternative to the Sale Transaction.

## DISCUSSION

The various objections filed by the objecting parties break down into a number of more or less discrete categories.  The Court considers them in turn.

### I.   Standing

The First Lien Agent has argued that neither the Second Lien Agent nor any Second Lien Lender has standing to object to the Sale Motion.   The Second Lien Agent asserts that it and various objecting Second Lien Lenders have standing to argue, *inter alia*, that the Debtors are selling their assets at an inopportune time; that pending FERC regulatory reforms are likely to increase the value of the Debtors' assets in the first quarter of 2011; and that the timing of this 363 sale process was motivated by an improper purpose of securing tax benefits for the non-Debtor parent, USPG.  The Second Lien Agent argues the Debtors cannot satisfy the Second Circuit's test for selling substantially all of their assets outside of a plan.   As a threshold matter, the Court must make a determination on the question of standing.

As detailed above, prior to the commencement of these chapter 11 cases, the operations of the Debtors were financed by two tranches of secured debt: (i) a $1.45 billion credit facility secured by first-priority liens on the Collateral, and (ii) a $350 million second-lien term loan facility secured by subordinated second-priority liens on the same Collateral, as well as (iii) unsecured mezzanine debt, in the amount of $422 million, pursuant to a term-loan facility advanced to EBG.

In connection with the issuance of the First Lien Debt and the Second Lien Debt, (i) the Debtors, (ii) the First Lien Agent on behalf of itself and the First Lien Lenders, and (iii) the Second Lien Agent on behalf of itself and the Second Lien Lenders entered into a December 21,

2006 Collateral Agency and Intercreditor Agreement (the "Intercreditor Agreement"), a dense,

sixty-five page document governing the relationship between and among the Secured Parties.

Broadly speaking, the Intercreditor Agreement establishes the priority of the liens on the

Collateral and the Secured Parties' rights and duties relative to each other.  Other than the lien

subordination provisions of the Intercreditor Agreement, section 3 of the Intercreditor Agreement

is perhaps the most critical substantive provision of the Intercreditor Agreement and is at the

heart of the dispute between the First Lien Lenders and the Second Lien Lenders with respect to

the issue of standing.

Section 3.1(b)(i) of the Intercreditor Agreement provides, *inter alia*, that:

Until the Discharge of First Lien Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced . . . . the First Lien Collateral Agent, at the written direction of [First Lien Lenders holding a majority of the First Lien Debt], shall have the exclusive right to enforce rights, exercise remedies  . . . and make determinations regarding the release, sale, disposition or restrictions with respect to the Collateral without any consultation with or the consent of the Second Lien Collateral Agent or any Second Lien Secured Party  . . . . provided that the Lien securing the Second Lien Obligations shall remain on the proceeds of such Collateral released or disposed of subject to the relative priorities described in Section 2.1[].

Section 3.1(c) of the Intercreditor Agreement states:

. . . Without limiting the generality of the foregoing, unless and until the Discharge of First Lien Obligations has occurred, except as expressly provided in Sections 3.l(a)(i), 3.1(g) and 6.3(b) and this Section 3.1(c), the *sole right* of the Second Lien Collateral Agent, the Second Lien Administrative Agent, and any other Second Lien Secured Party with respect to the Collateral is to hold a Lien on the Collateral pursuant to the Second Lien Collateral Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of First Lien Obligations has occurred.  (emphasis added).

Section 3.1(c) is subject to certain exceptions, including section 3.1(g), which sets forth rights

retained by the Second Lien Lenders, including the right to vote on a plan of reorganization

(section 3.1(g)(v)) and the right to assert any "right and interest available to unsecured creditors" in a manner not inconsistent with the terms of the Intercreditor Agreement (section 3.1(g)(iv)).

In connection with the Bid Procedures Hearing, the First Lien Agent asserted that the Second Lien Agent and the Second Lien Lenders lacked standing to object to the portion of the Sale Motion seeking approval of the Bid Procedures. On October 4, 2010, the Court ruled that the Second Lien Agent had standing to object to the Bid Procedures, noting that "[t]he plain language of the Intercreditor Agreement says the seconds are silent in certain circumstances, but I do not read any express prohibition against objection to bidding procedures anywhere in the intercreditor agreement." The Court distinguished *In re Ion Media Networks, Inc.*, 419 B.R. 585 (Bankr. S.D.N.Y. 2009) and *In re Erickson Retirement Communities*, 425 B.R. 309 (Bankr. N.D. Tex. 2010). The Court's ruling on October 4, 2010, as specifically stated at the hearing, was limited only to the issue of standing to object to the Bid Procedures. The Court noted that, if necessary, it would address the issue of standing to object the Sale Transaction at a later date.

The Sale Hearing began on November 17, 2010 with lengthy and thoughtful oral arguments by counsel for the First Lien Agent and counsel for the Second Lien Agent on the issue of whether the provisions of the Intercreditor Agreement precluded the Second Lien Lenders from objecting to the Sale Transaction. Additional briefing on the issue was filed by the First Lien Agent and the Second Lien Agent.

During oral argument, counsel for the First Lien Agent and the Second Lien Agent "stipulated" to the conclusion that the actions taken (or to be taken) by the First Lien Agent in connection with the proposed sale are not an "exercise of remedies" for the purposes of the Intercreditor Agreement; the specific action in question is the consent of the First Lien Agent pursuant to section 363(f)(2) of the Bankruptcy Code. A colloquy ensued as to the whether the

Court was required to accept such a "stipulation" or whether the Court was free to make its own

determination as to whether a consent pursuant to section 363(f)(2) was an "exercise of

remedies" under the Intercreditor Agreement, which appeared to the Court to be a mixed

question of fact and law.  The Second Lien Agent urged the Court to defer to the view of the

counterparties to the Intercreditor Agreement on the meaning of the term.  The Second Lien

Agent also argued that both parties had waived any argument that there was an exercise of

remedies.  The reason for the Second Lien Agent's position, while not anywhere explained,

seems clear: to avoid the express prohibition in section 3.1(d)(i) of the Intercreditor Agreement,

which states that "each Second Lien Secured Party . . . agrees not to take any action that would

hinder any exercise of remedies under the First Lien Documents or is otherwise prohibited

hereunder including any sale, lease, exchange, transfer or other disposition of the Collateral,

whether by foreclosure or otherwise."  The reason for the First Lien Agent's position is less clear

and the Court will refrain from speculation on this point.  Moreover, during closing argument,

counsel for the First Lien Agent informed the Court that it was the position of the First Lien

Agent that the consent of the First Lien Lenders, though given, was not required pursuant to

section 363(f)(2) and that the Sale Transaction could be approved without such consent pursuant

to section 363(f)(5).

While the term "exercise of remedies" is used in numerous provisions of the Intercreditor

Agreement, it is not defined anywhere in the Intercreditor Agreement.  For the purposes of this

decision, I accept the Secured Parties' stipulation that there has been no exercise of remedies by

the First Lien Agent.   However, absent this stipulation, I may have concluded that consent under

section 363(f)(2) is an exercise of the rights afforded to a secured creditor and is thus an exercise

of remedies.  *See, e.g., In re Chrysler LLC*, 405 B.R. 84, 101-02 (Bankr. S.D.N.Y. 2009).  This

may have altered my conclusion herein regarding standing and whether or not the objections

asserted by the Second Lien Agent and the Second Lien Lenders were a violation of the

Intercreditor Agreement.

The stipulation that there is no "exercise of remedies" renders sections 3.1(a) and

3.1(d)(i) inapplicable to the standing issues before the Court. The crux of the issue thus becomes

the meaning of sections 3.1(b) and 3.1(g) of the Intercreditor Agreement.

There is little dispute that the Intercreditor Agreement is not a model of clarity with

respect to the narrow issues before the Court. The parties all but acknowledged that, were they

starting from scratch, the Intercreditor Agreement would be drafted differently. No arguments

were made or evidence adduced as to the intent of the Secured Parties and, accordingly, my

analysis is limited to interpreting the text of the specific provisions of the Intercreditor

Agreement.

Interpreting text requires some discussion and understanding of context. If one were to

explain, in lay terms, the purpose and function of an intercreditor agreement between first lien

parties and second lien parties, the explanation would include the notion, as the First Lien Agent

stated, that first lien lenders would be "in the driver's seat" when it came to decisions regarding

collateral.[10] In other words, or to use a different metaphor, the second lien lenders agree not to

use their subordinated lien as an offensive weapon against first lien lenders with respect to

collateral. Notwithstanding their agreement to be subordinated, second lien lenders do retain

certain rights under a typical intercreditor agreement, including the right to appear and be heard

in a bankruptcy case as unsecured creditors. This right includes making arguments that an

unsecured creditor would have the standing (and the economic interest) to assert and those

---

[10]    Statement of Credit Suisse AG, Cayman Islands Branch, in Support of the Debtors' Bidding Procedures
and Sale Motion (Docket No. 247) at 10.

arguments that are not otherwise expressly waived by the intercreditor agreement. *See Ion Media*, 419 B.R. at 595.

The Intercreditor Agreement is an enforceable agreement under section 510(a) of the Bankruptcy Code to the extent that it is a subordination agreement.  The Court should not and will not interpret it in a way that re-drafts or re-negotiates the Secured Parties' bargained-for rights.  If a secured lender seeks to waive its rights to object to a 363 sale, it must be clear beyond peradventure that it has done so.  Under New York law, the First Lien Lenders must point me to some provision that reflects an express or intentional waiver of rights.  *See Golfo v. Kycia Associates, Inc.*, 845 N.Y.S.2d 122, 124 (N.Y. App. Div.  2007) (compiling cases); Intercreditor Agreement section 9.11 (stating New York law applies).  For example, in the May 2010 issue of the *Business Lawyer*, the American Bar Association published the *Report of the Model First Lien/Second Lien Intercreditor Agreement Task Force* which contained a Model Intercreditor Agreement, including commentary (the "ABA Model Intercreditor").[11]  In section 6.2, the ABA Model Intercreditor contains an express waiver of the right to object to a sale pursuant to section 363 of the Bankruptcy Code.  It states,

> Second Lien Agent, as holder of a Lien on the Collateral and on behalf of the Second Lien Claimholders, will not contest, protest, or object, and will be deemed to have consented pursuant to section 363(f) of the Bankruptcy Code, to a Disposition of Collateral free and clear of its Liens or other interests under section 363 of the Bankruptcy Code if First Lien Agent consents in writing to the Disposition *provided* that….(i) the liens of the second lien creditors attach to the proceeds of such disposition to the extent so ordered by the court, (ii) the net cash proceeds are applied to reduce the first lien obligations permanently, and (iii) the second lien creditors will not be deemed to have waived any right to bid in connection with such disposition.

*Id*. at 858-59, 858 n.67. The language in the Intercreditor Agreement falls short of such clarity.

---

[11]    *See* 65 Bus. Law. 809.

The First Lien Agent argues that "[s]ection 3.1(b)(i) makes two points abundantly clear: first, that decisions as to whether the Collateral should be sold free and clear of liens are the exclusive province of the First Lien Agent; and second, that the Second Lien Lenders' protection comes not from overruling determinations by the First Lien Agent, but from the attachment of their liens to the proceeds of the sale."[12]  The First Lien Agent notes that section 3.1(b)(i) is conjunctive and gives the First Lien Agent "the exclusive right to enforce rights, exercise remedies . . . *and* make determinations regarding the release, sale, disposition or restrictions with respect to the Collateral" (emphasis added).[13]

The Second Lien Agent argues that, "[a]ll [Section 3.1(b)(i)] means is that the First Lien Lenders do not need to consult with the Second Lien Lenders, which has been obviously the case before and after the Petition Date.  But it simply does not prohibit the Second Lien Agent and the Second Lien Lenders from taking action on their own including objecting to a 363 Sale which the First Lien Lenders support."[14]  The Second Lien Agent argues, "[i]n light of the absence of an explicit prohibition against filing a 363 sale objection under the Intercreditor Agreement and the fact that general unsecured creditors can object to the Sale Transaction, the conferral under Section 3.1(g) of the Intercreditor Agreement to the Second Lien Agent and the Second Lien Lenders of rights of unsecured creditors must be viewed as granting such parties authorization to file the Objection."[15]

---

[12]    Statement of Credit Suisse AG, Cayman Islands Branch, in Support of the Debtors' Bidding Procedures and Sale Motion (Docket No. 247) at 8.

[13]    *Id.* at 10.

[14]    Objection of Second Lien Agent to Motion of the Debtors for Entry of an Order Approving and Authorizing (a) the Sale of Substantially All of the Assets of the Debtors Free and Clear of All Claims, Liens, Liabilities, Rights, Interests and Encumbrances; (b) the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement; (c) the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases; (d) the Transition Services Agreement; and (e) Related Relief (Docket No. 397) at 11.

[15]    *Id.* at 10.

Section 3.1(g)(iv) of the Intercreditor Agreement allows the Second Lien Agent to "file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Loan Parties arising under any Insolvency or Liquidation Proceeding or Applicable non-Bankruptcy Law, in each case not inconsistent with the terms of this Agreement . . . ."  The Second Lien Agent argues the Sale Transaction cannot be approved in accordance with section 363(b) of the Bankruptcy Code.  Its objections (other than its arguments relating to section 363(f)) assert rights and interests available to unsecured creditors.  Moreover, nothing in the Intercreditor Agreement specifically prohibits the Second Lien Agent from objecting to the Sale Transaction.  The Second Lien Agent is not asserting that it has the right to direct the First Lien Agent, nor is it requesting that the First Lien Agent consult with the Second Lien Agent.

Although I believe it goes against the spirit of the subordination scheme in the Intercreditor Agreement to allow the Second Lien Lenders to be heard and to attempt to block the disposition of the Collateral supported by the First Lien Agent, I am now (as I was at the Bid Procedures Hearing) constrained by the language of the Intercreditor Agreement.  After extensive briefing and oral argument as well as detailed review of the Intercreditor Agreement, the Court finds no provision which can be read to reflect a waiver of the Second Lien Agent's right to object to a 363 sale motion, either in its capacity as a Secured Party or in its capacity as an unsecured creditor.  Here, the perfect storm of a poorly drafted agreement, the ill-defined scope of section 3.1(g)'s retained right to object as an unsecured creditor, and the fact that, pursuant to the Secured Parties' own stipulation, there is "no exercise of remedies" leads me to conclude that the Second Lien Agent and Second Lien Lenders have standing to object to the 363 sale.

27

This reading of the Intercreditor Agreement is, to say the least, a very close call. While not dispositive, additional facts that enter into the Court's analysis include: (i) the fact that the issue here is a 363 sale of substantially all of the Debtors' assets outside of a plan of reorganization, which, if approved, will effectively deprive the Second Lien Lenders of the opportunity to vote, in an economically meaningful way, on a plan of reorganization[16] and (ii) as the Court found at the Bid Procedures Hearing, the Second Lien Lenders are on the "cusp" of a recovery and are not engaging in the type of obstructionist behavior identified by the Court in *Ion Media*.

As will become apparent, however, this is a somewhat hollow victory for the Second Lien Lenders, inasmuch as I have determined, after giving full consideration to the arguments and evidence presented by the Second Lien Agent and the objecting Second Lien Lenders, to approve the Sale Transaction.

## II.    Sale of the Debtors' Assets under Section 363

In order to determine that the Sale Transaction can be approved, the Court must determine, consistent with well-established Second Circuit law, that section 363 of the Bankruptcy Code can be utilized for the sale of substantially all of the Debtors' assets before confirmation of a plan of reorganization; that the necessary showings for approval of any section 363 sale have been made; that the proposed sale is not a "sub rosa" plan; that the section 363 sale does not run afoul of the District Court Opinions; and that various additional objections asserted by the Second Lien Agent and the objecting Second Lien Lenders; Algonquin; and the UCC have been resolved or addressed.

---

[16]    S*ee, generally, Bank of Am. v. North LaSalle St. L.P. (In re 203 North LaSalle St. Psp.)*, 246 B.R. 325, 331 (Bankr. N.D. Ill. 2000) (stating "§ 510(a), in directing enforcement of subordination agreements, does not allow for waiver of voting rights under § 1126(a)") and *Lionel*, 722 F.2d at 1070 (discussing the benefits of a plan process).

(a) **Utilization of Section 363**

Section 363(b) of the Bankruptcy Code provides, in relevant part, that, after notice and a hearing, a debtor-in-possession "may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  In *Lionel*, the Second Circuit was called upon to determine whether, pursuant to section 363(b) of the Bankruptcy Code, a major asset of a bankruptcy estate could be sold "out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization."  *See Lionel*, 722 F.2d at 1066.

In *Lionel*, the Second Circuit reviewed the history of a court's administrative power under the Bankruptcy Code to authorize asset sales.  Under the Bankruptcy Act, sales prior to confirmation had been limited to wasting assets, situations where the assets were physically perishable or likely to deteriorate in price.  *Id.* at 1067.  The Bankruptcy Reform Act of 1978 introduced section 363(b), which does not constrain a court with strict limitations on its ability to authorize a sale of assets and does not confine the use of section 363(b) to emergency situations only.  *Id.* at 1069.

In its decision, the Second Circuit articulated a standard for determining when to authorize a section 363(b) sale "prior to acceptance and outside of any plan of reorganization" which strikes a balance between a debtor's ability to sell its assets and the right of a creditor to an informed vote on a plan of reorganization.  The standard recognized some flexibility in allowing the court to do "what is best for the estate" while simultaneously reflecting the Second Circuit's view that section 363 does not grant a bankruptcy judge "carte blanche."  *Id.*

The *Lionel* Court concluded that there has to be some articulated business justification, other than appeasement of a particular creditor, for the use, sale or lease of a debtor's property outside of the ordinary course of business.  *Id.* at 1070.  Thus, a court rendering a section 363(b)

determination must "expressly find from the evidence presented . . . a good business reason to grant such application."  *Id.* at 1071.  This "good business reason" standard was articulated again in *In re Chateaugay Corp. (LTV Corporation)*, 973 F.2d 141, 143 (2d Cir. 1992), in which the Second Circuit affirmed a sale of substantially all assets of a debtor where the debtor articulated risk of loss of value of the assets.

In *Lionel*, the Second Circuit found that, in making its determination as to whether to authorize a sale of assets outside of a plan pursuant to section 363 of the Bankruptcy Code, a court should consider all of the "salient factors pertaining to the proceeding" and "act to further the diverse interests of the debtor, creditors and equity holders."  *Lionel*, 722 F.2d at 1071.  The Court then set forth a nonexclusive list of factors (the "*Lionel* Factors") to guide a court in its consideration of the issue, which are the following:

- the proportionate value of the asset to the estate as a whole,
- the amount of elapsed time since the filing,
- the likelihood that a plan of reorganization will be proposed and confirmed in the near future,
- the effect of the proposed disposition on future plans of reorganization,
- the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property,
- which of the alternatives of use, sale or lease the proposal envisions, and
- whether the asset is increasing or decreasing in value.

*Id.*  In his decision in *In re General Motors Corp.*, 407 B.R. 463, 490 (Bankr. S.D.N.Y. 2009) ("*GM*"), Judge Gerber also suggested that courts consider the following additional factors (the "*GM* Factors"), in appropriate cases:

- Does the estate have the liquidity to survive until confirmation of a plan?
- Will the sale opportunity still exist as of the time of plan confirmation?
- If not, how likely is it that there will be a satisfactory alternative sale opportunity, or a stand-alone plan alternative that is equally desirable (or better) for creditors? and

- Is there a material risk that by deferring the sale, the patient will die on the operating table?

In *GM*, Judge Gerber noted that each of the *Lionel* Factors, and the additional ones he suggested, support the ultimate questions that the *Lionel* Court identified:  Is there an "articulated business justification" and a "good business reason" for proceeding with the sale without awaiting the final confirmation of a plan?  *See id.*  In addition, per *Lionel*, a court must consider if those opposing the sale produced evidence that would rebut the articulated business justification.  *Lionel*, 722 F.2d at 1071.

The Court finds that the Debtors have an articulated business justification and a good business reason for selling their assets pursuant to section 363.  I am going to review those *Lionel* and *GM* Factors that were central to this dispute and bear most heavily on my analysis.

### *Lionel* **Factors:**

1. **The Likelihood That a Plan of Reorganization Will Be Proposed and Confirmed in the Near Future**

There is no basis on which the Court can find that a plan will be proposed and can be confirmed in the near future, let alone by April 30, 2011, which is the date on which the Debtors project they will run out of cash.

Matlin's proposed plan, which is reflected on a term sheet submitted on November 13 and clarified on November 14, is not confirmable.  The Matlin "plan" has the support of no constituency, indeed no party, other than Matlin – not even CarVal and Fortress, who helped lead the charge of the Second Lien Lenders at the Bid Procedures Hearing.  The Court finds persuasive the views of Mr. Wolf as to why the Matlin plan would be very difficult to confirm and does not reflect a commercially reasonable course of action for the Debtors.   In his declaration, Mr. Wolf expressed the following concerns about the Matlin proposal:

> [(a)] no lock-up of Fortress and CarVal; (b) no consent of the First Lien Lenders
> to the plan or even to take equity in partial satisfaction; (c) no plan support
> agreement from [Matlin]; (d) no consent to a priming [or *pari passu*] DIP loan; (e)
> DIP Financing subject to [Matlin]'s determination that there is a demonstrated
> need for financing; (f) unclear whether the proposed DIP financing is sufficient
> [to meet the Debtors' liquidity needs]; (g) no plan, just a plan term sheet; . . . (j)
> the view of the financial advisors to both the Special Committee and the Debtors,
> respectively, that [Matlin] had not demonstrated that the [Matlin] proposal was
> feasible.[17]

Mr. Zhugayer, the independent financial advisor for the Special Committee, testified that it
would have been "commercially reckless" to abandon the Constellation bid and embark on a free
fall bankruptcy in order to give Matlin an opportunity to secure support from additional
creditors.  The Court agrees with Mr. Zhugayer.

There has been no evidence adduced as to any other prospective plan of reorganization.

### 2. The Proceeds to Be Obtained from the Disposition vis-a-vis Any Appraisals of the Property

The value of the Debtors' assets is at the very heart of this case.  Since the beginning of
the case, the Second Lien Agent and objecting Second Lien Lenders have argued that the
Debtors are not getting fair market value for their assets.  While there are no appraisals *per se* of
the Debtors' assets, several data points indicate the potential value of their assets.  First, there is
the Sale Transaction, which represented the highest and best offer after a robust, open, and fair
process in which substantial marketing and due diligence materials were widely distributed.
Second, there is the bid submitted by the runner-up bidder in the pre-petition auction ("Bidder
B"), whose bid was very close in amount to Constellation's bid.  Third, there is Matlin's plan
proposal, which Matlin asserts reflects a value of $1.35 billion.  And finally, there is the
valuation opinion of Mr. Judah Rose, which reflects a $1.38 billion discounted cash flow

---

[17]    Declaration of William Howard Wolf in Support of Debtors' Motion for Sale of Substantially All of the
Debtors' Assets (Docket No. 465) at ¶ 89.

("DCF") valuation of the Debtors' assets.   Based on the entirety of the record, the Court finds

that the Sale Transaction is the best determination of the value of the Debtors' assets.

### (a) The $1.1 Billion Cash Sale Transaction

There is a great deal of evidence that the JPM sale process, both pre-petition and post-

approval of the Bid Procedures, was well-executed and robust.  No evidence was adduced during

the Sale Hearing that alters the Court's finding in the Bid Procedures Decision that the sale

process was properly executed to obtain the highest price.[18]  If anything, the robust post-petition

marketing improved the overall sale process.  JPM was knowledgeable about those parties that

might be interested in purchasing the Debtors' assets.  Information about the Debtors' business

and regulatory upside was appropriately highlighted.  Because the Debtors' sale process was

heavily marketed and potential buyers were presented with abundant information, the sale

process reflects a true test of value.

### (b) Bidder B's Pre-Petition Bid

Bidder B was actively engaged in the pre-petition auction process.  Bidder B is a

sophisticated party who has the industry, regulatory, and financial expertise to evaluate the

Debtors' assets and has sufficient capital to purchase the Debtors' assets.  Bidder B made a cash

bid very similar to, though slightly lower than, the Constellation bid.  During the Bid Procedures

Hearing, the Second Lien Lenders argued that the Debtors should have done more to continue

the bidding process after Bidder B declined to top Constellation's bid.  The existence and amount

of Bidder B's bid provides another data point regarding the value of the Debtors' assets.

### (c) Matlin's Plan Proposal

---

[18]    Mr. Carsten Woehrn, the lead banker on the JPM team that ran the sale process, was contemporaneously engaged on the sale process that was being conducted for the Comparable transaction discussed *infra*.  The Second Lien Lenders argue that this dual representation undercut and impaired the Debtors' sale process.  While not ideal, the fact that Mr. Woehrn was "wearing two hats" does not persuade the Court that the Debtors' sale process was negatively affected, or that JPM's discharge of its duties to the Debtors was compromised.

Matlin asserts that its proposal reflects an implied valuation of $1.35 billion. The record does not contain any evidence that supports this valuation. Among other things, no attempt was made to value the common stock component of the Matlin proposal. The most that can be said, based on the record of the Sale Hearing, is that Matlin purports to be willing to invest $250 million of cash to purchase preferred stock junior to $750 million of new secured debt in the reorganized Debtors.

Additionally, no other Second Lien Lender has agreed to participate in Matlin's proposal. CarVal and Fortress, who separately engaged ICF and Mr. Rose to advise them, have not signed on as co-proponents of the Matlin proposal. The lack of committed support for the Matlin proposal casts serious doubt on the implied value Matlin ascribes to it. *See, e.g., In re Chemtura Corp.*, --- B.R. ---, 2010 Bankr. LEXIS 3773, *123, 2010 WL 4272727, *16 (Bankr. S.D.N.Y. Oct. 21, 2010) (finding that lack of interest in proposals at certain values lends support to conclusion that value is too high).

**(d) The Rose Valuation**

Judah Rose, Managing Director of ICF and the Second Lien Agent's industry expert, was an impressive witness. It cannot be gainsaid that Mr. Rose is a leading expert on the energy industry generally and, in particular, on electric power. His declaration reflects a valuation that is detailed, thorough, and professional. Mr. Rose concluded, based on a DCF analysis, that the Debtors' assets are worth $1.38 billion.

There are numerous critical assumptions that underlie Mr. Rose's DCF valuation. First, there are economic assumptions that form the basis of the appropriate discount rate. Second, there are regulatory and economic assumptions about the Debtors' future revenue.

34

Small changes in assumptions result in substantial differences in value. *See In re Chemtura Corp.*, 2010 WL 4272727 at *6. For example, in order to perform his DCF analysis, Mr. Rose formed a view of the discount rate. He estimated the discount rate using the Capital Asset Pricing Model with an implied weighted after-tax cost of capital of 10.4%. Key economic assumptions that underlie his DCF valuation include, *inter alia*: the risk-free rate of return, nominal equity rate of return, nominal debt rate of return, and debt-to-equity ratio. Other than the risk-free rate of return, which is commonly dictated by U.S. Treasury prices, the other variables involve substantial judgment on which reasonable minds can disagree. The evidence demonstrates that a small variation in the assumptions causes a large swing in value.

The Debtors highlight how Mr. Rose's revenue projections far exceed the Debtors' own projections, particularly with respect to projected forward capacity prices. Mr. Rose testified that the most important determinant of value is the forward capacity price. Forward capacity prices are currently low because capacity far exceeds demand. Where capacity exceeds demand, power generators are economically willing to sell at their marginal cost. However, economically rational power generators will not build new plants until the forward capacity price equals the cost of new entry. Assuming demand growth and steady capacity, at some point, demand will grow to exceed capacity and a new power plant will need to be built (a point Mr. Rose refers to as "Equilibrium"). Equilibrium is the point at which Mr. Rose estimates prices will increase from the current price of approximately $3/kW-month (with a corresponding 2011 projected EBITDA of $69 million) to approximately $16/kW-month (with a corresponding 2018 projected EBITDA of $283 million).

The key variable in determining Equilibrium is demand growth. Mr. Rose believes that for the years 2012, 2013, and 2014, ISO-NE summer peak demand growth will be 2.8%, 2.8%,

and 1.9%, respectively.  ISO-NE's projections for the same period are 1.6%, 1.2%, and 1.3%, respectively.  These seemingly small differences cause multi-year shifts in the Equilibrium date.  Shifting Equilibrium by one year changes the value of the Debtors' assets by approximately $100 million.

Mr. Rose believes ISO-NE's demand growth projections are wrong.  He testified that ISO-NE has historically under-forecasted demand, while his forecasts have been historically correct.  Nonetheless, ISO-NE uses its forecasts to set prices and policy.  Mr. Rose posits that when actual future demand proves ISO-NE wrong, prices will be even higher, as ISO-NE will have failed to encourage appropriately timed new entry into the market.

Equilibrium is also accelerated by decreasing capacity.  Mr. Rose believes that older power plants that currently sell capacity into the forward capacity market will be retired in the near future.  He posits that increasingly onerous environmental regulation will make older polluting plants uneconomical and they will thus be retired.  One of these plants is Mystic 7 and is owned by the Debtors.  Thus, a buyer of the Debtors' assets will be able to influence market capacity.  The retirement of these plants will further decrease capacity.

Mr. Rose's demand and price projections are heavily contingent on a wide range of factors, including future regulatory reform, the timing of regulatory reform, demand for electricity (which is, in itself, contingent on broad economic factors), environmental regulation, retirement of competing plants, cost of plant operation, energy costs, construction costs, and other costs of new entry.   Changes to these variables result in dramatically different forward capacity prices and dramatic swings in value.

Given Mr. Rose's firm view that the Debtors' assets are worth $1.38 billion, what is the explanation for the quarter billion dollar gap between his valuation and the amount of the Sale

36

Transaction?  Simply put, Mr. Rose believes he is right and the market is wrong.  It is generally accepted, however, that absent a showing that there has been a clear market failure, the behavior in the marketplace is the best indicator of enterprise value.  *See, e.g.*, *In re Chemtura Corp.*, 2010 WL 4272727 at *16 n.106; *Bank of America Nat. Trust and Sav. Ass'n v. 203 North La Salle Partnership*, 526 U.S. 434, 457 (1999) (acknowledging "the best way to determine value is exposure to a market" rather than a determination by a bankruptcy judge); *In re Granite Broad. Corp.*, 369 B.R. 120, 143 (Bankr. S.D.N.Y. 2007) ("there is no dispute that in many circumstances the best evidence of value is what a third party is willing to pay in an arm's length transaction"); *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d. Cir. 2007) ("[a]bsent some reason to distrust it, the market price is 'a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.'" (citation omitted)).  Mr. Zughayer echoed this view in his testimony during the Sale Hearing, stating, "the market is very efficient . . . as long as you go to a broad enough swathe of potential buyers, the market will tell you what the asset is worth."  As Chief Judge Gonzalez noted in *Chrysler*, "the true test of value is the sale process itself."  *In re Chrysler LLC*, 405 B.R. at 98.

Mr. Rose posits that the market failure, in this case, is the failure to understand or anticipate future regulatory changes.  His analysis "assumes the value of the power plants is the value realizable via a sale process that adequately accommodates the expected reforms of the ISO-NE capacity market.  These reforms are currently being conducted by [FERC] . . . . FERC is scheduled to [issue its reform order] before March 1, 2011. . . . The goal is to provide adequate information to the set of potential purchasers of the EBG plants [on] the expected impacts of the forthcoming FERC Order."[19]  Mr. Rose explains the difference between the $1.1 billion Sale

---

[19]    Declaration of Judah Rose, dated November 15, 2010 at ¶ 15.  The Declaration of Judah Rose was admitted into evidence at the Sale Hearing.

Transaction and his valuation by stating, "First, the sale occurred before the market participants, especially the marginal buyer, had time to properly consider the impacts of the FERC reforms . . . . Second, Boston Generating and its professionals failed to provide adequate information about the potential increased revenues of the plant due to the fast moving reform process."[20]  The Court disagrees with Mr. Rose on these critical points, for the following reasons.

First, the Debtors and their professionals did provide adequate information to potential bidders about the possibility of increased revenues that could result from FERC reforms.  JPM's management presentation presented to bidders clearly highlight regulatory upside, specifically stating that "[p]roposed modifications to Forward Capacity Market . . . provide potential upside."[21]  The record at the Bid Procedures Hearing also includes detailed testimony and documentary evidence regarding potential regulatory developments elicited by Algonquin's counsel.  Interested parties, both strategic and financial – and including Bidder B – were sophisticated and experienced investors and industry participants who had the financial and regulatory expertise to analyze the public FERC docket.

Second, although armed with unfettered access to Mr. Rose's knowledge and expertise, CarVal and Fortress did not bid on the Debtors' assets.  Mr. Rose was retained by the Second Lien Agent, CarVal, and Fortress during the sale process.  The First Lien Agent introduced email correspondence between CarVal and Fortress, on the one hand, and Mr. Rose, on the other hand, in which CarVal and Fortress: (i) discuss bidding on the Debtors' assets, (ii) receive Mr. Rose's views on the very regulatory issues Mr. Rose posits that the market misunderstands, and (iii) demonstrate a high level of knowledge about the FERC issues, including issues specific to the Boston power market discussed extensively in Mr. Rose's testimony.   Thus, potential bidders

---

[20]      *Id.* at  ¶ 26.
[21]      Exhibit 41 (Sale Hearing) at p. 11.

with sufficient capital and demonstrated interest had actual knowledge of the key regulatory issues identified by Mr. Rose. They chose not to top Constellation's bid.[22]

In the Court's view, contrary to Mr. Rose's opinion, there was no market failure. Parties did obtain and process relevant information. In response to a direct question from the Court, Mr. Rose could not explain why no bidders (including his own clients) would pay more than $1.1 billion for the Debtors' assets. He reasoned that they did not understand the regulatory and economic environment, or that the market did not have the time (or the ability) to fully digest the complexities of the regulatory environment. In sum, Mr. Rose seems to be of the view that it was unlikely that anyone understood the issues other than him.

Lastly, Mr. Rose (and the Second Lien Lenders) touted the allegedly most comparable plant (the "Comparable") in support of his valuation. The Comparable's facility is similar to the Debtors' combined cycle plants in certain respects, as articulated by Mr. Rose, but it is also different in certain ways identified by Mr. Rose and in ways of which Mr. Rose was not aware. At the Sale Hearing, Mr. Rose conceded that power plants are not commodities, and his valuation explicitly states that comparable transactions are not the best way to value power plants. While the Comparable provides another data point, its existence does not change the Court's conclusion regarding the value of the Debtors' assets; certain confidential testimony given by Mr. Rose regarding the Comparable also does not change the Court's conclusion.[23]

---

[22]    *See In re Granite Broad. Corp.*, 369 B.R. at 140-141, noting that, in appropriate circumstances, "'[p]eople who must back their beliefs with their purses are more likely to assess the value of the [asset] accurately than are people who simply seek to make an argument.'" (quoting *In re Central Ice Cream Co.*, 836 F.2d 1068, 1072 n. 3 (7th Cir. 1987)); *In re Chemtura Corp.*, 2010 WL 4272727 at *16 n. 110 (same); *In re Central Ice Cream Co.*, 836 F.2d at 1072 n. 3 ("[a]stute investors survive in competition; those who do not understand the value of assets are pushed aside. There is no similar process of natural selection among expert witnesses and bankruptcy judges.").

[23]    There was no evidence presented on which the Court could base a conclusion that Mr. Rose can accurately predict market outcomes. In order to draw a conclusion as to the predictive validity of Mr. Rose's model, the Court would require evidence of how often the model accurately predicted market outcomes and how often it did not. In other words, there should be no cherry-picking of the data, i.e., pointing to one piece of data that supports a particular conclusion, while ignoring other data that may contradict that conclusion. *See Oxford English Dictionary*

Finally, it bears noting that Mr. Rose's valuation was presented *after* the Bid Deadline. The Second Lien Lenders, however, had retained Mr. Rose during the pre-petition marketing process; Mr. Rose attended the Bid Procedures Hearing; and Mr. Rose indicated that he would have been willing to testify to value at the Bid Procedures Hearing, if asked.  I do not fault Mr. Rose for the timing of his valuation.  However, there is no credible explanation for why his valuation was introduced so late in the process.  The Second Lien Agent apparently made a purposeful decision not to bring Mr. Rose's valuation forward until the thirteenth hour.  Here, where the Second Lien Lenders have relentlessly complained about the Debtors' process, it is worth noting how they chose to conduct themselves on this critical issue.

Based on the entirety of the evidence, the Court finds that the market price, represented by the Sale Transaction, is the best valuation for the Debtors' assets.

### 3.    Whether the Asset is Increasing or Decreasing in Value

In *Lionel*, the Second Circuit stated that this factor is to be the most important one, *see Lionel*, 722 F.2d at 1071; I find that it favors the proposed sale of the Debtors' assets.  The Debtors' liquidity in 2010 allowed them to engage in a robust marketing process and to position their assets for sale well ahead of the projected point in time when they would be perceived to be a distressed seller.  In light of the time between negotiating a new transaction and obtaining FERC approval, the Debtors' negotiating leverage will decrease if they are forced to sell their assets under duress arising from liquidity issues.  Decreased leverage inevitably leads to a lower price, worse terms, or both.

---

Online (November 2010), available at www.oed.com (defining "cherry-pick" as "to choose selectively (the most beneficial or profitable items, opportunities, etc.) from what is available").  At best, Mr. Rose's view of the Comparable reflects a piece of anecdotal evidence of questionable applicability to the Sale Transaction.

Mr. Rose asserted his belief that delay increases the value of the Debtors' assets because it will increase clarity on future regulatory reform.[24]  The Court disagrees.  This argument was extensively explored at the Bid Procedures Hearing.  The Court's findings in the Bid Procedures Decision still stand, and, as discussed *infra*, the value of the Debtors' assets may indeed have already declined.

## GM Factors:

### 1.  Does This Estate Have the Liquidity to Survive Until Confirmation of a Plan?

Mr. Hunter projects that, if the Debtors continue to operate through 2011, they will run out of cash on or about April 30, 2011.  This testimony was credible and consistent with his testimony at the Bid Procedures Hearing and confirms the Debtors' business judgment that they are liquidity-constrained and will have a negative cash position as of April 2011.

Certain objectors, including Matlin and the Second Lien Agent, argue that the Debtors have sufficient cash to operate until confirmation of a plan, which includes either a sale or a stand-alone restructuring.  The Court disagrees.  It is not reasonable to believe that these Debtors, in light of their current liquidity situation and capital structure, can confirm a plan without a great deal of litigation, and they certainly cannot confirm a plan in the near future.  Given the costs and time associated with confirming a plan under these circumstances, I find that the Debtors do not have the liquidity to survive until confirmation of a plan.

---

[24]    According to Mr. Rose, this occurs for three reasons.  First, any delay allows for improvements in the information provided to the market, especially if a delay extends the sale past March 1, 2011, the expected timing for the completion of the FERC regulatory reform process.  Second, there might be additional power plant sales transactions in the interim which might provide information on the value.  Third, the prices for capacity and energy are forecasted to increase over time given the expected reforms, and, as one approaches the date of this market improvement and reduced regulatory uncertainty, the large amount of discounting in Mr. Rose's DCF analysis is lessened.

2.    **Will the Sale Opportunity Still Exist As of the Time of Plan Confirmation?**

There is no evidence that the Sale Transaction will remain available, and the Second Lien

Agent concedes that it "probably" will not exist at the time a plan is confirmed.  Constellation

can terminate the Asset Purchase Agreement if the Court does not enter a sale order reasonably

satisfactory in form and substance to Constellation on or before November 24, 2010.  *See In re*

*General Motors Corp.*, 407 B.R. at 491 (discussing approval of the *Adelphia* section 363 sale

where intercreditor disputes made it impossible to confirm a plan in time to save the sale

opportunity).  Moreover, evidence was presented that natural gas prices have declined since

August 7, 2010 and (all other things being equal) this decline decreased the value of the Debtors'

assets.  Should Constellation remain interested in buying the Debtors' assets, there can be no

assurance (and it seems highly unlikely) that it would continue to agree to pay $1.1 billion in

cash for the assets.  The Second Lien Lenders bemoan the fact that Bidder B did not submit a

topping bid for the Debtors' assets.  Bidders routinely move on to the next transaction when it

suits their interests to do so.  It is a real possibility that Constellation may move on as well.

The fact that the Sale Transaction probably will not exist at the time of a plan

confirmation – whenever that might occur – weighs in favor of approving the Sale Transaction.

3.    **How Likely Is It that There Will Be a Satisfactory Alternative Sale Opportunity, or a Stand-Alone Plan Alternative That Is Equally Desirable (or Better) for Creditors?**

As discussed above, the record reflects that, on the Bid Deadline, Matlin tendered a

"proposal" to the Debtors.  The infirmities of the proposal were identified and discussed with

Matlin as reflected in the declaration filed by Mr. Wolf.  In addition, both Mr. Wolf and Mr.

Hunter testified that the Matlin proposal does not reflect a confirmable plan of reorganization.

The Court agrees.  No other potential bidder submitted a Qualified Bid to the Debtors by the Bid

Deadline which would lead me to conclude that an equally desirable or better alternative exists

now or will materialize in the future.

4.   **Is There a Material Risk That, by Deferring the Sale, the Patient Will Die On the Operating Table?**

The evidence presented by the Debtors leads the Court to conclude that, if the Debtors

were to abandon the Sale Transaction (deferral not being a realistic option), there is a material

risk that, although the Debtors may not "die," their condition would significantly deteriorate.

The Debtors do not have sufficient liquidity to continue operating without DIP financing, and,

even if they were to obtain such financing, there is no guarantee that they would be able to obtain

a different purchaser with a higher and better offer during the period in which financing remains

intact.  As the Court observed in the Bid Procedures Decision, if the Debtors were to wait until

they were severely cash-constrained, there well could be degradation in the value of their assets

simply because buyers may perceive that the Debtors needed to sell the assets immediately.

For all of the foregoing reasons, the Court concludes that there exists an articulated

business justification and a good business reason to grant the Sale Motion now and not wait for

confirmation of a plan of reorganization.

(b)   **Compliance with Standards for Approval of Section 363 Sales**

Having concluded that the requisite articulated business justification and good business

reason exist for the Sale Transaction, the Court now must determine whether the routine

requirements for section 363 sales, and appropriate exercise of the business judgment rule, have

been satisfied.  Specifically, in addition to determining that the Debtors have complied with the

business judgment rule, the Court must be satisfied that (i) proper notice has been given to all

creditors and interested parties; (ii) the proposed sale price is fair and reasonable; and (iii) the

purchaser is proceeding in good faith.  *See, e.g., In re General Motors Corp.*, 407 B.R. at 493-94.

The Court is satisfied that each of these factors has been met.  First, the Debtors provided appropriate notice of the sale to all interested parties.  Second, consistent with the Court's findings herein, the proposed purchase price is fair and reasonable.  The Debtors conducted a robust marketing process, and, despite testimony otherwise as to the potential value of the Debtors' assets, the Debtors received no higher and better offers.

I next turn to the question of whether the purchaser, Constellation, has acted in good faith.  The Court finds that, both for the purpose of approval of the sale and for the purpose of the protections provided by section 363(m) of the Bankruptcy Code, Constellation is a good faith purchaser.  No party has questioned Constellation's good faith in this process, and the evidence establishes that the negotiations between Constellation and the Debtors were conducted with integrity and at arms' length.

Consistent with the Court's Bid Procedures Decision, I again find that the Debtors have satisfied the business judgment rule.  The business judgment rule entails "(1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *In re General Motors Corp.*, 407 B.R. at 495 (citation omitted).

Both Matlin and the Second Lien Agent have, in essence, argued that the Debtors have not exercised due care or good faith in proposing the current Sale Transaction.  Matlin in effect argues that the Debtors are pursuing a federal foreclosure at the sole request of the First Lien Lenders.  Matlin further argues that the Debtors have abrogated their fiduciary duties by failing to abandon the Sale Transaction to continue to negotiate the plan of reorganization proposed by Matlin.  The Court disagrees.  To the contrary, as Chief Judge Gonzalez noted in *Chrysler*, "to suggest that the Debtors should have pursued proposals that could not have been consummated

. . . is to suggest that the Debtors should have breached their fiduciary duty." *In re Chrysler LLC*, 405 B.R. at 105.

The Debtors, in discharging their fiduciary obligations, must balance the interests of all creditors.  *See In re Integrated Resources*, 147 B.R. 650, 658 (S.D.N.Y. 1992).  In the Bid Procedures Decision, the Court found that the Debtors discharged their fiduciary duties to all creditors in good faith and satisfied the business judgment standard.  Nothing has come to light since that decision, including the new evidence adduced by the Second Lien Lenders regarding the tax implications and timing of the sale process via-a-vis the interests of USPG and its equity holders, that causes the Court to change its determination in that regard.  For the reasons articulated herein, the Court finds that the Debtors have demonstrated that the Special Committee's decision to move forward with the Sale Transaction now is a valid exercise of business judgment and that each of the factors of the business judgment test have been met.

**(c)  "Sub Rosa" Plan**

The Second Lien Agent and objecting Second Lien Lenders contend that, by proposing the Sale Transaction, the Debtors have proposed the implementation of a forbidden "sub rosa" plan.  The Court finds that they have not.

Caselaw in this Circuit and this District recognizes that "the debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan 'sub rosa' in connection with a sale of assets."  *See In re General Motors Corp.*, 407 B.R. at 495 (citing *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007)); *see also In re Chrysler LLC*, 405 B.R. at 97.  Here, the proposed sale of the Debtors' assets is not a "sub rosa" plan of reorganization.  The Debtors' assets are simply being sold; the First Lien Lenders will receive most of the proceeds in

45

accordance with their lien priority; and remaining consideration will be subsequently distributed under a plan. As the Court has held, the proposed Sale Transaction has a proper business justification and is not calculated to evade the plan confirmation process.

### III.    Sale Free and Clear Pursuant to Section 363(f)

Section 363(f) of the Bankruptcy Code authorizes a debtor to sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

1) applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

2) such entity consents;[25]

3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

4) such interest is in bona fide dispute; or

5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). The Second Lien Agent argues that none of the five conditions of section 363(f) has been satisfied.[26] The Debtors and the First Lien Agent argue that the Court can

---

[25]    While the First Lien Agent has consented to the Sale Transaction, *see* Statement of Credit Suisse AG, Cayman Islands Branch, as First Lien Agent, in Further Support of Debtors' Sale Motion (Docket No. 440) at 22, it takes the position that it is not, in doing so, exercising remedies as that term is used in the Intercreditor Agreement. Moreover, the Second Lien Agent apparently concedes that, if the First Lien Agent were exercising remedies in respect of the Collateral and releasing such Collateral, then the Collateral securing the liens of the Second Lien Agent would similarly be released. *See* Objection of Second Lien Agent to Motion of the Debtors for Entry of an Order Approving and Authorizing (a) the Sale of Substantially All of the Assets of the Debtors Free and Clear of All Claims, Liens, Liabilities, Rights, Interests and Encumbrances; (b) the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement; (c) the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases; (d) the Transition Services Agreement; and (e) Related Relief (Docket No. 397) at 15 n.11 (citing section 5.1(a) of the Intercreditor Agreement). The First Lien Agent further argues that section 5.1 of the Intercreditor Agreement is irrelevant and points instead to section 3.1(b)(i) as authority for the view that the Second Lien Agent's lien can be released incident to the consent of the First Lien Agent even in the absence of an exercise of remedies. The Court need not decide this deemed consent issue inasmuch as it finds that sections 363(f)(3) and 363(f)(5) are satisfied.

[26]    If the Court were to have held that the Second Lien Agent did not have standing or had standing only to object as an unsecured creditor, the Second Lien Agent arguably would not be able to assert its 363(f) objection.

nonetheless approve the Sale Transaction under section 363(f)(3), or alternatively, under section

363(f)(5).  The Court finds that both sections 363(f)(3) and section 363(f)(5) are satisfied.

### (a) Section 363(f)(3)

The Second Lien Agent argues that the Sale Transaction cannot satisfy the requirements

of section 363(f)(3) with respect to the liens of the Second Lien Lenders.  In support of its

position, the Second Lien Agent primarily relies on *Clear Channel Outdoor, Inc., v. Knupfer (In

re PW, LLC)*, 391 B.R. 25 (9th Cir. B.A.P. 2008) ("*Clear Channel*").  *Clear Channel* interpreted

the term "value," as used in section 363(f)(3), to refer to the face amount of the lien.

Accordingly, the Second Lien Agent argues that, in order to satisfy section 363(f)(3), the

proceeds of the Sale Transaction must exceed the aggregate amount of the First Lien Debt and

the Second Lien Debt, which amounts to approximately $1.45 billion.

I decline to follow *Clear Channel;* rather, on the whole, the Court finds cases such as *In

re Beker Industries Corp.*, 63 B.R. 474 (Bankr. S.D.N.Y. 1986) to be more persuasive than *Clear

Channel* in their interpretations of a less than perfect statutory provision.  As this Court held in

*Beker Industries*, section 363(f)(3) should be interpreted to mean that "the price must be equal to

or greater than the aggregate *value* of the liens asserted against it, not their *amount*."  *Id.* at 476

(emphasis added).[27]

The "value" of a lien is to be determined by reference to section 506(a) – that is, it is the

amount by which the lienholder's claim is actually secured.  *See Beker*, 63 B.R. at 475; *see also

United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 372

---

[27]    Admittedly, the reasoning of *Beker* is not free from doubt inasmuch as the words "equal to" do not, in fact,
appear in section 363(f)(3).  The key to *Beker*, however, is its focus on the value of the asserted liens, as opposed to
their amount, and its recognition that Congress, in enacting the Bankruptcy Code, consistently focused on protecting
the value of a lienholder's collateral and ensuring that a lienholder would not be deprived of its rights in collateral
without appropriate compensation.  Such is the case here, where a robust sale process, if consummated, will lead to
sale proceeds being distributed in accordance with lien priority.

(1988) ("The phrase 'value of such creditor's interest' in § 506(a) means 'the value of the collateral.'" (citations omitted)).  As this Court previously held, the best evidence of the value of the Debtors' assets is the $1.1 billion Constellation bid.  Based on Mr. Hunter's testimony, the proceeds of the Sale Transaction may be insufficient to pay the First Lien Debt in full; if that is the case, then the Second Lien Lenders' claims are not secured.  Under *Beker* and the many decisions of other Bankruptcy Courts following its reasoning, I find that section 363(f)(3) is satisfied.  To hold otherwise would effectively mean that most section 363 sales of encumbered assets could no longer occur either (a) absent consent of all lienholders (including those demonstrably out of the money) or (b) unless the proceeds of the proposed sale were sufficient to pay the face amount of all secured claims in full.  If section 363(f)(3) and (as discussed below) section 363(f)(5) are read in the manner suggested by the Second Lien Lenders, it seems unlikely that a Court, under any circumstance, could approve a non-consensual section 363 sale.  As both a practical matter and a matter of statutory construction, that cannot be the case.  It is hard to imagine that Congress intended to so limit a debtor's power to dispose of encumbered assets, particularly where such disposition otherwise satisfies the requirements of section 363(b).

### (b) Section 363(f)(5)

The Second Lien Agent argues that the Debtors have not met their burden to prove that the Second Lien Lenders could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of their liens.  It relies on *Clear Channel*, where the Court held that (i) the fact that a lender could be satisfied with money in respect of credit extended and (ii) the existence of cramdown under section 1129(d) did not mean there were legal or equitable proceedings that could compel satisfaction of a junior lien for less than payment in full.  *Clear Channel*, 391 B.R. at 45-47.  As noted above, this Court declines to follow *Clear Channel*.

Section 363(f)(5) does not require that the sale price for the property exceed the value of the

interests.  As recognized in a post-*Clear Channel* decision from a Bankruptcy Court in the Ninth

Circuit, the existence of judicial and nonjudicial foreclosure and enforcement actions under state

law can satisfy section 363(f)(5).  *See In re Jolan, Inc.*, 403 B.R. 866, 870 (Bankr. W.D. Wash.

2009).[28]  Numerous legal and equitable procedures exist by which the Second Lien Lenders

could be forced to accept less than full payment of the Second Lien Debt.[29]  Thus, the Court

finds that because the Second Lien Lenders could be compelled under state law to accept general

unsecured claims to the extent the sale proceeds are not sufficient to pay their claims in full,

section 363(f)(5) is satisfied.

### IV.    Objections of the Official Committee of Unsecured Creditors

The UCC argues that if the Sale Transaction is approved, the proceeds should be placed

in escrow pending the expiration of the UCC's challenge period.  The proposed sale order

provided for the distribution of substantially all the proceeds to the First Lien Lenders to pay

down the First Lien Debt, but it also provided for a holdback of funds sufficient to cover the

alleged amount of certain claims the UCC may seek standing to assert pursuant to *In re STN

Enterprises*, 779 F.2d 901, 904 (2d Cir. 1985) and its progeny. The Sale Transaction proceeds

withheld will ultimately fund distributions under a plan of liquidation.  The objections of the

UCC have thus been addressed.

---

[28]    *See also* Frank A. Oswald and Andy Winchell, "*Missing the Forest for the Trees in § 363: How the Ninth
Circuit's Bankruptcy Appellate Panel Neglected the Big Picture in the Clear Channel Decision*" No. 4 Norton
Bankr. L. Adviser 2 (April 2009).

[29]    Under New York law, a junior lienholder (either in a foreclosure of real property or of collateral under the
Uniform Commercial Code) is entitled to nothing more than the surplus cash generated in a sale.  *See, e.g.*, N.Y.
U.C.C. §§ 9-608, 9-615; *see also* N.Y. Real Prop. Acts. Art. 13.  Similar laws exist in Massachusetts.

### V.    Additional Objections

#### (a) Entire Fairness

Matlin argues that an entire fairness standard, rather than a business judgment standard,

should be applied to the Sale Transaction because, *inter alia*, members of the Debtors' Board,

other than Mr. Wolf, were affiliated with USPG (the Debtors' non-debtor ultimate parent).

Matlin alleges that those Board members stood to gain financially from tax benefits flowing to

USPG from the sale of the Debtors' assets.    The essence of Matlin's argument is that the

Debtors' sales process was "tainted" because the Debtors' USPG-affiliated board members had

"personal and economic allegiances to entities other than the Debtors."  Matlin thus argues that

an entire fairness standard is applicable to the Sale Transaction.  In addition, Matlin urges that

the "belated constitution" of the Special Committee with the power to make the ultimate decision

to move forward with the Sale Transaction is insufficient to "overcome entire fairness."[30]

Matlin argues that "when management is tainted by conflicts of interest, Delaware law

imposes a heavy burden on them to justify their decisions as entirely fair" and that, per the

decision in *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983), in order to satisfy the

"entire fairness" standard, the Debtors need to demonstrate both fair process and fair price.[31]

Contrary to Matlin's assertions, the Court finds that the Debtors' USPG-affiliated Board

members did not have personal and economic allegiances to entities other than the Debtors that

infected their decisions regarding disposition of the Debtors' assets.  Substantial testimony and

deposition designations were introduced, both at the Bid Procedures Hearing and the Sale

Hearing, that revealed, not surprisingly, that the Debtors and USPG engaged in tax planning.

---

[30]     Objection of MatlinPatterson Global Advisers LLC to the Motion of the Debtors for Entry of an Order
Approving and Authorizing the Sale of Substantially All of the Assets of the Debtors Free and Clear of Claims,
Liens, Liabilities, Rights, Interests and Encumbrances (Docket No. 404) at ¶¶ 2, 26, 33.
[31]     *Id.* at ¶ 25.

This tax planning focused on what other actions could be taken to produce the optimal tax results in the event of a 2010 sale of the Debtors' assets. Absent some other tax event (e.g., a deconsolidation or liquidation) the Sale Transaction will produce certain "negative" tax consequences. Matlin and the Second Lien Agent specifically argue that the timing of the Sale Transaction was motivated by securing tax benefits for USPG. The Court does not agree. The record does not support such a finding. Mr. Hunter, for example, stated that USPG would have been equally happy from a tax perspective to close the Sale Transaction in 2010 or 2011; indeed, under some tax scenarios, it may have been better to close the Sale Transaction in 2011. The documents, deposition designations, and testimony adduced by the Second Lien Agent on this point fail to convince the Court that there was a conflict regarding the timing of the sale process that infected the decision of the Board, or that the Board acted based on personal or economic allegiances to entities other than the Debtors.

Mr. Hunter testified that the timing of the Sale Transaction was motivated by concerns about the Debtors' liquidity and by advice rendered to the Debtors by their advisors concerning market conditions. The Debtors' Board, including those Board members affiliated with USPG, determined to sell the Debtors' assets in 2010 because they believed it would lead to the highest and best recovery for creditors and not for any improper purpose.

Finally, as to the actions of the Special Committee, the Court has already found that the Special Committee made an informed and reasonable choice to move forward with the Sale Transaction. The Court's conclusions in the Bid Procedures Decision regarding Mr. Wolf's active engagement, knowledge, and experience were, if anything, bolstered by the testimony at the Sale Hearing. The Special Committee received independent advice after the Bid Procedures were approved that assisted it in responding to post-petition bids. The Special Committee's

approval of the Sale Transaction provides "belt and suspenders" to an otherwise supportable decision of the Debtors' Board.

Accordingly, an entire fairness standard does not apply here. Additionally, even if an entire fairness standard were applicable, I find that the sale process and price are fair, for the reasons stated above.

**(b) Distribution of "Amounts Due" to the Second Lien Agent**

Under the distribution terms of the proposed sale order, substantially all of the Sale Transaction proceeds will be distributed immediately to the First Lien Agent and the First Lien Lenders. The proposed sale order did not reserve for "amounts due" to the Second Lien Agent as such term is used in section 4.1 of the Intercreditor Agreement.

The First Lien Agent and Second Lien Agent have disagreed about the interpretation of section 4.1 of the Intercreditor Agreement. Section 4.1, if applicable, directs that all "amounts due" to the First Lien Agent and the Second Lien Agent be paid before any interest or principal to First Lien Lenders. The First Lien Agent asserts that section 4.1 does not apply in the instant case because there has been no "exercise of remedies." The Second Lien Agent argues that section 4.1 applies to all distributions of Collateral.

The Court declines to determine in this decision what are essentially disputed priority rights between the First Lien Lenders and the Second Lien Lenders. Such decisions are more appropriately rendered during the plan process, or via adversary proceeding between the Secured Parties. *See, e.g., Contrarian Funds, LLC v. Westpoint Stevens Inc. (In re Westpoint Stevens Inc.)*, 333 B.R. 30, 51-52 (Bankr. S.D.N.Y. 2005). The Debtors should establish a reserve funded from the Sale Transaction proceeds in an amount that reasonably estimates the alleged

"amounts due" to the Second Lien Agent (including fees and expenses of counsel and advisors),

pending agreement by the Secured Parties or further order of the Court on this issue.

## CONCLUSION

After having given due consideration, among other things, to the factors set forth in

*Lionel* and in *General Motors*, the Court finds that all relevant standards have been established to

grant the relief requested by the Debtors.  Further, the Court finds that (i) the Sale Transaction is

consistent with the District Court Opinions and the Bankruptcy Code, (ii) the Sale Transaction

does not implement a "sub rosa" plan; (iii) the assets in the Sale Transaction can be sold free and

clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy

Code; and (iv) the protections of a good faith purchaser pursuant to section 363(m) shall apply to

Constellation.

The Sale Motion is granted in its entirety, and the Debtors' entry into and performance

under and in respect of the Asset Purchase Agreement and the Sale Transaction are hereby

approved.  All objections, if any, to the Sale Motion or the relief requested therein that have not

been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by

stipulation filed with the Court, and all reservation of rights included therein, are hereby

overruled, except as expressly provided in the final order approving the Sale Transaction entered

on November 24, 2010 (the "Sale Order").[32]

Consistent with and pursuant to the Court's bench ruling on November 24, 2010, this

opinion shall supersede such bench ruling, the text of which was filed as an exhibit to the Sale

Order; as indicated on the record on November 24, 2010, the filing of this opinion today shall not

---

[32]        Order Authorizing (A) the Sale of Substantially All of the Assets of the Debtors Free and Clear of All
Claims, Liens, Liabilities, Rights, Interests and Encumbrances; (B) the Debtors to Enter Into and Perform Their
Obligations Under the Asset Purchase Agreement; (C) the Debtors to Assume and Assign Certain Executory
Contracts and Unexpired Leases; (D) Approving the Transition Services Agreement; and (E) Granting Related
Relief (Docket No. 494).

affect the time period for filing a notice of appeal pursuant to Federal Rule of Bankruptcy

Procedure 8002 or the stay imposed by Federal Rules of Bankruptcy Procedure 6004(h) and

6006(d), which began to run on November 24, 2010.[33]

Dated: New York, New York                 /s/ Shelley C. Chapman
      December 3, 2010                 United States Bankruptcy Judge

---

[33]      The Court is aware that two notices of appeal and certain related motions were filed between November 30, 2010 and December 2, 2010.  The Court has not reviewed any of these pleadings prior to issuing this opinion.