**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| EBG Holdings LLC, <br> et al.,[1] | Case No. 10-14419 (SCC) |
| Debtors. | Jointly Administered |

**DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION OF BOSTON GENERATING, LLC, ET AL.**

LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
D. J. Baker
Robert J. Rosenberg
Caroline A. Reckler (appearing *pro hac vice*)
Kimberly A. Posin (appearing *pro hac vice*)

Counsel to the Debtors and Debtors-in-Possession

Dated: March 21, 2011

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: EBG Holdings LLC (3635); Boston Generating, LLC (0631); Fore River Development, LLC (7933); Mystic I, LLC (0640); Mystic Development, LLC (7940); BG New England Power Services, Inc. (0476); and BG Boston Services, LLC (6921).

I.      INTRODUCTION ...................................................................................................1

        A.      Overview of the Plan ................................................................................4
        B.      Voting Instructions ...................................................................................8
        C.      Confirmation of the Plan by the Bankruptcy Court ...............................10

II.     BACKGROUND OF THE DEBTORS .................................................................12

        A.      The Debtors .............................................................................................12
        B.      Summary of Certain Liabilities ..............................................................12
        C.      Restructuring Efforts and Events Leading to Chapter 11 .......................16

III.    THE CHAPTER 11 CASES ................................................................................17

        A.      Commencement of the Chapter 11 Cases ...............................................17
        B.      Retained Professionals ............................................................................18
        C.      First Day Orders ......................................................................................18
        D.      Appointment of Creditors' Committee ...................................................19
        E.      Cash Collateral ........................................................................................19
        F.      Sale of Assets ..........................................................................................22
        G.      The Second Lien LC Adversary Proceeding ..........................................27
        H.      The Creditors' Committee's Standing Motion .......................................28
        I.      The Creditors' Committee Motion to Convert ........................................29
        J.      The Claims Process ..................................................................................29
        K.      Settlements ..............................................................................................30
        L.      Substantive Consolidation of the Plan Debtors .....................................32
        M.      Dismissal of EBG's Chapter 11 Case .....................................................33

IV.     CHAPTER 11 PLAN ............................................................................................34

        A.      Plan Overview .........................................................................................34
        B.      Plan Summary ..........................................................................................35
        C.      Unclassified Claims .................................................................................35
        D.      Treatment of Classified Claims and Interests ........................................37
        E.      The Liquidating Trust, Dissolution of the Plan Debtors, and
                Cancellation of Existing Securities and Agreements ..............................41
        F.      Liquidating Trust Agreement ..................................................................44
        G.      Objections to Claims ...............................................................................44
        H.      Distributions Under the Plan ...................................................................45
        I.      Conditions to Confirmation .....................................................................47
        J.      Conditions to the Effective Date .............................................................48
        K.      Termination of Plan for Failure To Become Effective ...........................48
        L.      Modification of the Plan, Waiver of Conditions ....................................48
        M.      Effect of Confirmation ............................................................................49
        N.      Exculpation, Injunction, and Limitation of Liability .............................49
        O.      Retention of Jurisdiction .........................................................................52
        P.      Treatment of Executory Contracts and Unexpired Leases .....................54

Q.      No Admissions, Revocation of the Plan, Severability of Plan
Provisions, Entire Agreement ......................................................................56
R.      Preservation of Rights of Setoffs .................................................................56
S.      Exemption from Certain Transfer Taxes ......................................................57
T.      Successors and Assigns.................................................................................57
U.      Defenses with Respect to Unimpaired Claims..............................................57
V.      Dissolution of Creditors' Committee............................................................57

V.      CONFIRMATION OF THE PLAN..........................................................................57

A.      Confirmation Hearing ...................................................................................57
B.      Confirmation Standards ................................................................................57

VI.      FUNDING AND FEASIBILITY OF THE PLAN ..................................................58

A.      Funding of the Plan.......................................................................................58
B.      Best Interests Test ........................................................................................58
C.      Avoidance Action Analysis ..........................................................................59
D.      Feasibility.....................................................................................................60
E.      Risk Factors Associated with the Plan.........................................................60

VII.      ALTERNATIVES TO THE PLAN .........................................................................61

VIII.      CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS ......................62

A.      In General.....................................................................................................62
B.      U.S. Federal Income Tax Consequences to the Plan Debtors.......................63
C.      U.S. Federal Income Tax Treatment of the Liquidating Trust ......................65
D.      Disputed Claims Reserve .............................................................................66
E.      U.S. Federal Income Tax Consequences to Holders of Claims.....................66
F.      Backup Withholding and Information Reporting. ..........................................68

NY\1674006.14

**Exhibits To Disclosure Statement**

| Annex 1 | Debtors |
|---|---|
| Exhibit A | Joint Plan of Liquidation of Boston Generating, LLC, et al. |
| Exhibit B | Disputed Claims |
| Exhibit C | Liquidation Analysis |
| Exhibit D | Recovery Analysis |
| Exhibit E | Preferences |
| Exhibit F | Insider Payments |

## DISCLOSURE STATEMENT FOR JOINT PLAN OF
## LIQUIDATION OF BOSTON GENERATING, LLC, et al.

> **THE PLAN DEBTORS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS DISCLOSURE STATEMENT AT OR BEFORE THE CONFIRMATION HEARING.**

## I.
## INTRODUCTION

Boston Generating, LLC ("BosGen"), a Delaware limited liability company, and its affiliates and subsidiaries listed on Annex 1 hereto (other than EBG Holdings LLC ("EBG")) (collectively with BosGen, the "Plan Debtors"), provide this Disclosure Statement (the "Disclosure Statement") to certain of the Plan Debtors' impaired creditors to permit such creditors to make an informed decision in voting to accept or reject the Joint Plan of Liquidation of Boston Generating, LLC, et al. (the "Plan") Filed on March 21, 2011 with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in connection with the above-captioned cases (the "Chapter 11 Cases") filed pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). A copy of the Plan is attached to this Disclosure Statement as Exhibit A. Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code and Federal Bankruptcy Rule 3019, the Plan Debtors expressly reserve the right to alter, amend, modify, revoke, or withdraw the Plan prior to its substantial consummation.

**Capitalized terms used herein but not otherwise defined have the meanings assigned to such terms in the Plan.** Whenever the words "include," "includes" or "including" are used in this Disclosure Statement, they are deemed to be followed by the words "without limitation."

This Disclosure Statement is presented to certain holders of Claims against the Plan Debtors in accordance with the requirements of Section 1125 of the Bankruptcy Code. Section 1125 of the Bankruptcy Code requires that a disclosure statement provide information sufficient to enable a hypothetical and reasonable investor, typical of the Plan Debtors' creditors and stockholders, to make an informed judgment whether to accept or reject the Plan. This Disclosure Statement may not be relied upon for any purpose other than that described above.

The Disclosure Statement is based on information publicly available in pleadings Filed with the Bankruptcy Court, information provided by the Plan Debtors' management, claims information provided by The Garden City Group, Inc. ("GCG"), the Plan Debtors' claims agent, a liquidation analysis prepared by Perella Weinberg Partners LP ("PWP"), the Plan Debtors' financial advisor, and legal analysis by Latham & Watkins LLP ("Latham & Watkins"), counsel for the Plan Debtors.

**THIS DISCLOSURE STATEMENT AND THE PLAN ARE AN INTEGRAL PACKAGE, AND THEY MUST BE CONSIDERED TOGETHER FOR THE READER TO BE ADEQUATELY INFORMED. THIS INTRODUCTION IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS**

DISCLOSURE STATEMENT, AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN.

NO REPRESENTATIONS CONCERNING THE PLAN DEBTORS (PARTICULARLY AS TO THE VALUE OF THEIR PROPERTY) ARE AUTHORIZED BY THE PLAN DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE PLAN DEBTORS, WHO WILL IN TURN DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING ANY EXHIBITS CONCERNING THE FINANCIAL CONDITION OF THE PLAN DEBTORS AND THE OTHER INFORMATION CONTAINED HEREIN, HAS NOT BEEN SUBJECTED TO AN AUDIT OR INDEPENDENT REVIEW EXCEPT AS EXPRESSLY SET FORTH HEREIN. ACCORDINGLY, THE PLAN DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONCERNING THE PLAN DEBTORS OR THEIR FINANCIAL CONDITION IS ACCURATE OR COMPLETE. THE PROJECTED INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PRESENTED FOR ILLUSTRATIVE PURPOSES ONLY, AND, BECAUSE OF THE UNCERTAINTY AND RISK FACTORS INVOLVED, THE PLAN DEBTORS' ACTUAL RESULTS MAY NOT BE AS PROJECTED HEREIN.

ALTHOUGH AN EFFORT HAS BEEN MADE TO BE ACCURATE AND THE PLAN DEBTORS BELIEVE IN GOOD FAITH THAT THE INFORMATION HEREIN IS ACCURATE, THE PLAN DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS IS CORRECT. THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. EACH CREDITOR IS STRONGLY URGED TO REVIEW THE PLAN PRIOR TO VOTING ON IT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

A STATEMENT OF THE ASSETS AND LIABILITIES OF THE PLAN DEBTORS AS OF THE DATE OF THE COMMENCEMENT OF THEIR CHAPTER 11 CASES IS ON FILE WITH THE CLERK OF THE BANKRUPTCY COURT AND MAY BE INSPECTED BY INTERESTED PARTIES DURING REGULAR BUSINESS HOURS.

NY\1674006.14

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, INTERESTS IN OR SECURITIES OF, THE PLAN DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT ONLY IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY OTHER FEDERAL OR STATE REGULATORY AGENCY NOR HAS SUCH COMMISSION OR AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT WILL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN. EACH CREDITOR SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISERS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION OF VOTES ON THE PLAN, THE PLAN OR THE TRANSACTIONS CONTEMPLATED THEREBY.

Pursuant to the Bankruptcy Code, this Disclosure Statement and the Plan were Filed on March 21, 2011. The Bankruptcy Court will hold a hearing on confirmation of the Plan beginning at 10:00 a.m. (prevailing Eastern time) on June 1, 2011, before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, One Bowling Green, Room 610, New York, New York, 10004 (the "Confirmation Hearing"). At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code, including whether the Plan is in the best interests of the Plan Debtors' creditors, and will review a ballot report concerning votes cast for acceptance or rejection of the Plan.

To obtain, at your cost, additional copies of this Disclosure Statement or of the Plan, please contact GCG by telephone at 1.866.454.3498, by email at BGrestructuring@gcginc.com, or

**By First Class Mail at:**

The Garden City Group, Inc.
Attn: BG Bankruptcy Administration
P.O. Box 9648
Dublin, Ohio 43017-4948

**By Hand Delivery or Overnight at:**

The Garden City Group, Inc.
Attn: BG Bankruptcy Administration

5151 Blazer Parkway, Suite A
Dublin, OH 43017

The Disclosure Statement and the Plan have been electronically Filed with the Bankruptcy Court and may also be examined and inspected by interested parties by (i) accessing the Bankruptcy Court's website at www.nysb.uscourts.gov/ or (ii) accessing the website maintained by the Debtors in connection with their Chapter 11 Cases at www.bgrestructuring.com. Note that a PACER password is needed to access documents on the Bankruptcy Court's website.

A.     **Overview of the Plan**

**THE FOLLOWING IS A BRIEF SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY AND IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN AND THE LIQUIDATING TRUST AGREEMENT. CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN AND THE LIQUIDATING TRUST AGREEMENT CONTAINED IN SECTION IV OF THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF. THE PLAN IS ATTACHED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS.**

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganizations. The fundamental purpose of a chapter 11 case is to formulate a plan to restructure a debtor's finances so as to maximize recoveries to its creditors. With this purpose in mind, businesses sometimes use chapter 11 as a means to conduct asset sales and other forms of liquidation. Whether the aim is reorganization or liquidation, a chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors and stockholders with respect to their claims against and equity interests in a debtor's bankruptcy estate.

The Plan is a liquidating plan pursuant to which all of the Plan Debtors' remaining assets are to be transferred to a Liquidating Trust (subject to existing Liens and encumbrances, to the extent specified in the Plan) which will liquidate the Plan Debtors' assets; as and when any funds are realized from the sale or disposition of the assets, such funds will be distributed to certain holders of Allowed Claims, whose claims against the Plan Debtors will be exchanged for beneficial interests in the Liquidating Trust.

The Plan is premised on the substantive consolidation of the Plan Debtors with respect to the voting of all Claims and Interests and the treatment of all Claims and Interests and the dismissal of EBG's Chapter 11 Case. This means that the Plan Debtors propose to satisfy the claims of all of their respective creditors from a common pool comprised of their collective assets. If the Plan cannot be confirmed as to some or all of the Plan Debtors, in the Plan Debtors' sole discretion after consultation with the First Lien Facility Agent, (a) the Plan may be revoked as to all of the Plan Debtors, or (b) the Plan Debtors may revoke the Plan as to any Plan Debtor not satisfying the cramdown requirements of Section 1129(b) of the Bankruptcy Code (with any such Plan Debtor's Chapter 11 Case then being converted to a chapter 7 liquidation,

continued or dismissed as may be determined in the Plan Debtors' sole discretion) and confirm the Plan as to the remaining Plan Debtors. A list of each Debtor and its corresponding Chapter 11 Case docket number is attached hereto as <u>Annex 1</u>. Each of the Debtors (other than EBG) is a proponent of the Plan.

The Plan divides the Claims against and Interests in the Plan Debtors into Classes. Certain Claims – in particular, the First Lien Facility Superpriority Claim, Administrative Expense Claims, Statutory Fees, Professional Claims and Priority Tax Claims – remain unclassified in accordance with Section 1123(a)(1) of the Bankruptcy Code. The Bankruptcy Code entitles only holders of impaired claims or equity interests who receive some distribution under a proposed plan to vote to accept or reject that plan. Holders of claims or equity interests that are unimpaired under a proposed plan are conclusively presumed to have accepted that plan and are not entitled to vote on it. Holders of claims or equity interests that are expected to receive no distributions under a proposed plan are conclusively presumed to reject that plan and, therefore, are also not entitled to vote on it. The Plan assigns all other Claims and Interests as described below:

**Class 1** consists of all Other Priority Claims, which includes any Claim, other than an Administrative Expense Claim, the First Lien Facility Superpriority Claim, or a Priority Tax Claim, of a Creditor to the extent such Claim is entitled to priority pursuant to Bankruptcy Code Section 507(a). On the Effective Date or as soon thereafter as is reasonably practicable in recognition of the applicable claims reconciliation process set forth in the Plan, each holder of an Allowed Other Priority Claim shall receive on account of the Allowed Other Priority Claim and in full satisfaction, settlement and release of and in exchange for such Allowed Other Priority Claim, (a) Cash equal to the amount of such Allowed Other Priority Claim, or (b) such other treatment as to which the Plan Debtors and the holder of such Allowed Other Priority Claim have agreed upon in writing. Class 1 is Unimpaired and will be deemed to accept the Plan without voting on the Plan.

**Class 2** consists of the First Lien Facility Secured Claim. On the Effective Date or, solely with respect to distributions of the Available Cash, as soon thereafter as is reasonably practicable in recognition of the applicable claims reconciliation process set forth in the Plan, the First Lien Facility Agent shall receive, for the benefit of the First Lien Facility Lenders and the Hedge Bank, in full satisfaction, settlement and release of and in exchange for the First Lien Facility Secured Claim, (a) the Adjusted Cash Amount, plus (b) any Available Cash (other than any Net Avoidance Action Proceeds and Other Superpriority Proceeds) after payment in full of all Allowed Administrative Expense Claims (other than the First Lien Facility Superpriority Claim), Allowed Priority Tax Claims and Allowed Other Priority Claims. Until the First Lien Facility Secured Claim is paid in full in Cash, the Liens securing the First Lien Facility Secured Claim shall remain on the Available Cash, provided the Plan Debtors and their Estates shall have no further liability therefor. The First Lien Facility Deficiency Claim shall not constitute a Class 2 First Lien Facility Secured Claim and shall be treated as a Class 4 General Unsecured Claim. Class 2 is Impaired and may vote to accept or reject the Plan.

**Class 3 et seq.** consists of all Other Secured Claims. This Class is subdivided into subclasses designated by letters of the alphabet (Class 3A, Class 3B and so on), so that each holder of any Other Secured Claim is in a Class by itself, except to the extent that there are Other

NY\1674006.14

Secured Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified Other Secured Claims. On the Effective Date or as soon thereafter as is practicable in recognition of the applicable claims reconciliation process set forth in the Plan, each holder of an Allowed Other Secured Claim that was not assumed by the Purchaser in connection with the 363 Sale shall receive, in full satisfaction, settlement and release of and in exchange for such Allowed Other Secured Claim, (i) the collateral securing any such Allowed Other Secured Claim (to the extent such collateral does not constitute collateral securing the First Lien Facility Secured Claim on a senior basis) or (ii) such other treatment that leaves such Allowed Other Secured Claim Unimpaired pursuant to Section 1124(2) of the Bankruptcy Code. The Other Secured Claim Liens shall be released and the Plan Debtors and their Estates shall have no further liability therefor; provided, however, that any Deficiency Claims of holders of Class 3 Other Secured Claims shall not constitute Class 3 Other Secured Claims and shall be treated as Class 4 General Unsecured Claims pursuant to the Plan. Class 3 is Unimpaired and will be deemed to accept the Plan. For the avoidance of doubt, the Second Lien Facility Agent and Second Lien Facility Lenders have only a Second Lien Facility Deficiency Claim against the Plan Debtors and their Estates.

**Class 4** consists of all General Unsecured Claims. On the Effective Date or as soon thereafter as is practicable in recognition of the applicable claims reconciliation process set forth in the Plan, the holders of Allowed General Unsecured Claims shall receive, in full satisfaction, settlement and release of and in exchange for such Allowed General Unsecured Claims (a) any Net Avoidance Action Proceeds and Other Superpriority Proceeds after payment in full of the First Lien Facility Superpriority Claim, Allowed Administrative Expense Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims and (b) any Available Cash (other than any Net Avoidance Action Proceeds and Other Superpriority Proceeds) after payment in full of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, the First Lien Facility Secured Claim and the First Lien Facility Superpriority Claim. Holders of Allowed General Unsecured Claims shall be Beneficiaries; it being understood that distributions from the Liquidating Trust shall be exclusively governed in accordance with Section 10.8 of the Plan. Class 4 is Impaired, is not expected to receive any distribution, and will be deemed to reject the Plan.

**Class 5** consists of all Intercompany Claims. Holders of Intercompany Claims will not receive any distribution of property under the Plan on account of their Intercompany Claims and, on the Effective Date, the Intercompany Claims will be cancelled; provided, however, Class 5 shall exclude any claims of a Plan Debtor against a non-Plan Debtor Affiliate. Class 5 is Impaired and will be deemed to reject the Plan.

**Class 6** consists of all Interests arising from or relating to Old Equity. Holders of Old Equity Interests will not receive and will not retain any property of the Plan Debtors under the Plan on account of such Interests and all Old Equity Interests will be cancelled as of the Effective Date. Class 6 is Impaired and will be deemed to reject the Plan.

**Class 7** consists of all Claims and Interests arising from or relating to Old Equity Rights. Holders of any Claim or Interest arising from or relating to Old Equity Rights will not receive and will not retain any property of the Plan Debtors under the Plan on account of such Claim or Interest and all Old Equity Rights and any Interests or Claims arising from or relating

thereto will be cancelled as of the Effective Date.  Class 7 is Impaired and will be deemed to reject the Plan.

The Plan Debtors believe that the distributions under the Plan will provide Creditors of the Plan Debtors at least the same recovery on account of Allowed Claims as would distributions by a chapter 7 trustee.  However, distributions under the Plan to Creditors of the Plan Debtors would be made more quickly than distributions by a chapter 7 trustee and a chapter 7 trustee would charge a substantial fee, reducing the amount available for distribution on account of Allowed Claims.

1.      **Summary of Estimated Allowed Claims**

Following are detailed, Class-by-Class summaries of the estimated Allowed Claims against the Plan Debtors and the estimated distribution to the Creditors of the Plan Debtors on account of such Allowed Claims.

The Plan Debtors calculated the total asserted claims (other than Administrative Expense Claims)[1] based on Filed and scheduled claims.  To the extent a Creditor Filed a proof of claim that superseded a scheduled claim, the amount in the Filed proof of claim was utilized.

The Plan Debtors then reviewed all of the proofs of claims asserting Priority Tax Claims, Other Priority Claims, Other Secured Claims, and a large sample size of the proofs of claims asserting General Unsecured Claims.

The Plan Debtors then determined a range of estimated Allowed Claims by reducing asserted claim amounts for duplicate claims, amended claims, misclassified claims, settled claims, repaid claims and claims that lack merit.  For purposes of the analysis that follows the Plan Debtors assume the Effective Date will occur on or about June 17, 2011.

**THE RECOVERY PERCENTAGES SET FORTH IN THE FOLLOWING TABLE ARE MERELY ESTIMATES.  THE ACTUAL AMOUNTS DISTRIBUTED TO HOLDERS OF ALLOWED CLAIMS UNDER THE PLAN MAY BE HIGHER OR LOWER THAN ESTIMATED.**

| Class | Description | Approximate Amount Asserted | Range of Estimated Recovery for Allowed Claims | Status |
|-------|-------------|------------------------------|--------------------------------------------------|--------|
| N/A | First Lien Facility Superpriority Claim | $[•] | [•]% | Unclassified and not entitled to vote |
| N/A | Administrative Expense Claims | $[650,000][2] | 100% | Unclassified and not entitled to vote |

---

[1]      Asserted Administrative Expense Claims are based on filed, accrued and budgeted amounts.

[2]      This amount does not include Professional Claims, the First Lien Facility Superpriority Claim or Statutory Fees.  Because the Administrative Expense Claims Bar Date has not yet passed, additional Administrative Expense Claims may be asserted.

| Class | Description | Approximate Amount Asserted | Range of Estimated Recovery for Allowed Claims | Status |
|-------|-------------|-----------------------------|-------------------------------------------------|--------|
| N/A | Priority Tax Claims | $53,872 | 100% | Unclassified and not entitled to vote |
| N/A | Statutory Fees | $100,000 | 100% | Unclassified and not entitled to vote |
| N/A | Professional Claims | $11,458,000[3] | 100% | Unclassified and not entitled to vote |
| 1 | Other Priority Claims | $21,074[4] | 100% | Unimpaired, deemed to accept the Plan and not entitled to vote |
| 2 | First Lien Facility Secured Claim | $[•] | [__]% | Impaired and entitled to vote |
| 3 | Other Secured Claims | $2,936,621.59[5] | 100% | Unimpaired, deemed to accept the Plan and not entitled to vote |
| 4 | General Unsecured Claims | Unknown[6] | 0% | Impaired, deemed to reject the Plan and not entitled to vote |
| 5 | Intercompany Claims | $904,137,378 | 0% | Impaired, deemed to reject the Plan and not entitled to vote |
| 6 | Old Equity | N/A | 0% | Impaired, deemed to reject the Plan and not entitled to vote |
| 7 | Old Equity Rights | N/A | 0% | Impaired, deemed to reject the Plan and not entitled to vote |

## B.    Voting Instructions

   **THE PLAN DEBTORS STRONGLY RECOMMEND EACH CREDITOR ENTITLED TO VOTE ON THE PLAN VOTE TO <u>ACCEPT</u> THE PLAN.**

---

[3]    This amount includes certain Professional Claims that may be paid prior to the Effective Date of the Plan.

[4]    The Plan Debtors have objected or will object to all of these Claims as being improperly classified as priority claims.

[5]    The Plan Debtors have estimated all Claims filed in unliquidated, unstated or unknown amounts at $0. Each of the Claims reflected in the approximate amount asserted have either been improperly classified as Secured Claims, have already been paid or were assumed by the Purchaser.

[6]    Asserted General Unsecured Claims include the First Lien Facility Deficiency Claim in the amount of $[•], the Second Lien Facility Deficiency Claim in the amount of $352,278,777.67, the Claims of EBG against the Plan Debtors in the amount of $310,699.92, and a variety of other General Unsecured Claims many of which have already been paid or have been asserted in an unliquidated amount. The Plan Debtors have not completed their analysis of the validity of filed General Unsecured Claims.

The holders of Claims in Class 1 and Class 3 are not Impaired under the Plan. Thus, pursuant to Section 1126(f) of the Bankruptcy Code, the claimants in Class 1 and Class 3 are deemed to have accepted the Plan and are not entitled to vote.

The holders of the Class 2 Claim are Impaired but are expected to receive a distribution under the Plan and may vote to accept or reject the Plan. The Plan Debtors have enclosed Ballots with this Disclosure Statement to solicit the votes of the holders of the Class 2 Claim.

The holders of Claims and Interests in Class 4, Class 5, Class 6, and Class 7 are not expected to receive any distribution under the Plan. Thus, pursuant to Section 1126(g) of the Bankruptcy Code, holders of Claims and Interests in Class 4, Class 5, Class 6, and Class 7 are deemed to have rejected the Plan and such holders are not entitled to vote on the Plan.

**A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF THE CLASS 2 CLAIM. BEFORE VOTING, SUCH HOLDERS SHOULD READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS, INCLUDING THE PLAN AND THE PLAN DOCUMENTS, IN THEIR ENTIRETY.**

You should use the Ballot sent to you with this Disclosure Statement to cast your vote for or against the Plan. **You may not cast Ballots or votes orally or by facsimile. In order for your Ballot to be considered by the Bankruptcy Court, it must be received at the address set forth on the Ballot by 4:00 p.m. (prevailing Eastern time) on [_____] (the "Voting Deadline").** If you are a claimant in Class 2, and you did not receive a Ballot with this Disclosure Statement, please contact GCG by telephone at 1.866.454.3498, by email at BGrestructuring@gcginc.com, or:

**By First Class Mail at:**

The Garden City Group, Inc.
Attn: BG Bankruptcy Administration
P.O. Box 9648
Dublin, Ohio 43017-4948

**By Hand Delivery or Overnight at:**

The Garden City Group, Inc.
Attn: BG Bankruptcy Administration
5151 Blazer Parkway, Suite A
Dublin, OH 43017

Only holders of Allowed Claims in Impaired Classes of Claims which are not deemed to reject the Plan are entitled to vote on the Plan. Any Ballot executed by such holder of an Allowed Claim, but which does not indicate acceptance or rejection of the Plan, will be considered a vote to accept the Plan. Any Ballot not executed by the holder of an Allowed

Claim will not be counted as a vote to accept or reject the Plan, although it may impact the approval of the Plan as immediately set forth below.

An Impaired Class of Claims is deemed to accept the Plan if at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in the Class that actually vote are cast in favor of the Plan. Whether or not a Creditor or Interest holder votes on the Plan, such Person will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities of the holders of the Class 2 Claim and is confirmed by the Bankruptcy Court, *provided* that each member of Class 2 will receive property of a value, as of the Effective Date, that is not less than the amount such Class member would receive or retain if the Plan Debtors were liquidated under chapter 7 of the Bankruptcy Code. Pursuant to the provisions of Section 1126(e) of the Bankruptcy Code, the Bankruptcy Court may disallow any vote accepting or rejecting the Plan if such vote is not cast in good faith.

The Plan Debtors or other parties in interest may dispute proofs of Claims or Interests that have been Filed or that the Plan Debtors listed as disputed in the schedules the Plan Debtors Filed with the Bankruptcy Court. A list of all Claims which the Plan Debtors have disputed as of the date hereof is attached hereto as <u>Exhibit B</u>. Persons whose Claims are disputed may vote on or otherwise participate in distributions under the Plan only to the extent that the Bankruptcy Court allows their Claims. The Bankruptcy Court may temporarily allow a Claim for voting purposes only. Allowance of a Claim for voting purposes or disallowance of a Claim for voting purposes does not necessarily mean that all or a portion of that Claim will be allowed or disallowed for distribution purposes. The Plan Debtors' Schedules listing Claims and whether such Claims are disputed can be inspected online at www.bgrestructuring.com.

## C.      Confirmation of the Plan by the Bankruptcy Court

Once it is determined whether Class 2 has or has not accepted the Plan, the Bankruptcy Court will determine whether the Plan may be confirmed. **Class 4, Class 5, Class 6, and Class 7 are expected to receive no distributions on account of their respective Claims and Interests and are therefore deemed to have rejected the Plan.** However, the Bankruptcy Court may confirm the Plan even if all but one of the Impaired Classes do not accept the Plan if the Bankruptcy Court finds that the remaining Impaired Class of Claims (not including any acceptances by "insiders" as defined in Section 101(31) of the Bankruptcy Code) has accepted the Plan and that certain additional conditions are met. The Plan Debtors will therefore request that the Bankruptcy Court confirm the Plan under Section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class of Claims or Interests.

Section 1129(b) of the Bankruptcy Code is generally referred to as the "cramdown" provision. Pursuant to the cramdown provision, the Bankruptcy Court may confirm the Plan over the objection of a non-accepting Class of Secured Claims if the Plan satisfies one of the alternative requirements of Section 1129(b)(2)(A) of the Bankruptcy Code, including (a)(I) that the holders of such Secured Claims retain the liens securing such Claims, whether the property subject to such liens is retained by the Plan Debtor or transferred to another entity, to the extent of the allowed amount of such Claims; and (II) that each holder of a Secured Claim of such Class receive on account of such Claim deferred cash payments totaling at least the allowed amount of such Claim, of a value, as of the Effective Date, of at least the value of such holder's

interest in the Plan Debtor's Estate's interest in such property; (b) where there is a sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such Claims free and clear of such liens, such liens attach to the proceeds of such sale, and such liens on proceeds are treated as provided under subparagraph (a) or (c) hereof; or (c) such holders realize the indubitable equivalent of such Claims. Likewise, the Bankruptcy Court may confirm the Plan over the objection of a non-accepting Class of Unsecured Claims if the non-accepting claimants will receive the full value of their Claims, or, if the non-accepting claimants receive less than full value, if no Class of junior priority will receive anything on account of their pre-petition Claims or Interests.

If the Plan does not meet the cramdown requirements as set forth above with respect to all of the Plan Debtors, in the Plan Debtors' sole discretion after consultation with the First Lien Facility Agent, (a) the Plan may be revoked as to all of the Plan Debtors, or (b) the Plan Debtors may revoke the Plan as to any Plan Debtor not satisfying the cramdown requirements (with any such Plan Debtor's Chapter 11 Case being converted to a chapter 7 liquidation, continued or dismissed in the Plan Debtors' sole discretion) and confirm the Plan as to the remaining Plan Debtors.

**THESE ARE COMPLEX STATUTORY PROVISIONS, AND THE PRECEDING PARAGRAPHS ARE NOT INTENDED TO BE A COMPLETE SUMMARY OF THE LAW. IF YOU DO NOT UNDERSTAND THESE PROVISIONS, PLEASE CONSULT WITH AN ATTORNEY QUALIFIED TO PROVIDE ADVICE ON SUCH PROVISIONS. BECAUSE CLASSES 4, 5, 6, AND 7 RECEIVE NO DISTRIBUTIONS ON ACCOUNT OF THEIR RESPECTIVE CLAIMS AND INTERESTS AND ARE THUS DEEMED TO HAVE REJECTED THE PLAN, THE PLAN DEBTORS INTEND TO RELY UPON THE "CRAMDOWN" PROVISION OF SECTION 1129(b) OF THE BANKRUPTCY CODE.**

The Plan provides for the liquidation of substantially all of the property of the Plan Debtors' Estates, which consists primarily of Cash. Pursuant to Section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan will not discharge the Plan Debtors from any of their debts which arose prior to the Petition Date, however, Confirmation will make the Plan binding upon the Plan Debtors, their Creditors, holders of Claims and Interests, the Liquidating Trust and other parties in interest regardless of whether they have accepted the Plan.

The Plan is premised on the substantive consolidation of all of the Plan Debtors with respect to the treatment of all Claims and Interests and the dismissal of EBG's Chapter 11 Case. The Plan serves as a request by the Plan Debtors, in lieu of a separate motion, to the Bankruptcy Court that it grant substantive consolidation with respect to the treatment of all Claims and Interests of the Plan Debtors and a request by EBG, in lieu of a separate motion, to the Bankruptcy Court that it grant dismissal of EBG's Chapter 11 Case.

# II.
# BACKGROUND OF THE DEBTORS

## A.    The Debtors

Prior to the closing of the 363 Sale, the Debtors were a wholesale power generation company that owned and operated three electric power generating facilities located in the Boston metropolitan area. The Debtors' operation of these facilities was vital to maintaining a reliable electricity supply to the city of Boston and surrounding communities. Prior to the 363 Sale, the Debtors generated revenues by selling electric energy, installed capacity and ancillary services. In addition, the Debtors used a variety of derivative instruments and other long-term contracts to manage the various risks and market price fluctuations inherent in the conversion of fossil fuels to electric energy.

Debtor EBG is the parent company of BosGen and has operated mainly as a holding company with no significant independent business operations. Debtor EBG is a wholly owned subsidiary of non-debtor US Power Generating Company ("US PowerGen"). Debtor BosGen was the main operating entity of Debtor EBG prior to the closing of the 363 Sale.

Prior to the closing of the 363 Sale, (a) Debtor Mystic I, LLC owned Mystic Station, which included the Mystic 7 and Mystic Jet power generating units, (b) Debtor Mystic Development, LLC owned the Mystic 8 and Mystic 9 power generating units ("Mystic 8&9"), (c) Debtor Fore River Development, LLC owned the Fore River power generating unit and (d) Debtors BG Boston Services, LLC and BG New England Power Services, Inc. provided union plant personnel for the plants, and Debtor BG New England Power Services, Inc. also provided all salaried employees for the Company.

Pursuant to the terms of an asset management agreement by and between US PowerGen, Astoria Generating Company Acquisitions, LLC and BosGen dated January 1, 2008 (as amended and restated on July 30, 2010, the "Asset Management Agreement"), the Company has historically received management and energy services from USPG Power Services, Inc., as successor to Astoria Generating Company Acquisitions, LLC's responsibilities under the Asset Management Agreement. USPG Power Services, Inc. is a subsidiary of US PowerGen. On February 10, 2011, the Debtors Filed a motion with the Bankruptcy Court seeking authorization to amend and restate the Asset Management Agreement to reduce the scope of the services provided thereunder and the amounts of related fees paid by the Debtors (the "AMA Motion"). Pursuant to the proposed amendment, the fees paid by the Debtors under the Asset Management Agreement for January 2011 will be recharacterized as payment for services from January 3, 2011 through June 30, 2011. A hearing on the AMA Motion has been scheduled for April 25, 2011.

## B.    Summary of Certain Liabilities

On December 21, 2006, BosGen entered into a first lien secured credit facility agreement and a second lien secured credit facility agreement. Also on December 21, 2006, EBG entered into an unsecured credit facility agreement. Each of the credit facilities and the amounts owed thereunder is described below. None of the Debtors' credit facilities are (i)

guaranteed by US PowerGen or any of its non-Debtor subsidiaries or (ii) secured by any of these non-Debtor entities' assets.

| Type of Prepetition Indebtedness | Approximate Amount of Outstanding Debt as of Petition Date[7] |
| --- | --- |
| First Lien Debt<br>    Revolver<br>    Term B | $1,107,950,000 (in the aggregate)<br>    $17,500,000<br>    $1,090,450,000 |
| Second Lien Debt | $350,000,000 |
| Mezzanine Debt | $422,578,510 |
| Trade Debt (unsecured) | $9,457,516 |

    *First Lien Debt*:  The first lien facility (the "First Lien Facility") is evidenced by that certain First Lien Credit and Guaranty Agreement dated as of December 21, 2006 by and among BosGen, as borrower, the guarantors listed therein, the initial lenders, synthetic issuing banks and the fronting bank named therein, Credit Suisse AG, Cayman Islands Branch (formerly known as Credit Suisse, Cayman Islands Branch) ("Credit Suisse"), as first lien collateral agent and administrative agent, and Credit Suisse Securities (USA) LLC and Goldman Sachs Credit Partners L.P., as co-syndication agents, co-documentation agents, joint lead arrangers and joint book running managers (the "First Lien Credit Agreement").  The First Lien Facility includes a $70 million revolving credit facility, a $1.1 billion Term Loan B facility and a $250 million synthetic letter of credit facility.  As of the Petition Date, BosGen had $17.5 million outstanding under the revolver, with an interest rate of 2.78344%, and $231.5 million in letters of credit outstanding under the synthetic letter of credit facility.[8]  The revolver and synthetic letter of credit facilities are also subject to a 2.375% annual fee, payable quarterly, on the full facility amounts.  As of the Petition Date, BosGen also had $1.090 billion outstanding under the Term Loan B facility with an interest rate of 2.78344%.  As of the Petition Date, the total outstanding indebtedness under the First Lien Facility was approximately $1,107,950,000.[9]

---

[7]    These amounts exclude interest, fees, expenses.

[8]    On August 16, 2010, the Debtors directed the applicable issuing bank to reduce the amount of the first lien and second lien debt service reserve letters of credit outstanding under the synthetic letter of credit facility by $47 million and $13 million, respectively, because no debt service was anticipated to be payable in the next six months.  The Debtors' reduction of such letters of credit is discussed below in Section III(G).

[9]    Pursuant to the First Lien Credit Agreement, the first lien debt is collaterally secured by first priority liens upon and security interests in substantially all of the assets owned directly by BosGen and its subsidiaries, which currently consists primarily of Cash and, prior to the 363 Sale, included, without limitation: accounts, equipment, inventory, equity interests, intercompany indebtedness, all investment property, all agreements, contracts and documents (including hedge agreements), and intellectual property (collectively, the "First Lien Collateral").  The first lien debt is guaranteed by each of BG Boston Services, LLC, BG New England, Mystic I, LLC, Mystic Development, LLC, and Fore River Development, LLC.  In addition, on December 21, 2006, EBG entered into that certain First Lien Pledge Agreement with Credit Suisse, in its capacity as collateral agent under the First Lien Facility, pursuant to

As discussed below (in Section III(F)), upon the closing of the 363 Sale $1,005,902,449.94 of proceeds from the 363 Sale were paid to the First Lien Facility Agent for distribution to the First Lien Facility Lenders. In addition, pursuant to the *Final Order (I) Authorizing Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. Section 363; (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. Sections 361, 362 and 363* [D.I. 165], the Debtors have continued to pay interest when due to the First Lien Facility Lenders. In the event the First Lien Facility Lenders are determined to be undersecured, such payments will be recharacterized as prepayments of principal. If such payments are recharacterized, following the payment of 363 Sale proceeds to the First Lien Facility Agent, there is currently $[_____] of indebtedness outstanding under the First Lien Facility.

On February 14, 2007, BosGen entered into an interest rate swap agreement (the "Goldman Swap Agreement") with Goldman Sachs Credit Partners L.P. ("Goldman") for a period from February 27, 2007 to December 31, 2010. BosGen's obligations to Goldman under the Goldman Swap Agreement are secured *pari passu* with BosGen's obligations under the First Lien Facility. On September 23, 2009, BosGen entered into two interest rate cap transactions with Goldman for calendar years 2011 and 2012. The Goldman Swap Agreement and the transactions thereunder were terminated pursuant to their terms on August 19, 2010. On January 3, 2011 and in accordance with the *Order Establishing Procedures for Settling Terminated Safe Harbor Contracts* [D.I. 176], BosGen and Goldman entered into a Settlement Agreement (the "Hedge Termination Settlement Agreement") establishing a settlement amount (the "Goldman Settlement Claim") on account of such termination of $23,175,077.90 owing from BosGen to Goldman plus interest in the event Goldman is oversecured. The Settlement Agreement provides that the Goldman Settlement Claim will be an Allowed Claim and afforded equal and *pari passu* treatment, in all material respects, with the Claims of the First Lien Facility Lenders under the First Lien Credit Agreement. Upon the closing of the 363 Sale, approximately $20,738,569 of 363 Sale proceeds were paid to Goldman on account of the Goldman Settlement Claim. As a result, the Goldman Settlement Claim is now approximately $2,436,509.

*Second Lien Debt*: The second lien facility (the "Second Lien Facility") is a $350 million Term Loan C facility and is evidenced by that certain Second Lien Credit and Guaranty Agreement, dated as of December 21, 2006, by and among BosGen, as borrower, the guarantors listed therein, the initial lenders, synthetic issuing banks and the fronting bank named therein, Credit Suisse, as second lien collateral agent and administrative agent, and Credit Suisse Securities (USA) LLC and Goldman Sachs Credit Partners L.P., as co-syndication agents, co-documentation agents, joint lead arrangers and joint book running managers (the "Second Lien Credit Agreement"). On February 18, 2009, Credit Suisse resigned as second lien collateral agent and administrative agent and Wilmington Trust FSB was appointed as successor second lien collateral agent and administrative agent. As of the Petition Date, BosGen had $350 million outstanding under the Second Lien Facility, with an interest rate of 4.78344%. The Second Lien Facility matures on June 20, 2014.[10]

---

which EBG agreed to grant Credit Suisse, as collateral agent, a continuing security interest in EBG's membership interests in BosGen and all rights and benefits under BosGen's LLC Agreement.

[10]     The second lien debt is collaterally secured by second priority liens on and security interests in all of the First Lien Collateral. The second lien debt is also guaranteed by each of BG Boston Services, LLC,

*Unsecured Debt*:  The mezzanine facility (the "Mezzanine Facility," and together with the First Lien Facility and the Second Lien Facility, the "Credit Facilities") is a $300 million term loan facility evidenced by that certain Credit Agreement dated as of December 21, 2006 by and among EBG, as borrower, the lenders listed therein (the "Mezzanine Facility Lenders"), Credit Suisse, as administrative agent for the lenders,[11] and Credit Suisse Securities (USA) LLC and Goldman Sachs Credit Partners L.P., as co-syndication agents, co-documentation agents, joint lead arrangers, and joint lead book running managers.  As of the Petition Date, the total outstanding indebtedness under the Mezzanine Facility was approximately $422.6 million, with an interest rate of 7.53344%.  Under the Mezzanine Facility, EBG has the option to pay interest either with cash or by increasing the principal amount of the term loan.  To date, EBG has elected to pay interest by increasing the principal amount of the Mezzanine Facility.  The Mezzanine Facility has a maturity date of December 20, 2016.

*Hedging Transactions*:  As a means to reduce its exposure to energy commodity price risk, the Company entered into energy hedges whereby the Company effectively sold a series of daily call options for a fixed premium of $14.5 million per month from May to September and $15.0 million per month from October to April.  The call options were required to be exercised for the block of time specified in the contracts (generally daytime and nighttime).  For the periods where the options were exercised, the Company paid the counterparty a floating amount for each megawatt hour that was equal to the average hourly price specified in the contract less the sum of (i) the product of the heat rate times the daily gas price specified in the contract and (ii) a fixed amount, intended to approximate other costs, including variable plant operating costs and start-up costs.  Specifically:

- On November 20, 2006, BosGen entered into certain hedging transactions with Credit Suisse Energy LLC ("CSE") documented under an ISDA Master Agreement dated as of December 20, 2006.  The transactions had an effective date of January 1, 2007 and continued through December 31, 2010.  BosGen provided to CSE a first lien on the First Lien Collateral *pari passu* in right of payment with, and secured equally and ratably with, all amounts owed and outstanding under the First Lien Facility and all

---

BG New England, Mystic I, LLC, Mystic Development, LLC, and Fore River Development, LLC.  In addition, on December 21, 2006, EBG entered into that certain Second Lien Pledge Agreement with Credit Suisse, in its capacity as collateral agent under the Second Lien Facility, pursuant to which EBG agreed to grant Credit Suisse, as collateral agent, a second priority security interest in EBG's membership interests in BosGen and all rights and benefits under BosGen's LLC Agreement.  On December 21, 2006, EBG entered into a Collateral Agency and Intercreditor Agreement (the "Intercreditor Agreement") with BosGen, Credit Suisse, in its capacity as collateral agent for the First Lien Facility and the Second Lien Facility, and Credit Suisse Energy LLC, in its capacity as first lien commodity hedge counterparty (collectively, the "Intercreditor Parties").  Pursuant to the terms of the First Lien Credit Agreement and the Second Lien Credit Agreement, and in order to induce first and second lien secured parties to enter into the transactions contemplated by the First Lien Credit Agreement and the Second Lien Credit Agreement, each of the Intercreditor Parties agreed to enter into the Intercreditor Agreement which sets forth their respective rights and remedies with respect to the First Lien Collateral

[11]     On August 23, 2010, The Bank of New York Mellon replaced Credit Suisse as administrative agent under the Mezzanine Facility.

other first lien obligations and a $60 million letter of credit (the "CSE Letter of Credit").

- On December 11, 2007, BosGen entered into a hedging transaction with Sempra Energy Trading LLC ("Sempra") for the period from January 1, 2008 to December 31, 2010. Under the terms of the hedge, Sempra was provided a letter of credit in the amount of $25 million (the "Sempra Letter of Credit") and was granted a first lien on the First Lien Collateral *pari passu* in right of payment with, and secured equally and ratably with, all amounts owed and outstanding under the First Lien Facility and all other first lien obligations of BosGen for an amount up to $75 million.

Both the CSE and Sempra hedges were assumed by the Debtors and both hedges expired on December 31, 2010. A final payment from BosGen to each counterparty was paid in January 2011. No further obligations under the hedges are owed by and between BosGen and CSE or Sempra and the CSE Letter of Credit and Sempra Letter of Credit were cancelled.

*Trade Debt*: The Company has been paying obligations due and owing to its vendors, suppliers and other pre-petition creditors as they come due in the ordinary course of business. As of the Petition Date, the total outstanding obligations due and owing to vendors, suppliers and other general unsecured creditors (other than the lenders under the Mezzanine Facility) was approximately $9,457,516. Pursuant to the *Final Order Pursuant to Sections 105(a), 363(b), 364, 503(b)(9) and 507(a)(2) of the Bankruptcy Code Authorizing the Debtors to Pay Prepetition Claims of Certain Essential Vendors* [D.I. 172], the Debtors have paid approximately $5,242,000 of the obligations owing to vendors and suppliers as of the Petition Date.

## C. Restructuring Efforts and Events Leading to Chapter 11

Over the last several years, low fuel prices, eroding demand, and a significant surplus of supply put downward pressure on margins in the energy, capacity, and ancillary service markets in New England. Additionally, a significant amount of new uneconomic supply is expected to come online over the next three to five years. The Debtors define "uneconomic supply" as supply that may be subsidized or is otherwise below a hypothetical market price. This new uneconomic supply, combined with eroding demand, created a significant surplus of future energy capacity which depressed market prices and reduced revenue. Due to these and other unfavorable market conditions, the Debtors anticipated being unable to meet certain covenant requirements in the third quarter of 2010 and being unable to generate sufficient cash to service their debt and fund ongoing operations beginning in the second quarter of 2011. The Company's liquidity constraints were expected to be exacerbated as a result of the expiration, on December 31, 2010, of cash-positive energy hedge agreements that enabled the Company to service its debt and fund operations.

In order to consider various new financing and refinancing, as well as strategic, opportunities, the Debtors retained PWP to act as their financial advisor and J.P. Morgan Securities Inc. ("JPM") to act as their investment banker. The Debtors decided to pursue a sale

of all of their assets, because they believed that it was the best way to maximize the value of their assets for the benefit of their creditors.

In late April 2010, JPM began an extensive marketing and sale process by contacting 199 potential buyers, considering both strategic and financial parties. JPM distributed a confidential information memorandum to thirty six parties and requested in return a preliminary letter of interest from interested parties by May 18, 2010. Ten parties returned preliminary letters of interest with a wide range of bids (the "Potential Purchasers"). The Debtors decided to continue further discussions with six of the Potential Purchasers, and those Potential Purchasers received access to an electronic data room, a management presentation and a draft asset purchase agreement. Of the six Potential Purchasers, only two submitted final bids.

After considering both proposals, the Debtors and their advisors engaged in parallel, but individual, arm's-length and good faith negotiations with such parties and their counsel and advisors. Following extensive negotiations on the terms and conditions of each offer, the Debtors, with the assistance of JPM and their other advisors, conducted a side-by-side analysis of the proposals and ultimately made the considered determination that the offer of Constellation Holdings, Inc. (the "Stalking Horse Bidder") was the best offer presented.

During the same period that the Debtors were pursuing a sale, the Debtors, PWP and JPM also investigated other strategic alternatives. The Debtors were unable to raise additional equity or debt to fund their operations or service their debt and therefore determined that a sale would maximize the value of their assets for the benefit of all of their creditors and equity holders.

On August 7, 2010, the Debtors and the Stalking Horse Bidder entered into an Asset Purchase Agreement between the Debtors, as sellers, Constellation Holdings, Inc., as buyer, and Constellation Energy Group, Inc., as guarantor (as amended or modified, the "APA"). Under the APA the Debtors agreed to sell substantially all of their assets to Constellation Holdings, Inc., and Constellation Holdings, Inc. agreed to assume certain liabilities of the Debtors. The sale was to be conducted under the provisions of Section 363 of the Bankruptcy Code and was subject to proposed bidding procedures and the receipt of a higher and better bid at an auction conducted pursuant to such proposed bidding procedures.

On August 17, 2010, a group of First Lien Facility Lenders who hold in excess of 50% of the outstanding first lien obligations under the First Lien Credit Agreement executed a sale support agreement with the Debtors (the "Sale Support Agreement").

## III.
## THE CHAPTER 11 CASES

### A. Commencement of the Chapter 11 Cases

On August 18, 2010 (the "Petition Date"), the Debtors Filed voluntary petitions under chapter 11 of the Bankruptcy Code. The Debtors in the Chapter 11 Cases are continuing in possession of their respective properties and are operating their respective businesses, as debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Chapter 11 Cases are pending before the Honorable Shelley C. Chapman for the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), located at the United States Bankruptcy Court, One Bowling Green, New York, NY 10004-1408.

## B.    Retained Professionals

The Bankruptcy Court authorized the Debtors to retain certain professionals to represent them and assist them in connection with the Chapter 11 Cases.  Specifically, the Debtors have retained, and the Bankruptcy Court has approved the retention of, the following professionals: (a) Latham & Watkins LLP, as counsel, (b) PWP, as financial advisors, (c) JPM, as investment banker, (d) GCG, as noticing and claims agent, (e) Brown Rudnick LLP, as special counsel, (f) Anderson Kill & Olick, P.C., as conflicts counsel, and (f) FTI Consulting, Inc., as restructuring advisors (collectively, the "Debtors' Professionals").  In addition, the Special Committee (as defined below) has retained Young Conaway Stargatt & Taylor, LLP, as counsel, and Berenson & Company, LLC, as financial advisors.  Finally, the Bankruptcy Court authorized the Debtors to retain, employ, compensate and reimburse the expenses of certain attorneys who have rendered services to the Debtors unrelated to the Chapter 11 Cases to assist with the operation of the Debtors' businesses in the ordinary course.

On September 10, 2010, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Creditors' Committee.  The Creditors' Committee retained, and the Bankruptcy Court has approved the retention of, Jager Smith P.C., as its counsel, Pryor Cashman LLP, as its special counsel, and Goldin Associates LLC, as its financial advisors (collectively, the "Committee Professionals").  The Creditors' Committee has also sought Bankruptcy Court approval of the retention of Milberg LLP, as special litigation counsel.  The Bankruptcy Court has not yet ruled on this request.

## C.    First Day Orders

On the Petition Date, the Debtors Filed a number of motions seeking approval of certain so-called "first day orders."  The first day orders facilitated the transition between the Debtors' pre-petition and post-petition business operations by authorizing the Debtors to continue with certain regular business practices that may not be specifically authorized under the Bankruptcy Code, or for which the Bankruptcy Code requires prior court approval.  The first day orders in these Chapter 11 Cases authorized, among other things, the following: (i) the joint administration of the Debtors' Chapter 11 Cases; (ii) the waiver of the requirement to file a list of creditors on the Petition Date and the adoption of certain procedures and the form of notice for notifying creditors of the commencement of the Chapter 11 Cases and the meeting of the creditors under Section 341 of the Bankruptcy Code; (iii) the adoption of certain case management procedures for the orderly administration of the cases; (iv) an extension of the time by which the Debtors were required to file their schedules and statements; (v) the payment and honoring of pre-petition wages, salaries, and benefits; (vi)  the direction by the Bankruptcy Court to all financial institutions at which the Debtors maintained payroll and benefit accounts to honor pre-petition checks for payment of all such pre-petition obligations; (vii) payment of pre-petition property, excise, and franchise taxes; (viii) the adoption of certain procedures for the termination of contracts protected by or potentially protected by the Bankruptcy Code's safe harbor

NY\1674006.14

provisions; (ix) the continued use of the Debtors' existing cash management system, bank accounts and business forms; (x) the continuation and renewal of prepetition insurance programs; (xi) the payment of certain prepetition claims of shippers, warehousemen and other lien claimants; and (xii) the payment of prepetition claims of certain essential vendors.

## D.  Appointment of Creditors' Committee

Since the formation of the Creditors' Committee, the Debtors have consulted with the Creditors' Committee and their professionals concerning the administration of the Chapter 11 Cases.  The Debtors have kept the Creditors' Committee informed about their operations.

The Creditors' Committee consists of the following members: Algonquin Gas Transmission, LLC; Sprague Energy Corp.; and Utility Workers Union of America, Local 369.

On October 20, 2010, the Bankruptcy Court entered an order authorizing the employment of Jager Smith P.C. ("**Jager Smith**") as counsel to the Creditors' Committee *nunc pro tunc* to September 10, 2010 and an order authorizing the employment of Goldin Associates LLC as financial advisor to the Creditors' Committee *nunc pro tunc* to September 17, 2010.  On December 7, 2010, the Bankruptcy Court entered an order authorizing the employment of Pryor Cashman LLP as special counsel to the Creditors' Committee *nunc pro tunc* to September 17, 2010.

On December 7, 2010, the Creditors' Committee filed an application seeking an order authorizing the employment of Milberg LLP as special litigation counsel to the Creditors' Committee *nunc pro tunc* to November 29, 2010 on a contingency fee basis to pursue certain litigation matters in which the Creditors' Committee will seek to act in the name of and for the benefit of the Debtors' Estates.  Also on December 7, the Creditors' Committee filed a motion seeking to modify the Bankruptcy Court's order authorizing the employment of Jager Smith to provide that Jager Smith may be compensated for services rendered to the Creditors' Committee in connection with the aforementioned litigation matters in accordance with a contingent fee arrangement.  A hearing on the Milberg retention application and the motion to modify the Jager Smith retention order has been scheduled for April 25, 2011.

## E.  Cash Collateral[12]

The Debtors' obligations to the First Lien Facility Lenders and the Second Lien Facility Lenders (collectively, the "Prepetition Secured Parties") are secured, respectively, by perfected first and second priority liens upon and security interests in the First Lien Collateral. As of the Petition Date, the First Lien Collateral included substantially all of the Debtors' Cash and cash equivalents.  As a result, the Debtors did not have any unencumbered cash with which to operate their businesses.  The First Lien Facility Agent and certain First Lien Facility Lenders holding a majority of the First Lien Obligations agreed to permit the Debtors to use Cash

---

[12]     Terms used but not defined in this Section III(E) shall have the meaning ascribed to them in the *Final Order (I) Authorizing Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362 and 363* [D.I. 165] (the "Cash Collateral Order") entered by the Bankruptcy Court on September 22, 2010.

Collateral to fund the day-to-day activities of the Debtors. The Debtors sought the entry of an agreed order between the Debtors and the First Lien Facility Agent authorizing the use of Cash Collateral pursuant to certain terms and conditions described in the agreed order, including, but not limited to: (i) the granting of certain adequate protection to the Prepetition Secured Parties; (ii) the Debtors' agreement to certain factual stipulations regarding the First Lien Facility and the Second Lien Facility; (iii) the granting by the Debtors of certain releases vis-à-vis the First Lien Facility Agent, the First Lien Secured Parties, the Second Lien Facility Agent and the Second Lien Secured Parties; (iv) approval of a Budget for the use of Cash Collateral, including Budget Covenants; (v) the establishment of a Carve-Out for certain professional fees; (vi) the establishment of a Challenge Period during which the Creditors' Committee could investigate and challenge the Debtors' Stipulations, which were otherwise binding on all parties in interest; and (vii) certain other terms and conditions typically found in orders granting similar relief. The Cash Collateral Order was entered on September 22, 2010 and amended on November 9, 2010 and December 8, 2010.

On September 8, 2010, the Second Lien Facility Agent Filed a limited objection to the Debtors' proposed cash collateral order and a cross motion for additional adequate protection [D.I. 97] (the "Adequate Protection Cross Motion"). On October 12, 2010, the Second Lien Facility Agent filed the *Second Lien Agent's Memorandum of Law in Support of its Cross Motion for Additional Adequate Protection* (the "MOL") [D.I. 270] with the Bankruptcy Court, asserting, among other things, that its and its professionals' fees and expenses incurred in connection with the Debtors' bankruptcy cases must be paid from proceeds realized upon the sale of the Debtors' assets in accordance with the Second Lien Facility Agent's interpretation of Section 4.1 of the Collateral Agency and Intercreditor Agreement, dated as of December 21, 2006 (the "Intercreditor Agreement"), among the Debtors, the First Lien Facility Agent and the Second Lien Facility Agent (such assertion, the "Section 4.1 Dispute"). The unresolved portion of the Adequate Protection Cross Motion was heard by the Bankruptcy Court on October 19, 2010.[13] Although the Bankruptcy Court has not yet ruled on the Adequate Protection Cross Motion, the Bankruptcy Court ordered that $5,000,000 of proceeds from the 363 Sale be segregated in the Second Lien Fee Escrow pending resolution of the Adequate Protection Cross Motion. As described below, the Debtors, the First Lien Facility Agent and the Second Lien Facility Agent entered into the First Lien/Second Lien Settlement Agreement pursuant to which the Section 4.1 Dispute was resolved. A motion to approve the First Lien/Second Lien Settlement Agreement will be heard by the Bankruptcy Court on March 23, 2011.

Pursuant to the Cash Collateral Order, the Debtors' Stipulations contained therein are binding on all parties in interest, including any Committee, unless such party in interest obtains the authority to commence and commences on or before the Challenge Period Termination Date (i) a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, findings or releases included in the Debtors' Stipulations or (ii) a contested matter or adversary proceeding against any or all of the Prepetition Secured Parties in connection with or related to the Prepetition Obligations, or the actions or inactions of any or all of the Prepetition Secured Parties arising out of or related to the

---

[13]     Prior to a hearing, the First Lien Facility Agent agreed that the Debtors could maintain a $13 million escrow pending the resolution of the Second Lien LC Adversary Proceeding (as defined below) (the "LC Reserve").

Prepetition Obligations (collectively, the "Claims and Defenses") and the Bankruptcy Court (or any other court of competent jurisdiction) rules in favor of such plaintiff in any such timely and properly commenced contested matter or adversary proceeding. If no Claims and Defenses with respect to the First Lien Secured Parties, First Lien Obligations, Second Lien Secured Parties or Second Lien Obligations have been timely asserted in any such adversary proceeding or contested matter, then, upon the Challenge Period Termination Date, the Cash Collateral Order provides that any and all such Claims and Defenses by any party in interest shall be deemed to be forever released, waived and barred with respect to the First Lien Secured Parties and the Second Lien Secured Parties, respectively.

The Cash Collateral Order provides that the Challenge Period Termination Date shall be the date that is the later of (a) fifty (50) days after entry of the Cash Collateral Order or (b) five (5) days before the date of the hearing relating to the Debtors' motion to approve a sale of substantially all of the Debtors' assets free and clear of all liens, claims, encumbrances and other interests, but in any event no later than sixty-five (65) days after entry of the Cash Collateral Order. On December 8, 2010, the Bankruptcy Court entered an order [D.I. 569] extending the Challenge Period Termination Date to December 9, 2010.

On December 9, 2010, the Creditors' Committee filed a motion (the "Standing Motion") seeking authorization to initiate and prosecute adversary proceedings and litigation matters asserting standing claims on behalf of the Debtors' Estates, including an adversary proceeding against, among others, the First Lien Facility Agent, the First Lien Facility Lenders, the Second Lien Facility Agent, and the Second Lien Facility Lenders asserting Claims and Defenses and one or more adversary proceedings or litigation matters asserting claims and causes of action arising in connection with or related to the transactions giving rise to the First Lien Facility and the Second Lien Facility (the "Creditors' Committee Claims") [D.I. 571]. Concurrently with filing the Standing Motion, the Creditors' Committee filed a Complaint and Objection to Claims against Credit Suisse AG, Cayman Islands Branch, Wilmington Trust FSB, Credit Suisse Securities (USA) LLC, Goldman Sachs Credit Partners L.P., and certain of the First Lien Facility Lenders and the Second Lien Facility Lenders (the "Creditors' Committee Complaint") initiating Adversary Proceeding No. 10-05381 (SCC) (the "Creditors' Committee Adversary Proceeding"). The Creditors' Committee Adversary Proceeding is stayed pending the Bankruptcy Court's ruling on the Standing Motion.

On January 18, 2011, the Bankruptcy Court assigned the following matters to mediation before the Honorable Allan L. Gropper, United States Bankruptcy Judge [D.I. 647]: (a) the Second Lien LC Adversary Proceeding (discussed below); (b) the Creditors' Committee Adversary Proceeding and the Standing Motion; (c) the determination of the "amounts due," if any, to the Second Lien Facility Agent pursuant to Section 4.1 or any other applicable provision of the Intercreditor Agreement as requested in the Adequate Protection Cross Motion; and (d) the economic terms of a consensual plan of liquidation. Each of the First Lien Facility Agent, the Second Lien Facility Agent, the Creditors' Committee and the Debtors submitted a mediation statement to Judge Gropper on January 27, 2011.

NY\1674006.14

## F.     Sale of Assets

As described above, on or before April 2010, the Debtors began the process of soliciting bids to purchase the Debtors' assets.  Under the APA, the Debtors agreed to sell substantially all of their assets to Constellation Holdings, Inc. ("Constellation" or the "Purchaser"), and Constellation agreed to assume certain liabilities of the Sellers for a base purchase price of $1,100,000,000.00.

On August 19, 2010, the Debtors Filed a motion (the "Sale Motion," D.I. 24) seeking approval of both the 363 Sale as well as the proposed bidding procedures negotiated with Constellation.  Certain parties in interest, including the Creditors' Committee, the Second Lien Facility Agent and certain Second Lien Facility Lenders, objected to both the 363 Sale and the proposed bidding procedures.  On October 12, 2010, after five days of hearings, the Bankruptcy Court entered the *Order Approving and Authorizing (A) Bidding Procedures in Connection with the Sale of Substantially All of the Assets of the Debtors, (B) Stalking Horse Bid Protections, (C) Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases In Connection with the Sale of Substantially All of the Assets of the Debtors (D) the Form and Manner of Notice of the Sale Hearing and (E) Related Relief* [D.I. 268] (the "Bid Procedures Order") approving certain bid procedures (the "Bid Procedures").  Pursuant to the Bid Procedures Order, November 1, 2010 and November 13, 2010 were set as the Preliminary Bid Deadline (as defined in the Bid Procedures Order) and Qualified Bid Deadline (as defined in the Bid Procedures Order), respectively.  An auction was scheduled for November 15, 2010 (the "Auction") and November 17, 2010 was set as the date of the commencement of the sale hearing (the "Sale Hearing").

After approval of the Bid Procedures, JPM contacted (i) the 199 potential bidders it had contacted prepetition and (ii) over 40 additional potential bidders who had not been previously contacted. JPM aggressively sought out interested buyers and encouraged them to participate in the process.  Potential bidders had access to an electronic due diligence data site with tens of thousands of pages of information.  Potential bidders were also able to submit due diligence questions to the Debtors and participate in site visits and management presentations.

Under the Bid Procedures, Constellation would be declared the Successful Bidder (as defined in the Bid Procedures) and the Auction would not be held if no "Qualified Bids" (which, as defined in the Bid Procedures, must, *inter alia*, (i) exceed the value of the 363 Sale plus the break-up fee plus the $10 million bid increment, (ii) not be conditioned on obtaining financing, and (iii) include a $50 million good faith deposit) were submitted on or before November 13, 2010 at 12:00 p.m. (the "Bid Deadline").

On November 4, 2010, the board of managers (the "Board") of EBG voted to establish a special committee of the Board (the "Special Committee") and appointed William Howard Wolf as its sole member.  The Special Committee was delegated the full power of the Board to evaluate all possible options available to EBG to maximize the value of the Debtors' estates.   Specifically, the Board resolution establishing the Special Committee delegates to the Special Committee the authority of the full Board to (i) review and evaluate a possible sale pursuant to Section 363 of the Bankruptcy Code or other strategic alternative; (ii) discuss and negotiate possible restructuring alternatives with any party the Special Committee deemed or

deems appropriate; (iii) approve a possible restructuring alternative, if appropriate; and (iv) assist with any other matter which could present an actual or potential conflict between the interests of EBG and its parent.

Prior to the Bid Deadline (as extended by the Debtors), only one bid was received – a plan of reorganization proposal (the "Matlin Bid") by MatlinPatterson Global Advisors LLC ("Matlin"). The Special Committee reviewed the Matlin Bid and determined that it was not a Qualified Bid as such term is defined in the Bid Procedures. As a result, Constellation was declared the Successful Bidder, the Auction was cancelled, and the Debtors sought approval of the 363 Sale at the Sale Hearing.

Certain parties in interest, including the Creditors' Committee, the Second Lien Facility Agent and Matlin, objected to the 363 Sale. The Bankruptcy Court conducted the evidentiary portion of the Sale Hearing on November 17, 18, 19, 21 and 22 and heard six hours of closing arguments on November 23, 2010. On November 24, 2010, the Bankruptcy Court approved the 363 Sale and entered the *Order Authorizing (A) the Sale of Substantially All of the Assets of the Debtors Free and Clear of All Claims, Liens, Liabilities, Rights, Interests and Encumbrances; (B) the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement; (C) the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases; (D) Approving the Transition Services Agreement; and (E) Granting Related Relief* [D.I. 494] (as modified by the Notice of Filing of Exhibit A to the Order dated November 29, 2010 and the Notice of Filing of Final Opinion dated December 7, 2010, the "Sale Order"). On November 30 and December 2, 2010, Matlin and the Second Lien Facility Agent, respectively, Filed a Notice of Appeal (the "Appeal Petitions") appealing the Sale Order [D.I. 506 and 518] (the "Appeals"). On December 6, 2010, the First Lien Facility Agent Filed its notice of appeal of the Sale Order solely to the extent the Sale Order granted the Second Lien Facility Agent and Second Lien Facility Lenders standing to object [D.I. 546] (the "First Lien Appeal"). On December 7, 2010, the Bankruptcy Court granted the request by Matlin and the Second Lien Facility Agent that the Appeals be directly certified to the United States Court of Appeals for the Second Circuit pursuant to 28 U.S.C. § 158(d)(2)(A). On February 3, 2011, the Second Circuit Court of Appeals denied Matlin and the Second Lien Facility Agent's motion for leave to appeal the Sale Order. The Appeals and the First Lien Appeal remain pending before the United States District Court for the Southern District of New York. However, as described below, the First Lien Facility Agent agreed to dismiss the First Lien Appeal and the Second Lien Facility Agent and Matlin agreed to dismiss the Appeals pursuant to the First Lien/Second Lien Settlement Agreement. A motion to approve the First Lien/Second Lien Settlement Agreement will be heard by the Bankruptcy Court on March 23, 2011.

On December 2, 2010, the Second Lien Facility Agent and Matlin filed a joint motion in the Bankruptcy Court for a stay of the Sale Order pending the outcome of the Appeals [D.I. 520] (the "Bankruptcy Court Stay Motion"). On December 7, 2010, the Bankruptcy Court entered an Order denying the Bankruptcy Court Stay Motion [D.I. 547]. Also on December 7, 2010, the Second Lien Facility Agent and Matlin filed a joint emergency motion for stay of the Sale Order pending the outcome of the Appeals with the Second Circuit Court of Appeals (the "Second Circuit Stay Motion"). On December 21, 2010, the Second Circuit entered an Order denying the Second Circuit Stay Motion.

NY\1674006.14

Concurrently with the process of seeking approval of the 363 Sale with the Bankruptcy Court, the Debtors and Constellation sought approval of the 363 Sale pursuant to section 203 of the Federal Power Act, 16 U.S.C. § 824b (the "FPA") from the Federal Energy Regulatory Commission ("FERC"). On August 18, 2010, the Debtors and Constellation filed with FERC their *Joint Application for Authorization of Disposition of Jurisdictional Facilities, Request for Waivers of Certain Filing Requirements, and Request for Shortened Comment Period and Expedited Consideration* (the "203 Application"). Approval by FERC of the 203 Application was a condition precedent to the closing of the 363 Sale. Algonquin Gas Transmission, LLC ("Algonquin") opposed the 203 Application as well as the 363 Sale, in part because on August 27, 2010, the Debtors Filed the *First Omnibus Motion of Debtors for Entry of Order Authorizing the Debtors to Reject Certain Executory Contracts* Nunc Pro Tunc *to Their Respective Notice Dates* (the "Rejection Motion") seeking authorization to reject, among other executory contracts, the 2001 HubLine Service Agreement, dated as of January 31, 2001, between the Debtors and Algonquin (the "HSA").[14] In addition, Algonquin sought to have the Rejection Motion and the Sale Motion withdrawn to the United States District Court for the Southern District of New York.

On the final day of the Sale Hearing, the Debtors, Constellation and Algonquin reached an agreement (the "Algonquin Settlement") resolving Algonquin's objections to the 363 Sale, among other issues. Algonquin agreed to withdraw its pleadings contesting the 363 Sale both in the Bankruptcy Court and in the FERC proceedings. In consideration, Algonquin would receive $10 million on the date of the closing of the 363 sale from Constellation[15] and a $10 million general unsecured claim against the Debtors' estates. On December 7, 2010, the Bankruptcy Court authorized the settlement with Algonquin in the *Order Authorizing the Debtors to Enter Into a Settlement Agreement with Algonquin Gas Transmission, LLC and Constellation Holdings, Inc., Constellation Mystic Power, LLC and Constellation Energy Group, Inc.* [D.I. 549].

On December 22, 2010, FERC approved the 203 Application. FERC's approval of the 203 Application was the last condition precedent to the closing of the 363 Sale.

On January 3, 2011 (the "Closing Date"), the 363 Sale closed (the "Close" or "Closing")[16] and (i) the transactions contemplated by the APA were consummated; (ii) the First Lien Facility Agent, for the benefit of the First Lien Facility Lenders and the Hedge Bank, received a payment of $1,005,902,449.94 in partial satisfaction of the First Lien Facility Secured Claim; (iii) $13,550.00 in cure amounts were paid by Purchaser; (iv) $1,212,400.00 in cure amounts were paid by the Debtors; (v) Algonquin was paid $10,000,000.00 pursuant to the Algonquin Settlement; (v) $5,530,000.00 was escrowed for JPM's success fee; (vi) $26,850,539.00 was deposited into a segregated account of the Debtors to fund the Plan and to

---

[14] The Debtors sought to reject the HSA because they believed, in their business judgment, that the HSA did not provide a substantial benefit to the estates and, moreover, imposed a burden on the estates.

[15] The $10 million payment from Constellation to Algonquin reduced the base purchase price under the APA from $1,100,000,000 to $1,090,000,000.

[16] Pursuant to Section 363(m) of the Bankruptcy Code, the Appeals have been mooted by the Closing.

make distributions pursuant to the Plan (the "2.5% Escrow"); (vii) Goldman was paid $20,738,569.06 on account of the Goldman Settlement Claim; (viii) $5,000,000.00 was deposited into a segregated escrow account of the Debtors to establish the Second Lien Fee Escrow; and (ix) $10,000,000.00 was reserved in an adjustment escrow account (the "APA Escrow"). After reducing the base purchase price to take into account the working capital adjustment ($14,556,323), the capital expenditure adjustment ($1,422,120) and the Algonquin Settlement amount ($10,000,000), the net Sale price was $1,074,021,557. As set forth in the Sale Order, Liens, claims, interests and encumbrances attached to sale proceeds in the same order and priority as they existed prior to the Closing.

Certain of the funds in the escrow accounts created at Closing may be available for distribution to creditors. The purchase price paid by the Purchaser was decreased by approximately $14,556,323 based on a shortfall of the Debtors' estimated working capital at Closing from a target closing date working capital agreed to in the APA. The APA Escrow contains $10,000,000 available to the Purchaser in the event the Purchaser determines that the purchase price should have been decreased by an additional amount. Any funds in the APA Escrow that are not distributed to the Purchaser pursuant to the Adjustment Escrow Agreement, dated January 3, 2011, by and among the Debtors, the Purchaser and the Escrow Agent (as defined in the APA) will be distributed to the First Lien Facility Lenders. On March 3, 2011, the Purchaser informed the Debtors that pursuant to the Purchaser's post closing working capital calculation, the Debtors owe the Purchaser approximately $7,910,000. However, the Debtors disagree and estimate that the full APA Escrow will be released to the Debtors and that the Purchaser will be required to pay the Debtors approximately $2,400,000. As set forth in the APA, the Debtors have 30 days to inform the Purchaser of any objection to the Purchaser's post closing calculations and the Debtors expect to inform the Purchaser of their objection within that timeframe. Thereafter, the Debtors will continue to discuss the post closing calculations with the Purchaser pursuant to the procedures and mechanisms for resolving such disagreement set forth in the APA.

Finally, any funds remaining in the 2.5% Escrow contemplated by the Sale Support Agreement will be distributed to the First Lien Facility Lenders upon the earlier of June 18, 2011 or the Effective Date.

As of the most recently submitted variance report, the Debtors' Estates held approximately $51,005,415.21 in Cash on March 12, 2011. Pursuant to the Budget filed by the Debtors on January 24, 2011, as updated to reflect actual and expected invoices, the Plan Debtors expect to expend approximately $34,497,185.23 in accrued and accruing fees and administrative expenses between March 13, 2011 and the Effective Date (the "Budgeted Amount"). If the Plan Debtors expend the Budgeted Amount, approximately $16,558,229.98 in cash would remain on the Effective Date for distribution pursuant to the Plan. In addition, approximately $3,077,700 in Administrative Expense Claims, Other Secured Claims and Tax Priority Claims have been filed and may ultimately be deemed Allowed Claims, which would further reduce the Plan Debtors' cash balance on the Effective Date.

Prior to Closing, the First Lien Facility Secured Claim totaled approximately $1,137,233,000. At Closing, the First Lien Facility Agent and Goldman were paid approximately $1,026,641,000 on account of their Secured Claims. In addition, since the

Petition Date, the Debtors have paid the First Lien Facility Agent [$31,439,633.20] in adequate protection payments and professional fees that will be recharacterized as payments of principal if the First Lien Facility Lenders are determined to be undersecured. The Plan Debtors believe that the First Lien Facility Lenders are undersecured and stand to receive a recovery of approximately [___]%.

*Transition Services Agreement*

On the date of the Closing, and as required by the APA, USPG Power Services, Inc. (the "Seller Provider") and Mystic Power, LLC ("Mystic"), an affiliate of Purchaser, entered into a Transition Services Agreement (the "Transition Services Agreement").

Pursuant to the Transition Services Agreement, Seller Provider agreed to provide Mystic, directly, or indirectly through one or more of its Affiliates or through third party service providers, various services, including: commercial operations, settlement services, commercial operation consulting, information technology, North American Electrical Reliability compliance, human resources, and accounting and legal services (collectively, the "Services" and each a "Service"). Each Service was to be provided for a period commencing on the Closing Date and ending on the earlier of (i) a date specified on Schedule A to the Transition Services Agreement, (ii) the date Mystic terminates such Service in accordance with the Transition Services Agreement or (iii) upon termination of the Transition Services Agreement in accordance with its terms. All Services shall cease to be provided by May 3, 2011 in accordance with the terms of the Transition Services Agreement. The Seller Provider is no longer providing any energy management services to Mystic pursuant to the Transition Services Agreement.

Additionally, the Seller Provider also agrees to use its commercially reasonable efforts to obtain, and to assist Mystic in its efforts to obtain, any third party consents necessary for Mystic to receive the Services. In the event that any necessary third party consent is not obtained, the Seller Provider agrees to reasonably cooperate with Mystic to identify and, if commercially feasible, to implement, an alternative arrangement, at Mystic's expense.

Mystic is required to pay the Seller Provider for the Services at agreed-upon customary rates and is being invoiced on a monthly basis.

*Assumption and Assignment of Executory Contracts and Unexpired Real Property Leases in Connection with the Sale*

The Sale Order provides that, until Closing and including during the time when the Transition Services Agreement is in effect, Constellation may designate on a schedule to the APA ("Schedule 2.1(c)") any executory contract or unexpired lease of the Debtors as a contract or lease that it would like to have assumed by the Debtors and assigned to it. In order to facilitate the assumption and assignment of executory contracts and unexpired leases, the Debtors Filed a master list of all known executory contracts and unexpired leases and their related cure amounts on October 12, 2010 [D.I. 274] (as amended, the "Master List"), which was subsequently amended on October 28, 2010 [D.I. 364]; November 5, 2010 [D.I. 379]; November 9, 2010 [D.I. 402]; and November 16, 2010 [D.I. 468] (together, the "Potential Assumption Notices"). Counterparties to contracts on the Master List were required to object to

assumption/assignment and the proposed cure amount prior to the Sale Hearing. After Constellation was declared the Successful Bidder under the Bid Procedures, on November 15, 2010, the Debtors published the *Notice of (I) Successful Bidder, (II) Assumption and Assignment of Executory Contracts and Unexpired Leases and (III) Cure Amount with Respect to Executory Contracts and Unexpired Leases to be Assumed and Assigned* [D.I. 452], which contained a list of contracts designated by Constellation for assumption by the Debtors and assignment to Constellation. On December 22, 2010, in accordance with the Sale Order, the Debtors Filed the *Notice of (I) Assumption and Assignment of Executory Contracts and Unexpired Leases; (II) Exercise of Buyer Designation Rights and (III) Intent to Assume and Assign Certain Executory Contracts* [D.I. 594], which amended the list of contracts and leases designated by Constellation for inclusion on Schedule 2.1(c). At the Closing, cure amounts (if required) were paid to counterparties to contracts and leases listed on Schedule 2.1(c) and such contracts were assigned to Constellation. A complete list of contracts assigned to Constellation as of the Closing is contained in the *Notice Of Filing Amendment No. 2 To Asset Purchase Agreement* [D.I. 624].

Constellation's right (the "Buyer Designation Rights") to add or remove contracts from Schedule 2.1(c) continues during the time when the Transition Services Agreement is in effect. Pursuant to the Sale Order, within three (3) Business Days of receipt by the Debtors of prior written notice by Constellation of an exercise of the Buyer Designation Rights requiring assumption by the Debtors and assignment to Purchaser or an Affiliate of Purchaser of any proposed assumed contract, the Debtors shall File a notice of assumption and assignment ("Assumption and Assignment Notice") with the Bankruptcy Court and serve a copy of such notice on each non-Debtor party to the subject proposed assumed contract (each, a "Contract Counterparty"). No later than ten (10) days after the date on which the Debtors serve an Assumption and Assignment Notice, the Debtors are required to File with the Bankruptcy Court an order authorizing the assumption/assignment of the Assumed Contracts listed in the Assumption and Assignment Notice which provides (1) that the assumption of such Assumed Contracts are approved, final and effective, pursuant to Section 365 of the Bankruptcy Code and (2) Purchaser provided adequate assurance of future performance under the applicable contract in accordance with Section 365(f)(2)(B).

On December 22, 2010, the Debtors Filed a motion seeking to assume and assign to Constellation eleven additional contracts not included on the Master List [D.I. 593]. An order approving the motion was entered by the Bankruptcy Court on January 20, 2011 [D.I. 656]. In the event that Constellation elects to assume any additional contracts not previously noticed in the Potential Assumption Notices while the Transition Services Agreement is in effect, the Debtors will seek to assume and assign such contracts by regular motion practice.

## G.     The Second Lien LC Adversary Proceeding

On October 18, 2010, the Second Lien Facility Agent Filed a complaint (the "Second Lien Complaint") in the Bankruptcy Court that commenced an adversary proceeding against the Debtors and Credit Suisse (collectively, "Defendants"), Adv. Proc. No. 10-03908 (SCC), in connection with the reduction to $0 of a $13 million letter of credit to which the Second Lien Facility Agent purports to be a third party beneficiary (the "Second Lien LC Adversary Proceeding"). The complaint asserts seven causes of action against the Defendants, including causes of action against the Debtors for fraud, breach of contract, conversion, aiding

and abetting conversion, and tortious interference. Relief requested for causes of action against the Debtors includes monetary damages of at least $13 million, injunctive relief to restore the letter of credit, a constructive trust of no less than $13 million, and any fees and costs incurred in connection with the adversary proceeding. On December 1, 2010, the Debtors moved for summary judgment on the breach of contract claim and to dismiss all remaining claims asserted against them for failure to state a claim upon which relief may be granted. The Second Lien Facility Agent opposed the motion on January 10, 2011. Pursuant to a status conference on January 6, 2011, all remaining dates and obligations related to the adversary proceeding are adjourned *sine die* pending settlement discussions amongst the relevant parties, including any obligation by the Debtors to respond to discovery requests served on December 10, 2010. On January 18, 2011, the Bankruptcy Court assigned the Second Lien LC Adversary Proceeding to mediation [D.I. 647]. As described in Section III(K) below, the parties to the Second Lien LC Adversary Proceeding have entered into the First Lien/Second Lien Settlement Agreement to resolve the Second Lien LC Adversary Proceeding. A motion to approve the First Lien/Second Lien Settlement Agreement will be heard by the Bankruptcy Court on March 23, 2011.

## H.    The Creditors' Committee's Standing Motion

As noted above, on December 9, 2010, the Creditors' Committee filed the Standing Motion and the Creditors' Committee Complaint in the Bankruptcy Court. Pursuant to the Standing Motion, the Creditors' Committee seeks authority, *nunc pro tunc* to December 9, 2010, to (i) initiate and prosecute the Creditors' Committee Claims, in the name of and for the benefit of the Debtors' Estates and (ii) to compromise any such Creditors' Committee Claims. The Standing Motion was originally scheduled for hearing in the Bankruptcy Court on January 20, 2011. On January 6, 2011, the Bankruptcy Court held a status conference and took the Standing Motion off-calendar. On January 18, 2011, the Bankruptcy Court assigned the Standing Motion and the Creditors' Committee Complaint to mediation [D.I. 647]. A hearing on the Standing Motion has been scheduled for April 25, 2011.

The Creditors' Committee Complaint sets forth the Claims and Defenses that the Creditors' Committee seeks the authority to initiate and prosecute pursuant to the Standing Motion. Specifically, the Creditors' Committee Complaint asserts eighteen claims against all or certain of the defendants named therein for (i) the avoidance of alleged preferential transfers under the Bankruptcy Code, (ii) fraudulent conveyances under New York law and the Bankruptcy Code, (iii) attorneys' fees, (iv) the enforcement of the Bankruptcy Code's strong arm powers, (v) recovery and transferee liability under New York law and the Bankruptcy Code, (vi) a declaration that the Creditors' Committee and the Debtors' Estates are not bound by the Debtors' Stipulations contained in the Cash Collateral Order; (vii) the disallowance of claims asserted by the First Lien Facility Lenders and the Second Lien Facility Lenders under the Bankruptcy Code, (viii) a judgment and order charging the First Lien Facility Lenders' and the Second Lien Facility Lenders' pre-petition collateral with costs and expenses pursuant to 11 U.S.C. § 506(C), (ix) objections to claims of the First Lien Facility Agent, First Lien Facility Lenders, Second Lien Facility Agent and Second Lien Facility Lenders pursuant to 11 U.S.C. § 502(B); and (x) a determination of the validity, priority and extent of the First Lien Facility Lenders' and the Second Lien Facility Lenders' security interests in pre-petition collateral pursuant to 11 U.S.C. § 506(A).

NY\1674006.14

The Debtors do not believe that the Standing Motion has merit, and expect to challenge it as untimely under the Bankruptcy Court's Cash Collateral Order, as well as futile (in light of the fact that the Debtors have determined the First Lien Facility Secured Claim is valid, binding, enforceable and perfected) and unnecessarily burdensome to the Estates insofar as the Creditors' Committee Complaint does not assert plausible claims for relief. The Debtors further expect that the agent for the First Lien Facility Lenders will oppose the Standing Motion on the same grounds, and that the agent for the Second Lien Facility Lenders (as well as those Second Lien Facility Lenders party to the First Lien/Second Lien Settlement Agreement) also will oppose the Standing Motion and any Creditors' Committee Claims to the extent the Creditors' Committee proposes to challenge the liens of, or otherwise obtain payment from, the First and Second Lien Facility Lenders or their agents.

## I.     The Creditors' Committee Motion to Convert

On December 30, 2010, the Creditors' Committee Filed a motion for entry of an order converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code [D.I. 607] (the "Motion to Convert"). The Creditors' Committee asserts that conversion of the cases is proper because of the Debtors' inability to pay all outstanding administrative expenses in the Chapter 11 Cases, the substantial and continuing losses to and diminution of the Debtors' Estates and the absence of a reasonable likelihood of rehabilitation. The Plan Debtors do not agree that the Chapter 11 Cases should be converted and believe that the Plan is in the best interests of the Plan Debtors' Estates and that it can and should be confirmed. The Motion to Convert was originally scheduled for hearing in the Bankruptcy Court on January 20, 2011. A hearing on the Motion to Convert has been scheduled for April 25, 2011.

## J.     The Claims Process

The Bankruptcy Code provides a procedure for each person who believes he has a claim against a debtor to assert such claim, so that such claimant can receive distributions from the debtor's bankruptcy estate. The bankruptcy court establishes a "bar date" – a date by which creditors must File their claims, or else such claims will not participate in the bankruptcy case or any distribution. After the filing of all claims, the debtor evaluates such claims and can, along with other parties in interest, raise objections to them. These claims objections allow the debtor to minimize claims against it, and thereby maximize the recovery to creditors with Allowed Claims.

By Order [D.I. 185] dated September 23, 2010 ("Bar Date Order"), the Bankruptcy Court established 4:00 p.m. (prevailing Eastern Time) on December 1, 2010 (the "Bar Date") as the deadline for filing proofs of Claims against the Debtors, other than claims of Governmental Units and Administrative Expense Claims. The Bankruptcy Court established 4:00 p.m. (prevailing Eastern Time) on February 14, 2011 as the deadline for filing proofs of Claims by Governmental Units (the "Governmental Units Claims Bar Date").

Pursuant to the Plan, all unpaid Administrative Expense Claims must be Filed on or before the Administrative Expense Claims Bar Date. The Administrative Expense Claims Bar Date is the first Business Day that is at least thirty-five (35) days following the Effective Date.

The Plan Debtors have been reviewing, analyzing and resolving Claims on an ongoing basis as part of the claims reconciliation process. To date approximately 445 proofs of claim have been Filed in the Plan Debtors' Chapter 11 Cases. Despite ongoing efforts, a significant number of these Claims have not been resolved to date, and the actual ultimate aggregate amount of Allowed Claims may differ significantly from the amounts used for the purposes of the Plan Debtors' estimates. Additionally, the Plan Debtors are in the process of reviewing their Schedules Filed with the Bankruptcy Court and, upon the completion of such review, may amend such Schedules to account for certain Claims that have been satisfied or settled. Accordingly, the amount of the Pro Rata share that will ultimately be received by any particular holder of an Allowed Claim may be adversely affected by the outcome of the claims resolution process.

## K. Settlements

On February 24, 2011, the Debtors, the First Lien Facility Agent, the Second Lien Facility Agent and certain First Lien Facility Lenders and Second Lien Facility Lenders (collectively, the "Settlement Parties") entered into a settlement agreement (the "First Lien/Second Lien Settlement Agreement"). On March 4, 2011, the Debtors filed a motion seeking Bankruptcy Court approval of the First Lien/Second Lien Settlement Agreement (the "Settlement Motion"). The Settlement Motion has been set for hearing on March 23, 2011.

The First Lien/Second Lien Settlement Agreement resolves a number of issues by and among the Settlement Parties. The salient terms of the First Lien/Second Lien Settlement Agreement are as follows:[17]

- Each of the Second Facility Lien Agent and the Second Lien Facility Lenders party to the First Lien/Second Lien Settlement Agreement agree not, in any way or any capacity, to support the Standing Motion, the Committee Claims (as defined in the First Lien/Second Lien Settlement Agreement) and any pleading or motion filed, or proceeding commenced, by the Creditors' Committee in connection therewith, solely insofar as the Standing Motion and the Committee Claims seek to invalidate the liens or claims of the First Lien Facility Agent, the First Lien Facility Lenders, the Second Lien Facility Agent and the Second Lien Facility Lenders or avoid any payment made by the Debtors to the First Lien Facility Agent and the First Lien Facility Lenders in connection with the First Lien Facility Credit Agreement or avoid any payment made by the Debtors to the Second Lien Facility Agent and the Second Lien Facility Lenders in connection with the Second Lien Credit Agreement.

---

[17] To the extent any summaries and/or descriptions of the relationships of the parties and the terms of the First Lien/Second Lien Settlement Agreement contained herein differ in any way from that contained in the First Lien/Second Lien Settlement Agreement, the First Lien/Second Lien Settlement Agreement shall govern.

- The Second Lien LC Adversary Proceeding shall be dismissed with prejudice.

- The Section 4.1 Dispute shall be dismissed with prejudice.

- The Appeals shall be dismissed with prejudice.

- The First Lien Appeal shall be dismissed with prejudice.

- Withdrawal of the Second Lien Pleadings (as defined in the First Lien/Second Lien Settlement Agreement) with prejudice to refiling.

- In exchange for the releases contained in the First Lien/Second Lien Settlement Agreement, the First Lien Facility Agent shall indefeasibly pay to the Second Lien Facility Agent $11,500,000 in cash from the proceeds of the 363 Sale previously distributed to the First Lien Facility Agent by the Debtors, free and clear of any liens, claims or encumbrances.

- The Second Lien Fee Escrow and the LC Reserve shall be terminated and any and all funds therein shall be paid to the First Lien Facility Agent for distribution to the First Lien Facility Lenders.

- Each of the Second Lien Facility Agent and the Second Lien Facility Lenders party to the First Lien/Second Lien Settlement Agreement shall support, and not object to, (a) the Debtors filing a separate motion seeking a separate proposed order (the form and substance of each of which shall be reasonably acceptable to the Settlement Parties) for authority to reduce the 2.5% Escrow to $15,000,000.00 and to allow any and all funds in such segregated account in excess of $15,000,000.00 to be paid to the First Lien Facility Agent for distribution to the First Lien Facility Lenders for application against the First Lien Facility Secured Claim (the "2.5% Escrow Motion") and (b) the reduction of the 2.5% Escrow to $15,000,000.00 and the payment of any and all funds in such segregated account in excess of $15,000,000.00 to the First Lien Facility Agent for distribution to the First Lien Facility Lenders for application against the First Lien Facility Secured Claim, in each case, pursuant to such separate proposed order if entered.

- Each of the Second Lien Facility Agent and the Second Lien Facility Lenders party to the First Lien/Second Lien Settlement Agreement agree not to file at any time any motion, application or other request seeking payment of fees, costs or expenses, in each case, incurred by it in connection with the Debtors' bankruptcy cases prior to the date of the First Lien/Second Lien Settlement Agreement.

- The Settlement Parties shall grant each other mutual releases relating to the subject matter of the First Lien/Second Lien Settlement Agreement.

NY\1674006.14

The 2.5% Escrow Motion was filed with the Bankruptcy Court on March 4, 2011 and has been set for hearing on March 23, 2011.

**L.     Substantive Consolidation of the Plan Debtors**

**As set forth in more detail in Section IV of this Disclosure Statement, the Plan provides for the substantive consolidation of the Plan Debtors with respect to the voting of all Claims and Interests and the treatment of all Claims and Interests.   Section 105(a) of the Bankruptcy Code empowers a bankruptcy court to authorize substantive consolidation.**

The recoveries for creditors in these cases derive overwhelmingly from a single source:  the proceeds of the 363 Sale.  The proceeds of the 363 Sale were not allocated among the separate Plan Debtors and there is no equitable or logical basis for doing so.  Because the Plan Debtors were operated as a consolidated group and provided only consolidated information to their creditors pre-petition, substantively consolidating the Plan Debtors for distribution purposes under the Plan is the most equitable treatment of the proceeds of the 363 Sale.

There is extensive evidence of a substantial identity, extensive interrelationship, interdependence and entanglement between and among the Plan Debtors such that the Plan Debtors are inextricably intertwined in virtually all operational and functional aspects.  Such operational and financial interdependence and entanglement is evidenced in numerous ways.  Although separate books and records are maintained for each Plan Debtor, the Plan Debtors' businesses were operated without regard for their separate assets, liabilities, employees or management.  For example, all employees were employed and paid by either BG New England Power Services, Inc. or BG Boston Services, LLC, but performed services for each of the operating entities, and the Plan Debtors are included in a consolidated federal tax return.

Prior to the Petition Date, the Plan Debtors prepared and disseminated consolidated financial reports to certain parties, their sole customer, certain suppliers, landlords, lenders, credit rating agencies and debtholders.  Because the Plan Debtors disseminated financial information on a consolidated basis, it is unlikely that creditors relied on the separate identity of any Plan Debtor in extending credit to such Plan Debtor.

After considering how the Plan Debtors conducted their businesses, it is clear that the Plan Debtors' businesses were inextricably intertwined on a financial basis and not merely on an operational basis.  For example, the Plan Debtors maintain a joint main operating account that, in turn, funds five checking accounts and two payroll accounts that are used for accounts payable and payroll purposes, respectively.  BosGen maintains a separate checking account on behalf of each of BosGen, Fore River Development, LLC, Mystic I, LLC and Mystic Development, LLC and two payroll accounts on behalf of BG New England Power Services, Inc. and BG Boston Services, LLC.  Funds are transferred from the main joint operating account to fund the checking accounts and the payroll accounts.  Additionally, funds were typically wired directly from the operating account to approximately twelve entities, including the Plan Debtors' largest fuel vendors, counterparties to certain hedge contracts, Mitsubishi Power Systems Americas, Inc. and USPG Power Services, Inc. for management fees owed by the Plan Debtors pursuant to the AMA.  The Plan Debtors also maintain a joint revenue account which collects funds from a variety of different sources, including from ISO New England.

NY\1674006.14

In addition, all revenues from ISO New England resulting from power generated by each of the power generation facilities flowed directly into the revenue account maintained by BosGen at US Bank regardless of which Plan Debtor owned the facility. Settlements with ISO New England also flowed through BosGen as ISO New England did not recognize any of the other Plan Debtors as market participants.

Because of the forgoing, it is unlikely that creditors relied upon the separate identity of any Plan Debtor in conducting business. Moreover, because the Plan Debtors' affairs are integrated, interrelated and entangled from both a functional and financial perspective, the substantive consolidation of the Plan Debtors would be equitable for all creditors. Substantive consolidation would ensure that the Plan Debtors' creditors, having relied on the creditworthiness of the Plan Debtors as a unit, receive the benefit of distribution in satisfaction of their claims, as available, from a single pool of assets.

Because the First Lien Facility Secured Claim is secured by the assets of all of the Plan Debtors, the recovery to holders of General Unsecured Claims, if any, will come entirely from Causes of Action, which are difficult to allocate among the Plan Debtors. Substantive Consolidation enables all holders of General Unsecured Claims to share in the outcomes of the various Causes of Action. Absent substantive consolidation, the cost of litigating the allocation of such recoveries and Intercompany Claims would further reduce recoveries.

Finally, substantive consolidation will expedite the conclusion of the Plan Debtors' Chapter 11 Cases. Absent substantive consolidation, the Plan Debtors would be required to disentangle their assets and liabilities and litigate the validity and priority of their respective Intercompany Claims. The reconciliation and resolution of the Intercompany Claims that would be required by such disentanglement would be extremely costly and would unnecessarily delay the conclusion of the Plan Debtors' Chapter 11 Cases; costs and delay which are unjustified where, as is the case here, the Plan Debtors project no recovery for holders of General Unsecured Claims under the Plan. See In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 766 (Bankr. S.D.N.Y. 1992) (ordering substantive consolidation and stating "[e]stablishing to whom actual liability, if any, should be allocated would be a herculean task consuming years of costly professional services. . . . The reorganization effort will be obstructed perhaps irreparably . . . by an effort to [tear] apart pieces of an integrated whole."); Chemical Bank New York Trust Co. v. Kheel (In re Seatrade Corp.), 369 F.2d 845, 847 (2d Cir. 1966) (ordering substantive consolidation and stating "where the interrelationships of the group are hopelessly obscured and the time and expense necessary even to attempt to unscramble them so substantial as to threaten the realization of any net assets for all the creditors, equity is not helpless to reach a rough approximation of justice to some rather than deny any to all.").

For the reasons set forth above, the Plan Debtors believe that the requirements for substantive consolidation of the Plan Debtors with respect to voting and treatment of all Claims and Interests are satisfied.

## M.    Dismissal of EBG's Chapter 11 Case

The Debtors are requesting that EBG's Chapter 11 Case be dismissed. EBG operated solely as a holding company and its only creditors are other Debtors and the Mezzanine Facility Lenders who are structurally subordinate to all other creditors of the Debtors. The

Mezzanine Facility debt is solely a debt of EBG and not of any of the Plan Debtors. EBG's current assets include solely approximately [$219,000] in Cash and potential causes of action, which the Debtors do not believe have any merit. EBG will pay all U.S. Trustee fees prior to dismissal. The Debtors believe that dismissal of EBG's Chapter 11 Case is appropriate given the minimal assets that remain at EBG and the small universe of creditors. The Debtors also propose that the Bankruptcy Court retain jurisdiction after dismissal of EBG's Chapter 11 Case to enforce any and all Orders entered by the Bankruptcy Court during the pendency of EBG's Chapter 11 Case.

Under Section 1112(b) of the Bankruptcy Code, a court may dismiss a chapter 11 case "for cause." 11 U.S.C. § 1112(b). Section 1112(b) provides, in pertinent part: " . . . on request of a party in interest or the United States trustee or bankruptcy administrator, and after notice and a hearing, the court may . . . dismiss a case under this chapter . . . for cause . . ." A determination of cause is made on a case-by-case basis and is left to the bankruptcy court's "sound discretion." In re Camden Ordnance Mfg. Co. of Arkansas, Inc., 1999 WL 587790, at *2 (Bankr. E.D. Pa. 1999). Here, dismissal is supported under Section 1112(b) based on: (1) the continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation; and (2) the inability to effectuate a plan. 11 U.S.C. § 1112(b)(2). EBG has liquidated substantially all of its assets (except for any causes of action that may exist) and is beyond rehabilitation. In addition, the Debtors do not believe EBG would be able to effectuate a plan. For each of these reasons, the Debtors request that EBG's Chapter 11 Case be dismissed.

## IV.
## CHAPTER 11 PLAN

**THE FOLLOWING IS A BRIEF SUMMARY OF CERTAIN OF THE MORE SIGNIFICANT MATTERS CONTEMPLATED BY OR IN CONNECTION WITH THE CONFIRMATION OF THE PLAN. THUS, THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A. THIS SUMMARY ONLY HIGHLIGHTS CERTAIN SUBSTANTIVE PROVISIONS OF THE PLAN. CONSIDERATION OF THIS SUMMARY WILL NOT, NOR IS IT INTENDED TO, YIELD A THOROUGH UNDERSTANDING OF THE PLAN. SUCH CONSIDERATION IS NOT A SUBSTITUTE FOR A FULL AND COMPLETE READING OF THE PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO REVIEW THE PLAN CAREFULLY. THE PLAN, IF CONFIRMED, WILL BE BINDING ON EACH OF THE PLAN DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS.**

## A.      Plan Overview

The Plan contains five types of unclassified Claims: the First Lien Facility Superpriority Claim, Administrative Expense Claims, Statutory Fees, Professional Claims and Priority Tax Claims. In addition, the Plan classifies Claims against and Interests in the Plan Debtors as follows: Class 1 Other Priority Claims, Class 2 First Lien Facility Secured Claim, Class 3 et. seq. Other Secured Claims, Class 4 General Unsecured Claims, Class 5 Intercompany Claims, Class 6 Old Equity Interests and Class 7 Old Equity Rights. Classes 1 and 3 are Unimpaired and Classes 2, 4, 5, 6, and 7 are Impaired.

## B.     Plan Summary

The Plan is premised on the substantive consolidation of all of the Plan Debtors with respect to the voting of all Claims and Interests and the treatment of all Claims and Interests.  The Plan shall serve as a request by the Plan Debtors, in lieu of a separate motion, to the Bankruptcy Court that it grant substantive consolidation with respect to the treatment of all Claims and Interests as follows: on the Effective Date, (a) all Class 5 Intercompany Claims will be eliminated (except to the extent such claims are by a Plan Debtor against a non-Plan Debtor Affiliate); (b) no distributions shall be made under the Plan on account of any equity interest held by a Plan Debtor in any other Plan Debtor; (c) all Assets and liabilities of the Plan Debtors will be merged or treated as though they were merged; (d) all guarantees of the Plan Debtors of the obligations of any other Plan Debtor and any joint or several liability of any of the Plan Debtors shall be eliminated; and (e) each and every Claim or Interest against any Plan Debtor shall be deemed Filed against the consolidated Plan Debtors and all Claims Filed against more than one Plan Debtor for the same liability shall be deemed one Claim against any obligation of the consolidated Plan Debtors.  In the event the Bankruptcy Court determines that substantive consolidation of the Plan Debtors is not appropriate, the Plan Debtors may request that the Bankruptcy Court otherwise confirm the Plan and the treatment of the different Classes under the Plan on a Plan Debtor by Plan Debtor basis.

## C.     Unclassified Claims

The Unclassified Claims consist of the First Lien Facility Superpriority Claim, Administrative Expense Claims, Statutory Fees, Professional Claims and Priority Tax Claims. These Claims shall be treated as follows:

**First Lien Facility Superpriority Claim.**  The First Lien Facility Agent shall receive, for the benefit of the First Lien Facility Lenders and the Hedge Bank, in full satisfaction, settlement and release of and in exchange for any First Lien Facility Superpriority Claim (to the extent of the amount of the First Lien Facility Superpriority Claim), (a) the Net Avoidance Action Proceeds, (b) Other Superpriority Proceeds and (c) any Available Cash (other than Net Avoidance Action Proceeds and Other Superpriority Proceeds) remaining after payment in full of the First Lien Facility Secured Claim.  The Plan Debtors do not anticipate that the Net Avoidance Action Proceeds and Other Superpriority Proceeds will be sufficient to pay the First Lien Facility Superpriority Claim in full or that there will be Available Cash (other than Net Avoidance Action Proceeds and Other Superpriority Proceeds) sufficient to pay the First Lien Facility Secured Claim in full such that Available Cash will also be available to satisfy the First Lien Facility Superpriority Claim.  Nonetheless, the First Lien Facility Agent and First Lien Facility Lenders have consented to the treatment set forth in the Plan.

**Administrative Expense Claims.**  Subject to the allowance procedures and deadlines provided in the Plan, on the Effective Date or as soon thereafter as is practicable in recognition of the applicable claims resolution process set forth in the Plan, the holder of an Allowed Administrative Expense Claim (other than Administrative Expense Claims that are Assumed Liabilities, the First Lien Facility Superpriority Claim and Professional Claims) shall receive on account of such Allowed Administrative Expense Claim and in full satisfaction, settlement and release of and in exchange for such Allowed Administrative Expense Claim,

(a) Cash equal to the unpaid portion of such Allowed Administrative Expense Claim, or (b) such other treatment as to which the Plan Debtors, or, if after the Effective Date, the Liquidating Trustee, and the holder of such Allowed Administrative Expense Claim have agreed upon in writing; provided, however, that (i) Administrative Expense Claims that are Assumed Liabilities have been Assumed and shall be satisfied in accordance with the APA and shall not receive distributions pursuant to the Plan, (ii) the First Lien Facility Superpriority Claim shall be paid in accordance with Section 2.1 of the Plan and (iii) Professional Claims shall be paid in accordance with Section 2.4 of the Plan.

**Statutory Fees.** On or before the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid in full, in Cash.

**Professional Claims.** Immediately prior to the Effective Date, the Plan Debtors shall pay all amounts owing to the Professionals for all unpaid Professional Claims relating to prior periods and for the period ending on the Effective Date; provided, however, that the amount paid to each Professional immediately prior to the Effective Date shall not exceed the amount provided for in the Budget for such Professional (unless otherwise agreed in writing by the Consenting First Lien Lenders holding a majority of the First Lien Facility Secured Claim held by all Consenting First Lien Lenders). The Professionals shall estimate Professional Claims due for periods that have not been billed as of the Effective Date. On or prior to the Administrative Expense Claims Bar Date, each Professional shall File with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Effective Date. Within ten (10) days after entry of a Final Order with respect to its final fee application, each Professional shall remit any overpayment to the First Lien Facility Agent for distribution to the First Lien Facility Lenders. For the avoidance of doubt, consistent with the Budget, in no event shall the Creditors' Committee or its Professionals be entitled to receive during the course of the Chapter 11 Cases aggregate compensation in excess of $600,000.00 (unless otherwise agreed in writing by the Consenting First Lien Lenders holding a majority of the First Lien Facility Secured Claim held by all Consenting First Lien Lenders).

**Priority Tax Claims.** With respect to each Allowed Priority Tax Claim, at the sole option of the Plan Debtors or, if after the Effective Date, the Liquidating Trustee, the holder of an Allowed Priority Tax Claim shall be entitled to receive on account of such Allowed Priority Tax Claim, in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, (a) Cash equal to the unpaid portion of such Allowed Priority Tax Claim; or (b) such other treatment agreed to by the holder of such Allowed Priority Tax Claim and the Plan Debtors or, if after the Effective Date, the Liquidating Trustee, provided such treatment is on more favorable terms to the Plan Debtors or the Liquidating Trustee, as the case may be, than the treatment set forth in subsection (a) hereof.

In accordance with the Bankruptcy Code, the Allowed Administrative Expense Claims and Allowed Priority Tax Claims are not classified. Therefore, the claimants holding the aforementioned Claims may not vote on the Plan.

36

**D.**  **Treatment of Classified Claims and Interests**

The treatment of and consideration to be received by holders of Allowed Claims and the treatment to be received by holders of Interests pursuant to Article 5 of the Plan will be in full satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims against, or Interests in, the Plan Debtors and the Plan Debtors' Estates, except as otherwise expressly provided in the Plan or the Confirmation Order.

1.  **Class 1 – Priority Claims**

a.  Definition of Class 1 – Other Priority Claims

Other Priority Claims are any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, of a Creditor to the extent such Claim is entitled to priority pursuant to Bankruptcy Code Sections 507(a)(1), (4), (5), (6) or (7).

b.  Treatment of Class 1 – Other Priority Claims

On the Effective Date or as soon thereafter as is reasonably practicable in recognition of the applicable claims reconciliation process set forth in the Plan, the holder of an Allowed Other Priority Claim shall receive on account of the Allowed Other Priority Claim and in full satisfaction, settlement and release of and in exchange for such Allowed Other Priority Claim, (a) Cash equal to the amount of such Allowed Other Priority Claim, or (b) such other treatment as to which the Plan Debtors and the holder of such Allowed Other Priority Claim have agreed upon in writing.

c.  Voting Status of Class 1 – Other Priority Claims

Class 1 is not Impaired and is deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Thus, the claimants in Class 1 may not vote on the Plan.

2.  **Class 2 – First Lien Facility Secured Claim**

a.  Definition of Class 2 – First Lien Facility Secured Claim

The First Lien Facility Secured Claim consists of (i) the Secured Claims of the First Lien Facility Lenders under the First Lien Credit Agreement and (ii) the Secured Claim of the Hedge Bank under the Hedge Termination Settlement Agreement. The First Lien Facility Secured Claim is Allowed in the aggregate amount of $[•].

b.  Treatment of Class 2 – First Lien Facility Secured Claim

On the Effective Date or, solely with respect to distributions of the Available Cash, as soon thereafter as is reasonably practicable in recognition of the applicable claims reconciliation process set forth in the Plan, the First Lien Facility Agent shall receive, for the benefit of the First Lien Facility Lenders and the Hedge Bank, in full satisfaction, settlement and release of and in exchange for the First Lien Facility Secured Claim, (a) the Adjusted Cash

Amount, plus (b) any Available Cash (other than any Net Avoidance Action Proceeds and Other Superpriority Proceeds) after payment in full of all Allowed Administrative Expense Claims (other than the First Lien Facility Superpriority Claim), Allowed Priority Tax Claims and Allowed Other Priority Claims. Until the First Lien Facility Secured Claim is paid in full in Cash, the Liens securing the First Lien Facility Secured Claim shall remain on the Available Cash, provided the Plan Debtors and their Estates shall have no further liability therefor. The First Lien Facility Deficiency Claim shall not constitute a Class 2 First Lien Facility Secured Claim and shall be treated as a Class 4 General Unsecured Claim. Holders of the First Lien Facility Secured Claim shall be Beneficiaries; it being understood that distributions from the Liquidating Trust shall be exclusively governed in accordance with Section 10.8 of the Plan. For the avoidance of doubt, the Plan contemplates that the First Lien Facility Agent, for the benefit of the First Lien Facility Lenders and Hedge Bank, shall receive all Cash of the Plan Debtors and their Estates on the Effective Date other than (a) the Cause of Action Proceeds; (b) $[12,262,000] on account of the aggregate amount of (i) all estimated Allowed Administrative Expense Claims (excluding the First Lien Facility Superpriority Claim and Allowed Professional Claims), (ii) all estimated Allowed Priority Tax Claims, (iii) all estimated Allowed Other Priority Claims, and (iv) all estimated Allowed Professional Claims; and (c) $100,000 deposited in the Trust Administrative Fund to fund Liquidating Trustee Administrative Fees, in each case, as of the Effective Date.

   c.  Voting Status of Class 2 – First Lien Facility Secured Claim

   Class 2 is Impaired and may vote on the Plan.

  3.  **Class 3 et seq. – Other Secured Claims**

   a.  Definition of Class 3 et seq. – Other Secured Claims

   Other Secured Claims are all Secured Claims against the Plan Debtors other than the First Lien Facility Secured Claim; *provided, however,* that any Secured Claim that is an Assumed Liability has been Assumed and shall be satisfied in accordance with the APA and shall not receive distributions pursuant to the Plan. This Class is subdivided into subclasses designated by letters of the alphabet (Class 3A, Class 3B and so on), so that each holder of any Other Secured Claim is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified Other Secured Claims.

   b.  Treatment of Class 3 et seq. – Other Secured Claims

   On the Effective Date or as soon thereafter as is practicable in recognition of the applicable claims reconciliation process set forth in the Plan, each holder of an Allowed Other Secured Claim that was not assumed by the Purchaser in connection with the 363 Sale shall receive, in full satisfaction, settlement and release of and in exchange for such Allowed Other Secured Claim, (i) the collateral securing any such Allowed Other Secured Claim (to the extent such collateral does not constitute collateral securing the First Lien Facility Secured Claim on a senior basis) or (ii) such other treatment that leaves such Allowed Other Secured Claim Unimpaired pursuant to Section 1124(2) of the Bankruptcy Code. The Other Secured Claim

Liens shall be released and the Plan Debtors and their Estates shall have no further liability therefor; provided, however, that any Deficiency Claims of holders of Class 3 Other Secured Claims shall not constitute Class 3 Other Secured Claims and shall be treated as Class 4 General Unsecured Claims hereunder. For the avoidance of doubt, the Second Lien Facility Agent and Second Lien Facility Lenders have only a Second Lien Facility Deficiency Claim against the Plan Debtors and their Estates.

    c.        Voting Status of Class 3 et seq. – Other Secured Claims

Class 3 is not Impaired and is deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Thus, the claimants in Class 3 may not vote on the Plan.

    4.       **Class 4 – General Unsecured Claims**

    a.        Definition of Class 4 – General Unsecured Claims

General Unsecured Claims are all Unsecured Claims against the Plan Debtors other than the Intercompany Claims and the Old Equity Rights.

    b.        Treatment of Class 4 – General Unsecured Claims

On the Effective Date or as soon thereafter as is practicable in recognition of the applicable claims reconciliation process set forth in the Plan, the holders of Allowed General Unsecured Claims shall receive, in full satisfaction, settlement and release of and in exchange for such Allowed Claims (a) any Net Avoidance Action Proceeds and Other Superpriority Proceeds after payment in full of the First Lien Facility Superpriority Claim, Allowed Administrative Expense Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims and (b) any Available Cash (other than any Net Avoidance Action Proceeds and Other Superpriority Proceeds) after payment in full of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, the First Lien Facility Secured Claim and the First Lien Facility Superpriority Claim.  Holders of Allowed General Unsecured Claims shall be Beneficiaries; it being understood that distributions from the Liquidating Trust shall be exclusively governed in accordance with Section 10.8 of the Plan.

    c.        Voting Status of Class 4 – General Unsecured Claims

Class 4 is Impaired.  However, because the holders of General Unsecured Claims in Class 4 are not expected to receive any distribution under the Plan, they are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, holders of General Unsecured Claims in Class 4 may not vote on the Plan.

    5.       **Class 5 –Intercompany Claims**

    a.        Definition of Class 5– Intercompany Claims

Intercompany Claims are the Claims of a Plan Debtor against any other Plan Debtor, and shall exclude any claims of a Plan Debtor against a non-Plan Debtor Affiliate.

b.      Treatment of Class 5 – Intercompany Claims

Holders of Intercompany Claims will not receive any distribution of property under the Plan on account of their Intercompany Claims and, on the Effective Date, the Intercompany Claims will be cancelled; provided, however, Class 5 shall exclude any claims of a Plan Debtor against a non-Plan Debtor Affiliate.

c.      Voting Status of Class 5 – Intercompany Claims

Class 5 is Impaired.  However, because the holders of Intercompany Claims in Class 5 will not receive any distribution under the Plan, they are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, holders of Intercompany Claims in Class 5 may not vote on the Plan.

6.      **Class 6 – Old Equity**

a.      Definition of Class 6 – Old Equity

Old Equity consists of any outstanding or retired ownership interests in any of the Plan Debtors, including interests evidenced by stock, membership interests or their equivalents, but excluding the Old Equity Rights.[18]

b.      Treatment of Class 6 – Old Equity

Holders of Old Equity Interests will not receive and will not retain any property of the Plan Debtors under the Plan on account of such Interests and all Old Equity Interests will be cancelled as of the Effective Date.

c.      Voting Status of Class 6 – Old Equity

Class 6 is Impaired.  However, because the holders of Old Equity Interests in Class 6 will not receive any distribution under the Plan, they are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, holders of Old Equity Interests in Class 6 may not vote on the Plan.

7.      **Class 7 – Old Equity Rights**

a.      Definition of Class 7 – Old Equity Rights

Old Equity Rights are any calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised options, warrants, unvested common, preferred or other interests or any other agreement of any character related to Old Equity, obligating any of the Plan Debtors to issue, transfer, purchase, redeem, or sell any common, preferred or other interests or securities,

---

[18]     BosGen owns all of the ownership Interests in each of the other Plan Debtors.  EBG owns all of the ownership Interests in BosGen.

any rights under any equity incentive plans, voting agreements, investor agreements and registration rights agreements regarding common, preferred or other interests or equity securities of any of the Plan Debtors, any claims arising from the rescission of a purchase, sale or other acquisition of any outstanding common, preferred, membership or other interests or equity securities (or any right, claim, or interest in and to any common, preferred, membership or other interests or equity securities) of any of the Plan Debtors, any claims for the payment of any distributions with respect to any common, preferred, membership or other interests or equity securities of any of the Plan Debtors, and any claims for damages or any other relief arising from the purchase, sale, or other acquisition of the outstanding common, preferred, membership or other interests or equity securities of any of the Plan Debtors.

b.      Treatment of Class 7 – Old Equity Rights

Holders of any Claim or Interest arising from or relating to Old Equity Rights will not receive and will not retain any property of the Plan Debtors under the Plan on account of such Claim or Interest and all Old Equity Rights and any Interests or Claims arising from or relating thereto will be cancelled as of the Effective Date.

c.      Voting Status of Class 7 – Old Equity Rights

Class 7 is Impaired.  However, because the holders of Old Equity Rights in Class 7 will not receive any distribution under the Plan, they are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, holders of Old Equity Rights in Class 7 may not vote on the Plan.

**E.      The Liquidating Trust, Dissolution of the Plan Debtors, and Cancellation of Existing Securities and Agreements**

On the Effective Date, the Plan Debtors, on their own behalf and on behalf of the Beneficiaries, shall execute the Liquidating Trust Agreement and take all steps necessary to establish the Liquidating Trust.  The initial Liquidating Trustee shall be [•] or such other Person identified by the Plan Debtors in writing no less than 10 days before the Confirmation Hearing and reasonably acceptable to the First Lien Facility Agent.

The Liquidating Trust (as described more fully below) is being established for the sole purpose of liquidating the Plan Debtors' Assets and distributing the proceeds thereof to certain holders of Allowed Claims, as identified in and prescribed by the Plan.  The Liquidating Trust shall not continue or engage in any trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  Unless otherwise required by law, all parties shall treat the Liquidating Trust as a liquidating trust for all federal income tax purposes.

On the Effective Date of the Plan, each of the Plan Debtors shall transfer and assign all of its respective Assets to the Liquidating Trust free and clear of all Liens, Claims, interests and encumbrances (except for the Adjusted Cash Amount, which shall be distributed to the First Lien Facility Agent for the benefit of the First Lien Facility Lenders on account of the First Lien Facility Secured Claim on or about the Effective Date and as otherwise provided in Section 5.2 and 7.10 of the Plan).

NY\1674006.14

For U.S. federal income tax purposes, the Plan Debtors, the Liquidating Trustee and the Beneficiaries will treat the transfer of assets to the Liquidating Trust as a transfer by the Plan Debtors of their Assets (net of any applicable liabilities) to the Beneficiaries (to the extent of the value of their respective interests in the applicable Assets), followed by a transfer of such Assets (net of any applicable liabilities) by the Beneficiaries to the Liquidating Trust (to the extent of the value of their respective interests in the applicable Assets). For U.S. federal income tax purposes, the Liquidating Trust (except with respect to the Disputed Claims Reserve) will be treated as one or more grantor trusts, and the Beneficiaries will be treated as the grantors and deemed owners of the Liquidating Trust.

Following Confirmation and prior to the occurrence of the Effective Date, the then-current officers and directors of each of the Plan Debtors shall continue in their respective capacities and the Plan Debtors shall execute such documents and take such other action as is necessary to effectuate the transactions provided for in the Plan. On and after the Effective Date, all such officers and directors shall be deemed to have resigned.

Payment of the First Lien Facility Superpriority Claim shall be funded from Net Avoidance Action Proceeds, Other Superpriority Proceeds and any Available Cash remaining after the payment in full of the First Lien Facility Secured Claim, Allowed Administrative Expense Claims (excluding the First Lien Facility Superpriority Claim), Allowed Priority Tax Claims and Allowed Other Priority Claims. Consistent with Article 5 of the Plan, payment of all other Allowed Claims shall be paid from Available Cash in accordance with the priorities set forth in the Plan to the extent of the Available Cash. The Plan Debtors anticipate that there shall be sufficient Available Cash to pay all Allowed Administrative Expense Claims (other than the First Lien Facility Superpriority Claim), Allowed Priority Tax Claims, and Allowed Other Priority Claims in full in Cash on the Effective Date.

On the Effective Date, the Plan Debtors shall set aside Cash in the aggregate amount of $100,000.00 in the Trust Administrative Fund solely to fund the Liquidating Trustee Administrative Fees.

As soon as practicable after the Effective Date, each of the Plan Debtors will be dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Plan Debtors or payments to be made in connection therewith; provided, however, that pursuant to Section 1142(b) of the Bankruptcy Code, the Liquidating Trustee shall be authorized to file each Plan Debtor's final tax returns, and shall be authorized to file and shall file with the official public office for keeping corporate records in each Plan Debtor's state of incorporation a certificate of dissolution or equivalent document. Such a certificate of dissolution may be executed by the Liquidating Trustee without need for any action or approval by the shareholders or Board of Directors of any Plan Debtor. From and after the Effective Date, the Plan Debtors (i) for all purposes shall be deemed to have withdrawn their business operations from any state in which they were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum or take any other action in order to effectuate such withdrawal, (ii) shall be deemed to have cancelled pursuant to the Plan all Interests and all Intercompany Claims, and (iii) shall not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

Notwithstanding anything to the contrary in the Bankruptcy Rules providing for earlier closure of the Plan Debtors' Chapter 11 Cases, when all Assets contributed to the Liquidating Trust have been liquidated and converted into Cash (other than those Assets abandoned by the Liquidating Trust), and such Cash has been distributed in accordance with the Liquidating Trust Agreement and the Plan, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Plan Debtors' Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

On and after the Effective Date and until such time as the First Lien Facility Lenders are paid in full in Cash, in order to settle or abandon Causes of Action owned by the Liquidating Trustee, the Liquidating Trustee shall be required to obtain (a) the prior written consent of the First Lien Facility Agent or, (b) an Order of the Bankruptcy Court approving such settlement or abandonment after notice and a hearing. After the First Lien Facility Lenders are paid in full in Cash, except as otherwise set forth in this Plan, the Confirmation Order or the Liquidating Trust Agreement, the Liquidating Trustee shall not be required to obtain approval of the First Lien Facility Agent or the Bankruptcy Court to settle or abandon Causes of Action owned by the Liquidating Trustee.

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order, after transfer of the Plan Debtors' Assets to the Liquidating Trust pursuant to Section 7.2.3 of the Plan, the Liquidating Trustee (and to the extent retained by the Liquidating Trust to perform such work, any other Person) will, subject to Section 7.8 of the Plan, have the exclusive right to enforce any and all Causes of Action against any Entity and rights of the Plan Debtors that arose before or after the Petition Date, including but not limited to the rights and powers of a trustee and debtor-in-possession, against any Entity whatsoever, including but not limited to all avoidance powers granted to the Plan Debtors under the Bankruptcy Code and all causes of action and remedies granted pursuant to Sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code, but excluding, for the avoidance of doubt, Released Claims.

Subject to Section 7.8 of the Plan, the Liquidating Trustee shall have the right to abandon any Causes of Action or other Assets that the Liquidating Trustee deems appropriate without the approval of the Bankruptcy Court.

As promptly as practicable after the making of any distributions that are required under the Plan to be made on the Effective Date or as soon as practicable thereafter in recognition of the applicable claims reconciliation process, but in any event no later than ten (10) Business Days after the making of such distributions, the Liquidating Trustee shall File with the Bankruptcy Court and serve on the United States Trustee a report setting forth the amounts and timing of all such distributions and the recipients thereof. In addition, the Liquidating Trustee shall File with the Bankruptcy Court and serve on the United States Trustee quarterly reports summarizing the cash receipts and disbursements of the Liquidating Trust for the immediately preceding three-month period. Each quarterly report shall also state the Liquidating Trust's cash balances as of the beginning and ending of each such period. Quarterly reports shall be provided no later than the fifteenth (15th) day of each January, April, July and October until all Final Distributions under the Plan have been made.

On the Effective Date, any document, agreement, or instrument evidencing any Claim or Interest against or in the Plan Debtors (including, but not limited to, the First Lien Credit Agreement and the Second Lien Credit Agreement) that has not been Assumed by the Purchaser shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order, or rule and the Plan Debtors shall have no further obligations under such documents, agreements or instruments. Notwithstanding the forgoing and Section 7.10 of the Plan (and consistent with Section 5.2 of the Plan), the Liens on Available Cash securing the First Lien Facility Secured Claim shall remain on Available Cash.

## F.     Liquidating Trust Agreement

The Plan is a liquidating plan pursuant to which all of the Plan Debtors' remaining Assets are to be transferred to a Liquidating Trust (subject to existing Liens and encumbrances, to the extent specified in the Plan) which will liquidate the Plan Debtors' Assets; as and when any funds are realized from the sale or disposition of such Assets, such funds will be distributed to certain holders of Allowed Claims, whose claims against the Plan Debtors will be exchanged for beneficial interests in the Liquidating Trust.

On the Effective Date, the Plan Debtors, on their own behalf and on behalf of the Beneficiaries, shall execute the Liquidating Trust Agreement and take all steps necessary to establish the Liquidating Trust.  The initial Liquidating Trustee shall be [•] or such other Person identified by the Plan Debtors in writing no less than 10 days before the Confirmation Hearing and reasonably acceptable to the First Lien Facility Agent.

## G.     Objections to Claims

Following the Effective Date, only the Liquidating Trustee shall be entitled to object to Claims not previously Allowed.  No objection shall be required with respect to a proof of Claim Filed after the Bar Date, the Governmental Claims Bar Date or the Administrative Expense Claims Bar Date (as applicable), and any and all such Claims shall be deemed disallowed unless otherwise ordered by the Bankruptcy Court after notice and a hearing.  Any objections to Administrative Expense Claims shall be Filed and served on the claimant no later than the later of (x) sixty (60) days after the Administrative Claims Bar Date, and (y) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, which later date may be fixed before or after the date specified in clause (x) above.  Any objections to any Claim other than an Administrative Expense Claim shall be Filed and served on the claimant no later than the later of (x) forty-five (45) days after the date the Claim is Filed, (y) forty-five (45) days after the Effective Date and (z) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing.

After the Effective Date, the Liquidating Trustee shall have the exclusive authority to compromise, settle, otherwise resolve, or withdraw any objections to Disputed Claims without approval of the Bankruptcy Court.

After the Confirmation Date, a proof of Claim for any Claim other than an Administrative Expense Claim may not be amended without the authorization of the Bankruptcy Court.  After the Administrative Expense Claims Bar Date, a proof of Claim for an

Administrative Expense Claim may not be amended without the authorization of the Bankruptcy Court. Any such new proofs of Claim or proofs of claim for an Administrative Expense Claim amended after the Confirmation Date or the Administrative Expense Claims Bar Date (as applicable) shall be deemed disallowed in full and expunged without any action by the Plan Debtors or the Liquidating Trustee, unless the holder of the Claim or Administrative Expense Claim has obtained prior Bankruptcy Court authorization to File the amendment.

Notwithstanding any other provision in the Plan, if any portion of a Claim or Administrative Expense Claim is Disputed, no payment or distribution provided in the Plan shall be required to be made on account of such Claim or Administrative Expense Claim unless and until such Disputed Claim or Disputed Administrative Expense Claim becomes Allowed in its entirety.

## H.      Distributions Under the Plan

In accordance with Section 7.1 of the Plan and unless otherwise expressly provided in the Plan, to the extent more than one Plan Debtor is liable for any Claim, such Claim shall be considered a single Claim and entitled only to the payment provided therefor under the applicable provisions of the Plan.

Distributions to holders of Allowed Claims shall be made: (a) at the addresses set forth in the proofs of Claim Filed by such holders; (b) at the addresses set forth in any written notices of address change Filed with the Bankruptcy Court or delivered to the Liquidating Trustee after the date on which any related proof of Claim was Filed; or (c) at the addresses reflected in the Schedules relating to the applicable Allowed Claim if no proof of Claim has been Filed and the Liquidating Trustee has not received a written notice of a change of address.

Except as otherwise provided in the Confirmation Order, Cash payments to be made pursuant to the Plan shall be made by checks drawn on a domestic bank or by wire transfer from a domestic bank, at the option of the Plan Debtors (with respect to Cash payments made on the Effective Date) and Liquidating Trustee (with respect to Cash payment made after the Effective Date).

Except as required by applicable bankruptcy law or otherwise agreed by the Plan Debtors or the Liquidating Trustee, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim. To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Allowed Claim first and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to the portion of such Allowed Claim representing accrued but unpaid interest.

No payment of Cash in an amount of less than $100.00 shall be required to be made on account of any Allowed Claim. Such undistributed amount shall instead be made part of the Available Cash for distribution in accordance with the Plan.

Unless otherwise expressly set forth in the Plan with respect to a specific Claim or Class of Claims, for the purpose of the provisions of Article 10 of the Plan, the "Face Amount" of a Disputed Claim means the amount set forth on the proof of Claim unless the Disputed Claim has been estimated for distribution purposes or, in the alternative, if no proof of Claim has been timely Filed or deemed Filed, zero.

If the distribution check to any holder of an Allowed Claim is not cashed within 90 days after issuance by the Liquidating Trustee, the Liquidating Trustee may give a stop payment order with respect to the check and no further distributions shall be made to such holder on account of such Allowed Claim. Such Allowed Claim shall be discharged and the holder of such Allowed Claim shall be forever barred from asserting such Claim against the Liquidating Trustee, the Plan Debtors, or the Liquidating Trust. In such cases, any Cash held for distribution on account of such Claim shall (i) become the property of the Liquidating Trust, and (ii) be distributed to other Creditors in accordance with the terms of the Plan.

The Plan Debtors or Liquidating Trust, as applicable, shall make distributions to the holders of various Allowed Claims as follows:

- On the Effective Date, the First Lien Facility Agent shall receive, for the benefit of the First Lien Facility Lenders and Hedge Bank, on account of the First Lien Facility Secured Claim, the Adjusted Cash Amount.

- On the Effective Date, or as soon thereafter as practicable in accordance with the claims resolution process described in the Plan, the Liquidating Trustee shall distribute to the holders of Allowed Administrative Expense Claims (other than the First Lien Facility Superpriority Claim), Allowed Priority Tax Claims, and Allowed Other Priority Claims the distributions as set forth in the Plan.

- From time to time, but in no event less than once every three (3) months, the Liquidating Trustee shall distribute all Available Cash (other than Disputed Available Cash, Net Avoidance Action Proceeds and Other Superpriority Proceeds), if any, (a) to the First Lien Facility Agent for distribution to the First Lien Facility Lenders in satisfaction of the First Lien Facility Lien Facility Secured Claim, (b) after payment in full of the First Lien Facility Secured Claim, to the First Lien Facility Agent for distribution to the First Lien Facility Lenders in satisfaction of the First Lien Facility Superpriority Claim and (c) after payment in full of the First Lien Facility Secured Claim and First Lien Facility Superpriority Claim, Pro Rata to holders of Allowed General Unsecured Claims.

- The Liquidating Trustee shall distribute any Net Avoidance Action Proceeds or Other Superpriority Proceeds, if any, to the First Lien Facility

Agent for distribution to the First Lien Facility Lenders no later than two (2) Business Days after receipt thereof by the Liquidating Trustee.

- From time to time, but in no event less than once every three (3) months, the Liquidating Trustee shall, after payment in full of the First Lien Facility Superpriority Claim, distribute any remaining Net Avoidance Action Proceeds or Other Superpriority Proceeds Pro Rata to holders of Allowed General Unsecured Claims.

- After (a) the liquidation into Cash of all Causes of Action (other than those Causes of Action abandoned by the Liquidating Trustee), (b) the collection of all remaining sums due or otherwise remitted or returned to the Plan Debtors' Estates, and (c) the resolution of all Disputed Claims, the Liquidating Trustee shall distribute the remaining Available Cash (including any remaining Disputed Available Cash, Net Avoidance Action Proceeds and Other Superpriority Proceeds) in accordance with the Plan (the "<u>Final Distribution</u>"). The date of the Final Distribution shall be the "<u>Final Distribution Date</u>."

- On the Effective Date, the Liquidating Trustee shall establish a reserve (the "<u>Disputed Claims Reserve</u>") for the payment of Disputed Claims in accordance with the terms of the Liquidating Trust Agreement. Upon ultimate determination that any Disputed Claim is not Allowed, the Liquidating Trustee shall immediately release the portion of the Disputed Claim Reserve on account of such Claim and distribute such portion in accordance with the Plan.

- In connection with the Plan and the distributions made in accordance therewith, to the extent applicable, the Liquidating Trustee shall comply with all tax withholding and reporting requirements imposed by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

## I.     Conditions to Confirmation

The following are each conditions to entry of the Confirmation Order:

- The Bankruptcy Court shall have approved this Disclosure Statement with respect to the Plan in form and substance that is acceptable to the Plan Debtors and the First Lien Facility Agent; and

- The Confirmation Order shall be in form and substance reasonably satisfactory to the Plan Debtors and the First Lien Facility Agent.

**J.      Conditions to the Effective Date**

The Plan shall not become effective and the Effective Date shall not occur unless and until:

- All conditions to Confirmation of the Plan set forth in Section 11.1 of the Plan remain satisfied or have been waived;

- The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to the Plan Debtors and the First Lien Facility Agent;

- No stay of the Confirmation Order shall be in effect at the time the other conditions set forth in Section 11.2 of the Plan are satisfied, or, if permitted, waived;

- All documents, instruments and agreements, in form and substance reasonably satisfactory to the Plan Debtors and the First Lien Facility Agent provided for under the Plan or necessary to implement the Plan, including, without limitation, the Liquidating Trust Agreement, shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby; and

- The Plan Debtors shall have reasonably determined that there shall exist sufficient Available Cash to pay in full in Cash on the Effective Date all estimated Allowed Administrative Expense Claims (other than the First Lien Facility Superpriority Claim), Allowed Other Priority Claims, and Allowed Priority Tax Claims.

**K.      Termination of Plan for Failure To Become Effective**

If the Effective Date shall not have occurred on or prior to the date that is twenty (20) days after the Confirmation Date, then the Plan shall terminate and be of no further force or effect unless the provisions of Section 11.3 of the Plan are waived in writing by the Plan Debtors and the First Lien Facility Agent.

**L.      Modification of the Plan, Waiver of Conditions**

Subject to the restrictions on Plan modifications set forth in Section 1127 of the Bankruptcy Code and either (a) the prior written consent of the First Lien Facility Agent or (b) the approval of the Bankruptcy Court after notice and a hearing, the Plan Debtors reserve the right to alter, amend or modify the Plan before its substantial consummation.

The Plan Debtors and the First Lien Facility Agent may each waive any or all of the conditions set forth in Sections 11.1 and/or 11.2 of the Plan (other than, with respect to waiver by the Plan Debtors, the conditions set forth in Sections 11.2.1 and 11.2.5 of the Plan, and, with respect to waiver by the First Lien Facility Agent, the condition set forth in Section 11.2.1 of the Plan).

NY\1674006.14

## M.    Effect of Confirmation

Pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Plan Debtors' Chapter 11 Cases and the Plan to the fullest extent permitted by law.

Except as otherwise provided in Section 1141(d) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind (i) any holder of a Claim against or Interest in the Plan Debtors and its respective successors and assigns (including the Liquidating Trust), whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan and (ii) the Liquidating Trustee.

Unless otherwise provided in a separate Order from the Bankruptcy Court, all injunctions or stays arising under or entered during the Plan Debtors' Chapter 11 Cases in accordance with Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect and apply to all Beneficiaries and creditors holding claims against the Plan Debtors, their Estates, the Plan Debtors' Assets, the Liquidating Trustee and the Liquidating Trust until the Final Distribution Date or, if different, the date indicated in such applicable Order.

Upon the entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former Affiliates, employees, agents, officers, directors, principals, or advisors, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

## N.    Exculpation, Injunction, and Limitation of Liability

### 1.    Exculpation

**Except as otherwise specifically provided in the Plan, none of the Purchaser (in its capacity as a purchaser under the APA), the Plan Debtors, the Special Committee, the Plan Debtors' Affiliates, the Liquidating Trustee, the First Lien Facility Agent, the First Lien Facility Lenders (in their capacity as such), the Hedge Bank (in its capacity as such), nor any of such parties' respective present members, officers, directors, shareholders, employees, representatives, advisors, attorneys, financial advisors, investment bankers, agents or Affiliates, or any of such parties' successors and assigns, shall have or incur, and such parties are hereby released from, any Claim, obligation, cause of action in any form whatsoever or liability to one another or to any holder of a Claim or an Interest, or any other party in interest, or any of their respective officers, directors, shareholders, members and/or enrollees, employees, representatives, advisors, attorneys, financial advisors, investment bankers, agents, related professionals or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Plan Debtors' Chapter 11 Cases, the negotiation and execution of the Plan, the Disclosure Statement, the APA and the 363 Sale, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, the APA, the 363 Sale  and the property to be distributed under**

the Plan, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all prepetition activities leading to the promulgation and confirmation of the Plan except fraud, willful misconduct or gross negligence as determined by a Final Order. Nothing in Section 12.5 of the Plan shall: (i) be construed as a release of any Entity's fraud, gross negligence or willful misconduct with respect to matters set forth in Section 12.5 of the Plan or (ii) limit or abrogate the obligations of the Plan Debtors or the Purchaser and any of their respective Affiliates to one another under the APA. Any of the foregoing parties in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities (if any) under the Plan.

Notwithstanding any other provision of the Plan, neither any holder of a Claim or Interest, nor other party in interest, nor any of their respective officers, directors, shareholders, members and/or enrollees, employees, representatives, advisors, attorneys, financial advisors, investment bankers, related professionals, agents or Affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Purchaser (in its capacity as a purchaser under the APA), the Plan Debtors, the Special Committee, the Plan Debtors' Affiliates, the Liquidating Trustee, the First Lien Facility Agent, the First Lien Facility Lenders (in their capacity as such), the Hedge Bank (in its capacity as such), nor any of such parties' respective present members, officers, directors, shareholders, employees, representatives, advisors, attorneys, financial advisors, investment bankers, related professionals, agents or Affiliates, or any of such parties' successors and assigns, for any act or omission in connection with, relating to, or arising out of, the Plan Debtors' Chapter 11 Cases, the negotiation and execution of the Plan, the Disclosure Statement, the APA and the 363 Sale, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, the APA, the 363 Sale and the property to be distributed under the Plan, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all prepetition activities leading to the promulgation and confirmation of the Plan except fraud, willful misconduct or gross negligence as determined by a Final Order.

2. **Injunction**

Except as otherwise specifically provided in the Plan or the Confirmation Order, all Entities or Persons who have held, hold or may hold claims, rights, causes of action, liabilities or any equity interests based upon any act or omission, transaction or other activity of any kind or nature related to the Plan Debtors, the Liquidating Trust or the Plan Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, regardless of the filing, lack of filing, allowance or disallowance of such claims, rights, causes of action, liabilities or any equity interests and regardless of whether such Entity or Person has voted to accept the Plan, and any successors, assigns or representatives of such Entities or Persons shall be precluded and permanently enjoined on and after the Effective Date from (a) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order with respect to any such claims, rights, causes of action, liabilities or any equity interests against the Plan Debtors, the Special Committee, the Liquidating

Trustee, the Liquidating Trust or any assets of the Plan Debtors or the Liquidating Trust which such Entities or Persons possessed or may possess prior to the Effective Date, (b) the creation, perfection or enforcement of any encumbrance of any kind with respect to any such claims, rights, causes of action, liabilities or any equity interests against the Plan Debtors, the Special Committee, the Liquidating Trustee, the Liquidating Trust or any assets of the Plan Debtors or the Liquidating Trust which they possessed or may possess prior to the Effective Date, and (c) the assertion of any claims, rights, causes of action, liabilities or any equity interests that are released by the Plan.

3.  **Releases by Plan Debtors**

Except as expressly provided in the Plan, upon the Effective Date, each of the Plan Debtors hereby (i) remises, acquits, waives, releases and forever discharges each of the Debtor Releasees, and (ii) covenants and agrees never to institute or cause to be instituted any suit or other form of action or proceeding of any kind or nature whatsoever against any of the Debtor Releasees based upon any claims, demands, indebtedness, agreements, promises, causes of action, obligations, damages or liabilities of any nature whatsoever (other than rights to enforce obligations of the Debtor Releasees under any Order of the Bankruptcy Court, the Plan and all contracts, instruments, releases and other agreements delivered in connection therewith), in law or in equity, whether or not known, suspected or claimed, that the Plan Debtors or their Estates ever had, claimed to have, has, or may have or claim to have against the Debtor Releasees, or any of them, by reason of any matter, cause, thing, act or omission of the Debtor Releasees, or any of them, in each case related to the Plan Debtors, their Chapter 11 Cases, the 363 Sale or the Plan against Debtor Releasees; provided, however, that nothing herein shall release any of the Debtor Releasees from any act or omission that constitutes fraud, willful misconduct or gross negligence as determined by a Final Order.

4.  **Releases by Holders of Claims and Interests**

As of the Effective Date, to the fullest extent permitted under applicable law, in consideration for the obligations under the Plan and the Cash, securities, contracts, instruments, releases and other agreements or documents to be delivered in connection with the Plan, and the benefits provided by the Creditor Releasees in the Plan and in the Plan Debtors' Chapter 11 Cases, each present and former holder of a Claim or Interest who votes in favor of the Plan will be deemed to release forever, waive and discharge any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the rights to enforce the Plan Debtors' obligations under any Order of the Bankruptcy Court, the APA, the Plan and the securities, contracts, instruments, releases and other agreements and documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Plan Debtors, their Chapter 11 Cases, the 363 Sale, or the Plan against Creditor Releasees; provided, however, that nothing herein shall release any of the Creditor Releasees from

NY\1674006.14

any act or omission that constitutes fraud, willful misconduct or gross negligence as determined by a Final Order.

     5.     <u>Limitation of Liability</u>

     Except as expressly set forth in the Plan or the APA, following the Effective Date, none of the Plan Debtors, the Liquidating Trust, the Liquidating Trustee, the Special Committee, the Plan Debtors' Affiliates, the First Lien Facility Agent, the First Lien Facility Lenders (in their capacity as such), the Hedge Bank (in its capacity as such), nor any of their respective members, officers, directors, employees, advisors, attorneys, professionals, agents or Affiliates shall have or incur any liability to any holder of a Claim or Interest who votes in favor of the Plan for any act or omission in connection with, related to, or arising out of, the Plan Debtors' Chapter 11 Cases, the 363 Sale, the negotiation and pursuit of confirmation of the Plan, the consummation of the Plan or any contract, instrument, release or other agreement or document created in connection with the 363 Sale, the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct.

**O.     Retention of Jurisdiction**

     Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court may retain jurisdiction over the Plan Debtors' Chapter 11 Cases after the Effective Date to the fullest extent legally permissible, including jurisdiction to, among other things:

- Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of (x) any request for payment of any Administrative Expense Claim, (y) any Disputed Claims or Interests and (z) any and all objections to the allowance or priority of any Claim or Interest;

- To the extent not inconsistent with the Bankruptcy Code, hear and determine any and all causes of action against any Person and rights of the Plan Debtors that arose before or after the Petition Date, including, but not limited to, the rights and powers of a trustee and debtor-in-possession, against any Person whatsoever, including, but not limited to, all avoidance powers granted to the Plan Debtors under the Bankruptcy Code and all causes of action and remedies granted pursuant to Sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code;

- Grant or deny any applications for allowance of compensation for Professionals authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

- Resolve any matters relating to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to

which any Plan Debtor is a party or with respect to which any of the Plan Debtors may be liable, including, without limitation, the determination of whether such contract is executory for the purposes of Section 365 of the Bankruptcy Code, and hear, determine and, if necessary, liquidate any Claims arising therefrom;

- Enter Orders approving the Liquidating Trustee's post-Confirmation sale or other disposition of Assets of the Liquidating Trust;

- Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and the Liquidating Trust Agreement;

- Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving any Plan Debtor or the Liquidating Trust that may be pending in the Plan Debtors' Chapter 11 Cases on the Effective Date;

- Hear and determine matters concerning state, local or federal taxes in accordance with Sections 346, 505 or 1146 of the Bankruptcy Code;

- Enter such Orders as may be necessary or appropriate to implement or consummate the provisions of the Liquidating Trust Agreement, the Plan and the Confirmation Order;

- Hear and determine any matters concerning the enforcement of the provisions of Article 12 of the Plan and any other exculpations, limitations of liability or injunctions contemplated by the Plan;

- Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Liquidating Trust Agreement, the Plan or the Confirmation Order;

- Permit the Plan Debtors, to the extent authorized pursuant to Section 1127 of the Bankruptcy Code, to modify the Plan or any agreement or document created in connection with the Plan, or remedy any defect or omission or reconcile any inconsistency in the Plan or any agreement or document created in connection with the Plan;

- Issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Liquidating Trust Agreement, the Plan or the Confirmation Order;

- Enforce any injunctions entered in connection with or relating to the Plan or the Confirmation Order;

- Enter and enforce such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or distributions pursuant to the Liquidating Trust Agreement or the Plan are enjoined or stayed;

- Determine any other matters that may arise in connection with or relating to the Plan, the 363 Sale, the APA or the Confirmation Order;

- Enter any Orders in aid of prior Orders of the Bankruptcy Court; and

- Enter a final decree closing the Plan Debtors' Chapter 11 Cases.

**P.     Treatment of Executory Contracts and Unexpired Leases**

Pursuant to the Bid Procedures Order and the Sale Order, the Bankruptcy Court established deadlines and procedures for the assumption and rejection of executory contracts and unexpired leases by the Debtors at the direction of the Purchaser and allocated responsibility for payment of cure amounts between the Debtors and the Purchaser.  Any executory contracts and unexpired leases of the Plan Debtors, including executory contracts and unexpired leases entered into after the Petition Date, not assumed and assigned to the Purchaser or rejected prior to the Effective Date or with respect to which the Plan Debtors have not Filed an Assumption and Assignment Notice (as defined in the Sale Order) prior to the Effective Date (the "Remaining Contracts") shall be rejected pursuant to Section 6.5 of the Plan unless assumed or assumed and assigned pursuant to Section 6.2 of the Plan.  Notwithstanding anything in Article 6 of the Plan to the contrary, to the extent the Plan Debtors have Filed an Assumption and Assignment Notice prior to the Effective Date with respect to an executory contract or unexpired lease to be assumed and assigned to the Purchaser, but the Bankruptcy Court has not yet entered an Order approving such assumption and assignment and fixing the cure amount therefor, any such cure amount shall be paid in full in Cash by the Purchaser, and neither the Plan Debtors nor the Liquidating Trust shall have any liability therefor.

As of the Effective Date, the Plan Debtors shall assume and assign to the Liquidating Trust, pursuant to Bankruptcy Code Section 365, each of the Remaining Contracts that are identified in Exhibit 3 to the Plan (the "Assumption Schedule") that have not expired under their own terms prior to the Effective Date.  The Plan Debtors reserve the right to amend the Assumption Schedule not later than twenty-eight (28) days prior to the Confirmation Hearing either to:  (a) delete any executory contract or lease listed therein and provide for its rejection pursuant to Section 6.5 of the Plan; or (b) add any executory contract or lease to the Assumption Schedule, thus providing for its assumption and assignment pursuant to Section 6.2 of the Plan. The Plan Debtors shall provide notice of any such amendment to the Assumption Schedule to the parties to the executory contract or lease affected thereby not later than twenty-eight (28) days prior to the Confirmation Hearing.  The Confirmation Order shall constitute an Order of the Bankruptcy Court pursuant to Bankruptcy Code Section 365 approving all assumptions and assignments described in Section 6.2 of the Plan, as of the Effective Date.

Any monetary defaults under each Remaining Contract to be assumed or assumed and assigned under the Plan shall be satisfied pursuant to Bankruptcy Code Section 365(b)(1) by

payment of the cure amount in Cash in full on the Effective Date by the Plan Debtors or the Purchaser pursuant to the Sale Order. In the event of a dispute regarding (i) the amount or timing of any cure payments, (ii) the ability of the Plan Debtors, the Liquidating Trustee, or an assignee thereof to provide adequate assurance of future performance under the Remaining Contracts to be assumed or assumed and assigned, as applicable, or (iii) any other matter pertaining to assumption or assumption and assignment of the Remaining Contracts to be assumed, the Liquidating Trustee or the Purchaser, as applicable, shall pay all required cure amounts promptly following the entry of a Final Order resolving the dispute.

To the extent that any party to a Remaining Contract identified for assumption and assignment asserts arrearages or damages pursuant to Bankruptcy Code Section 365(b)(1), or has any other objection with respect to any proposed assumption, cure or assignment on the terms and conditions provided in the Plan, all such arrearages, damages and objections must be Filed and served no later than twenty-one (21) days after such party is served with notice of such assumption and assignment.

Failure to assert such arrearages, damages or objections in the manner described above shall constitute consent to the proposed assumption, cure or assignment on the terms and conditions provided in the Plan, including an acknowledgement that the proposed assumption and/or assignment provides adequate assurance of future performance and that the amount identified for "cure" in the Assumption Schedule is the amount necessary to cover any and all outstanding defaults under the Remaining Contract to be assumed or assumed and assigned, as well as an acknowledgement and agreement that no other defaults exist under such Remaining Contract.

If any assumption of a Remaining Contract proposed in the Plan for any reason is not approved by the Bankruptcy Court, then the Plan Debtors shall be entitled, in their sole discretion, upon written notice to the applicable non-Debtor party to such Remaining Contract, to deem such Remaining Contract to have been rejected pursuant to the provisions of Section 6.5 of the Plan.

Except for those executory contracts and unexpired leases that (a) are assumed or assumed and assigned pursuant to the Plan, (b) have been previously assumed and assigned or rejected pursuant to previous Orders of the Bankruptcy Court, or (c) are the subject of a pending motion before the Bankruptcy Court with respect to the assumption and assignment of such executory contracts and unexpired leases, as of the Effective Date, all executory contracts and unexpired leases of the Plan Debtors shall be rejected pursuant to Section 365 of the Bankruptcy Code; provided, however, that neither the inclusion by the Plan Debtors of a contract or lease on the Assumption Schedule nor anything contained in Article 6 of the Plan shall constitute an admission by any Plan Debtor that such contract or lease is an executory contract or unexpired lease or that any Plan Debtor or its successors and assigns, including, but not limited to, the Liquidating Trust, has any liability thereunder.

The Confirmation Order shall constitute an Order of the Bankruptcy Court approving the rejection of executory contracts and unexpired leases under Section 6.5 of the Plan pursuant to Bankruptcy Code Section 365 as of the Effective Date. Any Claim for damages arising from any such rejection must be Filed within thirty (30) days after the mailing of notice

of the entry of the Confirmation Order, or such Claim shall receive no distribution under the Plan or otherwise on account of such Claim. All Allowed Claims arising from the rejection of the Plan Debtors' executory contracts or unexpired leases shall be classified as General Unsecured Claims and shall be treated in accordance with Section 5.4 of the Plan.

## Q.    No Admissions, Revocation of the Plan, Severability of Plan Provisions, Entire Agreement

If Confirmation or the Effective Date does not occur, nothing contained in the Plan or Disclosure Statement shall be deemed as an admission by the Plan Debtors with respect to any matter set forth therein including, without limitation, liability on any Claim or the propriety of any Claims classification.

The Plan Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Plan Debtors revoke or withdraw the Plan, or if Confirmation does not occur or if the Plan does not become effective, then the Plan shall be null and void, and nothing contained in the Plan or Disclosure Statement shall:  (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Plan Debtors; (b) constitute an admission of any fact or legal conclusion by the Plan Debtors or any other Entity; or (c) prejudice in any manner the rights of the Plan Debtors in any further proceedings involving the Plan Debtors.

If prior to Confirmation any term or provision of the Plan that does not govern the treatment of Claims or Interests is held by the Bankruptcy Court to be invalid, void or unenforceable, at the request of the Plan Debtors the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, Impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

The Plan (together with the Liquidating Trust Agreement) sets forth the entire agreement and undertaking relating to the subject matter thereof and supersedes all prior discussions and documents.  The Plan Debtors' Estates shall not be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter thereof, other than as expressly provided for therein.

## R.    Preservation of Rights of Setoffs

The Plan Debtors, may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Plan Debtors may have against the holder of such Claims; but neither the failure to do so nor the allowance of any Claim under the Plan shall

constitute a waiver or release by the Plan Debtors of any such claim that the Plan Debtors may have against such holder.

## S.    Exemption from Certain Transfer Taxes

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any Security or the making or delivery of any instrument of transfer under the Plan may not be taxed under any law imposing a stamp tax, use tax, sales tax or similar tax. Any sale of any Asset of the Plan Debtors or the Liquidating Trust occurring after or upon the Effective Date shall be deemed to be in furtherance of the Plan.

## T.    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

## U.    Defenses with Respect to Unimpaired Claims

Except as otherwise provided in the Plan, nothing shall affect the rights and legal and equitable defenses of the Plan Debtors with respect to any Unimpaired Claim, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

## V.    Dissolution of Creditors' Committee

The Creditors' Committee shall be dissolved on the Effective Date without need for a further Order of the Bankruptcy Court.

## V.
## CONFIRMATION OF THE PLAN

## A.    Confirmation Hearing

The Bankruptcy Court has scheduled the Confirmation Hearing for confirmation of the Plan to commence on June 1, 2011 at 10:00 a.m. (Prevailing Eastern Time) before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, One Bowling Green, Room 610, New York, New York, 10004. The Confirmation Hearing may be adjourned from time to time without notice except as given at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing. The Bankruptcy Court has directed that objections, if any, to the confirmation of the Plan be served on or before [_____], 2010 at [__:___ __m.] (Prevailing Eastern Time) in the manner described in the Notice accompanying this Disclosure Statement.

## B.    Confirmation Standards

For a plan to be confirmed, the Bankruptcy Code requires, among other things, that a plan be proposed in good faith and comply with the applicable provisions of chapter 11 of

NY\1674006.14

the Bankruptcy Code. Section 1129 of the Bankruptcy Code also imposes requirements that at least one class of impaired claims accept a plan, that confirmation of a plan is not likely to be followed by the need for further financial reorganization, that a plan be in the best interest of creditors, and that a plan be fair and equitable with respect to each class of claims or interests which is impaired under the plan.

The Bankruptcy Court will confirm a plan only if it finds that all of the requirements enumerated in section 1129 of the Bankruptcy Code have been met. The Plan Debtors believe that the Plan satisfies all of the requirements for confirmation.

# VI.
# FUNDING AND FEASIBILITY OF THE PLAN

## A.    Funding of the Plan

The Plan will be funded from Available Cash except that the payment of the Allowed First Lien Facility Superpriority Claim shall be funded from (a) the Net Avoidance Action Proceeds, (b) Other Superpriority Proceeds and (c) any Available Cash (other than Net Avoidance Action Proceeds and Other Superpriority Proceeds) remaining after payment in full of the First Lien Facility Secured Claim. The Plan Debtors anticipate that there shall be sufficient Available Cash to pay all Allowed Administrative Expense Claims (other than the First Lien Facility Superpriority Claim), Allowed Priority Tax Claims, and Allowed Other Priority Claims in full in Cash on the Effective Date.

## B.    Best Interests Test

An Impaired Class of Claims shall have accepted the Plan if (i) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

Notwithstanding acceptance of the Plan by each Impaired Class, in order to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Impaired Class who has not voted to accept the Plan. Accordingly, if an Impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such Class member would receive if the Plan Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

To estimate what members of each Impaired Class of unsecured creditors and equity security holders would receive if the Plan Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Plan Debtors' Assets if their Chapter 11 Cases were converted to a chapter 7 case under the

Bankruptcy Code and their Assets were liquidated by a trustee in bankruptcy (the "Liquidation Value" of such assets). The Liquidation Value would consist of the net proceeds from the disposition of the Plan Debtors' Assets and would be augmented by any Cash held by the Plan Debtors.

As detailed in the liquidation analysis prepared by PWP, the financial advisors to the Debtors, from information provided by the Plan Debtors and other sources, a copy of which is attached hereto as Exhibit C, the Liquidation Value of the Plan Debtors' Assets available to general Creditors would be reduced by the costs and expenses of the liquidation, as well as other administrative expenses of the chapter 7 cases. The Plan Debtors' costs of liquidation under chapter 7 would include the compensation of a trustee or trustees, as well as counsel and other professionals retained by the trustee(s), disposition expenses, all unpaid expenses incurred by the Plan Debtors during their chapter 11 proceedings (such as compensation for attorneys and accountants) which are allowed in the chapter 7 proceedings, and litigation costs and claims against the Plan Debtors arising from their business operations during the pendency of their Chapter 11 Cases and chapter 7 liquidation proceedings. These costs, expenses and claims would be paid in full out of the Plan Debtors' liquidation proceeds before the balance would be made available to pay other Claims.

Once the percentage recoveries in liquidation of secured claimants, priority claimants, general unsecured creditors and equity security holders are ascertained, the value of the distribution available out of the Liquidation Value is compared with the value of the property offered to each of the classes of Claims and Interests under the Plan to determine whether the Plan is in the best interests of each Class. The Plan Debtors believe that the Plan satisfies the best interest test because the Plan Debtors' assets will be liquidated under the terms of the Plan. If the Plan is not confirmed and, instead, the Plan Debtors' Chapter 11 Cases are converted to chapter 7, the value of the Plan Debtors' Estates would diminish because (i) the Plan Debtors' Estates would need to pay fees to any chapter 7 trustee and (ii) the Plan Debtors' Estates would incur increased professional fee costs associated with supporting the chapter 7 proceedings and associated litigation costs and claims. Comparing the claims against the Plan Debtors described herein with the liquidation analysis attached hereto as Exhibit C, the Plan Debtors believe that distributions under the Plan will provide at least the same recovery to holders of Allowed Claims against each of the Plan Debtors on account of such Allowed Claims as would distributions by a chapter 7 trustee. Conversion would also likely delay the liquidation process and distributions to creditors.

## C. Avoidance Action Analysis

The Plan Debtors transferred $239,987,063.45 to approximately 196 creditors other than insiders during the 90 days prior to the Petition Date. A list of such transfers is attached hereto as Exhibit E. The Liquidating Trustee will perform an analysis of such transfers to determine whether legal actions for recovery of any or all such transfers as preferences under Section 547 of the Bankruptcy Code are warranted.

The Plan Debtors transferred $22,844,695.90 to 4 creditors who are insiders, not including intercompany transfers between Plan Debtors, during the approximately one year prior to the Petition Date. A list of such transfers is attached hereto as Exhibit F. The Liquidating

Trustee will perform an analysis of such transfers to determine whether legal actions for recovery of any or all such transfers as preferences under Section 547 of the Bankruptcy Code are warranted.

The Plan Debtors believe that any transfers made to persons released in the Plan would likely not be deemed preferential and that the Plan Debtors' determination as to which transfers are preferential would not differ markedly from that of a trustee under chapter 7 of the Bankruptcy Code. Except as otherwise provided in the releases, the Plan Debtors and the Liquidating Trustee reserve their right to conduct a further review of the transfers made within 90 days of the Petition Date and to seek recovery of such transfers under the provisions of the Bankruptcy Code before or after the Confirmation Date.

The Liquidation Analysis described in Section VI(B) above was prepared by PWP in partial reliance on the estimated aggregate recovery from preference claims formulated by the Plan Debtors. Based on a preliminary review of payments made 90 days prior to the Petition Date, the Plan Debtors do not expect there to be significant recoveries on account of preferences because prior to the Petition Date the Plan Debtors did not face imminent liquidity constraints and were able to pay obligations in the ordinary course.

## D.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Plan Debtors be able to perform their obligations under the Plan. For purposes of determining whether the Plan meets this requirement, the Plan Debtors analyzed their ability to meet their obligations under the Plan. The Plan Debtors believe that they have adequate funding to be able to meet their obligations under the Plan.

## E.    Risk Factors Associated with the Plan

Holders of Claims against the Plan Debtors should read and consider carefully the information set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan. This information, however, should not be regarded as the only risks involved in connection with the Plan and its implementation.

A substantial amount of time may elapse between the Effective Date and the receipt of distributions, including, but not limited to, a Final Distribution, under the Plan for holders of Claims, because of the time required to achieve recovery of certain assets. To the extent that distributions under the Plan are derived, in whole or in part, from recoveries on the Causes of Action, including Avoidance Actions, prosecuted by the Liquidating Trustee, there can be no assurance that any such Causes of Action will produce recoveries that will provide sufficient funds for such distributions to be made by the Liquidating Trust.

If the Bankruptcy Court were not to grant the Plan Debtors' request for substantive consolidation of the Plan Debtors with respect to the voting of all Claims and Interests and treatment of all Claims and Interests, confirmation and consummation of the Plan, if still possible, could be substantially more burdensome, time consuming, and costly to the Plan Debtors' Estates. As stated above, the Plan Debtors believe that substantive consolidation of the

Plan Debtors' Estates for purposes of the voting of all Claims and Interests and treatment of all Claims and Interests will facilitate implementation of the Plan and foster similarity and fairness of treatment among holders of Claims. There can be no assurance, however, that the Bankruptcy Court will reach the same conclusion.

Even if all holders of the Class 2 First Lien Facility Secured Claim, who are entitled to vote, accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization unless, as here, such liquidation or reorganization is proposed in the plan, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code. The Plan Debtors believe that the Plan satisfies all the requirements for confirmation of a plan of reorganization under the Bankruptcy Code. There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for confirmation of the Plan have been satisfied.

Additionally, successful confirmation of the Plan is subject to satisfaction or waiver of the conditions to Plan effectiveness, which are discussed in detail above. **THUS, THERE CAN BE NO ASSURANCE THAT ALL OF THE CONDITIONS TO EFFECTIVENESS OF THE PLAN WILL BE TIMELY SATISFIED OR WAIVED.**

## VII.
## ALTERNATIVES TO THE PLAN

Although this Disclosure Statement is intended to provide information to assist a Claim or Interest holder in determining whether to vote for or against the Plan, a summary of the alternatives to confirmation of the Plan may be helpful.

If the Plan is not confirmed with respect to any of the Plan Debtors, the following alternatives are available: (a) confirmation of another chapter 11 plan; (b) conversion of the Plan Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; or (c) dismissal of the Plan Debtors' Chapter 11 Cases leaving Creditors and Interest holders to pursue available non-bankruptcy remedies. These alternatives to the Plan are very limited and not likely to benefit Creditors. Although the Plan Debtors could theoretically File a new plan, the most likely result if the Plan is not confirmed is that the Plan Debtors' Chapter 11 Cases will be converted to cases under chapter 7 of the Bankruptcy Code. The Plan Debtors believe that conversion of their Chapter 11 Cases to chapter 7 cases would result in (i) significant delay in distributions to all Creditors who would have received a distribution under the Plan and (ii) diminished recoveries for certain Creditors. If the Plan Debtors' Chapter 11 Cases are dismissed, Creditors would be free to pursue non-bankruptcy remedies in their attempts to satisfy claims against the Plan Debtors. However, in that event, Creditors would be faced with the costs and difficulties of attempting, each on its own, to collect claims from a non-operating entity.

NY\1674006.14

# VIII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

### A. In General

The following discussion summarizes certain material U.S. federal income tax consequences expected to result from the consummation of the Plan. This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "Service"). There can be no assurance that the Service will not take a contrary view, no ruling from the Service has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to the beneficial owners of Claims (each a "Holder" and collectively, the "Holders"), the Liquidating Trust, or the Plan Debtors. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

The following summary is for general information only. The tax treatment of a Holder may vary depending upon such Holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences and does not address the tax consequences to a Holder that has made an agreement to resolve its claim in a manner not explicitly provided for in the Plan. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, Holders that hold Claims as a position in a "straddle" or as part of a "synthetic security," "hedging," "conversion" or other integrated transaction, Holders that have a "functional currency" other than the United States dollar and Holders that have acquired Claims in connection with the performance of services. The following summary assumes that the Claims are held by Holders as "capital assets" within the meaning of Section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been

held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder.  Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

****************

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## B.      U.S. Federal Income Tax Consequences to the Plan Debtors

If there is a discharge of a debt obligation by a debtor (in the case of indebtedness with multiple obligors, indebtedness that is allocable to such debtor) for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments), such discharge generally would give rise to cancellation of debt ("COD") income, which must be included in the debtor's income.  However, the Plan Debtors should be able to utilize a special tax provision which excludes from income debts discharged in a chapter 11 case (the "Bankruptcy Exception").

Under Section 108(b) of the IRC and Treasury Regulations that apply to members of a consolidated group, each Plan Debtor that does not recognize COD income under the Bankruptcy Exception will be required to reduce certain tax attributes, including consolidated

attributes, such as consolidated net operating losses and net operating loss carryforwards (and certain other losses, credits and carryforwards, if any), attributable to such Plan Debtor, attributes that arose in separate return limitation years of such Plan Debtor (if any), and the Plan Debtor's tax basis in its assets (but not below the amount of its liabilities remaining immediately after the discharge of indebtedness), in an amount generally equal to the amount of such Plan Debtor's COD income excluded from income under the Bankruptcy Exception. A "look-through rule" applies when asset basis reduction reduces the basis of stock of another member of the consolidated group and requires corresponding adjustments to be made to the attributes attributable to the lower-tier member.

As a result of the required attribute reduction resulting from the discharge of indebtedness, the Plan Debtors believe that all or a significant portion of NOLs (and alternative minimum tax NOLs) of the Plan Debtors will be eliminated after consummation of the Plan. Because the Plan Debtors are liquidating rather than continuing to operate in reorganized form, and because substantially all of the Plan Debtors' assets will be transferred to the Liquidating Trust, any remaining NOLs allocable to the Plan Debtors are not expected to have material value.

The 363 Sale, the transfer of the Plan Debtors' assets to the Liquidating Trust and the liquidation of the Plan Debtors may trigger income or gain recognition by the Plan Debtors. However, the Plan Debtors' existing NOLs and capital losses (prior to being reduced as a result of any attribute reduction) should generally first be available to offset any such income or gain (with any capital losses available to only offset capital gains). Based on the amount of the Plan Debtors' NOLs, the Plan Debtors do not anticipate owing regular U.S. federal income tax with respect to taxable years ending after the Petition Date. If, however, the Service were to prevail in assessing U.S. federal income tax for any of these years or for tax years ending prior to the Petition Date, payments of such taxes could reduce the amounts otherwise available for distribution under the Plan.

A corporation or a consolidated group of corporations may incur alternative minimum tax ("AMT") liability even where a NOL is generated for regular corporate income tax purposes or where NOL carryovers and certain other tax attributes are sufficient to eliminate taxable income as computed under the regular corporate income tax. In general, the AMT is imposed on a corporation's alternative minimum taxable income at a twenty percent (20%) rate to the extent such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances allowed in computing a corporation's regular U.S. federal income tax are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, a portion of a corporation's taxable income for AMT purposes may not be offset by available NOL carryforwards (as computed for AMT purposes). Although it is possible that the Plan Debtors could be liable for the AMT, at this time the Plan Debtors do not expect to incur a material amount of AMT as a result of the discharge of indebtedness, the 363 Sale, the transfer of the Plan Debtors' Assets to the Liquidating Trust or the liquidation of the Plan Debtors, each pursuant to the consummation of the Plan.

## C. U.S. Federal Income Tax Treatment of the Liquidating Trust

Except with respect to the Disputed Claims Reserve, it is intended that the Liquidating Trust will be treated as one or more "grantor trusts" for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity. The Service, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an advanced ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. Consistent with the requirements of Revenue Procedure 94-45, the Liquidation Trust Agreement requires all relevant parties to treat, for federal income tax purposes, the transfer of the Plan Debtors' Assets to the Liquidating Trust as (i) a transfer of such Assets (net of any applicable liabilities) to the Beneficiaries of the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets) followed by (ii) a transfer of such Assets (net of any applicable liabilities) by such Beneficiaries to the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets), with the Beneficiaries being treated as the grantors and owners of the Liquidating Trust. Each Beneficiary of the Liquidating Trust will generally recognize gain (or loss) in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Claim and its adjusted tax basis in such Claim. The amount realized for this purpose should generally equal the amount of cash and the fair market value of any other assets (net of any applicable liabilities) received or deemed received for U.S. federal income tax purposes under the Plan in respect of such Holder's Claim. A Holder that is deemed to receive for U.S. federal income tax purposes a non-cash asset under the Plan in respect of its Claim should generally have a tax basis in such asset in an amount equal to the fair market value of such asset on the date of its deemed receipt.

The Plan and the Liquidating Trust Agreement generally provide that the Beneficiaries of the Liquidating Trust must value the assets of the Liquidating Trust consistently with the values determined by the Liquidating Trustee for all U.S. federal, state, local and foreign income tax purposes. As soon as possible after the Effective Date, but in no event later than sixty (60) days thereafter, the Liquidating Trustee, based upon his good faith determination after consultation with his counsel, shall inform the Beneficiaries in writing solely as to his estimate of the value of the assets transferred to the Liquidating Trust and the value of such assets allocable to the Holders of Allowed Claims in Class 2.

Consistent with the treatment of the Liquidating Trust (except with respect to the Disputed Claims Reserve) as one or more grantor trusts, the Liquidating Trust Agreement will require each Holder to report on its U.S. federal income tax return its allocable share of the Liquidating Trust's income. Therefore, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Liquidating Trust whether or not the Liquidating Trust has made any distributions to such Holder. The character of items of income, gain, deduction, and credit to any Holder and the ability of such Holder to benefit from any deduction or losses will depend on the particular situation of such Holder.

In general, a distribution of underlying assets from the Liquidating Trust to a Beneficiary (other than in respect of distributions attributable to a reduction in the Disputed Claims Reserve) will generally not be taxable to such Holder because such Holders are already regarded for U.S. federal income tax purposes as owning such assets. Holders are urged to

NY\1674006.14

consult their tax advisors regarding the appropriate U.S. federal income tax treatment of distributions from the Liquidating Trust.

Except with respect to the Disputed Claims Reserve, the Liquidating Trustee will file with the Service tax returns for the Liquidating Trust as one or more grantor trusts pursuant to Treasury Regulation Section 1.671-4(a) and will also send to each Holder a separate statement setting forth such Holder's share of items of Trust income, gain, loss, deduction, or credit. Each such Holder will be required to report such items on its U.S. federal income tax return.

The discussion above assumes that, except with respect to the Disputed Claims Reserve, the Liquidating Trust will be respected as one or more grantor trusts for U.S. federal income tax purposes. If the Service were to challenge successfully such classification, the U.S. federal income tax consequences to the Liquidating Trust and the Beneficiaries could differ materially from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Liquidating Trust).

**D.     Disputed Claims Reserve**

Until such time as all of the beneficial interests in the Liquidating Trust can be distributed to the Holders in accordance with the terms of the Plan, the Disputed Claims Reserve will be treated as owning a portion of the assets in the Liquidating Trust. Distributions from the Disputed Claims Reserve will be made to Holders of Disputed Claims when such Claims are subsequently Allowed and to other Beneficiaries when Disputed Claims are subsequently disallowed. The Liquidating Trust shall file all income tax returns with respect to any income attributable to the Disputed Claims Reserve and shall pay the federal, state and local income taxes attributable to the Disputed Claims Reserve, based on the items of income, deduction, credit or loss allocable thereto.

Beneficiaries should note the tax treatment of the Disputed Claims Reserve is unclear and should consult their tax advisors as to the tax consequences to them of the establishment of, the income on, and distributions from, the Disputed Claims Reserve.

**E.     U.S. Federal Income Tax Consequences to Holders of Claims**

1.     **Holders of Allowed Claims in Class 2.**

Although not free from doubt, Holders of Allowed Claims in Class 2 as of the Effective Date should be treated as receiving from the Plan Debtors their respective shares of the applicable assets (net of any applicable liabilities) of the Liquidating Trust remaining (other than any assets allocated to the Disputed Claims Reserve) after distributions to Holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims in satisfaction of their Allowed Claims, and simultaneously transferring such assets (net of any applicable liabilities) to the Liquidating Trust. Accordingly, a Holder of such Claim should generally recognize gain or loss in an amount equal to the amount deemed realized on the Effective Date (as described above) less its adjusted tax basis of its Claim. Additionally, such Holders should generally recognize their allocable share of income, gain, loss and deductions recognized by the Liquidating Trust on an annual basis.

Because a Holder's ultimate share of the assets of the Liquidating Trust based on its Allowed Class 2 Claim will not be determinable on the Effective Date due to, among other things, the value of the assets at the time of actual receipt not being ascertainable on the Effective Date, such Holder should recognize additional or offsetting gain or loss if, and to the extent that, the aggregate amount of Cash and fair market value of the assets of the Liquidating Trust ultimately received by such Holder is greater than or less than the amount used in initially determining gain or loss in accordance with the procedures described in the preceding paragraph. It is unclear when a Holder of an Allowed Class 2 Claim should recognize, as an additional amount received for purposes of computing gain or loss, an amount attributable to the disallowance of a Disputed Claim.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim; (ii) the tax status of the Holder of the Claim; (iii) whether the Claim has been held for more than one year; (iv) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to the Claim; and (v) whether the Claim was acquired at a market discount. A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC. Under those rules (subject to a *de minimis* exception), assuming that such Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

It is possible that the Service may assert that any loss should not be recognizable until the Liquidating Trustee makes its final distribution of the assets of the Liquidating Trust. Holders should consult their tax advisors regarding the possibility that the recognition of gain or loss may be deferred until the final distribution of the assets of the Liquidating Trust.

2.      **Holders of Disputed Claims.**

Although not free from doubt, Holders of Disputed Claims should not recognize any gain or loss on the date that the Assets of the Plan Debtors are transferred to the Liquidating Trust, but should recognize gain or loss in an amount equal to: (i) the amount of Cash and the fair market value of any other property actually distributed to such Holder less (ii) the adjusted tax basis of its Claim. However, it is possible that such Holders may be required to recognize the fair market value of such Holder's allocable share of the Liquidating Trust's assets, as an amount received for purposes of computing gain or loss, either on the Effective Date or the date such Holder's Claim becomes an Allowed Claim.

3.      **Interest Income with respect to Allowed Claims.**

Holders of Allowed Claims will be treated as receiving a payment of interest (includible in income in accordance with the Holder's method of accounting for tax purposes) to the extent that any Cash or other property received (or deemed received) pursuant to the Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims. The extent to which the receipt of Cash or other property should be attributable to accrued but unpaid interest is unclear. The Plan Debtors and the Liquidating Trust intend to take the position, and the Plan

provides, that such Cash or property distributed pursuant to the Plan will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued but unpaid interest thereon.  Each Holder should consult its tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any).  A Holder generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

**F.      Backup Withholding and Information Reporting.**

A Holder of an Allowed Claim may be subject to backup withholding currently at the rate of 28% with respect to any "reportable" payments received pursuant to the Plan unless (i) such Holder is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number, certifies as to no loss of exemption from backup withholding and complies with applicable requirements of the backup withholding rules.  A Holder who does not provide a correct taxpayer identification number may be subject to penalties imposed by the Service.  Amounts withheld under the backup withholding rules may be credited against a Holder's tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup holding rules by timely filing the appropriate claim for refund with the Service.

The Liquidating Trustee will report annually to each Holder of the Allowed Class 2 Claim, and to the Service the Holder's share of any income, gains and losses of the Liquidating Trust during the calendar year to the extent required by law.

Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including certain transactions that result in the taxpayer recognizing a loss in excess of specified thresholds. Each Holder should consult its tax advisor regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations.

THE FOREGOING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  ACCORDINGLY, EACH HOLDER SHOULD CONSULT ITS TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN AND THE APPLICATION OF FEDERAL, STATE, LOCAL AND FOREIGN TAX LAWS.  NEITHER THE PLAN DEBTORS, NOR THEIR PROFESSIONALS SHALL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE                                         FOREGOING                                         DISCUSSION.

# CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Plan Debtors believe that confirmation of the Plan is preferable to all other alternatives. Consequently, the Plan Debtors recommend all holders of the Class 2 Claim to vote to **ACCEPT** the Plan, and to complete and return their Ballots so that they will be **RECEIVED** by GCG on or before 4:00 p.m. (prevailing Eastern time) on [_____], 2011.

Dated: March 21, 2011

EBG Holdings LLC

By:    */s/ Jeff Hunter*
        Name: Jeff Hunter
        Title:  Executive Vice President and
               Chief Financial Officer

Boston Generating, LLC

By:    */s/ Jeff Hunter*
        Name: Jeff Hunter
        Title:  Executive Vice President and
               Chief Financial Officer

Fore River Development, LLC

By:    */s/ Jeff Hunter*
        Name: Jeff Hunter
        Title:  Executive Vice President and
               Chief Financial Officer

Mystic I, LLC

By:    */s/ Jeff Hunter*
        Name: Jeff Hunter
        Title:  Executive Vice President and
               Chief Financial Officer

Mystic Development, LLC

By:    */s/ Jeff Hunter*
        Name: Jeff Hunter
        Title:  Executive Vice President and
               Chief Financial Officer

BG New England Power Services, Inc.

By:    */s/ Jeff Hunter*
        Name: Jeff Hunter
        Title:  Executive Vice President

BG Boston Services, LLC

By:    */s/ Jeff Hunter*
        Name: Jeff Hunter
        Title:  Executive Vice President

1

NY\1674006.14

Respectfully submitted by,

LATHAM & WATKINS LLP

By:    /s/ D. J. Baker
       D. J. Baker
       Robert J. Rosenberg
       Caroline A. Reckler (appearing pro hac vice)
       Kimberly A. Posin (appearing pro hac vice)

       Counsel to the Debtors and Debtors-in-Possession

1

## Annex 1

**DEBTORS**

The Debtors, along with their Chapter 11 Case Number, include:

1.      EBG Holdings LLC (3635): Case No. 10-14417 (SCC)

2.      Boston Generating, LLC (0631): Case No. 10-14419 (SCC)

3.      Fore River Development, LLC (7933): Case No. 10-14220 (SCC)

4.      Mystic I, LLC (0640): Case No. 10-14421 (SCC)

5.      Mystic Development, LLC (7940): Case No. 10-14422 (SCC)

6.      BG New England Power Services, Inc. (0476): Case No. 10-14423 (SCC)

7.      BG Boston Services, LLC (6921): Case No. 10-14424 (SCC)

1

NY\1674006.14